**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

DONNA DORSEY DAVIS,                          :
as an individual and derivatively upon       :
behalf of I-65 Properties, Inc.,             :
                                             :
       Plaintiff,                            :
                                             :
vs.                                          :    Case No. 2:06-cv-766-MHT
                                             :
RICHARD M. DORSEY, as an individual          :
and CD&O, LLC, as a necessary party,         :
                                             :
       Defendants.                           :

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW Richard M. Dorsey and CD&O, LLC, Defendants in the above-styled cause, and move this Court to grant summary judgment pursuant to Rule 56 of the *Federal Rules of Civil Procedure* on the grounds that there are no genuine issues of material fact to be submitted to a jury. In support of this motion, Defendants rely on the following:[1]

|     |            |                                                                          |
| --- | ---------- | ------------------------------------------------------------------------ |
| 1.  | Exhibit "1" | Deposition of Donna Dorsey Davis                                         |
| 2.  | Exhibit "2" | Deposition of Richard Dorsey                                             |
| 3.  | Exhibit "3" | October 1, 1990 Promissory Note from I-65 Properties to Dorsey Motor Sales |
| 4.  | Exhibit "4" | Articles of Incorporation for I-65 Properties                            |
| 5.  | Exhibit "5" | By-Laws for I-65 Properties                                              |
| 6.  | Exhibit "6" | Certificate of Incorporation for I-65 Properties                         |
| 7.  | Exhibit "7" | Closing Statement for I-65 Properties                                    |
| 8.  | Exhibit "8" | January 6, 2000 Letter from John Davis to Alan Taunton                   |
| 9.  | Exhibit "9" | February 17, 2000 Letter from Alan Taunton to John Davis                 |

---

[1] Defendants reserve the right to cite to any deposition cited here or cited by Plaintiff in any response filed. Defendants further reserve the right to submit additional evidence when replying to any response to the extent such is necessary to fully reply.

10.    Exhibit "10"    April 5, 2000 Letter from Richard Dorsey to Donna Davis

11.    Exhibit "11"    Affidavit of Alan Taunton

12.    Exhibit "12"    Unsigned Copy of October 28, 2003 Letter from Alan Taunton to John Davis

13.    Exhibit "13"    March 18, 2006 Letter from Alan Taunton to Lindsey Erwin

14.    Exhibit "14"    Affidavit of Richard M. Dorsey

15.    Exhibit "15"    Compilation of Expenses Owed

16.    Exhibit "16"    January 17, 2006 Letter from Richard Dorsey to Donna Davis

17.    Exhibit "17"    February 3, 2006 Letter from Alan Taunton to Lindsey Erwin

18.    All pleadings of record in this case;

19.    Memorandum Brief in Support of Defendants' Motion for Summary Judgement, filed contemporaneously with this motion.

Wherefore the premises having been considered, Defendants respectfully request the Court to grant the Defendants' Motion for Summary Judgment and dismiss the Plaintiff's claims as a matter of law.

Respectfully Submitted this 19th day of March, 2007.

RICHARD M. DORSEY, as an individual, and CD&O, LLC, as a necessary party,

/s/ Clifford W. Cleveland
CLIFFORD W. CLEVELAND

OF COUNSEL:

CLEVELAND & COLLEY, P.C.
744 East Main Street
Prattville, AL 36067
(334) 365-1500 phone
(334) 365-1601 fax

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed the foregoing *Defendants' Motion for Summary Judgment* with the Clerk of the Court for the United States District Court, for the Middle District of Alabama, Northern Division, using the CM/ECF system which will send notification of such filing to Lindsay B. Erwin, Esquire (lindsayerwin@gmail.com) and James Edward Roberts, Esquire (attyjuris@aol.com) this the 19th day of March, 2007.

/s/ Clifford W. Cleveland
OF COUNSEL

# EXHIBIT "1"

## Deposition of Donna Dorsey Davis

1

# ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


DONNA DORSEY DAVIS,

      Plaintiff,

vs.                  CASE NO. 2:06CV766-MHT

RICHARD M. DAVIS, etc.,
and CD&O, LLC, etc.,

      Defendants.




      * * * * * * * * * *

DEPOSITION OF DONNA DORSEY DAVIS, taken

pursuant to stipulation and agreement before Dee

Coker, Registered Professional Reporter and

Commissioner for the State of Alabama at Large,

in the Law Offices of Cleveland & Colley, 744

East Main Street, Prattville, Alabama, on

Tuesday, March 13, 2007, commencing at

approximately 9:15 a.m.

      * * * * * * * * * *

2

APPEARANCES

FOR THE PLAINTIFF:

Mr. James E. Roberts
Attorney at Law
4908 Cahaba River Road
Birmingham, Alabama  35243

Ms. Lindsay Erwin
MEACHAM, EARLEY & FOWLER
Attorneys at Law
1321 Broad Street
Phenix City, Alabama  36867

FOR THE DEFENDANTS:

Mr. Clifford W. Cleveland
CLEVELAND & COLLEY
Attorneys at Law
744 East Main Street
Prattville, Alabama  36067

ALSO PRESENT:

Mr. Richard M. Dorsey

* * * * * * * * * *

EXAMINATION INDEX

DONNA DORSEY DAVIS
    BY MR. CLEVELAND                    4
    BY MR. ROBERTS                    150
    BY MR. CLEVELAND                  189
    BY MR. ROBERTS                    203

EXHIBIT INDEX

DEFENDANTS' EXHIBIT NO.:

1    By-Laws of I-65 Properties,        38,150
     Inc.

2    Articles of Incorporation          42,43,60,61,
     of I-65 Properties, Inc.           150

3

DEFENDANTS' EXHIBITS, continued:

3    2/17/2000 letter to John        43,47
     Davis from Alan Taunton

4    3/18/06 letter to Lindsay       56,68
     Erwin from Alan Taunton with
     attached closing statement,
     warranty deed, and promissory
     note

5    4/5/00 letter to Dona Davis     82
     from Dick Dorsey in re: 3/6/00
     meeting

* * * * * * * * * *

STIPULATIONS

It is hereby stipulated and agreed by

and between counsel representing the parties that

the deposition of DONNA DORSEY DAVIS is taken

pursuant to the Federal Rules of Civil Procedure

and that said deposition may be taken before Dee

Coker, Registered Professional Reporter and

Commissioner for the State of Alabama at Large,

without the formality of a commission; that

objections to questions other than objections as

to the form of the questions need not be made at

this time but may be reserved for a ruling at

such time as the deposition may be offered in

evidence or used for any other purpose as

4

1    provided for by the Federal Rules of Civil

2    Procedure.

3            It is further stipulated and agreed by

4    and between counsel representing the parties in

5    this case that said deposition may be introduced

6    at the trial of this case or used in any manner

7    by either party hereto provided for by the

8    Federal Rules of Civil Procedure.

9                  * * * * * * * * * * *

10                 DONNA DORSEY DAVIS

11           The witness, having first been sworn to

12   speak the truth, the whole truth and nothing but

13   the truth, testified as follows:

14                    EXAMINATION

15   BY MR. CLEVELAND:

16   Q.    State your name for the record, please.

17   A.    Donna Dorsey Davis.

18   Q.    And where you do you live, Ms. Davis?

19   A.    In Clemson, South Carolina.

20   Q.    Pardon?

21   A.    Clemson, South Carolina.

22   Q.    What's the physical address?

23   A.    202 Wescott -- that's W-E-S-C-O-T-T -- Drive.

5

| | | |
|---|---|---|
| 1 | Q. | Is that the address that was on the |
| 2 | | complaint?  Do you recall? |
| 3 | A. | I don't know. |
| 4 | Q. | How long have you lived at that address? |
| 5 | A. | We moved last April.  It may have been the |
| 6 | | Birmingham address?  No. |
| 7 | Q. | No, it was out of state.  I just -- that |
| 8 | | address didn't ring a bell with me.  But |
| 9 | | that's really not important.  So you've lived |
| 10 | | there since April of 2006? |
| 11 | A. | Yes. |
| 12 | Q. | Okay. |
| 13 | A. | We rented when we first got there.  So you |
| 14 | | may have that address, Purple Court. |
| 15 | Q. | Was that also in Clemson? |
| 16 | A. | Yes. |
| 17 | Q. | If you would -- I know you were here |
| 18 | | yesterday, and you heard -- answer yes or |
| 19 | | no.  If you don't understand -- |
| 20 | A. | I'm sorry.  I really didn't hear it |
| 21 | | yesterday, but -- |
| 22 | Q. | That's fine.  Just answer yes or no so that |
| 23 | | she'll have a verbal response. |

6

```
 1    A.    Right.

 2    Q.    A head shake on that record can mean many

 3          things to many people.

 4    A.    Right.  Yeah, I heard that yesterday.

 5    Q.    Yeah.  And so -- and if you don't understand

 6          my question, just tell me, hey, I don't

 7          understand what you're asking, and I'll try

 8          to do a better job.

 9                Are you on any kind of medication or

10          anything today that in your opinion may

11          interfere with you understanding my questions

12          or should make me need to talk slower or

13          any --

14    A.    No.

15    Q.    Okay.  Give me some background information on

16          yourself.  Where did you go to college?

17    A.    University of Tennessee.

18    Q.    When did you graduate?

19    A.    In '62.

20    Q.    And what was your degree in?

21    A.    Education.

22    Q.    Any advanced degrees?

23    A.    I went to Georgia State University.
```

7

```
1    Q.    Did you obtain a degree from Georgia?

2    A.    My master's.

3    Q.    A master of what?

4    A.    Education.

5    Q.    When did you get your master's?

6    A.    You know, I'm not sure.  After -- I'm really

7          not sure.  I'll have to look it up and tell

8          you.

9    Q.    Best guess.  Had you worked a while before

10         you went for your master's?

11   A.    Yes.

12   Q.    Do you have any idea how many years?

13   A.    Five and -- let's see.  Three years -- one

14         year in Atlanta, three years in Memphis,

15         and -- well, that's it for that period of

16         time.  And then I got my master's.

17   Q.    Okay.  So about four years.  Did you go to

18         work directly after graduating from the

19         University of Tennessee?

20   A.    Yes.

21   Q.    So if you graduated in '62, four years later

22         would put us at about '66?

23   A.    '67 probably.
```

8

| | | |
|---|---|---|
| 1 | Q. | '67.  Okay. |
| 2 | A. | Yeah. |
| 3 | Q. | And I understand that's not exact, but |
| 4 | | approximately -- |
| 5 | A. | Right. |
| 6 | Q. | -- the latter 60's is when you got your |
| 7 | | master's? |
| 8 | A. | No.  I didn't get that until later.  You |
| 9 | | asked when I graduated from Tennessee? |
| 10 | Q. | And you told me in 1962. |
| 11 | A. | Yes. |
| 12 | Q. | Okay.  And I thought you said that you |
| 13 | | started your master's four years after you -- |
| 14 | A. | No.  You asked -- I thought you asked about |
| 15 | | my teaching. |
| 16 | Q. | Okay.  So as we sit here today, you have no |
| 17 | | independent recollection of when you began or |
| 18 | | when you finished your master's degree in |
| 19 | | education at Georgia State? |
| 20 | A. | I can think about it and tell you. |
| 21 | Q. | Well, think about it kind of on the side |
| 22 | | while I'm asking you some other questions. |
| 23 | A. | Okay.  Okay. |

9

1    Q.    In other words, if it pops in your mind, tell

2          me; if it doesn't, that's not really why

3          we're here today.

4    A.    Okay.

5    Q.    I'm just trying to get some background

6          information on you.  Any other educational

7          training other than what you've told me

8          about?

9    A.    I went to Converse for two quarters to take

10         some courses.

11   Q.    And what was your concentration of study at

12         Converse?

13   A.    Children with learning disabilities.

14   Q.    Do you recall when that was?

15   A.    Let's see.  Probably '85, around that period

16         of time.

17   Q.    Any other educational training?

18   A.    I took a chemistry course at De Kalb Junior

19         College in the '70s while I was at Georgia

20         State.

21   Q.    And that was sometime in the '70s?

22   A.    It was the same time that I was going to

23         Georgia State getting my master's.

10

Q.   Okay.  Anything else?

A.   Not that I can think of.

Q.   Okay.  Give me your work history.

A.   In high school, I worked for Kesslers.

Q.   Give me college forward.

A.   Okay.  College -- after college, I taught
     school in De Kalb County for one year; then
     in Memphis, I taught school for three years.
     And didn't work for a while.

Q.   Tell me what a while is.

A.   Probably -- let me think.  Probably nine or
     ten years.

Q.   What would have been the time frame for that?

A.   Let's see.  Start with '62, I taught in
     Atlanta; three years in Memphis.  And so '62,
     '63, 64, '65.  '63 I had Kelley.  '64, '65,
     '66, and '67 I taught school in Memphis.  And
     then I didn't work after that.  '62-'63 I
     taught in Atlanta.  The next '63 and part of
     '64, I had Kelley and I didn't work.  Then
     Memphis -- '64 through '67, I taught school
     in Memphis.

Q.   And you did not work after '67?

11

1    A.    Right, for about eight or nine years.

2    Q.    And then you went back to work?

3    A.    Yes.

4    Q.    Okay.  Doing what?

5    A.    Before I taught again, I rep'd for a

6          stainless steel fabricator, MDK, that daddy

7          and two other men owned.  A part-time rep.

8    Q.    What did you do?  What were your job

9          responsibilities?

10   A.    I called on food and beverage companies to

11         sell them stainless steel equipment for the

12         kitchens.  Fabricate -- custom fab.

13   Q.    How long did you work with MDK?

14   A.    I'm not sure.

15   Q.    When did you work for MDK?

16   A.    Let's see.  I'm not sure of the exact date or

17         year.  Kelley was in high school, so if she

18         was 15 -- I'm really not sure.

19            MR. ROBERTS:  Donna, don't guess.  I

20               don't think Mr. Cleveland wants

21               you to guess.  If you know, you

22               know; if you don't -- if he wants

23               to ask for it like we did

12

```
 1              yesterday, he can ask for it and
 2              we'll be glad to furnish a
 3              complete resume.  I just don't
 4              want you guessing.  It's not
 5              material to this, but you know or
 6              you don't know.
 7                   And for the record,
 8              Mr. Cleveland, if you'll remind
 9              me, I'll get a complete
10              reconstruction.  I think her
11              husband can help her -- Jack can
12              help her.
13      MR. CLEVELAND:  Yeah.  I'd like to know
14              today about, you know --
15      MR. ROBERTS:  Well, question her it on.
16      MR. CLEVELAND:  -- her educational
17              background, her training, her
18              experience.
19      MR. ROBERTS:  It's totally, totally
20              relevant.
21      MR. CLEVELAND:  I think it is, too.
22      MR. ROBERTS:  But what I'm saying is I
23              don't want her to guess.  And
```

13

```
 1              anything I can do to help you get
 2              all of that information, I'll be
 3              glad to do it, just like we did
 4              with Mr. Dorsey.
 5    Q.   Yeah.  Well, what I'd like to do and what I'm
 6         going to do is ask you these questions.  If
 7         you don't know, tell me you don't know.  But
 8         I do want you to give me your best effort and
 9         your best recollection, because to tell me if
10         you don't know and you think you know is
11         dishonest.
12    A.   Well, exact dates I don't know right now.
13    Q.   Okay.
14    A.   But I can certainly get them for you.
15    Q.   Yeah.  But, you know, give me your best
16         recollection.  I understand exact dates.  I
17         mean, to me, exact day is day of the month,
18         and that would be --
19    A.   Or years.  I mean, that would really --
20    Q.   That would be impossible for --
21    A.   When I didn't work and everything --
22    Q.   Yeah.
23    A.   -- and then I -- I taught and then I didn't
```

14

```
 1          work and all that.  So I have -- I'll get you

 2          a resume.

 3    Q.    Do you have any recollection of when you

 4          worked for MDK?

 5    A.    When my daughter was in high school.

 6    Q.    And when was your daughter in high school?

 7    A.    She was born in '63.

 8    Q.    When did she graduate from high school?

 9    A.    I don't even remember.  Isn't that awful.

10          She was born in '63.

11    Q.    Other than MDK, any other work experience?

12              MR. ROBERTS:  Just listen to his

13                  questions.

14    A.    Yes.  Yes.  Frank Diaz, at TeleBeverage that

15          I called on, and I had a business.

16    Q.    Okay.  I'm sorry.  I didn't understand you.

17    A.    Frank Diaz.

18    Q.    How do you spell that last name?

19    A.    D-I-A-Z.

20    Q.    And the name of his business?

21    A.    He worked for TeleFood and Beverage when I

22          was calling on him as a rep for MDK.  And

23          then we formed a business, Phoenix Food
```

21

```
1    A.   Yes.

2    Q.   For three years?

3    A.   And the school didn't qualify for Chapter 1,

4         and then I went back to the City for one year

5         and taught third grade in a trailer at my old

6         school.

7    Q.   After that?

8    A.   I didn't teach after that.  I didn't work

9         after that.

10   Q.   Okay.  So you retired after your year

11        teaching the third grade?

12   A.   I didn't really retire.  Daddy had a stroke

13        during that year.  So when I finished the

14        year, I didn't teach again.

15   Q.   Do you recall the year that your father had

16        his stroke?

17   A.   I think it was in '93.

18   Q.   And did you work continuously as you left one

19        job and went to the next job?

20   A.   From -- you mean from the very beginning?

21   Q.   No.  I'm talking about once you came back to

22        Birmingham.

23   A.   As far as teaching -- teaching in the City
```

22

```
 1        and then going to the County and back to the

 2        city, yes.

 3   Q.   Correct.  So we should be able to back into

 4        some of these dates; would you agree with

 5        that?

 6   A.   Oh, yeah.  I mean, I'll give you the dates.

 7   Q.   Okay.  And you mentioned getting married to

 8        your husband.  When was that?

 9   A.   '82.

10   Q.   Are you familiar with his educational

11        background?  I mean, what degrees he has,

12        where he went to school?

13   A.   He went to Drexel the first year, and he

14        graduated from the University of Pittsburgh

15        in engineering.

16   Q.   Do you know anything about his work history,

17        some of the people he may have worked for?

18   A.   You really need to ask him.

19   Q.   You don't have any recollection of anybody

20        that he worked for?

21   A.   When?  I mean, after I knew him --

22   Q.   Yeah.  I mean, after --

23   A.   -- or before?
```

23

1    Q.   No.   After you married him.

2    A.   Oh, yeah.   Yes.   He worked for Sarene

3         (phonetic) in Greenville.

4    Q.   Spell that.

5    A.   I don't know.

6    Q.   Okay.   Sarene?

7    A.   Yeah.   J.E. Sarene.   Then he -- then, when we

8         moved to Birmingham, he worked for Rust

9         Engineering.

10   Q.   Anyone other than Rust in Birmingham?

11   A.   No.

12   Q.   Is he still with Rust?

13   A.   No.   He's retired.

14   Q.   Retired.   When was the first knowledge that

15        you had of the property that is now known as

16        I-65 Properties?   The first knowledge,

17        regardless of whose name it may have been

18        in.

19   A.   Daddy -- I can remember daddy calling and

20        saying that they were going to give Dick and

21        I the property.   And then Dick called and

22        said, Donna, mamma and daddy are going to

23        give some of our -- us some of our

24

1    inheritance early.  And then my mother called

2    shortly, the next week or two, and said, Your

3    daddy had to remind your brother that he's

4    not an only child.  I said, What are you

5    talking about?  She said, They were

6    discussing the percentage that you would own

7    of I-65.

8    Q.    When did this conversation take place?

9    A.    I don't know.  I guess when they gave us the

10          property.

11   Q.    Well, would it have been before I-65 was

12          formed or after it was formed?

13   A.    I don't know.  It was --

14   Q.    You have absolutely no recollection at all?

15   A.    No, I don't.  I do remember that happening.

16          I remember daddy saying they were going to

17          give it to us.  And I remember Dick saying,

18          Donna, they're going to give us part of our

19          inheritance early.  And then I got a phone

20          call, all in this time period, of my mother

21          saying what she did; because she said Dick

22          wanted me to have like ten or 13 percent and

23          daddy had to tell him that it would be 30

25

```
 1            percent.
 2     Q.     30 percent interest in?
 3     A.     The property.
 4     Q.     In the property.  To your knowledge, where
 5            did the property come from?  And by come
 6            from, I'm speaking of the ownership.
 7     A.     What do you mean, where did it come from?
 8     Q.     The title to it.  To your knowledge, who had
 9            title to the property before I-65 Properties
10            got title to it?
11     A.     I don't remember their names.
12     Q.     Tell me what you do remember.
13     A.     I just did.
14     Q.     Okay.  You said you didn't remember their
15            names.  So --
16     A.     The people who owned the property.
17     Q.     Okay.  So you do remember that -- it's your
18            understanding that some individuals owned the
19            property before I-65 Properties got it?
20     A.     Right.
21     Q.     And do you have any recollection as to who
22            those individuals were or what family they
23            were from or --
```

26

```
 1   A.   I used to know, but I don't remember now.

 2   Q.   Okay.  If I told you that the chain of title

 3        goes back to the Cobb family, would that help

 4        refresh your recollection?

 5   A.   I don't -- I just -- I thought somebody else

 6        owned it.

 7   Q.   Other than the -- some individuals other than

 8        the Cobbs?

 9   A.   I don't know.

10   Q.   When I-65 acquired the property, did you have

11        any knowledge of the fact that there was a

12        note and a mortgage on that property?

13   A.   No.

14   Q.   You didn't know anything about it?

15   A.   No.

16   Q.   When was the first that you learned that

17        there was a debt associated with the

18        acquisition of the property by I-65?

19   A.   I guess at the 2005 meeting when my brother

20        said I owed half a million dollars.

21   Q.   Okay.  So until 2005, you had absolutely no

22        knowledge whatsoever that there was any debt

23        associated with the acquisition of the I-65
```

27

```
 1          property?

 2   A.     And let me tell you why.

 3   Q.     Okay.

 4   A.     Because when the property was given to us, my

 5          one question was -- or request, if I owe any

 6          money -- this was from the get-go -- please

 7          let me know.

 8   Q.     Who did you make that inquiry of?

 9   A.     Dick and daddy.

10   Q.     So until 2005, you had absolutely no

11          knowledge whatsoever that there was any debt

12          associated with the acquisition of the

13          property as it went into --

14   A.     No. It was my understanding that when it was

15          given to us, it was debt free.

16   Q.     Debt free?

17   A.     Uh-huh.

18   Q.     No debt associated --

19   A.     Paid for.

20   Q.     -- with it at all?

21   A.     No.

22   Q.     And that's the way you treated it from 1990

23          until 2005 when you learned there was a note
```

28

1    and a mortgage?

2    A.    In 2000, my mother -- daddy died --

3          MR. ROBERTS:  Just one objection.

4          Object to your statement that when

5          there was a note and mortgage with

6          no foundation being laid.  I don't

7          know that there was a note and a

8          mortgage.  I'm just, for -- the

9          form of your question presupposed

10         that there was a note and a

11         mortgage.

12         MR. CLEVELAND:  Okay.  Let me -- that,

13         you know --

14         MR. ROBERTS:  I'm just trying to keep

15         it straight on the record.

16         MR. CLEVELAND:  Yeah.  I don't have a

17         problem with that, because I want

18         the question to be clear.  I don't

19         want her to come back later and

20         say, well, I --

21         MR. ROBERTS:  Right.

22    Q.    Let me change my terminology from note and

23    mortgage to say any debt.  Does that help

29

| | | |
|---|---|---|
| 1 | | clear -- does that make my question clearer |
| 2 | | to you? |
| 3 | A. | No.  Because it goes back to what I said in |
| 4 | | the beginning when we got the land.  If I owe |
| 5 | | any money, I need to know. |
| 6 | Q. | Would you have rejected the property, your 30 |
| 7 | | percent interest, if you had known there was |
| 8 | | debt associated with it? |
| 9 | A. | I have no idea. |
| 10 | Q. | Between 1990 and 2005, did you make any |
| 11 | | inquiries as to who's paying the taxes on |
| 12 | | this property and -- |
| 13 | A. | My father died -- |
| 14 | Q. | Pardon? |
| 15 | A. | My father died in '96. |
| 16 | Q. | Correct. |
| 17 | A. | Three months later, my mother had a massive |
| 18 | | stroke.  And from that point on -- in 2000, I |
| 19 | | gave my husband my power of attorney as far |
| 20 | | as I-65. |
| 21 | Q. | Okay.  You know, that's good to know. |
| 22 | A. | So -- |
| 23 | Q. | But my real question to you, though, was did |

30

```
 1         you make any inquiry from 1990 --
 2    A.   No.  I had asked in the beginning to be told
 3         if I owed any money.
 4    Q.   Okay.  But let me -- okay.  But let me ask
 5         you -- let me finish my question.  Did you
 6         make any inquiry from 1990 to 2005 as to who
 7         is paying the taxes on this property, do we
 8         have insurance on it, how the -- you know,
 9         property just doesn't sit out there and take
10         care --
11    A.   I asked for minutes.
12    Q.   Okay.  You asked for minutes.  When did you
13         ask for the minutes?
14    A.   When did I ask for them?
15    Q.   Yes, ma'am.
16    A.   From the get-go.
17    Q.   Okay.  Tell me when the get-go was.  Give me
18         a date of the get-go.
19    A.   When they gave us the land.
20    Q.   So in 1990, you asked for minutes?
21    A.   Or you may not want to call it minutes.  But
22         if -- if I'm -- if I'm going to be a part of
23         this, I need to know what's going on.
```

31

```
1    Q.   Well --
2    A.   But at that point --
3    Q.   Tell me what you asked for in 1990.
4    A.   Information.  But actually, you know, my -- I
5         trusted my brother and my father.  And they
6         just -- I didn't have any reason to insist.
7         But after my father died, things changed.
8    Q.   So in 1990, you asked for information?
9    A.   Uh-huh.
10   Q.   Did you renew that request for information
11        prior to 2005?
12   A.   I guess you'll have to ask Jack.
13   Q.   I'm asking you.  Did you?  I mean, you're the
14        stockholder.  Jack is not the stockholder.
15   A.   I understand that.  But when I gave him my
16        durable power of attorney, my main goal was
17        to take care of mamma.
18   Q.   Okay.  Would it be accurate to say that up
19        until 2005, you, Donna Dorsey Davis, made no
20        independent request for any information?
21   A.   After my father died?
22   Q.   I'm talking -- I'm not -- I'm talking about
23        at any time.  Before --
```

32

```
 1    A.   Requests were made for minutes and
 2         information.
 3    Q.   In 1990?
 4    A.   Jack -- Jack went to the board meeting.  And
 5         you were there when you were on --
 6    Q.   Here's what I'm trying to do.
 7    A.   -- the board.
 8    Q.   I'm not trying to make it difficult.  I'm
 9         trying to understand what you did as compared
10         to what Jack did.
11              And Mr. Roberts is right.  We'll take
12         Jack's deposition and ask him what he did.
13         I'm asking you -- and if your answer is I
14         didn't do anything, I turned it over to Jack,
15         that's fine.  But I don't want you to tell me
16         that today and then later say something
17         else.  If you did anything, fine.  If you
18         didn't, just say I didn't do anything, I
19         turned it all over to Jack.
20    A.   I can hear you.  I told you I gave him my
21         power of attorney in 2000.  And as long as my
22         father was alive, I trusted him.  And I
23         trusted my brother.
```

33

1    Q.   Okay.  Your father died in '96.  You gave

2          your power of attorney to your husband in

3          2000.  Did you individually make any request

4          between '96 and 2000 for any information or

5          make any inquiries as to the business matters

6          of I-65 Properties, Inc.?

7    A.   We met with Alan Taunton.

8    Q.   When was that?

9    A.   I'll have to look on the paper.  It was

10         between that time period, I believe.

11    Q.   So you believe you met with Alan Taunton

12         between '96 and 2000?

13    A.   Yes.

14    Q.   Well, when you met with Alan Taunton, did you

15         discover that there was a debt associated

16         with the property at that time?

17    A.   He was talking -- yes.  Because he said there

18         was maintenance on the land because the

19         County required that the bamboo be kept under

20         control.  And -- and there were just expenses

21         of maintaining the property.  I remember

22         that.

23    Q.   So am I correct in understanding that when

```
 1          you met with Alan Taunton, you learned that

 2          there were maintenance expenses, but you did

 3          not --

 4     A.   Right.

 5     Q.   -- learn that there was any debt associated

 6          with the acquisition of the property; is that

 7          correct or incorrect?

 8     A.   I don't remember.  I remember the bamboo and

 9          the County requiring the lot -- that the lot

10          be maintained to a reasonable degree.

11     Q.   Well, you told me a few minutes earlier that

12          you did not learn about the debt until 2005.

13          And now you've told me that you met with Alan

14          Taunton between '96 and 2000.  And I'm trying

15          to understand what -- if the only thing that

16          you learned at the meeting with Alan Taunton

17          was associated with maintenance and taxes and

18          those type things and you didn't learn

19          anything about a debt --

20     A.   I don't remember --

21     Q.   -- or if you did -- you don't recall?

22     A.   -- learning about a debt.  I do remember

23          learning about an amount, and it was for
```

35

1          maintaining the property because the County

2          required it.

3     Q.   Do you recall --

4     A.   I remember -- I remember the bamboo.

5     Q.   You remember the bamboo?

6     A.   Yeah.

7     Q.   And Dick testified about the bamboo

8          yesterday, about someone going in there and

9          cutting it.

10    A.   No.  That -- no.  No.  Because I remember

11         that Alan said the County required it.  It

12         wasn't Dick's bamboo.

13    Q.   Did you obtain any documents from Alan

14         Taunton at the meeting that you had with him

15         at some time between '96 and 2000?

16    A.   He -- he wrote us a letter after the fact, I

17         believe.

18    Q.   And then, in 2000, you gave your husband your

19         power of attorney, and you concentrated your

20         attention toward providing care for your

21         mother rather than I-65?

22    A.   Right.  And then I went to the meeting in

23         December of 2005.  It was Dick and me, and Jo

36

1        Anne filled in for you.

2    Q.   No.  I filled in for her the time I sat in.

3    A.   Well, Dick said at the meeting she was

4         filling in for you.

5    Q.   Oh, okay.

6    A.   Because I asked where you were.

7    Q.   Okay.  That's fine.  Tell me about that

8         meeting.  What do you recall?

9    A.   He gave me some pages and explained why I

10        owed -- and then told me I owed 500,000

11        something dollars.

12   Q.   Were those the pages that we had yesterday?

13   A.   Yes.

14   Q.   The ones that you had written some notes on?

15   A.   Yes.

16   Q.   Okay.

17   A.   The meeting was partially tape recorded, and

18        I had asked Jo Anne to send me copies.

19   Q.   Of the tape?

20   A.   Of the meeting.

21   Q.   Of the minutes?

22   A.   Yes.  And I never received them.

23   Q.   Did your husband attend that meeting?

1   A.   He wasn't allowed in.

2   Q.   Okay.  So --

3   A.   He sat outside --

4   Q.   So it was --

5   A.   -- the room.

6   Q.   -- you, Dick, and Jo Anne?

7   A.   Yes.

8   Q.   Did you receive notice of that meeting?

9   A.   Yes.  I think it was about a -- a week ahead

10       of time.  And it was December the -- close to

11       Christmas.

12  Q.   Do you contend that there was anything

13       improper with the notice, the sufficiency of

14       the notice?

15  A.   It would have been better to have more notice

16       at that time of year.  Because my daughter

17       lives in New Jersey, and we go up there for

18       Christmas now that mamma is in heaven.

19  Q.   Did you receive notice of any other meetings

20       that you recall?

21  A.   You need to ask Jack.

22  Q.   Okay.  Would your answer be that you have no

23       recollection of receiving any notice?

38

```
1    A.   You need to ask Jack.

2    Q.   No.  I'm asking you.  Did you receive any

3         notice?

4    A.   I can -- I don't know.

5    Q.   You don't remember?

6    A.   I don't know.

7    Q.   Some of these are some of the same ones we

8         went over yesterday.  I'm going to remark

9         them again where we don't have confusion in

10        the numbers.

11             Ms. Davis, this is a copy of the bylaws

12        that were introduced yesterday as Exhibit #4.

13        Are you familiar with --

14   A.   Is this my copy?

15   Q.   Yes.  That's yours for you to look at and

16        keep.

17   A.   Okay.

18   Q.   Okay.  It's going to be our Exhibit #1.  Are

19        you familiar with these bylaws?

20   A.   Do I understand them?

21   Q.   Have you read them?

22   A.   Probably.

23   Q.   Do you have a recollection as to the first
```

39

| | | |
|---|---|---|
| 1 | | knowledge that you had concerning these? |
| 2 | A. | No, I don't. |
| 3 | Q. | Well, turn to the last page, if you would. |
| 4 | | Is that your signature? |
| 5 | A. | It looks like it.  Yes, it looks like it. |
| 6 | Q. | It is?  I also -- I can see Dick's initials |
| 7 | | on the copy that I have. |
| 8 | | MR. CLEVELAND:  And mine is not any |
| 9 | | better than yours, Mr. Roberts. |
| 10 | | MR. ROBERTS:  Okay. |
| 11 | Q. | It appears that there were some other |
| 12 | | initials below Dick's. |
| 13 | A. | The three dots? |
| 14 | Q. | Yes.  But it's, in the process of copying and |
| 15 | | recopying -- my question to you is do you |
| 16 | | have any recollection as to whether you |
| 17 | | initialed along with Dick -- |
| 18 | A. | No. |
| 19 | Q. | -- each page of these bylaws? |
| 20 | A. | No. |
| 21 | Q. | But you do acknowledge your signature on the |
| 22 | | last page? |
| 23 | A. | It looks like it. |

40

```
1    Q.   I mean, you don't have any reason to believe

2         that that's not your signature, do you?  If

3         you do, tell me.

4    A.   I said it looks like it.

5    Q.   And my question was do you have any reason to

6         believe that it's not your signature?  And if

7         so, please tell me.

8    A.   I don't know.

9    Q.   So as we sit here today, it appears to be

10        your signature, but you aren't confident that

11        it's not a forgery?

12   A.   I don't know.  It's a copy.  Is there an

13        original here?

14   Q.   Of what?

15   A.   The original of this.

16             MR. ROBERTS:  Cliff, I'm familiar with

17                  her signature, and I'll be willing

18                  to stipulate as her attorney that

19                  that is her signature.  It is a

20                  copy and, therefore, it may raise

21                  some doubt.  But I'm familiar, and

22                  I'm instructing the witness for

23                  your --
```

43

```
 1    Q.   Our Plaintiff's #2 -- I mean, our Defendants'
 2         #2 was your Plaintiff's #3 from yesterday.
 3    A.   Okay.
 4    Q.   And we have your signature in I believe two
 5         different places on Defendants' #2.  And to
 6         your best knowledge, that is your signature?
 7    A.   Yes.
 8    Q.   Okay.  What we have marked as Defendants' #3
 9         was #6 yesterday on Dick's deposition.
10    A.   Okay.
11    Q.   This is a letter from Alan Taunton to your
12         husband, correct?
13    A.   Right, uh-huh.
14    Q.   He says that he is responding to a letter.
15         But it's your recollection that you and your
16         husband met with Alan Taunton; is that
17         correct?
18    A.   At some point, we did.  And you'll have to
19         ask Jack about the letter.
20    Q.   I'm still trying to get a time frame on the
21         meeting.  And really what I'm trying to see
22         is if this letter refreshes your
23         recollection.  You said that your meeting --
```

44

```
 1    A.    No, I don't remember the date of the meeting.

 2    Q.    Okay.

 3    A.    But I will get the date of the meeting for

 4          you.

 5    Q.    Do you have notes or a calendar or

 6          information -- I mean, you said I'll get you

 7          the date of the meeting.  Do you have that

 8          information at home?

 9    A.    I don't know.  You know what?  I'll find it.

10          I don't -- I honestly don't know where it

11          is.

12    Q.    Have you maintained records and files

13          concerning the I-65 property?

14    A.    My husband has.

15    Q.    So any correspondence that came to you, you

16          gave that correspondence to your husband

17          and --

18    A.    After -- in 2000, yeah.

19    Q.    What about prior to 2000?  Where would that

20          correspondence be?

21    A.    I don't know.  I mean, I don't know.  Daddy

22          talked to Jack and I about a lot of things.

23          So I don't know.
```

45

| | | |
|---|---|---|
| 1 | Q. | Okay.  That would have had to have been prior |
| 2 | | to '96, though, correct? |
| 3 | A. | Yes. |
| 4 | Q. | Because your father died in '96. |
| 5 | A. | Exactly. |
| 6 | Q. | Okay.  Any correspondence that you got from |
| 7 | | '96 to 2000, do you have any recollection as |
| 8 | | to where that would be? |
| 9 | A. | If I have it, it's at home. |
| 10 | Q. | Okay.  Well, do you have a system or a method |
| 11 | | for keeping up with those type things? |
| 12 | A. | I think I do. |
| 13 | Q. | Okay.  So you think that you have a place |
| 14 | | that you can search and possibly find those |
| 15 | | records; is that correct or incorrect? |
| 16 | A. | I think I can. |
| 17 | Q. | Okay.  Have you reviewed any documents or |
| 18 | | looked at anything prior to us taking your |
| 19 | | deposition to help refresh your memory or |
| 20 | | refresh your recollection of the sequence of |
| 21 | | events? |
| 22 | A. | I saw those yesterday. |
| 23 | Q. | When did you see those? |

46

```
 1    A.   During his deposition.

 2    Q.   That's the first time you had seen them?

 3    A.   No.  I've seen them other times, but I don't

 4         remember when.

 5    Q.   Okay.

 6    A.   My main concern was -- about this was if I

 7         had my calendars, then I could -- when you

 8         ask me something date wise, I thought I could

 9         do a better job.  So I was really concerned

10         about the dates.

11    Q.   Would those dates be on a calendar?

12    A.   I think so, yeah.

13    Q.   So is one of your methods for keeping up with

14         things --

15    A.   A calendar.

16    Q.   -- calendaring it?

17    A.   Uh-huh.

18    Q.   Okay.  And have you archived or retained or

19         kept old calendars for -- I mean, we're in

20         2007.

21    A.   Yes.

22    Q.   I mean, would you have the 2000 calendar or

23         the '96 calendar?
```

47

1   A.   I think I do.

2   Q.   Would you have calendars all the way back to

3        '90?

4   A.   I wish I did.  I might.

5   Q.   You may?  Would you look and see?

6   A.   Yes, I will.

7   Q.   Okay.  But you're fairly certain that you've

8        got calendars for the past several years

9        anyway; you just don't know if they go all

10       the way back to '90?

11  A.   With the moving that we've done, I hope I

12       have them.

13  Q.   Do you think you will have them from at least

14       the time that you came to Birmingham forward?

15  A.   I'm not sure about that.

16  Q.   Let's look at what we've marked as

17       Defendants' #3.  When your husband got this

18       letter from Alan Taunton, did he show it to

19       you or discuss it with you?

20  A.   After he got the letter?

21  Q.   Yes.

22  A.   Yes.

23  Q.   Okay.

48

```
 1    A.   I'm sure he probably did.  I don't remember,
 2         but I'm sure he probably did.  I think he
 3         did.
 4    Q.   Do you have any recollection of the letter
 5         that he sent to Alan?
 6    A.   Not at -- right at this -- no.  I couldn't
 7         tell you what it said right now.
 8    Q.   For bullet number two, his response to the
 9         question about the Cobb sisters note, that
10         the purchase price was $100,000, the
11         purchaser was Dorsey Motor Sales --
12    A.   Where does it say that?  Number two?
13    Q.   Bullet two.
14    A.   Okay.
15    Q.   There was an 80,000 note from Dorsey Motor to
16         the Cobb sisters.
17    A.   You're talking about the land that Sisters
18         was on?
19    Q.   No.  The Cobb sisters --
20    A.   Oh.
21    Q.   -- that the property was purchased from by
22         Dorsey Motor Sales.  My question to you is as
23         of February the 17th, 2000, you had no
```

49

1        knowledge of the fact that this property had

2        previously been owned by Dorsey Motor Sales

3        rather than some individuals?

4   A.   You know -- and this could be wrong -- but I

5        thought daddy paid off the $20,000

6        increments.

7   Q.   Individually rather than the company?

8   A.   Yes.

9   Q.   And what did you base that on?

10  A.   I guess from what he told me. I just don't

11       remember. But it -- I just remember that I

12       thought that he had paid the $20,000 note

13       increments.

14  Q.   So was it your understanding that your father

15       owned the property individually rather than

16       the motor company owning it?

17  A.   I'm not sure.

18  Q.   If you'll look at bullet three, he makes

19       reference to the note. Do you see that?

20  A.   Yes.

21  Q.   Okay. So now that we've had a chance to

22       review this, would it be accurate to say that

23       it was not 2005 but at least February --

50

```
 1        somewhere around February the 17th of 2000

 2        that you would have learned that there was a

 3        note on the property?

 4   A.   If I did, I didn't understand what it was.

 5   Q.   Do you know what a promissory note is?

 6   A.   No.

 7   Q.   You don't have any idea what a promissory

 8        note is?

 9   A.   No.

10   Q.   Have you ever borrowed any money before?

11   A.   No.

12   Q.   When you and Mr. Diaz went into business, did

13        y'all borrow any money?

14   A.   I borrowed $3,000 from mom and daddy.

15   Q.   Okay.

16   A.   Which I paid back.

17   Q.   Bullet five makes reference to an appraisal.

18        Have you had an appraisal done or asked

19        anyone that you felt was knowledgeable in

20        real estate their opinion as to the value of

21        this property at any time from 1990 until

22        today?

23   A.   Daddy talked about it.
```

51

Q.    What did daddy say?

A.    I don't remember.  But he might have had an appraisal.  I know they had -- maybe this was for Dorsey Motor Sales, but when they -- I thought they hired a helicopter or something to go and take pictures of all the land.  So I think this land was part of that.

Q.    Have you made any inquiries as to the value of the land?

A.    I've not had an appraisal.

Q.    Okay.  Have you asked anyone, other than your lawyers, what they thought the value of the land was?  Have you asked your husband what he thought the value was?

A.    He's not an appraiser.

Q.    I didn't ask you if he was an appraiser.  I asked if you had asked him what he thought the value was?

A.    I may have.

Q.    What did he say?

A.    He didn't know.  He's not an appraiser.  It needed to be an appraised.

Q.    Well, everybody has an opinion.  They don't

52

```
 1              have to be qualified to give that opinion.
 2     A.   You'll have to ask him.  I'm sorry.
 3     Q.   Well, I'm going to ask him, I promise.  But
 4              I'm asking you today, do you recall ever
 5              inquiring of your husband as to what he
 6              thought the property was worth?
 7     A.   Do I remember specifically doing that?  No.
 8     Q.   Okay.
 9     A.   Did I do that?  Probably.
10     Q.   Do you remember what he probably told you?
11     A.   No, I do not remember what he probably told
12              me.
13     Q.   Have you asked anyone else what they thought
14              the value of the property was?
15              MR. ROBERTS:  Other than your lawyer.
16     Q.   Other than your lawyer.
17     A.   Oh.
18     Q.   Well, let me ask you this.  Have you asked
19              your lawyers what they thought it was worth?
20              Don't tell me what they told you, but did you
21              ask them?
22     A.   Yeah.  I mean, he's not an appraiser either,
23              though.  So --
```

53

```
 1              MR. ROBERTS:  Just answer.  He didn't
 2                 ask you the amount.  And you know
 3                 me.  I have an opinion on
 4                 everything.
 5              MR. CLEVELAND:  That's what I said.
 6                 Opinions are cheap.
 7    A.   Right.  I mean, he probably gave me his
 8         opinion before I asked.
 9              MR. ROBERTS:  But for the record, I
10                 don't remember her asking me.
11                 We're going to really work with
12                 you on this, Cliff, so we can get
13                 through.  I don't want to testify,
14                 but I want to help you.
15    Q.   Have you ever provided a financial statement
16         or any financial information to anyone where
17         you reflected the value of this property on
18         your financial statement?
19    A.   I don't remember.
20    Q.   Have you ever provided a financial statement
21         to anyone where you reflected on that
22         financial statement the fact that there was a
23         debt on that property and what your
```

54

```
 1            percentage of the debt would be?

 2     A.    The debt?

 3     Q.    Yes.

 4     A.    I don't remember.

 5     Q.    Do you know if you and/or your husband have

 6            provided financial statements to any

 7            financial institution, lending institution?

 8     A.    We probably have.

 9     Q.    Would you have copies or have access to those

10            financial statements?

11     A.    He would probably.

12     Q.    He would?

13     A.    Uh-huh.

14            MR. ROBERTS:  Cliff, for the record --

15                 and I do think that maybe we can

16                 provide a lot of data back and

17                 forth without even subpoenas -- I

18                 would submit that I'm confident

19                 that Jack will have a lot of

20                 records.  And maybe we should have

21                 taken him before Donna -- and I

22                 have seen a financial statement.

23                      But we'll provide -- before
```

55

```
 1              we even take the deposition, if

 2              Mr. Dorsey will give us what we

 3              will ask for in a written letter,

 4              then we'll provide the entire file

 5              to you, including any financial

 6              statements, et cetera.

 7                    Can we kind of have a mutual

 8              agreement on that so we don't have

 9              to do subpoenas through federal

10              court?  I mean, we can still do

11              them.

12        MR. CLEVELAND:  I don't think we have

13              to do subpoenas.  I think what we

14              would need to do, to formalize it,

15              we'll put it in a request for

16              production, which is just

17              basically a letter.

18        MR. ROBERTS:  That's fine.

19        MR. CLEVELAND:  And that way it will

20              get both of us on record.

21        MR. ROBERTS:  And we can stipulate as

22              to all the documents.

23        MR. CLEVELAND:  Yeah.
```

56

```
 1              MR. ROBERTS:  Still on the record, we
 2                  will try to get together -- and I
 3                  think before you take Jack's
 4                  deposition, to make it productive,
 5                  you'll be much served if you have
 6                  all those documents to question
 7                  him from.  And if Mr. Dorsey
 8                  provides those limited documents,
 9                  that will help us.
10      Q.  Our #4 was the #10 from Dick's deposition,
11          for purposes of reference.
12      A.  Okay.
13      Q.  This is a letter dated March the 18th, 2006
14          from Alan Taunton to Ms. Erwin.  Did you
15          receive a copy of this letter approximately
16          the same time that it's dated from Ms. Erwin?
17      A.  Probably.
18      Q.  If you'll look at the closing sales statement
19          which was attached, do you see there that the
20          price of the property was $250,000?
21      A.  Yes.
22      Q.  Do you also see that I-65 Properties, Inc.,
23          is assuming a mortgage of 21,800 and issuing
```

57

1        a promissory note in the amount of $228,200

2        to come up with that 250,000?

3  A.   And this was October the 1st, 1990?

4  Q.   Yes, ma'am.

5  A.   I see that on this paper.

6  Q.   Okay.  Does that appear to be your father's

7        signature down in the lower left-hand corner,

8        Richard T. Dorsey?

9  A.   It appears to be.

10  Q.   Okay.  Would that indicate to you that as of

11        October the 1st, 1990, your father knew that

12        there was a $250,000 debt on this piece of

13        property?

14  A.   If that's his signature.

15        MR. ROBERTS:  Objection only as to the

16             form of the question as to whether

17             or not he knew or whether or not,

18             since it was -- some reference was

19             made by Taunton, that it was a --

20             what was the word -- famous word?

21        MS. ERWIN:  Maneuver in defense.

22        MR. ROBERTS:  A defensive maneuver.

23             But to the extent that this is

58

```
 1              here, we don't disagree with it.

 2              I just wanted to clear up your

 3              question.

 4                   You can answer his question

 5              the best you know.

 6   Q.   Would this indicate to you that your father

 7        had knowledge of the $250,000 debt?

 8              MR. ROBERTS:  And our same objection to

 9                   form that there was in fact a

10                   250,000 -- I'm not challenging

11                   what he says but just as to what

12                   Mr. Dorsey knew or didn't know.

13              MR. CLEVELAND:  I didn't ask what he

14                   knew.  I indicated would this

15                   indicate to her from looking at

16                   this document.

17              MR. ROBERTS:  That there was a debt?

18              MR. CLEVELAND:  That there was a debt.

19              MR. ROBERTS:  Okay.

20   A.   Yes.

21   Q.   Okay.  And the second page is a copy of the

22        promissory note that was attached to this

23        correspondence that came back.  Do you see
```

61

```
1              are not numbered.

2     A.   Okay.  Oh, my page is numbered.  Okay.  Your

3          page isn't numbered?

4     Q.   Well, there's a fax number, but the document

5          itself --

6     A.   There's a P-06.

7     Q.   I give that no significance.  I'm talking

8          about at the bottom of the page.

9     A.   Okay.  I understand.  I just wanted to make

10         sure I had the same thing.

11    Q.   Yeah.

12    A.   You said your pages weren't numbered.

13              MR. ROBERTS:  Is this the bylaws?

14              MR. CLEVELAND:  It's the articles of

15                   incorporation which are --

16              MR. ROBERTS:  I got you.

17              MR. CLEVELAND:  -- Defendants' #2.

18              THE WITNESS:  Mine are numbered.

19              MR. ROBERTS:  He said disregard that

20                   number.  That was probably the

21                   fax.

22              THE WITNESS:  Right.  But he said he

23                   didn't have, yeah, that number on
```

62

```
 1                              there.
 2    Q.   I believe your question to me was why --
 3    A.   I'm sorry.
 4    Q.   -- why is Connie Dorsey's --
 5    A.   I'm sorry.
 6    Q.   And I'm attempting to -- do you see that she
 7         is not listed there -- that she is listed
 8         there as the secretary?
 9    A.   Names and addresses of the officers of the
10         corporation chosen for the year is as
11         follows.
12    Q.   Okay.  A, what does A say?
13    A.   President, Richard T. Dorsey -- I
14         mean, Richard M. Dorsey.  Excuse me.
15    Q.   Okay.
16    A.   And then I was listed as vice president.  She
17         was listed as secretary.
18    Q.   That's correct.
19    A.   Uh-huh.
20    Q.   So --
21    A.   I had no idea Connie was involved until
22         later.
23    Q.   Well, now, Ms. Davis, we've got your
```

69

```
1    Q.   Sort of?

2    A.   Yeah.

3    Q.   Okay.  What is your recollection of the

4         sequence of events surrounding that scenario?

5    A.   After the 2005 meeting when he said I owed

6         500 -- or half a million dollars, I was in a

7         state of shock and scared and petrified;

8         because I thought I don't have that money,

9         and I was afraid that he could take my house

10        and everything.  And it was just -- it was

11        horrible.

12            So I decided to call Dick and ask him if

13        I sold him my part of the land -- my 30

14        percent for a dollar, would that clear up the

15        debt.  And he said he couldn't answer that;

16        it sounded good to him -- it was on a

17        Friday -- and that he would try and call

18        Alan.  I said, But I need to know

19        immediately, as soon -- you know, he said,

20        Well, I can't tell you today because Alan

21        usually takes off on Friday but I will talk

22        to him on Monday.

23            And I didn't hear from Dick on Monday.
```

```
 1        I didn't hear from him on Tuesday.  And I --
 2   he had said he'd let me know Monday.  So when
 3   that happened, I called Jim Roberts.  And
 4   then on -- I met with him on Wednesday.
 5             MR. ROBERTS:  Let me put in one
 6                  objection just so you don't -- and
 7                  Mr. Cleveland wouldn't want you to
 8                  communicate anything that you told
 9                  to me as your lawyer.  So just
10                  answer every question that you
11                  can, but it would be inappropriate
12                  for you to give any
13                  conversation --
14             THE WITNESS:  Yeah.  I just --
15             MR. ROBERTS:  No.  No.  Stay with me.
16                  Mr. Cleveland would do the same
17                  thing.  Everything you can tell
18                  him other than anything that I
19                  told you --
20             THE WITNESS:  Right.
21             MR. ROBERTS:  -- between us.  Go
22                  ahead.  You're doing good.  Keep
23                  going.
```

71

| | | |
|---|---|---|
| 1 | A. | On Friday, I faxed Dick saying I was |
| 2 | | canceling my offer or whatever you call it. |
| 3 | Q. | But you initiated the offer, not Dick, |
| 4 | | correct? |
| 5 | A. | Right.  I did. |
| 6 | Q. | How did you come up -- |
| 7 | A. | With a dollar? |
| 8 | Q. | -- with the conclusion that that was a fair |
| 9 | | exchange? |
| 10 | | MR. ROBERTS:  Object to the form that |
| 11 | | she formed an opinion it was a |
| 12 | | fair exchange.  But you can |
| 13 | | answer. |
| 14 | Q. | Well, that's the offer you made, right? |
| 15 | A. | No.  I just offered to excuse my debt. |
| 16 | Q. | Yeah. |
| 17 | A. | That's how -- |
| 18 | Q. | Yeah.  The offer to excuse your debt for your |
| 19 | | 30 percent. |
| 20 | A. | A dollar. |
| 21 | Q. | Well, you knew what the debt was, right? |
| 22 | A. | I didn't think it was a true debt.  But to go |
| 23 | | through -- because there were things on it |

72

```
 1        that didn't pertain -- that didn't make sense
 2        to me.  And it -- and going back to the
 3        beginning of this, I -- I couldn't believe
 4        that after -- all of a sudden, 2005, my
 5        brother is telling me I owe half a million
 6        dollars.
 7   Q.   Because that's the very first you ever heard
 8        about it, wasn't it?
 9   A.   Yes.  And I just thought I -- I -- I don't
10        have that kind of money.  And the thought of
11        him taking my home -- and I told Jack, I
12        said, I can't do this.  So I called Dick and
13        I said I would sell him it for a dollar if it
14        would excuse the debt so we could both get on
15        with our lives.  And that was it.  And then,
16        on that following Friday, like I said, I sent
17        him a fax taking it back.  He had told me
18        he'd call me on Monday.
19             MR. ROBERTS:  Just answer his
20                  questions.  If you need a break --
21             THE WITNESS:  No, I don't need a
22                  break.  I'm fine.
23             MR. CLEVELAND:  Well, let's everybody
```

73

| | |
|---|---|
| 1 | take a break. |
| 2 | MR. ROBERTS:  Yeah, that's good. |
| 3 | MR. CLEVELAND:  We'll take ten minutes. |
| 4 | (Brief recess) |
| 5 | Q.  We had discussions yesterday about the Nissan |
| 6 | deal.  Do you recall that? |
| 7 | A.  Right. |
| 8 | Q.  What did you know about the Nissan deal? |
| 9 | A.  I knew that my brother really wanted to put a |
| 10 | dealership out on the interstate.  It was |
| 11 | very creative thinking at that time. |
| 12 | Q.  Was it your understanding that it was going |
| 13 | to be his dealership rather than someone else |
| 14 | acquiring the property? |
| 15 | A.  I don't know.  I just -- he handled all of |
| 16 | that.  I just knew that he believed that the |
| 17 | time was ready to put a dealership out there |
| 18 | and -- with the traffic going to-and-fro.  I |
| 19 | knew he was talking to Nissan. |
| 20 | Q.  What involvement did you have in it, if any? |
| 21 | A.  None.  He ran that show.  It was his dream. |
| 22 | Q.  Pardon? |
| 23 | A.  He ran that show.  It was his dream. |

74

| | | |
|---|---|---|
| 1 | Q. | The Nissan was his dream? |
| 2 | A. | Yes.  To have on the interstate. |
| 3 | Q. | Okay.  Well, did you or your husband have any |
| 4 | | involvement or anything with any of the |
| 5 | | Nissan transactions to your recollection? |
| 6 | A. | I don't remember.  I know Dick told me that |
| 7 | | he was talking to Nissan and trying to work |
| 8 | | out a plan. |
| 9 | Q. | We had discussion yesterday also about the 12 |
| 10 | | percent interest.  Do you recall that? |
| 11 | A. | Yes. |
| 12 | Q. | Okay.  Have you made any effort to obtain |
| 13 | | financing at an interest rate of less than 12 |
| 14 | | percent? |
| 15 | A. | Personally? |
| 16 | Q. | Yeah. |
| 17 | A. | I don't know.  I don't -- I don't know. |
| 18 | Q. | Okay.  Do you remember any correspondence or |
| 19 | | communication with Dick where he encouraged |
| 20 | | you to -- if you thought somebody could do it |
| 21 | | for less than 12, for you to find them, bring |
| 22 | | them to the table? |
| 23 | A. | No, I don't remember that.  I do remember, |

75

| | | |
|---|---|---|
| 1 | | after Cracker Barrel looked at the land -- |
| 2 | | and it was part of our original lot and part |
| 3 | | of the adjoining lots -- that he was talking |
| 4 | | to Cracker Barrel. |
| 5 | Q. | Okay.  So it's your understanding that |
| 6 | | Cracker Barrel had made an inquiry anyway |
| 7 | | about the land at one time? |
| 8 | A. | Yes. |
| 9 | Q. | And did he make you aware of the fact that |
| 10 | | Cracker Barrel was looking at it? |
| 11 | A. | Yes.  That's what I just said. |
| 12 | Q. | Yeah.  So to your knowledge, who else has |
| 13 | | looked at it? |
| 14 | A. | I don't know.  Because he said, after that, |
| 15 | | he would let Jim Gilliland handle the -- |
| 16 | Q. | The marketing of it? |
| 17 | A. | Or the -- I guess the marketing. |
| 18 | Q. | Well, I mean, what else would Jim Gilliland |
| 19 | | do other than -- |
| 20 | A. | I don't know.  There's no telling.  And Dick |
| 21 | | said, you know, if I thought of anybody that |
| 22 | | might be interested.  I said, I don't know. |
| 23 | Q. | Well, I mean, did you make any efforts to try |

```
 1              to promote the property, market the property,

 2              move it, do anything with it?

 3       A.     Move it?  No.  I mean, if I saw -- a friend

 4              of mine talked about a new business that she

 5              saw on the interstate that had a lot of

 6              traffic.  But I don't even remember what it

 7              was.  I mean, that's called driving around

 8              looking.  And she just mentioned it.  It was

 9              a neat place to eat.

10       Q.     And did you tell your friend about this piece

11              of property?

12       A.     No.  She knew that we had this piece of

13              property.

14       Q.     Okay.  Did she make -- to your knowledge, did

15              that friend make any other inquiries?

16       A.     No.  No.  She just said they had eaten at

17              this restaurant, and it was really -- the way

18              it was laid out -- it was a cafeteria style

19              that maybe travelers could run in and run

20              out.

21       Q.     Well, I mean, did you put all the

22              responsibility on trying to promote the

23              property and sell it or lease it or whatever
```

77

1          on Dick, or did you try to do anything on

2          your own?

3    A.   Well, I tried to think of new places that

4          would go there.  Because you've got a Holiday

5          Inn and all the other stuff, so you couldn't

6          have that.  So trying to find something new

7          from that standpoint.  And then Dick said --

8          afterward, he said he made a mistake; he

9          should have sold it to Cracker Barrel, when

10         they went down the highway, because it would

11         have enhanced the rest of the property.

12   Q.   How much of it did Cracker Barrel want?

13   A.   I think he told me 300,000.

14   Q.   I mean, I'm talking about how much land?

15   A.   It was part of ours and part of the land --

16         the lots adjoining.

17   Q.   They wanted the whole nine acres for a

18         Cracker Barrel?

19   A.   No.  No.  No.  No.  No.  No.  No.  No.  They

20         wanted -- on our 9.6, it was to take a

21         portion of that and then a portion of the

22         land that abuts the 9.6.

23   Q.   Oh, okay.  So they didn't want it all?

78

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | They wanted a little bit of one and a little |
| 3 | | bit of the other? |
| 4 | A. | Right.  Right. |
| 5 | Q. | Well, what did you think about the Cracker |
| 6 | | Barrel offer? |
| 7 | A. | The amount of money? |
| 8 | Q. | Yeah. |
| 9 | A. | I couldn't -- I couldn't make a comment on |
| 10 | | that, I mean, as far as me and business and |
| 11 | | real estate.  As far as Cracker Barrel |
| 12 | | sitting there, I thought it was a great |
| 13 | | idea.  But I wasn't in the financial part of |
| 14 | | it, and I -- I wouldn't be qualified to do |
| 15 | | it. |
| 16 | | And then, after the fact, Dick said, you |
| 17 | | know, he made a mistake.  He shouldn't have |
| 18 | | listened to Jim; he should have done it.  And |
| 19 | | I have to agree with him on that as far as if |
| 20 | | you look down the street and what happened |
| 21 | | when Cracker Barrel went in down there. |
| 22 | Q. | Okay.  So it's your understanding that when |
| 23 | | the Cracker Barrel offer came up, he did seek |

79

```
 1           the counsel and advice of a real estate

 2           person as to what was a fair price and what

 3           they -- what --

 4      A.   I'm sure he -- I don't know whether he hired

 5           him or Jim was his friend and he asked him.

 6           I don't know the circumstances.

 7      Q.   But you do recall him telling you that he

 8           should have ignored Jim Gilliland's advice

 9           and I-65 Properties move forward with --

10      A.   Said, yeah, I think I made a mistake.  You

11           know, I should have -- I should have done

12           it.  And I didn't know -- you know, I don't

13           know if there was an offer on paper like,

14           here, you know, sign on the bottom line if

15           you agree with this 300,000 or whatever.  I

16           don't know.  You'd have to ask --

17      Q.   What did your husband think about the Cracker

18           Barrel offer?

19      A.   I don't recall.

20      Q.   Now, he has some background in the real

21           estate business, doesn't he?

22      A.   Only after he retired from engineering.

23      Q.   What did he do --
```

80

```
 1    A.   He went --

 2    Q.   -- relative to the real state business?

 3    A.   He was an engineer.

 4    Q.   I said relative to the real estate business.

 5    A.   Oh.  After he retired from Rust -- or not

 6         retired.  I mean, Kaverner -- Rust -- he came

 7         back to Rust -- he went to real estate school

 8         and sold real estate.

 9    Q.   Okay.  So he's a licensed real estate agent?

10    A.   He was.

11    Q.   Okay.  How long did he do that?

12    A.   I don't know.  You'll have to ask him.

13    Q.   A couple of months, a couple of years?

14    A.   I'm not sure how many years.

15    Q.   So it was some years he sold real estate?

16    A.   Yes.

17    Q.   Who was his license with?

18    A.   Let me think.  I cannot think of it now.

19         What's one of the biggest ones in

20         Birmingham -- oh, I can't ask you a question.

21    Q.   You're asking the wrong person.  I don't

22         know.

23    A.   You need to ask him.
```

81

1    Q.    Okay.  But anyway, once your husband left

2          Rust, he went to real state school, got a

3          real estate license, and sold real estate for

4          some years; is that correct or incorrect?

5    A.    That's correct.

6    Q.    Okay.  Did he ever get his broker's license?

7    A.    No.

8    Q.    Does he still have his real estate license?

9    A.    No.

10   Q.    Do you know when he -- when he surrendered it

11         or just didn't renew or whatever the

12         circumstances were?

13   A.    We moved to South Carolina.

14   Q.    Okay.

15   A.    And I think it was -- I don't know how long.

16         You'll just have to ask him.

17   Q.    Okay.  Let me be sure I'm correct.  You think

18         you discussed it with your husband, but you

19         don't remember what he said about the Cracker

20         Barrel offer?

21   A.    Right.  That's correct.

22   Q.    Okay.  Do you recall receiving this letter

23         from Dick?

82

```
1    A.   What number was this yesterday?

2    Q.   This was not a yesterday.  This is

3         Defendants' #5.

4    A.   Oh.

5                     (Brief pause)

6    A.   Yes.

7    Q.   Okay.  I saw you underlining some different

8         dialogue in there.  Is there anything in this

9         letter that you disagree with?

10   A.   I guess all the documents that I have

11        concerning I-65 Properties.  I would think --

12        are minutes documents?

13   Q.   I don't know.  Just tell me what sentence

14        you're referring to so we'll all be on the

15        same line.

16   A.   Second paragraph, second sentence.

17   Q.   I have provided the accountant with all the

18        documents that I have concerning I-65

19        Properties, Inc., from its inception to

20        date.  I have been informed that these are

21        being summarized on a year by year basis.

22   A.   Okay.

23   Q.   Okay.  What is your concern?
```

83

```
1   A.   Nothing.  I just -- it -- I just underlined
2        it so that when I look at this --
3   Q.   Okay.
4   A.   And at the line -- the bottom part next to
5        the last sentence -- the last complete
6        sentence:  I hope you realize that my holding
7        two positions has certainly not been to your
8        detriment but very much to your benefit.
9   Q.   Okay.  And you disagree with that?
10  A.   No.  I just underlined it.
11  Q.   Okay.  Why did you underline it?
12  A.   Because -- so when I look at it, I can see
13       that.
14  Q.   Okay.  I guess here's what I'm asking you.
15       Normally when I underline or highlight
16       something, it's for some particular person or
17       that point is of some significance to me.
18  A.   This is for me.
19  Q.   And what I'm asking you, of what significance
20       is that sentence to you, if any?
21  A.   That when I pick up this, I can look at that
22       without reading everything.
23  Q.   Okay.  But you had told me earlier that you
```

84

```
1          did recall a communication where Dick said,

2          hey, if you want to find somebody else to

3          finance it, you know, that it was fine with

4          him.  My question -- my follow-up question is

5          is it your best recollection that it was this

6          April the 5th, 2000 communication or is it

7          your recollection it was some other

8          communication?

9     A.   That Dick said if you find -- if you come up

10         with anything --

11    Q.   Yes.

12    A.   -- for I-65?  It was a verbal communication,

13         not from this.

14    Q.   Okay.  So it's your best recollection that he

15         said it to you verbally and then communicated

16         it again by way of this correspondence?

17    A.   This is after the Cracker Barrel thing didn't

18         work.  That's when he told me that.

19    Q.   So after the Cracker Barrel deal went

20         through, he told you, hey, if you can find

21         somebody, bring them on?

22    A.   Yeah.  If you hear of anything, let me know.

23    Q.   Yeah.  Okay.
```

85

1    A.   Let him know.

2    Q.   What about the interest rate?

3    A.   There was nothing said about the interest

4        rate that I remember -- recall.

5    Q.   Okay.  Well, he says here that you make

6        reference to mortgage financing being

7        obtained from a commercial -- I'm looking at

8        the forth -- the first sentence of the forth

9        paragraph.  Do you see that?

10   A.   You meaning me meaning Jack, thinking Jack

11       has written a letter for me since Jack had

12       the power of attorney.

13   Q.   Well --

14   A.   You'd have to talk to Jack about this.

15   Q.   Okay.  It says you, and it's --

16   A.   I understand what it says.

17   Q.   And the letter is to you.  So --

18   A.   Yeah.  I know the letter is to me, and I know

19       it says you.  But this is after I gave Jack

20       my power of attorney.  And from 2000 on when

21       I did that, it was Jack writing the letters.

22   Q.   But you do see that he says he has absolutely

23       no objection to you -- if you can get a

86

|    |    |    |
|----|----|----|
| 1  |    | better interest rate, go get it.  Do you see |
| 2  |    | that?  That's the second sentence in the |
| 3  |    | fourth paragraph. |
| 4  | A. | Okay.  I'm underlining and starring.  Okay. |
| 5  |    | Yes, I see it. |
| 6  | Q. | You see it.  Okay.  My question is did you |
| 7  |    | make any effort to obtain -- |
| 8  | A. | At this point in time? |
| 9  | Q. | Yes, ma'am. |
| 10 | A. | No. |
| 11 |    | MR. ROBERTS:  Let him finish his |
| 12 |    | question.  You cut him off. |
| 13 |    | MR. CLEVELAND:  She was right, though, |
| 14 |    | as to what the question was going |
| 15 |    | to be. |
| 16 | A. | No. |
| 17 | Q. | Did you make any effort to obtain lending or |
| 18 |    | financing at less -- |
| 19 | A. | No, I did not. |
| 20 | Q. | Okay.  Have you ever since this time?  Your |
| 21 |    | response back to me was at this time.  My |
| 22 |    | follow-up question is have you made an effort |
| 23 |    | to obtain financing since that time? |

87

```
1    A.   No.

2    Q.   And I believe there was a question yesterday

3         about a survey.  So you have been provided a

4         copy of a survey; is that correct or

5         incorrect?  And I'm looking at the enclosures

6         on the bottom of page 2.

7    A.   You'll have to ask Jack.  I know -- you'll

8         have to ask him.

9    Q.   Articles of incorporation, bylaws, survey --

10   A.   You'll have to ask him.  I'm sorry.

11   Q.   -- and a topographical survey.  You have no

12        independent recollection, but you think Jack

13        would know?

14   A.   Right.  I do.

15            MR. CLEVELAND:  I've got the

16                complaint.  I didn't bring an

17                extra copy.  Do y'all have an --

18            MR. ROBERTS:  That's all right.  We've

19                got them.

20            MR. CLEVELAND:  You've got them?

21                Okay.

22            MR. ROBERTS:  Not handy, but that's

23                fine.
```

```
 1            MR. CLEVELAND:  I was not going to

 2                 offer it, so I didn't copy it.

 3            MR. ROBERTS:  That's fine.  We'll

 4                 stipulate it as the complaint.

 5            MR. CLEVELAND:  Let me make --

 6            MS. ERWIN:  I've got them.

 7            MR. CLEVELAND:  You got an extra one

 8                 for her?

 9            MS. ERWIN:  Yes.

10                 (Brief recess)

11            MR. CLEVELAND:  I'm not going to offer

12                 this, so it will not have an

13                 exhibit number.

14      Q.  Turn to your factual allegations.  It would

15           be your numbered paragraph -- it's Article

16           V.  It's going to be paragraph -- your

17           numbered paragraph 10.

18      A.  Okay.

19      Q.  Defendant Dick Dorsey has used his position

20           to control I-65 and its assets and to manage

21           I-65 in a manner oppressive to the other

22           shareholder in violation of his --

23      A.  Wait a minute.  I don't think I'm on the
```

89

1           right page.

2    Q.    Paragraph number 10.

3    A.    Five, paragraph 10?

4    Q.    Number 10.

5    A.    Mine says defendant.

6           MR. ROBERTS:  Let him find it for you.

7    Q.    Yeah.

8    A.    Mine didn't say Dick Dorsey.

9    Q.    I inserted Dick Dorsey.

10   A.    Oh, okay.

11   Q.    In a manner oppressive to the other

12         shareholder in violation of the fiduciary

13         duty he owes her.  What are your specific

14         allegations there?  What has he done or

15         failed to do?

16   A.    When he told me I owed half a million dollars

17         in 2005.  I just think it would have been

18         nice if I had known along the way each year.

19   Q.    So if you had known -- so your allegation

20         there is that you did not know early on?

21   A.    Right.

22   Q.    And that the first you knew about it was in

23         2005?

90

```
1    A.    And my fear was --

2    Q.    Answer my question.

3    A.    Okay.  Yes.  Yes.

4    Q.    Okay.  Now -- and if you want to -- I'm not

5          trying to cut you short.

6    A.    That's fine.  Yes.

7    Q.    But, I mean, if you want to broaden your

8          answer, that's fine.  So your contentions as

9          to that sentence in paragraph number 10 is

10         that if you had known early on and had not

11         waited until 2005, then he would not have

12         conducted himself in a manner that was

13         oppressive to you?  That's the oppressive

14         thing that happened, correct?

15   A.    Yes.

16   Q.    Okay.  You also say that he refused to

17         provide minority shareholder with documents

18         or access to information.  What are you

19         talking about there?

20   A.    Minutes.

21   Q.    Well, now, you say refused.  Tell me what

22         request was made that he refused.

23   A.    I don't know how to answer that.
```

91

```
 1   Q.   Okay.  Your allegation -- your factual
 2        allegation is that he refused you.  I want to
 3        know when the request was made that he either
 4        said I'm not doing it or he failed to do it.
 5   A.   I guess the minutes along the way.  I still
 6        don't have the minutes from the 2005 meeting
 7        to my knowledge.
 8   Q.   All right.  Tell me whether or not you're
 9        referring there to the minutes from the 2005
10        meeting.
11   A.   No.  Minutes through the years.  But I'm sure
12        he has copies of them.
13   Q.   Okay.  Tell me specifically when you
14        requested those minutes.
15   A.   I guess it goes back to the very beginning.
16   Q.   Okay.
17   A.   I didn't know -- I didn't know a stockholder
18        had to request minutes --
19   Q.   Well, now, you say that he --
20   A.   -- every year.
21   Q.   I'm not arguing with you, but I want to make
22        sure I understand your allegations.  You say
23        he refused.  To me, refused means that you
```

92

```
 1              asked for and didn't get.
 2     A.   Refused means that to you?
 3     Q.   Yes.
 4     A.   Yes.   That's what it means to me.
 5     Q.   That means the same thing to you.  Okay.
 6              Good.   So we worked through the semantics of
 7              it.   When did you request?
 8     A.   From the beginning.
 9     Q.   So it's your contention that you requested --
10              specifically requested to Dick at the very
11              beginning, Provide me with documents?
12     A.   And -- and if I owe any money, I need to
13              know.
14     Q.   And if I owe any money, I need to know?
15     A.   Uh-huh.
16     Q.   Okay.   This says that he denied you
17              meaningful participation in the management of
18              the corporate affairs.   Tell me what you are
19              referring to there.
20     A.   The way this is set up, he's the president,
21              he's the 70 percent stockholder, and I
22              essentially don't have any say-so.   He can do
23              exactly what he wants to do.
```

93

| | | |
|---|---|---|
| 1 | Q. | Well, you knew from the very beginning that |
| 2 | | he was 70 percent, did you not? |
| 3 | A. | Yes.  But also, back then, I trusted my |
| 4 | | brother -- |
| 5 | Q. | Well -- |
| 6 | A. | -- and my father.  But mainly, I had no |
| 7 | | problem with it at 70/30 then.  I trusted him |
| 8 | | implicitly. |
| 9 | Q. | Well, it's always been 70/30. |
| 10 | A. | I know.  And I trusted Dick implicitly. |
| 11 | Q. | And it hasn't changed. |
| 12 | A. | I had no reason not to, to my knowledge. |
| 13 | Q. | And you began as an officer and a director, |
| 14 | | did you not? |
| 15 | A. | If you can show me the minutes, I'll say yes. |
| 16 | Q. | I can show you the articles that we've looked |
| 17 | | at about three or four times today that |
| 18 | | showed you as the vice president and on the |
| 19 | | board of directors. |
| 20 | A. | Okay.  Yes. |
| 21 | Q. | Failed to allow you to participate in any |
| 22 | | annual stockholder meeting.  Tell me what |
| 23 | | you're talking about there. |

94

```
 1    A.    Probably notification of the meetings.

 2    Q.    So it's -- well, I think you acknowledged

 3          that you got notification.

 4    A.    I did.  In the meeting for December of 2005,

 5          yes.  I got a certified letter, I think, or a

 6          registered letter saying there was a meeting.

 7    Q.    Well, you came to that one, right?

 8    A.    Right.

 9    Q.    Then your husband came to some of them,

10          didn't he, without you?

11    A.    You'll have to ask -- yes, he did.  I don't

12          know how many.

13    Q.    Okay.  Well, would you agree with me that for

14          him to know the date and the time and the

15          place, that he would have had to have had

16          notice of the meeting?

17    A.    Yes.  That's why he knew when to come.

18    Q.    That's right.  So when you say that you

19          didn't get any notice of the meeting, that

20          would not be accurate, would it?

21    A.    It doesn't look like it would be.

22    Q.    Stripped I-65 of future profits by acquiring

23          most land surrounding I-65.  Tell me what
```

95

1              you're talking about there.

2     A.    Maybe it went back to the option.

3     Q.    Well, we had some discussion yesterday about

4              I believe CD&O owning four lots on the other

5              side of the service road that comes in.  Do

6              you recall that?

7     A.    Yes.  I recall that at one point, I-65 had an

8              option on the land.

9     Q.    We also had discussion of the fact that CD&O

10            or somebody, Dick -- anyway, somebody that

11            Dick was associated with had purchased the

12            property that is due south of the I-65

13            property.  Do you recall that?

14    A.    Yes.

15    Q.    Is that what you're referring to?

16    A.    I'm referring to the option that I-65 had on

17            that land -- or some of it.

18    Q.    Well, it says here --

19    A.    Or option, yeah.

20    Q.    Okay.  It says here by acquiring most land

21            surrounding.  Do you see that language?

22    A.    Uh-huh.

23    Q.    Okay.  Is it your contention that because he

96

```
 1          is a shareholder in I-65, Inc., that he

 2          cannot acquire other property in that

 3          vicinity without you or I-65 being a party to

 4          it?

 5                  MR. ROBERTS:  Objection to form as to

 6                      he acquire.  And you can answer if

 7                      you know.  That calls for a legal

 8                      conclusion.

 9                  MR. CLEVELAND:  I'm just going over her

10                      allegations.

11                  MR. ROBERTS:  The only reason I want to

12                      do it -- that's probably my first

13                      objection -- as to whether or not

14                      he can acquire, whether it's in

15                      his capacity individually or if he

16                      had a duty to acquire in -- first

17                      in the name of I-65 Investment

18                      Properties -- or I-65 or whatever

19                      it is.

20     Q.   Do you remember my question?

21     A.   No.

22                  MR. ROBERTS:  Ask it again.

23     Q.   Is it your contention that Dick has an
```

97

1      obligation to you as a shareholder or to I-65

2      Properties, Inc., before he acquires, in

3      whatever capacity, any other property in that

4      general vicinity?

5    A.   I mean, can he just go and buy property

6      anywhere?  He doesn't need to check with

7      me --

8    Q.   Yeah.

9    A.   -- just because of I-65.

10   Q.   Yeah.  Yeah.

11   A.   Sure.  Yes.  No.  Yes.  Yes meaning I'm sure

12     he can go buy it anywhere without checking

13     with me.

14   Q.   Let's use, for example, the piece of property

15     that's due south of I-65.  You know what I'm

16     talking about?  That's on the other side of

17     the branch or the creek or whatever we looked

18     at yesterday?

19   A.   Where the church is?

20   Q.   Yeah.  Yeah.  Could you and your husband have

21     bought that piece of property without letting

22     Dick be a partner or participate in it in

23     some way?

98

```
 1     A.   We couldn't even think about buying that
 2          property.
 3     Q.   I mean, if you had the resources.  If you had
 4          the financial resources, a piece of property
 5          is on the market, it's got a for sale sign on
 6          it, could you and your husband have gone and
 7          bought it; or is it your contention that you
 8          couldn't have bought it without calling Dick
 9          and saying, hey, we can't buy this because it
10          adjoins I-65, Inc., and I'm a shareholder in
11          I-65, Inc.?
12     A.   We could have done it just like he could.
13     Q.   Yeah.  Nothing wrong with that, is there?
14               MR. ROBERTS:  Object to nothing wrong
15                    with that.  That calls for a legal
16                    conclusion.
17               MR. CLEVELAND:  I'm asking in her --
18     Q.   In your opinion, is there anything wrong with
19          that?
20     A.   With Dick buying the land around it?
21     Q.   Yeah.
22     A.   It was all for Dick.
23     Q.   Okay.  Number 11 says that he has engaged in
```

101

```
 1         debt on October the 1st, 1990 was unlawful in

 2         some way?

 3    A.   I didn't know there was a debt then.  I

 4         didn't understand; didn't know.  Still don't

 5         understand it.  I just know that when he told

 6         me I owed half a million dollars, it was

 7         frightening.

 8    Q.   I understand that part.  But my question was

 9         is it your contention -- is it your

10         allegation that the original debt of October

11         the 1st, 1990 was unlawful in some way?

12    A.   I didn't think there was a debt.

13    Q.   Do you have -- do you know of any facts

14         whatsoever that would indicate that the

15         original debt was unlawful in any way?

16    A.   I guess because I didn't see the note and

17         didn't know about it.  I don't know.

18    Q.   The fact that you didn't see it, is that the

19         basis for your contending that it was

20         unlawful?

21    A.   I just didn't -- I just didn't understand.

22    Q.   The fact that you didn't understand, is that

23         the only basis that you have that that debt
```

102

```
 1            was unlawful?

 2      A.    No.

 3      Q.    Well, tell me what else you have.

 4      A.    I don't know how to explain it.

 5      Q.    Just in your own words.

 6      A.    I mean, what do you mean, if I have?

 7      Q.    Your allegation here is that it --

 8      A.    I just --

 9      Q.    -- that the debt was unlawful.  I want to

10            know every fact that you know of or every

11            fact that you contend made it unlawful.

12      A.    I just know that my father would not have

13            done this if he thought the end result was

14            going to be that I was going to owe half a

15            million dollars on the property.  That's not

16            my father.

17      Q.    You saw where your father signed that closing

18            statement, did you not?

19      A.    Yes, I did.  Today.

20      Q.    Okay.

21      A.    But believe me, my father --

22            MR. ROBERTS:  Answer his question.

23                 Just answer his question.
```

103

```
 1    Q.   Would it be accurate to say that you know of

 2         no facts that indicate that the original debt

 3         was unlawful?

 4    A.   You mean from what daddy -- I saw his

 5         signature today on that?

 6    Q.   Just any -- you know, any facts that you

 7         have.  I know what you tell me that your gut

 8         tells you about your daddy.  I want facts.

 9    A.   You need to ask Jack.

10    Q.   You realize that Jack's name is not on the

11         top of this complaint, don't you?  Your name

12         is the one that's up there.

13    A.   I know.

14              MR. ROBERTS:  That's in the record, and

15                   she knows.  And her answer is

16                   you'll have to ask Jack.  And

17                   that's the best she seems to be

18                   able to do.  I hope we can move

19                   along.

20    Q.   You know of no facts, do you?

21    A.   You'll have to ask Jack.  I -- I gave him my

22         power of attorney in 2000.  And I promise

23         you, I can't answer yes or no.
```

104

```
 1      Q.   I will -- I will ask Jack.  You, Donna Davis,
 2           know of no facts, do you.  And if you do,
 3           speak up now.  And if you -- just tell me yes
 4           or no, and I'll move on.
 5      A.   Is there a maybe?
 6      Q.   No, there's not a maybe.
 7      A.   No.
 8      Q.   Okay.
 9      A.   Not that I can remember.
10      Q.   Number 12 -- paragraph number 12, Defendant
11           has denied plaintiff any meaningful
12           participation in the management of I-65 by
13           using his position as controlling shareholder
14           and the holder of 70 percent of the
15           outstanding shares of I-65.  Tell me what you
16           are speaking of there.
17      A.   He just has free rein.  I mean, he can do
18           whatever he wants to do.
19      Q.   Why?
20      A.   Because he is the majority stockholder.
21      Q.   Has he always been majority stockholder?
22      A.   Yes.  Yes.  He runs the show exactly like he
23           wants to do it.
```

105

1    Q.    But you have participated in the management,

2          have you not?

3    A.    In what way?

4    Q.    You have been an officer and a director, have

5          you not?

6    A.    With my name on the paper saying that?  Yes.

7    Q.    You have attended shareholder meetings, have

8          you not?

9    A.    I went to the one in 2005.

10   Q.    Your husband has attended shareholder

11         meetings on your behalf, has he not?

12   A.    He's -- yes.

13   Q.    You accuse him of willfully miscommunicating

14         the timing of the meetings so that the

15         meeting was finished upon your arrival.

16   A.    You need to ask Jack about that.

17   Q.    Tell me the basis for that.

18   A.    You need to ask Jack about that.

19   Q.    Well, tell me what you know about it.

20   A.    You really need to ask Jack.

21              MR. ROBERTS:  He's asked you, though,

22                   Donna.  Not to tie down anything

23                   other than he wants you to tell

106

```
 1                        him just what you know.  And that

 2                        would be anything you know that

 3                        Jack told you.  That would be

 4                        anything that you know like I

 5                        showed up and --

 6      A.   He came to a meeting --

 7                   MR. ROBERTS:  And go slow.  I'm not

 8                        trying to -- I'm not prepping

 9                        you.  I want you to answer his

10                        question.

11      A.   He came to a meeting here -- I guess it was

12           here -- and due to a wreck on the interstate,

13           he was late by five to ten minutes; the

14           meeting was over.

15                   MR. ROBERTS:  Is "he" Jack, for the

16                        record?

17                   THE WITNESS:  Yes, Jack.

18      Q.   Okay.  So that allegation is based upon Jack

19           was coming to the meeting, had a wreck on the

20           interstate --

21      A.   No.  No.  There was a wreck on the

22           interstate.

23      Q.   There was a wreck?  There was --
```

107

```
 1    A.   Or something.

 2    Q.   There was --

 3    A.   Yes.  Somewhere, there was.

 4    Q.   Traffic slowed him on the interstate --

 5    A.   Yes.

 6    Q.   -- as to where --

 7    A.   Yes.

 8    Q.   -- he was 10 or 15 minutes late getting

 9         here --

10    A.   Yes.

11    Q.   -- and the meeting was over?

12    A.   Right.

13    Q.   Okay.  Tell me everything you know of your

14         own knowledge, been told by anybody except

15         your lawyer as to how the timing of the

16         meeting was willfully miscommunicated,

17         willfully being intentionally

18         miscommunicated.

19    A.   I think it was probably notification of the

20         meeting.

21    Q.   Okay.  Tell me what you're talking about.

22    A.   The time that Dick decided to call the

23         meeting.  The date and the place and the
```

108

```
1              time.
2        Q.    So it's your allegation -- okay.  Well --
3        A.    And you asked me what I thought, in my
4              opinion.
5        Q.    Well, I'm asking you what your allegation
6              is.  Did he -- so you're saying that he set
7              it at one time and told you another time?
8        A.    No.  No.  No.  No.  No.  No.  If he decided
9              to have the meeting on the 5th, he might have
10             just decided that on the 2nd, to have this
11             meeting.  It's the time factor, notification
12             of the meetings, and the meeting.
13       Q.    So you're saying that he didn't give -- not
14             that he willfully miscommunicated the time;
15             he just didn't give you adequate notice?
16       A.    Notice.
17       Q.    Okay.  Number 13 says, To further squeeze
18             plaintiff out of I-65, defendant offered to
19             buy plaintiff's stock in I-65 to satisfy a
20             mortgage that was made to defendant's
21             corporations.  Do you see that, the first
22             sentence of paragraph number 13?
23       A.    Yes, I do see it.
```

109

```
 1    Q.   Okay.  The truth of the matter is that you're

 2         the one that made that offer, correct?  And I

 3         think you've acknowledged that today.

 4    A.   Yes.

 5    Q.   Okay.  The actual value of your stock is

 6         approximately triple the value that defendant

 7         offered.

 8    A.   Well, since there's been no appraisal of the

 9         land, I don't know.

10    Q.   That was my question.  What is the basis of

11         the allegation that your stock is worth

12         triple the value?

13    A.   If I was going to sell him my stock for a

14         dollar.

15    Q.   So you're saying it's worth $3, then?

16    A.   I guess so.  No.  I don't know.

17    Q.   Okay.  You're not saying that.  That would be

18         ridiculous, wouldn't it?

19    A.   I know.

20    Q.   Yeah.  Is the truth of the matter that you

21         don't have any basis for that allegation?

22    A.   I can't see one.

23    Q.   It goes on to say that, Said mortgage is
```

110

1          purported -- purported by whom?

2     A.   I guess me.

3     Q.   Okay.

4     A.   Since I thought the land was paid for.

5     Q.   Okay -- to be inadequate and false upon its

6          conception.  Is that what you're -- is that

7          your allegation there?

8     A.   I guess so.

9     Q.   That you thought it was paid for?

10    A.   I didn't know about the note.  So I guess

11         that's why that's there.

12    Q.   So that language goes back to the note at its

13         inception that you say you didn't know

14         anything about?

15    A.   Right.

16    Q.   Okay.  Paragraph number 14, Defendant

17         breached his fiduciary duties of good faith

18         and ordinary care owed to I-65.  How did he

19         breach his fiduciary duties?

20    A.   Tell me what that means.

21    Q.   Well, fiduciary duties are --

22              MR. ROBERTS:  Would you read the whole

23                 one or let her read -- you read

111

| | |
|---|---|
| 1 | part of it.  I'm only asking would |
| 2 | you read it -- |
| 3 | MR. CLEVELAND:  I read the entire |
| 4 | sentence. |
| 5 | MR. ROBERTS:  I missed it.  In that he |
| 6 | has exposed I-65 -- am I on the |
| 7 | wrong one -- to financial |
| 8 | obligations? |
| 9 | MR. CLEVELAND:  Paragraph number 14. |
| 10 | MR. ROBERTS:  Okay.  You read a |
| 11 | sentence, but not all of 14.  I'm |
| 12 | just asking, in context, would you |
| 13 | allow her to respond -- or at |
| 14 | least have time to read all of |
| 15 | 14? |
| 16 | Q.   Yeah.  Well, read all of paragraph 14, and |
| 17 | then I'm going to ask you about each |
| 18 | allegation. |
| 19 | MR. ROBERTS:  Right.  That's fine.  It |
| 20 | will be easier to get the whole |
| 21 | thing. |
| 22 | (Brief pause) |
| 23 | A.   Okay. |

112

```
1    Q.   You've read it?

2    A.   Uh-huh.

3    Q.   Okay.  How has he breached his fiduciary

4         duties to I-65?

5    A.   Tell me again fiduciary duties.

6    Q.   Financial.

7    A.   I think he might have used it to buy up the

8         other land.

9    Q.   Okay.  Tell me your basis for thinking that.

10   A.   Because, originally, I thought it was paid

11        off.  And he could have used it for whatever

12        you call it to buy the other land.

13   Q.   You think he's used it for collateral?  Is

14        that the word you were looking for?

15   A.   I think so.

16   Q.   So it's your allegation -- one of the things

17        you're talking about there in number 14 is

18        that it's your allegation that Dick has used

19        the I-65 property as collateral to buy other

20        property?

21   A.   Yes.

22   Q.   Now, are -- and we went into this yesterday.

23        Are you saying that he has directly, in other
```

113

| | | |
|---|---|---|
| 1 | | words, placed a mortgage or a lien on it, or |
| 2 | | that he has indirectly used it by showing his |
| 3 | | ownership as an asset? |
| 4 | A. | I don't know. |
| 5 | Q. | Have you ever shown that asset -- your |
| 6 | | ownership as an asset for you and your |
| 7 | | husband? |
| 8 | A. | To buy something?  No. |
| 9 | Q. | To buy something. |
| 10 | A. | Unh-unh. |
| 11 | Q. | Never put it on a financial statement? |
| 12 | A. | I don't believe so. |
| 13 | Q. | Okay.  If you had, then you would be doing |
| 14 | | the same thing you accused him of, correct? |
| 15 | | MR. ROBERTS:  Object to the form of the |
| 16 | | question. |
| 17 | Q. | You can go ahead and answer it.  He's just |
| 18 | | putting his objection on the record. |
| 19 | A. | Oh.  I never knew what you were doing |
| 20 | | yesterday.  And he started doing it. |
| 21 | | If you put -- I mean, to put it on a |
| 22 | | financial statement, if you're not buying |
| 23 | | anything, I don't see how that's the same if |

114

```
 1        you use the land to -- for collateral.

 2   Q.   Well, by collateral, are you talking about

 3        putting a lien on it, putting a mortgage on

 4        it?

 5   A.   No, I don't think so.

 6   Q.   Well, what do you mean?  Tell me what you

 7        mean by using it for collateral.

 8   A.   I guess maybe it is -- I don't know -- so you

 9        can get a loan to buy the others.

10   Q.   So is it your allegation there that Dick has

11        mortgaged or used this property as

12        collateral, given some financial institution

13        a lien on this property so he could buy

14        something else?

15   A.   I think there's a possibility.

16   Q.   Just tell me what you know.

17   A.   You know --

18            MR. ROBERTS:  If you don't know, just

19               say I don't know.

20   Q.   Tell me why you think there's a possibility.

21   A.   I don't know.  I don't know.

22   Q.   Okay.  Do you have any basis whatsoever --

23   A.   I don't know.
```

115

1    Q.  Any factual basis for that allegation?

2    A.  I don't know.

3    Q.  Well, either, yes, you do, or, no I don't.

4           MR. ROBERTS:  No.  I'm afraid she can

5                say I don't know.

6           MR. CLEVELAND:  No.  I disagree with

7                you.

8           MR. ROBERTS:  Well, on the record, let

9                me go ahead and clear that up.

10          MR. CLEVELAND:  Well, make it real

11               quick, because you're the one

12               trying to get out of here.

13          MR. ROBERTS:  Well, I understand.

14          MR. CLEVELAND:  And I'm trying to

15               accommodate you.

16          MR. ROBERTS:  Well, and I appreciate

17               that.  But there are three answers

18               to any question.  It's yes, no,

19               and I don't know.

20              Now, all I'm saying is you

21               have the right to argue at trial

22               that her "I don't know" is

23               equivalent to that is a no.  But

```
 1                    she still has the right to answer

 2                    not in.  We're not in a police

 3                    thing where she's under a light.

 4                    There's yes, no, I don't know.

 5                    And, actually, there's another

 6                    one, maybe so.

 7         MR. CLEVELAND:  Okay.  Are you

 8                    finished?

 9         MR. ROBERTS:  I'm finished.  But I'm

10                    just telling you -- and it's the

11                    only time I've really objected --

12                    if she says I don't know, that's

13                    an answer

14    Q.   Ms. Davis, these are your -- and you've heard

15         his objection.  But I'm going to ask you my

16         question anyway.  These are your factual

17         allegations.  Factual allegations are the

18         facts that you know of your own knowledge to

19         file this lawsuit.

20             Now, what I'm asking you, what facts do

21         you have to accuse Dick of using that

22         property, the I-65 property, for collateral

23         on other business transactions?
```

```
1    Q.   So your answer was I know of no fact that

2         would support the allegation that Dick has

3         used this property for collateral on another

4         business deal?

5    A.   I don't know.

6    Q.   You mentioned Myron Thompson's name

7         yesterday.  I -- we'll see how far those

8         answers get.

9              MR. ROBERTS:  Well, if he wants to jump

10                 on a school teacher, then that's

11                 fine with me.

12             MR. CLEVELAND:  I can tell you, he'll

13                 jump on anyone that he thinks is

14                 playing with his court.

15             MR. ROBERTS:  And I'm really pleased to

16                 hear that.  We've got the right

17                 judge when it comes to playing.

18             MR. CLEVELAND:  We do have the right

19                 judge.  We do.  I've been in front

20                 of him a number of times, and he's

21                 an outstanding judge.

22             MR. ROBERTS:  Well, I agree.

23   Q.   Number 15.  Would you read 15 in its
```

120

```
 1        entirety, and then we will address the

 2        different allegations.

 3                        (Brief pause)

 4   A.   Okay.

 5   Q.   Are you ready?

 6   A.   Uh-huh.

 7   Q.   The second sentence says that, The defendant

 8        has used the resources of CD&O to the

 9        detriment of I-65.  What fact do you have to

10        support that allegation?

11   A.   It's -- is that the advertising company?

12   Q.   It's CD&O is all I know.

13   A.   Well, I have to remember what it -- CD&O is

14        before I can answer it.  So I have to say I

15        don't know.

16   Q.   Okay.  Well, let's do it this way.  Let's

17        assume, for purposes of my question, that

18        CD&O is the advertising company.  What facts

19        do you have as it relates to the advertising

20        company?

21   A.   On the financial statement from the 2005

22        meeting, the moneys involved with CD&O.

23   Q.   Tell me what you're talking about.
```

121

```
 1    A.   The financial statement and CD&O and the

 2         money listed for CD&O on the financial

 3         statement of the 2005 meeting.

 4    Q.   The money owed to CD&O?

 5    A.   It may have been money paid to CD&O.

 6    Q.   Or money paid by CD&O?

 7    A.   I need the financial statement.

 8    Q.   Okay.  Well, let's look at it.  I'm going to

 9         show you what was marked yesterday as

10         Plaintiff's Exhibit #8.  Is that the

11         financial statement that you were referring

12         to?

13    A.   Yes.

14    Q.   Okay.  If you would look at it and tell me

15         what, off that financial statement relating

16         to CD&O, is the basis of this allegation.

17    A.   I can't find it.  On the back, TD&O.

18    Q.   The last page?

19    A.   Yes.

20    Q.   Okay.

21    A.   $3,000.

22    Q.   TD&O?

23    A.   Uh-huh.
```

122

```
 1      Q.   $3,000?

 2      A.   And --

 3      Q.   Wait.  Keep your spot and try to hold your

 4           train of thought.  Is that money paid to TD&O

 5           or paid by TD&O --

 6      A.   It says --

 7      Q.   -- on behalf of I-65?

 8      A.   I don't know.  It doesn't have a top.  It has

 9           TD&O -- May 14th, TD&O, $3,000.

10      Q.   Okay.  So is your allegation based upon the

11           fact that from looking at that, it's your

12           understanding that that's money that I-65

13           paid to TD&O?

14      A.   I don't know.

15      Q.   Well, if it was paid by TD&O on behalf of

16           I-65, that would be to the benefit of I-65,

17           would it not?

18      A.   Yes.

19      Q.   Okay.  So that would -- that could not be

20           what you're talking about, is it?

21      A.   I don't know what it means.  It has TD&O and

22           $3,000.

23      Q.   Okay.  Well, your allegation says that he has
```

123

```
 1           used the resources of CD&O to the detriment

 2           of I-65.  And my whole point, Ms. Davis, is

 3           that if it's money that was paid to TD&O, I

 4           can understand your allegation.  If it was

 5           money that was paid by TD&O on behalf of

 6           I-65, then that would be no detriment to

 7           I-65, would it?

 8      A.   Right.  But you see on here where it's listed

 9           and it has money?  It doesn't say what it is.

10      Q.   Okay.  And you are speaking of -- and I want

11           you to confirm it for me -- the November

12           24th, 1993 entry concerning CD&O; is that

13           right?

14      A.   It says November the 24th, CD&O, Inc.

15      Q.   Right.

16      A.   No year.

17      Q.   Well, it's 1993.

18      A.   Oh, yeah.  Yeah.  Excuse me.  Yes.

19      Q.   I just wanted --

20      A.   Yes.

21      Q.   So that when we all look back at this record,

22           we'll know what line item you're looking at.

23      A.   And then the -- in 2003, May 14th, TD&O,
```

124

```
 1            Inc., 3,000.

 2    Q.    Okay.  And that's another line item that

 3          you're looking at?

 4    A.    Yes.

 5    Q.    Okay.  And those two line items are the

 6          factual allegations for paragraph number 15?

 7    A.    Yes.

 8    Q.    Okay.  Read 16, if you would, and then we'll

 9          try to see if we can break it down.

10    A.    Okay.

11    Q.    Defendant engaged in a series of conflicting

12          interest transactions that put I-65 at

13          immediate risk of serious loss either without

14          disclosure to the board or without approval

15          or ratification of a majority of qualified

16          shareholders.  What are you talking about?

17    A.    I don't know.

18    Q.    Honest answer.

19    A.    You believe me now, don't you?

20    Q.    Well, that's all I wanted you to say before.

21    A.    I know.

22    Q.    Do you have any facts to -- do you know of

23          any facts --
```

125

```
 1    A.   I don't know.

 2    Q.   Okay.  Number 17.  The paragraphs are getting

 3         a little shorter, thank goodness.  We thank

 4         the author for that.

 5    A.   Okay.

 6    Q.   Defendant made it impossible to obtain a

 7         quorum of qualified directors to review,

 8         ratify, or approve any conflicting interest

 9         transactions relating to himself.  What are

10         the factual -- or what are the facts behind

11         that allegation?

12    A.   I don't know.

13    Q.   Do you know of anything that he has done to

14         make it impossible to obtain a quorum of

15         qualified directors?

16    A.   With the 70 percent that he owns, he can do

17         anything he wants.

18    Q.   I understand that.  But how did he make it

19         impossible?

20    A.   He can do -- he can vote any -- anything that

21         he wants to do.  I'm a minority stockholder.

22         I can't outvote him if I disagree with

23         something.
```

126

Q.   Read number 18, if you would.   Paragraph
     number 18.

                    (Brief pause)

A.   Okay.

Q.   What facts do you have to support the
     allegation that he has not committed the time
     or resources to I-65?

A.   I think the upkeep of the land, the
     maintenance.  As we talked about, the bamboo
     and everything way back when; that the County
     wanted the land presentable or maintained.
     And it didn't look like it was maintained
     yesterday.

Q.   So is the maintenance of the property the
     only thing that you're talking about there?

A.   I don't know.

Q.   Well, how do you think it should be
     maintained?

A.   I guess where it looks like a property.

Q.   I mean, what would you have to do?  In your
     mind, what's your opinion of what would need
     to be done out there on that nine acres to
     make it look like a property?

127

| | | |
|---|---|---|
| 1 | A. | When the County was having him keep the |
| 2 | | bamboo in check.  And originally, it just |
| 3 | | didn't look like it does now. |
| 4 | Q. | Tell me about the -- who did you hear from |
| 5 | | that the County was requiring the bamboo be |
| 6 | | cut? |
| 7 | A. | Alan Taunton. |
| 8 | Q. | So Alan told you that? |
| 9 | A. | Yes. |
| 10 | Q. | But my question to you is -- you said that |
| 11 | | the maintenance is not what you think it |
| 12 | | should be -- |
| 13 | A. | Yes. |
| 14 | Q. | -- based upon the way it looked yesterday? |
| 15 | | What would you do to maintain it at a level |
| 16 | | that you think would be acceptable and would |
| 17 | | not constitute negligence on his part? |
| 18 | A. | I would clean up the property. |
| 19 | Q. | How would you clean it up?  What would you |
| 20 | | do? |
| 21 | A. | I guess I'd get the Vietnamese back and give |
| 22 | | them the bamboo. |
| 23 | Q. | Where would you get -- would you get -- |

128

```
 1              MR. ROBERTS:  Off the record a minute.

 2              (Off-the-record discussion)

 3    Q.   Let's get back to my serious question and to

 4         your allegation.  Your allegation --

 5    A.   What number are we on?

 6    Q.   We're on number -- we're on number 18.  Your

 7         response to my question was you said that the

 8         property was not being maintained -- you

 9         thought he was negligent because the property

10         was not being maintained as it should be

11         maintained.

12              My question back to you is, well, how

13         would you maintain it?  And we'll leave the

14         Vietnamese out of it.  How would you maintain

15         it to have it at the standard that you think

16         it should be?

17    A.   I don't think it has to look exactly like the

18         surrounding property, but I think the bamboo

19         is out of control.  I would clean it up.

20    Q.   Would you bring a bulldozer in and clean it?

21         I mean, what would you do?

22    A.   I'm not a -- I don't know.  I wouldn't

23         bulldoze it; I'd just clean it up.  It's
```

129

```
 1              never been just clear from the beginning.

 2    Q.   Do you have any idea of the cost that would

 3         be associated --

 4    A.   I don't, no.

 5    Q.   -- with bringing it to the level that you

 6         want it?

 7    A.   No.

 8    Q.   Would you acknowledge that all of that costs

 9         money?

10    A.   Yes.

11    Q.   Okay.  Have you spent any money whatsoever on

12         maintaining or taking care of the I-65

13         property?

14    A.   No.

15    Q.   Look at paragraph number 21.

16    A.   Okay.

17    Q.   Is it your contention that there have been

18         profits made and that there are dividends to

19         be distributed which have not been

20         distributed?

21    A.   I don't know.

22    Q.   Do you know of any fact that would indicate

23         that I-65 has made a profit?
```

130

```
 1     A.   I don't know.

 2     Q.   Do you know of any fact to support your

 3          allegation that he has manipulated corporate

 4          earnings to squeeze you out?

 5     A.   A debt of a half a million.  Next year it may

 6          be 700,000.  That's scary.

 7     Q.   I understand that.  But your allegation is

 8          that he has manipulated corporate earnings.

 9          Do you have any facts to support that

10          allegation?

11     A.   When he gave me this in the meeting

12          (indicating), this is the financial statement

13          he said.  And then yesterday it was said, no,

14          no, no, this isn't a true financial

15          statement.  But at the December 2005 meeting,

16          he told me it was a financial statement.  Not

17          a make believe one, but it was the financial

18          statement explaining why I owed half a

19          million dollars.  And there's a page missing

20          off of this six of six.

21     Q.   Those are the documents that y'all had

22          produced yesterday, not the ones we

23          introduced.
```

133

```
 1    A.    Okay.  Let me read it, because --

 2    Q.    Do.

 3    A.    Well, I look at you while you're talking and

 4          I'm not reading it.

 5    Q.    Okay.  Yeah.

 6                    (Brief pause)

 7    A.    It goes back to the option.

 8    Q.    It goes back to the option?

 9    A.    Yeah.

10    Q.    Nothing new there?

11    A.    Not that I can see.

12    Q.    Okay.  Look at number 28.  Does that relate

13          back to the allegations that we have

14          discussed earlier, or are there new items

15          there that have not been included that I

16          haven't asked you about before?

17    A.    Are you talking about the 12 percent rate for

18          all these years?

19    Q.    Yeah.  The 12 percent and the mortgage.

20    A.    It's --

21    Q.    Do you understand my question?

22    A.    Yes.  I'm trying to figure out, since I

23          understand it, is it a yes or a no that I
```

134

```
 1            say.
 2       Q.   Well, my question is is this the same -- is
 3            this allegation the same thing that you had
 4            talked about earlier?
 5       A.   Yes.  To my knowledge, yes.
 6       Q.   Okay.  Nothing new here that we haven't
 7            already talked about?
 8       A.   No.
 9       Q.   Let's look at 31.
10       A.   Okay.
11       Q.   It appears that this allegation is that he
12            has willfully and wantonly allowed CD&O to
13            purchase surrounding land without giving an
14            option to I-65 and entering into the mortgage
15            agreement with Dorsey Motors, Inc., at an
16            exorbitant interest rate.  Are these the same
17            allegations that we have previously
18            discussed?
19       A.   I believe so.
20       Q.   Okay.  Nothing new?
21       A.   Not to my knowledge.
22       Q.   Look at 34.
23       A.   Okay.
```

135

1    Q.   Are these the same items that we have

2         discussed before?

3    A.   Yes.

4    Q.   And I think we went into some detail on

5         that.  Nothing new?  No new allegations here

6         in count six under your paragraph number 34

7         that we have not previously discussed?

8    A.   Correct.

9    Q.   Look at paragraph number 36, if you would.

10   A.   Okay.

11   Q.   What facts do you have that Dick has

12        defrauded you?

13   A.   I guess at the 2005 meeting when he said I

14        owed half a million dollars.  And I have no

15        say-so or control or anything in this.  And

16        then, next year, if we meet, he could come,

17        like I said, and say now it's 700,000.

18   Q.   Well, let's talk about fraud in the past.

19   A.   Well, I think that is.  If I don't have

20        the -- the true -- I thought this was a true

21        financial statement.  If I don't -- if

22        somebody tells me this is a financial

23        statement, I assume this is a true one.  And

136

```
 1          now, yesterday, he said it wasn't.  I don't

 2          know whether you call that fraud or just

 3          plain -- I don't know what you call it.

 4     Q.   This complaint was filed in August of '06,

 5          according to the stamp.  Okay.  I want to

 6          know what facts you knew in August of '06

 7          that Dick had defrauded you and not something

 8          that you heard yesterday.

 9     A.   This is in a board -- a meeting for I-65.

10          And that was in 2005.  So this was before

11          this.  This is part of it.

12     Q.   So you knew immediately that there was

13          something wrong with that?

14     A.   No.  I -- in the meeting, he said this is the

15          financial statement.  Through the years --

16          and I'm going to show you why you owe half a

17          million dollars.  I thought this was a

18          legitimate, true financial statement.

19     Q.   Okay.  But my question to you, as of August

20          of 2006 when this complaint was filed, what

21          basis do you have that he had defrauded you?

22          What did you know in August of 2006 -- or

23          what did you think you knew in August of 2006
```

137

1         that would mean that Dick had defrauded you

2         in some way?

3    A.   I just didn't trust him anymore.

4    Q.   Okay.  A lack of --

5    A.   And I am afraid.

6    Q.   A lack of trust, then?

7    A.   I am afraid -- I am afraid of him, and I

8         don't trust him.  That's the honest truth.

9    Q.   As of August 2006, what facts did you have

10        that Dick had been deceitful or had deceived

11        you?

12   A.   At this board meeting of 2005, there was a

13        tape recorder.  And I -- somebody said in

14        Alabama you don't have to tell somebody

15        they're being tape.  I wasn't -- I didn't

16        even realize it was being taped.  At one

17        point we were talking, and Dick said that

18        when daddy and mamma gave us the land, they

19        had a verbal agreement -- he had -- he and

20        daddy had a verbal agreement that it was in

21        lieu of my percent -- my 30 percent that I

22        would inherit when they died of the

23        dealership.

138

```
1    Q.   And that statement was made in --

2    A.   At the 2005 meeting.

3    Q.   That was when that -- that statement was

4         made, at that time --

5    A.   Yes.

6    Q.   -- in 2005?

7    A.   And I said, well, if that's true, why

8         didn't -- why didn't daddy change his will?

9         And Dick said, I don't know.  Because when my

10        father died, the will said that when mamma

11        died, I would get 30 percent and Dick would

12        get the -- whatever is left, the 40 or -- to

13        make him -- I'd have 30 and he'd have 70 of

14        the dealership.

15   Q.   Of the dealership.

16   A.   Uh-huh.  That's why it says verbal agreement

17        with dad.  That's what he said.

18             MR. ROBERTS:  Answer his questions,

19                  not --

20             THE WITNESS:  Okay.  Oh, that's right.

21   Q.   Okay.  I want to be sure I understand, now.

22        The deceit occurred at the shareholders

23        meeting in December of 2005?
```

139

A. Yes. And then when daddy -- it was before that, too.

Q. When was that?

A. When daddy had a stroke.

Q. In '93?

A. In '93. We brought him home from the hospital five or six days later. And when daddy died, Dick brought a black case over with all the records for mamma and daddy, insurance, et cetera. And in there, there were two pieces of paper that -- like durable power of attorney for daddy that he had signed and a durable power of attorney for mother. And the date that supposedly my father signed this was the date we brought him home from the hospital after his stroke. I was with him the whole time, and he couldn't have written his name like it was on that durable power of attorney.

Q. But that was in '96, right?

A. And that was giving Dick the durable power of attorney, not Dick and me. It was just giving Dick the durable power of attorney.

140

```
1    Q.    And that was in '96 when your dad died that
2          Dick brought the box over?
3    A.    Yes.
4    Q.    Okay.
5    A.    Yes.  And he wanted to know if I'd look
6          through it.
7    Q.    Okay.  And you say that he has suppressed
8          material facts from you.  What material facts
9          do you contend have been suppressed from you?
10   A.    I don't know.
11   Q.    This is an interesting allegation.  Perhaps
12         it's -- that you relied, to your detriment,
13         on nondisclosure of material facts.
14   A.    Where are you?
15   Q.    I'm at the --
16   A.    The same one?
17   Q.    I'm at the last -- I'm in the last sentence
18         of 36.
19   A.    I think that means that -- it's a horrible
20         thing to find out your brother -- you can't
21         trust your brother.  And I just -- it's
22         horrible.
23   Q.    Would you be surprised to know that he feels
```

141

```
 1           the same way?

 2   A.   Would you be surprised to know that I don't

 3        believe that?

 4   Q.   No, I'm not surprised.

 5           MR. ROBERTS:  You're asking questions

 6               again.

 7           THE WITNESS:  I know it.

 8           MR. ROBERTS:  I've got a lot of

 9               questions for her.  So if you can

10               hurry.  I say a lot.  I need to

11               get through pretty quick.

12   Q.   What do you want out of this lawsuit?

13   A.   Peace.

14   Q.   Okay.

15   A.   P-E-A-C-E.

16   Q.   What would it take to give you peace?

17           MR. ROBERTS:  I'm going to object to

18               that.  I'm her attorney, and I

19               think I'd have to -- as you would,

20               Cliff, I think I'd -- I'd have to

21               have an appraisal of the property

22               to give you an answer to that.  I

23               mean, if you're soliciting an
```

142

```
 1                        offer, we'd be glad to talk about

 2                        it.

 3                             But I think I said on the

 4                        record we are going to have, at

 5                        our own expense, the property

 6                        appraised by an MAI.  And then she

 7                        and I both will be able to come to

 8                        Dick and see if we can resolve

 9                        some of this.

10      Q.    Well, you have asked for compensatory and

11            punitive damages.   In what amount?

12      A.    I don't know.

13      Q.    Do you know what punitive damages are?  Do

14            you know that they are damages to punish?

15      A.    Explain it a little more.

16      Q.    Well, punitive damages are money damages to

17            punish Dick.

18      A.    It's like spanking a bad child when they do

19            something?

20      Q.    Okay.  How bad do you want this bad child

21            spanked?  And put that into dollars for me.

22      A.    I want him to --

23      Q.    Because that's the only way you can spank
```

145

```
 1                      relationship.

 2             MR. CLEVELAND:  I don't think it does.

 3                  I mean, that's part of the relief

 4                  you've asked for.  We have a right

 5                  to know what we're facing.

 6             MR. ROBERTS:  If she knows, she can

 7                  answer.

 8      A.  Honestly --

 9      Q.  Your husband did that?

10      A.  No.

11      Q.  Okay.

12      A.  No.

13      Q.  You don't know what your financial

14          relationship with your attorneys are?

15      A.  I can get it for you.

16      Q.  You can get it for me?

17             MR. ROBERTS:  Don't look at me.  Don't

18                  look at me.

19      A.  I mean, I'd have to look at it to tell you

20          specifically.

21      Q.  Okay.  You also ask for costs other than

22          filing fees.  Do you know what other costs

23          you are referring to there?
```

146

1    A.   I don't know.

2    Q.   You own no interest in CD&O, LLC, do you?

3    A.   No.

4    Q.   And have never owned any interest in that?

5    A.   No.

6             MR. CLEVELAND:  Give us about four or

7                   five minutes.  We're getting

8                   close.

9             MR. ROBERTS:  All right.

10               (Brief recess)

11   Q.   Mrs. Davis, you made reference to a will

12       earlier.  And maybe I just didn't hear you

13       correctly or didn't understand.  I'm going to

14       get you to clear it up for me.  Did you say

15       that your mother or father's will left you 30

16       percent of the dealership --

17   A.   No.  When daddy died --

18   Q.   -- in '96?

19   A.   -- everything went to mamma.

20   Q.   Correct.

21   A.   And then, on her death, Dick and I -- let me

22       see -- Dick and I would -- I'd get 30 percent

23       and Dick would get 30 percent, their stock in

149

```
 1        recorder.  I don't know whether that was on

 2        the tape recorder, but then he turned it

 3        off.  And then -- at some point.  So it may

 4        be on the tape.  I don't know.

 5   Q.   Was Jo Anne present?

 6   A.   Yes.

 7   Q.   Anyone else?

 8   A.   No.  And she was taking the minutes.  I don't

 9        know that she -- I don't know whether -- I

10        don't know what her instructions were when

11        the tape recorder went off, and then it was

12        turned back on.

13   Q.   Is it your contention that you are entitled

14        to 30 percent of the profits of I-65

15        Properties?

16   A.   I don't understand what you're saying.

17   Q.   I'm just asking you, you own 30 percent of

18        the stock; do you not?

19   A.   Yes, I do.

20   Q.   Is it your contention that you are entitled

21        to 30 percent of the profits of I-65?

22   A.   I would think so.

23   Q.   Would it also be your understanding that you
```

```
 1          would be responsible for 30 percent of the
 2          debt of I-65?
 3     A.   A true debt?
 4     Q.   Yeah, a true debt.  Whatever the true numbers
 5          work out to be.
 6     A.   Yes.
 7               MR. CLEVELAND:  Okay.  That's all I
 8                  have.  Thank you.
 9               MR. ROBERTS:  Thank you.  I'm going to
10                  move as quickly as I can.  And if
11                  you'll allow me a little room,
12                  Mr. Cleveland, rather than reading
13                  all of the articles of
14                  incorporation and the bylaws which
15                  are marked in this case -- what
16                  are the markings on them?  Did you
17                  submit them in this case?
18               MR. CLEVELAND:  I did.
19               MR. ROBERTS:  I just want to refer to
20                  them.
21               THE WITNESS:  The last is #5.
22               MR. CLEVELAND:  No.  #1 and #2.
23               MR. ROBERTS:  #1 and #2.  All right.
```

151

```
1                           EXAMINATION

2     BY MR. ROBERTS:

3     Q.    Ms. Dorsey, I've studied them, and I've had

4           my co-counsel study them.  And,

5           Mr. Cleveland, the only thing I can find

6           about any duties in either of these about a

7           vice president -- which I think we've

8           established she was scrivener and vice

9           president -- is that if the president dies or

10          is unable -- and I'm referring to Article

11          II -- Roman numeral II of the bylaws -- then

12          the vice president can perform other duties

13          of the corporation.  I may stand to be

14          corrected.  The two documents are in

15          evidence.

16                But assuming that there are no duties

17          set out in either -- for a vice president in

18          either of the I-65 Properties' articles of

19          incorporation or in the bylaws -- now, listen

20          to my question -- assuming that no duties are

21          prescribed, what duties would you think you

22          would be able to perform if they're not

23          authorized as vice president?
```

152

```
 1    A.   I guess I could call a meeting and say I
 2         don't know what the duties are.
 3    Q.   All right.  But assuming there are no duties,
 4         did Dick ever tell you what rights you had as
 5         a vice president, i.e --
 6    A.   No.
 7    Q.   -- if you had any rights?
 8    A.   No.
 9    Q.   Okay.  Now, you've heard -- we went through
10         this complaint laboriously.  And I notice in
11         the complaint that you asked -- I'll start
12         with the factual allegations.  One of the
13         allegations in the facts is that Mr. Dorsey,
14         your brother, denied you meaningful
15         participation in the management of the
16         corporate affairs as required under Alabama
17         law.
18              If the vice president doesn't have any
19         prescribed duties in the bylaws or in the
20         articles of incorporation, do you believe you
21         had a right to, as we say here in the factual
22         allegations, have meaningful participation in
23         the management of the corporate affairs?
```

153

```
 1              MR. CLEVELAND:  Object to the form.

 2       Q.    Yes or no?

 3       A.    Yes.

 4       Q.    Okay.  You believe you were denied?

 5       A.    Right.

 6       Q.    Okay.

 7       A.    Correct.

 8       Q.    I'm sorry.  All right.  The next one in the

 9             factual allegations, Failed to allow you to

10             participate in annual stockholder meetings

11             directly or indirectly with the exception of

12             the meetings.

13                  And if you'll tell me how many -- from

14             let's say 1990 to today, approximately how

15             many stockholder meetings did he allow you to

16             participate in, meaning Mr. Dorsey.

17                  MR. CLEVELAND:  We'll see if her memory

18                     has improved.  She didn't remember

19                     when I asked her that question.

20                  MR. ROBERTS:  It's because you're a bad

21                     guy, and I'm asking them sweet.

22                  MR. CLEVELAND:  Maybe that's it.

23                  THE WITNESS:  No.  You were very nice.
```

154

```
 1    Q.   Question, now.  See, you got off on that.

 2         I'm just asking you for an estimate from -- I

 3         want you to listen.  I don't think you

 4         listened to his questions.  From 1990 --

 5              MR. CLEVELAND:  Well, I think you know

 6                   she didn't.

 7    Q.   From 1990 --

 8              MR. CLEVELAND:  I didn't ask her but

 9                   six times -- I didn't ask until

10                   you objected.

11    Q.   From 1990 to the present as we sit here

12         today, will you tell this Court approximately

13         how many times you ever participated in any

14         meetings -- formal meetings -- I'm not

15         talking about Christmas and Thanksgiving --

16         formal meetings in regards to I-65 investment

17         properties -- or I-65 Properties

18         approximately?

19    A.   I went to the one in 2005.

20    Q.   No.  I'm going to ask you the question

21         again.  And we're going to stay here all day

22         if we have to.  I want you to listen.

23    A.   Okay.
```

155

```
 1    Q.   It's simple.  You either know or you don't.

 2         From about 1990 --

 3    A.   That's a long time ago.

 4    Q.   Okay.  That's a statement, not a question.

 5         From about 1990 to as we sit here today,

 6         approximately how many I'll call them formal

 7         meetings did you attend that were held --

 8         that was held by I-65?

 9    A.   One.

10    Q.   One.  Is that from '90 to today, one formal

11         meeting?

12    A.   To the best of my knowledge.

13    Q.   Okay.  Now -- all right.  While Ms. Lindsay

14         Erwin finds it, I'm going to direct your

15         attention --

16              MR. ROBERTS:  Cliff, I'm on the bylaws.

17    Q.   Now, I'm going to ask you to read it from

18         this one.  I want you to read Article VIII.

19              MR. CLEVELAND:  The bylaws have been

20                   offered twice.  The bylaws stand

21                   for themselves.

22              MR. ROBERTS:  Well, that's fine.  This

23                   is my turn.  You've been from nine
```

156

```
1                    o'clock until one.  Let me have --
2          MR. CLEVELAND:  And you were all day
3                    long yesterday.
4          MR. ROBERTS:  No --
5          MR. CLEVELAND:  I mean, I know what --
6                    I know what you're trying --
7          MR. ROBERTS:  Cliff --
8          MR. CLEVELAND:  I know what you're
9                    trying --
10         MR. ROBERTS:  Well, let me do it.
11         MR. CLEVELAND:  Well, do it right,
12                   though.
13         MR. ROBERTS:  Okay.  I'm going to ask
14                   her to read it.
15    Q.   Read Article VIII out loud for the court
16         reporter.
17    A.   The books of the corporation shall be audited
18         once a year at the close of the fiscal year
19         by a disinterested auditor who shall prepare
20         a balance sheet.
21    Q.   Okay.  Now, my question -- which he's done a
22         great job of trying to keep me from asking
23         it -- do you know if these bylaws were
```

157

1        complied with?  Did Dick ever give you an

2        audited copy by a disinterested auditor of

3        the books of I-65?

4   A.   No.

5   Q.   No.  Is that one of the reasons you feel like

6        that you were squeezed out, pushed out?  And

7        your whole testimony was I never got a real

8        accounting.  Was that what you said earlier?

9   A.   Correct.  Yes.

10   Q.   Do you believe you have a right, as a

11        minority stockholder, to rely on the bylaws

12        of the corporation?

13   A.   Yes.

14   Q.   Okay.  The same article says they will

15        prepare a profit and loss statement.  Did you

16        ever get a profit and loss statement?

17   A.   No.

18   Q.   Okay.  Do you know what a profit and loss

19        statement is?  Income, expenses; that's what

20        a profit and loss statement is.

21   A.   Other than that (indicating).

22   Q.   Okay.  And are you referring to what I'll

23        call a recapitulation that was provided in

158

```
 1        2005?

 2   A.   Yes.

 3   Q.   And that recapitulation, as I'll call it,

 4        went back to 1990, correct?

 5   A.   Yes.

 6   Q.   Okay.  Or '91.  To that date, other than what

 7        I'll call the recapitulation which is in

 8        evidence, you never got these things

 9        annually, meaning '91 --

10   A.   No.

11   Q.   -- '92; is that right?

12   A.   '93 --

13   Q.   All the way through.  Do you consider a

14        majority stockholder, Dick Dorsey,

15        responsible to abide by the bylaws of this

16        corporation?

17             MR. CLEVELAND:  Object to the form.

18   Q.   You can answer.

19   A.   Yes.

20   Q.   Did he abide by the bylaws of this

21        corporation in your opinion?

22   A.   No.

23   Q.   Did he make every effort in his ability to
```

161

```
 1    A.   Yes.

 2    Q.   Okay.  You heard Mr. Dorsey say yesterday in

 3         his testimony that the reason that the

 4         beautiful big sign on the property, the

 5         billboard, that the income is not flowing

 6         from Lamar Advertising to I-65 was because

 7         his son had the permit for the sign?  Did you

 8         hear him say that?

 9    A.   Yes.

10    Q.   Did you notice that there was a significant

11         difference -- I don't know the exact fact,

12         but it seems like I-65 gets about $600 a

13         year; and his son, who I think is eight years

14         old, is getting $600 a month or $5,400 a

15         year.  Did you hear that testimony?

16    A.   Yes.

17    Q.   Did it cross your mind as to whether or not

18         Mr. Dorsey could have acquired a permit for

19         the sign in the name of his company, I-65

20         Properties, rather than his son?  Did that

21         raise any question in your mind?

22    A.   Yes.

23    Q.   Did that likewise raise any question in your
```

162

```
 1            mind as related in this complaint that the

 2            profits of I-65 have been diverted by your

 3            brother, Mr. Dorsey, from I-65 to his son?

 4     A.     Yes.

 5     Q.     Okay.  You heard your brother's testimony

 6            yesterday; is that correct?

 7     A.     Yes.

 8     Q.     If I were to summarize his testimony with

 9            regard to the I-65 option on the four tracts

10            of property contiguous to and across from

11            east of the service road, would I be correct

12            in saying that he said that I-65 did have an

13            option on those four tracts at one time?

14                 MR. CLEVELAND:  Object to the form.

15     Q.     You can answer it.

16     A.     Yes.

17     Q.     Were you aware that I-65 had an option on

18            those four tracts?

19     A.     No.

20     Q.     Were you aware that Mr. Dorsey, the majority

21            stockholder, either allowed them to expire or

22            transferred them to a corporation known as

23            Connie, Dick & Others, or an LLC or some
```

165

1    that. Did Mr. Dorsey either give the

2    corporation, I-65, or you an opportunity to

3    buy that property?

4  A. No.

5  Q. I think Mr. Dorsey indicated yesterday that

6    one reason he did not think I-65 should or

7    could buy it was because it had so much debt

8    and couldn't afford it. Is that your

9    understanding of his testimony?

10  A. Yes.

11  Q. And that was his reason for not offering it

12    to yourself or the corporation; is that

13    correct?

14  A. Yes.

15  Q. You heard Mr. Dorsey's testimony, your

16    brother, stating that -- or asking, I guess,

17    did -- and you were questioned this morning

18    did you ever try to refinance the debt. My

19    question is do you believe the majority

20    stockholder, Mr. Dorsey, had a duty as the

21    majority stockholder to try to refinance the

22    debt?

23  A. Yes.

166

| | |
|---|---|
| 1 | Q. In other words, if the interest rate at |
| 2 | certain times was five and a half percent, |
| 3 | would the fact that he was charging -- his |
| 4 | company, Dorsey Motor Company, was charging |
| 5 | 12 percent constitute wrongful conduct, in |
| 6 | your opinion, by him as the majority |
| 7 | stockholder? |
| 8 | A. Yes. |
| 9 | Q. Would that be even more so where it's his own |
| 10 | flesh and blood; it's you, his sister, that |
| 11 | he's charging? |
| 12 | MR. CLEVELAND: Object to the form. |
| 13 | Q. You can answer. |
| 14 | A. Yes. |
| 15 | Q. Did that hurt your feels? |
| 16 | A. Yep. Yes. |
| 17 | Q. But you didn't find out about the 12 percent |
| 18 | until way late in the game, did you? |
| 19 | A. Correct. |
| 20 | Q. Okay. You don't really understand the |
| 21 | difference sometimes between -- or do you |
| 22 | understand the difference between you as a 30 |
| 23 | percent stockholder of I-65 and you as a |

167

```
 1              retired teacher?

 2                   I'll restate it.  I'm asking you what

 3              led up to your agreeing to convey your share

 4              to Mr. Dorsey in exchange for his forgiving

 5              the debt.  Are you with me on that?

 6    A.   Yes.

 7    Q.   Okay.  Follow me.  When Mr. Dorsey -- or did

 8         there come a time when Mr. Dorsey told you

 9         that you -- and I mean you, not you as a

10         minority stockholder.

11    A.   Right.

12    Q.   -- owed 500,000 plus debt?

13    A.   Yes.

14    Q.   Did you understand that, at that time, you

15         never signed a note?

16    A.   Correct.

17    Q.   Did you understand at that time that you

18         might, as a result of his comment that you

19         owed it, lose your home, business?

20    A.   Yes.

21    Q.   Did that frighten you?

22    A.   Extremely.  Yes.

23    Q.   Did he ever tell you, Donna, the corporation
```

168

```
 1            is the only one that owes the debt and the

 2            worst that could ever happen is I, Dorsey

 3            Motor, could foreclose on the corporation,

 4            I-65, and take the property if it was a valid

 5            debt?  Did he tell you that?

 6       A.   No.

 7       Q.   Did you understand that you would have no

 8            personal liability if Mr. Dorsey -- and we're

 9            assuming if he holds this to the year 2090,

10            the debt is going to increase.

11       A.   Yes.

12       Q.   Did he ever tell you that the worst you could

13            lose would be your share, your 30 percent of

14            the property?

15       A.   No.

16       Q.   Did he ever tell you that if he foreclosed on

17            the property, he, Dorsey Motor Sales, would

18            have ordinary income of approximately

19            $1,700,000?

20                 MR. CLEVELAND:  Mr. Roberts, I mean,

21                      you're --

22       A.   No.

23                 MR. ROBERTS:  She can answer.
```

169

```
 1              MR. CLEVELAND:  Hey, no.

 2              MR. ROBERTS:  No?

 3              MR. CLEVELAND:  I'm going to object.

 4                   You're testifying for her.  You're

 5                   not asking --

 6              MR. ROBERTS:  I thought that was a

 7                   question.

 8              MR. CLEVELAND:  No, it wasn't.  You are

 9                   creating a scenario.  You are

10                   creating scenario.  I mean, you

11                   can ask her did he ever tell you

12                   you were going to go to the moon.

13                   I mean, it --

14    Q.   Did he ever tell you you were going to go to

15         the moon?

16    A.   No.

17              MR. CLEVELAND:  Did he ever tell you he

18                   was going to go to the moon?

19              MR. ROBERTS:  Did you want to object to

20                   that?  I allowed you free reins

21                   with her.  I let you run in an 80

22                   acre field with her and never

23                   objected but once.
```

170

```
 1              MR. CLEVELAND:  I ran in an 80 acre

 2                   field and kept my questions

 3                   directed to the allegations before

 4                   us.  All you're doing is

 5                   testifying -- or attempting to

 6                   testify for her and creating these

 7                   scenarios and saying follow me,

 8                   follow me, and she's sitting there

 9                   saying yes and no.  She hasn't

10                   given a substantive answer yet.

11              MR. ROBERTS:  Oh, really?

12              MR. CLEVELAND.  No.  That's my opinion.

13              MR. ROBERTS:  Well, when you said no,

14                   that strikes me as being a

15                   substantive answer.

16              MR. CLEVELAND:  Well, I thought you

17                   said her answers were I don't

18                   know, maybe.  But --

19              MR. ROBERTS:  Maybe I'm making the

20                   questions where she can understand

21                   them.  All I'm saying --

22              MR. CLEVELAND:  No, what you're doing

23                   is you are --
```

171

```
 1            MR. ROBERTS:  I consider you a good
 2                 lawyer.  And you are --
 3            MR. CLEVELAND:  -- attempting to
 4                 testify for her.  And it's totally
 5                 improper.
 6            MR. ROBERTS:  Well, let me try to see
 7                 if I -- I don't think I was.  But
 8                 let's go forward, and let me ask
 9                 her straight questions.  I'm not
10                 giving her answers.  I'm asking
11                 her straight questions.  And
12                 here's one, for example.
13    Q.   Have you been kept in the dark and not
14         allowed to participate in the day-to-day
15         decisions of I-65 Properties?
16            MR. CLEVELAND:  And I would object to
17                 the form of that.
18    Q.   And you can answer, Donna.
19            MR. CLEVELAND:  You know, what does
20                 keep in the dark -- kept in the
21                 dark mean?
22    Q.   You can answer.
23            MR. ROBERTS:  And you can object to
```

```
 1              form.

 2    Q.   You may answer the questions.

 3    A.   Yes.

 4    Q.   And is that one of the basis of your --

 5         continuing basis of your complaint against

 6         the majority stockholder:  That he has failed

 7         to inform you, failed to hold regular

 8         meetings, failed to audit the balance sheet

 9         as required by the bylaws, failed to provide

10         profit and loss statements?  Are those some

11         of the allegations in your complaint?

12    A.   Yes.

13    Q.   Does transferring -- I think I've already

14         asked you, but I want to keep it simple for

15         Mr. Cleveland.  Does obtaining a lease for

16         his son on a billboard which creates revenue

17         for his son and not for I-65 in your opinion

18         constitute all through your complaint an

19         abuse by him as majority stockholder?

20    A.   If that's true, yes.

21    Q.   Okay.  If he testified to that yesterday, do

22         you have any reason to disagree with your

23         brother's testimony that that's what he did?
```

177

1              don't recall.

2              MR. ROBERTS:  Go slow so she can get

3                   it.

4              MR. CLEVELAND:  Oh, she can get it.

5                   She's good.

6    Q.   In fact, Ms. Dorsey, it's good that he said

7         hand feed, because I noticed when you were

8         answering questions, every answer to the

9         question he asked you was contained in the

10        complaint.  Specifically like why did he do

11        this, and said he did this because.  But

12        that's okay.  He hand fed you a little bit;

13        maybe I'll hand feed you.

14             MR. ROBERTS:  All right.  And I will

15                  point out for Mr. Cleveland that

16                  my client teared up twice where

17                  yours didn't, and perhaps she is

18                  under a little emotional pressure

19                  and maybe didn't understand either

20                  of our questions.  But let's go

21                  ahead.

22             MR. CLEVELAND:  Appreciate you pointing

23                  that out to me.  I missed it.

178

| | |
|---|---|
| 1 | MR. ROBERTS: Okay. Well, you were too |
| 2 | busy laughing. |
| 3 | MR. CLEVELAND: No, I was laughing at |
| 4 | you is what I was laughing at. |
| 5 | MR. ROBERTS: Oh, okay. Off the |
| 6 | record. |
| 7 | (Off-the-record discussion) |
| 8 | Q. So would you say, Ms. Dorsey -- Ms. Davis, |
| 9 | excuse me, that Dick's testimony yesterday |
| 10 | that you heard, when one reads it in his |
| 11 | deposition, without me summarizing all of it, |
| 12 | that his testimony alone is a basis for your |
| 13 | allegation of freeze out, failure to keep |
| 14 | informed, all of the allegations in your |
| 15 | complaint? |
| 16 | A. Yes. |
| 17 | Q. You're a retired school teacher, aren't you? |
| 18 | A. Yes. |
| 19 | Q. And Mr. Cleveland is an accomplished lawyer. |
| 20 | You said you liked him, didn't you? |
| 21 | A. Yes. |
| 22 | Q. Okay. That's the two yeses. You like him |
| 23 | and he's an accomplished lawyer, right? |

179

```
 1    A.    Yes.

 2    Q.    Okay.  When he went over this complaint with

 3          you, you didn't draft the complaint yourself,

 4          did you?

 5    A.    No.

 6    Q.    You simply gave -- did you give information

 7          to your lawyer at that time, Ms. Erwin, upon

 8          which she put all the legalese of what we'll

 9          call your grievances against Dick?

10    A.    Yes.

11    Q.    Okay.  So when he -- I won't say grilled, but

12          when he went over that complaint with you and

13          asked you all these questions, although

14          you're not on any drugs, were you in a total

15          state of confusion, yes or no, as to legal

16          terms?

17    A.    Yes.

18    Q.    Okay.  Now, at the time the alleged

19          promissory note was signed, it was signed by

20          Dick Dorsey, 70 percent stockholder and

21          president, and his, at that time, wife,

22          Connie Dorsey; is that right?

23    A.    Yes.
```

180

```
 1   Q.   Okay.  Since neither the bylaws or the

 2        articles of incorporation provide for any

 3        duties of the vice president, is it your

 4        opinion that that's why they didn't ask you

 5        to sign the note?

 6            MR. CLEVELAND:  I object to the form.

 7                She would have no way of knowing

 8                the mental operation of either

 9                Dick or Connie Dorsey.

10   Q.   Okay.  Did the fact that you didn't sign the

11        note, in your opinion, give rise to the fact

12        that you didn't know about such a note until

13        much later?

14            MR. CLEVELAND:  Object to the form.

15   A.   Yes.

16   Q.   You can answer.  Answer.

17   A.   Yes.

18   Q.   Okay.  Mr. Cleveland opened the door as to

19        had you ever -- how many times, was his

20        question, had you sued your brother?  Did you

21        hear him ask you that?

22   A.   Yes.

23   Q.   And your answer was, to my knowledge, none,
```

183

```
 1        you wanted in this lawsuit.  I think you've

 2        already testified you'd like for Mr. Dorsey

 3        to get an independent MAI appraisal; is that

 4        correct?

 5   A.   That would be nice.

 6   Q.   And that would help you, as a minority

 7        stockholder, to make up your mind as to

 8        whether or not -- if he presents an offer to

 9        you, whether or not to accept it or reject

10        it; is that right?

11   A.   Yes.

12   Q.   Okay.  Do you think failing to have the

13        property appraised in all these years with

14        the massive -- I think the Court will take

15        notice of the massive growth at this

16        intersection -- probably the most in the

17        state -- is negligence on his part not having

18        an appraisal?

19   A.   Yes.

20   Q.   I'm going to ask you this, Ms. Dorsey --

21        Ms. Davis.  I'm conceding that after he told

22        you you personally -- you perceived that you

23        personally would owe 500,000 plus debt; is
```

184

```
 1            that correct?

 2     A.   Yes.

 3     Q.   That's your earlier testimony.  And I think

 4            you testified that it frightened you; isn't

 5            that right?

 6     A.   Definitely.  Yes.

 7     Q.   So at that point, all you wanted was out; is

 8            that correct?

 9     A.   Yes.

10     Q.   You hadn't spoken to a lawyer?

11     A.   No.

12     Q.   Or an accountant?

13     A.   Nope.

14     Q.   And Dick wrote you at a point and said it

15            sounds good, right?

16     A.   I called him, and he said it sounds good.

17     Q.   Okay.

18     A.   But that he had to talk to his accountant.

19     Q.   As majority stockholder and you minority, him

20            president, you vice president with no duties

21            that I can see prescribed, would he have had

22            a better opinion -- and this is in your

23            opinion -- of the market value of the
```

185

```
 1           property and thus whether it was a good deal

 2           for the minority stockholder, meaning you, to

 3           sell out to him?

 4      A.   Yes, I think so.

 5      Q.   Did he suggest to you, Donna, I want to be

 6           fair with you so let's get the property

 7           appraised and that way I can buy your share

 8           for the debt?  Did he suggest that?

 9      A.   No.

10      Q.   In fact, he's basically been camped out on

11           this property on one side of the freeway or

12           another for years, hasn't he?  The Suzuki

13           dealership, Victory.  He's been here almost

14           every day of his life in Prattville, Alabama

15           except when he was traveling; is that

16           correct, to your knowledge?

17      A.   Yes.

18      Q.   Adult life I should say.  And I think the

19           record shows that for many of these years,

20           you lived either in Greenville or Birmingham;

21           is that correct?

22      A.   Atlanta.

23      Q.   So you --
```

186

| | | |
|---|---|---|
| 1 | A. | Birmingham. |
| 2 | Q. | You, as a minority stockholder, would have |
| 3 | | had very little opportunity to observe the |
| 4 | | growth or, for that matter, what was going on |
| 5 | | with the I-65 property; is that correct? |
| 6 | A. | Yes.  When I came down to take care of mamma |
| 7 | | I certainly -- I mean, I certainly saw |
| 8 | | changes when we would visit.  But when it |
| 9 | | really started booming -- |
| 10 | Q. | Now, that's interesting.  When you came down |
| 11 | | to take care of mamma.  I think you testified |
| 12 | | on direct that your mother suffered a serious |
| 13 | | stroke; is that correct? |
| 14 | A. | Yes. |
| 15 | Q. | Approximately how long did you take care of |
| 16 | | mamma?  From the time of the stroke to her |
| 17 | | death, approximately how long was that?  How |
| 18 | | long did you actually take care of her? |
| 19 | A. | Almost nine years. |
| 20 | Q. | Did you hire sitters during that time? |
| 21 | A. | Yes. |
| 22 | Q. | Did you sit yourself? |
| 23 | A. | Yes. |

189

1    Q.    Okay.

2    A.    If it happened.

3    Q.    Ms. Davis, final question.  Do you believe

4          that not only as your brother but as the

5          majority stockholder, that Mr. Dick Dorsey

6          has a duty to treat you fairly as a minority

7          stockholder in I-65?

8    A.    Yes.

9    Q.    Do you believe that he did treat you fairly?

10   A.    No.

11              MR. ROBERTS:  Any follow-up,

12           Mr. Cleveland?

13                   EXAMINATION

14   BY MR. CLEVELAND:

15   Q.    Ms. Davis, I understood one of your responses

16         to be that you want Dick to buy you out; is

17         that right?  Out of the property?

18   A.    I think that is a nice possibility.

19   Q.    Is that why you want the appraisal, so he can

20         buy you out?

21   A.    I want the appraisal to know what the land is

22         worth.

23   Q.    Do you have someone that's interested in the

190

| | | |
|---|---|---|
| 1 | | land? |
| 2 | A. | Me personally, no. |
| 3 | Q. | Well, has anyone told you that they were |
| 4 | | interested in the land? |
| 5 | A. | No. |
| 6 | Q. | Okay.  But you want -- you're just kind of |
| 7 | | wondering what it's worth?  Is that what |
| 8 | | you're telling us? |
| 9 | A. | Exactly. |
| 10 | Q. | Don't you agree with me -- or wouldn't you |
| 11 | | agree with me that it would be much more |
| 12 | | appropriate to have an appraisal done when |
| 13 | | you have someone that is a legitimate buyer |
| 14 | | than just to randomly have appraisals done |
| 15 | | and incur those expense on a periodic basis? |
| 16 | A. | I think, due to the number of years, it would |
| 17 | | be very smart to have an appraisal of the |
| 18 | | land at this point. |
| 19 | Q. | To use in what way?  How are you going to |
| 20 | | utilize the appraisal? |
| 21 | A. | Well, I think when -- when you own 30 percent |
| 22 | | of something and you don't know what it's |
| 23 | | worth, that that's not very good.  I think |

```
 1              anybody would want to know what it's worth.
 2      Q.      Have you --
 3      A.      An owner.
 4      Q.      Have you ever asked Dick to have an appraisal
 5              done, yes or no?
 6      A.      I have to think.  I can't just say no, I
 7              didn't.  And then what if I had?  And then
 8              I've answered you, and then I really don't
 9              know.
10      Q.      Well, you had a real fast yes or no to
11              Mr. Roberts' questions.  I just thought maybe
12              you could give me a real fast yes or no.
13      A.      Well, you asked me about something did I, you
14              know.
15      Q.      Yeah.  Did you ever ask him to have an
16              appraisal done, yes or no?
17      A.      Not to my knowledge, no.
18      Q.      Okay.  Did you ever ask him for a copy of an
19              audit, yes or no.
20      A.      That's what I thought we got in the meetings.
21      Q.      Did you ever ask him for a copy of an audit,
22              yes or no?
23      A.      Yes.
```

192

```
 1      Q.   When?

 2      A.   I don't know.  I don't recall.

 3      Q.   Don't recall.  Maybe, perhaps.  Did you ever

 4           ask him for a financial statement, yes or no?

 5      A.   Yes.

 6      Q.   When?  Don't recall, correct?

 7                MR. ROBERTS:  Now, we'll move -- it's

 8                     okay for her to ask you questions,

 9                     but you don't ask and answer them,

10                     okay?  I can direct you to Article

11                     VIII of the bylaws, which --

12      Q.   Did you understand as a shareholder that you

13           had the right to call a shareholder meeting?

14      A.   No, I didn't.

15      Q.   Did not know that.  Did you understand that

16           as a shareholder that you had a right to ask

17           for a copy of the profit and loss or any

18           other corporate records?

19      A.   We did request -- it was requested, but it

20           didn't happen.

21      Q.   Okay.

22      A.   It was asked for, but it didn't -- there was

23           no response.
```

193

| | |
|---|---|
| 1 | Q. Do you recall the correspondence back to your |
| 2 | attorney, Ms. Erwin, that said that you or |
| 3 | your auditor or anyone could go up to Alan |
| 4 | Taunton's office and go through any of these |
| 5 | records whenever you wanted?  Do you recall |
| 6 | that correspondence? |
| 7 | A. No. |
| 8 | MR. ROBERTS:  It's in this one. |
| 9 | Mr. Cleveland, I'll submit there |
| 10 | has been a document in evidence |
| 11 | where Mr. Taunton responded and |
| 12 | said if there are any other |
| 13 | questions, you can come to my |
| 14 | office and I'll go over them with |
| 15 | you. |
| 16 | MR. CLEVELAND:  That was my |
| 17 | recollection, but I can't see |
| 18 | that. |
| 19 | MR. ROBERTS:  Well, you're correct. |
| 20 | MR. CLEVELAND:  I can't see that. |
| 21 | MR. ROBERTS:  And somewhere, as her |
| 22 | attorney, I'll remind her that |
| 23 | there is a document perhaps in the |

194

```
1                          rest of those exhibits.  But in

2                          the interest of time, that

3                          Mr. Taunton -- now, it did come at

4                          a matter of time, maybe 2005 or --

5              MR. CLEVELAND:  Yeah.  Well, I want her

6                          to look at it.  Perhaps it will

7                          refresh her recollection as to

8                          some other issues.

9                              I'm going to come over and

10                          look over her shoulder if I may.

11             MR. ROBERTS:  Sure.  You may approach

12                          the witness.

13   Q.    I didn't ask you about this.  I'm glad

14         Mr. Roberts reminded me of it.  Do you recall

15         this exhibit from yesterday?

16   A.    Yes.

17   Q.    Okay.  Did your attorney forward a copy of

18         that correspondence to you in February of

19         '06?

20   A.    I think so, yes.

21   Q.    Okay.  The correspondence says that on

22         October the 18th of 2003, he sent you copies

23         of the tax returns for '98, '99, 2000, 2001,
```

195

| | | |
|---|---|---|
| 1 | | and 2002.  Do you acknowledge receipt of |
| 2 | | those tax returns? |
| 3 | A. | You'd have to talk to my husband. |
| 4 | Q. | Okay.  Do you have any recollection of |
| 5 | | receiving those tax returns? |
| 6 | A. | You'd have to talk to my husband. |
| 7 | Q. | Would your answer be, then, that you have no |
| 8 | | recollection? |
| 9 | A. | I have no recollection. |
| 10 | Q. | That's -- that was my -- |
| 11 | A. | That was 2003.  So -- |
| 12 | Q. | And that was my question.  Do you have any |
| 13 | | recollection? |
| 14 | A. | No. |
| 15 | Q. | And your answer is, no, I don't? |
| 16 | A. | No. |
| 17 | Q. | But I guess a follow-up to the answer would |
| 18 | | be, but my husband may know something about |
| 19 | | it? |
| 20 | A. | Yes. |
| 21 | Q. | Okay.  Now, he also says that the 2003 and |
| 22 | | 2004 -- and he didn't know if Mr. Dorsey had |
| 23 | | forwarded you a copy or not.  Do you see |

196

| 1 | | that? |
|---|---|---|
| 2 | A. | Yeah.  Okay. |
| 3 | Q. | Okay.  He said if he didn't, I'll be happy to |
| 4 | | provide a copy.  Do you have any recollection |
| 5 | | of asking for or receiving the '03 or '04 tax |
| 6 | | returns for I-65? |
| 7 | A. | You'll have to ask Jack. |
| 8 | Q. | But you have no recollection of that? |
| 9 | A. | No. |
| 10 | Q. | He also says that it should be a fairly |
| 11 | | straightforward task to verify the debt of |
| 12 | | the company. |
| 13 | A. | Okay. |
| 14 | Q. | Did you make any effort, prior to filing this |
| 15 | | lawsuit, to exercise that straightforward |
| 16 | | task of verifying the debt of the company? |
| 17 | A. | You'll have to ask Jack. |
| 18 | Q. | Did you? |
| 19 | A. | No. |
| 20 | | MR. ROBERTS:  Objection to the form of |
| 21 | | your question, because I don't |
| 22 | | know if debt includes expenses of |
| 23 | | cleaning the property or if you're |

1          referring to debt meaning the

2          infamous note to brother Dick.

3     MR. CLEVELAND:  I'm --

4     MR. ROBERTS:  I'm just asking --

5     MR. CLEVELAND:  She said that she had

6          received this correspondence.

7     MR. ROBERTS:  I'm just asking you if

8          debt means -- if your question was

9          if debt means the note -- I'm not

10         trying to be picky.  Just if it

11         means the note or if debt of the

12         corporation meant cost of cleaning

13         the property, paying taxes, and

14         things like that.

15    MR. CLEVELAND:  This is not my letter,

16         so I don't know.

17    MR. ROBERTS:  Well, you can ask her --

18    MR. CLEVELAND:  Yeah.

19    MR. ROBERTS:  She can answer

20         anything --

21 Q.   My real question is did you make any effort

22      to exercise this option for the debt,

23      whatever debt may mean?

198

1    A.    Me personally --

2    Q.    And I think the answer was no.

3    A.    -- no.

4    Q.    Okay.

5    A.    Right.

6    Q.    Okay.  And this is also -- I believe this --

7          and Mr. Roberts was right.  This was the

8          correspondence that I was thinking about.

9          And he says if you want to come up and look

10         at the books or have your auditor audit the

11         books, you're welcome to do so.  Did anyone

12         exercise that option?

13   A.    You'll have to ask Jack.

14             MR. ROBERTS:  Just on a follow-up on

15                that when you get through.  I

16                wasn't rushing you.  We can

17                follow-up on that.  We can do this

18                all day.

19   Q.    You testified a moment ago to a question

20         presented to you by Mr. Roberts that learning

21         about the sign was the basis for your

22         lawsuit, did you not?  That in and of itself

23         would constitute the basis for your lawsuit?

203

```
 1    A.   What?

 2    Q.   They lived over on Adell?

 3    A.   Yes.

 4    Q.   Yeah.

 5    A.   Yes.  We didn't -- if we went -- I mean, we

 6         played golf sometimes.  But basically we were

 7         there.  It wasn't go out to restaurants and

 8         stuff.  It was stay at the house.

 9    Q.   So you were not aware of the growth that was

10         taking place out Main Street or Cobbs Ford or

11         out Highway 14 toward --

12    A.   As it gradually happened, yeah.

13    Q.   Okay.

14    A.   I mean, we'd go down to Hope's and downtown

15         and -- but we didn't -- it was simple

16         things.

17              MR. CLEVELAND:  Okay.  That's all I

18              have.  Thank you.

19              MR. ROBERTS:  About two follow-ups.

20                   EXAMINATION

21    BY MR. ROBERTS:

22    Q.   He showed you -- Mr. Cleveland showed you a

23         February 3rd, 2006 letter with a marked
```

204

```
 1          Plaintiff's Exhibit #9.  And you're not sure
 2          if you got the tax returns.  Your testimony
 3          was, if I did, Jack would be able to answer
 4          that.
 5     A.   Correct.
 6     Q.   Okay.  Now, think with me.  Do you think that
 7          providing tax returns -- and we're assuming
 8          the date of the letter, February 3rd, 2006 --
 9          for eight years ago -- meaning he says '98,
10          '99, 2000, 2001, 2002 -- is that timely to be
11          provided these tax returns?
12               MR. CLEVELAND:  Object to the form.
13     Q.   You can answer.
14     A.   No.
15     Q.   Would it have been nice for the president to
16          have authorized the accountant or perhaps
17          even made a copy of the tax returns and
18          mailed them to you?
19     A.   Yes.
20               MR. CLEVELAND:  Object to the form.
21     Q.   Are you offended because he didn't?
22               MR. CLEVELAND:  Object to the form.
23     A.   Yes.
```

205

```
 1    Q.   Is that part of your complaint in the --
 2              MR. ROBERTS:   Continuing object to the
 3         form.
 4    Q.   Is that part of the complaint contained in
 5         the complaint you filed against your brother?
 6              MR. CLEVELAND:   Object to the form.
 7    A.   Yes.
 8    Q.   Okay.   Now, I'm looking again at what I'll
 9         call the bullet document, the bylaws.  And I
10         think bylaws -- and I think Mr. Cleveland
11         will admit that every stockholder is deemed
12         to know the bylaws of the corporation.  Do
13         you understand that?
14    A.   Yes, I do.
15    Q.   Okay.   When I think as I call it the bullet,
16         if -- I'm not an accountant, and you're a
17         school teacher.  But if the bylaws required
18         every single year that a balance sheet be
19         prepared, it is my understanding and I submit
20         to you that a balance sheet is the value of
21         the assets of the company less the
22         liabilities which gives you the net worth.
23         In other words, what we own, the value of
```

206

1    what we own, what we owe, and you're either

2    positive or negative somewhere down there.

3    Is that your understanding of a balance

4    sheet?

5         MR. CLEVELAND:  Object to the form.

6  A.  Yes.

7  Q.  Okay.  Do you consider the fact that -- well,

8    let me strike that.  Without an appraisal --

9    assuming Mr. Dorsey had followed the bylaws

10    of which he's the majority stockholder, how

11    could anyone know, to prepare a balance

12    sheet, what the value of the assets are

13    without an appraisal?  Help me with that.

14  A.  I don't know.

15  Q.  Do you think -- I guess I'm missing

16    something.  But perhaps Dick Dorsey had the

17    right to ignore, as majority stockholder,

18    Article VIII of the bylaws of the company.

19    Do you think he had a right to ignore that?

20         MR. CLEVELAND:  Object to the form.

21  A.  No.

22  Q.  Had he abided by that and provided you with

23    an audited, by a disinterested party, balance

207

```
 1          sheet, profit and loss statement during all

 2          of those years, do you think you'd have a

 3          complaint against him as we sit here today?

 4               MR. CLEVELAND:  Object to the form.

 5     A.   No.

 6               MR. ROBERTS:  She can answer it.

 7               MR. CLEVELAND:  She did.

 8               MR. ROBERTS:  No further questions.

 9               MR. CLEVELAND:  I have none.

10               MR. ROBERTS:  Thank you.  Thank you,

11               Mr. Dorsey.

12                    (The deposition concluded at

13                    2:02 p.m.)

14               *  *  *  *  *  *  *  *  *  *  *

15               FURTHER DEPONENT SAITH NOT

16               *  *  *  *  *  *  *  *  *  *  *

17

18

19

20

21

22

23
```

208

REPORTER'S CERTIFICATE

STATE OF ALABAMA

ELMORE COUNTY

I, Dee Coker, Registered Professional
Reporter and Commissioner for the State of
Alabama at Large, hereby certify that on Tuesday,
March 13, 2007, I reported the deposition of
DONNA DORSEY DAVIS, who was first duly sworn or
affirmed to speak the truth in the matter of the
foregoing cause, and that pages 4 through 207
contain a true and accurate transcription of the
examination of said witness by counsel for the
parties set out herein.

I further certify that I am neither of kin
nor of counsel to any of the parties to said
cause, nor in any manner interested in the
results thereof.

This 16th day of March, 2007.


DEE COKER, CSR, RPR
Commissioner for the
State of Alabama at Large

MY COMMISSION EXPIRES: 1/25/2009

# EXHIBIT "2"

## Deposition of Richard Dorsey

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                   NORTHERN DIVISION

4

5     DONNA DORSEY DAVIS,

6              Plaintiff,

7     vs.                    CASE NO. 2:06CV766-MHT

8     RICHARD M. DORSEY, etc.,
      and CD&O, LLC, etc.,

9              Defendants.

10

11

12

13              * * * * * * * * * * *

14          DEPOSITION OF RICHARD M. DORSEY, taken

15     pursuant to stipulation and agreement before Dee

16     Coker, Registered Professional Reporter and

17     Commissioner for the State of Alabama at Large,

18     in the Law Offices of Cleveland & Colley, 744

19     East Main Street, Prattville, Alabama, on Monday,

20     March 12, 2007, commencing at approximately

21     10:03 a.m.

22              * * * * * * * * * * *

23

2

APPEARANCES

FOR THE PLAINTIFF:

Mr. James E. Roberts
Attorney at Law
4908 Cahaba River Road
Birmingham, Alabama  35243

Ms. Lindsay Erwin
MEACHAM, EARLEY & FOWLER
Attorneys at Law
1321 Broad Street
Phenix City, Alabama  36867

FOR THE DEFENDANTS:

Mr. Clifford W. Cleveland
CLEVELAND & COLLEY
Attorneys at Law
744 East Main Street
Prattville, Alabama  36067

ALSO PRESENT:

Ms. Donna Dorsey Davis

\* \* \* \* \* \* \* \* \* \* \*

EXAMINATION INDEX

RICHARD M. DORSEY
     BY MR. ROBERTS                    5

EXHIBIT INDEX

PLAINTIFF'S EXHIBIT NO.:

1     Certificate of Incorporation    9,167
      of I-65 Properties, Inc.

2     Name Reservation Certificate    10
      for I-65 Properties, Inc.

1        Cleveland, this -- your attorney?

2    A.   Yes.

3    Q.   All right.  Now, I understand that there came

4         a time -- and I want to get some documents in

5         because, as I said, most of this goes back to

6         the '90s.  And there came a time when there

7         was an incorporation of a company called I-65

8         Properties, comma, Incorporated; is that

9         correct --

10   A.   Correct.

11   Q.   -- to the best of your knowledge?  Okay.  I

12        call this housekeeping, just to get them in

13        so that when we question --

14            MR. ROBERTS:  Here's a copy,

15                Mr. Cleveland.  Here's a copy of a

16                document, and we'll mark that

17                Plaintiff's #1, please.

18   Q.   Does that appear, to the best your knowledge,

19        to be a copy of the certificate of

20        incorporation of the company?

21   A.   Yes.

22   Q.   All right.  And I notice the date is the 9th

23        day of October, 1990, and it is sealed by the

```
 1          Judge of Probate and signed by the Judge of
 2          Probate.  So for our purposes here today, we
 3          can assume that this is a correct copy of the
 4          certificate of incorporation; is that
 5          correct?
 6     A.   Yes.
 7     Q.   All right.  Now, I likewise --
 8               MR. ROBERTS:  Let me give your attorney
 9                    a copy of this.  We'll mark this
10                    Plaintiff's #2.
11     Q.   I'll go ahead and give this to you.  This
12          appears to be a recognition by the Secretary
13          of State as to the name reservation for I-65
14          Properties, Inc.  Does that appear to be a
15          correct document to you?
16     A.   Yes.
17     Q.   Okay.  And it appears to be dated -- the name
18          was reserved September 24th of 1990.
19               MR. ROBERTS:  All right.  Plaintiff's
20                    #3 in order.
21     Q.   I'll next show you a certificate -- excuse
22          me -- articles of incorporation which are
23          dated -- stamped by the Elmore County Circuit
```

13

| | | |
|---|---|---|
| 1 | | incorporation -- or the original |
| 2 | | bylaws. |
| 3 | Q. | Are those your initials, RMD, to the best of |
| 4 | | your knowledge? |
| 5 | A. | Yes. |
| 6 | Q. | Okay.  And absent -- and without regard to |
| 7 | | any markings that may be on it, it looks like |
| 8 | | there's some typos.  Well, the word on page 9 |
| 9 | | says, certificate property endorsed, someone |
| 10 | | has slashed in properly; but we will |
| 11 | | stipulate that anything other than the typed |
| 12 | | word is what you've signed.  And that is your |
| 13 | | signature attached hereto; is that correct? |
| 14 | A. | Yes. |
| 15 | Q. | Okay.  And that document is likewise dated |
| 16 | | the 1st day of October, 1990. |
| 17 | | MR. ROBERTS:  This will be Plaintiff's |
| 18 | | #5 in order. |
| 19 | Q. | Okay.  Does that appear to be a true and |
| 20 | | correct copy of a note signed October 1st, |
| 21 | | 1990, a promissory note from I-65 Properties |
| 22 | | to Dorsey Motor Sales, Inc.? |
| 23 | A. | Correct. |

14

```
 1    Q.   Okay.  And it is attested by Connie Dorsey.

 2         Now, I believe that was your -- she was your

 3         wife at the time; is that correct?

 4    A.   Yes.

 5    Q.   Is she still -- does she still live in

 6         Prattville?

 7    A.   Yes.

 8    Q.   And it shows you as president.  Who do -- who

 9         is the current secretary of I-65 Properties,

10         Inc., if you know?

11    A.   I -- I'd have to look at the minutes.

12    Q.   Okay.  And who normally keeps the minutes?

13         Who drafts the minutes of I-65?

14    A.   Either Mr. Cleveland's office or my secretary

15         over at the dealership.

16    Q.   Is that Ms. Perry?

17    A.   Yes.

18    Q.   That is her.  Okay.  Now, I may be skipping

19         around a little bit; but I understand, just

20         for the record, that from about 1990, the

21         inception of the corporation, until maybe

22         2000 -- somewhere, give or take, around

23         2000 -- there were no minutes taken of the
```

```
 1        corporation; is that correct?

 2   A.   I haven't looked at my records, so I can't

 3        answer that.

 4   Q.   All right.  And how would we -- where are the

 5        records of I-65 kept?

 6   A.   Kept at the dealership.

 7   Q.   Okay.  Kept in a file cabinet or --

 8   A.   I would say so.

 9   Q.   If your sister said that between the year --

10        from the inception of the corporation until

11        2000, there were no meetings held of the

12        corporation and she didn't receive any

13        correspondence during that period, would you

14        have any reason to disagree with that?

15   A.   I wouldn't think that would be correct.

16   Q.   Okay.  If I asked your attorney to provide

17        all the minutes and records and, of course,

18        at our expense, the copying, would you have

19        any problem with agreeing to furnish all the

20        minutes from the inception of the corporation

21        to the current date?

22   A.   No.

23   Q.   All right.  Let me see what else I need to
```

16

```
 1            get, and then we'll go to some questions.

 2                 All right.  Now, I'm informed, back to

 3            the I-65 investment -- and I'll just -- for

 4            the record, I'll just call it I-65 -- that

 5            there came a time in 1990 when Dorsey Motor

 6            Sales was defending a lawsuit regarding the

 7            running back of a speedometer.  Does that

 8            ring a bell to you?  Are you -- do you

 9            remember that?

10     A.     No.  Had nothing to do with that.

11     Q.     I mean, are you aware that there was such a

12            lawsuit?

13     A.     Oh, there's been several lawsuits.

14     Q.     All right.  Are you aware that sometime

15            around '88, '89, '90, there was a particular

16            lawsuit that involved the turning back of a

17            speedometer?

18     A.     No.

19     Q.     All right.  Let's go back to Mr. -- your dad,

20            Richard T. Dorsey, and your mother owned --

21            about the time that this transfer -- that the

22            I-65 was formed, I think they owned 60

23            percent, together, of Dorsey Motor Sales and
```

1      you owned 40 percent; is that a correct

2      statement?

3  A.  That's correct.

4  Q.  Okay.  Now, I'm also informed that sometime

5      around the inception of this corporation,

6      I-65, that Mr. and Mrs. Dorsey elected to

7      make a gift of 30 percent of a parcel of

8      property that we'll refer to in a minute as

9      the I-65 nine point some acres and that she

10     gave that 30 percent -- by she, your mother

11     and dad -- gave that 30 percent to Donna; is

12     that correct?

13  A.  No.

14  Q.  That's not correct.  All right.  Then I'm

15     also incorrect if I say that since they owned

16     60 percent of the dealership and you owned

17     40, meaning the Chrysler dealership, Dorsey

18     Motor -- it is Dorsey Motor Sales back then?

19     Is that the correct name?

20  A.  Correct.

21  Q.  Okay.  And that since you owned 40 percent,

22     that they gave you a 30 percent, Donna a 30

23     percent; and since you already owned 40 of

18

|   |   |   |
|---|---|---|
| 1 |    | the dealership, that's how we got to the 70 |
| 2 |    | percent of I-65 owned by you and 30 by |
| 3 |    | Donna.  Is that incorrect? |
| 4 | A. | That's incorrect. |
| 5 | Q. | Tell me how I-65 wound up owning -- you |
| 6 |    | owning 70 percent of the stock and Donna |
| 7 |    | owning 30. |
| 8 | A. | My father and I had had a discussion |
| 9 |    | concerning the property that Dorsey Motor |
| 10 |   | Sales, Inc., owned at I-65.  And we decided |
| 11 |   | that the property was vulnerable connected to |
| 12 |   | Dorsey Motor Sales and the automobile |
| 13 |   | business at that time due to litigation in |
| 14 |   | the state, the atmosphere of litigation.  And |
| 15 |   | we elected to move the property out of Dorsey |
| 16 |   | Motor Sales, Inc., into a company called I-65 |
| 17 |   | Properties, Inc. |
| 18 | Q. | Okay.  And how had Dorsey Motor Sales |
| 19 |   | acquired the property we're referring to, the |
| 20 |   | nine point something acres? |
| 21 | A. | They purchased it. |
| 22 | Q. | And who did they purchase it from? |
| 23 | A. | From the Cobb family. |

19

Q.   Okay.  And approximately what year did they
     purchase it?

A.   1987.

Q.   And roughly how much did they pay -- did
     Dorsey pay for it?

A.   $100,000.

Q.   Okay.  And when you say a somewhat -- I don't
     want to misquote you, but a bad environment,
     were -- what do you mean by that as far as
     the dealership deciding to transfer it out?

A.   Just that there was a bad legal environment
     in the state at that time versus car dealers.

Q.   Okay.  And help me with that.  Not being a
     car dealer, I don't -- I don't know what a
     bad environment was.

A.   There was a lot of litigation going on in the
     state.

Q.   And what was the nature of the litigation?

A.   Frivolous.

Q.   Okay.  Frivolous what?

A.   Frivolous litigation.

Q.   All right.  Now, I submit to you that in
     1990, I represented numerous car dealers in

```
 1        Alabama.  And one of them, Lonnie Russell
 2        Ford, Stokes Chevrolet, Art Blue Chevrolet in
 3        Decatur.  And as attorney for them, I don't
 4        remember any frivolous litigation.  So I'm
 5        not trying to tie you down, but I think we're
 6        going to need -- in order to make me
 7        understand what you're saying, I'm going to
 8        have to have a little more suits for -- I
 9        thought it was what we used to call tuning up
10        speedometers.
11   A.   That has nothing to do with it.
12   Q.   Okay.  No bondo in the side, no banana peels
13        in the transmissions to make them run better?
14   A.   No.
15   Q.   Okay.  Well, now, I've given you three that I
16        know were occurring, not by our dealerships;
17        but help me with what -- this pervasive cloud
18        over the automobile industry in 1990, since I
19        don't know.
20   A.   I don't really recall, but I remember there
21        was a lot of litigation going on in the
22        state.
23   Q.   Okay.  So it just behooved Mr. Dorsey, R.T.,
```

21

```
1        your dad, and you.  Who else was in on the

2        decision to transfer that property out of

3        I-65?

4   A.   Our mother.

5   Q.   Okay.  And that would be Mrs. -- your

6        mother's name again?

7   A.   Ann.

8   Q.   Ann Madre Dorsey, right.  All right.  How did

9        y'all decide that Donna, your sister, would

10       only get 30 percent and you would get 70 of

11       I-65?

12  A.   My father asked me to consider my sister in

13       moving the land out of the dealership into

14       the corporation.

15  Q.   And help me with consider.  What did he mean

16       by consider?

17  A.   I'm not really sure, but I took it as meaning

18       to give her some of that land.

19  Q.   Okay.  And I totally agree with your -- I

20       don't think he meant to say it, but to give

21       as opposed to sell.  Was that just a mistake

22       of words on your part?

23  A.   He asked --
```

22

Q.   It's my position that it was a gift.

A.   No, it was not a gift.  It was a sale.

Q.   So you would like to change that and say it was the family decision to sell my sister 30 percent and me 70; is that right?

A.   It was the family position to move the land out of Dorsey Motor Sales, Inc., and sell it to another corporation, I-65 Properties, Inc.  My father then asked me to consider my sister in this matter.

Q.   Okay.  But the fact that you owned 40 percent of Dorsey Motor Sales and that Donna got 30 and that you would have gotten your 40 that you owned plus a 30, you're saying that's just a coincidence; that those numbers just happened to be she gets 30, you got an additional 30 -- because you already owned 40 percent of the assets of Dorsey Motor Sales?  So it is strictly a coincidence; is that right?

A.   That was the formula that I came up with when I met back with my mother and father two weeks later.

23

```
1    Q.   Okay.  And by that formula, you indicated

2         since I own 40 percent, it would only be fair

3         for Donna to only get 30; I own 40.  And

4         whether it was a gift or a sale, the

5         additional 30 would go to you.  I mean, that

6         makes sense.  Is that --

7    A.   That's not the way I looked at it.

8    Q.   Well, help me.  How did you look at it?

9    A.   I looked at it as if my mother and father

10        were both deceased at the same time and that

11        my sister would get half of the estate and I

12        had get the other half; therefore, 30 and 30.

13   Q.   Well, I'm sorry, then.  I totally apologize.

14        That's exactly what I was -- the point I was

15        trying to make.  And you already owning 40

16        percent and the land was in Dorsey Motor

17        Sales, it -- it wouldn't be fair for you --

18        I'm not challenging the 30 to Donna.  It

19        wouldn't be fair for you to get 50 and 50,

20        because you already owned 40.  So we've got

21        30 to you, 30 to Donna, which represented the

22        sum total of your mother and father's

23        ownership stock in Dorsey Motor?
```

24

```
 1              MR. CLEVELAND:  I think you're taking
 2                   it a step beyond what he did.
 3              MR. ROBERTS:  All right.  Well, let's
 4                   say what they did, then.
 5     Q.   The sum total --
 6              MR. CLEVELAND:  Well, I think he was
 7                   the one that said that he came up
 8                   with the proposal.
 9              MR. ROBERTS:  Okay.
10              MR. CLEVELAND:  I mean, you're the one
11                   that's adding the 40 back to it.
12              MR. ROBERTS:  Okay.  Well, I guess
13                   you're right.  Let me -- I don't
14                   want to belabor this, because I
15                   think --
16              MR. CLEVELAND:  Well, we're getting
17                   real close to it.  We've been on
18                   this for some time now.
19              MR. ROBERTS:  Well, we may have to stay
20                   on it for a while.
21              MR. CLEVELAND:  Well, we need to move
22                   on.  I mean, you know, once a
23                   question has been asked and
```

27

1          MR. ROBERTS:  Okay.  Well, let's --

2          MR. CLEVELAND:  He said half of 60 is

3               30.  Then you started the

4               mathematical gyrations that --

5               that got us to the point where we

6               are.

7   Q.   Did there -- this is a new question.  Did

8        there come a time when the property was

9        transferred from DMS, Dorsey Motor Sales, to

10       I-65, that you believed that you already

11       owned 40 percent of the nine point something

12       acres?  Yes or no?

13  A.   No.  I -- I sat down and proposed to my

14       parents how the property would move to I-65.

15       And then I also honored my father's wishes

16       and included Donna in I-65.

17  Q.   Okay.  Tell me about their wishes.  They just

18       wanted to see that Donna got 30 percent,

19       correct?  That was their wishes?

20  A.   I'm not sure what their wishes were, because

21       Donna had nothing to do with the property.

22       I -- you know, it was just something my dad

23       asked, and -- and I honored that wish.  And I

28

```
 1            told my father that I would honor that wish

 2            in lieu of any ownership of Dorsey Motor

 3            Sales, Inc.

 4      Q.    All right.  Let's move along, then.  Let's

 5            assume that Dorsey -- according to your

 6            testimony, DMS paid 100,000 for the

 7            property.  That's what you've previously

 8            testified to; is that correct?

 9      A.    Correct.

10      Q.    And I think there came a time when, in 1990,

11            the transfer from DMS to I-65 was apparently

12            sold for somewhere around $230,000.  228.  Is

13            that correct?

14      A.    No.  250.

15      Q.    250.  How was the 250 figure arrived at?

16      A.    The 250 figure was arrived at from an

17            approximate evaluation that arose in another

18            matter.

19      Q.    Okay.  And what was the other matter?

20      A.    The litigation that we -- we had somebody

21            value the property at 250,000.

22      Q.    All right.  Which litigation are you talking

23            about?
```

31

| | | |
|---|---|---|
| 1 | | Properties, Inc. |
| 2 | Q. | And how do you spell it?  Was it the |
| 3 | | Braden -- spell the name of the litigation |
| 4 | | for me that was -- |
| 5 | A. | Alice Braden. |
| 6 | Q. | A-L-I-C-E, B-R-A-D-E-N?  Is that how -- |
| 7 | | MR. CLEVELAND:  If you know. |
| 8 | A. | I don't know how she spelled it. |
| 9 | Q. | But that was a suit in the Autauga County |
| 10 | | Circuit Court, correct? |
| 11 | A. | Correct. |
| 12 | Q. | Okay.  Just so I'll know, did -- was the |
| 13 | | Braden case the one case at that point, |
| 14 | | though, that caused the transfer of the |
| 15 | | property?  Maybe I misunderstood. |
| 16 | A. | No. |
| 17 | Q. | Okay.  So that was just one of many other |
| 18 | | cases going on in the state? |
| 19 | A. | Correct. |
| 20 | Q. | But that case was against Dorsey Motors. |
| 21 | A. | Correct. |
| 22 | Q. | Just generally, five words or less, what were |
| 23 | | the allegations of the Alice Braden case |

```
1            against DMS?

2    A.      The allegation was that we sold a used car

3            for a new car.

4    Q.      Okay.  And I apologize.  I thought it was a

5            speedometer had something to do with it.  Was

6            there any allegation during that case that

7            the speedometer had in fact been reversed?

8    A.      Correct -- no.

9    Q.      No.  All right.

10                MR. ROBERTS:  Now, let me see if I can

11                     find the defensive maneuver

12                     language.  Okay.  Plaintiff's #6.

13                     I'm going to give you time -- we

14                     can go off the record for a few

15                     minutes while he studies that

16                     document.  It's very extensive.

17                     (Brief pause)

18   Q.      You've got a copy of this, I assume?

19   A.      Somewhere probably.

20   Q.      Okay.  I wanted to give you a chance to study

21            it before I asked you questions about it.

22            And the primary point, before we went off the

23            record to allow you time to read it, was
```

33

```
1         the -- this appears to be a document which

2         was produced by Mr. Alan Taunton in response

3         to questions by -- we call him Jack, but John

4         Davis, your sister's husband, your

5         brother-in-law.  Is that your understanding

6         of it at this point?

7    A.   It's a letter from Alan Taunton to John H.

8         Davis.

9    Q.   Okay.  And it appears to be in response to

10        questions that Mr. Davis had asked.  Okay.

11        Now, was Mr. Taunton your accountant at the

12        time of this letter, around February of 2000?

13   A.   Yes.

14   Q.   And he also represented the corporation DMS,

15        Dorsey Motor Sales?

16   A.   Yes.

17   Q.   Okay.  And does he represent you personally?

18        Does he do your personal tax returns also?

19   A.   Yes.

20   Q.   And has he continuously been representing you

21        from let's just say the '90s through the date

22        of this deposition, March of '07?

23             MR. CLEVELAND:  Can you get closer on
```

34

1      the '90s?

2          MR. ROBERTS:  I don't have -- I

3              guess -- well, that's a good

4              question.

5  Q.   Did he represent you at the time of the

6       transfer of the property from DMS to I-65?

7  A.   I'm not sure if it was him or one of the

8       other partners in the firm.

9  Q.   Okay.  But the firm actually, Mr. Diamond or

10      someone, has represented you consistently?

11 A.   Yes.

12 Q.   All right.  Now, I direct your attention in

13      this document to a question called the

14      bullet, meaning a specific pointed question,

15      where Mr. Davis asks for a copy of the note

16      and -- which was dated October -- excuse me.

17      He said, we have a copy of the note; and it

18      was dated October 1, 1990, signed by yourself

19      as president.  And the payee of the note, he

20      responds, which is correct, does not have to

21      sign the note; in other words, the person who

22      is getting the note.  Only the obligor signs

23      the note.

1          Okay.  Now, he -- I draw your attention

2     specifically to Mr. Taunton's statement in

3     the first paragraph under bullet three, This

4     transaction was a defensive manover -- one

5     word, M-A-N-O-V-E-R -- designed to protect

6     the property from possible seizure in the

7     event a judgment was ever rendered against

8     DMS.  Do you see that?

9  A.  Yes, sir.

10 Q.  Do you disagree with Mr. Taunton that the

11    transfer was in the nature of a defensive

12    maneuver, or manover?

13 A.  I -- I can't speak for what Mr. Taunton is

14    thinking.

15 Q.  Okay.  So -- but I'm asking you for your

16    opinion.  It's one of the allegations in this

17    complaint that the transfer was in fact not

18    an arms-length transfer, that it was a --

19    call it a defensive maneuver, call it a

20    gift.  You disagree about both of

21    those categorizations?

22 A.  I disagree with them.

23 Q.  Okay.  And would Mr. Taunton -- do you have

36

1       any idea where -- where or why he would have

2       responded in writing that it was just a

3       defensive manover, maneuver?

4  A.   No, sir.

5  Q.   We'd have to ask him, I assume, right?

6  A.   Yes, sir.

7  Q.   All right.  Now, when he says -- and I'm

8       still on bullet three of Plaintiff's #6:

9       There was no distribution of proceeds by DMS

10      because no cash was collected from I-65.  DMS

11      did report a taxable gain from the sale even

12      though no cash was collected.

13         Is that a correct statement by

14      Mr. Taunton, as to the best of your

15      knowledge?

16  A.   You would have to ask Mr. Taunton.

17  Q.   Well, I'm actually asking you, though.  Do

18      you know if -- what was your title at DMS in

19      1990 -- or in 2000?

20  A.   President.

21  Q.   Okay.  And what was your title in 1990?

22  A.   President.

23  Q.   Okay.  So here today, you can't say that you

39

A.    Taxes would be Alan Taunton.   Bush hogging --

Q.    I'm just using that as an example.   There
came a time, which we'll put it in evidence
later, when someone prepared a
recapitulation, I'll call it, of expenses
over the past years going back from I think
2000 back to the inception of I-65.   I've
seen the document, and I'll fish it out in a
minute.   You might have prepared it in
response to your sister's request?

A.    Either myself or Jo Anne Perry.

Q.    All right.   Now, tell me, in this letter --
while we're here, an LLC was apparently
formed.   Can you help me with why the LLC --
and I believe it was I-65 Properties, LLC; is
that right?

A.    Yes, that's what this says.

Q.    Do you remember when it was formed?

A.    No.

Q.    Do you know the purpose for which it was
formed?

A.    I think there was some discussion and
consideration given to tax benefits, but it

40

```
 1              was later decided that that was not

 2              beneficial.

 3        Q.    Okay.  About when was the LLC formed, just

 4              roughly?  Between '90 and 2000, I assume.

 5        A.    I would assume.

 6        Q.    Okay.  Did there come a time when Mr. Taunton

 7              advised you, as president of I-65 and a

 8              partial owner of DMS, that if all of this

 9              interest was ever collected, it would all be

10              ordinary income to you -- or to DMS, excuse

11              me -- to your company?

12        A.    I don't recall that.

13        Q.    Do you own DMS still, Dorsey Motor Sales?

14        A.    Yes.

15        Q.    But it is not the -- what we call Victory?

16              It's just a separate corporation, correct?

17        A.    Yes.

18        Q.    What does it do now, if anything?

19        A.    It has an automobile franchise.

20        Q.    Okay.  What kind?

21        A.    Suzuki.

22        Q.    Okay.  And where is it located?  Where does

23              it do business?
```

41

A.    At 621 East Main Street.

Q.    I'm not familiar.  Is that toward downtown?

A.    Yes.

Q.    But it's not the same premises as Victory?

A.    Yes.

Q.    So it's run -- although in the same place,
      the same location, it's a completely separate
      corporation?

A.    The Suzuki franchise is incorporated in the
      state of Alabama at 621 East Main Street,
      which is the used car lot down there at
      Victory.

Q.    I see.  But it still operates, correct?

A.    Yes.

Q.    Okay.  So DMS owns the Suzuki franchise.  And
      what other assets does DMS have?

A.    It owns the facility.

Q.    The properties which you've referred to?

A.    Correct.

Q.    Okay.  And is it your position that DMS still
      is the holder of a note from -- I think we've
      already introduced it.  Have we introduced
      the note?  Yes.  What we'll call Plaintiff's

42

```
 1            Exhibit #5, that note?

 2    A.     Correct.

 3    Q.     Okay.  Does DMS operate on a cash basis or an

 4            accrual basis?  By that, I mean an annual,

 5            like cash is January 1 to December 31st.

 6    A.     I don't know the --

 7    Q.     You don't know?

 8    A.     -- the closing date on -- on the taxes.

 9    Q.     Has Mr. Taunton -- to the best of your

10            knowledge, he does do the return for DMS,

11            Dorsey Motor Sales?

12    A.     Yes.

13    Q.     Okay.  Has he been accruing this interest

14            over all these years that you're claiming --

15            I think you filed a counterclaim, or your

16            attorney did, claiming that I-65, the

17            corporation, owes a million seven, something

18            like that?

19    A.     I don't know how Mr. Taunton treated it.

20    Q.     Okay.  Are you aware that if it is ever

21            collected, that it would all be ordinary

22            income?  And you're the sole stockholder of

23            DMS; is that right?
```

43

1    A.    Correct.

2    Q.    That you would have DMS and consequently --

3         is it a sub S corporation, or do you know?

4    A.    Dorsey Motor Sales, Inc.?

5    Q.    Yes, sir.

6    A.    Yes, it's a sub S.

7    Q.    I'm just curious because this will help me.

8         If that note was ever collected, you would

9         have ordinary income passed through to you of

10        about a million seven of interest income?

11   A.    I can't speak to that.  I'm not a tax -- a

12        tax person.

13   Q.    But are you aware that when we earn

14        interest -- if we have money in the bank and

15        it earns interest, sometimes we call it the

16        tree is the principal, the fruit is the

17        interest -- that interest is taxable in the

18        United States by the Internal Revenue

19        Service?

20            MR. CLEVELAND:  Object to the form.

21   Q.    You can answer.

22   A.    I'm sure interest is taxable in some form

23        unless it's tax free.

44

```
 1    Q.    Right.  And as far as we know, absent you

 2          being a government agency, if this note were

 3          ever collected, you, as 70 percent

 4          stockholder in I-65 and your sister as 30

 5          percent, DMS would owe ordinary income on

 6          close to a million seven?

 7    A.    I'm -- I'm not a tax person.

 8    Q.    Okay.  We'd have to ask Mr. Taunton about

 9          that, is that right, the effect if it were

10          collected?

11    A.    Yes.

12    Q.    Because you have filed -- you are aware you

13          filed a counterclaim claiming that you -- by

14          you, DMS -- is owed in excess of a million

15          five in interest.  Are you aware of that?

16    A.    Not a million five.

17    Q.    All right.

18    A.    No, sir.

19    Q.    Let me look at the counterclaim.  How much do

20          you believe it is?  It's just a little

21          unusual to let that much interest accrue, if

22          it is in fact interest.  Let's see if we can

23          find it.
```

51

```
 1    A.   Maybe.  Maybe so; maybe not.  I don't know.

 2    Q.   Okay.  Is it prudent for the president of a

 3         corporation to keep up with the value of its

 4         assets?

 5    A.   Sure.

 6    Q.   But it's your testimony you haven't?

 7    A.   I don't know the value of the asset today,

 8         no, sir.

 9    Q.   Do you have a rough opinion?

10    A.   I would hope it's worth what the debt is.

11    Q.   If I told you that it is Ms. Davis's informed

12         opinion that the value is a minimum of $8 a

13         square foot, would you have any reason, since

14         you don't know the value, to argue with that?

15    A.   I -- I don't have an argument one way or the

16         other with it.

17    Q.   Don't you have to know in case an offer is

18         made?  Since you're our -- you're the pilot

19         of the airplane of I-65, don't you need to

20         know the value so that you could consider if

21         we get an offer -- by we, I-65 -- gets an

22         offer to purchase the property?

23    A.   No, not really.  Why?
```

52

```
 1    Q.   Well, I'm curious.  I think you're answering

 2         my question.  I-65 doesn't have any other

 3         business.  It simply holds title to a piece

 4         of naked real estate, unimproved, on I-65 and

 5         what I call 82 or the Wetumpka Road; is that

 6         correct?

 7    A.   There's a road through it.

 8    Q.   All right.  Did you put the road in?

 9    A.   Yes, sir.

10    Q.   How long ago?

11    A.   1991.

12    Q.   And who installed the road?  Who was the

13         contractor?

14    A.   Bobby Carter.

15    Q.   All right.  And what was the approximate cost

16         of the road?

17    A.   I don't recall.

18    Q.   All right.  Is it your intention as

19         president -- well, let me go back.  Let me

20         strike that.

21              Absent the road through it, isn't it a

22         fact that I-65 Properties, Inc.'s sole

23         business is to hold title to that piece of
```

55

| | | |
|---|---|---|
| 1 | | value for 17 years is, in your opinion, a |
| 2 | | good job? |
| 3 | A. | Yes. |
| 4 | Q. | Would you consider it prudent at this point |
| 5 | | to get an appraisal of the property? |
| 6 | A. | No. |
| 7 | Q. | And why would that be? |
| 8 | A. | Extra expense. |
| 9 | Q. | Three or $4,000? |
| 10 | A. | At least. |
| 11 | Q. | If you get an offer next week to purchase the |
| 12 | | property, would you consider it prudent to |
| 13 | | get an appraisal at that time to determine |
| 14 | | whether or not it's a good offer or not? |
| 15 | A. | No, sir. |
| 16 | Q. | Because you would just turn it down anyway, |
| 17 | | right? |
| 18 | A. | That's not my plan for the property. |
| 19 | Q. | Okay.  That's going to help me.  When you say |
| 20 | | your plans, you mean as president of I-65, |
| 21 | | correct? |
| 22 | A. | Correct. |
| 23 | Q. | Would you mind sharing your plans with my |

56

```
 1              client, the 30 percent minority stockholder?

 2     A.    Well, I'm waiting to see if someone wants to

 3              long-term lease the property.

 4     Q.    Ground lease?

 5     A.    Excuse me?

 6     Q.    A ground lease?

 7     A.    Ground lease.

 8     Q.    Why would you prefer -- well, how old are

 9              you, Mr. Dorsey?

10     A.    61.

11     Q.    Why would you prefer a ground lease to a

12              sale?

13     A.    Well, once you sell, it's sold.

14     Q.    You don't own it anymore, do you?

15     A.    Correct.

16     Q.    Do you know the difference -- and I'll tell

17              you the difference.  If you ground lease,

18              it's all ordinary income.  You're aware of

19              that?

20     A.    No.

21     Q.    You're not?  Are you aware that if you sold

22              the property, it is capital gain at a very,

23              very low taxable rate?
```

59

| | | |
|---|---|---|
| 1 | | you do or don't do directly bears on the |
| 2 | | value of your sister's interest, 30 percent. |
| 3 | | Is that right or wrong? |
| 4 | | MR. CLEVELAND:  Object to the form. |
| 5 | A. | I would say that's true. |
| 6 | Q. | Okay.  Is it your opinion here today that |
| 7 | | from the period 1990 to as we sit here today, |
| 8 | | that you have properly discharged your duties |
| 9 | | as president such as to prevent loss to my |
| 10 | | client's 30 percent interest in I-65? |
| 11 | A. | Yes. |
| 12 | Q. | Can you think of any area in which you have |
| 13 | | failed to protect her interest? |
| 14 | A. | No. |
| 15 | Q. | If you were going to buy a piece of property |
| 16 | | individually or otherwise, wouldn't it be |
| 17 | | prudent to appraise the property or have it |
| 18 | | appraised before you purchased it? |
| 19 | A. | Not necessarily. |
| 20 | Q. | Is that because you have a specific -- and |
| 21 | | I'm not arguing that you don't -- a knowledge |
| 22 | | of value of real estate and you could apply |
| 23 | | your knowledge of real estate and, therefore, |

60

```
 1              not need an appraisal to know if it's a fair
 2              value?
 3      A.     I would hope so.
 4      Q.     All right.  But you don't have an opinion as
 5              to the value of the property, the nine point
 6              acres, today as we sit here?
 7      A.     No, sir.
 8      Q.     Kind of like the bigger than a bread basket,
 9              do you think it's more than $7 a square foot?
10      A.     No, sir.
11      Q.     Less than seven?
12      A.     I don't know.
13      Q.     Is the property served by sewer?
14      A.     No, sir.
15      Q.     By city water?
16      A.     No, sir.
17      Q.     Where is the closest sewer?
18      A.     The sewer is in Millbrook.
19      Q.     Okay.  When I see the motels across -- and
20              there are -- there's a Country Inn across.
21              Are they on sewer or some type of ergonomic
22              system?
23      A.     I don't know.
```

1    A.    You mark it.

2    Q.    Okay.

3    A.    You're getting paid, not me.

4    Q.    Yeah, there you go.  That's in question.

5          Service road.  My client may have a big debt

6          she may not be able to pay.

7              All right.  I've marked service road.

8          Now, the yellow road, what do we call it?

9          Private road?  Is that okay?  I mean, it is

10         private?  It's not a deeded easement?

11   A.    No.

12   Q.    Okay.  And that's the one that was put in

13         some years ago, correct?

14   A.    Correct.

15   Q.    I'm going to mark that private, meaning the

16         yellow road.  What was the purpose of putting

17         in the private road, if you can help me with

18         that?

19   A.    We had an interested party in building a

20         business on the property.

21   Q.    Okay.  What kind of business?

22   A.    A Nissan dealership.

23   Q.    Okay.  And would you have been the primary

68

```
 1              stockholder of the Nissan dealership?

 2      A.    No.  The guy that owned it was -- I don't

 3            recall his name.  I don't remember.

 4      Q.    Would you have had any ownership of the

 5            Nissan dealership?

 6      A.    No.

 7      Q.    Isn't it a little unusual to construct a road

 8            before a contract is finalized?

 9      A.    It's what my father said do.

10      Q.    Okay.  That's a good reason.  Is the road

11            30-feet wide or more, roughly?

12      A.    I don't know if it's 30-feet wide.  I'd --

13            I'd have to go measure it.  I don't know the

14            width of it.

15      Q.    Are there locks, as you call them, security

16            posts, on the Cobbs Ford -- is that what

17            locally people call it, the Cobbs Ford Road,

18            or what is that referred to now?

19      A.    Cobbs Ford Road.

20      Q.    Cobbs Ford Road.  It's an extension of 82,

21            though, correct?

22      A.    No.

23      Q.    It isn't?  Okay.  I don't know.  Are there
```

69

|   |   |   |
|---|---|---|
| 1 |  | gates on the north side of the property -- |
| 2 |  | security gates on the north side up towards |
| 3 |  | Cobbs Road and on the -- along what we call |
| 4 |  | the service road? |
| 5 | A. | No.  Just on the service road. |
| 6 | Q. | Okay.  Why?  Is it impassable up on the -- it |
| 7 |  | seems like the flow of traffic would be more |
| 8 |  | up around Cobbs Ford Road. |
| 9 | A. | There's a steep bank there. |
| 10 | Q. | A steep bank.  All right.  Now, apparently on |
| 11 |  | Plaintiff's Exhibit #7 -- everything I'm |
| 12 |  | questioning you on will be Plaintiff's |
| 13 |  | Exhibit #7.  It's my understanding that the |
| 14 |  | tract in which this water was running would |
| 15 |  | have been onto a tract that is labeled on the |
| 16 |  | tax tract 10.01; is that correct? |
| 17 | A. | Does the water run on that tract? |
| 18 | Q. | Well, it appears that that's exactly where |
| 19 |  | you drew the green line.  It would go right |
| 20 |  | onto that property; is that correct? |
| 21 | A. | No.  It drops into a branch. |
| 22 | Q. | Oh, okay.  And the branch, is this the Hudson |
| 23 |  | Branch that I'm look at right here?  Is that |

*DUNN, KING & ASSOCIATES*
*Montgomery, Alabama*

70

```
 1              the branch that I'm --

 2      A.    I didn't know the name of it.

 3      Q.    All right.  So that branch is a conduit for

 4              the water.  And it does have a sharp V, if

 5              you'll notice; but the water flows freely all

 6              along the Hudson Branch.  Is that right?

 7      A.    I've never walked it.  I assume it does.

 8      Q.    All right.  So did you say earlier, though,

 9              that there was a problem with the water flow

10              over the 9.6 acres of I-65?

11      A.    Yes.  It's causing erosion to the property.

12      Q.    I see.  And how did you plan to stop that?

13              Water bars?  Riprap?

14      A.    No.  We had a study done to take the water --

15              pick the water up here and run it down a

16              common line and drop it into the head of the

17              branch here.

18      Q.    Okay.  Now, let the record show that the

19              witness is testifying that along the west

20              property line, a possibility of diverting the

21              water down the west line along the service

22              road and hitting the Hudson Branch at the

23              southwest corner of the 9.6 acres.
```

83

1              break before we do?  Because this

2              is going to take a while.  Do we

3              need a break?  No?  Let's go,

4              then.

5    Q.   Let's start with the first one you purchased,

6       if you know, either by yourself, the

7       corporation, and most importantly, that Donna

8       Davis, the minority stockholder, is not a

9       partner in.  And you can color them with that

10      yellow, and we'll mark them as we go.

11          MR. ROBERTS:  All right.  The defendant

12              has marked four parcels on this

13              map from -- one, two, three,

14              four -- ending at the south end as

15              sister's and on the east side --

16              the west side, the service road,

17              the right side, Market Street as

18              its called, and the north side,

19              Cobbs Ford Road.

20    Q.   Is that a fair depiction?

21    A.   Correct.

22    Q.   Okay.  When did you purchase -- or who

23       purchased these and when, if you know?

84

```
 1    A.   CD&O Properties -- or CD&O purchased those.

 2         And I want to say it was in 1991 or '92.

 3    Q.   All right.  And who is CD&O?

 4    A.   Just a corporation that -- that I formed.

 5    Q.   Okay.  A corporation you formed?

 6    A.   Uh-huh.  Excuse me.  An LLC, I mean.

 7    Q.   An LLC.  And am I right, just from somewhere

 8         in a public record, that's Connie, Dick &

 9         Others?

10    A.   Yes.

11    Q.   Okay.  Who are the others?

12    A.   Others?

13    Q.   Yeah.  Are others people?

14    A.   People.

15    Q.   Who are the people?

16    A.   People of America.

17    Q.   Okay.  I really enjoy this, but it's going to

18         delay it.  We can start with a phone book.

19         If we have to, we'll do that.  Is there some

20         reason why you don't want your minority

21         stockholder to know who the others were?

22    A.   No.  Just others.

23    Q.   Okay.  Well, now, we're in federal court.
```

87

```
1    A.   You're an other.  I declare it.

2    Q.   All right.  I decline, but thank you.  All

3         right.  Where would I find the LLC so that I

4         can see who the others are?

5    A.   I'd have to pull the paperwork on it.

6         There's no others.  I mean, others are just

7         other people.

8    Q.   All right.  I did see a TD&O at some point.

9         While we're here, before we get there, what's

10        the TD&O?

11   A.   That's Taylor, Dick & Others.

12   Q.   Is that Ted Taylor?

13   A.   No.

14   Q.   Okay.  Who is Taylor?

15   A.   My son.

16   Q.   Oh, good.  I'm sorry.  Taylor, Dick &

17        Others.  All right.  That will help me when

18        we get there later.

19             Okay.  Now, it's your testimony here

20        today that the CD&O is basically, as far as

21        ownership goes, the right to sell or mortgage

22        or whatever reposes solely in Dick, yourself,

23        right?
```

88

| | | |
|---|---|---|
| 1 | A. | CD&O? |
| 2 | Q. | Yes. |
| 3 | A. | Yes. |
| 4 | Q. | Okay.  And you're not a managing partner for |
| 5 | | some other people who are, let's say, silent |
| 6 | | partners? |
| 7 | A. | No. |
| 8 | Q. | All right.  Do you know when the LLC was |
| 9 | | formed, CD&O? |
| 10 | A. | No. |
| 11 | Q. | You don't?  I think you said around '91 or |
| 12 | | '92? |
| 13 | A. | No.  That's when the property was purchased. |
| 14 | Q. | All right.  And it was purchased, though, in |
| 15 | | the name CD&O.  So, obviously, CD&O was in |
| 16 | | existence around '91 or '92, right? |
| 17 | | MR. CLEVELAND:  Object to the form. |
| 18 | Q. | You can answer it. |
| 19 | | MR. CLEVELAND:  I mean, he's assuming |
| 20 | | it was purchased in the name -- |
| 21 | | MR. ROBERTS:  Oh, okay. |
| 22 | | MR. CLEVELAND:  I don't know if that's |
| 23 | | accurate or not, Dick.  It may be; |

91

```
 1         property on both sides of the road, a road

 2         can either be vacated or sometimes

 3         relocated?  Were you aware of that?

 4    A.   No.

 5    Q.   All right.  When you purchased -- or excuse

 6         me.  When CD&O purchased the four tracts

 7         shown on #7 on the service road, did you

 8         contact your sister, the minority

 9         stockholder, and discuss the purchase with

10         her?

11    A.   I -- I don't recall.

12    Q.   Is it safe to say if you don't recall, that

13         your best judgment is you didn't?

14              MR. CLEVELAND:  Object to the form.

15    A.   No.  I don't recall.

16    Q.   If she testifies you didn't, would you

17         disagree with that?

18    A.   I don't recall.

19    Q.   My question is -- okay.  You don't recall.

20         But if Donna, your sister and your only

21         sister, testifies that you didn't contact

22         her, since you don't recall, would you accept

23         her testimony as being correct?
```

92

          MR. CLEVELAND:  Object to the form.

Q.   You can answer.

A.   I don't remember.

Q.   Would it have been prudent, since you are the

     captain of the 9.6 -- I'll call it the

     ship -- to have contacted the minority and

     suggested that she might want to buy it with

     you, become an other?

A.   I don't think so.

Q.   Has anyone ever told you that you had a duty

     under Alabama law to not act against the

     interest of your sister, the minority

     stockholder?

          MR. CLEVELAND:  Object to the form.

Q.   You can answer it.

A.   I thought we were talking about purchasing

     the property.

Q.   When you point to it, we're talking about

     those four tracts.  And I'll restate the

     question.  Has anyone ever told you that it

     would be improper as the CEO, the captain of

     the ship, whatever you want to call your 70

     percent in I-65, to purchase property,

93

1        particularly contiguous to the 9.6 acres,

2        without giving the minority partner an

3        opportunity to join in that purchase?

4   A.   No.

5   Q.   No one has ever told you that?

6   A.   No, sir.

7   Q.   At the time, did it ever cross your mind to

8        do that?

9   A.   I'd have to look at the time that I purchased

10       the property.

11  Q.   Do you know that sometimes small tracts of

12      property, in real estate nomenclature, tails

13      wag dogs.  Have you ever heard that?

14  A.   No.

15  Q.   Were you not aware that the purchase of those

16      four tracts that we're talking about by CD&O

17      could either increase their value by virtue

18      of ownership of the 9.6 or they could

19      decrease the value of the 9.6?

20  A.   No.

21  Q.   You're not aware of that?  You just thought

22      it would be a good idea to buy them, right?

23  A.   Just an opportunity came up and we bought

94

```
 1              them.

 2      Q.      And when you say we, CD&O?

 3      A.      Right.

 4      Q.      Okay.  And that's exactly what one of the

 5              allegations of the complaint is, that it was

 6              a missed opportunity for my client, your

 7              sister, but an opportunity for you.

 8      A.      No.  I-65 had no income.  How could they buy

 9              that property?

10      Q.      Well, let's assume for the moment that

11              there's -- I think this is an old Regions

12              Bank, isn't it?

13      A.      Excuse me?

14      Q.      Isn't this where we're sitting -- was a

15              Regions Bank or something?

16      A.      I don't know.

17      Q.      Without being flippant, that's what banks

18              do.  They loan money to minority stockholders

19              to buy property.

20      A.      In the name of the corporation?

21      Q.      Well, it could be.  Yes, that would be a good

22              point.  I-65 could have purchased the

23              property instead of Dick.
```

95

1           MR. CLEVELAND:  Is that a question?

2  Q.  Well, let me ask the question.  Could --

3           MR. ROBERTS:  You're helping me.

4  Q.  Could --

5           MR. CLEVELAND:  I'm trying to.  I'm

6                trying to get through this.

7           MR. ROBERTS:  Well, Cliff, it's a big

8                matter, a lot of money.

9  Q.  Could I-65 have purchased the property --

10     assuming it had a loan, or my client, as a

11     school teacher, had socked away money --

12     could I-65 have purchased the property, the

13     four tracts?

14  A.  I don't -- I don't think so, no, sir.

15  Q.  And why?

16  A.  They have no income.  They have no worth.

17  Q.  Okay.  Don't people sometimes loan money to

18     corporations?

19  A.  I don't know.

20  Q.  Well, you should know because Dorsey Motor

21     Sales is contending in a counterclaim, if you

22     do the math, that it loaned, including

23     accrued interest, a million six to I-65.

96

```
 1    A.    I don't think they loan money to corporations

 2          that have no worth and no income.

 3    Q.    All right.  So you assumed that Donna could

 4          not come up with sufficient moneys -- and I

 5          mean, this is what I think you're saying --

 6          to allow I-65 to have purchased this

 7          property.  Is that your assumption -- or was

 8          your assumption?

 9    A.    The property became available for sale.  And

10          myself and Connie looked at it and came up

11          with what we thought was a business plan that

12          she wanted to do, and we purchased the

13          property.

14    Q.    Okay.  And I think your testimony is you did

15          not, to your recollection, notify the

16          minority stockholder of I-65.

17    A.    No.  It's separated by a service road.

18    Q.    And, therefore, you didn't deem it to be

19          necessary?  That's fine.

20          COURT REPORTER:  I'm sorry?

21          THE WITNESS:  No.

22          MR. ROBERTS:  Separated by a service

23              road and no, he didn't deem it
```

97

1                          necessary to contact Donna.

2    Q.    Let's go to the next one.  Let's do -- we did

3          yellow on that one.  Let's do green for

4          anything else you purchased.

5               Okay.  I think the record will show in

6          #7 that -- and by the way, this is CD&O

7          purchased what we called tax tract 10.01,

8          which shows to be 2.52 acres; is that

9          correct?  Is that what you marked?

10   A.    Yes.

11   Q.    And what was on we'll call it tax tract 10.01

12         at the time you purchased it, if anything?

13   A.    A building.

14   Q.    Is that building still on there today?

15   A.    Yes.

16   Q.    And that building -- it's a metal building,

17         correct?

18   A.    Yes, metal and brick.

19   Q.    And it has been added on to at least once,

20         correct?

21   A.    Yes.

22   Q.    Okay.  Is CD&O the landlord of that property?

23   A.    Yes.

98

Q.   What is the rental per month on that
     property?

A.   Right now, about $3200.

Q.   Per month?

A.   Yes, sir.

Q.   All right.  What else, if anything, have you,
     CD&O, others, or anyone purchased on our
     Plaintiff's Exhibit #7?

A.   I'm sorry.  Say that again.

Q.   Any other properties, you, CD&O, or anyone in
     your family, friends, have purchased.  For
     example, 03.04.  Do you know who owns that,
     this tract right here?  It's 2.86 acres.

A.   I don't know who owns that.

Q.   Okay.  Do you know who owns 17.01?  That's
     this tract right there.

A.   No.  It's an insulation company.

Q.   Okay.  So this Plaintiff's Exhibit #7 fairly
     depicts at this point two tracts of property
     that either you or CD&O has purchased, the
     green and the yellow; is that correct?

A.   Correct.

Q.   Have you, at any time since 1990, owned any

1    of these other tracts and now don't own them,

2    either you, CD&O or anyone else?

3  A.  No, sir.  I can't -- wait a minute.  Let me

4    rephrase that.  I can't go back to 1990,

5    because I don't know who owned them then.

6  Q.  No.  I'm just saying have you owned them and

7    sold them to someone else since 1990?

8  A.  No.

9  Q.  That was the answer.  All right.  Have you

10    had any offers on any of the four tracts in

11    L-7, boundaried by the yellow, to sell them?

12  A.  No.

13  Q.  Okay.  And I assume you wouldn't have an idea

14    of the fair market value of those either,

15    correct?

16  A.  No, sir.

17  Q.  Okay.  Just real quick, what is on --

18    starting with the one that says "Sisters" on

19    there, what's on there now, on that lower of

20    the four tracts, just south of the four

21    tracts?  Just run through for me real quick.

22  A.  The sister's building.

23  Q.  And what is Sisters?  What does it do?

100

```
 1    A.   It's a mattress sales company.

 2    Q.   Okay.  That's good.  That's what I saw, a

 3         mattress company.  What is the next one,

 4         coming north, the next track above Sisters?

 5    A.   Vacant land.

 6    Q.   Vacant land.  And what about the next one

 7         above that?

 8    A.   Vacant land.

 9    Q.   And vacant on Cobbs Ford Road?

10    A.   Correct.

11    Q.   All right.  Now, where -- am I wrong that you

12         may have had the Suzuki dealership out there

13         at one point on one of these parcels of

14         property?

15    A.   No.

16    Q.   I'm wrong?

17    A.   No, you're not wrong.

18    Q.   Okay.  Which tract would have you have had it

19         on?

20    A.   The 10.01.

21    Q.   Okay.  And what about antique cars or

22         anything like that?  Have you had a place

23         there?  I just vaguely remember seeing some
```

101

| | | |
|---|---|---|
| 1 | | antique cars coming by there, vintage cars or |
| 2 | | something like that. |
| 3 | A. | Well, they have some cars over there across |
| 4 | | the street at 10.008, but they're not -- |
| 5 | | that's not mine. |
| 6 | Q. | Okay.  Do you know who owns that? |
| 7 | A. | Yes. |
| 8 | Q. | Who owns that? |
| 9 | A. | Vintage Autos. |
| 10 | Q. | Okay.  And I'm looking for where you're |
| 11 | | saying.  I just don't see 1008.  Which one is |
| 12 | | that, now? |
| 13 | A. | Right there. |
| 14 | Q. | Oh, I see it now.  Do you know who owns |
| 15 | | Vintage Autos? |
| 16 | A. | Wasn't Smith. |
| 17 | Q. | And he was a partner at some point, or am I |
| 18 | | wrong, of yours in some other endeavor? |
| 19 | A. | No. |
| 20 | Q. | He wasn't?  He never worked for the |
| 21 | | dealership? |
| 22 | A. | Yes. |
| 23 | Q. | Okay.  Does he still work for the dealership? |

102

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | And he is the only titled owner?  You've |
| 3 | | never owned any interest in that yourself? |
| 4 | A. | No, sir. |
| 5 | Q. | Okay.  And the RV center, 10.03, do you know |
| 6 | | who owns that? |
| 7 | A. | It's Saxon Properties. |
| 8 | Q. | All right.  No -- you've never had any tie |
| 9 | | with them at all or anything? |
| 10 | A. | Yes. |
| 11 | Q. | You have?  What tie have you had with them? |
| 12 | A. | I'm a part owner of Saxon. |
| 13 | Q. | All right.  How much owner are you? |
| 14 | A. | 50 percent. |
| 15 | Q. | Any buy and sell agreements on it? |
| 16 | A. | Not that I -- no.  I don't know. |
| 17 | Q. | Okay.  It's a corporation? |
| 18 | A. | No.  It's an LLC. |
| 19 | Q. | And the other man is Wayne Smith?  No. |
| 20 | | Excuse me.  Wayne is over on 1008.  Who are |
| 21 | | the other partners of Saxon Properties? |
| 22 | A. | Now, there's another property in between |
| 23 | | Wayne and Saxon.  That's the 10.03.  And I -- |

103

| | | |
|---|---|---|
| 1 | | I don't know.  I think Jim Sullivan still |
| 2 | | owns that. |
| 3 | Q. | All right.  Now, there's not a mark.  It |
| 4 | | would indicate that that -- that there's no |
| 5 | | break between the two properties, but |
| 6 | | there -- you're saying there is a difference. |
| 7 | A. | There's another property there. |
| 8 | Q. | Okay. |
| 9 | A. | I think it's a radio business or something. |
| 10 | Q. | Okay.  And you think it's not -- it's not |
| 11 | | part of Saxon property? |
| 12 | A. | No. |
| 13 | Q. | Okay.  How did you come to become an owner of |
| 14 | | Saxon Properties and the -- and that |
| 15 | | particular tract of property?  Was it again |
| 16 | | found out it was for sale? |
| 17 | A. | Yeah.  Found out it was for sale and came |
| 18 | | available. |
| 19 | Q. | About when was that bought? |
| 20 | A. | I -- |
| 21 | Q. | If you know. |
| 22 | A. | I'm guessing.  2000, 2001. |
| 23 | Q. | Okay.  Now, although it's not contiguous, the |

104

1        same question, did you ever contact Donna,

2        the minority stockholder, and tell her that

3        it was available and would she like to buy in

4        either individually or as I-65?

5    A.   No.

6    Q.   Okay.  The same reason, corporation had too

7        much debt, meaning I-65, and you just assumed

8        that she wouldn't want to purchase; is that

9        right?

10   A.   No.  I just didn't think about it at all.

11   Q.   Who found out about it being for sale?  Was

12       it Mr. Saxon -- excuse me.  No.  No.  You own

13       50 percent.  Who owns the other percentage?

14   A.   Mr. Cleveland.

15   Q.   Okay.  Are we talking about the same attorney

16       here today?

17   A.   Yes, sir.

18   Q.   Did you or Mr. Cleveland, which one of you

19       first learned about the property coming for

20       sale?

21   A.   The property has been up for sale and off of

22       sale and up for sale several times.  I -- I

23       think we both knew about it.  It's a pretty

1    with that.

2         MR. CLEVELAND:  If you know.

3  Q.  If you know.  That's all a deposition is.

4    I'm not asking you to make things up.  If you

5    know, since you've been around dealerships.

6    I thought someone mentioned or said at some

7    time you had a dealership there.

8         MR. CLEVELAND:  See where he's talking

9              about, Dick?

10 Q.  Number 10 right here.

11 A.  I was trying to read that writing.  CU 7?

12 Q.  I didn't write it.  Did you?

13 A.  I didn't write it.  I don't know.

14 Q.  But, I mean, the question is -- if you don't

15   know, you don't know.  You've never leased

16   it, owned it, been a silent partner in it or

17   anything, right?

18 A.  No, sir.

19 Q.  And who does own it?

20 A.  Don't know.

21 Q.  All right.  So is it safe to say other than

22   parcel 03.04 -- and you see that's the

23   question mark piece.  I'll mark it on here,

108

```
 1              question mark.  I just want to see --
 2    A.   Oh, that one?
 3    Q.   Yes, sir.  You said you don't know who owns
 4         that?
 5    A.   I do not.
 6    Q.   So, other than that parcel, is it safe to say
 7         that properties owned by you or under your
 8         control completely surround the 9.606 acres?
 9              MR. CLEVELAND:  Other than what
10                   parcel?
11              MR. ROBERTS:  Other than 03.04.
12    A.   Well, 17.01.
13    Q.   Oh, excuse me.  Who owns that?
14    A.   I don't know.
15    Q.   So your answer is that other than those two
16         parcels, you or entities owned or controlled
17         by you virtually surround the property; is
18         that right?
19    A.   On the east side and the south side.
20    Q.   All right.  Is it your testimony here today
21         that you don't believe that your ownership or
22         other entities -- and I'm not even including
23         Mr. Cleveland and your other tract -- that
```

109

|     |     |                                                       |
|-----|-----|-------------------------------------------------------|
| 1   |     | they would not impact the fair market value,          |
| 2   |     | either up or down, of I-65 investment                 |
| 3   |     | properties?                                           |
| 4   | A.  | I don't think they would.                             |
| 5   | Q.  | If something were done negatively, nasty              |
| 6   |     | warehouses on I-65, Inc., are you telling me          |
| 7   |     | you don't think that would affect your                |
| 8   |     | parcels in yellow and green below it?                 |
| 9   | A.  | I can't speak for what somebody would do on           |
| 10  |     | the property.                                         |
| 11  | Q.  | I'm just asking you assuming -- I'm trying to         |
| 12  |     | get back to -- I think your answer was it's           |
| 13  |     | your opinion that what happens on the                 |
| 14  |     | contiguous properties owned by you and/or             |
| 15  |     | others would not have an effect on I-65's             |
| 16  |     | property, and, conversely, I-65 would not             |
| 17  |     | have an effect, potentially, on your                  |
| 18  |     | properties.                                           |
| 19  | A.  | If I --                                               |
| 20  |     | MR. CLEVELAND:  I mean, is your                       |
| 21  |     | question based upon no zoning,                        |
| 22  |     | no restrictions; you can put                          |
| 23  |     | anything you wanted to there?                         |

110

```
 1              MR. ROBERTS:  Yes.

 2              MR. CLEVELAND:  A garbage dump?

 3              MR. ROBERTS:  Anything.

 4    A.    No ADEM?  No nothing?

 5    Q.    That's a good question.  What is the property

 6          zoned?  Both tracts, yours and the subject

 7          property.

 8    A.    I'd have to look at the zoning for Millbrook.

 9          I don't really recall.  I think it's B1.  Is

10          there a B1?

11    Q.    General business where I'm from, but it might

12          not be down here.

13    A.    Yeah.  I don't know.

14    Q.    So as far as you know, all of those

15          properties are B1 or something along that

16          line?

17    A.    Yes, sir.

18    Q.    Okay.  But, again -- and I -- in deference to

19          Mr. Cleveland's comment, my question is do

20          you believe that -- and we're assuming that

21          it operates within the acceptable zoning --

22          that what happens to one -- and by one, I

23          mean does not necessarily affect the other.
```

A.  That's -- that's really hypothetical.  I can't -- I can't --

Q.  Let me ask you.

A.  I can't answer something that hypothetical.

Q.  Let's just say -- I don't know if what they call smut, porno sales places -- are you saying that if that was on either one of those, it wouldn't have an adverse impact on either one of them, potentially?

A.  I'm sorry.  I don't have an opinion on that.

Q.  Okay.  What about mini warehouses on one? Would that affect the commercial nature of the other?  And it's either one.  You can put them on I-65 or you can put them on your other properties.

A.  As far as mini warehouses, anything can be built can be removed.  So I don't know.  I don't -- I don't see the connection.

Q.  All right.  Well, I got you.  Where -- I mean, I completely understand you.  It is your opinion, your professional opinion, that what happens on one tract, I-65, doesn't impact your other tracts, meaning the green,

112

1          and advice versa; that to your knowledge

2          right now, neither tract could impact the

3          value of the other depending on what's built

4          there?

5     A.   I don't think the three tracts are really

6          connected.  One is separated by the road; the

7          other one is separated by a natural branch.

8     Q.   All right.  Do you believe -- for example,

9          you see Market Street on there, 50 foot

10         right-of-way?

11    A.   Yes, sir.

12    Q.   All right.  Do you believe that Market Street

13         could become the access and the service road

14         could be eliminated because persons exiting

15         Cobbs Ford Road could simply come down the 50

16         foot right-of-way, which appears to be

17         significantly greater than the service road,

18         and then re-intersect the service road going

19         south, which would mean that all four

20         properties would become part -- could become

21         part of I-65?  Had you not thought about

22         that?

23    A.   No, sir.

113

Q.   Sound like a good idea if somebody needed --
     say a dealership says, we've got to have at
     least 14 acres; you know, churches need 30.
     It wouldn't be a great help to I-65, if
     somebody needs 14 acres, if these four tracts
     were joined to the 9.6?

A.   I never thought of doing away with the road.

Q.   Okay.  I'll ask you here today.  Not that I'm
     the real estate guru, but it's a possibility,
     isn't it?

A.   Anything is possible.

Q.   Okay.  And Market Street looks like a better
     road, would you agree, than the service road?

A.   I -- I can't say that.

Q.   Okay.  Do you know who put the service road
     in?  Was it there when you bought the I-65,
     or when Dorsey bought the I-65?

A.   Yes, sir.

Q.   Okay.  Now, this -- we go back to my original
     assumption.  Had Donna or I-65 -- we'll call
     it I-65 -- purchased the CD&O property, it
     could have been blended with the 9.606?

          MR. CLEVELAND:  Object to the form.

114

Q.   You can answer.

A.   No, I don't think so.

Q.   You don't think so.  Why not?

A.   I-65 couldn't pay for it.

Q.   Okay.  And that's based on the fact that I-65
didn't have any money?

A.   That's right.

Q.   All right.  I'll move right along on this.
Is it your opinion that I-65 partners,
meaning you and your sister or whoever,
couldn't have borrowed the money and
purchased it?

A.   I don't think so, no, sir.

Q.   All right.  How do you -- does that mean that
Dick Dorsey couldn't have?  Were you so
extended you couldn't have borrowed money?

A.   I don't think somebody is going to loan me
money when I don't have the income to repay
it.

Q.   But, now, we're not looking at just income
from I-65.  We're looking at income from any
other source.  Banks don't care about
unimproved property; they'll look at your

115

| | | |
|---|---|---|
| 1 | | personal financial statement.  So I'll ask |
| 2 | | you that question.  Somebody had the money to |
| 3 | | buy it.  How did you get your money to buy |
| 4 | | it? |
| 5 | A. | We presented a business plan to the bank. |
| 6 | Q. | Okay.  And which bank? |
| 7 | A. | Regions. |
| 8 | Q. | Which office? |
| 9 | A. | Main. |
| 10 | Q. | Downtown, Birmingham, or here? |
| 11 | A. | Montgomery. |
| 12 | Q. | All right.  And what loan officer did you |
| 13 | | present it to? |
| 14 | A. | Spencer Knight. |
| 15 | Q. | Is he still with Regions? |
| 16 | A. | Yes, sir. |
| 17 | Q. | Did he require the LLC to personally endorse |
| 18 | | the loan, meaning you and Connie? |
| 19 | A. | Yes, sir. |
| 20 | Q. | So he wasn't just looking to the raw land for |
| 21 | | repayment, was he? |
| 22 | A. | No, sir.  He was looking to us to repay. |
| 23 | Q. | Had personal guarantees, correct? |

116

```
 1    A.   Yes, sir.
 2    Q.   Okay.  So what's different about I-65 having
 3         purchased it and we get Spencer Knight to
 4         agree that you and Donna personally guarantee
 5         the loan?
 6    A.   I-65 had negative equity at the time.
 7    Q.   All right.  But let's assume it had negative
 8         equity.  They ultimately are looking at the
 9         personal guarantee, aren't they?
10    A.   I don't know.
11    Q.   Well, in other words, if my net worth was
12         $7 million and I've got a piece of property
13         with a negative worth, isn't it a fact that
14         Regions wouldn't be worried about the
15         property; they'd be looking at my assets?
16    A.   Boy, that sounds great to me.
17    Q.   You weren't aware of that, then?
18    A.   No, sir.
19    Q.   I submit to you that I leased to Regions Bank
20         for years in Birmingham and that's how they
21         work.  They'll loan you money on triple
22         negative if you're -- if you've got $500,000
23         in cash sitting in their bank.  But that's a
```

117

1    problem.  I mean, you're the CEO.  You're the

2    leader.  You didn't know that.  And that's

3    one of the reasons that you didn't allow

4    Donna to participate in that.  That is your

5    testimony, isn't it?

6    A.   No.  I didn't allow I-65 to participate.

7    Q.   Excuse me.  Well, I-65.  Is that correct?

8    A.   That's right.

9    Q.   And who was the 30 percent owner of I-65?

10   A.   Donna.

11   Q.   Donna.  So didn't you indirectly, by virtue

12       of her 30 percent ownership, keep her from

13       being able to participate in that sale, yes

14       or no?

15           MR. CLEVELAND:  Object to the form.

16           MR. ROBERTS:  You can answer.

17   Q.   Yes or no?

18   A.   I didn't have any consideration of I-65

19       Properties, Inc., buying this property,

20       because they had a negative equity, had zero

21       income, and could not pay for the property.

22   Q.   Okay.  Now, I-65 -- I may be wrong; but if I

23       check the bank records, hasn't I-65 --

118

1          haven't you used that property, which doesn't

2          have a recorded mortgage, as collateral for

3          another loan?  Yes or no?

4   A.   I --

5   Q.   I'll restate it.  I'll go slow.  There is no

6          outstanding recorded mortgage by I-65 on this

7          piece of property, meaning the I-65 property;

8          is that right?

9   A.   That's correct.

10   Q.   Okay.  And with it being unrecorded, is it

11          your testimony here today that you have never

12          pledged, assigned, or otherwise used this,

13          quote, negative value property as collateral

14          for any other loans?

15   A.   Well, it's on my financial statement.  So if

16          I personally guarantee something, then I'm

17          pledging my personal assets, which is stock

18          of I-65 to that debt, am I not?

19   Q.   Yes, sir, you are.

20             MR. CLEVELAND:  His question was have

21               you mortgaged it, though.

22   A.   No.

23   Q.   Or pledged it?

119

1  A.  No.

2  Q.  When was your last financial statement that

3     you filed?

4  A.  I don't remember.

5  Q.  Other than Spencer Knight and Regions, what

6     other banks, local, have you dealt with in

7     the last five years?

8  A.  To borrow money?

9  Q.  Yeah.  Or anything.  Put money in or take it

10    out.

11 A.  First Community Bank.

12 Q.  Okay.  And who's the loan officer there?

13 A.  Tracey Alexander.

14 Q.  Are they local here in Prattville?

15 A.  Yes.

16 Q.  Okay.  Name any others for me, if you will.

17 A.  I have an account at -- what is it, River

18    Bank.

19 Q.  No loans, just a bank account?

20 A.  Just a bank account.

21 Q.  Who does the Dorsey Motor Sales Suzuki

22    dealership have its bank account with?

23 A.  With the First Community.

120

```
 1      Q.   Who does Victory have their main account

 2           with?

 3      A.   First Community.

 4      Q.   All right.  Do you happen to remember what

 5           value you put your 70 percent interest in

 6           I-65 on your last statement, what you valued

 7           it at?

 8      A.   I don't remember.

 9      Q.   Normally, banks like to get them about every

10           two years.  So am I correct you would have

11           filed one within the last couple of years?

12      A.   I would say so.

13      Q.   Now, since it is material to this case the

14           value you placed on it, I would like to ask

15           you if a request is made through your

16           attorney, Mr. Cleveland, if you would have

17           any problem with providing a copy of that

18           financial statement.

19      A.   No.

20      Q.   No, you wouldn't or, no, it's okay?

21      A.   It's okay.

22      Q.   All right.  Now, concluding on this -- and

23           it's about time for a break -- did you ever
```

121

1    use any of the I-65 property, other than

2    indirectly, pledged as collateral for any

3    loans?

4    A.   No, sir.

5    Q.   And to date, there are no debts other than

6    the alleged mortgage or promissory note

7    outstanding against the I-65 property?

8    A.   That's correct.

9         MR. ROBERTS:  The time is five after

10             12.  I'm going to need either a

11             short break, or we can break for

12             45 minutes or an hour.

13        MR. CLEVELAND:  Let's go ahead and

14             break for lunch and let

15             everybody --

16        MR. ROBERTS:  Back at one?

17        MR. CLEVELAND:  Yeah.  Sounds good.

18             (Lunch recess)

19    Q.   Just one question.  And certainly -- did you

20    have a chance to discuss the maps or anything

21    with your attorney when we were -- during the

22    break?

23    A.   No.  I mean, was I supposed to?

122

```
 1    Q.   No.   No.   I was just going to ask you did

 2         you.

 3    A.   No.

 4    Q.   I always ask that question just so you know.

 5         Okay.   Now we're back to the map.   And I

 6         think you've told me everything you know

 7         about the map as far as ownerships, as far as

 8         ever owned, not owned, no offers of sale on

 9         the -- I mean no offers to buy the 9.6.   Any

10         offers to buy the 10.01?   That's the --

11    A.   Oh, the --

12    Q.   The CD&O.

13    A.   No.

14    Q.   No?   Any offers to buy the four lots owned by

15         CD&O?

16    A.   No.

17    Q.   No.   Okay.   Now, I notice -- and I'm skipping

18         ahead of myself, but we noticed that a

19         complainant in -- and this may be a legal

20         question, and you're perfectly okay to

21         answer.   I don't know why they did that.

22         TD&O, which is your son Taylor, Dick &

23         Others, apparently has filed a counterclaim
```

123

1    against Donna individually.  Can you help me

2    with why TD&O has anything to do with this?

3  A.  TD&O has been one of the companies that I've

4    borrowed money for, for I-65.

5  Q.  Oh, I got you.

6  A.  To pay property taxes, maintenance, upkeep.

7  Q.  Okay.  Got you.  And will that show --

8    here's -- it's all marked up, so I almost

9    hate to use it, but this was furnished at a

10    point.  I think Ms. Perry did it.  It was

11    furnished to my client.  Forget all the

12    writing.  She took notes.  It's the only copy

13    she had.  So will that show on here?  It's

14    got loans Dorsey Motors, Dorsey Motors.  I

15    haven't studied it.  I didn't see TD&O on

16    here.

17  A.  I haven't seen the document.

18  Q.  Okay.  Well, we'll go to that -- well, we may

19    as well go to it, because I'm trying to

20    ascertain how TD&O -- I didn't know they

21    were, because you told me it's Taylor.  So

22    we'll go ahead and use this document.

23    MR. ROBERTS:  Now, I don't have a clean

124

1        copy.  And, Cliff, if it's all

2        right with you -- and y'all have

3        one -- I will introduce it with

4        the idea that we can substitute a

5        perfectly clean copy or we can

6        redact any and all writing.

7        Because in the meeting that Donna

8        had, she didn't have an extra copy

9        or a paper and she wrote on the

10       only copy.

11       MR. CLEVELAND:  Okay.

12       MR. ROBERTS:  If you have a clean copy,

13       it is my representation to the

14       Court that will be Plaintiff's

15       #8.  I'll give it to you.  It's

16       kind of out of order, but a good

17       time to cover it.

18   Q.  I'm going to let you study it for a minute,

19       because I haven't studied it.

20                   (Brief pause)

21   Q.  Okay.  Have you had a chance to look at it?

22   A.  Uh-huh.

23   Q.  I now see that you are completely correct.

127

| | |
|---|---|
| 1 | somewhere around December of 2005. Is that |
| 2 | anywhere close? Not holding you to it. |
| 3 | A. I don't know. |
| 4 | Q. Okay. Jo Anne Perry would be the one that |
| 5 | would know? She would know when she made it |
| 6 | up, wouldn't she? |
| 7 | A. If she made it up. |
| 8 | Q. Okay. I thought earlier you may be -- I'm |
| 9 | probably wrong. I thought you -- who |
| 10 | actually does this, keeps the books, so to |
| 11 | speak, on 65. I mean, this is a |
| 12 | compilation. |
| 13 | A. Jo Anne and Alan Taunton. |
| 14 | Q. Okay. So we'd ask both of them and somebody |
| 15 | would know. All right. And the reason I |
| 16 | said, if you'll look at the first page, under |
| 17 | amount, Department of Revenue and Bob Gray, |
| 18 | it looks like the total is 5,000. And the |
| 19 | actual figures over here was $35 and 140. |
| 20 | And it must be carrying it forward in order |
| 21 | to get $5,000. Do you see the first page I'm |
| 22 | talking about? |
| 23 | A. I -- I don't follow you. |

128

| | | |
|---|---|---|
| 1 | Q. | Well, 35 and 140 equals $175.  Those two |
| 2 | | fees.  And then on the right, it would appear |
| 3 | | that Dorsey Motors loaned the $35 and the |
| 4 | | 140; but on the far right column, it says |
| 5 | | 4,000 and 1,000.  And I'm assuming that |
| 6 | | begins the running total.  I don't know what |
| 7 | | the 4,000 and the 1,000 represents. |
| 8 | A. | I don't either. |
| 9 | Q. | Okay.  Taunton and Jo Anne Perry.  All |
| 10 | | right.  But let's talk about artist sketches, |
| 11 | | Bob Gray.  Do you have any idea?  Was that |
| 12 | | something to deal with the property itself |
| 13 | | for a sales tool or something? |
| 14 | A. | I don't know.  I think my dad spoke to Bob |
| 15 | | and -- and asked him to sketch some things on |
| 16 | | the property.  Don't know what it was in |
| 17 | | regards to. |
| 18 | Q. | Is Bob still around? |
| 19 | A. | Yes. |
| 20 | Q. | Is he an architect?  Engineer? |
| 21 | A. | No. |
| 22 | Q. | What does he do? |
| 23 | A. | Works for the Water Works. |

129

```
 1    Q.   All right.  Let's go as fast as we can

 2         through.  Let's go '91, option on four lots.

 3         So that would be the property that you have

 4         already shown us right here, okay, meaning on

 5         Plaintiff's Exhibit #7.

 6              MR. ROBERTS:  Wait.  Plaintiff's

 7                   Exhibit #7, the one that's marked,

 8                   where is that, the exhibit?

 9                   Okay.  Good.  I just wanted to be

10                   sure it was Exhibit #7.

11    Q.   So that's the four lots.  So we -- if this is

12         correct, we can assume that that gives us an

13         idea of when the property was purchased

14         beings or optioned, the beginning.  And that

15         was 1991.  And we had an appraisal to Carmike

16         on Carmichael.  Are they local?

17    A.   I think they're in Montgomery.

18    Q.   Okay.  You don't know if they're MAIs, I

19         guess, do you?

20    A.   I don't know.

21    Q.   All right.  Why did you deem it necessary to

22         have it appraised back then and not, as you

23         said, you don't want to do it now?
```

130

| | | |
|---|---|---|
| 1 | A. | At this time, there was an offer on the table |
| 2 | | with the Nissan dealership. |
| 3 | Q. | Okay.  And that fell through, I assume? |
| 4 | A. | Yes. |
| 5 | Q. | All right.  The option was extended to Ralph |
| 6 | | Bennett.  And there was a design -- Southern |
| 7 | | Survey and Design.  Are they still around? |
| 8 | A. | I -- I think so. |
| 9 | Q. | Okay.  Do you have a survey on the property? |
| 10 | A. | Yes. |
| 11 | Q. | Okay.  Again, we should make a note we'd like |
| 12 | | to request a copy of the survey through your |
| 13 | | attorney.  We'll file, but if you could be |
| 14 | | getting it together. |
| 15 | | All right.  Quite a good bit of money |
| 16 | | went to Southern Survey and Design.  Am I |
| 17 | | right to assume that you would have had some |
| 18 | | nonrefundable earnest money before you spent |
| 19 | | all this money on a proposed sale? |
| 20 | A. | I don't understand.  What nonrefundable |
| 21 | | earnest money are you talking about? |
| 22 | Q. | Well, were you willing to spend all this |
| 23 | | money prior to having some reimbursement if |

131

```
 1          the Nissan deal went south?
 2   A.     Well, I don't know.  Dad did most of the
 3          discussion with Southern Survey and Design.
 4   Q.     That's fine.  That's the answer.  No
 5          problem.  So ultimately, as far as you know,
 6          the money was defaulted?  I mean, when they
 7          didn't go forward, y'all didn't get any --
 8          get to keep any of the earnest money?
 9   A.     There was no earnest money.  It was strictly
10          a proposal.
11   Q.     Okay.  So there wasn't really a contract at
12          all, then, if you know.  Long time ago.  I
13          wouldn't know.
14   A.     I -- I don't recall.
15   Q.     That's all right.  It would have shown up as
16          income to I-65 if there had been; is that
17          correct?
18   A.     Oh, yes.
19   Q.     Okay.  Now, along this line, there's
20          virtually no income all these years.
21          Everything I see on this recapitulation, as
22          I'll call it, is expenses.  So am I correct,
23          other than the billboard, there's virtually
```

132

| | | |
|---|---|---|
| 1 | | been no income off of I-65 Investment, |
| 2 | | Inc. -- or I-65 -- excuse me -- Properties? |
| 3 | A. | That's right. |
| 4 | Q. | What is the rental -- is there only one |
| 5 | | billboard on the property on I-65? |
| 6 | A. | Only one billboard. |
| 7 | Q. | And what is the annual rental on that? |
| 8 | A. | $600 year. |
| 9 | Q. | Okay. And how long is the lease on that, if |
| 10 | | you know, approximately? |
| 11 | A. | I don't recall. |
| 12 | Q. | Was it perhaps a 20-year lease is why it's so |
| 13 | | low at 600? |
| 14 | A. | I don't know. |
| 15 | Q. | Okay. Similar billboards, unless it's been |
| 16 | | under a long-term lease and got the Lady Bird |
| 17 | | Johnson brouhaha, but normally would be about |
| 18 | | $800 a month. So are you just under a real |
| 19 | | restrictive lease that you can't go up on the |
| 20 | | rent? |
| 21 | A. | I -- I don't know about $800 a month. |
| 22 | Q. | Okay. Who is the tenant? Which company is |
| 23 | | the -- is the tenant on the billboard? |

133

A.   Okay.  TD&O leases the land from I-65
     Properties.  Okay?  They, in turn, turn
     around and lease their permit to Lamar
     Advertising.

Q.   Okay.  That's good.  So as far as you know,
     TD&O could be getting significantly more
     money than $600 a year; is that right?

A.   Yes, sir.

Q.   Do you know how much TD&O does in fact get?

A.   They get $5400 a year.

Q.   Okay.  Do the math for me.  It's not much
     more.  About 12 -- all right.  Was there any
     reason that TD&O was the -- that there is
     that lease to TD&O by I-65 and then TD&O --
     was there some kind of a legal liability,
     some reason TD&O got into it, as opposed to
     just a direct lease from I-65 to Lamar
     Advertising?

A.   Well, TD&O had the permit.

Q.   Okay.  They took out the permit?

A.   They owned the permit.

Q.   Okay.  But anybody could take out -- if you
     could get the permit, I-65 could have just as

134

1        easily got the permit, right?

2    A.    I don't know.  I -- TD&O is really an

3        advertising company.

4    Q.    Okay.  Does TD&O -- I would like to get a

5        copy of the lease, because if the -- if the

6        sign cannot be moved to another location or

7        pay a default amount, it could have an impact

8        on the fair market value of the property.

9        Are you aware of that?

10    A.    I -- I'd have to look at the terms of the

11        lease.

12    Q.    I'd like to get a copy.  And we'll ask for

13        it, if it's a lease, between TD&O and Lamar

14        Advertising.  And then if I understand you

15        right, TD&O pays I-65 about $600 a year; is

16        that right?

17    A.    Yes, sir.

18    Q.    And TD&O earns around $5400 a year.  And TD&O

19        has the sign permit.  And you're not sure if

20        the lease can be canceled based on --

21        withdraw that.

22        When billboards are put up like that,

23        frequently, Lamar Advertising, in particular,

145

| | |
|---|---|
| 1 | A. Not that I recall. |
| 2 | Q. Okay. And -- |
| 3 | A. The capacity of that line? |
| 4 | Q. Yes. Well, not the line. Ultimately, the -- |
| 5 | the pumping station itself. Question, do you |
| 6 | know -- |
| 7 | A. No. |
| 8 | Q. -- where the pumping station is for |
| 9 | Millbrook? |
| 10 | A. I -- no, sir. |
| 11 | Q. Okay. And you've never inquired as to |
| 12 | whether or not you could -- the property, |
| 13 | I-65, could tap onto it, correct? |
| 14 | A. Have I inquired about it? |
| 15 | Q. Yes. Yes. |
| 16 | A. Yes, sir. That's what Mr. Crumpton did. |
| 17 | Q. Yeah, but I'm talking about recently, in the |
| 18 | year. |
| 19 | A. No, sir. |
| 20 | Q. So you haven't -- maybe since 2003, you |
| 21 | haven't inquired? |
| 22 | A. No, sir, not that I remember. |
| 23 | Q. You're a partner in Saxon Properties. And it |

```
 1          appears that the creek, Millbrook -- well,

 2          no, what's the name of the creek?  Hudson

 3          Branch.  It appears that it goes right

 4          through the Saxon Properties.  Do you know,

 5          as a 50 percent owner, if that Saxon

 6          Properties, the 5.3 acres, is tapped onto

 7          that sewer?

 8   A.     Yes.

 9   Q.     Okay.  And how -- when did they tap on?

10   A.     In 2005.

11   Q.     Okay.  Who secured the permit to tap on?

12   A.     Saxon Properties, I would think.

13   Q.     Okay.  But who would I want to talk to

14          about -- since you don't know many about taps

15          and sewers and that, who would I want to talk

16          to, to get that information?

17   A.     Millbrook Sewer.

18   Q.     Okay.  Who from Saxon Properties would have

19          made contact in order to get the tap?  I

20          think Mr. Cleveland is a 50 percent owner.

21          Would it be him maybe?

22   A.     I -- I don't recall.  Either him or me.

23   Q.     Okay.  So that was around 2005.  I think this
```

155

1    would each receive 50 percent of their

2    parents' 60 percent.  Now, if you know, was

3    that the reasoning of your parents, yes or

4    no?

5  A.  I don't know.

6  Q.  You don't know.  Have you ever known

7    Mr. Taunton to make mistakes.  He's a CPA,

8    and they're not like lawyers.  They're very

9    detailed.  Is that right?

10  A.  I don't know that.

11  Q.  Would Mr. Taunton take seriously -- as your

12    accountant responding to an attorney, would

13    he take that seriously and try to verify

14    things that he says in the letter?

15  A.  I think he would take it serious and produce

16    the information that was requested.

17  Q.  So at this point, since you don't know what

18    your parents' intent was, you don't have any

19    reason to question Mr. Taunton's opinion at

20    this point, do you?

21     MR. CLEVELAND:  Nor substantiate it.

22     MR. ROBERTS:  Nor substantiate it.

23  Q. Is that correct?

156

A.   That's correct.

Q.   All right.  Read the rest of that.  I've let
     you read it off the record, but read the rest
     of it.  I just want to be sure, since you
     weren't sure of that -- and I'm trying not to
     take a lot of time, but I-65 didn't pay cash
     but tendered a mortgage.  No problem with
     that, right?

A.   Yes.

Q.   Yes.  She can't read it a head shake.
     Subsequent to the corporation acquiring the
     real state, there have been ongoing costs,
     such as property taxes, annual franchise
     privilege.  You don't have a disagreement
     with that.  We have a document that appears
     to be ongoing costs, correct?

A.   Yes.

Q.   All right.  And there were -- as time passed,
     you don't have any argument that you either
     paid some of those expenses or put money into
     the account to pay the expenses, correct?

A.   Correct.

Q.   Okay.  That's #9.  Following up, we have

165

```
 1        were unfavorable.

 2              Okay.  Is that a correct statement by

 3        Mr. Taunton, as far as you know, of the

 4        reason for appraisal and the reason that it

 5        was made?

 6   A.   Well, you would have to ask Mr. Taunton.  He

 7        wrote the letter.

 8   Q.   That's fine.  Okay.  Did you ever ask Donna

 9        or discuss the note with Donna, since she was

10        not on the note or anything, prior to the

11        year 2000?

12   A.   Discuss the note with her?

13   Q.   The note that's attached here, the promissory

14        note.

15   A.   Absolutely.

16   Q.   You did?

17   A.   Yes, sir.

18   Q.   And what, if anything, did you discuss or

19        tell her?

20   A.   Just that we owed that money to Dorsey Motor

21        Sales.

22   Q.   Do you have any kind of a letter or anything

23        where you forwarded it to her?
```

166

```
 1    A.   No.

 2    Q.   Okay.  When did --

 3    A.   I think we were at Mom and Dad's house.

 4    Q.   Okay.  And that would have been your -- I

 5         think your testimony is it would have been

 6         contemporaneous sometime around the '90 --

 7         '90s is when you signed the note?

 8    A.   Contemporaneous?

 9    Q.   Contemporaneous.  Would it have been before

10         you signed the note or after?

11    A.   I think it was before we signed the note.

12    Q.   Okay.  Would anyone else -- would Ms. Dorsey

13         your former -- Connie.  Does she still go by

14         Dorsey?

15    A.   I don't think so.

16    Q.   I'll just have to call her by her first

17         name.  Would Connie know potentially about

18         that?

19    A.   I don't know.

20    Q.   Okay.  Have you discussed this lawsuit with

21         your former wife, Connie?

22    A.   No.

23    Q.   Where does she live, if you know?  In
```

1                have to check his records.

2          MR. ROBERTS:  No.  I asked about

3               minutes.  I'm asking about a

4               meeting, just a meeting.

5          MR. CLEVELAND:  You mean a meeting

6               other than a shareholders'

7               meeting?

8          MR. ROBERTS:  Yes.  Well, just a

9               meeting.  I'm trying to

10              establish -- the purpose --

11        MR. CLEVELAND:  I'm trying to

12              understand.

13        MR. ROBERTS:  Let me tell you where I'm

14              going.

15   Q.   Let me tell you where I'm going.  I'm going

16      with I don't think this is a corporation.  I

17      think it's property owned tenancy in common

18      or whatever.  And I don't think for ten

19      years, there was absolutely any communication

20      with my client about the property or what's

21      going on or whatever.  Am I wrong on that?

22   A.   That's wrong.

23   Q.   Okay.  Now, tell me why I'm wrong.

172

| | | |
|---|---|---|
| 1 | A. | Because we would talk about it at Mom and |
| 2 | | Dad's house. |
| 3 | Q. | Okay.  About how many times in ten years did |
| 4 | | we talk about it at your mother and dad's? |
| 5 | A. | I don't recall. |
| 6 | Q. | Less than ten? |
| 7 | A. | I don't recall. |
| 8 | Q. | Okay.  We don't have fees for meetings of |
| 9 | | I-65; so if there were meetings during that |
| 10 | | ten-year period, it would have had to have |
| 11 | | been very informal and not held at a lawyer's |
| 12 | | office.  Is that correct? |
| 13 | A. | It was held at my mother and father's house. |
| 14 | Q. | Okay.  Thanksgiving, Christmas, something |
| 15 | | like that? |
| 16 | A. | I don't recall. |
| 17 | Q. | No formal meetings, though, am I correct? |
| 18 | A. | I don't recall.  I don't remember. |
| 19 | Q. | If Donna says there were none, do you have |
| 20 | | any reason to challenge that? |
| 21 | A. | Yes. |
| 22 | Q. | Why if you don't recall? |
| 23 | A. | That's not the truth. |

173

1    Q.   Well, then, I need the truth.  You either

2         recall or you don't.  So there were formal

3         meetings or there weren't.  Which one?

4    A.   There was no formal meetings.  There were

5         meetings at the house where we discussed the

6         property.  We discussed a lot of things in

7         business.

8    Q.   Were they called meetings?

9              MR. CLEVELAND:  What do you mean by

10                  called?

11             MR. ROBERTS:  The bylaws say that

12                  they're to be called and all of

13                  this.  We've got the bylaws if you

14                  need to see them.  They're in

15                  evidence.

16   Q.   I understand brothers and sisters sometimes

17        don't go through total formalities, but I'm

18        really trying to ascertain if there were

19        formal meetings for a ten-year period from

20        '90 to 2000.

21   A.   I'd have to check my records on that.

22   Q.   If you'll do that and let me know, I will

23        hold you to that and appreciate it.

174

```
 1              All right.  Do you ever remember your

 2         father telling you and Donna or Donna that

 3         the note, meaning the promissory note, was

 4         paid off?

 5    A.   Paid off by who?

 6    Q.   Just paid off.  I don't know by who.  I'm

 7         traveling on a document that I have.

 8    A.   No.

 9    Q.   You don't?

10    A.   Unh-unh.

11    Q.   Are you aware that until a December 2000

12         meeting with Alan Taunton, Ms. Dorsey

13         indicated at that meeting that she didn't

14         have any knowledge of the note until December

15         2000?  Do you remember her saying that?

16    A.   Ms. Dorsey --

17    Q.   Donna.

18    A.   Donna.

19    Q.   Your sister.

20    A.   No.

21    Q.   Excuse me.  Donna Davis.  You don't remember

22         that?

23    A.   No.
```

175

Q. Do you believe -- and I think your earlier
testimony was that you discussed the note or
the promissory note, we'll call it, with
Donna. Is that your testimony?

A. Correct.

Q. And that she knew about it completely during
this ten years?

A. She knew about it at the time the property
was moved.

Q. Okay. She knew about the note?

A. Yes.

Q. Okay. Now, have you been carrying the
interest that you claim to be owing by I-65
on your tax return as an account -- or your
balance sheet -- as an account receivable?
In other words --

A. On my personal tax return?

Q. No. Dorsey Motors purports to be the holder
of the note. Have you been carrying --

A. I don't know. We'd have to ask Mr. Taunton
that.

Q. Well, now, I do need -- that's going to be
critical. Part of our allegation in this

176

| | |
|---|---|
| 1 | complaint is that this note is nothing, that |
| 2 | it was a gift.  So I do need copies. |
| 3 | A.  It wasn't a gift. |
| 4 | Q.  I need copies.  I think you used the word |
| 5 | gave, and I corrected you on that.  I'm |
| 6 | sorry.  I was using your word "gave," and |
| 7 | that's what threw me off.  I'm assuming that |
| 8 | we can get, through your attorney, if we ask |
| 9 | for them, the tax returns of Dorsey Motor for |
| 10 | the last five years? |
| 11 | A.  Sure. |
| 12 | Q.  Okay.  Do you know if Donna was furnished |
| 13 | those returns earlier, from the year 1990 |
| 14 | through about 2000?  Did she get copies of |
| 15 | the corporate tax returns? |
| 16 | A.  Corporate tax returns for what? |
| 17 | Q.  For I-65. |
| 18 | A.  I'd have to check my notes.  I thought you |
| 19 | were talking about Dorsey Motor Sales. |
| 20 | Q.  No, no, no.  She wasn't have had any reason |
| 21 | to get that.  All right.  Was there ever a |
| 22 | meeting after 2000 that Donna was invited to |
| 23 | attend that the meeting had already |

183

1    A.    I don't know if I did or not.  Mr. Striplin

2          is retired.

3    Q.    He is?

4              MR. CLEVELAND:  I believe your question

5                    was the last five years.

6              MR. ROBERTS:  And that was before that.

7              MR. CLEVELAND:  That would have been

8                    before that.

9              MR. ROBERTS:  Thank you.  I appreciate

10                    that.

11   Q.    Now, Ralph Bennett is -- who is Ralph

12         Bennett?

13   A.    Ralph Bennett owns a business adjacent to

14         some of the property.

15   Q.    Okay.  And what's -- is he -- I've

16         forgotten.  Which business?

17   A.    Toys for Men.

18   Q.    Motorcycles, if I took a long --

19   A.    A lot of things.

20   Q.    A lot of things.  All right.  And you bought

21         some property from him?

22   A.    Yes, sir.

23   Q.    Okay.  Were any of the I-65, Incorporation,

184

|   |    |                                                    |
|---|----|----------------------------------------------------|
| 1 |    | funds used to purchase that property?              |
| 2 | A. | I-65 had the options on a property when the        |
| 3 |    | we were working on the Nissan project.  When       |
| 4 |    | the Nissan project went away, then rather          |
| 5 |    | than lose the options that had been paid to        |
| 6 |    | Ralph Bennett, because I-65 couldn't afford        |
| 7 |    | to buy the property, then I turned around and      |
| 8 |    | had a couple of weeks and I developed a            |
| 9 |    | business plan and purchased the property in        |
| 10 |   | CD&O.  And we bought the options from I-65.        |
| 11 | Q. | Okay.  And which one of these properties is        |
| 12 |   | the one we're talking about on Plaintiff's         |
| 13 |   | #7?                                                |
| 14 | A. | These.                                             |
| 15 | Q. | All four properties?                               |
| 16 | A. | Yes, sir.                                          |
| 17 | Q. | Now, pardon me, but I didn't understand            |
| 18 |   | earlier that I-65 ever had an option on these      |
| 19 |   | four properties shown on Plaintiff's #7            |
| 20 |   | immediately south of the Cobbs Ford Road.  I       |
| 21 |   | just missed that, didn't I?                        |
| 22 | A. | Well, I had forgotten about it myself until I      |
| 23 |   | saw this option check in here, Ralph Bennett       |

185

```
 1          option.
 2    Q.    Okay.  And he's referring to Plaintiff's --
 3    A.    On 01, looks like January 10th of '91.
 4    Q.    You're referring to Plaintiff's Exhibit #8?
 5    A.    Yes, sir.  It's been a long time ago.
 6    Q.    And the money to Ralph Bennett was paid by
 7          I-65.  So I-65 actually had the option on
 8          four lots, January 10th, 1991?
 9              MR. CLEVELAND:  It was paid from I-65,
10                   right.  Right.
11    Q.    Paid from I-65.
12    A.    Right.
13    Q.    Now, did you tell Donna that I-65 had an
14          option to buy those four tracts of property?
15    A.    Well, an option is not a business deal.  An
16          option is a plan.  And this was something
17·         that my dad and I talked about long before
18          I-65 occurred.  And so we said that if the
19          Nissan dealership comes there, then, like you
20          said, that other property adjacent is going
21          to be more valuable.  And so we were looking
22          to get some expanding land.  And we went to
23          see Mr. Bennett, and Mr. Bennett gave us an
```

186

| | | |
|---|---|---|
| 1 | | option on it. |
| 2 | Q. | Okay.  But now you said long before I-65. |
| 3 | | And by any account of these exhibits, I-65 |
| 4 | | came into being sometime around 1990. |
| 5 | A. | Right. |
| 6 | Q. | So this money was paid the 10th of January |
| 7 | | 1991.  So it wouldn't be long before I-65 was |
| 8 | | started. |
| 9 | A. | I'm talking about the Nissan negotiations. |
| 10 | Q. | Okay.  Okay.  But my point is I-65, meaning |
| 11 | | the corporation, was in existence at the time |
| 12 | | it purchased an option for $2700 to buy those |
| 13 | | four lots from Ralph Bennett; is that |
| 14 | | correct? |
| 15 | A. | Yes. |
| 16 | Q. | Okay.  Ultimately, it is your position that |
| 17 | | that $2700 that was paid and another 3,000 |
| 18 | | extension on the option, total of five -- how |
| 19 | | did that money come back into I-65 if I-65 |
| 20 | | didn't exercise the option, or did it lose |
| 21 | | the money? |
| 22 | A. | Well, it would have lost the money to Ralph |
| 23 | | Bennett, but what happened was CD&O picked up |

187

1    the option from I-65 with a check in '90 --

2    it looks like November 24th of '93.

3    Q.   Okay.

4    A.   And I -- these -- these records -- I must beg

5    off.  These are not my initial records.  I'd

6    have to go through my files and get these --

7    get these checks, if they exist at all.  That

8    long ago, 14, 15 years --

9    Q.   Oh, I understand completely.  Question,

10    though.  How did you -- help me how you

11    looked at the '93 and you arrived at the fact

12    that this option was picked up by somebody

13    else.  Help me with that.

14    A.   Just remembered.  That's all.

15    Q.   But it's not on here, right?

16    A.   Yes, sir.  November 24th.  But it doesn't say

17    what it's for.  No, it does not.

18    Q.   Okay.  But that --

19    A.   CD&O wrote a check for $2100.

20    Q.   All right.  So now -- you mean for $2,000?

21    Oh, I see the 2100 over there.  I see 2,000

22    in the left column and 2100 in the other.

23    A.   Well, that's what I'm saying.  These are

188

```
 1        not --
 2    Q.  Okay.  But is this money that came out of --
 3        is this money owed by I-65 or -- or money
 4        that came from CD&O on behalf of I-65?
 5    A.  I don't know.
 6    Q.  Okay.  You said earlier -- and I'm -- at one
 7        point, you don't purport to be that
 8        knowledgeable in real estate; but on the
 9        other hand, a person who holds an option on a
10        piece of property has superior title during
11        the option period.
12            MR. CLEVELAND:  Superior title or
13                    superior right?
14            MR. ROBERTS:  Superior -- it's really
15                    title because it's the right to
16                    buy.  I'll use his word.
17    Q.  Superior right.  In other words, if I've got
18        an option to buy Cliff's office, he may be on
19        record as the 100 percent fee simple owner;
20        but he can't sell it if I've recorded an
21        option or even if I haven't.  So this option
22        would have allowed I-65, had you chosen to do
23        it, to buy the property.  Right or wrong?
```

193

 1      Suzuki or any of these others?  And I think

 2      your testimony was he did have an interest in

 3      the tract known as Shaw whatever.  Not Shaw,

 4      but the camper property.  Is that the only

 5      one, to your knowledge, that he is a co-owner

 6      with you, either directly or indirectly or

 7      otherwise?

 8  A.  Yes.

 9  Q.  All right.  Did Mr. Cleveland, to your

10      knowledge, ever have an interest in the TD&O

11      or the DO or any of these others?

12  A.  No.

13  Q.  It was, yeah, CD&O.  Was Alan Taunton ever

14      made a board member of I-65, Property, Inc.?

15  A.  He was nominated, and he declined the

16      nomination.

17  Q.  And he, I assume, never owned an interest in

18      any of these properties either; is that

19      correct?

20  A.  No.

21  Q.  No, he never owned an interest, right?

22  A.  No.

23  Q.  We're getting close.  I've got a few

194

```
 1        questions, and then we're going to go over

 2        the complaint and your countercomplaint, but

 3        I've got a couple more documents to show

 4        you.

 5              I'm showing you Plaintiff's #11.  And

 6        before we get into that, did there ever come

 7        a time when you offered if Donna would give

 8        up her 30 percent of I-65 Properties, Inc.,

 9        that you would forgive -- meaning Dorsey

10        Motor would forgive -- 30 percent of the

11        total debt owed to, in your opinion, Dorsey

12        Motor?

13   A.   That I made the proposal to her?

14   Q.   Well, I'm asking you.  Did you ever make that

15        proposal?

16   A.   No.

17   Q.   All right.  Is it your position per this

18        letter that Donna made the overture?

19   A.   Yes, sir.

20   Q.   And you did acknowledge -- you acknowledge

21        that you got a fax from Donna rescinding the

22        verbal offer; is that right?

23   A.   Yes, I got a fax.
```

195

| | |
|---|---|
| 1 | Q. And that was before anything else had been |
| 2 | done to accept it; is that right? |
| 3 | A. Before anything else had been -- |
| 4 | Q. Well, it hadn't been formally accepted. |
| 5 | Documents hadn't been drawn. |
| 6 | A. No. It had only been five days, and we had |
| 7 | to complete the document. |
| 8 | Q. I understand. All right. |
| 9 | A. I got a fax with Donna's signature on it. |
| 10 | Q. All right. Now, you state in here, I think |
| 11 | it's time to stop fighting and move ahead |
| 12 | with our lives. I represent Donna agrees |
| 13 | with that. Do you agree with that statement |
| 14 | you made? |
| 15 | A. Yes, sir. |
| 16 | Q. Now, Mr. Dorsey, you've testified you don't |
| 17 | know the value; but you are willing, whether |
| 18 | it was your offer or Donna's offer, to have |
| 19 | Donna walk away from her share of the |
| 20 | property, meaning the stock, in return for |
| 21 | your, meaning Dorsey Motor, erasing $500,000 |
| 22 | worth of debt. Right or wrong? |
| 23 | A. No. She made the offer to me. |

196

```
 1    Q.   No, no, no.  It doesn't matter who made it.
 2         I'm saying that would have been agreeable
 3         with you, correct?
 4    A.   No.  She also wanted to settle the estate,
 5         too.
 6    Q.   That would have been agreeable with you
 7         because you said the proposal sounded good,
 8         right?
 9    A.   Yes, sir.
10    Q.   And in order to know if the proposal is good
11         or bad for Donna or you or I-65 or Dorsey
12         Motor, you would have had to have known the
13         value of the property, wouldn't you?
14              MR. CLEVELAND:  Object to the form.
15    A.   No, sir.
16    Q.   You wouldn't?
17    A.   No, sir.
18    Q.   So my client Donna would be passing you 30
19         percent of a beautiful piece of property on
20         I-65, the freeway, in return for a debt on a
21         promissory note signed by you and Connie; is
22         that right?
23    A.   Yes, sir.
```

197

| | | |
|---|---|---|
| 1 | Q. | To your company; is that right? |
| 2 | A. | Yes, sir. |
| 3 | Q. | At a time, which I submit to you, there was |
| 4 | | no I-65 Properties even in existence at the |
| 5 | | time the note was signed, is that correct, |
| 6 | | from what you've seen?  I'm not asking you |
| 7 | | for a legal opinion. |
| 8 | A. | I don't agree. |
| 9 | Q. | You don't? |
| 10 | A. | I-65 Properties existed at the time the note |
| 11 | | was made. |
| 12 | Q. | Incorporated; is that right? |
| 13 | A. | Yes, sir. |
| 14 | Q. | And what do you base that on? |
| 15 | A. | Good faith.  Somebody made a clerical error, |
| 16 | | an attorney missed a date, he got buried on |
| 17 | | the desktop, any number of things. |
| 18 | Q. | Kind of like good intentions?  He had -- |
| 19 | A. | Sir? |
| 20 | Q. | Kind of like you said good faith.  You're |
| 21 | | saying that lawyer had good intentions to |
| 22 | | actually get this thing -- get the cart back |
| 23 | | out? |

198

```
1                MR. CLEVELAND:  Well, that -- Dick, I

2                    don't want you -- you have no way

3                    of knowing what George Walthall's

4                    intentions were.

5     A.    Exactly.  I don't know what his intentions

6           were.  I don't know what went on down there

7           at the office.

8     Q.    But it's your opinion that I-65 was a valid

9           corporation on the date that you signed that

10          note to your company, Dorsey Motor?

11    A.    Yes, sir.

12    Q.    Okay.  Now, you and Donna are blood kin, is

13          that right?  Whether either one of you wants

14          to claim it.  Same mom and same daddy, right?

15    A.    Yes, sir.

16    Q.    Assume with me one time, the only

17          hypothetical I've asked you I think in this

18          case, if that property was worth eight or ten

19          dollars a square foot and the proposal had

20          sounded good to you, Donna could have been

21          out -- even if you except the note, the

22          promissory note -- it could have placed her a

23          million dollars in the hole.  Do you disagree
```

1    A.    I don't know.

2    Q.    Under $500,000?

3    A.    I don't know.

4    Q.    So when you say -- and I realize your lawyer

5          drafted the counterclaim, but Davis owes

6          Dorsey Motors -- excuse me -- owes Dorsey --

7          that would be you individually -- Dorsey

8          Motors, and TD&O the sum of $518,645.16,

9          correct?

10   A.    Correct.

11   Q.    Would you break that down for me, just

12         roughly, since we're all friends, at a half

13         million how much you think she owes Dorsey

14         Motors, you individually, and TD&O?

15   A.    Well, the only way to do that is to take the

16         $250,000 original amount and extrapolate it

17         out at 12 percent a year and come up with

18         that figure.  And of course, Dorsey Motor

19         Sales also paid some of the other expenses

20         and ad valorem taxes and, you know, loaned

21         money to I-65 for that.  And then TD&O loaned

22         I-65 money, too.

23   Q.    A couple thousand dollars?

210

| | | |
|---|---|---|
| 1 | A. | I don't know. |
| 2 | Q. | Okay.  That brings up the main point.  Did |
| 3 | | there ever come a time that you felt like |
| 4 | | charging -- meaning Dorsey Motor charging |
| 5 | | I-65 12 percent when LIBOR was down around |
| 6 | | four, that that was usurious and outrageously |
| 7 | | high? |
| 8 | | MR. CLEVELAND:  Object to the form. |
| 9 | Q. | You can answer. |
| 10 | A. | What's LIBOR? |
| 11 | Q. | It's a method by which banks -- today you can |
| 12 | | borrow money at 4 percent.  LIBOR is about |
| 13 | | five, and it changes daily.  So most banks |
| 14 | | love -- it's kind like a floating amount. |
| 15 | | They like to have you sign on at LIBOR plus |
| 16 | | 2 percent or LIBOR plus three.  It's an |
| 17 | | index. |
| 18 | A. | Kind of like prime? |
| 19 | Q. | Like prime, yes, only they like it better.  I |
| 20 | | think they created it.  So now my question is |
| 21 | | this is your sister, Donna Davis.  We |
| 22 | | established that, somewhat reluctantly.  Did |
| 23 | | you ever come to a point where since you were |

211

```
1            the beneficiary of the 12 percent and you

2            also owed interest at 12 percent to yourself

3            that you could forgive anytime you wanted to,

4            that it was unfair to charge one sister 12

5            percent when prevailing rate was somewhere

6            between five and six?

7   A.     Well, I don't know what the rate was back

8            then, but my dad set the interest rate.  And

9            as far as I can forgive myself the interest

10           rate, I'd like that.  That would be good.

11           But you can't do that.

12   Q.     Is that because you would have to pay

13           ordinary income tax on all this money?

14   A.     I have no clue about that, but you can't do

15           for one that you don't do for the other.

16   Q.     Well, that's exactly right.  And you could

17           have done for yourself and for Donna.  You

18           could have adjusted the -- we contend the

19           note is a gift and that it's bogus from the

20           beginning.

21   A.     Well, not so.

22   Q.     Well, I'm accepting that --

23   A.     My father knew differently.  He set the
```

212

| | | |
|---|---|---|
| 1 | | interest rate. |
| 2 | Q. | Right. |
| 3 | A. | And I'll leave it at his interest rate. |
| 4 | Q. | Oh.  So we don't change the interest rate |
| 5 | | when the interest rate drops; we just |
| 6 | | continue conveniently. |
| 7 | A. | My father had a reason for doing it, and I'll |
| 8 | | bow to him. |
| 9 | Q. | You'll stay with that. |
| 10 | A. | Yes, sir. |
| 11 | Q. | Even though there was a time, many times, |
| 12 | | when a fair interest rate would have been, do |
| 13 | | you agree, significantly less than 12 |
| 14 | | percent? |
| 15 | | MR. CLEVELAND:  Object to the form. |
| 16 | Q. | You can answer. |
| 17 | | MR. CLEVELAND:  Whatever significantly |
| 18 | | means. |
| 19 | A. | I have no idea.  I just know that that's what |
| 20 | | my dad did, and he had a reason for doing it. |
| 21 | Q. | And your dad and your mother are dead.  And |
| 22 | | your only surviving sibling is my client, |
| 23 | | Donna Dorsey Davis.  So she lives with this |

217

1    of it as far as accountability, but -- and I

2    don't even remember when it was.  It was some

3    time ago.

4    Q.   Do you think that it was his opinion that the

5         property should be transferred from the

6         corporation to the LLC?

7    A.   Well, I -- I think that's where he was going;

8         but after I got into it, the LLCs are such an

9         unknown quantity and, to me, appear to be

10        loose.

11   Q.   Did it ever come up from Mr. Taunton to you

12        that it could create a large tax liability to

13        Dorsey Motor Sales if that note was

14        transferred out of I-65?

15   A.   No.  Because we didn't do that.

16   Q.   Okay.  Was I-65, in your opinion,

17        undercapitalized at its conception; in other

18        words, didn't have enough money to pay its

19        bills and all, had no visible source of

20        income other than a billboard?

21   A.   That's true.

22             MR. CLEVELAND:  You mean at inception,

23                  though?

218

| | | |
|---|---|---|
| 1 | Q. | Yes. |
| 2 | A. | At inception.  That's why the Nissan deal, we |
| 3 | | worked so hard on that. |
| 4 | Q. | All right.  And since that, you really |
| 5 | | haven't worked hard on any other sales, have |
| 6 | | you? |
| 7 | A. | Sure. |
| 8 | Q. | You have? |
| 9 | A. | Yes. |
| 10 | Q. | I was going to ask you earlier, you know, |
| 11 | | shopping centers are being sold over the |
| 12 | | Internet now based on fair market value, |
| 13 | | appraisals.  Wouldn't it be a great idea at |
| 14 | | least to put it on the Internet, beautiful |
| 15 | | property located at the intersection of Cobbs |
| 16 | | Road and I-65, sewer available?  And you |
| 17 | | never know.  The Japanese might pick that one |
| 18 | | up.  I mean, a lot of property sells sight |
| 19 | | unseen.  Would that not be a good idea to |
| 20 | | market it, or do you really want to market |
| 21 | | that property? |
| 22 | A. | Sure.  Property is always marketable. |
| 23 | Q. | If I had come to you and said I want to buy |

221

Q.   I think so.

A.   Okay.

Q.   Do you have any problem with Donna -- if
     you're not willing to pay for it, with Donna
     having it appraised?

A.   No.

Q.   Okay.  That's exactly what we plan to do.
     I'm giving you an offer to choose an MAI of
     our joint choosing.  And I'll leave it open
     for Mr. Cleveland.  That way, it might be a
     little more salient if we get down to a point
     where this corporation is not an entity and
     it's just property owned 70-30.  But if you
     choose to, let us know.  If not, we'll go
     ahead with the best MAI we can get.

          All right.  I think we're almost
     through.  All I've got to do is go through
     the complaint with you.

          MR. ROBERTS:  And I need about a
                  ten-minute break max, and it
                  shouldn't take us -- the time is
                  three o'clock.

          (Brief recess)

222

```
 1    Q.   All right.  Tell me if I'm wrong.  We're

 2         moving fast.  You own 100 percent of CD&O,

 3         LLC, and you own 100 percent of TD&O, LLC.

 4    A.   TD&O, Inc.

 5    Q.   Oh.  you own 100 percent of that?

 6    A.   Yes, sir.

 7    Q.   And 100 percent of CD&O, LLC?

 8    A.   Yes, sir.

 9    Q.   All right.  I'm just going to go over the

10         complaint very quickly with you.  Donna, your

11         sister, alleges on behalf of herself and,

12         derivatively, on behalf of the corporation

13         I-65 basically that you have done a lousy job

14         of managing the property.  Some of the

15         reasons we can augment today:  Don't know

16         what the property is worth, would consider an

17         offer without an appraisal; don't know for

18         sure where the sewer is; don't, don't, don't.

19         So, that's the essence.  That's a summary.

20              Donna alleges that the note itself -- by

21         the way, have you read the complaint?

22    A.   Yes, back when it was filed.

23    Q.   All right.  She alleges that -- let's see.
```

223

1    I've got to go to three -- that you used your

2    position -- this is under factual

3    allegations, number 10 -- used your position

4    to control I-65 and its assets and to manage

5    I-65 in a manner oppressive to her, the other

6    stockholder, in violation of what we lawyers

7    call a fiduciary duty.  And she alleges you

8    failed to provide her with documents and

9    access information as required by law; denied

10    the shareholders meaningful participation in

11    the management of the affairs, either

12    directly or through proxy; and that you have

13    caused I-65 -- stripped it of any future

14    profits by acquiring all of the surrounding

15    land on Plaintiff's Exhibit #7.

16        If my memory serves you right -- and you

17    have an excellent lawyer.  He denied all of

18    that, I assume.  Do you deny that here today?

19    A.  Yes.

20    Q.  Okay.  That's the way we move faster.  She

21    alleges you engaged in self-dealing, that

22    it's permitted you to unlawfully participate

23    in profits of the business at the expense of

224

1       the minority shareholder and I-65 as a

2       whole.  That, we didn't know for sure; but

3       that would be by taking an option in I-65's

4       name and then using it yourself to purchase

5       adjoining property.  And I don't think you

6       deny that you bought -- I mean your testimony

7       is you took the I-65 option and either

8       assigned it or let it lapse such that one of

9       your companies was able to buy the four

10      properties shown on Plaintiff's #7.  Do you

11      disagree with that?

12  A.   Well, CD&O took the option, because I-65 was

13      going to let it lapse and lose the money.

14      And CD&O then took the option and paid the

15      money to I-65, which I think, in turn, paid

16      the money back to Dorsey Motor Sales, where

17      they borrowed it.  I'd have to go trace it

18      back, but this was back in 1991.

19  Q.   I will greatly appreciate it if you can trace

20      back and maybe a copy of the option.

21         MR. CLEVELAND:  That's what I was going

22            to say.  Before we start admitting

23            or denying our understanding about

227

1    A.   I'm sure I told her about the options and the

2         Nissan project.

3    Q.   Okay.

4    A.   Because they were in conjunction together.

5    Q.   About the same time.  Okay.  So Nissan -- as

6         I said earlier, a dealership would need more

7         than ten acres.  I mean, that's -- am I

8         wrong?

9    A.   I think so.

10   Q.   Wouldn't a dealership normally need at least

11        20 acres?

12   A.   I don't think so.

13   Q.   Really?  Okay.  You think ten acres is

14        sufficient on a freeway?

15   A.   I don't think it needs ten acres.

16   Q.   Okay.  She also alleges that you acted

17        negligently towards the interest of I-65 by

18        failing and refusing to commit the time and

19        resources that were necessary to oversee I-65

20        as opposed to your competing businesses.  You

21        disagree with that?

22   A.   I disagree with that.

23   Q.   She claims that under certain case law, that

228

1    you have been oppressing her and attempting

2    to squeeze her out.  Disagree?

3  A.  Disagree.

4  Q.  Okay.  We're almost there.  She claims you

5    breached your fiduciary duty to her as a

6    minority stockholder.  Disagree?

7  A.  Disagree.

8  Q.  Negligence.  She claims that you have been

9    negligent in the operation of the Dorsey --

10    of the I-65 by virtue of, among other things,

11    like today, not having appraisals, not

12    knowing the location of the sewer or tap

13    fees, paying advanced tap fees.  Disagree

14    with that?

15  A.  I disagree.

16  Q.  Okay.  Other than sitting on the property,

17    what have you -- and paying the bills -- what

18    have you done that would -- would refute

19    these allegations as to your proficiency as a

20    manager of this very valuable real estate, if

21    any?

22  A.  Well, I think the records you produced showed

23    some action when we entertained the Nissan

229

| | | |
|---|---|---|
| 1 | | project, when we hired an attorney to speak |
| 2 | | to Millbrook City Council on the sewer |
| 3 | | question, when we defended the illegal |
| 4 | | placement of the signs at the entrance to the |
| 5 | | property by K Bar K., when we also acquired a |
| 6 | | movement of Millbrook's -- I mean -- excuse |
| 7 | | me -- Prattville city limits across the |
| 8 | | interstate.  We had the city limits moved. |
| 9 | Q. | All right.  To be in Prattville? |
| 10 | A. | Yes. |
| 11 | Q. | Okay. |
| 12 | A. | When we engineered -- or not engineered -- |
| 13 | | got the estimate on repiping the drainage |
| 14 | | from across the property to a common line |
| 15 | | with the State of Alabama to move the |
| 16 | | drain -- the drainage from the center.  We |
| 17 | | paid our taxes. |
| 18 | Q. | Okay.  That's good.  I just wanted to give |
| 19 | | you an opportunity -- since Ms. Davis is |
| 20 | | alleging that you breached your duty and all, |
| 21 | | I wanted to give you an opportunity to state |
| 22 | | what all you felt like you did that was |
| 23 | | right. |

A.  Told people to stop dropping old washing
    machines on the property.

Q.  And tires.

A.  Run off Vietnamese picking bamboo shoots for
    their restaurant, put up security poles and
    chain, reported the illegal dumping of the
    tires on the property, among other things
    that I can remember right off the top of my
    head.

Q.  Let the record show I'm not saying that
    that's all that you've done.  That just gives
    you an opportunity to respond.

        Okay.  Now, do you have any problem with
    erecting a sign that has an outline of the
    property?  You know, you can take a
    four-by-eight sheet of weather-proof plywood,
    marine plywood, and you can reproduce the
    outline of the property and maybe, this
    desirable nine point acres with sewers,
    zoned, available for ground lease or sale?
    Wouldn't that be a good idea to -- it's like
    fishing.  You throw that hook out there and
    see if you can catch somebody.  If it isn't,


1    you how to sell real estate.  I think that

2    based on my client's position, that what you

3    just said proves -- nothing personal, but

4    that you have not managed the property

5    properly.  Because I agree with you,

6    lookie-lou's all the time.  But approximately

7    a week ago, got a contract for a million

8    seven from Graham and Company on I-65

9    property that I own with a couple of

10   partners.  Graham and Company has a net worth

11   of probably $150 million.  I didn't have to

12   run up and down the highway wondering if they

13   were good.

14        In Cliff Cleveland was buying it with

15   their money -- and I'm not being facetious,

16   but someone of means -- I'd go talk to Cliff

17   if he came up there and wanted to buy some

18   property or the GMAC dealership or the bank.

19   So I'm just saying to you it strikes me as

20   there is a reason that you have sat on it

21   like a mother hen.  Am I wrong that you have

22   sat on it without advertising it, doing

23   anything to try to sell it?

234

```
 1      A.    I thought it was a good business decision.

 2      Q.    Okay.

 3      A.    Prattville is going to grow.  And I knew

 4            eventually the property would go up in value.

 5            As far as whether I'm open for legitimate

 6            offers, bring me a legitimate offer, then

 7            we'll look, then we'll talk, then we'll think

 8            about an expensive appraisal.

 9      Q.    But what about people that don't know -- I

10            mean, with no sign, how do they even know

11            it's for sale or ground lease?  If I give you

12            that, how do they know it's available for

13            ground lease?

14      A.    Real legitimate land developers find out who

15            owns what.

16      Q.    Because they have to go to the courthouse,

17            run the records, find Dick Dorsey.  It's a

18            little harder than seeing a sign, this

19            property for ground lease.  I won't argue

20            with you on it.  I'm just saying I thought it

21            might be, after this deposition, that as this

22            litigation progresses, it might be favorable

23            to help you get this interest you're claiming
```

235

1    for yourself and Donna to try to sell the

2    property.

3  A.   I thinks think it's in the best interest of

4    the property and I-65 to work the property

5    for a ground lease. I think it's in the best

6    interest of I-65 to work the property

7    possibly on a co-development basis.

8  Q.   Okay. Now, let me ask you a question on

9    that. This is probably the last one. I

10    reserve the right for Ms. Erwin to feed me

11    one more or two questions. But if the

12    property were ground leased tomorrow, it

13    wouldn't be for anywhere near its fair market

14    value; and you would still have a meter of 12

15    percent running on Donna Dorsey Davis, which

16    she probably couldn't come up with five or

17    600,000 dollars. And there's where you would

18    wipe her right off the map. Right or wrong?

19  A.   I don't think like that.

20  Q.   You don't?

21  A.   No, sir.

22  Q.   Well, let's say it was worth $10 million.

23    With a 10 percent return -- we'll just throw

```
 1          that out -- would be a million dollars a year
 2          for the ground lease.  And you look over at
 3          Donna and say, now, Donna, we're only getting
 4          a million dollars a year.  We got to pay
 5          taxes, upkeep.  We got to do all these
 6          things.  And now you owe Dorsey Motor 600,000
 7          and counting.  She wouldn't have enough money
 8          to pay you if that is a legitimate debt to
 9          pay Dorsey, right?
10     A.   I don't know.  I don't know your numbers.
11     Q.   Well, that's just her problem, then, right?
12          She owes money -- or at least her 30 percent,
13          owes that money?
14     A.   We both owe the money.
15     Q.   Okay.  And a ground lease is what is your
16          preference, and that's what you've been
17          looking for.  And you're waiting on somebody
18          to find you, right?
19     A.   Ground lease or co-development.
20     Q.   All right.  Now, if a co-development took
21          place, are you familiar with subordination?
22     A.   You'll have to give it to me simple.
23     Q.   Normally in a ground lease, any lender that
```

# EXHIBIT "4"

## Articles of Incorporation for
## I-65 Properties

Jan-20-00 03:16P

P.03

STATE OF ALABAMA
ELMORE COUNTY
I CERTIFY THIS INSTRUMENT
WAS FILED ON

STATE OF ALABAMA

ELMORE COUNTY

Oct 9  3 35 PM '90

ARTICLES OF INCORPORATION

OF

I-65 PROPERTIES, INC.

TO THE HONORABLE JUDGE OF PROBATE OF ELMORE COUNTY, ALABAMA:

KNOW YE:    That the undersigned, desiring to become a body incorporated under the general laws of the State of Alabama, for the purpose of carrying on a lawful business, and being all of the subscribers to the capital stock of the corporation hereby organized, do make, sign, and file these Articles of Incorporation as follows:

### ARTICLE I

The name of the Corporation shall be: I-65 PROPERTIES, INC.

### ARTICLE II

The corporate powers shall be exercised by the Board of Directors, except as otherwise provided by statute or by this Certificate of Incorporation. The Board of Directors shall consist of not less than one (1) nor more than seven (7) members. In the event of the death or resignation of a Director, a stockholder or stockholders, a successor shall be elected at the next regular called meeting. All officers and directors shall hold office for a period of one (1) year or until their successors are elected and qualified. It shall not be required of a person to own stock in the corporation in order to be a Director of the corporation. However, any officer or director of the corporation can be removed at a called meeting of the stockholders on a vote of a majority of

EXHIBIT

4

the holders of the capital stock of the corporation; at least ten
(10) days notice of the time and place of said called meeting shall
be given.   There shall be one vote cast for each share of stock
represented.   In furtherance and not in limitation of the powers
conferred  by  statute,  the  Board  of  Directors  is  expressly
authorized:

(1)   to make and alter the By-laws of the corporation by By-
Laws made by the Directors may be altered or repealed by the
directors or stockholders.

(2)   To make and use a corporate seal, and to alter the same
at pleasure.

(3)   To fix and determine and to vary the amount of working
capital of the corporation; to determine whether any, and if any,
what part of any accumulated, the date or dates of the declaration
and payment of dividends; to direct and determine the use and
disposition of any surplus or net profits over and above the
capital stock paid in.

(4)   The corporation may, in its By-Laws, confer powers upon
its Board of Directors in addition to the foregoing, and in
addition to the powers and authorities expressly conferred upon it
by statute.

### ARTICLE III

The purpose for which this corporation is organized are as
follows:

1.   To erect, construct, maintain, improve, rebuild, enlarge,
alter, manage, and control, directly or through ownership of stock
in any corporation, any and all kinds of buildings, houses, stores,

offices, shops, warehouses, factories, mills, machinery, and plants, and any and all other structures, erections which may in the judgment of the Board of Directors at any time be necessary, useful or advantageous, for the purposes of the corporation, and which can lawfully be done under the laws of the State of Alabama.

To make, enter into, perform and carry out contracts for construction, building, altering, improving, repairing, decorating, maintaining, furnishing and fitting up buildings, tenements, and structures of every description, and to advance money to and enter into agreements of all kinds with builders, contractors, property owners and others, for said purposes.

To design, draw and prepare plans, specifications and estimates for and to supervise, bid upon, enter into and execute contracts for the construction and alteration of buildings, structures, and any other engineering or construction project or enterprise of any nature whatsoever.

The purposes for which the Corporation is formed and the business or objects to be carried on and promoted by it, or any one or more of the acts and things herein set forth, and for the accomplishment of these purposes and the carrying on and the promotion of said business and said objects, the Corporation shall have, and may exercise, all powers conferred upon it by the laws of the State of Alabama, now or hereafter in effect.

Generally to carry on and undertake any other lawful business of the same general nature, which may from time to time seem to the directors of the corporation capable of being conveniently carried on in connection with the above objects, or calculated directly or

indirectly to render valuable or enhance the value of any of the Corporation's properties, privileges or rights.

## ARTICLE IV

The total authorized capital stock of said corporation shall be the sum of ONE THOUSAND AND NO/100 DOLLARS, consisting of One thousand shares of common stock of the par value of ONE AND NO/100 DOLLARS per share. The corporation shall begin business with a subscribed capital stock of ONE THOUSAND AND NO/100 DOLLARS, consisting of ONE THOUSAND AND NO/100 DOLLARS shares of common stock of the par value of ONE AND NO/100 DOLLARS per share, all fully subscribed and paid for as shown by certificate hereto attached, as Exhibit "B".

## ARTICLE V

The officer or agent designated by the incorporators to receive subscriptions to the capital stock and to act as the registered agent for the corporation is one and the same person, being RICHARD M. DORSEY, Post Office Box 26, Prattville, Alabama 36067.

## ARTICLE VI

The name and post office address of the incorporators and the number of shares subscribed for by him is as follows:

(a) RICHARD M. DORSEY
    Post Office Box 26
    Prattville, Alabama 36067
    Seventy (70)

(b) Donna D. Davis
    3612 Westbury Road
    Birmingham, Alabama 35223
    Thirty (30)

The name and post office address of the members of the Board of Directors of the corporation for the first year is as follows:

ROLL/OFRAME 00559

(a)   RICHARD M. DORSEY
      Post Office Box 26
      Prattville, Alabama 36067

(b)   DONNA D. DAVIS
      3612 Westbury Road
      Birmingham, Alabama 35223

The names and address of the officers of the corporation

chosen for the year is as follows:

(a)   RICHARD M. DORSEY
      Post Office Box 26
      Prattville, Alabama 36067
      PRESIDENT/TREASURER

(b)   DONNA D. DAVIS
      3612 Westbury Road
      Birmingham, Alabama 35223
      VICE PRESIDENT

(c)   CONNIE S. DORSEY
      Post Office Box 26
      Prattville, Alabama 36067
      SECRETARY

The office of the President, Vice-President, Secretary and

Treasurer may be separate or they may be combined with each other

or any other office of the corporation.

## ARTICLE VII

The location of the principal office of the corporation shall

be at 2602 Cobbs Ford Road, Prattville, Alabama 36067; but the

right is reserved to establish other places of business in other

localities in Alabama.

## ARTICLE VIII

The period for the duration of the corporation shall be

unlimited and perpetual.

## ARTICLE IX

All notes, mortgages or other evidence of debt given by the

ROLL 106 FRAME

000560

corporation and all deeds, conveyance, releases, or quitclaims shall be signed in the same name of the corporation, by the President and attested by the Secretary.

### ARTICLE X

Attached hereto, marked Exhibit "A" and made a part hereof by reference, is a true and correct copy of the subscription list showing the amount of capital stock in the corporation subscribed for by the said incorporator and the manner in which such subscription shall be discharged. Attached hereto, marked Exhibit "B" and made a part hereof, is a statement under oath made by RICHARD M. DORSEY, the officer or agent authorized by the incorporator to receive subscriptions to the capital stock of the corporation, showing the amount of capital stock of the corporation which has been paid in.

IN WITNESS WHEREOF, the undersigned incorporators have hereunto set their hands and seals this ___1___ day of _Oct___, 1990.

RICHARD M. DORSEY

DONNA D. DAVIS

STATE OF ALABAMA

AUTAUGA COUNTY

Before me, the undersigned authority, a Notary Public in and for said State at Large, personally appeared RICHARD M. DORSEY the incorporator above named, who, on oath, says that the matters stated in the foregoing certificate are true.

RICHARD M. DORSEY

GIVEN UNDER MY HAND AND SEAL THIS ___1___ DAY OF _October_
1990.

_____
NOTARY PUBLIC

STATE OF ALABAMA

AUTAUGA COUNTY

Before me, the undersigned authority, a Notary Public in and

for said State at Large, personally appeared DONNA D. DAVIS the

incorporator above named, who, on oath, says that the matters

stated in the foregoing certificate are true.

_____
RICHARD M. DORSEY

GIVEN UNDER MY HAND AND SEAL THIS ___1___ DAY OF _October_
1990.

_____
NOTARY PUBLIC

This instrument prepared by:
LAW OFFICES OF GEORGE P. WALTHALL, JR.
141 West Main Street
Prattville, Alabama 36067
(205) 365-2755 (Our File No. 90-412.PRO)

ROLL 06 FRAME

000562

EXHIBIT "A"

STATE OF ALABAMA

ELMORE COUNTY

SUBSCRIPTION LIST OF

I-65 PROPERTIES, INC.

We, the undersigned, do respectively subscribe for and agree
to pay for the number of shares of the common stock of I-65
PROPERTIES, INC., a corporation, proposed to be organized under the
law of the State of Alabama, as set below my representative
signature hereunder and to pay therefor forthwith upon the
organization of said corporation, it being understood and agreed
that the shares subscribed for by the undersigned will be paid for
in cash in the amount of ONE AND NO/100 DOLLARS for each share of
stock hereunder subscribed.

WITNESS my hand and seal this ___1___ day of __October__.
1990.

RICHARD M. DORSEY

DONNA D. DAVIS

Jan-20-00 03:18P                                                    P.11

EXHIBIT "B"

STATE OF ALABAMA
ELMORE COUNTY

Before me, the undersigned authority, a Notary Public in and

for said State at Large, personally appeared RICHARD M. DORSEY, who

is known to me, and who being by me first duly sworn according to

law, deposes and says, that he is the Officer/Agent designated and

authorized by the incorporator of I-65 PROPERTIES, INC., a

corporation, proposed to be incorporated under the laws of the

State of Alabama, to receive the subscriptions to the capital stock

subscribed for is ONE THOUSAND SHARES of common stock having a par

value of ONE AND NO/100 DOLLARS per share, that this certificate

is appended to a copy of the Subscription List to a capital stock

of said corporation marked Exhibit "A" and made a part hereof by

reference; that each of the said incorporators and subscribers to

the said capital stock has paid in full amount of his subscription

by causing to be delivered to affiant cash in the aggregate net

amount of their respective subscriptions for delivery to said

corporation upon completion of the organization thereof.

_____
RICHARD M. DORSEY

SWORN TO AND SUBSCRIBED before me this _____1_____ day of
October, 1990.

_____
NOTARY PUBLIC

ROLL:1/06 FRAME
000564

# EXHIBIT "5"

## By-Laws for I-65 Properties

BY-LAWS
I-65 PROPERTIES, INC.
A CORPORATION
PRATTVILLE, ALABAMA

### ARTICLE I

The President shall preside at all stockholder's and director's meetings. He shall be the Chairman of the Board of Directors. The President may and upon demand of the holders of a majority of the common stock of the corporation, call special meetings of the stockholders or directors. The office of President may be combined with any other office of said corporation.

### ARTICLE II

The Vice President shall in the case of the absence or disability of the President, perform the duties of the President. The office of the Vice-President may be combined with any other office of said corporation.

### ARTICLE III

The Secretary shall keep the records of the corporation and books of account. She shall have the custody of the seal of the corporation. She shall issue, sign and seal all certificates of stock which certificates must also be signed by the President, and the Secretary shall, in addition, perform all the other duties usually pertaining to his office. The office of Secretary may be combined with any other office of said corporation.

### ARTICLE IV

The Treasurer shall have the custody of all monies and securities of the corporation. He shall keep regular books. All monies of the corporation shall be deposited in such depository as

EXHIBIT
5

shall be selected, from time to time by the directors.  Checks may
be signed by any officer or officers of the corporation or by such
employee or employees of the corporation as the directors, may,
from time to time, designate.  In addition, the Treasurer shall
perform all duties usually pertaining to his office.  The office
of  Treasurer  may  be  combined  with  any  other  office  of  said
corporation.

### ARTICLE V

SECTION 1.  The business of the corporation shall be managed
by the Board of Directors, consisting of not less than one person
nor more than seven persons.  The President of the corporation
shall be the Chairman of the Board of Directors and shall preside
over all directors' meetings and the Secretary of the corporation
shall be the Secretary of all directors' meetings.

SECTION 2.  The general management and government and
direction of affairs of the corporation shall be vested in the
Board of Directors, who may establish rules not inconsistent with
these By-Laws for the proper regulation and performance of the
duties incumbent upon them.  They shall take all necessary measures
to preserve and protect the property of the corporation, see that
all taxes and necessary expenses are paid, and generally, take all
legitimate and appropriate measures to carry into force and effect
the objects and purposes of the corporation as defined in the
Articles of Incorporation and By-Laws.

SECTION 3.  Regular meetings of the Board of Directors shall
be held at such time and place as the directors may determine.  A
regular meeting of the Board of Directors shall be held before the

stockholder's annual meeting on the same day thereof, and immediately after the adjourned meeting of each regular meeting of the stockholders. No notice to directors of such regular meeting shall be required and it shall be the duty of each director to attend same without notice. The majority of the Board of Directors shall constitute a quorum.

SECTION 4. Special meetings of the directors may be called by the President or the holders of a majority of the shares of outstanding common stock upon 10 days notice of such special meetings may be held at any time by unanimous consent of the directors.

SECTION 5. The directors shall be elected immediately upon incorporation and shall hold office until their successors are respectively elected and qualified. Failure to elect officers or directors at any time designated for their election shall not work a dissolution of the corporation. But the several officers or directors thereof shall constitute to hold office until their successors are elected.

SECTION 6. Vacancies on the Board of Directors may be filled by elected by the remaining members of the Board of Directors at any regular or special meeting.

SECTION 7. No director shall receive a salary or other compensation for his service as a director.

ARTICLE V1

SECTION 1. The regular meeting of the stockholders of this corporation shall be held at the general office of the corporation

in the City of Prattville, Alabama on the first Monday in September
of every year.

SECTION 2.  Special meetings of the stockholders may be called
by the President or the holders of a majority of the shares of
outstanding common stock upon ten (10) days notice, mailed to each
stockholder at his or her last known address, or such special
meetings may be held at any time by unanimous consent.  Special
meetings shall be held at the same place as regular meetings.

SECTION 3.  At all meetings of the stockholders, regular or
special, a majority of the stock shall constitute a quorum.   A
majority of a quorum may decide any questions coming before the
meeting.

SECTION 4.  At all stockholder's meetings, each holder of
stock shall be entitled to one vote for each share of stock held
by him or her.  Each stockholder may vote either in person or by
written proxy.

SECTION 5.  The President and Secretary shall act as President
and Secretary of each stockholder's meeting unless those at the
meeting shall otherwise decide.

### ARTICLE VII

The officers of the corporation shall consist of a President,
Vice President, Secretary and Treasurer; or if the officers of this
corporation so direct, any of the officers of said corporation may
be combined.

### ARTICLE VIII

The books of the corporation shall be audited once a year at
the close of the fiscal year by a disinterested auditor, who shall

RML

prepare a balance sheet, profit and loss statement and such other statements as may be necessary, which shall be submitted to the first director's meeting following the preparation of the audit and to the stockholders at their annual meeting; the directors are charged with attending to the filing of all necessary State and Federal tax returns and for the same purpose, are authorized and empowered to employ a public accountant or auditor.

## ARTICLE IX

The corporation shall have a lien upon each share of stock for any indebtedness due to it from the holder thereof.

## ARTICLE X

The Seal of the corporation shall be circular and shall be inscribed as follows: "I-65 PROPERTIES, INC., Prattville, Alabama, Corporate Seal, State of Alabama."

## ARTICLE XI

The books, records and accounts of this corporation shall be opened to inspection by all stockholders or any members of the board of Directors at all times.

## ARTICLE XII

SECTION 1.    Shares of the capital stock must be transferred upon the books of the corporation, either in person or by attorney by endorsement of the certificate and it surrendered to the Secretary for cancellation, or by the signing of a transfer in a regular transfer book, whereupon a new certificate shall be issued to the regular transferee.    The Board of Directors may, by resolution, forbid the transfer of stock for a period of time not exceeding thirty (30) days immediately before a meeting of the

R M n

stockholders or immediately before the time when a dividend is payable.

A.   Transfer of stock shall be made only upon the books of the corporation, after compliance, among other things, with the requirements of this ARticle; and, before a new certificate of stock shall be issued, the older certificate of stock property endorsed, shall be surrendered. Surrendered certificates of stock shall be cancelled and shall be attached to the proper stub in Stock Book. Shares of the capital stock must be transferred upon the books of the corporation, either in person or by attorney, by endorsement of the certificate and it surrendered to the Secretary for cancellation, whereupon a new certificate of stock shall be issued to the regular transferee. The Board of Directors may, by resolution, forbid the transfer of stock for a period of time not to exceed thirty (30) days immediately before a meeting of the stockholders or immediately before a date when a dividend is payable.

B.   No shares of stock shall be sold or transferred to a person who is not already a stockholder unless the stock shall be firs offered for sale to the stockholders of this corporation, to each of them, in writing; the right to transfer the stock to a person other than stock holder shall not exist until all existing stock holders refuse the offer made as provided above or until receipt of the written offer to accept same by compliance with terms and provisions therein set forth. Regulation as formalities, terms and procedures shall be followed in effecting the transfer in accordance with the By-laws of this corporation.

C.   Every such offer shall be in writing and shall state that the offeror offers severally and not jointly to sell all of his shares of stock of the corporation held or owned by him and a copy of such offer signed by the offeror shall be delivered personally, or sent by registered mail to each of the other stockholders who may then be stock holders of the corporation, and a duplicate copy of such offer so signed and delivered and mailed, shall become similarly signed and delivered or mailed to the corporation at its principal place of business; every such offer shall state the number of share desired to be sold, and the offer shall be made, in equal parts, severally, and not jointly to the other stockholders.

D.   Each stockholder to whom such offer must be made as herein provided shall have a period of thirty (30) days from the time of mailing or delivery, to him of the said offer, within which to determine whether or not he will accept such offer, so far as it relates to him; and if

*R M L*

he shall elect to accept the same, such accepting stockholder shall within thirty (30) days so signify, in writing duly signed by him, to the stockholder making the offer and to the corporation; and such original and duplicate acceptance shall be either personally delivered or sent by registered mail, but no stockholder who may accept any such offer made to him shall be affected in respect of his own acceptance, by the failure or refusal or any other stockholder to act.

E.    If the offer aforesaid shall be made to the stockholders who number two or more and if one or more, of such stockholders shall signify his or their intention to accept such offer so made to him or them, and if any other of the stockholders aforesaid shall refuse, or fail, to accept the offer so made to him or them, the then accepting stockholder, or stockholders, shall have the right to purchase from the offeror, in equal parts, the shares of the stock remaining unaccepted at the expiration of such period of thirty days, as though, an offer to sell the same was then made by the offeror to such accepting stockholder of stockholders, under the providing paragraph of this Article; and such accepting stockholder, or stockholders, shall act upon the right hereby so granted (hereinafter called the "re-offer"), after the expiration of the said period of thirty (30) days, within the same period of time, and in the same manner, at the expiration of said period of thirty (30) days as though an offer has been made to him, or them, under the providing paragraph of this Article.

F.    If an offer made aforesaid, or any re-offer as provided in this Article, shall have been accepted as herein permitted, the shares of stock so accepted for purchase shall be delivered and paid for the accepting stockholder or stockholders, in the manner and at the price hereinafter provided; and no shares of stock of the corporation held or owned by the stockholders shall be transferrable, in any other manner, or to any other persons, firm or corporation until such other stockholder or stockholders, to whom such offer, or offers or re-offer is, or are required to be made as aforesaid, shall have refused in writing, or shall have failed to accept the offer, or offers, or re-offers, therefore, within the period, or periods, above provided.

G.    If any of the shares of stock so offered, or re-offered, for purchase, shall not be accepted for purchase as, and within the periods or periods of time above prescribed, such unaccepted shares of stock or offerer shall thereafter be free from the restrictions and provisions of the agreement; provided however, that if any one of the said shares of stock so free from such restrictions and provisions, shall thereafter be

*R M A*

acquired, held or owned by any of the stockholder, then, and in every such event, each and all of such shares of stock shall thereafter be held, or owned, subject to all and singular, the restrictions, and provisions of this agreement.

11.    Upon the death of the stockholder, the other stockholders who may then be stockholders of the corporation shall severally have the right to purchase the shares of stock of the corporation owned or held by the stockholders so deceased, at the time of his death, as though an offer to sell had been mae by such stockholder at the time of his death, as hereinabove provided, and such other stockholder or stockholders had accepted such offer as so made. The terms, provisions, and conditions set forth in these By-laws shall with necessary changes and points of detail, apply to, bind, and confirm the personal representative of such deceased stockholder, provided, however that the stockholder or stockholders, purchasing said stock shall be required to purchase said stock within three (3) months from the date that Letters Testamentary or Letters of Administration were issued by the Court wherein the Estate of said decedent is pending.

SECTION 2.    The purchase price hereunder of shares of stock of the corporation shall be their value as reflected by an adjusted balance sheet of the corporation, determined from an actual inventory and appraisal of all of the assets of the corporation (both real and personal property), and in accordance with standard *generally* accepted accounting practices, *principles* as of date of the acceptance of such offer by one of the stockholders, or, in the event of the death of a stockholder, as of the date of the death of said stockholder. No allowances shall be made for goodwill.

SECTION 3.    Upon being notified as provided for in this Article of any stockholder's offer to sell, or in the event of the death of any stockholder, the corporation shall cause a balance sheet to be prepared in accordance with the provisions of this Article and a copy thereof shall be promptly delivered or sent by

*R M. W.*

registered mail, or to the personal representative of a deceased
stockholder as the case may be.

SECTION 4. Within ten (10) days after delivery or mailing of
a copy of the balance sheet, the selling stockholder shall deliver
to the corporation all of his shares of stock offered for sale,
duly endorsed in blank, together with his written resignation as
an *officer* and/or director of the corporation, together with the
like resignation of the corporation, together with the like
resignation of any nominee of his who may then be an *officer* and/or
director of the corporation. Not later than fourteen (14) days
following such date of acceptance by the accepting stockholder, or
stockholders, each accepting stockholder shall deliver that
purchase price due from him to the corporation, for the account of
the offeror, and upon receipt thereof, the corporation shall
deliver, forthwith, to the offeror, the purchase price or prices
received, and shall deliver to the accepting stockholder who may
have paid the said purchase price, the shares of stock therefore.

SECTION 5. If any of the shares of stock so offered for sale,
as herein provided, shall not be accepted and paid for within the
time or times prescribed therefore, a new certificate of stock or
any unaccepted and/or unpaid for shares of stock shall be issued
and delivered to the offeror upon the demand of the offeror, made
after the date fixed for the acceptance of a re-offer or re-offers
as hereinabove provided for.

SECTION 6. The corporation shall not issue stock certificates
to a new stockholder, or sell any of its unissued or treasury stock
to any person, firm, association, or corporation, unless and until

such person, firm, association or corporation shall have signed in the Minute Book of the Corporation these By-laws and agreed to the terms and conditions thereof, each of the stockholders, as of the date of the ratification and approval of these By-laws and by signing his name does hereby agree to all of the terms and provisions of the By-laws and all of the restrictions placed on the stock said corporation.

SECTION 7.   All shares of stock issued and delivered to the stockholders shall have written, stamped or printed upon the face *properly* the following:

> Transferrable only on the Books of the Corporation by the holder hereof in person or by duly authorized Attorney, on surrender of this Certificate (properly) endorsed, and only in accordance with the terms and provisions of the By-Laws of this Corporation.

SECTION 8.   All offers, acceptance and notices herein provided for, if given by mail, shall be addressed to the person, firm, association, or corporation to be notified, at their respective addresses appearing on the transfer books of the corporation, at the time the same shall be mailed.

## ARTICLE XIII

The By-Laws of the corporation or any part of them may be abridged, altered, added to or repealed by the same body which enacted them at any regular or special meeting of the stockholders of the corporation.

## ARTICLE XIV

If there is anything in the foregoing By-Laws inconsistent or in conflict with the Laws of the State of Alabama, or with the Certificate of Incorporation, then it is hereby provided that such

*R M W*

fact would serve only to invalidate that particular clause or clauses, or provisions as may be so inconsistent and in conflict with the Laws of the State or Certificate of Incorporation and shall not affect or impair in any sense the other sections and provisions of these By-Laws.

The above By-Laws have been approved and confirmed by all of the holders of outstanding stock of the corporation who have hereunto set their hands and seals on this the __ 1 __ day of _October_ __, 19 _90_ .

_____
RICHARD M. DORSEY

ATTEST TO SIGNATURE

_____
DONNA D. DAVIS

R m D.

# EXHIBIT "6"

## Certificate of Incorporation for
## I-65 Properties

# State Of Alabama ROLL 106 FRAME 73

### ELMORE                              000566

# County

# Certificate Of Incorporation

## Of

### I-65 PROPERTIES, INC.

The undersigned as Judge of Probate of ___Elmore___ County, State of Alabama, hereby certifies that duplicate originals of Articles of Incorporation for the incorporation of ___I-65 Properties, Inc.___, duly signed pursuant to the provisions of Section 64 of the Alabama Business Corporation Act, have been received in this office and are found to conform to law.

ACCORDINGLY the undersigned as such Judge of Probate, and by virtue of the authority vested in him by law, hereby issues this Certificate of Incorporation of ___I-65 Properties, Inc.___, and attaches hereto a duplicate original of the Articles of Incorporation.

GIVEN Under My Hand and Official Seal on this the ___9th___ day of ___October___, 19 90.

Edward W Enslen
Judge of Probate

**EXHIBIT**

**6**

# EXHIBIT "8"

## January 6, 2000 Letter from John Davis to Alan Taunton

2056 Glen Eagle Lane
Birmingham, AL 35242
January 6, 2000

Mr. Allen Taunton
Diamond, Roller, Taunton and Carmichael, PA
475 South Hull Street
Montgomery, Alabama 36104

Subject: I-65 Property

Dear Mr. Allen,

I am writing to recap our meeting of December 10, 1999, concerning the disposition of I-65 Properties.

- Present in the meeting were Samuel Diamond, Allen Taunton, Donna Davis, and Jack Davis.

- The I-65 Property (9.606 Acres, recorded in Plat Book 8, page 73, of the Judge of Probate of Elmore County, Alabama), was originally purchased by Dorsey Motor Sales from Marjorie Virginia Cobb and Dorothy Cobb Jones on February 3, 1987. The purchase price was $100,000 ($20,000 cash, plus a $80,000 note held by Dorsey Motor Sales, Inc., and Dick Dorsey).

   It is important to note, at that time, the ownership of Dorsey Motor Sales, Inc. was held, by Richard M. (Dick) Dorsey (40%), Ann M. Dorsey (40%), and Richard T. Dorsey (20%). Is a copy of this original note available?

- In October 1990, "to avoid possible liabilities, which may be incurred by Dorsey Motor Sales, Inc.", the Property was then sold to I-65 Properties, Inc. (2602 Cobbs Ford Road, Prattville, AL, a Small Business Corporation), for the sum of $225,000 plus closing costs, or approximately $228,000. A note for this amount (accumulating 12½ % annual interest) was held by Dorsey Motor Sales, Inc. At that time, the ownership of Dorsey Motor Sales, Inc. remained unchanged from the above percentages. This note should contain the signatures of the stockholders of Dorsey Motor Sales, Inc., to confirm that all its stockholders agreed with the transaction. Do you have documentation of this transaction?

   You stated that Dorsey Motor Sales, Inc. paid taxes on the above income. However, any revenue distribution (approximately $125,000) to principles of Dorsey Motor Sales, Inc. is undefined. My review of the 1990 Tax Returns of Ann M. Dorsey and Richard T. Dorsey, prior to the subpoena of the returns for the Chrysler/Dorsey Motor Sales trial, showed no distributions to these parties, despite their combined 60% ownership in Dorsey Motor Sales. As the tax accountants for Dorsey Motor Sales, Inc., Richard M. Dorsey, and Mr. and Mrs. (Ann M.) Richard T. Dorsey, do you not have records of the distribution on these funds? Will you please furnish Donna with replacement copies of R.T. and A.M. Dorsey's 1990 Tax return.

   The ownership of I-65 Properties, Inc., per the Articles of Incorporation, filed with the State of Alabama, was 70% by Dick Dorsey (then President & Treasurer) and 30% by Donna D. Davis (Vice President). Fulfilling the Office of Secretary, was Connie S. Dorsey, then wife of Dick Dorsey. Other than an undated copy of the Articles of Incorporation, no other documents of the transaction (the note held by Dorsey Motor Sales, Inc., final executed documents, etc.) were given to Donna Davis. A "First Stockholders Meeting" was held September 25, 1990, without notification to or attendance by Donna Davis, giving Dick Dorsey (Chairman) the power to handle all financial and other matters pertaining to I-65 Properties, Inc.

EXHIBIT
B

No monies on the note held by Dorsey Motor Sales, Inc., either on the note itself or maintenance of the Property, has been paid. The sum now owed Dorsey Motor Sales, Inc., amounts to approximately $282,000. Have you documentation of the amounts spent on maintenance, etc. on the property?

As you stated, "to avoid future double corporation taxation", on December 11, 1995 Articles of Organization of I-65 Properties, L.L.C. (548 Selma Highway, Prattville, AL) were filed with the State of Alabama, converting I-65 Properties, Inc. to a Limited Liability Corporation. The Initial Members of the L.L.C. are listed as Dick Dorsey and Donna Davis. Neither, an Operating Agreement or statement of the L.L.C. Ownership Participation is included with this filing. Am I to assume that you have no documentation on this, but it can be requested from the Secretary of State?

Has the original note on I-65 Properties, Inc., held by Dorsey Motor Sales, Inc., has been assigned to I-65 Properties, L.L.C.? Where can a copy of the note be obtained?

The accounting firm of Diamond, Roller, Taunton, & Carmichael has prepared Tax Returns for I-65 Properties, L.L.C. As part owner of said Property, will you please supply Donna with copies of the returns and work papers?

Has a formal appraisal been made to determine the value of the Property? Can you supply a copy of the property taxes paid, before and after the Elmore County assessment, which occured about the time of the transfer from a Corporation to the L.L.C.?

I understand that during the course of the Chrysler Motors/Dorsey Motor Sales lawsuit, Diamond, Roller, Taunton and Carmichael were required to supply the majority of the financial information sought by Chrysler, and that Diamond, Roller, Taunton and Carmichel were allowed to retain copies of this information. Can you supply Donna with that information, pertaining to the I-65 Property?

Mr. Richard T. Dorsey died on January 26, 1996, potentially changing the ownership of Dorsey Motor Sales. Subsequent actions by Dick Dorsey, having been contested by Ann M. Dorsey and her Conservator and not fully resolved by the Courts, gave full ownership of Dorsey Motor Sales, Inc. (and therefore, the note held on I-65 Properties, L.L.C.) to Dick Dorsey.

With this change of ownership, can it now be presumed that Dick Dorsey, as owner of Dorsey Motor Sales, Inc., can foreclose on the note held on I-65 Properties, L.L.C., owned by Dick Dorsey and Donna Dorsey Davis? It seems unjust that the heritage (Ownership in I-65 Properties) set up by Donna Davis' father, Richard T, Dorsey, can later be taken away from her.

Again, thank you and Mr. Diamond for you assistance. Donna and I will continue to pursue an equitable solution to this dilemma.

Respectfully,

*Jack Davis*

John H. Davis, Jr. (Spouse)

2056 Glen Eagle Lane
Birmingham, AL 25242

Mr. Allen Taunton
Diamond, Roller, Taunton and Carmichael, PA
475 South Hull Street
Montgomery, Alabama 36104





# EXHIBIT "9"

## February 17, 2000 Correspondence from Alan Taunton to John Davis

*Rec'd 2-?-00*

# Diamond, Roller, Taunton and Carmichael

Certified Public Accountants * A Professional Association
200 Executive Park Drive
P. O. Box 780248
Tallassee, Alabama 36078
Telephone (334) 283-2567    Fax (334) 283-6900
Email drtc-tal@tallassee.net

Sam I. Diamond, Jr., C.P.A.
Thomas Roller, C.P.A.
J. Alan Taunton, C.P.A.
James D. Carmichael, C.P.A.
James J. Gary III, C.P.A.

Montgomery Office
475 South Hull Street
Montgomery, Alabama 36042
(334) 834-7720
Members
American Institute of CPA's
Alabama Society of CPA's

Tasha Patterson, C.P.A.
Christopher D. Haynes, C.P.A.
Jeannie G. Price, C.P.A.

February 17, 2000

Mr. John H. Davis, Jr.
2056 Eagle Lane
Birmingham, AL 35242



**EXHIBIT**

**9**

RE:  Letter dated January 6, 2000          **Personal and Confidential**

Dear John,

I apologize for not responding earlier to your letter, but I have been extremely busy and your letter got covered up on my desk.

**Bullet 2:  Questions about Cobb Sisters Note:**
The purchase price was $100.000.  The purchaser was Dorsey Motor Sales, Inc. (DMS).  There was an $80,000 note from DMS to the Cobb sisters.  This note was eventually paid off by DMS in annual increments of $20,000 plus interest.  We may have a copy of the original note to the sisters by Dorsey Motor Sales, Inc.  We are not aware of any guarantee by Dick, although there may have been,  or his individually having been a party to the note.

The ownership percentages referenced by your letter are in accordance with our records.

**Bullet 3:  Questions about I-65 Properties, Inc. Note:**
We do have a copy of this note.  The note is dated October 1, 1990 and is signed by Richard M. Dorsey as president of I-65 Properties, Inc.  The payee of a note does not sign the note, therefore, no signatures of DMS officers appear on the note.

This transaction was a defensive manover designed to protect the property from possible seizure in the event a judgement was ever rendered against DMS.

The sale was reported by DMS on its tax return.

There was no distribution of proceeds by DMS because no cash was collected from I-65.  DMS did report a taxable gain from the sale even though no cash was collected.

We do have a copy of the 1990 tax return for R. T. and Ann Dorsey.  Because Mrs. Dorsey now has an executor handling her affairs, we kindly request that you make the request for a copy through Mr. Faulk. We will gladely furnish a copy, but must respect the rules of confidentiality.

Mr. John H. Davis
Inquiries related to I-65 Properties, Inc. and LLC
Page 2 of 3

The ownership percentages and officers of I-65 Properties, Inc. agrees with our records.
Our files include a copy of the By Laws executed on October 1, 1990 and signed by Richard M. Dorsey
and attested to by Donna D. Davis.

The copy of the Articles of Incorporation in our file were signed by both Richard M. Dorsey and Donna
D. Davis.

Our files also include a copy of the First Stockholders Meeting held October 1, 1990, indicating both
Richard M. Dorsey and Donna D. Davis were in attendence. Your record indicating the meeting was
held on September 25, 1990 is not in agreement with our copies of signed minutes.

As to documentation of amounts expended by DMS on the I-65 Property, we have no details as to this
matter. I have not inquired of DMS as to the extent of it's documentation or as to whom the expenditures
were made.

**Bullet 4: Documentation on formation of LLC:**
The records I have are incomplete. The LLC articles of organization were prepared and a federal ID
number was obtained. I have no record of an operating agreement ever having been prepared.

Your statement that the corporation was converted to the LLC is not correct. The formation of the LLC
created a new legal entity. The old I-65, Inc. continued to exist and to my knowledge still exists. Our
records do indicate a 70% (Dick) 30%(Donna) ownership ratio of the LLC.

I have seen no records indicating an assumption of the note on the property by the LLC. I am enlclosing
a copy of the note from I-65 Properties, Inc to DMS

I am enclosing a copy of the LLC tax returns as filed.

**Bullet 5: Formal Appraisal:**
I have no knowledge of an independent appraisal. There may have been an appraisal several years back,
but I did not find a copy in our file. I have not located in our files a copy of the county's appraisal at the
time the property was transferred to I-65, Inc. There was a notice of appraised value by the county in the
files of DMS. This document can also be obtained from the county tax assessor's office.

**Bullet 6: Information supplied to Chrysler relative to the DMS lawsuit:**
Our firm did participate in numerous meetings during the course of this litigation. Our records were also
supoenaed. I do not remember supplying anything except what they obtained by supoena. We have no
record of what they copied once they had posession of the records. We did not copy anything for
Chrysler. I do not remember ever being asked to provide any records or documents related to I-65
Properties, Inc. or LLC and to my recollection, no documents of I-65 were supplied.

Mr. John H. Davis
Inquiries related to I-65 Properties, Inc. and LLC
Page 3 of 3

---

**Bullet 7:  Rights of DMS to foreclose on I-65 Properties note:**
This is a legal question and I am not an attorney.  I cannot offer an opinion as to this matter.

I hope this information will be sufficient.  If I can assist you any further, please let me know.

Yours truly,

*Alan*

J. Alan Taunton
Certified Public Accountant

Enclosures

# EXHIBIT "10"

## April 5, 2000 Letter from Richard Dorsey to Donna Davis

# I-65 PROPERTIES, INC.

548 Selma Hwy Prattville, AL 36067

April 5, 2000

Mrs. Donna Davis
2056 Glen Eagle Lane
Birmingham, Alabama 35242

RE: March 6th, 2000 Meeting

Dear Donna:

I have received a letter from Jack concerning additional documents on I-65 Properties, Inc. I trust that this request was made on your behalf since you are the Shareholder and an Officer. I am providing the information to you and you can share with Jack whatever you deem appropriate.

The first issue that I will address are the financial records. I have provided the accountant with all the documents that I have concerning I-65 Properties, Inc. from its inception to date. I have been informed that these are being summarized on a year by year basis. Once I have received that information, I will forward what I receive to you. I think this will address all inquiries that you made concerning financial matters. I am unclear as to what information you are seeking concerning who the benefactor of the promissory note from I-65 Properties, Inc. was. As you can see from looking at the note it was made payable to Dorsey Motor Sales, Inc.

I have also enclosed new copies of the Articles of Incorporation, By-Laws, etc. You received a copy of these at the time that you signed them yet if you cannot locate your copies, I certainly have no objection to providing you with new copies.

You make reference to mortgage financing being obtained from a commercial institution. I have absolutely no objection to that and would encourage you to make any inquiries which you deem appropriate to see if there is any interest by a commercial institution in providing the mortgage financing. I am at a loss as to your rationalization that there now exists a conflict of interest. This note was executed in 1990 and has not been modified in any way since that time. I was President of Dorsey Motor Sales, Inc. in 1990 and was also President of I-65 Properties, Inc. in 1990. Presently, I continue to serve as President of both corporations. I hope you realize that my holding these two (2) positions has certainly not been to your detriment but very much to your benefit. Had any third party commercial institution

EXHIBIT

10

Mrs. Donna Dorsey
April 5, 2000
Page 2

provided the financing for I-65 Properties, Inc. to obtain this property, which also bestowed upon you a 30% interest that you previously did not have, then I can also assure you that likewise payments on some regular basis would have been demanded.

I have also enclosed a copy of the survey and topographical information which I told Jack that I would gather in addition to the other documents which I have mentioned above.

I hope this answers the questions presented. However if you have any additional inquiries, please let me know.

Sincerely,


Dick Dorsey
Pres, I-65 Properties, Inc.

DD/bjm

Enclosures.

1.    Articles of Incorporation
2.    By-Laws
3.    Survey
4.    Topographical Survey

# EXHIBIT "11"

## Affidavit of Alan Taunton

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DONNA DORSEY DAVIS,
as an individual and derivatively upon
behalf of I-65 Properties, Inc.,

     Plaintiff,

vs.

RICHARD M. DORSEY, as an individual
and CD&O, LLC, as a necessary party,

     Defendants.

Case No. 2:06-cv-766-MHT

## Affidavit of J. Alan Taunton

1.    My name is J. Alan Taunton. I am a Certified Public Accountant with Diamond, Roller, Taunton and Carmichael. I have personal knowledge of the matters set forth herein.

2.    I have performed tax and accounting work for Richard Dorsey and I-65 Properties, Inc. since approximately 1976.

3.    The correspondence attached to this affidavit were received by me or forwarded by me as part of the work I performed for I-65 Properties, Inc. I communicated with the John Davis through this correspondence.

J. Alan Taunton

STATE OF ALABAMA     )
COUNTY OF Elmore )

Before me the undersigned Notary Public in and for State and County aforesaid, personally appeared J. Alan Taunton, who is personally known to me and who, being by me first duly sworn, doth depose and say that he signed the above affidavit to the best of his knowledge, information and belief and with full understanding of its effect.

NOTARY PUBLIC
My Commission Expires: 8/30/09

(SEAL)

EXHIBIT
11

16173

2056 Glen Eagle Lane
Birmingham, AL 35242
January 6, 2000

Mr. Allen Taunton
Diamond, Roller, Taunton and Carmichael, PA
475 South Hull Street
Montgomery, Alabama 36104

Subject: I-65 Property

Dear Mr. Allen,

I am writing to recap our meeting of December 10, 1999, concerning the disposition of I-65 Properties.

- Present in the meeting were Samuel Diamond, Allen Taunton, Donna Davis, and Jack Davis.

- The I-65 Property (9.606 Acres, recorded in Plat Book 8, page 73, of the Judge of Probate of Elmore County, Alabama), was originally purchased by Dorsey Motor Sales from Marjorie Virginia Cobb and Dorothy Cobb Jones on February 3, 1987. The purchase price was $100,000 ($20,000 cash, plus a $80,000 note held by Dorsey Motor Sales, Inc., and Dick Dorsey).

  It is important to note, at that time, the ownership of Dorsey Motor Sales, Inc. was held, by Richard M. (Dick) Dorsey (40%), Ann M. Dorsey (40%), and Richard T. Dorsey (20%). Is a copy of this original note available?

- In October 1990, "to avoid possible liabilities, which may be incurred by Dorsey Motor Sales, Inc.", the Property was then sold to I-65 Properties, Inc. (2602 Cobbs Ford Road, Prattville, AL, a Small Business Corporation), for the sum of $225,000 plus closing costs, or approximately $228,000. A note for this amount (accumulating 12½ % annual interest) was held by Dorsey Motor Sales, Inc. At that time, the ownership of Dorsey Motor Sales, Inc. remained unchanged from the above percentages. This note should contain the signatures of the stockholders of Dorsey Motor Sales, Inc., to confirm that all its stockholders agreed with the transaction. Do you have documentation of this transaction?

  You stated that Dorsey Motor Sales, Inc. paid taxes on the above income. However, any revenue distribution (approximately $125,000) to principles of Dorsey Motor Sales, Inc. is undefined. My review of the 1990 Tax Returns of Ann M. Dorsey and Richard T. Dorsey, prior to the subpoena of the returns for the Chrysler/Dorsey Motor Sales trial, showed no distributions to these parties, despite their combined 60% ownership in Dorsey Motor Sales. As the tax accountants for Dorsey Motor Sales, Inc., Richard M. Dorsey, and Mr. and Mrs. (Ann M.) Richard T. Dorsey, do you not have records of the distribution on these funds? Will you please furnish Donna with replacement copies of R.T. and A.M. Dorsey's 1990 Tax return.

  The ownership of I-65 Properties, Inc., per the Articles of Incorporation, filed with the State of Alabama, was 70% by Dick Dorsey (then President & Treasurer) and 30% by Donna D. Davis (Vice President). Fulfilling the Office of Secretary, was Connie S. Dorsey, then wife of Dick Dorsey. Other than an undated copy of the Articles of Incorporation, no other documents of the transaction (the note held by Dorsey Motor Sales, Inc., final executed documents, etc.) were given to Donna Davis. A "First Stockholders Meeting" was held September 25, 1990, without notification to or attendance by Donna Davis, giving Dick Dorsey (Chairman) the power to handle all financial and other matters pertaining to I-65 Properties, Inc.

EXHIBIT
B

No monies on the note held by Dorsey Motor Sales, Inc., either on the note itself or maintenance of the Property, has been paid. The sum now owed Dorsey Motor Sales, Inc., amounts to approximately $282,000. Have you documentation of the amounts spent on maintenance, etc. on the property?

- As you stated, "to avoid future double corporation taxation", on December 11, 1995 Articles of Organization of I-65 Properties, L.L.C. (548 Selma Highway, Prattville, AL) were filed with the State of Alabama, converting I-65 Properties, Inc. to a Limited Liability Corporation. The Initial Members of the L.L.C. are listed as Dick Dorsey and Donna Davis. Neither, an Operating Agreement or statement of the L.L.C. Ownership Participation is included with this filing. Am I to assume that, you have no documentation on this, but it can be requested from the Secretary of State?

Has the original note on I-65 Properties, Inc., held by Dorsey Motor Sales, Inc., has been assigned to I-65 Properties, L.L.C.? Where can a copy of the note be obtained?

The accounting firm of Diamond, Roller, Taunton, & Carmichael has prepared Tax Returns for I-65 Properties, L.L.C. As part owner of said Property, will you please supply Donna with copies of the returns and work papers?

- Has a formal appraisal been made to determine the value of the Property? Can you supply a copy of the property taxes paid, before and after the Elmore County assessment, which occured about the time of the transfer from a Corporation to the L.L.C.?

- I understand that during the course of the Chrysler Motors/Dorsey Motor Sales lawsuit, Diamond, Roller, Taunton and Carmichael were required to supply the majority of the financial information sought by Chrysler, and that Diamond, Roller, Taunton and Carmichael were allowed to retain copies of this information. Can you supply Donna with that information, pertaining to the I-65 Property?

- Mr. Richard T. Dorsey died on January 26, 1996, potentially changing the ownership of Dorsey Motor Sales. Subsequent actions by Dick Dorsey, having been contested by Ann M. Dorsey and her Conservator and not fully resolved by the Courts, gave full ownership of Dorsey Motor Sales, Inc. (and therefore, the note held on I-65 Properties, L.L.C.) to Dick Dorsey.

With this change of ownership, can it is now be presumed that Dick Dorsey, as owner of Dorsey Motor Sales, Inc., can foreclose on the note held on I-65 Properties, L.L.C., owned by Dick Dorsey and Donna Dorsey Davis? It seems unjust that the heritage (Ownership in I-65 Properties) set up by Donna Davis' father, Richard T, Dorsey, can later be taken away from her.

Again, thank you and Mr. Diamond for you assistance. Donna and I will continue to pursue an equitable solution to this dilemma.

Respectfully,

*Jack Davis*

John H. Davis, Jr. (Spouse)

2056 Glen Eagle Lane
Birmingham, AL 25242

3361043242213 33

Mr. Allen Taunton
Diamond, Roller, Taunton and Carmichael, PA
475 South Hull Street
Montgomery, Alabama 36104





Rec'd 3-2-00

# Diamond, Roller, Taunton and Carmichael

Certified Public Accountants  *  A Professional Association
200 Executive Park Drive
P. O. Box 780248
Tallassee, Alabama 36078
Telephone (334) 283-2567    Fax (334) 283-6900
Email drtc-tal@tallassee.net

Sam I. Diamond, Jr., C.P.A.
Thomas Roller, C.P.A.
J. Alan Taunton, C.P.A.
James D. Carmichael, C.P.A.
James J. Gary III, C.P.A.

Tasha Patterson, C.P.A.
Christopher D. Haynes, C.P.A.
Jeannie G. Price, C.P.A.

Montgomery Office
475 South Hull Street
Montgomery, Alabama 36042
(334) 834-7720
Members
American Institute of CPA's
Alabama Society of CPA's

February 17, 2000

Mr. John H. Davis, Jr.
2056 Eagle Lane
Birmingham, AL 35242

RE:  Letter dated January 6, 2000

<u>Personal and Confidential</u>



EXHIBIT

9

Dear John,

I apologize for not responding earlier to your letter, but I have been extremely busy and your letter got covered up on my desk.

**Bullet 2:  Questions about Cobb Sisters Note:**
The purchase price was $100.000.  The purchaser was Dorsey Motor Sales, Inc. (DMS).  There was an $80,000 note from DMS to the Cobb sisters.  This note was eventually paid off by DMS in annual increments of $20,000 plus interest.  We may have a copy of the original note to the sisters by Dorsey Motor Sales, Inc.  We are not aware of any guarantee by Dick, although there may have been, or his individually having been a party to the note.

The ownership percentages referenced by your letter are in accordance with our records.

**Bullet 3:  Questions about I-65 Properties, Inc. Note:**
We do have a copy of this note.  The note is dated October 1, 1990 and is signed by Richard M. Dorsey as president of I-65 Properties, Inc.  The payee of a note does not sign the note, therefore, no signatures of DMS officers appear on the note.

This transaction was a defensive manover designed to protect the property from possible seizure in the event a judgement was ever rendered against DMS.

The sale was reported by DMS on its tax return.

There was no distribution of proceeds by DMS because no cash was collected from I-65.  DMS did report a taxable gain from the sale even though no cash was collected.

We do have a copy of the 1990 tax return for R. T. and Ann Dorsey.  Because Mrs. Dorsey now has an executor handling her affairs, we kindly request that you make the request for a copy through Mr. Faulk.  We will gladely furnish a copy, but must respect the rules of confidentiality.

Mr. John H. Davis
Inquiries related to I-65 Properties, Inc. and LLC
Page 2 of 3
_____

The ownership percentages and officers of I-65 Properties, Inc. agrees with our records. Our files include a copy of the By Laws executed on October 1, 1990 and signed by Richard M. Dorsey and attested to by Donna D. Davis.

The copy of the Articles of Incorporation in our file were signed by both Richard M. Dorsey and Donna D. Davis.

Our files also include a copy of the First Stockholders Meeting held October 1, 1990, indicating both Richard M. Dorsey and Donna D. Davis were in attendence. Your record indicating the meeting was held on September 25, 1990 is not in agreement with our copies of signed minutes.

As to documentation of amounts expended by DMS on the I-65 Property, we have no details as to this matter. I have not inquired of DMS as to the extent of it's documentation or as to whom the expenditures were made.

**Bullet 4: Documentation on formation of LLC:**
The records I have are incomplete. The LLC articles of organization were prepared and a federal ID number was obtained. I have no record of an operating agreement ever having been prepared.

Your statement that the corporation was converted to the LLC is not correct. The formation of the LLC created a new legal entity. The old I-65, Inc. continued to exist and to my knowledge still exists. Our records do indicate a 70% (Dick) 30%(Donna) ownership ratio of the LLC.

I have seen no records indicating an assumption of the note on the property by the LLC. I am enlclosing a copy of the note from I-65 Properties, Inc to DMS

I am enclosing a copy of the LLC tax returns as filed.

**Bullet 5: Formal Appraisal:**
I have no knowledge of an independent appraisal. There may have been an appraisal several years back, but I did not find a copy in our file. I have not located in our files a copy of the county's appraisal at the time the property was transferred to I-65, Inc. There was a notice of appraised value by the county in the files of DMS. This document can also be obtained from the county tax assessor's office.

**Bullet 6: Information supplied to Chrysler relative to the DMS lawsuit:**
Our firm did participate in numerous meetings during the course of this litigation. Our records were also supoenaed . I do not remember supplying anything except what they obtained by supoena. We have no record of what they copied once they had posession of the records. We did not copy anything for Chrysler. I do not remember ever being asked to provide any records or documents related to I-65 Properties, Inc. or LLC and to my recollection, no documents of I-65 were supplied.

Mr. John H. Davis
Inquiries related to I-65 Properties, Inc. and LLC
Page 3 of 3

---

**Bullet 7:  Rights of DMS to foreclose on I-65 Properties note:**
This is a legal question and I am not an attorney.  I cannot offer an opinion as to this matter.

I hope this information will be sufficient.  If I can assist you any further, please let me know.

Yours truly,

J. Alan Taunton
Certified Public Accountant

Enclosures

# Diamond, Roller, Taunton and Carmichael

Certified Public Accountants * A Professional Association
200 Executive Park Drive
P. O. Box 780248
Tallassee, Alabama 36078

Telephone (334) 283-2567    Fax (334) 283-6900
Email drtc-tal@tallassee.net

Sam I. Diamond, Jr., C.P.A.
Thomas Roller, C.P.A.
J. Alan Taunton, C.P.A.
James D. Carmichael, C.P.A.
James J. Gary III, C.P.A.
Tasha Patterson, C.P.A.

Paula J. Duke, C.P.A.

Montgomery Office
475 South Hull Street
Montgomery, Alabama 36104
(334) 834-7720

Members
American Institute of CPA's
Alabama Society of CPA's

October 28, 2003

Donna D. Davis
2056 Glen Eagle Lane
Birmingham, AL 35242

RE:    Documents Requested

**Personal and Confidential**

Dear Donna,

Dick called me yesterday afternoon and requested that I send you the information in John's letter of October 22, 2003.

Enclosed please find the following:

I-65 Properties, Inc. Income Tax Returns
    Federal and state returns for 1998.
    Federal and state returns for 1999.
    Federal and state returns for 2000.
    Federal and state returns for 2001.
    Federal and state returns for 2002.
These are complete returns for each year just as they were filed.



**EXHIBIT**
tabbies®
**12**

Please note that on all of these returns there is no income reported and no expenses deducted. The lack of income is because there has been no income earned by the corporation. There have been expenses incurred, but these have been recorded as Deferred Expenses to be deducted whenever income is derived from the sale of the property.

I-65 Properties, LLC Income Tax Returns
    A copy of my letter of March 20, 2000, a copy of which was previously sent to you by me.
    Federal and state returns for 1999 marked final.
    Federal and state returns for 1998.

These are complete returns for each year. From John's letter it appears that you did receive a copy of the 1999 returns previously. This would be in accordance with my letter of March 20, 2000 also. To my knowledge no returns have been filed for this LLC since the 1999 returns.   If you need any additional

Page 2 of 2

information concerning these please let me know. If your CPA needs to discuss these returns with me please have him give me a call.

You should have no tax liabilities from any of the above returns.


Thanks,

                              Yours truly,



                              J. Alan Taunton
                              Certified Public Accountant

# Diamond, Roller, Taunton and Carmichael

Certified Public Accountants * A Professional Association
200 Executive Park Drive
P. O. Box 780248
Tallassee, Alabama 36078

Telephone (334) 283-2567    Fax (334) 283-6900
Email: alantaunton@drtccpa.com

Sam I. Diamond, Jr., C.P.A.
Thomas Roller, C.P.A.
J. Alan Taunton, C.P.A.
James D. Carmichael, C.P.A.
James J. Gary III, C.P.A.
Tasha Patterson, C.P.A.

Montgomery Office
475 South Hull Street
Montgomery, Alabama 36104
(334) 834-7720

Members
American Institute of CPA's
Alabama Society of CPA's

March 18, 2006                          Via: US mail

Lindsey B. Erwin
Attorney at Law
101 Brisstol Lane
Birmingham, AL 36078

RE:    I-65 Properties, Inc.

Dear Ms Erwin,

The sale from Dorsey Motor Sales, Inc. to I-65 Properties, Inc. took place on October 1, 1990. A closing statement, Warranty Deed recorded on October 3, 1990, and a Promissory Note dated October 1, 1990 are enclosed.

I was working with both Mr. Richard T. Dorsey and Mr. Richard M. Dorsey at the time this property sale took place and am not aware of any intent for this transaction to be anything other than a sale. There was never any discussion of there being any intent for causing the corporation to "gift" the property. Had there been a gift of the property, each shareholder would have been required to report the "benefit derived" as a taxable dividend on their respective tax returns.

As to the timing of the note please see the closing statement prepared by Mr. George P. Walthall, Jr. Esq. It shows the assumption of a mortgage in the amount of $21,800.00 and a Promissory Note in the amount of $228,200.00. This closing statement was signed by Mr. Walthall on 1 Oct 1990. In addition, Mr. Walthall prepared the Promissory Note. Mr. Walthall also prepared the Articles of Incorporation for I-65 Properties, Inc. on the same date.

The consideration for the Promissory note was a Warranty Deed for the real estate.

As I recall, a law suit had been filed or was threatened at the time the sale took place and the sale was believed to be in the best interest of the stockholder's.

The sale price was based on an appraisal prepared prior to the time of sale. The appraisal was made to insure that the stockholder's purchased the property from the corporation at "fair market value" and avoid any issues with the IRS or the courts in the event the law suite results were unfavorable.

Thanks,

Yours truly,

J Alan Taunton, CPA

*Integrity - Confidentiality - Competence    "The Cornerstones of Our Firm"*

EXHIBIT
13

# EXHIBIT "12"

**Unsigned Copy of October 28, 2003
letter from Alan Taunton to John Davis**

# *Diamond, Roller, Taunton and Carmichael*

Certified Public Accountants  *  A Professional Association
200 Executive Park Drive
P. O. Box 780248
Tallassee, Alabama 36078

Telephone (334) 283-2567    Fax (334) 283-6900
Email drtc-tal@tallassee.net

Sam I. Diamond, Jr., C.P.A.
Thomas Roller, C.P.A.
J. Alan Taunton, C.P.A.
James D. Carmichael, C.P.A.
James J. Gary III, C.P.A.
Tasha Patterson, C.P.A.

Paula J. Duke, C.P.A.

**Montgomery Office**
475 South Hull Street
Montgomery, Alabama 36104
(334) 834-7720

**Members**
American Institute of CPA's
Alabama Society of CPA's

October 28, 2003

Donna D. Davis
2056 Glen Eagle Lane
Birmingham, AL  35242

     RE:    Documents Requested

**Personal and Confidential**

Dear Donna,

Dick called me yesterday afternoon and requested that I send you the information in John's letter of October 22, 2003.

Enclosed please find the following:

I-65 Properties, Inc. Income Tax Returns
      Federal and state returns for 1998.
      Federal and state returns for 1999.
      Federal and state returns for 2000.
      Federal and state returns for 2001.
      Federal and state returns for 2002.
These are complete returns for each year just as they were filed.



Please note that on all of these returns there is no income reported and no expenses deducted.  The lack of income is because there has been no income earned by the corporation.  There have been expenses incurred, but these have been recorded as Deferred Expenses to be deducted whenever income is derived from the sale of the property.

I-65 Properties, LLC Income Tax Returns
      A copy of my letter of March 20, 2000, a copy of which was previously sent to you by me.
      Federal and state returns for 1999 marked final.
      Federal and state returns for 1998.

These are complete returns for each year. From John's letter it appears that you did receive a copy of the 1999 returns previously.  This would be in accordance with my letter of March 20, 2000 also.  To my knowledge no returns have been filed for this LLC since the 1999 returns.   If you need any additional

information concerning these please let me know.  If your CPA needs to discuss these returns with me please have him give me a call.

You should have no tax liabilities from any of the above returns.


Thanks,

                              Yours truly,



                              J. Alan Taunton
                              Certified Public Accountant

# EXHIBIT "13"

## March 18, 2006 Letter from Alan Taunton to Lindsey Erwin

## *Diamond, Roller, Taunton and Carmichael*

Certified Public Accountants * A Professional Association
200 Executive Park Drive
P. O. Box 780248
Tallassee, Alabama 36078

Telephone (334) 283-2567    Fax (334) 283-6900
Email: alantaunton@drtcpa.com

Sam I. Diamond, Jr., C.P.A.
Thomas Roller, C.P.A.
J. Alan Taunton, C.P.A.
James D. Carmichael, C.P.A.
James J. Gary III, C.P.A.
Tasha Patterson, C.P.A.

Montgomery Office
475 South Hull Street
Montgomery, Alabama 36104
(334) 834-7720

Members
American Institute of CPA's
Alabama Society of CPA's

March 18, 2006                                 Via: US mail

Lindsey B. Erwin
Attorney at Law
101 Brisstol Lane
Birmingham, AL 36078

RE:    I-65 Properties, Inc.

Dear Ms Erwin,

The sale from Dorsey Motor Sales, Inc. to I-65 Properties, Inc. took place on October 1, 1990. A closing statement, Warranty Deed recorded on October 3, 1990, and a Promissory Note dated October 1, 1990 are enclosed.

I was working with both Mr. Richard T. Dorsey and Mr. Richard M. Dorsey at the time this property sale took place and am not aware of any intent for this transaction to be anything other than a sale. There was never any discussion of there being any intent for causing the corporation to "gift" the property. Had there been a gift of the property, each shareholder would have been required to report the "benefit derived" as a taxable dividend on their respective tax returns.

As to the timing of the note please see the closing statement prepared by Mr. George P. Walthall, Jr. Esq. It shows the assumption of a mortgage in the amount of $21,800.00 and a Promissory Note in the amount of $228,200.00. This closing statement was signed by Mr. Walthall on 1 Oct 1990. In addition, Mr. Walthall prepared the Promissory Note. Mr. Walthall also prepared the Articles of Incorporation for I-65 Properties, Inc. on the same date.

The consideration for the Promissory note was a Warranty Deed for the real estate.

As I recall, a law suit had been filed or was threatened at the time the sale took place and the sale was believed to be in the best interest of the stockholder's.

The sale price was based on an appraisal prepared prior to the time of sale. The appraisal was made to insure that the stockholder's purchased the property from the corporation at "fair market value" and avoid any issues with the IRS or the courts in the event the law suite results were unfavorable.

Thanks,

Yours truly,

*J. Alan Taunton, CPA*

*Integrity – Confidentiality – Competence    "The Cornerstones of Our Firm"*

EXHIBIT
13

# EXHIBIT "14"

## Affidavit of Richard M. Dorsey

STATE OF ALABAMA

COUNTY OF AUTAUGA

### AFFIDAVIT OF RICHARD M. DORSEY

Before me, the undersigned authority in and for said County and State, personally appeared Richard M. Dorsey, who is known to me and who being first duly sworn, deposes and says:

"I make this affidavit based upon my own personal knowledge. I am a Defendant in this case and a shareholder in I-65 Properties, Inc. I-65 Properties, Inc. consists of undeveloped real estate located in Elmore County, Alabama. This is real estate my father and I purchased as an alternative to expand our automobile business. At my father's direction, this property was transferred into I-65 Properties, Inc. with my holding 70% of the stock and my sister Donna holding 30% of the stock. We are the only two (2) stockholders of I-65 Properties, Inc. I-65 Properties, Inc. assumed the mortgage on the property as part of the purchase price.

For many years, I-65 Properties, Inc. had no income and within the last few years I have been successful in leasing billboard space on this property. This is the only income the corporation has. Throughout all these years I have personally or through companies which I own made all payments on behalf of the corporation including the mortgage payments to the prior owners of the property, tax payments, insurance payments, accounting expenses and any other costs associated with the corporation. My sister has incurred no expense on behalf of the corporation.

I have provided my sister, either directly or indirectly, with copies of income tax returns prepared by Diamond, Roller, Taunton & Carmichael, P. A. I have also instructed Alan Taunton with Diamond, Roller, Taunton & Carmichael, P. A. to meet with my sister or her attorney and

EXHIBIT
14

make all books and records of I-65 Properties, Inc. available to them. It is my understanding that they have not availed themselves of this offer."

Further affiant sayeth not.

_____

RICHARD M. DORSEY

SWORN TO and SUBSCRIBED before me this the  day of _____ 18th of September, 2006.

_____

NOTARY PUBLIC

My Commission Expires: My Commission Expires on 9/17/2007

# EXHIBIT "15"

## Compilation of Expenses Owed

THEY ① DORSEY MOTOR SALES BECAME I PROPLAN — DICK CAT DEALERSHIP ASSIGN... TO HIM WHEN I-65 STOP INC. WAS FORMED

② TENNSTATE HYPOTHEC CORP RWINGER — VERBAL AGREEMENT (WITH DAD)

FOR N ③ GUINN U8 PART

OF OUR ③ DICK TO REMCO I-65 PROPERTIES ④ DISTOOK A NOTE BACK FROM I-65 INC.

(PROPERTY HAD BEEN MINIMISED AMT.)

AS TOOK A NOTE FROM BACK FOR THAT AMO

BECLAUSE OF LITIGATION MOTIVATING FACTOR.

| I-65 | PROPERTIES EXPENSES | | | DATE | LOANS | AMOUNT |
|---|---|---|---|---|---|---|
| **1990** | | | | | | |
| 17-Dec | Alabama Dept of Revenue | 90 Franchise Tax | $ 35.00 | 13-Nov | Dorsey Motors | $ 4,000.00 |
| 28-Dec | Bob Gray | Artist Sketches | $ 140.00 | 13-Nov | Dorsey Motors | $ 1,000.00 |
| | | | $ 175.00 | | | $ 5,000.00 |
| | | | | | | |
| **1991** | | | | | | |
| 10-Jan | Ralph Bennett | Option on 4 lots | $ 2,700.00 | | | |
| 7-Feb | Carmichael & Carmichael | Pay of Appraisal | $ 1,250.00 | | | |
| 17-Mar | Alabama Dept of Revenue | 91 Franchise Tax | $ 70.00 | | | |
| 11-Jun | Carmichael & Carmichael | Pay on Appraisal | $ 500.00 | | | |
| 3-Jul | Ralph-Bennett | ext on option | $ 3,000.00 | 29-Jul | Dorsey Motors | $ 3,000.00 |
| 9-Sep | Benair Helicopters | Bushhog I-65 | $ 95.00 | | | |
| 17-Sep | U S Postmaster | P O Box Rent | $ 49.00 | | | |
| 22-Nov | Southern Survey & Design | pay on survey | $ 1,000.00 | | | |
| 22-Nov | Goodwin Mills and Cawood | Interstate Nissan | $ 1,000.00 | 22-Nov | Dorsey Motors | $ 2,000.00 |
| | Regions Bank | Service Charges | $ 78.05 | | | |
| | | | $ 9,742.05 | | | $ 5,000.00 |
| | | | | | | |
| **1992** | | | | | | |
| 29-Jan | Ralph Bennett | Option | $ 6,800.00 | | | |
| 22-Jan | Southern Survey and Design | pay on survey | $ 500.00 | 22-Jan | Dorsey Motors | $ 600.00 |
| 13-Mar | Alabama Dept of Revenue | 92 Franchise Tax | $ 70.00 | 29-Jan | Dorsey Motors | $ 7,000.00 |
| 20-May | Southern Survey and Design | pay on survey | $ 1,038.63 | 20-May | Dorsey Motors | $ 1,000.00 |
| 22-Sep | U S Postmaster | P O Box Rent | $ 49.00 | 15-Oct | Dorsey Motors | $ 1,000.00 |
| 14-Oct | Goodwin Mills and Cawood | Interstate Nissan | $ 1,000.00 | | | |
| 9-Nov | Wm "Mike" Harper | 92 Property Tax | $ 535.44 | | | |
| | Regions Bank | Service Charges | $ 77.12 | 31-Dec | Dorsey Motors | $ 600.00 |
| | | | $ 10,070.19 | | | $ 10,200.00 |

THESE SIX (6) PAGES GIVEN AT DEC 19 2005 ...

X (1992 MISSING ON LIST)

EXHIBIT
15
tabbies

PROPERTY HOLDER - C D & O (own?) ← (arrow pointing to Dorsey Motors)

| Date | Payee | Description | Amount | | Date | Holder | Amount |
|------|-------|-------------|--------|---|------|--------|--------|
| **1993** | | | | | | | |
| 26-Feb | T O McDowell | K Bar K Legal | $ 1,805.50 | | 29-Jan | Dorsey Motors | $ 1,800.00 |
| 17-Mar | Alabama Department of Revenue | 93 Franchise Tax | $ 80.00 | | | | |
| 15-Sep | U S Postmaster | P O Box Rent | $ 49.00 | | | | |
| 24-Nov | Goodwin Mills & Cawood | Interstate Nissan | $ 2,000.00 | | 24-Nov | C D & O, Inc | $ 2,100.00 |
| 30-Dec | Wm "Mike" Harper | 93 Property Taxes | $ 835.20 | | 30-Dec | Dorsey Motors | $ 850.00 |
| | Regions Bank | Service Charges | $ 93.68 | | | | |
| | | | $ 4,863.38 | | | | $ 4,750.00 |
| | | | | | | | |
| **1994** | | | | | | | |
| 12-Mar | Alabama Department of Revenue | 94 Franchise Tax | $ 205.00 | | | | |
| 11-Oct | U S Postmaster | P O Box Rent | $ 49.00 | | 13-May | Dorsey Motors | $ 250.00 |
| 11-Oct | Wm. M "Mike" Harper | 94 Property Tax | $ 835.20 | | 12-Oct | Dorsey Motors | $ 1,000.00 |
| | Regions Bank | Service Charges | $ 112.29 | | | | |
| | | | $ 1,201.49 | | | | $ 1,250.00 |
| | | | | | | | |
| **1995** | | | | | | | |
| 14-Mar | Alabama Department of Revenue | 95 Franchise Tax | $ 70.00 | | | | |
| 18-May | McDowell, Faulk & McDowell | K Bar K Legal | $ 3,743.75 | | 19-May | Dorsey Motors | $ 4,000.00 |
| 18-Sep | U S Postmaster | P O Box Rent | $ 58.00 | | | | |
| 26-Oct | Wm M. "Mike" Harper | 95 Property Tax | $ 835.20 | | 26-Oct | Dorsey Motors | $ 1,000.00 |
| | Regions Bank | Service Charges | $ 85.60 | | | | |
| | | | $ 4,792.55 | | | | $ 5,000.00 |

3/6

| Date | Payee | Description | Amount | Date | Payee | Amount |
|---|---|---|---|---|---|---|
| **1996** | | | | | | |
| 11-Jan | Crumpton and Davis | Millbrook Sewer | $ 783.75 | 11-Jan | Dorsey Motors | $ 800.00 |
| 12-Mar | Alabama Department of Revenue | 96 Franchise Tax | 70.00 | | | |
| 22-Aug | Alabama Department of Revenue | Tax Penalty | 50.00 | | | |
| 21-Oct | McDowell, Faulk & McDowell | K Bar K Legal | 2,000.00 | 21-Oct | Dorsey Motors | $ 2,000.00 |
| 16-Dec | Wm M "Mike" Harper | 96 Property Tax | 835.20 | 18-Dec | Dorsey Motors | $ 1,000.00 |
| | Regions Bank | Service Charges | 88.25 | | | |
| | | | $ 3,827.20 | | | $ 3,800.00 |
| **1997** | | | | | | |
| 12-Mar | Alabama Department of Revenue | 97 Franchise Tax | 70.00 | | | |
| 17-Sep | U S Postmaster | P O Box Rent | 58.00 | | | |
| | Regions Bank | Service Charges | 104.77 | | | |
| | | | $ 232.77 | | | |
| **1998** | | | | | | |
| 17-Sep | U S Postmaster | P O Box Rent | 58.00 | 17-Sep | Dorsey Motors | $ 100.00 |
| 14-Dec | Wm M. "Mike" Harper | U S Postmaster | 1,009.20 | 14-Dec | Dorsey Motors | $ 1,000.00 |
| | Regions Bank | Service Charges | 117.29 | | | |
| | | | $ 1,184.49 | | | $ 1,100.00 |
| **1999** | | | | | | |
| 4-Jan | Alabama Dept Of Transportation | Billboard Permit | 25.00 | 4-Jan | Dorsey Motors | $ 100.00 |
| 4-Jan | Alabama Dept Of Transportation | Billboard Permit | 25.00 | | | |
| 10-Mar | Department of Revenue | 99 Franchise Tax | 70.00 | 10-Mar | Dorsey Motors | $ 100.00 |
| 27-Sep | U S Postmaster | P O Box Rent | 64.80 | 27-Sep | Dorsey Motors | $ 200.00 |
| 7-Dec | Wm M "Mike" Harper | Property Tax | 1,253.74 | 7-Dec | Dorsey Motors | $ 1,500.00 |
| 7-Dec | Diamond, Roller, Taunton | Accounting Serv | 64.80 | | | |
| | Regions Bank | Service Charges | 116.67 | | | |
| | | | $ 1,620.01 | | | $ 1,900.00 |

| Year | Date | Payee | Description | Amount | Date | Name | Amount |
|---|---|---|---|---|---|---|---|
| 2000 | | | | | | | |
| | 14-Mar | Alabama Department of Revenue | Privilege Tax | $ 110.00 | 15-Mar | Dick Dorsey | $ 25.00 |
| | 14-Jun | Diamond, Roller, Taunton | Accounting Serv | $ 277.92 | 14-Jun | Dick Dorsey | $ 300.00 |
| | 10-Jul | Cleveland & Colley | Legal Fees (70%) | $ 1,400.00 | 10-Jul | Dick Dorsey | $ 2,712.50 |
| | 10-Jul | Diamond, Roller, Taunton | Acct. Fees (70%) | $ 1,312.50 | | | |
| | 13-Oct | U S Postmaster | P O Box Rent | $ 64.00 | | | |
| | 22-Dec | Cleveland & Colley | Interstae Property | $ 1,385.65 | 22-Dec | Dick Dorsey | $ 4,131.95 |
| | 22-Dec | Cleveland & Colley | z | $ 598.60 | | | |
| | 22-Dec | Diamond, Roller, Taunton | Acct. Fees (70%) | $ 1,312.50 | | | |
| | 22-Dec | Wm M "Mike" Harper | Property Tax | $ 835.20 | | | |
| | | Regions Bank | Service Charges | $ 111.29 | | | |
| | | | | $ 7,407.66 | | | $ 7,169.45 |
| 2001 | | | | | | | |
| | 15-Mar | Alabama Department of Revenue | Privilege Tax | $ 110.00 | 14-Mar | Dick Dorsey | $ 150.00 |
| | 13-Aug | Diamond, Roller & Taunton | Legal Fees | $ 1,200.00 | 13-Aug | Dick Dorsey | $ 1,200.00 |
| | 28-Sep | U S Postmaster | P O Box Rent | $ 55.00 | 28-Sep | Dick Dorsey | $ 200.00- |
| | 21-Dec | Diamond, Roller & Taunton | Legal Fees | $ 1,645.00 | 21-Dec | Dick Dorsey | $ 1,700.00 |
| | 27-Dec | Wm M "Mike" Harper | Property Tax | $ 835.20 | 27-Dec | Dick Dorsey | $ 850.00 |
| | | Regions Bank | Service Charges | $ 136.13 | | | |
| | | | | $ 3,981.33 | | | $ 4,100.00 |
| 2002 | | | | | | | |
| | 18-Mar | Alabama Department of Revenue | PSA Tax Ext. | $ 110.00 | 18-Mar | Dick Dorsey | $ 110.00 |
| | 16-Sep | Cleveland & Colley | Review Notes | $ 1,380.00 | 16-Sep | Dick Dorsey | $ 6,000.00 |
| | 16-Sep | Cleveland & Colley | I65 Prop | $ 4,210.78 | | | |
| | 16-Sep | U S Postmaster | P O Box Rent | $ 68.00 | | | |
| | 12-Dec | Wm M "Mike" Harper | Property Tax | $ 835.20 | 12-Dec | Dick Dorsey | $ 600.00 |
| | | Regions Bank | Service Charges | $ 142.80 | | | |
| | | | | $ 6,746.78 | | | $ 6,710.00 |

## 2003

| Date | Payee | Item | Amount | Date | Payee | Amount |
|---|---|---|---|---|---|---|
| 14-Mar | Alabama Department of Revenue | PSE Tax | $ 100.00 | 17-Mar | Dick Dorsey | $ 1,000.00 |
| 14-Mar | Cleveland and Colley | Legal Fees | $ 900.00 | | | |
| 14-May | Diamond, Roller Taunton | Accounting Fees | $ 862.58 | 14-May | T D & O, Inc | $ 3,000.00 |
| 14-May | Cleveland and Colley | Legal Fees | $ 2,000.00 | | | |
| 24-Jul | Diamond, Roller Taunton | Accounting Fees | $ 450.00 | 24-Jul | Dick Dorsey | $ 500.00 |
| 30-Sep | U S Postmaster | P O Box Rent | $ 68.00 | | | |
| 10-Dec | Wm M "Mike" Harper | Property Tax | $ 835.20 | 10-Dec | | $ 850.00 |
| | Regions Bank | Service Charges | $ 143.35 | | | |
| | | | $ 5,359.13 | | | $ 5,350.00 |

## 2004

| Date | Payee | Item | Amount | Date | Payee | Amount |
|---|---|---|---|---|---|---|
| 17-Feb | Cleveland & Colley | Legal Fees | $ 403.12 | 17-Feb | Dick Dorsey | $ 750.00 |
| 17-Feb | Diamond, Roller, Taunton | Tax Return | $ 330.00 | | | |
| 12-Mar | Ala Department of Revenue | 2004 PSE Tax | $ 100.00 | 12-Mar | Dick Dorsey | $ 500.00 |
| 27-Sep | US Postmaster | P O Box Rent | $ 68.00 | | | |
| 15-Sep | Ala Dept of Revenue | 2004 Priv Tax | $ 10.00 | | | |
| 27-Sep | Diamond, Roller, Taunton | Tax Return | $ 200.00 | | | |
| | Regions Bank | Service Charges | $ 142.08 | | | |
| | | | $ 1,253.20 | | | $ 1,250.00 |

## 2005

| Date | Payee | Item | Amount |
|---|---|---|---|
| 15-Mar | Ala Department of Revenue | 2005 PSE Tax | $ 100.00 |
| 15-Sep | Ala Department of Revenue | Privilege Tax | $ 10.00 |
| 27-Sep | U S Postmaster | P O Box Rent | $ 68.00 |
| 22-Nov | Diamond, Roller Taunton & Carmic | Tax Preperation | $ 500.00 |
| | Wm M "Mike" Harper | Property Tax | $ 835.20 |
| | Regions Bank | Service Charges | $ 1,513.20 |

**Owed to Dorsey Motor Sales**    **Plus Interest**    $ 35,900.00

LOAN FROM    $ 2,000.00

$ 2,000.00

T D O ADVERTISING TO I-4S PROPERTIES TO PAY ALL OF THE EXPENSES.

T D O DICK DORSEY

6/6

# EXHIBIT "16"

January 17, 2006 Letter from
Richard Dorsey to Donna Davis

January 17, 2006

Donna Davis
2056 Glenn Eagle Lane
Birmingham, AL  35242

Dear Donna,

Per your verbal direction. I engaged Alan Taunton and Cliff Cleveland to produce an agreement where you would swap you stock on I-65 Properties, Inc. for the amount of debt that you owe. I told you that your proposal sounded good and I would move ahead as soon as I could reach them. Cliff's agreement is now ready as of yesterday, January 16, 2006 but I received a fax from you on January 16, resending your verbal offer. What is going on? I think it is time to stop fighting and move ahead with our lives – but this game playing has cost the corporation to incur additional useless debt. Since you refused to answer any of my phone calls or answering machine messages, this is the only way I know to communicate with you. Through all our ups and downs, I never stopped talking with you or answering your phone calls. Please let me know the direction now so we both can save some heartache.

Sincerely,

Dick

EXHIBIT
16
tabbies

# EXHIBIT "17"

**February 3, 2006 Letter from Alan
Taunton to Lindsey Erwin**

# Diamond, Roller, Taunton and Carmichael

Certified Public Accountants * A Professional Association
200 Executive Park Drive
P. O. Box 780248
Tallassee, Alabama 36078

Telephone (334) 283-2567  Fax (334) 283-6900
Email: alantaunton@drtccpa.com

Sam I. Diamond, Jr., C.P.A.
Thomas Roller, C.P.A.
J. Alan Taunton, C.P.A.
James D. Carmichael, C.P.A.
James J. Gary III, C.P.A.
Tasha Patterson, C.P.A.

Montgomery Office
475 South Hull Street
Montgomery, Alabama 36104
(334) 834-7720

Members
American Institute of CPA's
Alabama Society of CPA's

February 3, 2006                                    Via: USmail

Lindsay B. Erwin
101 Bristol Lane
Birmingham, AL 35242

RE:    I-65 Properties, Inc.

Dear Ms Erwin,

Mr. Richard M. Dorsey forwarded a copy of your letter of January 18, 2006 to me asking that I contact you and provide the information you may need and request concerning this company. He did stipulate that any accounting costs incurred would be at Mrs. Davis's expense and not his.

He has also provided us with documentation to substantiate the debt of the corporation. At this time we have not performed any verification of this balance.

Generally we review the transactions for the entire year at the time we prepare the corporate income tax returns. No services have been performed for 2005.

On October 18, 2003 I sent Mrs. Davis copies of tax returns for years 1998, 1999, 2000, 2001 and 2002. At the time these were all of the returns filed that she requested.

The 2003 and 2004 returns have since been filed and I do not know if Mr. Dorsey forwarded a copy to Mrs. Davis or not. If he did not send a copy to her I will certainly provide these to her.

If you have any specific questions concerning the books or tax returns of this corporation, please let me know. Mr. Dorsey has requested that I provide Donna anything she asks for that we may have relative to this company.

I have been a friend of the family for a long time and would like to see this matter handled in the most expeditious and fair manner as possible.

The corporation owns real estate that was acquired with a demand note from Dorsey Motor Sales, Inc. This occurred while Mr. Dorsey and Mrs. Davis's father was still living. Mr. Dorsey owns 70% of the stock and Mrs. Davis owns 30%. This ownership split was based on the ownership of Dorsey Motor Sales, Inc. at the time. Mr. Richard Dorsey owned 40% of the Dorsey Corporation and his parents owned the remaining 60%. The real estate was originally owned by the Dorsey Corporation. When it was determined that it would be in the best interest of all involved to take the real estate out of the Dorsey Corporation, a new corporation was formed (I-65 Properties, Inc.) with the 70% 30% ownership with the Dorsey parents not being shareholders. Their reasoning was that Richard M. already owned 40% and he

*Integrity - Confidentiality -- Competence    "The Cornerstones of Our Firm"*

EXHIBIT
17

Page 2 of 2

and Donna would each receive 50% of their parents 60% upon their death, hence, the 30% to her and the increase of 40% to 70% for him. I-65 Properties, Inc. did not pay cash for the real estate but rather tendered a mortgage to Dorsey Motor Sales, Inc. No payments of principal or interest have been paid on the mortgage since the date of sale. Subsequent to the corporation acquireing the real estate there have been ongoing costs such as property taxes, annual franchise or privilege taxes, costs of preparing the income tax returns, and upkeep on the land. Over the years there may have been other costs that came up from time to time, but I do not recall specific examples from memory.

From time to time as costs occurred, Mr. Dorsey either paid the expenses or put money into the company bank account from which to pay the expenses. The debt at this time is from the original mortgage, accrued interest, and loans to meet ongoing expenses.

I hope this gives you some insight into the character of this company.

It should be a fairly straight forward task to verify the debt of the company. Each year when we prepare the tax returns we are provided the bank statements and details of transactions not going through the bank account, such as expenditures made by Mr. Dorsey on behalf of the company from his personal funds. We have not audited these expenditures, but have relied on his direction to make the appropriate entries on the books of the company.

It will take some time to go back and document each expense incurred and I would appreciate your discussing this with Donna and advising as to whom we should bill for our services and the extent to which she requests that we go in vouching the accuracy of each expense. Our firm will be appreciative and honored to perform any services that she may request.

I look forward to working with you on this matter.

Thanks,

Yours truly,

J. Alan Taunton
Certified Public Accountant

# EXHIBIT "3"

## October 1, 1990 Promissory Note
## from I-65 Properties to Dorsey Motor Sales

*GEORGE P. WALTHALL, JR*
*ATTORNEY AT LAW*
*141 WEST MAIN STREET*
*PRATTVILLE, ALABAMA 36067*
*205/365-2255 (OUR FILE NO. 90-412.BO)*

## PROMISSORY NOTE

$228,200.00

For value received, the undersigned promises to pay to the order of DORSEY MOTOR SALES, INC. the principal sum of TWO HUNDRED TWENTY EIGHT THOUSAND TWO HUNDRED AND NO/100 DOLLARS ($228,200.00), with interest thereon from date at the rate of twelve (12.0%) percent per annum, the principal and interest payable as follows, namely:

Due and payable on demand.

Payable at the office of DORSEY MOTOR SALES, INC., 625 East Main Street, Prattville, Alabama 36067 or such other place as the holder of the note may designate.

In the event of default in the payment of any installment of principal or interest the entire indebtedness shall become due and payable at once and in full at the option of the holder thereof.

The parties of this instrument, whether maker, endorser, surety or guarantor, each for himself hereby severally waives as to this debt, or any renewal thereof, all rights of exemption under the Constitution and Laws of Alabama, or of any other state, as to personal property, and they each severally agree to pay all costs of collection or securing or attempting to collect or secure this note, including a reasonable attorney's fee, whether the same be collected or secured by any attorney consulted, with reference to suit or otherwise. And each maker, endorser, surety and guarantor of this note severally waives demand, presentment, protest, notice of protest, suit and all other requirements necessary to hold them or any of them and they severally agree that time of payment may be extended or a renewal note taken or other indulgence granted without notice of, or consent to, such action, without release of liability of any such party. This note may be declared due and payable with interest computed or abated to date at anytime by notation hereon by the holder in the event of the insolvency of, general assignment by, judgment against or petition in bankruptcy by or against any such party liable hereunder, subject to terms of mortgage.

DONE this ___1___ day of ___Oct___, 1990.

I-65 PROPERTIES, INC.

by:  RICHARD M. DORSEY, President

ATTEST:

CONNIE S. DORSEY, Secretary

Sworn to and subscribed before me this the ___1___ day of ___October___, 19_90_.

NOTARY PUBLIC

EXHIBIT

3

# EXHIBIT "7"

## Closing Statement for
## I-65 Properties

C L O S I N G   S A L E S   S T A T E M E N T

SELLER:     DORSEY MOTOR SALES. INC.
PURCHASER:  I-65 PROPERTIES. INC.
PROPERTY:   9.606 acres, more or less, located in N1/2 of Section
            17, Township 17 N. Range 17 E. Elmore County. Alabama

SALES PRICE

TOTAL SALES PRICE                                         $250,000.00

DEDUCTIONS FROM SALES PRICE

        FIRST MORTGAGE                      21,800.00
        PROMISSORY NOTE                    228,200.00

TOTAL DEDUCTIONS                                          250,000.00

NET AMOUNT DUE SELLER                                  $        0.00

ITEMS PAYABLE BY PURCHASER

        GROSS SALES PRICE                  250,000.00
        ATTORNEY FEES (including
        document preparation, office conferences
        and closing, title examination and
        title certification, and all fees
        associated with incorporating I-65
        Properties, Inc.                      1,500.00
        ABSTRACT UPDATE                         100.00
        RECORDING FEES                          260.00

TOTAL PAYABLE                                            251,860.00

CREDITS TO PURCHASERS

        MORTGAGE ASSUMED                    21,800.00
        PROMISSORY NOTE                    228,200.00

TOTAL CREDITS                                           250,000.00

NET AMOUNT DUE FROM PURCHASER:                         $  1,860.00

                                    I-65 PROPERTIES, INC.

                                    by: RICHARD M. DORSEY, PRES.

                                    by: CONNIE S. DORSEY, SEC.

                                    GEORGE P. WALTHALL, JR.
                                    CLOSING ATTORNEY

DORSEY MOTOR SALES, INC.

by: RICHARD M. DORSEY, PRES.

ATTESTED:

by: RICHARD T. DORSEY, TREAS.

DATED: _____, 1990

EXHIBIT
7