IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DONNA DORSEY DAVIS, | : | |
| as an individual and derivatively upon | : | |
| behalf of I-65 Properties, Inc., | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| vs. | : | **Case No. 2:06-cv-766-MHT** |
| | : | |
| RICHARD M. DORSEY, as an individual | : | |
| and CD&O, LLC, as a necessary party, | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW Richard M. Dorsey and CD&O, LLC, Defendants in the above-styled cause, and

submit the following Memorandum Brief in Support of their Motion for Summary Judgment.

## I.    SUMMARY OF THE CASE

This is a derivative suit filed by the sole minority shareholder Donna Dorsey Davis ("Davis"),

individually and on behalf of I-65 Properties, Inc. ("I-65 Properties") against the sole majority

shareholder of I-65 Properties Richard Dorsey ("Dorsey") and CD&O, LLC ("CD&O"), a company

owned solely by Dorsey.  This action was filed by Davis against Dorsey and CD&O on August 6,

2006.  Defendants filed a Motion to Dismiss Davis' *Complaint* based on lack of jurisdiction and

failure to meet the prerequisites of *Federal Rule of Civil Procedure* 23.1.  By order dated October

18, 2006, this Court denied Defendants' Motion to Dismiss. Following discovery, this matter is ripe

for consideration.

## II.    SUMMARY OF UNDISPUTED FACTS

### A.    PARTIES

#### 1.    DONNA DORSEY DAVIS

Davis lives in Clemson, South Carolina.  (See Exhibit "1" Deposition of Donna Dorsey Davis p. 4 at lines 16-19).  Davis graduated from the University of Tennessee in 1962 with a Bachelor's Degree in Education and graduated from Georgia State University with a Master's Degree in Education.  (Davis Depo. p. 6 at line 15 to p. 7 at line 4).  Davis has worked in various positions, most often as a teacher, and has also owned her own business. (Davis Depo. p. 10 at line 3 to p. 11 at line 18, p. 14 at line 11 to p. 21 at line 9).

#### 2.    RICHARD "DICK" DORSEY

Dorsey is a resident of Alabama and is Davis' brother. (See Exhibit "2" Deposition of Richard Dorsey p. 198 at lines 12-15).

Dorsey and Davis' parents were R.T. and Ann Dorsey. (Dorsey Depo. p. 20 at line 23 to p. 21 at line 7).  In 1990, Dorsey and his parents owned Dorsey Motor Sales, Inc. ("Dorsey Motor Sales"), with Dorsey holding 40% of the corporation and his parents together holding 60%.  (Dorsey Depo. p. 16 at line 19 to p. 17 at line 3, p. 28 at lines 10-14).  Since the Dorseys' deaths in 1996 and 1999, Dorsey has become the sole stockholder of Dorsey Motor Sales.  (Dorsey Depo. p. 36 at lines 17-22, p. 40 at lines 13-19, p. 42 at line 22 to p. 43 at line 1).

Parcels on the east and south side of the subject property are owned by corporations in which Dorsey has an ownership interest.  (Dorsey Depo. p. 108 at lines 15-19). These entities include CD&O for which Dorsey is the sole owner,[1] TD&O, LLC ("TD&O") which Dorsey owns with

---

[1]Davis concedes that she owns no interest in CD&O.  (Davis Depo. p. 146 at lines 2-5).

his son and Saxon Properties, for which Dorsey is a 50% owner.  (Dorsey Depo. p. 84 at lines 3-6, p. 87 at lines 8-15, p. 102 at lines 5-14, p. 222 at lines 1-8).

### B.    I-65 PROPERTIES, INC.

#### 1.    THE CREATION OF I-65 PROPERTIES

Dorsey testified that there was property on Interstate 65 initially owned by the Cobb Family. (Dorsey Depo. p. 18 at lines 18-23).  In 1987, Dorsey Motor Sales purchased that property from the Cobbs for $100,000.  (Dorsey Depo. p. 17 at lines 17-22).  Davis knows that some individuals owned the property before I-65 Properties obtained it but does not recall who.  (Davis Depo. p. 25 at line 4-p. 26 at line 9).

Dorsey and his father discussed the properties that Dorsey Motor Sales owned on Interstate 65.  (Dorsey Depo. p. 18 at lines 5-23).  They decided that the properties owned by Dorsey Motor Sales were vulnerable because of increased automobile litigation in the state and therefore they elected to transfer the property they purchased from the Cobbs from Dorsey Motor Sales into a company called I-65 Properties, Inc.  (Dorsey Depo. p. 18 at lines 5-23).  In 1990, the property was sold from Dorsey Motor Sales to the newly created I-65 Properties, Inc. for $250,000, the fair market value at the time of the sale.  (Dorsey Depo. p. 22 at lines 1-10; Exhibit "3" - October 1, 1990 Promissory Note from I-65 Properties to Dorsey Motor Sales).

At the time that the property was sold from Dorsey Motor Sales to I-65 Properties, Dorsey's father decided he wanted Davis to be included as well.  (Dorsey Depo. p. 21 at line 8 to p. 22 at line 10).  Davis received a 30% share of I-65 Properties, one half of her parents' 60% interest. (Dorsey Depo. p. 23 at lines 8-12). Dorsey received the other half of his parents' 60% interest, which coupled with the 40% he already held, left him with a 70% interest.  (Dorsey Depo. p. 22 at line 11 to p. 23 at line 12).  Davis says that Dorsey told her that their parents were going to give

them an early inheritance and that she would receive 30% interest in I-65 Properties. (Davis Depo. p. 23 at line 14 to p. 25 at line 3).

On October 1, 1990, the Articles of Incorporation and By-Laws for I-65 Properties were executed by Dorsey and Davis. (Exhibit "4" - Articles of Incorporation for I-65 Properties; Exhibit "5" - By-Laws for I-65 Properties). The Certificate of Incorporation was filed for I-65 Properties on October 9, 1990. (Dorsey Depo. p. 9 at line 18 to p. 10 at line 6; Exhibit "6" - Certificate of Incorporation for I-65 Properties). The sole asset of I-65 Properties is an undeveloped piece of real estate. (Dorsey Depo. p. 52 at lines 1-11).

2.    THE MORTGAGE

A promissory note for the subject property was executed on October 1, 1990 from I-65 Properties to Dorsey Motor Sales. (Dorsey Depo. p. 13 at lines 15-23, p. 28 at lines 10-21; Promissory Note). Dorsey Motor Sales still holds the promissory note payable by I-65 Properties. (Dorsey Depo. p. 41 at line 20 to p. 42 at line 2). The 12% interest rate which was established on the loan from Dorsey Motor Sales to I-65 Properties was set by R.T. Dorsey. (Dorsey Depo. p. 210 at line 19 to p. 211 at line 11, p. 211 at line 22 to p. 212 at line 1).

During her deposition, Davis was shown a closing statement that reflected a price on the I-65 property of $250,000, more specifically reflecting the assumption of a mortgage for $21,800 (the remainder of the Cobb loan) and the issuance of a promissory note in the amount of $228,200. (Davis Depo. p. 56 at line 13 to p. 57 at line 5; Exhibit "7" - Closing Statement for I-65 Properties). Davis acknowledges her father's signature and acknowledges that based on the records, her father had knowledge of a $250,000 debt on the property as of October 1, 1990. (Davis Depo. p. 57 at lines 3-14).

Regardless of the above, Davis claims to have had no knowledge regarding the mortgage until 2005 and says she believed the property was given to her debt free. (Davis Depo. p. 27 at lines 10-21). Davis alleges that she did not know that there was a mortgage or debt associated with

acquisition of the property until 2005 when she met with her brother. (Davis Depo. p. 26 at lines 16-20). Davis testified she had always told her father and brother, "If I owe any money--this was from the get-go--please let me know." (Davis Depo. p. 27 at lines 3-9, p. 29 at lines 3-5). When asked if she would have rejected her 30% share of I-65 Properties if she had known there was a debt, Davis testified, "I have no idea." (Davis Depo. p. 29 at lines 6-9). Davis said that until her father's death in 1996, she trusted him and her brother to take care of matters. (Davis Depo. p. 32 at lines 20-23).

Dorsey testified that Davis absolutely knew about the note at the time of its execution. (Dorsey Depo. p. 165 at lines 8-21, p. 166 at lines 2-11, p. 175 at lines 1-11). Despite Davis' assertions to the contrary, the following evidence suggests that Davis had full knowledge that there was a mortgage on the property in question long before 2005: (1) On January 6, 2000, John Davis (Davis' husband also referred to as "Jack") wrote Dorsey's accountant Alan Taunton a letter which referenced a December 1999 corporation meeting which Davis attended and posed questions specifically addressing the loan with Dorsey Motor Company and other issues. (Exhibit "8" - January 6, 2000 Letter from John Davis to Alan Taunton); (2) On February 17, 2000, Taunton responded to John Davis' January 2000 letter regarding I-65 Properties. (Dorsey Depo. p. 32 at line 20 to p. 33 at line 13; Exhibit "9", February 17, 2000 correspondence from Alan Taunton to John Davis). Davis recalls receiving a letter from Taunton. (Davis Depo. p. 47 at lines 16-22). The letter indisputably refers to the circumstances surrounding the transfer of property in 1990 and the mortgage associated therewith. (February 17, 2000 Letter); (3) Davis admits she discussed refinancing the property with Dorsey in 2000 which would indicate that she certainly knew about the debt then. (Davis Depo. p.83 at line 23 to p. 84 at line 22; See Exhibit "10" - April 5, 2000 Letter from Richard Dorsey to Donna Davis). Davis further acknowledges that the April 2000 correspondence states that Dorsey has absolutely no objection to her finding a better interest rate.

(Davis Depo. p. 85 at line 22 to p. 87 at line 1). She admits that she made no effort to obtain a better interest rate. (Davis Depo. p. 85 at line 22 to p. 87 at line 1).

Taunton's February 17, 2000 correspondence to Davis' husband states in part as follows:

> **Bullet 3: Questions about I-65 Properties, Inc. Note:**
> We do have a copy of this note. The note is dated October 1, 1990 and is signed by Richard M. Dorsey as president of I-65 Properties, Inc. The payee of a note does not sign the note, therefore, no signatures of DMS officers appear on the note.
> \* \* \*
> I am enclosing a copy of the note from I-65 Properties, Inc. to DMS.

Despite this, Davis denies having knowledge prior to 2005 that there was a mortgage on the property. (Davis Depo. p. 47 at line 16 to p. 50 at line 4). Incredibly, when reviewing the February 2000 letter during her deposition, Davis testified that she would not have understood the reference regarding a note on the property. (Davis Depo. p. 49 at line 21 to p. 50 at line 4). Moreover, Davis, who holds both a Bachelor's Degree and a Master's Degree and has owned her own business, denies knowing what a promissory note is or having ever borrowed money from anyone but her parents. (Davis Depo. p. 50 at lines 7-14).

In the face of all this evidence to the contrary, Davis insists that she did not know about the debt until attending a meeting in December 2005 wherein she learned she owed in excess of $500,000. (Davis Depo. p. 26 at lines 16-20, p. 35 at line 18 to p. 36 at line 11, p. 69 at lines 3-11).

### 3. DAVIS' KNOWLEDGE AND I-65 PROPERTIES BUSINESS

Davis acknowledges her signature on the By-laws for I-65 Properties as well as on the Articles of Incorporation. (Davis Depo. p. 38 at line 15 to p. 39 at line 5, p. 43 at lines 4-7). Davis was named the Vice-President of I-65 Properties and has always held that office. (Davis Depo. p. 62 at lines 15-17, p. 93 at lines 13-20). Davis claims she never received independent auditing information, balance sheets, or a profit/loss statement until 2005. (Davis Depo. p. 157 at lines 1-4, p. 157 at lines 15-17, p. 172 at lines 4-12). However, she has no recollection of when she would

have asked for that information.  (Davis Depo. p. 191 at line 18 to p. 192 at line 2).  In fact, Davis did receive financial information regarding I-65 Properties upon her request, if not from the inception. (See Exhibit "11" - Affidavit of Alan Taunton ¶3; Exhibit "12" - Unsigned Copy of October 28, 2003 letter from Alan Taunton to John Davis[2]; See also Exhibit "13" - March 18, 2006 Letter from Alan Taunton to Lindsey Erwin).

Between 1990 to 2000, I-65 Properties had meetings at the home of R.T. and Ann Dorsey at which time Davis and Dorsey communicated about the property.  (Dorsey Depo. p. 165 at line 12 to p. 166 at line 11, p. 172 at line 1 to p. 173 at line 7). Davis recalls having a meeting sometime between 1996 and 2000 where she learned that the county required maintenance on the property to keep the bamboo there under control.  (Davis Depo. p. 33 at line 11 to p. 35 at line 6).  She knows she learned about maintenance and taxes at that meeting, but does not remember if she learned about a debt on the property.  (Id.).   Davis does not remember whether she received notice of meetings prior to the December 2005 meeting, but it is undisputed that she was aware of and notified about other meetings.  (Davis Depo. p. 37 at line 19 to p. 38 at line 6, p. 94 at lines 2-21).  Davis later admits, however reluctantly, that she was an officer from the beginning and that she received proper notification of the shareholder meetings even though her *Complaint* alleges otherwise.  (Davis Depo. p. 93 at lines 1-20, p. 94 at lines 1-21, p. 105 at lines 4-12).

Davis again reiterates that she received information regarding the property and when asked if she had a system or a method for keeping up with those type documents, she said, "I think I do." (Davis Depo. p. 44 at line 12 to p. 45 at line 12).  Davis was uncertain whether she had records to refresh her recollection regarding the sequence of events or dates where she received information. (Davis Depo. p. 45 at lines 6-16).  Davis has never had nor sought to have the property appraised. (Davis Depo. p. 51 at line 8 to p. 52 at line 23).  Davis admits that she does not know what the

---

[2]The reference to an "October 18, 2003" letter in the deposition reflected a typo, as the letter was actually dated October 28, 2003.

property is worth.  (Davis Depo. p. 189 at lines 19-22).  Davis does not know whether she has ever provided financial information regarding the property on any of her financial statements.  (Davis Depo. p. 53 at line 15 to p. 54 at line 3).

I-65 Properties is simply a piece of naked real estate that is unimproved except for a road that was installed by Dorsey in 1991.  (Dorsey Depo. p. 52 at lines 1-11). Dorsey explained that the property was appraised in 1991 because there was an offer on the table regarding a potential Nissan deal.  (Dorsey Depo. p. 129 at line 11 to p. 130 at line 2).  Dorsey's father did most of the work on the Nissan deal.  (Dorsey Depo. p. 130 at line 1 to p. 131 at line 3).

Dorsey told Davis that someone inquired about putting a Nissan dealership on the property. (Davis Depo. p. 73 at line 5 to p. 74 at line 8).  Dorsey also told Davis that Cracker Barrel made inquiries about putting a restaurant on the property.  (Davis Depo. p. 75 at lines 5-11). Davis said that Dorsey consulted a professional on the Cracker Barrel property offer.  (Davis Depo. p. 78 at line 22 to p. 79 at line 6).  Davis said she discussed the Cracker Barrel situation with her husband who was a real estate agent, but does not remember what his opinion was.  (Davis Depo. p. 81 at lines 1-21). Davis said that after the Cracker Barrel inquiry, Dorsey told her he was going to let Jim Gilliland handle the marketing of the property. (Davis Depo. p. 75 at lines 9-17).  She admits that she did nothing to market or promote the property.  (Davis Depo. p. 75 at line 23-p. p. 77 at line 4).

There is one billboard on I-65 Properties and it has been the only income since 2000. (Dorsey Depo. p. 128 at lines 5-13).  The annual income for the billboard is $600 per year.  (Dorsey Depo. p. 128 at lines 14-15).

Dorsey testified that he does not know the value of the property at this time and does not intend to get it appraised until there is a viable offer because there is no justification for the expense.  (Dorsey Depo. p. 55 at lines 4-22, p. 60 at lines 4-7, p. 234 at lines 3-8).

Dorsey explained that he was actually interested in entering into a long-term lease for the property.  (Dorsey Depo. p. 55 at line 18 to p. 56 at line 15).  He has inquired about whether I-65

Properties could tap into the available sewer system. (Dorsey Depo. p. 145 at lines 11-16). Dorsey has also done a study about a proposal to divert storm water from the property with the help of an engineer based on his observations of some erosion he recognized as he walked the property. (Dorsey Depo. p. 70 at lines 8-17). The road was installed on the property at the request of Dorsey's father when Nissan was looking to place a dealership there. (Dorsey Depo. p. 67 at line 15 to p. 68 at line 9).

Dorsey further explained his activity in managing the property as follows:

A.   Well, I think the records you produced showed some action we entertained the Nissan project, when we hired an attorney to speak to Millbrook City Council on the sewer question, when we defend the illegal placement of the signs at the entrance to the property by K Bar K, when we also acquired a movement of Millbrook's – I mean – excuse me – Prattville City Limits across the interstate. We had the city limits moved.

Q.   All right. To be in Prattville?

A.   Yes.

Q.   Okay.

A.   When we engineered or – not engineered – got the estimate on repiping the drainage from across the property to a common line with the State of Alabama to move the drain – the drainage from the center. We paid our taxes.

Q.   Okay. That's good. I just wanted to give you an opportunity – since Ms. Davis is alleging that you breached your duty and all, I wanted to give you an opportunity to state what all you felt you did that was right?

A.   Told people to stop dropping old washing machines on the property.

Q.   And tires.

A.   Run off Vietnamese picking bamboo shoots for their restaurant, put up security poles and chain, reported the illegal dumping of the tires on the property, among other things that I can remember right off the top of my head.

(Dorsey Depo. p. 228 at line 22 to p. 230 at line 9).

Dorsey was continually pushed by Davis' counsel regarding why he had not sold the property sooner. Dorsey testified as follows:

A.    I thought it was a good business decision.

Q.    Okay.

A.    Prattville is going to grow. And I knew eventually the property would go up in value. As far as whether I'm open for legitimate offers, bring me a legitimate offer, then we'll look, then we'll talk, then we'll think about an expensive appraisal.

*    *    *

A.    I think it's in the best interest of the property and I-65 to work the property for a ground lease. I think it's the best interest of I-65 to work the property possibly on a co-development basis.

(Dorsey Depo. p. 234 at line 1 to p. 235 at line 7).

It must be noted that no evidence exists that the property could have been sold and there is certainly no information that selling the property before now would have been the best business decision for the property.

There is no dispute that Davis has never incurred any expense as a result of the mortgage held by Dorsey Motor Sales for I-65 Properties or for any other purpose relating to I-65 Properties. (See Exhibit "14" - Affidavit of Richard M. Dorsey; Davis Depo. p. 129 at lines 11-14). Davis admits that she never "spent any money whatsoever on maintaining or taking care of the I-65 property." (Davis Depo. p. 129 at lines 11-14).

C.    SURROUNDING PROPERTIES

1.    DORSEY'S OTHER COMPANIES

Dorsey confirmed that I-65 Properties had ongoing costs such as property taxes, maintenance and upkeep that have been paid by Dorsey in some manner, whether by him

personally or by a loan from TD&O. (Dorsey Depo. p. 123 at lines 1-6, p. 156 at lines 10-22; Exhibit "15" - Compilation of Expenses Owed).

TD&O is an advertising business that leases land from I-65 Properties for a billboard. (Dorsey Depo. p. 132 at line 4-8, p. 132 at line 22 to p. 133 at lines 4, p. 133 at line 22 to p. 134 at line 3). TD&O holds the billboard permit which it leases to Lamar Advertising for $5400 per year. (Dorsey Depo. p. 133 at lines 1-21).

In 1991, CD&O purchased four parcels around the area of I-65 Properties. (Dorsey Depo. p. 83 at line 5 to p. 84 at line 2). I-65 Properties had an option to purchase the four parcels but because the Nissan deal fell through, there was no money to exercise that option, therefore CD&O bought the options from I-65 Properties and purchased the properties. (Dorsey Depo. p. 183 at line 23 to p. 187 at line 19). Dorsey recalls that CD&O took the option because I-65 Properties was going to let the option lapse and lose the money. (Dorsey Depo. p. 224 at lines 12-18). He then explains that CD&O took the option and paid the money back to I-65 Properties which in turn would have paid it back to Dorsey Motor Sales from whom I-65 Properties borrowed it to begin with. (Id.)

Dorsey explained that when the property became available for sale, he and his wife looked at it, came up with a business plan for something she wanted to do and purchased the property via CD&O. (Dorsey Depo. p. 96 at lines 9-13). Dorsey explained that CD&O also bought a metal building. (Dorsey Depo. p. 97 at lines 11-22). Between 2001 and 2003, there was a Suzuki dealership on one of the parcels of land owned by CD&O. (Dorsey Depo. p. 100 at lines 11-17).

Dorsey was questioned extensively about why he did not approach his sister about the opportunity to buy the property and he explained that I-65 Properties had no income to purchase the property. (Dorsey Depo. p. 91 at line 5 to p. 94 at line 9). Upon further questioning, he explained that I-65 Properties did not have enough resources and could not have borrowed the money to purchase the property that CD&O purchased. (Dorsey Depo. p. 95 at lines 9-16).

Saxon Properties owns a non-contiguous tract of land near the property. (Dorsey Depo. p. 102 at lines 5-14). Saxon Properties bought the property which holds an RV center in 2000 or 2001. (Dorsey Depo. p. 103 at lines 13-22).

### 2.    IMPACT OF SURROUNDING PROPERTIES

When questioned extensively about how the connecting tracts could impact one another based on potential development, Dorsey testified that he did not believe the three tracts were connected because one is by the road and the other is separated by a natural branch. (Dorsey Depo. p. 108 at line 20 to p. 112 at line 7). At an impasse of asking hypothetical questions about what might happen, Dorsey finally conceded that anything was possible. (Dorsey Depo. p. 112 at line 8 to p. 113 at line 11).

Dorsey again explained that I-65 Properties possibly purchasing the adjoining properties rather than his other companies was not an issue because I-65 Properties did not have any money. (Dorsey Depo. p. 113 at line 19 to p. 114 at line 7). Again, Davis made clear that she did not have the resources to make these purchases. (Davis Depo. p. 97 at line 20 to p. 98 at line 2). Dorsey further opined that he did not believe that I-65 Properties could have borrowed the money to make the purchase. (Dorsey Depo. p. 114 at lines 8-19).

When asked the difference between Dorsey making personal guarantees for the contiguous properties in question and I-65 Properties getting a loan, Dorsey explained that I-65 Properties had negative equity at the time. (Dorsey Depo. p. 116 at lines 2-6). Dorsey again explains that he did not consider I-65 Properties buying the properties after the Nissan deal fell through because there was zero income and negative equity. (Dorsey Depo. p. 117 at lines 17-21). When asked if I-65 Properties was undercapitalized at its inception, Dorsey explained that it was which is why they worked so hard on obtaining the Nissan deal. (Dorsey Depo. p. 217 at lines 16-21).

### D.    DAVIS' OFFER TO SELL HER SHARE OF I-65 PROPERTIES

Dorsey did not offer to forgive Davis' portion of the debt in I-65 Properties in exchange for her 30% stock in I-65 Properties as alleged in paragraph 13 of her *Complaint*. (Dorsey Depo. p. 194 at lines 5-16). Rather, Davis made that proposal to Dorsey. (Dorsey Depo. p. 194 at lines 17-19).[3] After the 2005 meeting when Davis claims she learned of the mortgage, Davis testifies that she called her brother to offer to sell her portion of I-65:

> A.    So I decided to call Dick and ask him if I sold him my part of the land, my 30 percent for a dollar, would that clear up the debt and he said he couldn't answer that; it sounded good to him – it was on a Friday – and that he would try and call Alan. I said, But I need to know immediately, as soon – you know, he said, Well, I can't tell you today because Alan usually takes off on Friday but I will talk to him on Monday.
> And I didn't hear from Dick on Monday. I didn't hear from him on Tuesday. And I – he said he'd let me know Monday. So when that happened, I called Jim Roberts. And then on – I met with him on Wednesday.
>
> *    *    *
>
> Q.    But you initiated the offer, not Dick, correct?
>
> A.    Right. I did.
>
> Q.    How did you come up –
>
> A.    With a dollar?
>
> Q.    – with the conclusion that that was a fair exchange?
>
> [OBJECTION OMITTED]
>
> Q.    Well, that was the offer you made, right?
>
> A.    No. I just offered to excuse my debt.
>
> Q.    Yeah. The offer to excuse your debt for your 30 percent?
>
> A.    A dollar.

---

[3] Dorsey acknowledges that Davis' offer for Dorsey to forgive Davis' portion of the debt in exchange for her stock was withdrawn by a fax letter before any documentation had been finalized on the offer. (Dorsey Depo. p. 194 at lines 20-23; See Exhibit "16" - January 17, 2006 Letter from Richard Dorsey to Donna Davis).

Q.    Well, you knew what the debt was right?

A.    I didn't think it was a true debt. But to go through – because there were things on it that didn't pertain – that didn't make sense to me.  And it – and going back to the beginning of this, I – I couldn't believe that after – all of a sudden, 2005, my brother is telling me I owe half a million dollars.

Q.    Because that's the very first you ever heard about it, wasn't it?

A.    Yes.  And I just thought I – I – I don't have that kind of money.  And the thought of him taking my home – and I told Jack, I said, I can't do this.  So I called Dick and I said I would sell him it for a dollar if it would excuse the debt so we could both get on with our lives.  And that was it.  And then, on that following Friday, like I said, I sent him a fax taking it back.  He had told me he'd call me on Monday.

(Davis Depo. p. 69 at line 5 to p. 72 at line 18).

### E.    DAVIS' ALLEGATIONS AGAINST DORSEY

Davis testified as follows about her claims against Dorsey.  Davis said that as to her allegation in paragraph 10 of her *Complaint* that Dorsey operated in an oppressive manner and in violation of his fiduciary duties to her, she is referring to the fact that she did not know she owed half a million dollars until 2005.  (Davis Depo. p. 88 at line 14 to p. 90 at line 15).  When asked what she was referring to in her *Complaint* when she stated that Dorsey had refused to provide her with documents or access to information, she said, "I don't know how to answer that."  (Davis Depo. p.90 at lines 16-23).  As stated above, she was provided information at the inception and indisputably, not later than February 2000.  (February 17, 2000 Letter).  Davis also said that Dorsey should have told her about the debt because she told him from the beginning that she wanted to know if she owed money.  (Davis Depo. p. 92 at lines 9-15).  When asked about her allegation that he denied her meaningful participation in the management of the corporate affairs, Davis said that he is a 70% stockholder and can do what he wants to do.  (Davis Depo. p. 92 at lines 16-23).  As previously noted, Davis admits that she was an officer from the beginning and that she received

-14-

proper notification of the shareholder meetings even though her *Complaint* alleges otherwise. (Davis Depo. p. 93 at lines 1-20, p. 94 at lines 1-21, p. 105 at lines 4-12).

Davis said that her allegation about Dorsey hurting I-65 Properties by purchasing surrounding land is based on the fact that he made the purchase without telling her but she admits that she could have done the same thing.  (Davis Depo. p. 94 at line 22 to p. 98 at line 12). However, more importantly, she admits that she would not have had the resources to engage in such a purchase. (Davis Depo. p. 97 at line 20 to p. 98 at line 2).  Dorsey explained that I-65 Properties could not buy the adjacent property because I-65 Properties had too much debt. (Dorsey Depo. p. 95 at lines 9-16).  Davis does not deny such nor does she present evidence that she or the company could have acquired the property.   When Davis was shown the letter from Dorsey to her dated April 5, 2000, she testified that she did not disagree with the following statement: "I hope you realize that my holding two positions has certainly not been to your detriment but very much to your benefit."  (Davis Depo. p. 83 at lines 1-10; April 5, 2000 Letter).

Davis centers much of her argument on the premise that Dorsey acted wrongly as to the I-65 Properties debt, but when asked whether she believed the original mortgage issued in 1990 was unlawful in some way, Davis again said she did not know about the debt and that she "just didn't understand."  (Davis Depo. p. 101 at lines 13-21).  Davis then testified as follows:

> Q.    The fact that you didn't understand, is that the only basis that
>        you have that the debt was unlawful?
>
> A.    No.
>
> Q.    Well, tell me what else you have.
>
> A.    I don't know how to explain it.
>
> Q.    Just in your own words.
>
> A.    I mean, what do you mean, if I have?
>
> Q.    Your allegation here is that –

A.    I just –

Q.    – that the debt was unlawful.  I want to know every fact that you know of or every fact that you contend made it unlawful.

A.    I just know that my father would not have done this if he thought the end result was going to be that I was going to owe half a million dollars on the property.  That's not my father.

Q.    You saw where your father signed that closing statement, did you not?

A.    Yes, I did. Today.

(Davis Depo. p. 101 at line 22 to p. 102 at line 19).

Ultimately, Davis admits that she knows of no facts that would make the debt unlawful. (Davis Depo. p. 103 at line 1 to p. 104 at line 9). However, Davis continues to claim that the mortgage was inadequate and false upon its conception, again apparently based solely on the fact that she claims she did not know about the note.  (Davis Depo. p. 109 at line 23 to p. 110 at line 11).

Davis explains that her allegation in the *Complaint* regarding willfully miscommunicating the timing of meetings actually refers to the occasion where her husband attended a meeting instead of her.  (Davis Depo. p. 105 at line 13 to p. 106 at line 6).  Her husband was late for the meeting because of a wreck on the interstate and when he arrived, the meeting was over.  (Davis Depo. p. 106 at line 6 to p. 107 at line 12).  Davis then rethinks it, stating, " I think it was probably notification of the meeting."  (Davis Depo. p. 107 at lines 13-20).  Davis then testified that Dorsey never actually miscommunicated the meeting time, but vaguely suggests that he did not give her enough notice.  (Davis Depo. p. 107 at line 19 to p. 108 at line 12).  She provides no evidence to support this fact.      Davis admits that even though she alleges in the *Complaint* that Dorsey attempted to further squeeze her out of the business by offering to buy her stock, as previously established,

-16-

it is undisputed that she actually made the offer to sell.  (Davis Depo. p. 108 at line 17 to p. 109 at line 4; see also Davis Depo. p. 69 at line 5 to p. 72 at line 18).

When Davis was asked about her allegation in the *Complaint* that the stock was worth triple the value of a dollar (the value that she placed on the stock when she offered to sell it), she testified as follows:

> Q.  That was my question.  What is the basis of the allegation that your stock is worth triple the value?
>
> A.  If I was going to sell him my stock for a dollar.
>
> Q.  So you're saying it's worth $3, then?
>
> A.  I guess so.  No. I don't know.
>
> Q.  Okay.  You're not saying that.  That would be ridiculous, wouldn't it?
>
> A.  I know.
>
> Q.  Yeah.  Is the truth of the matter that you don't have any basis for that allegation?
>
> A.  I can't see one.

(Davis Depo. p. 109 at lines 10-22).

When asked how Dorsey had breached his fiduciary duty, Davis said she thinks he might have used I-65 Properties to buy other land.  (Davis Depo. p. 112 at lines 3-8).  Davis has no information or evidence that Dorsey used the land as collateral so that he could buy something else and says she does not know what her basis is for her allegation.  (Davis Depo. p. 112 at line 9 to p. 114 at line 21, p. 116 at line 2 to p. 119 at line 5). Dorsey testifies that he has never used I-65 Properties as collateral nor has he allowed a lien to be taken on the property for any reason. (Dorsey Depo. p. 120 at line 22 to p. 121 at line 8).

Davis was unable to provide any facts regarding her allegation that Dorsey used the resources of CD&O to the detriment of I-65 Properties and ultimately admitted that the financial

statement that she relied upon to make such an assertion actually reflected the fact that money had been paid on behalf of I-65 Properties by another entity which would be to the benefit, not the detriment, of I-65 Properties. (Davis Depo. p. 119 at line 23 to p. 124 at line 7). When asked what she was referring to when alleging that Dorsey had engaged in a series of conflicting interest transactions that put I-65 Properties at risk, Davis replied, "I don't know." (Davis Depo. p. 124 at lines 8-17).

When asked about the allegation that Dorsey made it impossible to obtain a quorum of qualified directors to review, ratify or approve any conflicting interest transactions relating to himself, Davis testified, "I don't know." (Davis Depo. p. 125 at lines 5-12). Davis only refers back to the fact that Dorsey is a 70% shareholder. (Davis Depo. p. 125 at lines 6-23).

When asked about her allegation that Dorsey has not committed the time and resources to I-65 Properties, Davis testified that Dorsey had not maintained the property like it should be and when asked what she would do differently she said, "I guess I'd get the Vietnamese back and give them the bamboo." (Davis Depo. p. 126 at line 1 to p. 127 at line 22).[4] Davis has no idea what cost would be associated with clearing the property as she believes should be done, but acknowledged that it would be an expense. (Davis Depo. p. 128 at line 12 to p. 129 at line 10). Davis further admits that she has expended no funds to maintain or otherwise support I-65 Properties. (Davis Depo. p. 129 at lines 11-14).

Davis does not know if there have been profits or dividends to be distributed to the shareholders as indicated in her *Complaint*. (Davis Depo. p. 129 at lines 17-21). She also does not know if I-65 Properties has ever made a profit. (Davis Depo. p. 129 at line 22 to p. 130 at line 1).

_____

[4]Dorsey previously testified that he had to stop people from a Vietnamese restaurant from illegally entering the property and cutting the bamboo. (Dorsey Depo. p. 230 at lines 4-9).

When asked again about her allegation in her *Complaint* regarding the "exuberant" interest rate on the mortgage in paragraphs 28 and 31, Davis says she is referring to the 12% interest rate on the 1990 mortgage from I-65 Properties to Dorsey Motor Sales.  (Davis Depo. p. 133 at line 12 to p. 134 at line 21).  Paragraph 34 of her *Complaint* involves the same information.  (Davis Depo. p. 134 at line 22 to p. 135 at line 8).  As previously established, Dorsey explains that the 12% interest rate which was established on the loan from Dorsey Motor Sales to I-65 Properties was set by his father.  (Dorsey Depo. p. 210 at line 19 to p. 211 at line 11, p. 211 at line 22 to p. 212 at line 1).  There is no argument that the interest rate established was improper at the time.  Davis opines that it was her brother's duty to find an interest rate lower than 12% but bases this statement on no information or law.  (Davis Depo. p. 165 at lines 15-23).  Again, Davis took no action to find a better interest rate after receiving Dorsey's letter dated April 5, 2000 saying it was acceptable if she did.  (Davis Depo. p. 85 at lines 22 to p. 87 at line 1; April 5, 2000 Letter)**.**

When asked about her allegations that Dorsey defrauded her, Davis said, "I guess at the 2005 meeting when he said I owed half a million dollars.  And I have no say-so or control or anything in this.  And then, next year, if we meet, he could come, like I said, and say now it's 700,000."  (Davis Depo. p. 135 at lines 9-17).  When asked further about the allegation of fraud, Davis simply stated, "I just didn't trust him anymore."  (Davis Depo. p. 136 at line 19 to p. 137 at line 3).

When asked about her allegations of deceit, Davis stated that Dorsey told her that he had a verbal agreement with their father "that it was in lieu of my percent - - my 30 percent that I would inherit when they died of the dealership."  (Davis Depo. p. 137 at lines 9-23).  Davis further said the deceit occurred in 1993 when her father executed a power of attorney to Dorsey after her father had a stroke.  (Davis Depo. p. 139 at lines 1-19).  Davis testified, "And he wanted to know if I'd look through it."  (Davis Depo. p. 140 at lines 1-6).

When asked about her suppression of material facts allegations, Davis said she did not know what facts upon which she based that claim other than she does not trust her brother. (Davis Depo. p. 140 at lines 7-22).

Davis testified that she believes she is due 30% of the profits from I-65 Properties and would be responsible for 30% of the "true debt" of I-65 Properties. (Davis Depo. p. 149 at line 20 to p. 150 at line 6).

When Davis' lawyer questioned her about the allegations in her *Complaint* on cross-examination, she provided simple responses to what can only be described as very leading questions or otherwise had an unusually difficult time answering demonstrated by her lawyer's penchant to correct her answers to his questions. As only one example:

> Q.    ...If the vice president doesn't have any prescribed duties in the bylaws or in the articles of incorporation, <u>do you believe you had a right to, as we say here in the factual allegations, have meaningful participation in the management of the corporate affairs</u>?
>
> MR. CLEVELAND:  Object to the form.
>
> Q.    Yes or no?
>
> A.    Yes.
>
> *    *    *
>
> Q.    I'm sorry.  All right.  The next one in the factual allegations, Failed to allow you to participate in annual stockholder meetings directly or indirectly with the exception of the meetings.
>         And if you'll tell me how many -- from let's say 1990 to today, approximately how many stockholder meetings did he allow you to participate in, meaning Mr. Dorsey?
>
> [Objection Omitted]
>
> A.    No, you were very nice.
>
> *      *      *

Q.    Question, now.  See, you got off on that.  I'm just asking you for an estimate from -- I want you to listen.  I don't think you listened to his questions.  From 1990 –

MR. CLEVELAND:  Well, I think you know she didn't.

Q.    From 1990 –

[Objection Omitted]

Q.    From 1990 to the present as we sit here today, will you tell this court approximately how many times you ever participated in any meetings -- formal meetings.  I'm not talking about Christmas and Thanksgiving, formal meetings in regards to I-65 investment properties -- or I-65 properties approximately?

A.    I went to the one in 2005.

Q.    No, I'm going to ask you the question again.  And we're going to stay here all day if we have to.  I want you to listen.

A.    Okay.

Q.    It's simple. You either know or you don't.  From about 1990 –

A.    That's a long time ago.

(See e.g. Davis Depo. p. 152 at line 18 to p. 155 at line 3; see also Davis Depo. p. 165 at lines 15 to p. 172 at line 20, p. 178 at line 8 to p. 180 at line 17, p. 183 at lines 6-19, p. 184 at line 3 to p. 186 at line 9, p. 205 at line 15 to p. 207 at line 207)(Emphasis added).

Again, Davis is unable to provide information regarding her allegations independently but was able to say "Yes" to her attorney asking if the basis of her claim was based on failure to hold regular meetings, failure to audit and provide profit/loss information. (Davis Depo. p. 172 at lines 3-12).

Again being led by her attorney, Davis answered "yes" when asked if her brother had been negligent in not having the property appraised.  (Davis Depo. p. 183 at lines 12-19).  When asked if it would be financially prudent to periodically appraise the property at great expense instead of waiting until there was a legitimate buyer, Davis only said she thinks it would have been smart to

have it appraised by this point. (Davis Depo. p. 190 at lines 10-18). When asked if she had ever asked her brother to have an appraisal done on the property (given her testimony that as an owner she would like to know its worth), Davis testified as follows: "I have to think. I cannot just say no, I didn't and then what if I had and then I've answered you and I really didn't know." (Davis Depo. p. 191 at lines 4-9). Upon further questioning, she finally admitted that she has not asked Dorsey to have an appraisal done on the property. (Davis Depo. p. 191 at lines 15-17).

Davis claims to have asked for audits and financial statements but replies simply "don't recall" when asked when she made these alleged requests. (Davis Depo. p. 191 at line 18 to p. 192 at line 2). Davis denies knowing that there was correspondence to her lawyer stating that she could go to Alan Taunton's office anytime and review the records in question. (Davis Depo. p. 193 at lines 1-7).[5] Moreover, in referring to a letter to Davis' attorney dated February 3, 2006, Davis said she did not recall whether she received the 1998, 1999, 2000, 2001 and 2002 tax returns for I-65 Properties that were sent to her on October 28, 2003.[6] (Davis Depo. p. 194 at line 17 to p. 195 at line 16; See Exhibit "17"-February 3, 2006 Letter from Alan Taunton to Lindsey Erwin).

The correspondence from Taunton, Dorsey's accountant, also said that he did not know whether Davis had the 2003 and 2004 tax returns but that if she did not, he would be happy to provide them to her. (Davis Depo. p. 195 at line 21 to p. 196 at line 2; February 3, 2006 Letter). She does not know whether they ever asked for that information. (Davis Depo. p. 196 at lines 3-9). Davis also said that she made no effort to verify the debt of the company even though the correspondence advised her that would be a "fairly straightforward task to verify the debt of the company." (Davis Depo. p. 196 at lines 10-19). Davis also confirms that the letter says "if you want to come up and look at the books or have your auditor audit the books, you are welcome to do so."

---

[5]However, Davis' attorney confirms knowledge of such a letter. (Davis Depo. p. 193 at lines 1-15).

[6]See footnote 2, supra.

(Davis Depo. p. 198 at lines 6-13; February 3, 2006 Letter).  After admitting actually receiving all the information for the years that she said she did not have, in an attempt to rehabilitate her allegations, Davis was questioned as follows by her attorney:

> Q.    Would it have been nice for the president to have authorized the accountant or perhaps even made a copy of the tax returns and mailed them to you?
>
> A.    Yes.
>
> [Objection Omitted]
>
> Q.    Are you offended because he didn't?
>
> [Objection Omitted]
>
> A.    Yes.
>
> Q.    Is that part of your complaint in the –
>
> [Objection Omitted]
>
> Q.    Is that part of the complaint contained in the complaint you filed against your brother?
>
> [Objection Omitted]
>
> A.    Yes.

(Davis Depo. p. 204 at line 15 to p. 205 at line 7).

**F.    DORSEY'S COUNTERCLAIM AGAINST DAVIS**

Following Davis' *Complaint*, Dorsey filed a counterclaim against Davis for her portion of the debt associated with I-65 Properties.[7]  (Dorsey Depo. p. 196 at line 12 to p. 198 at line 7).  The amount is representative of the original principal on the promissory note as well as the interest that

---

[7]Prior to the filing of this action, neither Dorsey nor I-65 Properties has never made any demand on Davis to satisfy any portion of the mortgage.  This counterclaim was only asserted after Davis filed her claim and out of an abundance of caution given the dictates regarding compulsory counterclaims in *Fed.R.Civ.Proc.* 13(a).

has accrued since its inception as well as loans made to I-65 Properties. (Dorsey Depo. p. 209 at lines 2-22).

## III.    ARGUMENTS AND CONCLUSIONS OF LAW

### A.    STANDARDS GOVERNING SUMMARY JUDGMENT

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and...the moving party is entitled to a judgment as a matter of law." Rule 56(c), *Federal Rules of Civil Procedure*; See also *Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir. 1996). "The moving party bears the initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1294 (11th Cir. 1998)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). That burden may be satisfied either by demonstrating that there is no evidence of a dispute of material fact or by demonstrating that the nonmoving party has failed to make a showing "sufficient to establish the existence of an element essential to [the nonmovant]'s case, and on which that party will bear the burden of proof at trial." See *Celotex*, supra, 477 U.S. at 322. It is well-settled that the Court, in passing on a motion for summary judgment, must view all evidence and resolve all reasonable inferences in favor of the nonmoving party. *Zipperer v. City of Fort Myers*, 41 F.3d 619, 622 (11th Cir. 1995).

Once the movant has met its burden under Rule 56(e) by showing that there are no genuine issues of material fact or that the nonmovant lacks an essential element, the burden then shifts to the nonmovant to show the existence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court noted further "[t]he mere existence of a

scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." In the event the nonmovant fails to advance sufficient evidence to support a jury finding for the nonmovant, the Court may properly grant summary judgment. Id. at 249-50.

### B.    LACK OF JURISDICTION

Federal courts have limited jurisdiction, and accordingly, "a federal court may hear a case only if it is authorized to do so by federal law." *Poole v. American Intern. Group, Inc.*, 414 F.Supp.2d 1111, 1114 (M.D.Ala. 2006)(citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) and *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994). In order to satisfy the jurisdictional requirements for this Court, Davis must establish that she has either federal question jurisdiction or diversity jurisdiction. A review of Davis' *Complaint* and the subsequent discovery in this matter reveals that neither is present.

### 1.    NO FEDERAL QUESTION

Pursuant to 28 U.S.C. §1331, federal district courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." It is undisputed here that there is no federal question jurisdiction as Plaintiff does not allege any violation of a federal law or any federal right conferred by the United States Constitution. To the extent Plaintiff seeks to establish jurisdiction pursuant to *Federal Rule of Civil Procedure* 23.1, such is not properly asserted as will be discussed more fully below.

### 2.    DIVERSITY JURISDICTION

Additionally, a party may establish diversity jurisdiction to proceed in federal court. Federal district courts have "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000...and is between citizens of different states". 28 U.S.C. §1332. While this action is between citizens of different states, the amount in controversy does not exceed

$75,000, despite Plaintiff's assertion otherwise in her *Complaint*. In fact, when asked what she wants out of this lawsuit, she replies, "peace." (Davis Depo. p. 141 at lines 12-15).

In order to invoke diversity jurisdiction, the plaintiff must allege facts that show the amount in controversy exceeds $75,000.00, excluding interest and costs. 28 U.S.C. §1332(a). If a plaintiff's allegation of the amount in controversy is challenged, the plaintiff must support her contention with proof of a reasonable probability that jurisdiction exists. *Anthony v. Security Pac. Fin. Servs., Inc.*, 75 F.3d 311,315 (7th Cir. 1996). Davis has not done so here. "[W]here diversity jurisdiction is based on a claim for indeterminate damages, the party seeking to invoke federal jurisdiction bears the burden of proving by a preponderance of the evidence that the claim on which it is basing jurisdiction meets the jurisdictional minimum." *Federated Mut. Ins. Co. v. McKinnon Motors*, LLC, 329 F.3d 805, 807 (11th Cir. 2003); 28 U.S.C. §1332. If it is apparent, to a legal certainty, from the face of the pleadings or after proof has been given that the plaintiff cannot recover the jurisdictional amount, the suit should be dismissed. *Morrison v. Allstate Indemnity Co.*, 228 F.3d 1255, 1268 (11th Cir. 2000).

Here, Plaintiff has made only the bare allegation that "the amount in controversy exceeds $75,000.00, exclusive of interest and costs". (*Complaint* ¶5). However, while "a diversity suit should not be dismissed unless it is apparent, to a legal certainty, that the plaintiff cannot recover [the requisite amount in controversy], this liberal standard for jurisdictional pleading is not a license for conjecture." *Id.* at 1269 (citing *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938).

Application of the foregoing precedential case authority dictates that the *Complaint* in the present matter is not properly before this Court. First, on the face of the *Complaint*, Plaintiff's demands for relief fall far short of establishing $75,000 in controversy. Calling for sanctions, an accounting of the books and declaring the property mortgage void cannot constitute money damages. Any call for damages to be paid to the Plaintiff directly is improper (as is more fully

discussed below).  Even if such were proper, Plaintiff did not present any cause of action which sets forth any relevant facts that would establish damages within or in excess of the jurisdictional amount.  Further, Davis has failed to present any evidence whatsoever that there is an amount in controversy in excess of $75,000.  It is undisputed that there is a significant mortgage on the property, but Davis' only response it that she was unaware of it.  (Davis Depo. p. 49 at line 21 to p. 50 at line 4).[8]  Davis says she has never had the property appraised.  (Davis Depo. p. 51 at line 8 to p. 52 at line 23). Davis admits that she does not know what the property is worth.  (Davis Depo. p. 189 at lines 19-22).  She has not paid for the expenses of maintaining the property.  (Davis Depo. p. 129 at lines 11-14).  She has no knowledge of facts that would indicate that there has been intentional failure to use the property in the manner which would have relative newer profitability.  However, even more telling is Dorsey's affidavit testimony regarding the financial status of I-65 which demonstrates that the amount in controversy does not exceed $75,000.  (Dorsey Aff.).  Critically, Dorsey Motor Sales has never made demand for payment of the debt.  Davis has not been required to pay any money whatsoever.  (Davis Depo. p. 129 at lines 11-14).  There is no evidence to the contrary.  The shortcomings of the evidence regarding facts asserted and relief demanded, coupled with Dorsey's affidavit testimony, render it impossible for Davis to meet the burden of proof necessary to establish the prerequisite amount in controversy for diversity jurisdiction.

Absent a sufficient amount in controversy, diversity jurisdiction is destroyed and this matter is due to be dismissed as a matter of law.

C. STATUTE OF LIMITATIONS

Davis asserts a derivative action and individual causes of action for oppression and squeeze-out, breach of fiduciary duty on her own behalf as well as I-65 Properties, negligence,

---

[8]  Regardless of what Davis maintains regarding her knowledge, it is undisputed that the existence of the debt on the property has been well known since its inception.

willful and wanton conduct, conversion and fraud. However, each of these claims have been brought outside the statute of limitations.

Ala. Code §6-2-38(l) states as follows:

> All actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section must be brought within two years.

The Alabama Supreme Court has repeatedly held that causes of action like those asserted by Davis are governed by a two-year statute of limitations. See *Hensley v. Poole*, 910 So.2d 96, 101 (Ala. 2005). In *Norman v. Occupational Safety Association of Alabama Workmen's Compensation Fund*, 811 So.2d 492, 497 (Ala. 2001), the Court held that breach of fiduciary duty claims sound in tort and are therefore controlled by the two-year statute of limitations dictated by Ala. Code §6-2-38(l). Claims of negligence and willful and wanton conduct are indisputably subject to a two-year statute of limitations. Id. at 944, 945. Claims of fraud are also subject to a two-year statute of limitations. See *Boyce v. Cassese*, 941 So.2d 932, 944 (Ala. 2006). As to Davis' oppression and squeeze-out claim as well as her conversion claim, they too would be subject to a two-year statute of limitations because the claims brought in the context here are based on alleged injury outside of a contractual agreement. Moreover, even if a derivative action can be maintained, the two-year statute of limitations would apply in that the causes of action here sound in tort regardless of how Davis characterizes her claims.

In the present cause of action, the following is undisputed based on Davis' version of the facts: (1) Davis knew that she was granted 30% interest in a corporation that held an undeveloped piece of real estate and had no income in 1990; (2) Davis knew that I-65 Properties did not purchase the surrounding four parcels of land purchased by CD&O in 1991; (3) Davis knew that the Cracker Barrel and Nissan deals were unsuccessful in1991; (4) Davis knew by 1996 that her

father had given Dorsey his power of attorney in 1993;[9] (5) Davis knew by December 1999 (or at the latest by February 2000) that a promissory note was executed for the property and that there was therefore debt owed by I-65 Properties; (6) Davis knew by December 1999 (or at the latest by February 2000) the interest rate on the loan between Dorsey Motor Sales and I-65 Properties, Inc.; (7) Davis knew that maintenance, taxes, etc. were expenses that had to be paid on behalf of I-65 Properties at the latest in February 2000; and (8) Davis received tax returns for I-65 Properties for 1998, 1999, 2000, 2001 and 2002 in October 2003 and was invited to review all financial information.[10]

Based on the foregoing, it is absolutely undisputed that even assuming that Davis had proper standing in her individual capacity to maintain the causes of action that she has brought here and/or she could maintain a derivative claim, her claims must fail because they are asserted much more than two years after the statute of limitations ran. Any allegations that Davis has about how the Nissan deal was handled or how the Cracker Barrel issue was handled or execution of her father's power of attorney, execution of the promissory note, the establishment of the corporation, the creation of the by-laws, etc., all occurred many, many years ago in 1990/1991 and Davis was aware of such at the time. To the extent her knowledge is in question regarding these issues as of 1990, no such question exists regarding her knowledge given the correspondence exchanged in late 1999 or early 2000.[11]

---

[9]Although it seems irrelevant, Davis mentions this matter in her description of how Dorsey was deceitful. Therefore, in an abundance of caution, it has been included herein.

[10] Davis says she knew about these items after a meeting that she says occurred between 1996 and 2000. (Davis Depo. p. 33 at line 11 to p. 35 at line 6).

[11] Davis' claims of ignorance are not relevant. *Ex parte American General Finance, Inc.,* 795 So.2d 685 (Ala. 2006)(holding that claims of fraud were barred by the statute of limitations because she received documents that would have put a reasonable person on notice of fraud two years prior to the filing of the lawsuit).

The applicable statute of limitations analysis for this case was addressed in *Robinson v. Hank Roberts, Inc.*, 514 So.2d 958 (Ala. 1987) wherein a former shareholder brought claims for fraud and breach of fiduciary duty. The *Robinson* plaintiff contended that he did not learn of the *specific* facts upon which he based his lawsuit until he received access to corporate records which was allegedly within a year of the filing of his lawsuit. Id. at 961. The court rejected this argument and held:

> The record amply shows, however, that Robinson was aware of facts on which his claims are based more than one year prior to filing his complaint. Robinson's fraud action is barred by the limitation of Code 1975, §6-2-39. The saving provision of Code 1975, §6-2-3, allowing a party one year from the discovery "of the fact constituting the fraud" in which to bring a fraud action, is not applicable under the evidence in this case. Fraud is deemed to have been "discovered" when "the party actually discovered the fraud, or had facts which, upon closer examination, would have led to the discovery of the fraud."

Id. at 961-962, citing *Kelly v. Smith,* 454 So.2d 1315, 1317 (Ala. 1984).[12]

Some conversion claims are subject to a six-year statute of limitations, however others may be subject to a two-year statute of limitations. See *Ex parte Prudential Insurance Co. of America*, 785 So.2d 348, 352 (Ala. 2000). However, even if the statute of limitations was six years, there is no question that as of February 2000 at the latest, Davis was completely aware of the issues which she now seeks to litigate or at a minimum, was on notice of information, which upon close examination, would have made her aware of the facts from the early 1990s upon which she now bases her claims. See *Franze v. Equitable Assurance,* 296 F.3d 1250 (11th Cir. 2002)(holding that the statute begins to run in a securities fraud case when knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed).

---

[12] This case arose before the change of the statute of limitations to two years.

Moreover, as to any conversion claim, the statute begins to run when the conversion occurred. See Crowe v. City of Athens, 733 So.2d 447, 453 (Ala. 1999). As her Complaint was filed in August 2006, the statute of limitations bars any claims that Davis tries to make here.

Based on the foregoing, Davis' claims against Dorsey and CD&O should all be dismissed as a matter of law as they are barred by the statute of limitations.

### D.    DAVIS' INDIVIDUAL CLAIMS FAIL

In the alternative, even if all Davis' claims were not time-barred, Defendants are still entitled to summary judgment. Davis makes individual claims on her own behalf based on harm she alleges was done to I-65 Properties by Dorsey. However, Davis' claims must fail as a matter of law.

Assuming a claim could be made, such would be in the nature of a derivative suit brought on behalf of the sole minority shareholder. Absent her status as an I-65 shareholder, Davis has no claim against Dorsey. See Pegram v. Hebding, 667 So.2d 696, 702 (Ala. 1995)(holding shareholder's claims are derivative and must be brought in the name of the corporation if claim for damages is based upon plaintiff's status as a shareholder); see also McLaughlin v. Pannell Kerr Forster, 589 So.2d 143, 144-145 (Ala. 1991).

The Alabama Supreme Court reiterated the concept of derivative actions as an exclusive remedy in James v. James, 768 So.2d 356 (Ala. 2000). The James plaintiff sued as a minority stockholder in a closely held family corporation and presented facts that the majority stockholder paid family members excessive salaries, bought his children cars with corporate funds, used excess corporate cash and personally retained interest on the loans. Id. at 358. The James plaintiff brought claims of oppression/squeeze-out, fraud, suppression and breach of fiduciary duty. Id. The court held:

> [t]he cause of this harm was [Defendant's] alleged mismanagement of [corporation]. Therefore, any claims made by [minority stockholder] should have been derivative claims.

Id. at 359.

In short, "a minority shareholder cannot parlay a wrong committed primarily against the corporation, which gives rise to a derivative claim only, into a personal recovery of damages under a squeeze-out theory by simply stating that the injury to the corporation is also 'unfair' to him as well." *Stallworth v. AmSouth Bank of Alabama*, 709 So.2d 458, 467 (Ala. 1997).

In the case of *Galbreath v. Scott*, 433 So.2d 454 (Ala. 1983), the court held that a plaintiff who alleged that the majority shareholders had committed waste of corporate assets could not recover individually under a squeeze-out theory. The *Galbreath* court held:

> The waste of corporate assets by majority stockholders is primarily an injury to the corporation itself. The injury to minority stockholders is secondary. If the corporation refused to assert its cause of action, an action may be maintained by stockholders on behalf of the corporation. In such an action the corporation is the real party in interest and would be the one whose favor a judgment would be rendered.

Id. at 457 (internal cite omitted).

It is undisputed in this case that Davis is making claims based on her 30% interest in I-65 Properties. She has never maintained to the contrary. She has never been made to pay any personal debt whether it be on the mortgage, taxes, or maintenance. Davis has suffered no personal injury from the transactions and events surrounding I-65 Properties. Rather, any claims that she would have (assuming she had taken the proper steps to maintain such) are derivative. All of Davis' claims are based on some notion that the corporation has not realized financial gain, the corporation is being forced to pay too high of an interest rate, that the property held by the corporation has not been properly maintained or marketed and that Davis has not been allowed to manage or participate, that information has been withheld from her or that she has not had access to corporate records as a stockholder. There is no question that Davis' claims must be presented in a derivative action. Any other such causes of action should be dismissed as a matter of law.

Given the derivative nature of the allegations made in the instant suit, Defendants are entitled to judgment as a matter of law as to any claims made by Davis in her individual capacity.

### E.    COMPLAINT FAILS TO COMPLY WITH RULE 23.1

This suit has been brought in part pursuant to Fed.R.Civ.P. 23.1, which governs shareholder derivative suits.  For numerous reasons, even if diversity jurisdiction could be established, Davis' claims are due to be dismissed because she cannot maintain any cause of action based on a Rule 23.1 shareholder derivative suit[13] and/or cannot present a genuine issue of fact pursuant to Rule 23.1.

#### 1.    PURPOSE OF RULE 23.1

Rule 23.1 suits are based on the wrongs committed against a corporation by an officer or director of that corporation.  See *Daily Income Fund, Inc. v.* Fox, 464 U.S. 523, 531-32, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984); *Jefferson County Truck Growers Ass'n v. Tanner,* 341 So.2d 485, 487 (Ala. 1977).  It is fundamental that the corporation must have suffered an actual injury for there to be grounds for a shareholder derivative suit, and that the only damages recoverable in a derivative suit are those related to the loss or damage proximately caused by the wrong committed. *Michaud v. Morris,* 603 So.2d 886, 887 (Ala. 1992).  From the outset it is critical to note that Davis' *Complaint* does not reflect the appropriate nature of a Rule 23.1 suit.  As such, the *Complaint* is due to be dismissed.  In addition, as explained below, Davis also fails to meet the necessary elements to maintain a Rule 23.1 shareholder derivative suit considering any admissible evidence that can be presented.

#### 2.    PRE-SUIT DEMAND

---

[13]This is true for any potential claim against CD&O to the extent Davis attempts to now argue that she is stating a claim against that entity.  It is undisputed that Davis holds no ownership interest in that company.

As an initial matter, this cause of action belongs to the corporation, not the individual shareholder, and thus before bringing suit, the plaintiff must make a demand on the corporation's board of directors to bring a suit on behalf of the corporation. *Fed.R.Civ.P.* 23.1; *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 95, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991).

The decision to bring a lawsuit is a business one and a corporation's board of directors has the primary responsibility of conducting the business affairs for the corporation. Id. at 101. A pre-suit demand gives the corporate directors an opportunity to correct any internal abuses without a lawsuit, make decisions that are in the best interest of the company, and thereby conserve company and judicial resources. *Stepak v. Addison,* 20 F.3d 398, 402 (11th Cir.1994). The presumption is that the directors will be "faithful to their fiduciary duties" and thus the burden is on the plaintiff in a derivative action to overcome that presumption. *Beam v. Stewart,* 845 A.2d 1040, 1048-49 (Del. 2004). No such demand was made by Davis prior to the filing of this action and therefore the action has been improperly instituted.

That being said, the pre-suit demand may be excused by a proper pleading of demand futility. *Kamen,* supra, 500 U.S. at 96. Under Fed.R.Civ.P. 23.1, when a shareholder plaintiff asserts that a demand was not made on the board because it would have been futile, the plaintiff must plead "with particularity" why the demand was not made. It has been noted that Rule 23.1 does not create a substantive demand requirement of any particular dimension and, on its face, speaks only to the adequacy of the shareholder representative's pleadings. *Kamen*, supra, 500 U.S. at 96. However, the rule clearly contemplates both the demand requirement and the possibility that the demand may be excused. Id. The heightened pleading standard further reinforces the notion that a shareholder derivative suit is an extraordinary procedural device, "to be used only when it is clear that the corporation will not act to redress the alleged injury to itself." *Stepak,* supra 20 F.2d at 402. The adequacy of the pleading is determined by the law of the state of incorporation, which here is the State of Alabama. See *Kamen*, 500 U.S. at 109.

Under Alabama law, Ala.R.Civ.P. 23.1 also requires that the plaintiff in a derivative action "allege with particularity the efforts, if any, made by the plaintiff to obtain the action [he or she] desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for [the plaintiff's] failure to obtain the action or the reasons for not making the effort." *Elgin v. Alfa Corp.,* 598 So.2d 807, 811 (Ala.1992) quoting R. 23.1.  This language is referred to as a provision for "director demand." *Elgin,* supra, 598 So.2d at 814.  Under Alabama law, the director demand may also be excused if that demand would be futile.  Id.  To show "futility," the shareholder must show such "a degree of antagonism between the directors and the corporate interest to such an extent that the directors would be incapable of doing their duty." Id. at 814.    However, "a bare allegation that a majority of the directors are wrongdoers is insufficient."  *Cooper v. USCO Power Equipment*, 655 So.2d 972, 974 (Ala. 1995).

A review of Davis' *Complaint* in the instant case, even when viewed in a light most favorable to her, reveals that she has failed to make such a demand upon the corporation and has also failed to demonstrate or plead with any particularity as to why such a demand was futile or due to be excused.  (*Complaint* ¶19).  Davis simply avers that demand is futile because Defendant is the majority stockholder of the corporation, which is insufficient under Alabama law. See *Stallworth,* supra, 709 So.2d at 464 (shareholder's bare allegation that a majority of the directors are wrongdoers is insufficient to satisfy director-demand requirement for maintaining derivative action); *Cooper*, supra, 655 So.2d at 975 (shareholder's conclusory allegation that demand would be futile was insufficient to demonstrate the same and thus shareholder's failure to make director demand barred her action under rule governing shareholder actions).

In addition, as noted by Dorsey, an open offer has been made to Plaintiff and her attorney to review the corporation's books and finances at their convenience, and to discuss the same. (Dorsey Aff.).  It is undisputed that Davis has never availed herself of this offer, but instead ignored the offer and chose to file suit.  Such an open offer to Davis certainly does not demonstrate that

any demand made by her on behalf of the corporation would be futile, even when the offer is construed in a light most favorable to her.  Davis' deposition testimony further solidifies this fact. She was incapable of providing any information as to alleged occasions wherein she asked for information and received no response.  (Davis Depo. p. 191 at line 18 to p. 192 at line 2).  Davis wanted to do nothing, pay nothing and skirt all responsibility and now seeks a financial gain from I-65 Properties that quite frankly does not exist.  The requirements of Rule 23.1 seek to thwart just such a motive.  Davis' failure to meet the pre-suit demand prerequisite is fatal.  Davis' derivative action is due to be dismissed as a matter of law.

### 3.    MONEY DAMAGES

In addition, Plaintiff avers in her *Complaint* that <u>she</u> is seeking money damages, both punitive and compensatory.  However, "a shareholder receives no direct benefit from a derivative suit."  *Rothenberg v. Security Management Co. Inc.*, 667 F.2d 958, 960, n. 3 (11th Cir. 1982).  Also, under Alabama law, minority shareholders are not entitled to recover damages in a shareholder-derivative action.   <u>See</u> *James*, <u>supra</u>, 768 So.2d at 358 ("a minority shareholder cannot parlay a wrong committed primarily against the corporation, which gives rise to a derivative claim only, into a personal recovery");  *Stallworth*, <u>supra</u>, 709 So.2d at 467 (same);  *Shelton v. Thompson,* 544 So.2d 845, 847 (Ala. 1989)(same).  In a shareholder-derivative action, the claims are asserted on behalf of a corporation;  therefore, only the corporation is entitled to recover damages on those claims.  If the corporation recovers damages as a result of the derivative action, the minority shareholders benefit indirectly by virtue of their ownership in the corporation. However, an award of damages directly to the minority shareholders on a shareholder-derivative claim is improper.  *Robbins v. Sanders*, 890 So.2d 998, 1013-1014 (Ala. 2004).  As such, Davis' claims for money damages, whether punitive or compensatory, are improper and are also due to be dismissed.

### 4.   REPRESENTATION OF OTHER SHAREHOLDERS

Additionally, Fed.R.Civ.P. 23.1 dictates that "[t]he derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association." I-65 Properties has only two shareholders: Davis who holds 30% of the shares and Dorsey who holds 70% of the shares.  There is no way that Davis can demonstrate that she represents similarly situated shareholders in this action as the only other shareholder is the Defendant.  Accordingly, by the plain language of Rule 23.1, this action is improper and is due to be dismissed as a matter of law.

### 5.   MERITS OF ANY DERIVATIVE ACTION FAIL
### - NO BREACH OF FIDUCIARY DUTY TO COMPANY

As stated previously, shareholder derivative suits are based on alleged wrongs committed by officer-directors of a corporation against the corporation.  *Jefferson County Truck Growers Association v. Tanner,* 341 So.2d 485, 487 (Ala. 1977).  It is fundamental that the corporation suffer an actual injury.  *Michaud*, supra, 603 So.2d 887.  Moreover, the Alabama Supreme Court has held: "[u]nless a court finds the existence of either bad faith or the absence of a 'reasonable basis,' a court is 'loath to interfere' in the decisions of a business."  *Hensley v.* Poole, 910 So.2d 96 (Ala. 2005)(quoting *Smith v. Dunlap*, 269 Ala. 97, 102, 111 So.2d 1, 4 (1959)).

Here, Davis claims that there has been negligent and intentional conduct by Dorsey which has caused harm to the corporation.[14]  In paragraph 10 of the *Complaint,* Davis summarizes her factual charges by alleging that she was not provided information as required by Alabama law, denied meaningful participation in management, denied participation in shareholder meetings, and

---

[14]The facts upon which she bases this claim are somewhat convoluted and confusing because many of the allegations in the *Complaint* are plainly contradicted by her deposition testimony.  Defendants adopt the specifics of those contradictions as set out in the Summary of Undisputed Facts, section II, above, as if set out fully here.

stripped of I-65 future profits. The first three allegations are somewhat duplicative. Regardless, Davis was completely incapable of establishing that she was ever denied access to records as the evidence is to the contrary. When her husband wrote for clarification on some issues in 2000, he received a response from both I-65 Properties' accountant and Dorsey himself. (See February 17, 2000 Letter and April 5, 2000 Letter). As to the meetings, Davis admits that her allegation of Dorsey intentionally miscommunicating shareholder meetings actually related to her husband missing a meeting because of a car accident on the interstate and then some vague reference to the notice of meetings not providing enough time. (Davis Depo. p. 106 at line 6 to p. 107 at line 12). In short, there is no evidence that Dorsey failed to share information, that he denied access to records or that he intentionally kept her out of shareholder meetings. As it relates to any claim that she has been denied participation in the management of I-65 Properties, it should be noted that the only activity of the corporation is maintenance of the property. Dorsey has never denied her the right to participate. He has paid for everything. Dorsey has maintained and improved the property. There is no indication that he refused to handle the property in any manner she thought appropriate. There is no evidence that he has failed to act as a prudent and reasonable person. As for the loan, it is undisputed that Dorsey encouraged her to obtain alternative financing if she thought it workable. (See April 5, 2000 Letter). It is undisputed that she never took any such action nor did she ask Dorsey to do so. (Davis Depo. p. 85 at line 22 to p. 87 at line 1). It is undisputed that Davis could not afford to do so. There can be no doubt that traditional financing would require regular debt payments to be made. Davis has never averred that she is in a position to undertake such. She does not claim she wants traditional financing, but simply claims ignorance of the debt. As it stands now, the plan is that the property can be rented or sold at an amount that reconciles any debt with a profitable gain to both stockholders. Davis has no evidence to the contrary.

To that end, her fourth factual allegation set forth in paragraph 10 of the *Complaint*, that she has been stripped of any future profits is speculative because it relates to events that have not

taken place. Davis still maintains her 30% share of I-65 Properties. She presents no evidence that the property could have been sold for an acceptable profit and was unreasonably squandered by Dorsey to this point in time.

In paragraph 11 of the *Complaint*, Davis claims that Dorsey has engaged in self-dealing that has allowed him to participate in the profits of the business at the expense of Davis. It is undisputed that there have been no profits to take from Davis. Dorsey has only paid money into I-65 Properties. In short, Davis' factual allegations do not bare out any wrongdoing by Dorsey to the corporation to support a derivative action.

Additionally, Davis makes an allegation in paragraph 15 of her *Complaint* about the fact that another of Dorsey's businesses, CD&O, enjoyed corporate opportunity at the expense of potential business for I-65 Properties.[15] First, it is undisputed that such occurred in 1991. Second, there is absolutely no evidence that I-65 Properties could have ever purchased the real estate in question. Third, there is no evidence that the financial standing of I-65 Properties is related to CD&O. Defendants adopt and incorporate herein the arguments made below regarding the CD&O land purchases.

The Alabama Supreme Court has clearly defined at least two instances wherein it is considered proper seizure of corporate opportunity for a stockholder to engage in other business. First, in *Cox & Perry, Inc. v. Perry*, 334 So.2d 867 (Ala. 1976), plaintiff corporation was formed to conduct general construction work. In 1969, the corporation contracted, to its financial gain, with the federal government to provide mobile homes to hurricane victims. The next year, one of the stockholders, Perry, approached the same federal agency to secure a contract to provide mobile homes to hurricane victims. In holding that Perry had not usurped a corporate opportunity, the Court held:

---

[15]Defendants assume that is what Davis is arguing in paragraph 15 of the *Complaint* when it is stated that Dorsey "has used the resources of CD&O to the detriment of I-65."

> The corporation had no pre-existing interest in the contracts. The corporation had no existing rights in the contracts. The corporation was created to do general construction; this purpose was in no way thwarted when Perry...secured contracts to provide mobile homes to the federal government. In addition, the corporation's insolvency affected the existence of a corporate opportunity. Consequently, Perry did not usurp corporate opportunity by securing the ...contracts for himself.

*Cox & Perry, Inc.,* supra, 334 So.3d at 869. Four years later, the Alabama Supreme Court again rejected the notion that a stockholder in one business could not engage in another. See *Bauman v. Hayes*, 379 So.2d 1251 (Ala. 1980).[16]

The precedential authority of *Perry* is persuasive. Although not completely clear at this juncture, it would appear that Davis is claiming that Dorsey engaged in other business ventures without I-65, Properties; namely, that Dorsey's other companies purchased property that I-65, Properties could have purchased. However, the fatal flaw in this argument is that such is based on the incorrect premise that Dorsey was prohibited from engaging in other businesses. It is undisputed that I-65 Properties lost the deal with Nissan in the early 1990s when CD&O purchased the adjacent property rendering I-65 Properties devoid of the resources to invest in additional property. (Dorsey Depo. p. 95 at lines 9-16, p. 183 at line 23 to p. 187 at line 19). Davis conceded that she certainly did not have the money to purchase additional property. (Davis Depo. p. 97 at line 20 to p. 98 at line 2). Again, it is undisputed that to date Davis has expended absolutely no resources whatsoever on the real estate held by I-65 Properties.

Even assuming the above factors were not the case, there is no evidence that the purpose of I-65 Properties was to continue to purchase other property. Just because other property was considered for purchase if the Nissan deal was successful, does not mean that I-65 Properties was looking to purchase property and therefore was competing with any company owned by Dorsey

---

[16]The facts of *Bauman,* while helpful to establish the point, are not particularly instructive here.

which also purchased property. Further, any argument made by Davis that Dorsey should not have purchased the four parcels of land in 1991 through CD&O is barred by the statute of limitations and is otherwise meritless. Accordingly, to the extent that this alleged derivative action is based on some type of corporate opportunity theory, said claim must fail as a matter of law.

In an abundance of caution, Dorsey addresses other issues that appeared to be relevant to Plaintiff's counsel during discovery. She appears to, in part, complain that Dorsey has allowed too much debt to accrue on the property and has not maintained and marketed the property in the best interest of the company. When addressing this issue, the Alabama Supreme Court has stated:

> [minority shareholder's] allegation seeks unfairly to extend the shareholder's derivative theory of recovery to cover the everyday employment decisions of majority shareholders. 'Corporate officers are required to act with fidelity and in good faith, subordinating their personal interest to the interest of the corporation." *Hardy v. Hardy,* 507 So.2d 404, 406 (Ala. 1986) (citations omitted). However, what have become known as the "business judgment" rule allows corporate management the freedom to make decisions in conducting the corporation's internal business affairs. This Court has expressed this rule as follows:
>
>> If in the course of management, directors arrive at a decision, within the corporation's powers ... , for which there is a reasonable basis, and they act in good faith, as a result of their independent discretion and judgment, and uninfluenced by any consideration other then what they honestly believe to be the best interest of the corporation, a court will not interfere with internal management and substitute its judgment for that of the directors to enjoin or set aside the transaction or the surcharge the directors for any resulting loss. *Roberts v. Alabama Power Company,* 404 So.2d 629, 631 (Ala. 1981), quoting H.Henn, *Law of Corporations*, §242 (2nd edition 1970).

*Michaud*, supra, 603 So.2d at 888.

There is no question that the business judgment rule negates the possibility of maintaining a derivative action here. It is undisputed that at the time of I-65 Properties' inception, an

undeveloped piece of real estate was sold to the company in exchange for a note being executed to Dorsey Motor Sales. It is undisputed that Davis' and Dorsey's father spear-headed this business transaction and that Dorsey owned only 40% of Dorsey Motor Sales at the time. It is undisputed that Dorsey, along with his father, worked diligently to acquire the Nissan deal but that such failed. Dorsey testified at length that it is his business judgment that the property should be held and not sold because it continues to increase in value. Davis is unable to provide any information that the property is not increasing in value at a much more greater rate than debt is accruing. Such is a critical factor in this Court's analysis because until such time as it became necessary to file a counterclaim in this lawsuit to protect his interest, neither Dorsey nor anyone on behalf of Dorsey Motor Sales ever made demand on Davis or I-65 Properties to pay the outstanding debt. (Dorsey Aff. ). There is absolutely no indication that Dorsey has done anything in regard to I-65 Properties that was self-interested. He has made absolutely no money off the property. To the contrary, unlike Davis, it has been Dorsey and Dorsey's companies that have expended funds to maintain the property with physical maintenance, improvements for marketing, payment of taxes, etc. It is worth noting that while Davis complains about the debt, she simultaneously claims that more maintenance should be done to the property and that the property should be appraised – all more expenses that she cannot tie to any financial benefit.

There is no evidence that Dorsey has breached a fiduciary duty to the corporation by exercising his right to maintain, rather than sell the property or to delay expending great resources to market the property at this time.

For reasons discussed above and based on the undisputed facts and precedential case authority presented herein, all of Davis' claims against all Defendants must fail as a matter of law because she cannot meet the jurisdictional requirements to maintain the causes of action in this Court, she fails to present evidence that would allow her to bring claims outside of a derivative action and as to any derivative action, she fails to meet many of the necessary prerequisites in

order to maintain such a cause or present a genuine issue of fact regarding a proper derivative action.

Moreover, Davis filed this lawsuit in August 2006, sixteen years after the creation of I-65 Properties and the loan in question and by even her own account, six years after having indisputable and actual knowledge of the loan in question and the expenses that were being incurred to maintain the property. Accordingly, Davis' lawsuit is due to be dismissed as a matter of law. In the alternative, and in an abundance of caution, Defendants present the factual and legal arguments below in regard to the various claims outside the derivative action context brought against the Defendants which establishes that regardless of jurisdiction, limitations of claims involving derivative actions and the statute of limitations, Davis cannot maintain any part of this lawsuit.

F.    INDIVIDUAL CAUSES OF ACTION

1.    OPPRESSION AND SQUEEZE-OUT

In a close corporation such as I-65, it is well settled in Alabama that the majority shareholder "owe[s] a duty to at least act fairly to the minority interests." *Burt v. Burt Boiler Works, Inc.*, 360 So.2d 327, 331 (Ala. 1978). In this regard, the causes of action of oppression and squeeze-out are recognized by Alabama courts. Id. However, the courts have repeatedly held that the "squeeze-out cause of action is not a panacea for any and all conduct undertaken by majority shareholders of a close corporation that could be deemed 'unfair' to the minority." *Brooks v. Hill*, 717 So.2d 759, 765 (Ala. 1998). In the landmark case of *Burt,* supra, although recognizing an oppression/squeeze-out claim for the first time, the court said that the plaintiffs could not recover because they "show[ed] only that the majority [had] taken control of the corporation." *Burt*, supra, 360 So.2d at 332. The plaintiffs had not demonstrated that they had been deprived of their rights as stockholders in the corporation. Id.

As stated previously, "[a] minority shareholder cannot parlay a wrong committed primarily against the corporation, which gives rise to a derivative claim only, into a personal recovery of damages under a squeeze-out theory by simply stating that the injury to the corporation is also 'unfair' to him as well." *Stallworth*, supra, 709 So.2d at 467.  In the matter of *Michaud*, supra, 603 So.2d at 886, the court addressed the issue of a minority shareholder oppression claim wherein a minority shareholder in a closely held corporation claimed oppression against the majority shareholders when he was terminated from his employment position with the company.  The plaintiff in *Michaud* was a minority shareholder in a restaurant and was also the general manager. The two majority shareholders determined that the restaurant was not profitable and made the decision to terminate his employment.  *Michaud*, supra, 603 So.2d at 887.  After a jury verdict awarded damages on the derivative and oppression claims, the Supreme Court held that the majority could not be held liable to the corporation for using business judgment and more specifically as to the oppression claim, held that the majority shareholders had not impermissibly oppressed the minority shareholder's interest in the corporation simply by making a management decision.  Id. at 888-889.  The court said:

> Shareholders in close corporations have a right to share in corporation earnings, and a majority cannot deprive such shareholders of that right by failing to declare dividends or otherwise manipulating corporate earnings to squeeze out minority interests. Applying these principles to the facts of this case, we note that there were no corporate earnings, so the majority did not unfairly deprive [plaintiff] of his pro rata share in corporate earnings by oppressively managing the affairs of the corporation.  The only evidence [plaintiff] offers to show oppressive at the hands of a majority is the fact that the majority exercised control of the corporation to terminate his role as a general manager of the restaurant.

Id. (footnote omitted).

In essence, absent some finding that monies had been withheld from the minority shareholders, the court found that an oppression claim could not be based on a management decision.  Id.

The Alabama Supreme Court addressed the issue again in *Stallworth,* supra, 709 So.2d at 458. There the court emphasized as discussed herein, that claiming the director is self-dealing or mismanaging might be considered unfair to minority stockholders but such is the quintessential derivative action. Id. at 467. Moreover, the court explained that oppression and squeeze-out causes of action are developed for when a minority stockholder in a closed corporation is being excluded from employment, participation in management or being deprived of a salary or profit. Id. In holding that the *Stallworth* plaintiff had not established such a claim, the court pointed out that the plaintiff participated in management decisions, maintained his status as a vice president in the company, had not even suggested that the majority stockholders were attempting to oust him from his post as the vice president or that the majority stockholders had withheld salaries or dividends from him. Id. at 468. Rather, the court explained, the *Stallworth* plaintiff simply brought the cause of action because the majority stockholders apparently would not "accede to his wishes on matters of corporate management." Id. at 468. As such Davis' reliance on *Fulton v. Callahan*[17], 621 So.2d 1235 (Ala. 1993) is misplaced. There is no evidence in the present case that Davis, as a Dorsey as the majority shareholder has failed to declare dividends to the detriment of Davis or that he has manipulated corporate earnings. There have been no profits to manipulate.

Although no fact-situations in close corporation type settings are exactly the same, the concepts discussed in *Stallworth* are instructive here. Davis cannot establish that she was disallowed participation in management. On the contrary, there is evidence of communications and correspondence throughout the years, at least since 2000 that dictate indisputably that she was allowed to be involved. Moreover, Davis admits that she had the right to participate (Davis Depo. p. 152 at line 18 to p. 155 at line 3) and never argues that anyone tried to take that position away. Davis' failure to participate does not constitute a squeeze-out by Dorsey. Although claiming that

---

[17]The quote Davis attributes to the *Fulton* court as reflected in paragraph 21 of her *Complaint* is located nowhere in the *Fulton* opinion.

she did not have notice of meetings in her *Complaint*, she clarified in her deposition that she did actually receive notice of meetings.

To the extent she questions the arrangement of the loan as some type of squeeze-out, it is undisputed that at the very latest, she was invited to have input regarding that decision by the majority stockholder in April 2000. (See April 5, 2000 Letter). Again, Davis has not missed out on dividends and profits. In fact, Davis testifies very plainly that she does not know whether the company has ever made profits. The record is not in dispute that I-65 Properties has never made a profit. Therefore, it is impossible for Davis to establish that she has been oppressed or squeezed out of I-65 Properties by Dorsey. To the extent that Davis attempts to make this argument based on some concept that the property should have already been sold, such allegation is meritless. First, sustaining a claim on such a notion is impossible when there is no way to establish whether the property could have been sold in a profitable manner to date. Moreover, there is absolutely no evidence that it is not the better business decision to allow the property to gain value until such time where it could be sold at a greater profit after satisfying the debt. It is critical to note that until Davis sued Dorsey and he was forced to file a counterclaim, no demand has ever been made on I-65 Properties or the stockholders in that company by Dorsey Motor Sales to make payment on any of the accruing debt.

As was addressed in *Stallworth*, Davis tries to make a claim here based simply on the fact that she disagrees with some of the management decisions made by her brother. Again, even if her disagreement was reasonable, it does not establish under Alabama law that Dorsey has engaged in oppression or squeeze-out. More importantly, the evidence shows that since 1990 Dorsey has managed the taxes on the property, the maintenance on the property, engaged in improvement for the property by the installation of a road, investigated sewer issues and developing a plan to handle water and erosion issues for the property. (Dorsey Depo. p. 123 at lines 1-6, p. 156 at lines 10-22, p. 228 at line 22 to p. 230 at line 9). Davis makes clear that the sole

reason she brought this lawsuit was because she was concerned about her liability on the debt. All evidence indicates that Davis knew about the debt from the beginning and certainly knew about the details of the debt since December 1999 or at the latest February 2000.

It is noteworthy to address that Davis states in her *Complaint* that Dorsey offered to buy her stock to satisfy the outstanding mortgage at three times less the actual value of the stock. (*Complaint* ¶13). Davis testifies unequivocally that she called her brother to ask that he take her stock in exchange for forgiveness for the debt for one dollar. (Davis Depo. p. 194 at lines 17-19). He was looking into the matter when she canceled the offer days later and this lawsuit soon resulted. (January 17, 2006 Letter).

Based on the foregoing, Davis' oppression and squeeze-out claims are due to be dismissed as a matter of law.

### 2.    BREACH OF FIDUCIARY DUTY TO SHAREHOLDER

Davis has asserted a cause of action claiming that Dorsey breached his fiduciary duty to her. She cannot maintain such a claim. *Shelton,* supra, 544 So.2d at 847. Rather the duty of good faith and loyalty is to the corporation. See *Massey v. Disc Manufacturing, Inc.*, 601 So.2d 449 (Ala. 1992). To the extent that this claim is recognized outside a derivative cause of action by this Court, Defendants adopt and incorporate herein all factual and legal arguments presented regarding any allegation of breach of fiduciary duty to the corporation under a Rule 23.1 action, discussed in section III.E, above.

### 3.    NEGLIGENCE

The elements of a negligence cause of action are well-settled. Davis must establish that Dorsey had a duty to the corporation, that Dorsey breached that duty, and that as a result of that breach, I-65 Properties suffered an injury. See *Jones v. Newton*, 454 So.2d 1345, 1348 (Ala. 1984). All claims upon which Davis would be basing this claim occurred more than two years prior

to August 2006.  Actual knowledge is not an issue in a negligence cause of action.  Paragraph 28 of the Complaint relates only to a mortgage with an "exuberant" interest rate.  This action occurred in 1990 and was handled by Dorsey's father.  As such the claim has been indisputably brought outside the statute of limitations.

To the extent this claim is asserted against Dorsey individually in favor of Davis individually, such is inherently flawed because Davis cannot establish that Dorsey owes her a duty in her individual capacity.  Her claims of negligence relate directly to her position as a stockholder and to that end, the discussions in Section III.E.5 above are adopted and incorporated herein which established no duty has been breached to the corporation. A negligence claim outside of the context of a derivative claim cannot be maintained. Again, Davis has not been made to pay any money.  Dorsey has expended his own or his other companies' resources to maintain and improve the real estate held by I-65 Properties.  Davis has no evidence that the property could have been sold for an acceptable profit or that it was negligent to refrain from selling the property because it was continuing to increase in value.  Other than Davis opining that the property did not look good, there is no evidence that Dorsey has been negligent in maintaining the property.  Dorsey in fact has expended his resources to maintain and improve the property for future rental or sale.

### 4.    WILFUL AND WANTON CONDUCT

Davis has brought a cause of action for wilful and wanton conduct.  Wanton conduct is defined as follows:

> [The] doing of some act or something with reckless indifference to the consequences of said act, or...a failure or omission to do something, with reckless indifference to the consequences of such failure or omission, that is, that the party acting or failing to act is conscious of his conduct, and even though without any actual intent to injure is aware from his knowledge of existing circumstances and conditions that his conduct would probably result in injury to another or in damage to his property.

*Hooper v. Columbus Regional Healthcare System, Inc.*, 2006 WL 2988689 at *4 (Ala.)(citations omitted). Davis cannot maintain a negligence claim and therefore certainly cannot present the heightened evidence required to maintain a wantonness claim. Again, Dorsey has expended only his resources to maintain this property. Davis has only incurred a debt that she has not been made to pay. Further, any claim for wantonness is time barred, not permitted outside a derivative action and otherwise cannot be maintained based on the facts of this case. Defendants adopt and incorporate herein all factual and legal arguments presented herein.

### 5.    CONVERSION

Davis makes a claim against Dorsey for conversion, however Davis cannot establish that Dorsey converted any property belonging to her.

> To establish conversion, a plaintiff must show a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or interference with another's property.

*Crowe v. City of Athens*, 733 So.2d 447, 450 (Ala. 1999)(quoting *Birmingham-Jefferson County Transit Auth. v. Arvan*, 669 So.2d 825, 828 (Ala. 1995).

To the extent that Davis asserts Dorsey converted money, the Alabama Supreme Court has repeatedly held that there can be no action for conversion when the money cannot be identified. *Campbell v. Naman's Catering, Inc.,* 842 So.2d 654, 659 (Ala. 2002). Davis can make no valid allegation that Dorsey converted any money whatsoever and she certainly cannot identify any such monies. In short, it is undisputed that I-65 Properties has no money - - it never has. Dorsey made clear that he has never pledged the property to obtain a loan as alleged in paragraph 34 of Plaintiff's *Complaint*. (Dorsey Depo. p. 120 at line 22 to p. 121 at line). To the extent the allegation is based on some notion of lost opportunity for money, such a claim cannot be maintained. Loss of potential profit is speculative and unreasonable based on the undisputed facts of this case. To that extent, all factual and legal arguments throughout are adopted and incorporated herein as if set out in full as it relates to CD&O's purchase of land and other factual claims which Plaintiff

asserts support a conversion claim.  Additionally, as previously argued, irrespective of whether this Court finds that the two-year or six-year statute of limitations is applicable as to this count, Davis' claim is barred thereunder.

### 6.    FRAUD

In order to establish a claim of fraud, the plaintiff must demonstrate "(1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation." *Padgett v. Hughes*, 535 So.2d 140, 142 (Ala. 1988).  In order to establish a suppression claim, the Alabama Supreme Court held in *Drummond Co., Inc. v. Walter Industries, Inc.*, 2006 WL 3462146 (Ala.) that a plaintiff must show: (1) that defendant had duty to disclose existing material fact; (2) that defendant suppressed such material fact; (3) that defendant's suppression of such fact induced plaintiff to act or to refrain from acting; and (4) that plaintiff suffered actual damage as proximate result.  Davis apparently bases this claim on the notion that Dorsey concealed facts about the corporation and misrepresented the value of the stock.  Addressing the latter issue first, it has already been determined that Davis, not Dorsey, offered the sale of stock and suggested a price.  Even so, there was certainly no intentional fraud on Dorsey's part.  He has stated, without contradiction, that he does not know the value of the property at this time.  (Dorsey Depo. p. 60 at lines 4-7).  As for the concealment of information, that allegation too has been dispelled.  Davis was aware of facts at the very latest by late 1999 as is evidenced by the correspondence from her husband in January 2000 recapping a shareholders meeting that Davis herself attended regarding the debt on the property and other issues.  (January 6, 2000 Letter).  It is undisputed that Davis' correspondence was followed by letters from the corporation's accountant  and Dorsey wherein he encouraged her participation and review of information.  Davis said Dorsey was deceitful in the participation of her father's execution of a power of attorney.  To what she is referring is unclear but there is no evidence that Dorsey did anything wrong or that those actions caused her any damage.  As with

her other claims, any fraud claim fails because of the lack of proof of damages.  <u>See</u> *Houston Cty. Health Care Authority v. Williams,* 2007 WL 80797 (Ala.); *Bosarge Offhore, LLC v. Compass Bank*, 943 So.2d 782 (Ala. 2006).

Both on its merits and given the statute of limitations and remedy exclusivity problems, Davis cannot maintain a cause of action of fraud against Dorsey.

### G.    CLAIMS AGAINST CD&O FAIL

Davis concedes that she does not have any interest in CD&O.  Davis has no relationship to CD&O.  Although she makes claims against Dorsey's activities, such claims cannot be made against CD&O as a corporation.  There is no a cause of action stated against CD&O and no request for relief made against CD&O.  She has never done business with CD&O.  Her only issue is that CD&O is the owner of property which *allegedly* could have been purchased by I-65 Properties.  There are no claims of intentional interference with business relations or any other allegations of intentional conduct related to CD&O.  Without question, CD&O owed no duty (and therefore there can be no breach of that duty) to Davis.  Again, it is critical that there are no actual allegations stated against CD&O. Otherwise, to the extent relevant, all legal and factual allegations discussed herein are adopted and incorporated here including Plaintiff's failure to secure jurisdiction of this Court and the fact that her claims would be barred by the statute of limitations.  Accordingly, CD&O is entitled to judgment as a matter of law.

## IV.    CONCLUSION

Wherefore the premises having been considered, the Defendants respectfully request the Court to grant the Defendants' Motion for Summary Judgment and dismiss the Plaintiff's claims as a matter of law.

Respectfully Submitted this 19ᵗʰ day of March, 2007.

RICHARD M. DORSEY, as an individual, and
CD&O, LLC, as a necessary party,

/s/ Clifford W. Cleveland
CLIFFORD W. CLEVELAND

OF COUNSEL:
CLEVELAND & COLLEY, P.C.
744 East Main Street
Prattville, AL 36067
(334) 365-1500 phone
(334) 365-1601 fax

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed the foregoing *Memorandum Brief in Support of Defendants' Motion for Summary Judgment* with the Clerk of the Court for the United States District Court, for the Middle District of Alabama, Northern Division, using the CM/ECF system which will send notification of such filing to Lindsay B. Erwin, Esquire (lindsayerwin@gmail.com) and James Edward Roberts, Esquire (attyjuris@aol.com) this the 19ᵗʰ day of March, 2007.

/s/ Clifford W. Cleveland
OF COUNSEL