UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| Donna Dorsey Davis,<br>as an individual and derivatively upon behalf<br>of I-65 Properties, Inc.<br><br>     Plaintiff,<br><br>vs.<br><br>Richard M. Dorsey, as an individual,<br>and CD& O, LLC, as a necessary party,<br><br>     Defendant.<br><br>and<br><br>Richard M. Dorsey,<br>Dorsey Motor Sales, Inc.,<br>and TD & O, Inc.,<br><br>     Counter Plaintiffs,<br><br>vs.<br><br>Donna Dorsey Davis,<br><br>     Counter Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) CIVIL ACTION NO: 2:06cv766<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Plaintiff/Counter-Defendant's Motion to Supplement the Record**

Comes now Plaintiff/Counter-Defendant, Donna Dorsey Davis, individually and derivatively, and respectfully files her Motion to Supplement the Record, and represents to the Court the following:

1.  The Defendant/Counter-Plaintiffs filed their Motion for Summary Judgment on March 19, 2007.

2.   Defendant/Counter-Plaintiffs' evidentiary submission listed all evidence relied upon in support of said motion.

3.   Plaintiff/Counter-Defendant was unaware and mislead of the fact that Defendant/Counter-Plaintiffs failed to submit the entire deposition for the Court review. Because the entire text of the deposition is relevant and pertinent to the instant action, the entire transcript should be submitted in the interest of substantial fairness and justice.

4.   The entire transcript of Plaintiff/Counter-Defendant and Defendant/Counter-Plaintiff is attached hereto as Exhibit "A" and Exhibit "B" respectfully.

WHEREFORE, PREMISES CONSIDERED, Plaintiff/Counter-Defendant prays this honorable Court will permit the record to be supplemented so that the entire transcript of Plaintiff's and Defendant's depositions may be included in the record.

RESPECTFULLY SUBMITTED,

By:   s/Lindsay B. Erwin
        Lindsay B. Erwin (ERW005)
        ASB-5299-y59e

Meacham, Earley & Fowler, P.C.
5704 Veterans Parkway
Columbus, GA  31904
(706) 576-4064

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 27th day of April, 2007, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system and have served a copy

of same electronically and placing a copy of same in the Unites States Mail, postage

prepaid and properly addressed to:


Clifford W. Cleveland                         James E. Roberts
Post Office Box 680689                     4908 Cahaba River Road, Suite 204
Prattville, Alabama 36068                   Birmingham, Alabama  35243



                                                    __s/Lindsay B. Erwin_____
                                                    Of Counsel

# Exhibit

# "A"

1

# COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


DONNA DORSEY DAVIS,

       Plaintiff,

vs.                  CASE NO. 2:06CV766-MHT

RICHARD M. DAVIS, etc.,
and CD&O, LLC, etc.,

       Defendants.




\* \* \* \* \* \* \* \* \* \*

     DEPOSITION OF DONNA DORSEY DAVIS, taken

pursuant to stipulation and agreement before Dee

Coker, Registered Professional Reporter and

Commissioner for the State of Alabama at Large,

in the Law Offices of Cleveland & Colley, 744

East Main Street, Prattville, Alabama, on

Tuesday, March 13, 2007, commencing at

approximately 9:15 a.m.

      \* \* \* \* \* \* \* \* \* \*

2

APPEARANCES

FOR THE PLAINTIFF:

Mr. James E. Roberts
Attorney at Law
4908 Cahaba River Road
Birmingham, Alabama  35243

Ms. Lindsay Erwin
MEACHAM, EARLEY & FOWLER
Attorneys at Law
1321 Broad Street
Phenix City, Alabama  36867

FOR THE DEFENDANTS:

Mr. Clifford W. Cleveland
CLEVELAND & COLLEY
Attorneys at Law
744 East Main Street
Prattville, Alabama  36067

ALSO PRESENT:

Mr. Richard M. Dorsey

* * * * * * * * * * *

EXAMINATION INDEX

DONNA DORSEY DAVIS
     BY MR. CLEVELAND            4
     BY MR. ROBERTS            150
     BY MR. CLEVELAND          189
     BY MR. ROBERTS            203

EXHIBIT INDEX

DEFENDANTS' EXHIBIT NO.:

1    By-Laws of I-65 Properties,     38,150
     Inc.

2    Articles of Incorporation       42,43,60,61,
     of I-65 Properties, Inc.        150

<i>DUNN, KING & ASSOCIATES</i>
<i>Montgomery, Alabama</i>
<i>(334)  263-0261 or  (800)  359-8001</i>

3

DEFENDANTS' EXHIBITS, continued:

3    2/17/2000 letter to John        43,47
     Davis from Alan Taunton

4    3/18/06 letter to Lindsay       56,68
     Erwin from Alan Taunton with
     attached closing statement,
     warranty deed, and promissory
     note

5    4/5/00 letter to Dona Davis     82
     from Dick Dorsey in re: 3/6/00
     meeting

* * * * * * * * * *

STIPULATIONS

It is hereby stipulated and agreed by

and between counsel representing the parties that

the deposition of DONNA DORSEY DAVIS is taken

pursuant to the Federal Rules of Civil Procedure

and that said deposition may be taken before Dee

Coker, Registered Professional Reporter and

Commissioner for the State of Alabama at Large,

without the formality of a commission; that

objections to questions other than objections as

to the form of the questions need not be made at

this time but may be reserved for a ruling at

such time as the deposition may be offered in

evidence or used for any other purpose as

4

| | |
|---|---|
| 1 | provided for by the Federal Rules of Civil |
| 2 | Procedure. |
| 3 | It is further stipulated and agreed by |
| 4 | and between counsel representing the parties in |
| 5 | this case that said deposition may be introduced |
| 6 | at the trial of this case or used in any manner |
| 7 | by either party hereto provided for by the |
| 8 | Federal Rules of Civil Procedure. |
| 9 | * * * * * * * * * * |
| 10 | DONNA DORSEY DAVIS |
| 11 | The witness, having first been sworn to |
| 12 | speak the truth, the whole truth and nothing but |
| 13 | the truth, testified as follows: |
| 14 | EXAMINATION |
| 15 | BY MR. CLEVELAND: |
| 16 | Q.   State your name for the record, please. |
| 17 | A.   Donna Dorsey Davis. |
| 18 | Q.   And where you do you live, Ms. Davis? |
| 19 | A.   In Clemson, South Carolina. |
| 20 | Q.   Pardon? |
| 21 | A.   Clemson, South Carolina. |
| 22 | Q.   What's the physical address? |
| 23 | A.   202 Wescott -- that's W-E-S-C-O-T-T -- Drive. |

5

| | | |
|---|---|---|
| 1 | Q. | Is that the address that was on the |
| 2 | | complaint?  Do you recall? |
| 3 | A. | I don't know. |
| 4 | Q. | How long have you lived at that address? |
| 5 | A. | We moved last April.  It may have been the |
| 6 | | Birmingham address?  No. |
| 7 | Q. | No, it was out of state.  I just -- that |
| 8 | | address didn't ring a bell with me.  But |
| 9 | | that's really not important.  So you've lived |
| 10 | | there since April of 2006? |
| 11 | A. | Yes. |
| 12 | Q. | Okay. |
| 13 | A. | We rented when we first got there.  So you |
| 14 | | may have that address, Purple Court. |
| 15 | Q. | Was that also in Clemson? |
| 16 | A. | Yes. |
| 17 | Q. | If you would -- I know you were here |
| 18 | | yesterday, and you heard -- answer yes or |
| 19 | | no.  If you don't understand -- |
| 20 | A. | I'm sorry.  I really didn't hear it |
| 21 | | yesterday, but -- |
| 22 | Q. | That's fine.  Just answer yes or no so that |
| 23 | | she'll have a verbal response. |

6

```
1     A.    Right.

2     Q.    A head shake on that record can mean many

3           things to many people.

4     A.    Right.  Yeah, I heard that yesterday.

5     Q.    Yeah.  And so -- and if you don't understand

6           my question, just tell me, hey, I don't

7           understand what you're asking, and I'll try

8           to do a better job.

9               Are you on any kind of medication or

10          anything today that in your opinion may

11          interfere with you understanding my questions

12          or should make me need to talk slower or

13          any --

14    A.    No.

15    Q.    Okay.  Give me some background information on

16          yourself.  Where did you go to college?

17    A.    University of Tennessee.

18    Q.    When did you graduate?

19    A.    In '62.

20    Q.    And what was your degree in?

21    A.    Education.

22    Q.    Any advanced degrees?

23    A.    I went to Georgia State University.
```

7

```
 1      Q.   Did you obtain a degree from Georgia?

 2      A.   My master's.

 3      Q.   A master of what?

 4      A.   Education.

 5      Q.   When did you get your master's?

 6      A.   You know, I'm not sure.  After -- I'm really

 7           not sure.  I'll have to look it up and tell

 8           you.

 9      Q.   Best guess.  Had you worked a while before

10           you went for your master's?

11      A.   Yes.

12      Q.   Do you have any idea how many years?

13      A.   Five and -- let's see.  Three years -- one

14           year in Atlanta, three years in Memphis,

15           and -- well, that's it for that period of

16           time.  And then I got my master's.

17      Q.   Okay.  So about four years.  Did you go to

18           work directly after graduating from the

19           University of Tennessee?

20      A.   Yes.

21      Q.   So if you graduated in '62, four years later

22           would put us at about '66?

23      A.   '67 probably.
```

8

1    Q.    '67.  Okay.

2    A.    Yeah.

3    Q.    And I understand that's not exact, but

4          approximately --

5    A.    Right.

6    Q.    -- the latter 60's is when you got your

7          master's?

8    A.    No.  I didn't get that until later.  You

9          asked when I graduated from Tennessee?

10   Q.    And you told me in 1962.

11   A.    Yes.

12   Q.    Okay.  And I thought you said that you

13         started your master's four years after you --

14   A.    No.  You asked -- I thought you asked about

15         my teaching.

16   Q.    Okay.  So as we sit here today, you have no

17         independent recollection of when you began or

18         when you finished your master's degree in

19         education at Georgia State?

20   A.    I can think about it and tell you.

21   Q.    Well, think about it kind of on the side

22         while I'm asking you some other questions.

23   A.    Okay.  Okay.

9

| | | |
|---|---|---|
| 1 | Q. | In other words, if it pops in your mind, tell |
| 2 | | me; if it doesn't, that's not really why |
| 3 | | we're here today. |
| 4 | A. | Okay. |
| 5 | Q. | I'm just trying to get some background |
| 6 | | information on you.  Any other educational |
| 7 | | training other than what you've told me |
| 8 | | about? |
| 9 | A. | I went to Converse for two quarters to take |
| 10 | | some courses. |
| 11 | Q. | And what was your concentration of study at |
| 12 | | Converse? |
| 13 | A. | Children with learning disabilities. |
| 14 | Q. | Do you recall when that was? |
| 15 | A. | Let's see.  Probably '85, around that period |
| 16 | | of time. |
| 17 | Q. | Any other educational training? |
| 18 | A. | I took a chemistry course at De Kalb Junior |
| 19 | | College in the '70s while I was at Georgia |
| 20 | | State. |
| 21 | Q. | And that was sometime in the '70s? |
| 22 | A. | It was the same time that I was going to |
| 23 | | Georgia State getting my master's. |

10

Q.   Okay.  Anything else?

A.   Not that I can think of.

Q.   Okay.  Give me your work history.

A.   In high school, I worked for Kesslers.

Q.   Give me college forward.

A.   Okay.  College -- after college, I taught
     school in De Kalb County for one year; then
     in Memphis, I taught school for three years.
     And didn't work for a while.

Q.   Tell me what a while is.

A.   Probably -- let me think.  Probably nine or
     ten years.

Q.   What would have been the time frame for that?

A.   Let's see.  Start with '62, I taught in
     Atlanta; three years in Memphis.  And so '62,
     '63, 64, '65.  '63 I had Kelley.  '64, '65,
     '66, and '67 I taught school in Memphis.  And
     then I didn't work after that.  '62-'63 I
     taught in Atlanta.  The next '63 and part of
     '64, I had Kelley and I didn't work.  Then
     Memphis -- '64 through '67, I taught school
     in Memphis.

Q.   And you did not work after '67?

11

| | | |
|---|---|---|
| 1 | A. | Right, for about eight or nine years. |
| 2 | Q. | And then you went back to work? |
| 3 | A. | Yes. |
| 4 | Q. | Okay.  Doing what? |
| 5 | A. | Before I taught again, I rep'd for a |
| 6 | | stainless steel fabricator, MDK, that daddy |
| 7 | | and two other men owned.  A part-time rep. |
| 8 | Q. | What did you do?  What were your job |
| 9 | | responsibilities? |
| 10 | A. | I called on food and beverage companies to |
| 11 | | sell them stainless steel equipment for the |
| 12 | | kitchens.  Fabricate -- custom fab. |
| 13 | Q. | How long did you work with MDK? |
| 14 | A. | I'm not sure. |
| 15 | Q. | When did you work for MDK? |
| 16 | A. | Let's see.  I'm not sure of the exact date or |
| 17 | | year.  Kelley was in high school, so if she |
| 18 | | was 15 -- I'm really not sure. |
| 19 | | MR. ROBERTS:  Donna, don't guess.  I |
| 20 | | don't think Mr. Cleveland wants |
| 21 | | you to guess.  If you know, you |
| 22 | | know; if you don't -- if he wants |
| 23 | | to ask for it like we did |

1    yesterday, he can ask for it and

2    we'll be glad to furnish a

3    complete resume.  I just don't

4    want you guessing.  It's not

5    material to this, but you know or

6    you don't know.

7         And for the record,

8    Mr. Cleveland, if you'll remind

9    me, I'll get a complete

10   reconstruction.  I think her

11   husband can help her -- Jack can

12   help her.

13   MR. CLEVELAND:  Yeah.  I'd like to know

14        today about, you know --

15   MR. ROBERTS:  Well, question her it on.

16   MR. CLEVELAND:  -- her educational

17        background, her training, her

18        experience.

19   MR. ROBERTS:  It's totally, totally

20        relevant.

21   MR. CLEVELAND:  I think it is, too.

22   MR. ROBERTS:  But what I'm saying is I

23        don't want her to guess.  And

13

```
 1                    anything I can do to help you get

 2                    all of that information, I'll be

 3                    glad to do it, just like we did

 4                    with Mr. Dorsey.

 5      Q.   Yeah.  Well, what I'd like to do and what I'm

 6           going to do is ask you these questions.  If

 7           you don't know, tell me you don't know.  But

 8           I do want you to give me your best effort and

 9           your best recollection, because to tell me if

10           you don't know and you think you know is

11           dishonest.

12      A.   Well, exact dates I don't know right now.

13      Q.   Okay.

14      A.   But I can certainly get them for you.

15      Q.   Yeah.  But, you know, give me your best

16           recollection.  I understand exact dates.  I

17           mean, to me, exact day is day of the month,

18           and that would be --

19      A.   Or years.  I mean, that would really --

20      Q.   That would be impossible for --

21      A.   When I didn't work and everything --

22      Q.   Yeah.

23      A.   -- and then I -- I taught and then I didn't
```

14

| | | |
|---|---|---|
| 1 | | work and all that.  So I have -- I'll get you |
| 2 | | a resume. |
| 3 | Q. | Do you have any recollection of when you |
| 4 | | worked for MDK? |
| 5 | A. | When my daughter was in high school. |
| 6 | Q. | And when was your daughter in high school? |
| 7 | A. | She was born in '63. |
| 8 | Q. | When did she graduate from high school? |
| 9 | A. | I don't even remember.  Isn't that awful. |
| 10 | | She was born in '63. |
| 11 | Q. | Other than MDK, any other work experience? |
| 12 | | MR. ROBERTS:  Just listen to his |
| 13 | | questions. |
| 14 | A. | Yes.  Yes.  Frank Diaz, at TeleBeverage that |
| 15 | | I called on, and I had a business. |
| 16 | Q. | Okay.  I'm sorry.  I didn't understand you. |
| 17 | A. | Frank Diaz. |
| 18 | Q. | How do you spell that last name? |
| 19 | A. | D-I-A-Z. |
| 20 | Q. | And the name of his business? |
| 21 | A. | He worked for TeleFood and Beverage when I |
| 22 | | was calling on him as a rep for MDK.  And |
| 23 | | then we formed a business, Phoenix Food |

15

```
 1            Service Group.
 2    Q.    And where was Phoenix Food Service located?
 3    A.    Atlanta.
 4    Q.    And what was the nature of their business?
 5          What did they do?
 6    A.    We supplied kitchens and did package -- fast
 7          food places.
 8    Q.    When was that?
 9    A.    You know, I'll have to get it for you.
10    Q.    How long were you -- you were a partner or a
11          shareholder in Phoenix Food Service?
12    A.    Yes.
13    Q.    You and Mr. Diaz, were you the only two?
14    A.    Yes.
15    Q.    Were you 50/50?
16    A.    No.  I was minority.
17    Q.    Okay.  How long did Phoenix Food Service stay
18          in business or were you associated with
19          Phoenix Food Service?
20    A.    I think about three years.  And then I had
21          told Frank that if he was robbing Peter to
22          pay Paul, I said, we've got to do something.
23          I said, I'll stay with you if you want to
```

16

1       declare bankruptcy.  Oh, no, no, he wasn't

2       going to do that.

3           So I talked to the federal man, and he

4       said, all you have to do is write me a letter

5       saying you're going to resign.  And I did.

6       But unfortunately, he said the State --

7       regardless of what he does in the future, the

8       State can't touch you personally.  So that's

9       how that went.

10  Q.  What was the federal man's interest in all of

11       this?

12  A.  Our taxes for the business.

13  Q.  Okay.  So there was a tax liability for

14       Phoenix Food Service, and you discussed those

15       liabilities --

16  A.  No.  I just -- he came by, and we were paying

17       our taxes.  And if I resigned, then I didn't

18       want -- I didn't know whether I'd be

19       responsible for what Frank did in the

20       future.  And he said I would not be, but I'd

21       have to put it in writing.  So I did.

22  Q.  That you had resigned?

23  A.  Yes.

17

```
 1      Q.   Okay.  What did he tell you about being

 2           responsible for anything that had happened up

 3           until the date of your resignation?

 4      A.   We had paid our taxes, so there was no

 5           problem.

 6      Q.   Okay.  So they were all current?

 7      A.   Yes.

 8      Q.   So there never was a tax issue.  You just

 9           didn't want any future liability; is that --

10      A.   Right.

11      Q.   Okay.  Did you sell your interest to

12           Mr. Diaz?

13      A.   No.  It just was gone.

14      Q.   Whatever happened to Phoenix Food Service?

15      A.   He continued for a while.

16      Q.   Did it eventually close down and go bankrupt?

17      A.   I'm not sure what happened, but it did stop.

18      Q.   Any other work experience?

19      A.   I taught at a private school after that for a

20           year and a half.

21      Q.   What was the name of that school?

22      A.   Wesleyan Day School.

23      Q.   When was that?
```

18

```
 1    A.   Let's see.   '80, '81 and -- half of '81, I

 2         believe.   It's real close to it, if it's not

 3         right.

 4    Q.   Any other work experience?   Just tell me

 5         about all of your work -- without my having

 6         to ask you, you know, just give me all of

 7         your work experience, regardless of the

 8         nature of it.

 9    A.   Okay.   After that, in '82, when Jack and I

10         got married, they weren't hiring teachers in

11         Greenville.   And I went to rep for the radio

12         station here -- I mean, in Greenville for a

13         year.

14    Q.   What did you do for them?

15    A.   I sold advertising.

16    Q.   That would have been in the early '80s?

17    A.   Yes.   I did that for --

18    Q.   One year?

19    A.   -- a little over a year.   And then I sold

20         wallpaper at one of the clients I had called

21         on when I was selling radio advertising.   And

22         then they called me and -- the school system

23         called and said they had an LD resource
```

19

| | | |
|---|---|---|
| 1 | | opening.  So I went and taught there.  And |
| 2 | | that's when I went to Converse to take the |
| 3 | | two quarters -- two courses to certify me for |
| 4 | | LD. |
| 5 | Q. | So you left the radio station, went to |
| 6 | | selling wallpaper.  While you were selling |
| 7 | | wallpaper, you got a call that they needed a |
| 8 | | teacher in learning disability, and you went |
| 9 | | to do that? |
| 10 | A. | Right. |
| 11 | Q. | And what school was that? |
| 12 | A. | What school was that?  Let me think.  It was |
| 13 | | in Greer. |
| 14 | Q. | South Carolina? |
| 15 | A. | Greer, South Carolina, yes. |
| 16 | Q. | How long did you work at the school in Greer? |
| 17 | A. | I think a year and a half.  It may have been |
| 18 | | two and a half.  A year and a half, I |
| 19 | | believe. |
| 20 | Q. | Would this take us up to about the middle of |
| 21 | | the '80s now? |
| 22 | A. | I guess.  If I had a calendar, it would make |
| 23 | | it a lot easier.  Then we moved to |

20

```
 1            Birmingham.

 2    Q.    When did you move to Birmingham?

 3    A.    After that half year of teaching here -- I

 4          mean, with the LD.  And I got a job in

 5          Birmingham City doing Chapter 1.

 6    Q.    Do you recall the year that you moved to

 7          Birmingham?

 8    A.    No.

 9    Q.    And then once you moved to Birmingham, you

10          went to work for the --

11    A.    Birmingham City School System.

12    Q.    Yeah.  Birmingham City School System working

13          in their Chapter 1 program.

14    A.    Uh-huh.  And I did that for six years.  And

15          then the year after the -- the seventh year,

16          I taught -- I had an LD resource room in the

17          county.

18    Q.    So you left Birmingham City and went to

19          Jefferson County?

20    A.    Right.  Because we moved from Mountainbrook

21          out to Inverness.  And I did that for three

22          years.

23    Q.    As an LD resource teacher?
```

21

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | For three years? |
| 3 | A. | And the school didn't qualify for Chapter 1, |
| 4 | | and then I went back to the City for one year |
| 5 | | and taught third grade in a trailer at my old |
| 6 | | school. |
| 7 | Q. | After that? |
| 8 | A. | I didn't teach after that.  I didn't work |
| 9 | | after that. |
| 10 | Q. | Okay.  So you retired after your year |
| 11 | | teaching the third grade? |
| 12 | A. | I didn't really retire.  Daddy had a stroke |
| 13 | | during that year.  So when I finished the |
| 14 | | year, I didn't teach again. |
| 15 | Q. | Do you recall the year that your father had |
| 16 | | his stroke? |
| 17 | A. | I think it was in '93. |
| 18 | Q. | And did you work continuously as you left one |
| 19 | | job and went to the next job? |
| 20 | A. | From -- you mean from the very beginning? |
| 21 | Q. | No.  I'm talking about once you came back to |
| 22 | | Birmingham. |
| 23 | A. | As far as teaching -- teaching in the City |

```
 1          and then going to the County and back to the

 2          city, yes.

 3     Q.   Correct.  So we should be able to back into

 4          some of these dates; would you agree with

 5          that?

 6     A.   Oh, yeah.  I mean, I'll give you the dates.

 7     Q.   Okay.  And you mentioned getting married to

 8          your husband.  When was that?

 9     A.   '82.

10     Q.   Are you familiar with his educational

11          background?  I mean, what degrees he has,

12          where he went to school?

13     A.   He went to Drexel the first year, and he

14          graduated from the University of Pittsburgh

15          in engineering.

16     Q.   Do you know anything about his work history,

17          some of the people he may have worked for?

18     A.   You really need to ask him.

19     Q.   You don't have any recollection of anybody

20          that he worked for?

21     A.   When?  I mean, after I knew him --

22     Q.   Yeah.  I mean, after --

23     A.   -- or before?
```

23

|    |    |    |
|----|----|----|
| 1  | Q. | No.  After you married him. |
| 2  | A. | Oh, yeah.  Yes.  He worked for Sarene |
| 3  |    | (phonetic) in Greenville. |
| 4  | Q. | Spell that. |
| 5  | A. | I don't know. |
| 6  | Q. | Okay.  Sarene? |
| 7  | A. | Yeah.  J.E. Sarene.  Then he -- then, when we |
| 8  |    | moved to Birmingham, he worked for Rust |
| 9  |    | Engineering. |
| 10 | Q. | Anyone other than Rust in Birmingham? |
| 11 | A. | No. |
| 12 | Q. | Is he still with Rust? |
| 13 | A. | No.  He's retired. |
| 14 | Q. | Retired.  When was the first knowledge that |
| 15 |    | you had of the property that is now known as |
| 16 |    | I-65 Properties?  The first knowledge, |
| 17 |    | regardless of whose name it may have been |
| 18 |    | in. |
| 19 | A. | Daddy -- I can remember daddy calling and |
| 20 |    | saying that they were going to give Dick and |
| 21 |    | I the property.  And then Dick called and |
| 22 |    | said, Donna, mamma and daddy are going to |
| 23 |    | give some of our -- us some of our |

24

```
 1              inheritance early.  And then my mother called

 2              shortly, the next week or two, and said, Your

 3              daddy had to remind your brother that he's

 4              not an only child.  I said, What are you

 5              talking about?  She said, They were

 6              discussing the percentage that you would own

 7              of I-65.

 8    Q.   When did this conversation take place?

 9    A.   I don't know.  I guess when they gave us the

10         property.

11    Q.   Well, would it have been before I-65 was

12         formed or after it was formed?

13    A.   I don't know.  It was --

14    Q.   You have absolutely no recollection at all?

15    A.   No, I don't.  I do remember that happening.

16         I remember daddy saying they were going to

17         give it to us.  And I remember Dick saying,

18         Donna, they're going to give us part of our

19         inheritance early.  And then I got a phone

20         call, all in this time period, of my mother

21         saying what she did; because she said Dick

22         wanted me to have like ten or 13 percent and

23         daddy had to tell him that it would be 30
```

25

```
 1              percent.

 2       Q.     30 percent interest in?

 3       A.     The property.

 4       Q.     In the property.  To your knowledge, where

 5              did the property come from?  And by come

 6              from, I'm speaking of the ownership.

 7       A.     What do you mean, where did it come from?

 8       Q.     The title to it.  To your knowledge, who had

 9              title to the property before I-65 Properties

10              got title to it?

11       A.     I don't remember their names.

12       Q.     Tell me what you do remember.

13       A.     I just did.

14       Q.     Okay.  You said you didn't remember their

15              names.  So --

16       A.     The people who owned the property.

17       Q.     Okay.  So you do remember that -- it's your

18              understanding that some individuals owned the

19              property before I-65 Properties got it?

20       A.     Right.

21       Q.     And do you have any recollection as to who

22              those individuals were or what family they

23              were from or --
```

26

| | | |
|---|---|---|
| 1 | A. | I used to know, but I don't remember now. |
| 2 | Q. | Okay.  If I told you that the chain of title |
| 3 | | goes back to the Cobb family, would that help |
| 4 | | refresh your recollection? |
| 5 | A. | I don't -- I just -- I thought somebody else |
| 6 | | owned it. |
| 7 | Q. | Other than the -- some individuals other than |
| 8 | | the Cobbs? |
| 9 | A. | I don't know. |
| 10 | Q. | When I-65 acquired the property, did you have |
| 11 | | any knowledge of the fact that there was a |
| 12 | | note and a mortgage on that property? |
| 13 | A. | No. |
| 14 | Q. | You didn't know anything about it? |
| 15 | A. | No. |
| 16 | Q. | When was the first that you learned that |
| 17 | | there was a debt associated with the |
| 18 | | acquisition of the property by I-65? |
| 19 | A. | I guess at the 2005 meeting when my brother |
| 20 | | said I owed half a million dollars. |
| 21 | Q. | Okay.  So until 2005, you had absolutely no |
| 22 | | knowledge whatsoever that there was any debt |
| 23 | | associated with the acquisition of the I-65 |

27

```
 1         property?

 2    A.   And let me tell you why.

 3    Q.   Okay.

 4    A.   Because when the property was given to us, my

 5         one question was -- or request, if I owe any

 6         money -- this was from the get-go -- please

 7         let me know.

 8    Q.   Who did you make that inquiry of?

 9    A.   Dick and daddy.

10    Q.   So until 2005, you had absolutely no

11         knowledge whatsoever that there was any debt

12         associated with the acquisition of the

13         property as it went into --

14    A.   No.  It was my understanding that when it was

15         given to us, it was debt free.

16    Q.   Debt free?

17    A.   Uh-huh.

18    Q.   No debt associated --

19    A.   Paid for.

20    Q.   -- with it at all?

21    A.   No.

22    Q.   And that's the way you treated it from 1990

23         until 2005 when you learned there was a note
```

28

```
 1          and a mortgage?

 2     A.    In 2000, my mother -- daddy died --

 3               MR. ROBERTS:  Just one objection.

 4                    Object to your statement that when

 5                    there was a note and mortgage with

 6                    no foundation being laid.  I don't

 7                    know that there was a note and a

 8                    mortgage.  I'm just, for -- the

 9                    form of your question presupposed

10                    that there was a note and a

11                    mortgage.

12               MR. CLEVELAND:  Okay.  Let me -- that,

13                    you know --

14               MR. ROBERTS:  I'm just trying to keep

15                    it straight on the record.

16               MR. CLEVELAND:  Yeah.  I don't have a

17                    problem with that, because I want

18                    the question to be clear.  I don't

19                    want her to come back later and

20                    say, well, I --

21               MR. ROBERTS:  Right.

22     Q.    Let me change my terminology from note and

23          mortgage to say any debt.  Does that help
```

29

```
 1          clear -- does that make my question clearer

 2          to you?

 3     A.   No.  Because it goes back to what I said in

 4          the beginning when we got the land.  If I owe

 5          any money, I need to know.

 6     Q.   Would you have rejected the property, your 30

 7          percent interest, if you had known there was

 8          debt associated with it?

 9     A.   I have no idea.

10     Q.   Between 1990 and 2005, did you make any

11          inquiries as to who's paying the taxes on

12          this property and --

13     A.   My father died --

14     Q.   Pardon?

15     A.   My father died in '96.

16     Q.   Correct.

17     A.   Three months later, my mother had a massive

18          stroke.  And from that point on -- in 2000, I

19          gave my husband my power of attorney as far

20          as I-65.

21     Q.   Okay.  You know, that's good to know.

22     A.   So --

23     Q.   But my real question to you, though, was did
```

30

```
 1            you make any inquiry from 1990 --

 2   A.   No.  I had asked in the beginning to be told

 3        if I owed any money.

 4   Q.   Okay.  But let me -- okay.  But let me ask

 5        you -- let me finish my question.  Did you

 6        make any inquiry from 1990 to 2005 as to who

 7        is paying the taxes on this property, do we

 8        have insurance on it, how the -- you know,

 9        property just doesn't sit out there and take

10        care --

11   A.   I asked for minutes.

12   Q.   Okay.  You asked for minutes.  When did you

13        ask for the minutes?

14   A.   When did I ask for them?

15   Q.   Yes, ma'am.

16   A.   From the get-go.

17   Q.   Okay.  Tell me when the get-go was.  Give me

18        a date of the get-go.

19   A.   When they gave us the land.

20   Q.   So in 1990, you asked for minutes?

21   A.   Or you may not want to call it minutes.  But

22        if -- if I'm -- if I'm going to be a part of

23        this, I need to know what's going on.
```

31

```
1    Q.   Well --

2    A.   But at that point --

3    Q.   Tell me what you asked for in 1990.

4    A.   Information.  But actually, you know, my -- I

5         trusted my brother and my father.  And they

6         just -- I didn't have any reason to insist.

7         But after my father died, things changed.

8    Q.   So in 1990, you asked for information?

9    A.   Uh-huh.

10   Q.   Did you renew that request for information

11        prior to 2005?

12   A.   I guess you'll have to ask Jack.

13   Q.   I'm asking you.  Did you?  I mean, you're the

14        stockholder.  Jack is not the stockholder.

15   A.   I understand that.  But when I gave him my

16        durable power of attorney, my main goal was

17        to take care of mamma.

18   Q.   Okay.  Would it be accurate to say that up

19        until 2005, you, Donna Dorsey Davis, made no

20        independent request for any information?

21   A.   After my father died?

22   Q.   I'm talking -- I'm not -- I'm talking about

23        at any time.  Before --
```

32

```
 1    A.   Requests were made for minutes and
 2         information.
 3    Q.   In 1990?
 4    A.   Jack -- Jack went to the board meeting.  And
 5         you were there when you were on --
 6    Q.   Here's what I'm trying to do.
 7    A.   -- the board.
 8    Q.   I'm not trying to make it difficult.  I'm
 9         trying to understand what you did as compared
10         to what Jack did.
11              And Mr. Roberts is right.  We'll take
12         Jack's deposition and ask him what he did.
13         I'm asking you -- and if your answer is I
14         didn't do anything, I turned it over to Jack,
15         that's fine.  But I don't want you to tell me
16         that today and then later say something
17         else.  If you did anything, fine.  If you
18         didn't, just say I didn't do anything, I
19         turned it all over to Jack.
20    A.   I can hear you.  I told you I gave him my
21         power of attorney in 2000.  And as long as my
22         father was alive, I trusted him.  And I
23         trusted my brother.
```

33

```
 1      Q.   Okay.  Your father died in '96.  You gave

 2           your power of attorney to your husband in

 3           2000.  Did you individually make any request

 4           between '96 and 2000 for any information or

 5           make any inquiries as to the business matters

 6           of I-65 Properties, Inc.?

 7      A.   We met with Alan Taunton.

 8      Q.   When was that?

 9      A.   I'll have to look on the paper.  It was

10           between that time period, I believe.

11      Q.   So you believe you met with Alan Taunton

12           between '96 and 2000?

13      A.   Yes.

14      Q.   Well, when you met with Alan Taunton, did you

15           discover that there was a debt associated

16           with the property at that time?

17      A.   He was talking -- yes.  Because he said there

18           was maintenance on the land because the

19           County required that the bamboo be kept under

20           control.  And -- and there were just expenses

21           of maintaining the property.  I remember

22           that.

23      Q.   So am I correct in understanding that when
```

34

```
1          you met with Alan Taunton, you learned that

2          there were maintenance expenses, but you did

3          not --

4    A.    Right.

5    Q.    -- learn that there was any debt associated

6          with the acquisition of the property; is that

7          correct or incorrect?

8    A.    I don't remember.  I remember the bamboo and

9          the County requiring the lot -- that the lot

10         be maintained to a reasonable degree.

11   Q.    Well, you told me a few minutes earlier that

12         you did not learn about the debt until 2005.

13         And now you've told me that you met with Alan

14         Taunton between '96 and 2000.  And I'm trying

15         to understand what -- if the only thing that

16         you learned at the meeting with Alan Taunton

17         was associated with maintenance and taxes and

18         those type things and you didn't learn

19         anything about a debt --

20   A.    I don't remember --

21   Q.    -- or if you did -- you don't recall?

22   A.    -- learning about a debt.  I do remember

23         learning about an amount, and it was for
```

35

```
 1              maintaining the property because the County

 2              required it.

 3      Q.      Do you recall --

 4      A.      I remember -- I remember the bamboo.

 5      Q.      You remember the bamboo?

 6      A.      Yeah.

 7      Q.      And Dick testified about the bamboo

 8              yesterday, about someone going in there and

 9              cutting it.

10      A.      No.  That -- no.  No.  Because I remember

11              that Alan said the County required it.  It

12              wasn't Dick's bamboo.

13      Q.      Did you obtain any documents from Alan

14              Taunton at the meeting that you had with him

15              at some time between '96 and 2000?

16      A.      He -- he wrote us a letter after the fact, I

17              believe.

18      Q.      And then, in 2000, you gave your husband your

19              power of attorney, and you concentrated your

20              attention toward providing care for your

21              mother rather than I-65?

22      A.      Right.  And then I went to the meeting in

23              December of 2005.  It was Dick and me, and Jo
```

36

```
 1              Anne filled in for you.

 2    Q.    No.  I filled in for her the time I sat in.

 3    A.    Well, Dick said at the meeting she was

 4          filling in for you.

 5    Q.    Oh, okay.

 6    A.    Because I asked where you were.

 7    Q.    Okay.  That's fine.  Tell me about that

 8          meeting.  What do you recall?

 9    A.    He gave me some pages and explained why I

10          owed -- and then told me I owed 500,000

11          something dollars.

12    Q.    Were those the pages that we had yesterday?

13    A.    Yes.

14    Q.    The ones that you had written some notes on?

15    A.    Yes.

16    Q.    Okay.

17    A.    The meeting was partially tape recorded, and

18          I had asked Jo Anne to send me copies.

19    Q.    Of the tape?

20    A.    Of the meeting.

21    Q.    Of the minutes?

22    A.    Yes.  And I never received them.

23    Q.    Did your husband attend that meeting?
```

37

```
 1      A.   He wasn't allowed in.

 2      Q.   Okay.  So --

 3      A.   He sat outside --

 4      Q.   So it was --

 5      A.   -- the room.

 6      Q.   -- you, Dick, and Jo Anne?

 7      A.   Yes.

 8      Q.   Did you receive notice of that meeting?

 9      A.   Yes.  I think it was about a -- a week ahead

10           of time.  And it was December the -- close to

11           Christmas.

12      Q.   Do you contend that there was anything

13           improper with the notice, the sufficiency of

14           the notice?

15      A.   It would have been better to have more notice

16           at that time of year.  Because my daughter

17           lives in New Jersey, and we go up there for

18           Christmas now that mamma is in heaven.

19      Q.   Did you receive notice of any other meetings

20           that you recall?

21      A.   You need to ask Jack.

22      Q.   Okay.  Would your answer be that you have no

23           recollection of receiving any notice?
```

38

```
 1    A.   You need to ask Jack.

 2    Q.   No.  I'm asking you.  Did you receive any

 3         notice?

 4    A.   I can -- I don't know.

 5    Q.   You don't remember?

 6    A.   I don't know.

 7    Q.   Some of these are some of the same ones we

 8         went over yesterday.  I'm going to remark

 9         them again where we don't have confusion in

10         the numbers.

11              Ms. Davis, this is a copy of the bylaws

12         that were introduced yesterday as Exhibit #4.

13         Are you familiar with --

14    A.   Is this my copy?

15    Q.   Yes.  That's yours for you to look at and

16         keep.

17    A.   Okay.

18    Q.   Okay.  It's going to be our Exhibit #1.  Are

19         you familiar with these bylaws?

20    A.   Do I understand them?

21    Q.   Have you read them?

22    A.   Probably.

23    Q.   Do you have a recollection as to the first
```

39

1            knowledge that you had concerning these?

2   A.   No, I don't.

3   Q.   Well, turn to the last page, if you would.

4            Is that your signature?

5   A.   It looks like it.  Yes, it looks like it.

6   Q.   It is?  I also -- I can see Dick's initials

7            on the copy that I have.

8            MR. CLEVELAND:  And mine is not any

9                better than yours, Mr. Roberts.

10           MR. ROBERTS:  Okay.

11   Q.   It appears that there were some other

12           initials below Dick's.

13   A.   The three dots?

14   Q.   Yes.  But it's, in the process of copying and

15           recopying -- my question to you is do you

16           have any recollection as to whether you

17           initialed along with Dick --

18   A.   No.

19   Q.   -- each page of these bylaws?

20   A.   No.

21   Q.   But you do acknowledge your signature on the

22           last page?

23   A.   It looks like it.

40

1    Q.    I mean, you don't have any reason to believe

2          that that's not your signature, do you?  If

3          you do, tell me.

4    A.    I said it looks like it.

5    Q.    And my question was do you have any reason to

6          believe that it's not your signature?  And if

7          so, please tell me.

8    A.    I don't know.

9    Q.    So as we sit here today, it appears to be

10         your signature, but you aren't confident that

11         it's not a forgery?

12   A.    I don't know.  It's a copy.  Is there an

13         original here?

14   Q.    Of what?

15   A.    The original of this.

16              MR. ROBERTS:  Cliff, I'm familiar with

17                   her signature, and I'll be willing

18                   to stipulate as her attorney that

19                   that is her signature.  It is a

20                   copy and, therefore, it may raise

21                   some doubt.  But I'm familiar, and

22                   I'm instructing the witness for

23                   your --

41

1          MR. CLEVELAND: Yes. I mean --

2          MR. ROBERTS: -- for your benefit. We

3               need to authenticate things, and

4               we need to move along.

5                   And if it looks like your

6               signature, Donna, and to the best

7               of your knowledge it is your

8               signature, then -- and if you have

9               any doubt, as he said --

10         MR. CLEVELAND: Yeah, tell me.

11         MR. ROBERTS: But based on reasonable

12              knowledge, it was signed back

13              then, it looks like your signature

14              to me, do you feel comfortable

15              saying it is?

16         THE WITNESS: Yes. Looking at a copy,

17              yes.

18         MR. ROBERTS: Okay. We'll stipulate

19              that it is her signature.

20         MR. CLEVELAND: Okay. Good.

21         THE WITNESS: And a copy.

22         MR. ROBERTS: I'm just trying to make

23              things along.

1      MR. CLEVELAND:  Thank you.

2      MR. ROBERTS:  I'd like to get out

3            before tomorrow.  I've got to be

4            in Philadelphia.  But just -- and

5            still on the record -- just answer

6            his question as best you can, and

7            we'll move faster.

8  Q.   And, Ms. Davis, I want you to understand, if

9      you question any of this, tell me.  And

10      that's my purpose for asking you.  I mean,

11      there's no ulterior motive behind it.  If

12      it's your signature, it is.  If you think

13      that it may not be, just say, hey, I don't

14      think it is.  But I think we've resolved that

15      on the first one.

16      MR. ROBERTS:  Same stipulation on the

17            second one.

18      MR. CLEVELAND:  Okay.  On the --

19      MR. ROBERTS:  With regard to the

20            Articles of Incorporation.

21      MR. CLEVELAND:  This is Defendants' #2.

22  Q.   Okay.  You ready?

23  A.   Yes.

43

```
1    Q.   Our Plaintiff's #2 -- I mean, our Defendants'

2         #2 was your Plaintiff's #3 from yesterday.

3    A.   Okay.

4    Q.   And we have your signature in I believe two

5         different places on Defendants' #2.  And to

6         your best knowledge, that is your signature?

7    A.   Yes.

8    Q.   Okay.  What we have marked as Defendants' #3

9         was #6 yesterday on Dick's deposition.

10   A.   Okay.

11   Q.   This is a letter from Alan Taunton to your

12        husband, correct?

13   A.   Right, uh-huh.

14   Q.   He says that he is responding to a letter.

15        But it's your recollection that you and your

16        husband met with Alan Taunton; is that

17        correct?

18   A.   At some point, we did.  And you'll have to

19        ask Jack about the letter.

20   Q.   I'm still trying to get a time frame on the

21        meeting.  And really what I'm trying to see

22        is if this letter refreshes your

23        recollection.  You said that your meeting --
```

44

| | | |
|---|---|---|
| 1 | A. | No, I don't remember the date of the meeting. |
| 2 | Q. | Okay. |
| 3 | A. | But I will get the date of the meeting for |
| 4 | | you. |
| 5 | Q. | Do you have notes or a calendar or |
| 6 | | information -- I mean, you said I'll get you |
| 7 | | the date of the meeting.  Do you have that |
| 8 | | information at home? |
| 9 | A. | I don't know.  You know what?  I'll find it. |
| 10 | | I don't -- I honestly don't know where it |
| 11 | | is. |
| 12 | Q. | Have you maintained records and files |
| 13 | | concerning the I-65 property? |
| 14 | A. | My husband has. |
| 15 | Q. | So any correspondence that came to you, you |
| 16 | | gave that correspondence to your husband |
| 17 | | and -- |
| 18 | A. | After -- in 2000, yeah. |
| 19 | Q. | What about prior to 2000?  Where would that |
| 20 | | correspondence be? |
| 21 | A. | I don't know.  I mean, I don't know.  Daddy |
| 22 | | talked to Jack and I about a lot of things. |
| 23 | | So I don't know. |

45

1    Q.    Okay.   That would have had to have been prior

2          to '96, though, correct?

3    A.    Yes.

4    Q.    Because your father died in '96.

5    A.    Exactly.

6    Q.    Okay.   Any correspondence that you got from

7          '96 to 2000, do you have any recollection as

8          to where that would be?

9    A.    If I have it, it's at home.

10   Q.    Okay.   Well, do you have a system or a method

11         for keeping up with those type things?

12   A.    I think I do.

13   Q.    Okay.   So you think that you have a place

14         that you can search and possibly find those

15         records; is that correct or incorrect?

16   A.    I think I can.

17   Q.    Okay.   Have you reviewed any documents or

18         looked at anything prior to us taking your

19         deposition to help refresh your memory or

20         refresh your recollection of the sequence of

21         events?

22   A.    I saw those yesterday.

23   Q.    When did you see those?

46

```
1    A.   During his deposition.

2    Q.   That's the first time you had seen them?

3    A.   No.  I've seen them other times, but I don't

4         remember when.

5    Q.   Okay.

6    A.   My main concern was -- about this was if I

7         had my calendars, then I could -- when you

8         ask me something date wise, I thought I could

9         do a better job.  So I was really concerned

10        about the dates.

11   Q.   Would those dates be on a calendar?

12   A.   I think so, yeah.

13   Q.   So is one of your methods for keeping up with

14        things --

15   A.   A calendar.

16   Q.   -- calendaring it?

17   A.   Uh-huh.

18   Q.   Okay.  And have you archived or retained or

19        kept old calendars for -- I mean, we're in

20        2007.

21   A.   Yes.

22   Q.   I mean, would you have the 2000 calendar or

23        the '96 calendar?
```

47

```
 1    A.    I think I do.

 2    Q.    Would you have calendars all the way back to

 3          '90?

 4    A.    I wish I did.  I might.

 5    Q.    You may?  Would you look and see?

 6    A.    Yes, I will.

 7    Q.    Okay.  But you're fairly certain that you've

 8          got calendars for the past several years

 9          anyway; you just don't know if they go all

10          the way back to '90?

11    A.    With the moving that we've done, I hope I

12          have them.

13    Q.    Do you think you will have them from at least

14          the time that you came to Birmingham forward?

15    A.    I'm not sure about that.

16    Q.    Let's look at what we've marked as

17          Defendants' #3.  When your husband got this

18          letter from Alan Taunton, did he show it to

19          you or discuss it with you?

20    A.    After he got the letter?

21    Q.    Yes.

22    A.    Yes.

23    Q.    Okay.
```

48

| | | |
|---|---|---|
| 1 | A. | I'm sure he probably did.  I don't remember, |
| 2 | | but I'm sure he probably did.  I think he |
| 3 | | did. |
| 4 | Q. | Do you have any recollection of the letter |
| 5 | | that he sent to Alan? |
| 6 | A. | Not at -- right at this -- no.  I couldn't |
| 7 | | tell you what it said right now. |
| 8 | Q. | For bullet number two, his response to the |
| 9 | | question about the Cobb sisters note, that |
| 10 | | the purchase price was $100,000, the |
| 11 | | purchaser was Dorsey Motor Sales -- |
| 12 | A. | Where does it say that?  Number two? |
| 13 | Q. | Bullet two. |
| 14 | A. | Okay. |
| 15 | Q. | There was an 80,000 note from Dorsey Motor to |
| 16 | | the Cobb sisters. |
| 17 | A. | You're talking about the land that Sisters |
| 18 | | was on? |
| 19 | Q. | No.  The Cobb sisters -- |
| 20 | A. | Oh. |
| 21 | Q. | -- that the property was purchased from by |
| 22 | | Dorsey Motor Sales.  My question to you is as |
| 23 | | of February the 17th, 2000, you had no |

49

```
 1           knowledge of the fact that this property had

 2           previously been owned by Dorsey Motor Sales

 3           rather than some individuals?

 4     A.    You know -- and this could be wrong -- but I

 5           thought daddy paid off the $20,000

 6           increments.

 7     Q.    Individually rather than the company?

 8     A.    Yes.

 9     Q.    And what did you base that on?

10     A.    I guess from what he told me.  I just don't

11           remember.  But it -- I just remember that I

12           thought that he had paid the $20,000 note

13           increments.

14     Q.    So was it your understanding that your father

15           owned the property individually rather than

16           the motor company owning it?

17     A.    I'm not sure.

18     Q.    If you'll look at bullet three, he makes

19           reference to the note.  Do you see that?

20     A.    Yes.

21     Q.    Okay.  So now that we've had a chance to

22           review this, would it be accurate to say that

23           it was not 2005 but at least February --
```

50

```
 1            somewhere around February the 17th of 2000
 2            that you would have learned that there was a
 3            note on the property?
 4      A.    If I did, I didn't understand what it was.
 5      Q.    Do you know what a promissory note is?
 6      A.    No.
 7      Q.    You don't have any idea what a promissory
 8            note is?
 9      A.    No.
10      Q.    Have you ever borrowed any money before?
11      A.    No.
12      Q.    When you and Mr. Diaz went into business, did
13            y'all borrow any money?
14      A.    I borrowed $3,000 from mom and daddy.
15      Q.    Okay.
16      A.    Which I paid back.
17      Q.    Bullet five makes reference to an appraisal.
18            Have you had an appraisal done or asked
19            anyone that you felt was knowledgeable in
20            real estate their opinion as to the value of
21            this property at any time from 1990 until
22            today?
23      A.    Daddy talked about it.
```

51

```
 1    Q.   What did daddy say?

 2    A.   I don't remember.  But he might have had an

 3         appraisal.  I know they had -- maybe this was

 4         for Dorsey Motor Sales, but when they -- I

 5         thought they hired a helicopter or something

 6         to go and take pictures of all the land.  So

 7         I think this land was part of that.

 8    Q.   Have you made any inquiries as to the value

 9         of the land?

10    A.   I've not had an appraisal.

11    Q.   Okay.  Have you asked anyone, other than your

12         lawyers, what they thought the value of the

13         land was?  Have you asked your husband what

14         he thought the value was?

15    A.   He's not an appraiser.

16    Q.   I didn't ask you if he was an appraiser.  I

17         asked if you had asked him what he thought

18         the value was?

19    A.   I may have.

20    Q.   What did he say?

21    A.   He didn't know.  He's not an appraiser.  It

22         needed to be an appraised.

23    Q.   Well, everybody has an opinion.  They don't
```

52

| | | |
|---|---|---|
| 1 | | have to be qualified to give that opinion. |
| 2 | A. | You'll have to ask him.  I'm sorry. |
| 3 | Q. | Well, I'm going to ask him, I promise.  But |
| 4 | | I'm asking you today, do you recall ever |
| 5 | | inquiring of your husband as to what he |
| 6 | | thought the property was worth? |
| 7 | A. | Do I remember specifically doing that?  No. |
| 8 | Q. | Okay. |
| 9 | A. | Did I do that?  Probably. |
| 10 | Q. | Do you remember what he probably told you? |
| 11 | A. | No, I do not remember what he probably told |
| 12 | | me. |
| 13 | Q. | Have you asked anyone else what they thought |
| 14 | | the value of the property was? |
| 15 | | MR. ROBERTS:  Other than your lawyer. |
| 16 | Q. | Other than your lawyer. |
| 17 | A. | Oh. |
| 18 | Q. | Well, let me ask you this.  Have you asked |
| 19 | | your lawyers what they thought it was worth? |
| 20 | | Don't tell me what they told you, but did you |
| 21 | | ask them? |
| 22 | A. | Yeah.  I mean, he's not an appraiser either, |
| 23 | | though.  So -- |

53

1                MR. ROBERTS:  Just answer.  He didn't

2                     ask you the amount.  And you know

3                     me.  I have an opinion on

4                     everything.

5                MR. CLEVELAND:  That's what I said.

6                     Opinions are cheap.

7  A.   Right.  I mean, he probably gave me his

8      opinion before I asked.

9                MR. ROBERTS:  But for the record, I

10                   don't remember her asking me.

11                   We're going to really work with

12                   you on this, Cliff, so we can get

13                   through.  I don't want to testify,

14                   but I want to help you.

15  Q.   Have you ever provided a financial statement

16      or any financial information to anyone where

17      you reflected the value of this property on

18      your financial statement?

19  A.   I don't remember.

20  Q.   Have you ever provided a financial statement

21      to anyone where you reflected on that

22      financial statement the fact that there was a

23      debt on that property and what your

```
 1          percentage of the debt would be?

 2   A.     The debt?

 3   Q.     Yes.

 4   A.     I don't remember.

 5   Q.     Do you know if you and/or your husband have

 6          provided financial statements to any

 7          financial institution, lending institution?

 8   A.     We probably have.

 9   Q.     Would you have copies or have access to those

10          financial statements?

11   A.     He would probably.

12   Q.     He would?

13   A.     Uh-huh.

14              MR. ROBERTS:  Cliff, for the record --

15                  and I do think that maybe we can

16                  provide a lot of data back and

17                  forth without even subpoenas -- I

18                  would submit that I'm confident

19                  that Jack will have a lot of

20                  records.  And maybe we should have

21                  taken him before Donna -- and I

22                  have seen a financial statement.

23                      But we'll provide -- before
```

55

| | |
|---|---|
| 1 | we even take the deposition, if |
| 2 | Mr. Dorsey will give us what we |
| 3 | will ask for in a written letter, |
| 4 | then we'll provide the entire file |
| 5 | to you, including any financial |
| 6 | statements, et cetera. |
| 7 | Can we kind of have a mutual |
| 8 | agreement on that so we don't have |
| 9 | to do subpoenas through federal |
| 10 | court?  I mean, we can still do |
| 11 | them. |
| 12 | MR. CLEVELAND:  I don't think we have |
| 13 | to do subpoenas.  I think what we |
| 14 | would need to do, to formalize it, |
| 15 | we'll put it in a request for |
| 16 | production, which is just |
| 17 | basically a letter. |
| 18 | MR. ROBERTS:  That's fine. |
| 19 | MR. CLEVELAND:  And that way it will |
| 20 | get both of us on record. |
| 21 | MR. ROBERTS:  And we can stipulate as |
| 22 | to all the documents. |
| 23 | MR. CLEVELAND:  Yeah. |

56

```
 1                MR. ROBERTS:  Still on the record, we
 2                     will try to get together -- and I
 3                     think before you take Jack's
 4                     deposition, to make it productive,
 5                     you'll be much served if you have
 6                     all those documents to question
 7                     him from.  And if Mr. Dorsey
 8                     provides those limited documents,
 9                     that will help us.
10      Q.   Our #4 was the #10 from Dick's deposition,
11           for purposes of reference.
12      A.   Okay.
13      Q.   This is a letter dated March the 18th, 2006
14           from Alan Taunton to Ms. Erwin.  Did you
15           receive a copy of this letter approximately
16           the same time that it's dated from Ms. Erwin?
17      A.   Probably.
18      Q.   If you'll look at the closing sales statement
19           which was attached, do you see there that the
20           price of the property was $250,000?
21      A.   Yes.
22      Q.   Do you also see that I-65 Properties, Inc.,
23           is assuming a mortgage of 21,800 and issuing
```

57

```
 1              a promissory note in the amount of $228,200
 2              to come up with that 250,000?
 3    A.    And this was October the 1st, 1990?
 4    Q.    Yes, ma'am.
 5    A.    I see that on this paper.
 6    Q.    Okay.  Does that appear to be your father's
 7              signature down in the lower left-hand corner,
 8              Richard T. Dorsey?
 9    A.    It appears to be.
10    Q.    Okay.  Would that indicate to you that as of
11              October the 1st, 1990, your father knew that
12              there was a $250,000 debt on this piece of
13              property?
14    A.    If that's his signature.
15              MR. ROBERTS:  Objection only as to the
16                    form of the question as to whether
17                    or not he knew or whether or not,
18                    since it was -- some reference was
19                    made by Taunton, that it was a --
20                    what was the word -- famous word?
21              MS. ERWIN:  Maneuver in defense.
22              MR. ROBERTS:  A defensive maneuver.
23                    But to the extent that this is
```

58

```
 1                    here, we don't disagree with it.

 2                    I just wanted to clear up your

 3                    question.

 4                         You can answer his question

 5                    the best you know.

 6   Q.    Would this indicate to you that your father

 7         had knowledge of the $250,000 debt?

 8              MR. ROBERTS:  And our same objection to

 9                    form that there was in fact a

10                    250,000 -- I'm not challenging

11                    what he says but just as to what

12                    Mr. Dorsey knew or didn't know.

13              MR. CLEVELAND:  I didn't ask what he

14                    knew.  I indicated would this

15                    indicate to her from looking at

16                    this document.

17              MR. ROBERTS:  That there was a debt?

18              MR. CLEVELAND:  That there was a debt.

19              MR. ROBERTS:  Okay.

20   A.    Yes.

21   Q.    Okay.  And the second page is a copy of the

22         promissory note that was attached to this

23         correspondence that came back.  Do you see
```

59

```
 1              that?
 2    A.   Yes.  The first one was done --
 3              MR. ROBERTS:  He didn't ask you that.
 4                   Just turn to the same page.
 5              THE WITNESS:  Okay.
 6    Q.   The first one was done October the 1st,
 7         right?
 8    A.   At George -- George Walthall's.  And then
 9         this one was done where, the promissory
10         note?
11    Q.   Well, look up at the top, and it will tell
12         you who did it.
13    A.   Okay.
14    Q.   I don't know where it was signed, but I know
15         who prepared it.
16    A.   I see.  I just saw Jo Anne's name.
17    Q.   Yeah.  I believe she notarized it, did she
18         not?
19    A.   Yes.
20    Q.   And this promissory note reflects the 228,200
21         that we have on the closing statement,
22         correct?
23    A.   On the closing statement?
```

60

1    Q.   On the first page that we looked at, the

2         closing sales statement.

3    A.   Yes.

4    Q.   And you also understand, do you not, that

5         there was an assumption of a $21,800, the

6         balance that remained on that property to the

7         Cobb sisters?

8    A.   First mortgage?

9    Q.   First mortgage.

10   A.   I don't understand why Connie was the

11        secretary on this when I used to be an

12        officer or whatever, I thought.  Wouldn't I

13        have had to be a part of this?

14             MR. ROBERTS:  He's asking you

15                  questions.  That's the way it

16                  works in this.  You're asking him.

17             THE WITNESS:  Oh, excuse me.

18   Q.   If you would, go back to your articles of

19        incorporation that I gave you.

20   A.   What number?  #1, #2, #3.  Bylaws?

21   Q.   Articles of incorporation.  #2.

22   A.   Oh, okay.  What page?

23   Q.   It's going to be under Article VI.  The pages

61

```
 1            are not numbered.

 2   A.   Okay.  Oh, my page is numbered.  Okay.  Your

 3        page isn't numbered?

 4   Q.   Well, there's a fax number, but the document

 5        itself --

 6   A.   There's a P-06.

 7   Q.   I give that no significance.  I'm talking

 8        about at the bottom of the page.

 9   A.   Okay.  I understand.  I just wanted to make

10        sure I had the same thing.

11   Q.   Yeah.

12   A.   You said your pages weren't numbered.

13             MR. ROBERTS:  Is this the bylaws?

14             MR. CLEVELAND:  It's the articles of

15                  incorporation which are --

16             MR. ROBERTS:  I got you.

17             MR. CLEVELAND:  -- Defendants' #2.

18             THE WITNESS:  Mine are numbered.

19             MR. ROBERTS:  He said disregard that

20                  number.  That was probably the

21                  fax.

22             THE WITNESS:  Right.  But he said he

23                  didn't have, yeah, that number on
```

62

```
 1                          there.
 2    Q.   I believe your question to me was why --
 3    A.   I'm sorry.
 4    Q.   -- why is Connie Dorsey's --
 5    A.   I'm sorry.
 6    Q.   And I'm attempting to -- do you see that she
 7         is not listed there -- that she is listed
 8         there as the secretary?
 9    A.   Names and addresses of the officers of the
10         corporation chosen for the year is as
11         follows.
12    Q.   Okay.  A, what does A say?
13    A.   President, Richard T. Dorsey -- I
14         mean, Richard M. Dorsey.  Excuse me.
15    Q.   Okay.
16    A.   And then I was listed as vice president.  She
17         was listed as secretary.
18    Q.   That's correct.
19    A.   Uh-huh.
20    Q.   So --
21    A.   I had no idea Connie was involved until
22         later.
23    Q.   Well, now, Ms. Davis, we've got your
```

63

1              signature all over this document.

2      A.     Is Connie's name on there?

3      Q.     No.  Your name is on here.

4      A.     No, I said Connie.  I didn't know Connie had

5              any part of I-65.  I know my name is on

6              there.  Is her name in that one?

7      Q.     Yes.  She's on here as the secretary.  She's

8              not on here as a shareholder.

9      A.     And when was that done, the date of that

10             one?

11     Q.     This was done the same day that note was

12             done, October the 1st, 1990.  And it bears

13             your signature that you signed the document.

14             MR. ROBERTS:  Donna, just answer his

15                 questions, if you know.  Don't

16                 get --

17             THE WITNESS:  No.  But --

18     A.     Oh, this promissory note, right?  The

19             promissory note?

20     Q.     Correct.

21             MR. ROBERTS:  He just asked if it's the

22                 same date.  It either is or it

23                 isn't.

64

| | | |
|---|---|---|
| 1 | A. | I signed this page.  Is this the promissory |
| 2 | | note? |
| 3 | Q. | No.  That is a closing -- that is a closing |
| 4 | | sales statement. |
| 5 | A. | Okay.  That's what I signed. |
| 6 | Q. | No, you did not sign that. |
| 7 | A. | No, I didn't sign that.  So where are you |
| 8 | | saying that I signed the note? |
| 9 | Q. | I didn't say you signed the note. |
| 10 | A. | The promissory note. |
| 11 | Q. | I said you signed the articles of |
| 12 | | incorporation. |
| 13 | A. | Oh, I thought you said I signed the |
| 14 | | promissory note. |
| 15 | Q. | No, sir. |
| 16 | A. | Oh, okay.  Did you say no, sir? |
| 17 | Q. | I don't think so.  I may have.  If I did, I |
| 18 | | apologize.  I thought I said nope.  But |
| 19 | | anyway -- |
| 20 | | MR. ROBERTS:  There is one thing that I |
| 21 | | point out for your benefit.  I |
| 22 | | know you think I'm being |
| 23 | | munificent, but have you noticed |

65

```
 1              the problem in the notary here on
 2              this document?  I didn't notice
 3              it.  My able co-counsel did.
 4                    And just for the record, I
 5              don't know what impact it has.
 6              But if you'll look at label 09,
 7              Mr. Dorsey was not the notary.
 8              And it does say up here, Donna
 9              Davis, incorporator, and
10              Mr. Dorsey notarized her signature
11              apparently.
12         MS. ERWIN:  He doesn't know what you're
13              looking at.
14         MR. ROBERTS:  Oh, I'm sorry.  Page 09
15              of the articles of incorporation.
16         MR. CLEVELAND:  Articles of
17              incorporation?
18         MR. ROBERTS:  Yes.  I just thought I'd
19              clear it up, because we're who
20              shot John on names and all.  And
21              Ms. Erwin noticed that Richard M.
22              Dorsey -- this is another Walthall
23              mistake it looks like.  But under
```

66

1              the attestation or the de jurat,

2              whatever you want to call it,

3              the --

4         MR. CLEVELAND:  Yeah.  There's a typo

5              in there that has Donna Davis'

6              name.

7         MS. ERWIN:  No.  The previous

8              attestation is Richard M. Dorsey

9              as well.

10        MR. ROBERTS:  I don't presuppose to

11             know what the legal effect is.  I

12             just think it needs to be --

13             again, in the spirit of

14             cooperation -- pointed out that it

15             should have been -- where Richard

16             Dorsey's name is on page 9 of the

17             articles of incorporation, it

18             should have been signed by Donna

19             Dorsey Davis.

20        MR. CLEVELAND:  I agree.  And that's

21             right.  Her name is typed in in

22             the body of it and yet his name is

23             typed below.

67

```
1          MR. ROBERTS:  Right.

2          MR. CLEVELAND:  Yeah.

3          MR. ROBERTS:  And I don't know -- I

4               just thought I'd help you if we

5               get on -- apparently my client

6               doesn't know if she signed or

7               didn't sign.  Well, I wasn't sure

8               about that.  For the record, I

9               don't know the import of it.

10         MR. CLEVELAND:  Well, quite frankly, I

11              didn't ask her about that.  I

12              asked her about her signature.

13         MR. ROBERTS:  I understand.

14         MR. CLEVELAND:  And I saw that there

15              were three but that she had only

16              signed twice.  So my question to

17              her, well, you did in fact sign

18              this document twice.  And she

19              should have signed it a third

20              time.

21         MR. ROBERTS:  I think she's getting a

22              little confused.  But go right

23              ahead.
```

68

Q.  We were reviewing the promissory note that is
    attached to Defendants' Exhibit #4 which was
    the March 18th, 2006 letter.  And I think my
    question to you at the time was that you do
    see that the note is for $228,200 which
    correlates and relates back to the amount
    that is reflected on the closing sales
    statement, which was the document before.
    And I think, without answering that, then you
    asked me what's Connie Dorsey's name doing on
    there.

        So now that we've resolved why Connie
    Dorsey's name is on there, do you see that
    amount is the same that is reflected on the
    closing statement?

A.  Yes.

Q.  Okay.  We had a series of questions put to
    Dick yesterday concerning communications that
    the two of you had relative to you
    transferring your stock in consideration of
    the debt.  Do you recall those questions that
    Mr. Roberts put to Dick?

A.  Sort of, yeah.  Some.

69

1    Q.    Sort of?

2    A.    Yeah.

3    Q.    Okay.  What is your recollection of the

4          sequence of events surrounding that scenario?

5    A.    After the 2005 meeting when he said I owed

6          500 -- or half a million dollars, I was in a

7          state of shock and scared and petrified;

8          because I thought I don't have that money,

9          and I was afraid that he could take my house

10         and everything.  And it was just -- it was

11         horrible.

12             So I decided to call Dick and ask him if

13         I sold him my part of the land -- my 30

14         percent for a dollar, would that clear up the

15         debt.  And he said he couldn't answer that;

16         it sounded good to him -- it was on a

17         Friday -- and that he would try and call

18         Alan.  I said, But I need to know

19         immediately, as soon -- you know, he said,

20         Well, I can't tell you today because Alan

21         usually takes off on Friday but I will talk

22         to him on Monday.

23             And I didn't hear from Dick on Monday.

1          I didn't hear from him on Tuesday.  And I --

2          he had said he'd let me know Monday.  So when

3          that happened, I called Jim Roberts.  And

4          then on -- I met with him on Wednesday.

5              MR. ROBERTS:  Let me put in one

6                   objection just so you don't -- and

7                   Mr. Cleveland wouldn't want you to

8                   communicate anything that you told

9                   to me as your lawyer.  So just

10                  answer every question that you

11                  can, but it would be inappropriate

12                  for you to give any

13                  conversation --

14            THE WITNESS:  Yeah.  I just --

15           MR. ROBERTS:  No.  No.  Stay with me.

16                  Mr. Cleveland would do the same

17                  thing.  Everything you can tell

18                  him other than anything that I

19                  told you --

20            THE WITNESS:  Right.

21           MR. ROBERTS:  -- between us.  Go

22                  ahead.  You're doing good.  Keep

23                  going.

71

```
 1    A.   On Friday, I faxed Dick saying I was

 2         canceling my offer or whatever you call it.

 3    Q.   But you initiated the offer, not Dick,

 4         correct?

 5    A.   Right.  I did.

 6    Q.   How did you come up --

 7    A.   With a dollar?

 8    Q.   -- with the conclusion that that was a fair

 9         exchange?

10              MR. ROBERTS:  Object to the form that

11                   she formed an opinion it was a

12                   fair exchange.  But you can

13                   answer.

14    Q.   Well, that's the offer you made, right?

15    A.   No.  I just offered to excuse my debt.

16    Q.   Yeah.

17    A.   That's how --

18    Q.   Yeah.  The offer to excuse your debt for your

19         30 percent.

20    A.   A dollar.

21    Q.   Well, you knew what the debt was, right?

22    A.   I didn't think it was a true debt.  But to go

23         through -- because there were things on it
```

72

```
 1          that didn't pertain -- that didn't make sense

 2          to me.  And it -- and going back to the

 3          beginning of this, I -- I couldn't believe

 4          that after -- all of a sudden, 2005, my

 5          brother is telling me I owe half a million

 6          dollars.

 7     Q.   Because that's the very first you ever heard

 8          about it, wasn't it?

 9     A.   Yes.  And I just thought I -- I -- I don't

10          have that kind of money.  And the thought of

11          him taking my home -- and I told Jack, I

12          said, I can't do this.  So I called Dick and

13          I said I would sell him it for a dollar if it

14          would excuse the debt so we could both get on

15          with our lives.  And that was it.  And then,

16          on that following Friday, like I said, I sent

17          him a fax taking it back.  He had told me

18          he'd call me on Monday.

19              MR. ROBERTS:  Just answer his

20                  questions.  If you need a break --

21              THE WITNESS:  No, I don't need a

22                  break.  I'm fine.

23              MR. CLEVELAND:  Well, let's everybody
```

73

```
 1              take a break.

 2              MR. ROBERTS:  Yeah, that's good.

 3              MR. CLEVELAND:  We'll take ten minutes.

 4              (Brief recess)

 5    Q.   We had discussions yesterday about the Nissan

 6         deal.  Do you recall that?

 7    A.   Right.

 8    Q.   What did you know about the Nissan deal?

 9    A.   I knew that my brother really wanted to put a

10         dealership out on the interstate.  It was

11         very creative thinking at that time.

12    Q.   Was it your understanding that it was going

13         to be his dealership rather than someone else

14         acquiring the property?

15    A.   I don't know.  I just -- he handled all of

16         that.  I just knew that he believed that the

17         time was ready to put a dealership out there

18         and -- with the traffic going to-and-fro.  I

19         knew he was talking to Nissan.

20    Q.   What involvement did you have in it, if any?

21    A.   None.  He ran that show.  It was his dream.

22    Q.   Pardon?

23    A.   He ran that show.  It was his dream.
```

74

| | | |
|---|---|---|
| 1 | Q. | The Nissan was his dream? |
| 2 | A. | Yes.  To have on the interstate. |
| 3 | Q. | Okay.  Well, did you or your husband have any |
| 4 | | involvement or anything with any of the |
| 5 | | Nissan transactions to your recollection? |
| 6 | A. | I don't remember.  I know Dick told me that |
| 7 | | he was talking to Nissan and trying to work |
| 8 | | out a plan. |
| 9 | Q. | We had discussion yesterday also about the 12 |
| 10 | | percent interest.  Do you recall that? |
| 11 | A. | Yes. |
| 12 | Q. | Okay.  Have you made any effort to obtain |
| 13 | | financing at an interest rate of less than 12 |
| 14 | | percent? |
| 15 | A. | Personally? |
| 16 | Q. | Yeah. |
| 17 | A. | I don't know.  I don't -- I don't know. |
| 18 | Q. | Okay.  Do you remember any correspondence or |
| 19 | | communication with Dick where he encouraged |
| 20 | | you to -- if you thought somebody could do it |
| 21 | | for less than 12, for you to find them, bring |
| 22 | | them to the table? |
| 23 | A. | No, I don't remember that.  I do remember, |

75

| 1 | | after Cracker Barrel looked at the land -- |
|---|---|---|
| 2 | | and it was part of our original lot and part |
| 3 | | of the adjoining lots -- that he was talking |
| 4 | | to Cracker Barrel. |
| 5 | Q. | Okay.  So it's your understanding that |
| 6 | | Cracker Barrel had made an inquiry anyway |
| 7 | | about the land at one time? |
| 8 | A. | Yes. |
| 9 | Q. | And did he make you aware of the fact that |
| 10 | | Cracker Barrel was looking at it? |
| 11 | A. | Yes.  That's what I just said. |
| 12 | Q. | Yeah.  So to your knowledge, who else has |
| 13 | | looked at it? |
| 14 | A. | I don't know.  Because he said, after that, |
| 15 | | he would let Jim Gilliland handle the -- |
| 16 | Q. | The marketing of it? |
| 17 | A. | Or the -- I guess the marketing. |
| 18 | Q. | Well, I mean, what else would Jim Gilliland |
| 19 | | do other than -- |
| 20 | A. | I don't know.  There's no telling.  And Dick |
| 21 | | said, you know, if I thought of anybody that |
| 22 | | might be interested.  I said, I don't know. |
| 23 | Q. | Well, I mean, did you make any efforts to try |

76

```
1              to promote the property, market the property,

2              move it, do anything with it?

3    A.        Move it?  No.  I mean, if I saw -- a friend

4              of mine talked about a new business that she

5              saw on the interstate that had a lot of

6              traffic.  But I don't even remember what it

7              was.  I mean, that's called driving around

8              looking.  And she just mentioned it.  It was

9              a neat place to eat.

10   Q.        And did you tell your friend about this piece

11             of property?

12   A.        No.  She knew that we had this piece of

13             property.

14   Q.        Okay.  Did she make -- to your knowledge, did

15             that friend make any other inquiries?

16   A.        No.  No.  She just said they had eaten at

17             this restaurant, and it was really -- the way

18             it was laid out -- it was a cafeteria style

19             that maybe travelers could run in and run

20             out.

21   Q.        Well, I mean, did you put all the

22             responsibility on trying to promote the

23             property and sell it or lease it or whatever
```

77

1           on Dick, or did you try to do anything on

2           your own?

3   A.   Well, I tried to think of new places that

4           would go there.  Because you've got a Holiday

5           Inn and all the other stuff, so you couldn't

6           have that.  So trying to find something new

7           from that standpoint.  And then Dick said --

8           afterward, he said he made a mistake; he

9           should have sold it to Cracker Barrel, when

10          they went down the highway, because it would

11          have enhanced the rest of the property.

12   Q.   How much of it did Cracker Barrel want?

13   A.   I think he told me 300,000.

14   Q.   I mean, I'm talking about how much land?

15   A.   It was part of ours and part of the land --

16          the lots adjoining.

17   Q.   They wanted the whole nine acres for a

18          Cracker Barrel?

19   A.   No.  No.  No.  No.  No.  No.  No.  No.  They

20          wanted -- on our 9.6, it was to take a

21          portion of that and then a portion of the

22          land that abuts the 9.6.

23   Q.   Oh, okay.  So they didn't want it all?

78

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | They wanted a little bit of one and a little |
| 3 | | bit of the other? |
| 4 | A. | Right.  Right. |
| 5 | Q. | Well, what did you think about the Cracker |
| 6 | | Barrel offer? |
| 7 | A. | The amount of money? |
| 8 | Q. | Yeah. |
| 9 | A. | I couldn't -- I couldn't make a comment on |
| 10 | | that, I mean, as far as me and business and |
| 11 | | real estate.  As far as Cracker Barrel |
| 12 | | sitting there, I thought it was a great |
| 13 | | idea.  But I wasn't in the financial part of |
| 14 | | it, and I -- I wouldn't be qualified to do |
| 15 | | it. |
| 16 | | And then, after the fact, Dick said, you |
| 17 | | know, he made a mistake.  He shouldn't have |
| 18 | | listened to Jim; he should have done it.  And |
| 19 | | I have to agree with him on that as far as if |
| 20 | | you look down the street and what happened |
| 21 | | when Cracker Barrel went in down there. |
| 22 | Q. | Okay.  So it's your understanding that when |
| 23 | | the Cracker Barrel offer came up, he did seek |

79

```
 1          the counsel and advice of a real estate

 2          person as to what was a fair price and what

 3          they -- what --

 4    A.    I'm sure he -- I don't know whether he hired

 5          him or Jim was his friend and he asked him.

 6          I don't know the circumstances.

 7    Q.    But you do recall him telling you that he

 8          should have ignored Jim Gilliland's advice

 9          and I-65 Properties move forward with --

10    A.    Said, yeah, I think I made a mistake.  You

11          know, I should have -- I should have done

12          it.  And I didn't know -- you know, I don't

13          know if there was an offer on paper like,

14          here, you know, sign on the bottom line if

15          you agree with this 300,000 or whatever.  I

16          don't know.  You'd have to ask --

17    Q.    What did your husband think about the Cracker

18          Barrel offer?

19    A.    I don't recall.

20    Q.    Now, he has some background in the real

21          estate business, doesn't he?

22    A.    Only after he retired from engineering.

23    Q.    What did he do --
```

80

| | | |
|---|---|---|
| 1 | A. | He went -- |
| 2 | Q. | -- relative to the real state business? |
| 3 | A. | He was an engineer. |
| 4 | Q. | I said relative to the real estate business. |
| 5 | A. | Oh.  After he retired from Rust -- or not |
| 6 | | retired.  I mean, Kaverner -- Rust -- he came |
| 7 | | back to Rust -- he went to real estate school |
| 8 | | and sold real estate. |
| 9 | Q. | Okay.  So he's a licensed real estate agent? |
| 10 | A. | He was. |
| 11 | Q. | Okay.  How long did he do that? |
| 12 | A. | I don't know.  You'll have to ask him. |
| 13 | Q. | A couple of months, a couple of years? |
| 14 | A. | I'm not sure how many years. |
| 15 | Q. | So it was some years he sold real estate? |
| 16 | A. | Yes. |
| 17 | Q. | Who was his license with? |
| 18 | A. | Let me think.  I cannot think of it now. |
| 19 | | What's one of the biggest ones in |
| 20 | | Birmingham -- oh, I can't ask you a question. |
| 21 | Q. | You're asking the wrong person.  I don't |
| 22 | | know. |
| 23 | A. | You need to ask him. |

81

```
 1     Q.   Okay.  But anyway, once your husband left

 2          Rust, he went to real state school, got a

 3          real estate license, and sold real estate for

 4          some years; is that correct or incorrect?

 5     A.   That's correct.

 6     Q.   Okay.  Did he ever get his broker's license?

 7     A.   No.

 8     Q.   Does he still have his real estate license?

 9     A.   No.

10     Q.   Do you know when he -- when he surrendered it

11          or just didn't renew or whatever the

12          circumstances were?

13     A.   We moved to South Carolina.

14     Q.   Okay.

15     A.   And I think it was -- I don't know how long.

16          You'll just have to ask him.

17     Q.   Okay.  Let me be sure I'm correct.  You think

18          you discussed it with your husband, but you

19          don't remember what he said about the Cracker

20          Barrel offer?

21     A.   Right.  That's correct.

22     Q.   Okay.  Do you recall receiving this letter

23          from Dick?
```

82

1    A.    What number was this yesterday?

2    Q.    This was not a yesterday.  This is

3          Defendants' #5.

4    A.    Oh.

5                  (Brief pause)

6    A.    Yes.

7    Q.    Okay.  I saw you underlining some different

8          dialogue in there.  Is there anything in this

9          letter that you disagree with?

10    A.    I guess all the documents that I have

11         concerning I-65 Properties.  I would think --

12         are minutes documents?

13    Q.    I don't know.  Just tell me what sentence

14         you're referring to so we'll all be on the

15         same line.

16    A.    Second paragraph, second sentence.

17    Q.    I have provided the accountant with all the

18         documents that I have concerning I-65

19         Properties, Inc., from its inception to

20         date.  I have been informed that these are

21         being summarized on a year by year basis.

22    A.    Okay.

23    Q.    Okay.  What is your concern?

83

| | | |
|---|---|---|
| 1 | A. | Nothing.  I just -- it -- I just underlined |
| 2 | | it so that when I look at this -- |
| 3 | Q. | Okay. |
| 4 | A. | And at the line -- the bottom part next to |
| 5 | | the last sentence -- the last complete |
| 6 | | sentence:  I hope you realize that my holding |
| 7 | | two positions has certainly not been to your |
| 8 | | detriment but very much to your benefit. |
| 9 | Q. | Okay.  And you disagree with that? |
| 10 | A. | No.  I just underlined it. |
| 11 | Q. | Okay.  Why did you underline it? |
| 12 | A. | Because -- so when I look at it, I can see |
| 13 | | that. |
| 14 | Q. | Okay.  I guess here's what I'm asking you. |
| 15 | | Normally when I underline or highlight |
| 16 | | something, it's for some particular person or |
| 17 | | that point is of some significance to me. |
| 18 | A. | This is for me. |
| 19 | Q. | And what I'm asking you, of what significance |
| 20 | | is that sentence to you, if any? |
| 21 | A. | That when I pick up this, I can look at that |
| 22 | | without reading everything. |
| 23 | Q. | Okay.  But you had told me earlier that you |

84

| 1 | | did recall a communication where Dick said, |
|---|---|---|
| 2 | | hey, if you want to find somebody else to |
| 3 | | finance it, you know, that it was fine with |
| 4 | | him.  My question -- my follow-up question is |
| 5 | | is it your best recollection that it was this |
| 6 | | April the 5th, 2000 communication or is it |
| 7 | | your recollection it was some other |
| 8 | | communication? |
| 9 | A. | That Dick said if you find -- if you come up |
| 10 | | with anything -- |
| 11 | Q. | Yes. |
| 12 | A. | -- for I-65?  It was a verbal communication, |
| 13 | | not from this. |
| 14 | Q. | Okay.  So it's your best recollection that he |
| 15 | | said it to you verbally and then communicated |
| 16 | | it again by way of this correspondence? |
| 17 | A. | This is after the Cracker Barrel thing didn't |
| 18 | | work.  That's when he told me that. |
| 19 | Q. | So after the Cracker Barrel deal went |
| 20 | | through, he told you, hey, if you can find |
| 21 | | somebody, bring them on? |
| 22 | A. | Yeah.  If you hear of anything, let me know. |
| 23 | Q. | Yeah.  Okay. |

85

| | | |
|---|---|---|
| 1 | A. | Let him know. |
| 2 | Q. | What about the interest rate? |
| 3 | A. | There was nothing said about the interest |
| 4 | | rate that I remember -- recall. |
| 5 | Q. | Okay.  Well, he says here that you make |
| 6 | | reference to mortgage financing being |
| 7 | | obtained from a commercial -- I'm looking at |
| 8 | | the forth -- the first sentence of the forth |
| 9 | | paragraph.  Do you see that? |
| 10 | A. | You meaning me meaning Jack, thinking Jack |
| 11 | | has written a letter for me since Jack had |
| 12 | | the power of attorney. |
| 13 | Q. | Well -- |
| 14 | A. | You'd have to talk to Jack about this. |
| 15 | Q. | Okay.  It says you, and it's -- |
| 16 | A. | I understand what it says. |
| 17 | Q. | And the letter is to you.  So -- |
| 18 | A. | Yeah.  I know the letter is to me, and I know |
| 19 | | it says you.  But this is after I gave Jack |
| 20 | | my power of attorney.  And from 2000 on when |
| 21 | | I did that, it was Jack writing the letters. |
| 22 | Q. | But you do see that he says he has absolutely |
| 23 | | no objection to you -- if you can get a |

86

```
 1          better interest rate, go get it.  Do you see
 2          that?  That's the second sentence in the
 3          fourth paragraph.
 4     A.   Okay.  I'm underlining and starring.  Okay.
 5          Yes, I see it.
 6     Q.   You see it.  Okay.  My question is did you
 7          make any effort to obtain --
 8     A.   At this point in time?
 9     Q.   Yes, ma'am.
10     A.   No.
11               MR. ROBERTS:  Let him finish his
12                    question.  You cut him off.
13               MR. CLEVELAND:  She was right, though,
14                    as to what the question was going
15                    to be.
16     A.   No.
17     Q.   Did you make any effort to obtain lending or
18          financing at less --
19     A.   No, I did not.
20     Q.   Okay.  Have you ever since this time?  Your
21          response back to me was at this time.  My
22          follow-up question is have you made an effort
23          to obtain financing since that time?
```

87

1    A.    No.

2    Q.    And I believe there was a question yesterday

3          about a survey.  So you have been provided a

4          copy of a survey; is that correct or

5          incorrect?  And I'm looking at the enclosures

6          on the bottom of page 2.

7    A.    You'll have to ask Jack.  I know -- you'll

8          have to ask him.

9    Q.    Articles of incorporation, bylaws, survey --

10   A.    You'll have to ask him.  I'm sorry.

11   Q.    -- and a topographical survey.  You have no

12         independent recollection, but you think Jack

13         would know?

14   A.    Right.  I do.

15              MR. CLEVELAND:  I've got the

16                  complaint.  I didn't bring an

17                  extra copy.  Do y'all have an --

18              MR. ROBERTS:  That's all right.  We've

19                  got them.

20              MR. CLEVELAND:  You've got them?

21                  Okay.

22              MR. ROBERTS:  Not handy, but that's

23                  fine.

```
 1              MR. CLEVELAND:  I was not going to
 2                   offer it, so I didn't copy it.
 3              MR. ROBERTS:  That's fine.  We'll
 4                   stipulate it as the complaint.
 5              MR. CLEVELAND:  Let me make --
 6              MS. ERWIN:  I've got them.
 7              MR. CLEVELAND:  You got an extra one
 8                   for her?
 9              MS. ERWIN:  Yes.
10                   (Brief recess)
11              MR. CLEVELAND:  I'm not going to offer
12                   this, so it will not have an
13                   exhibit number.
14    Q.   Turn to your factual allegations.  It would
15         be your numbered paragraph -- it's Article
16         V.  It's going to be paragraph -- your
17         numbered paragraph 10.
18    A.   Okay.
19    Q.   Defendant Dick Dorsey has used his position
20         to control I-65 and its assets and to manage
21         I-65 in a manner oppressive to the other
22         shareholder in violation of his --
23    A.   Wait a minute.  I don't think I'm on the
```

89

```
1              right page.

2      Q.   Paragraph number 10.

3      A.   Five, paragraph 10?

4      Q.   Number 10.

5      A.   Mine says defendant.

6              MR. ROBERTS:  Let him find it for you.

7      Q.   Yeah.

8      A.   Mine didn't say Dick Dorsey.

9      Q.   I inserted Dick Dorsey.

10     A.   Oh, okay.

11     Q.   In a manner oppressive to the other

12          shareholder in violation of the fiduciary

13          duty he owes her.  What are your specific

14          allegations there?  What has he done or

15          failed to do?

16     A.   When he told me I owed half a million dollars

17          in 2005.  I just think it would have been

18          nice if I had known along the way each year.

19     Q.   So if you had known -- so your allegation

20          there is that you did not know early on?

21     A.   Right.

22     Q.   And that the first you knew about it was in

23          2005?
```

90

```
1    A.   And my fear was --

2    Q.   Answer my question.

3    A.   Okay.  Yes.  Yes.

4    Q.   Okay.  Now -- and if you want to -- I'm not

5         trying to cut you short.

6    A.   That's fine.  Yes.

7    Q.   But, I mean, if you want to broaden your

8         answer, that's fine.  So your contentions as

9         to that sentence in paragraph number 10 is

10        that if you had known early on and had not

11        waited until 2005, then he would not have

12        conducted himself in a manner that was

13        oppressive to you?  That's the oppressive

14        thing that happened, correct?

15   A.   Yes.

16   Q.   Okay.  You also say that he refused to

17        provide minority shareholder with documents

18        or access to information.  What are you

19        talking about there?

20   A.   Minutes.

21   Q.   Well, now, you say refused.  Tell me what

22        request was made that he refused.

23   A.   I don't know how to answer that.
```

91

```
 1    Q.    Okay.  Your allegation -- your factual

 2          allegation is that he refused you.  I want to

 3          know when the request was made that he either

 4          said I'm not doing it or he failed to do it.

 5    A.    I guess the minutes along the way.  I still

 6          don't have the minutes from the 2005 meeting

 7          to my knowledge.

 8    Q.    All right.  Tell me whether or not you're

 9          referring there to the minutes from the 2005

10          meeting.

11    A.    No.  Minutes through the years.  But I'm sure

12          he has copies of them.

13    Q.    Okay.  Tell me specifically when you

14          requested those minutes.

15    A.    I guess it goes back to the very beginning.

16    Q.    Okay.

17    A.    I didn't know -- I didn't know a stockholder

18          had to request minutes --

19    Q.    Well, now, you say that he --

20    A.    -- every year.

21    Q.    I'm not arguing with you, but I want to make

22          sure I understand your allegations.  You say

23          he refused.  To me, refused means that you
```

92

| | | |
|---|---|---|
| 1 | | asked for and didn't get. |
| 2 | A. | Refused means that to you? |
| 3 | Q. | Yes. |
| 4 | A. | Yes.  That's what it means to me. |
| 5 | Q. | That means the same thing to you.  Okay. |
| 6 | | Good.  So we worked through the semantics of |
| 7 | | it.  When did you request? |
| 8 | A. | From the beginning. |
| 9 | Q. | So it's your contention that you requested -- |
| 10 | | specifically requested to Dick at the very |
| 11 | | beginning, Provide me with documents? |
| 12 | A. | And -- and if I owe any money, I need to |
| 13 | | know. |
| 14 | Q. | And if I owe any money, I need to know? |
| 15 | A. | Uh-huh. |
| 16 | Q. | Okay.  This says that he denied you |
| 17 | | meaningful participation in the management of |
| 18 | | the corporate affairs.  Tell me what you are |
| 19 | | referring to there. |
| 20 | A. | The way this is set up, he's the president, |
| 21 | | he's the 70 percent stockholder, and I |
| 22 | | essentially don't have any say-so.  He can do |
| 23 | | exactly what he wants to do. |

93

```
 1    Q.   Well, you knew from the very beginning that
 2         he was 70 percent, did you not?
 3    A.   Yes.  But also, back then, I trusted my
 4         brother --
 5    Q.   Well --
 6    A.   -- and my father.  But mainly, I had no
 7         problem with it at 70/30 then.  I trusted him
 8         implicitly.
 9    Q.   Well, it's always been 70/30.
10    A.   I know.  And I trusted Dick implicitly.
11    Q.   And it hasn't changed.
12    A.   I had no reason not to, to my knowledge.
13    Q.   And you began as an officer and a director,
14         did you not?
15    A.   If you can show me the minutes, I'll say yes.
16    Q.   I can show you the articles that we've looked
17         at about three or four times today that
18         showed you as the vice president and on the
19         board of directors.
20    A.   Okay.  Yes.
21    Q.   Failed to allow you to participate in any
22         annual stockholder meeting.  Tell me what
23         you're talking about there.
```

94

```
 1    A.   Probably notification of the meetings.

 2    Q.   So it's -- well, I think you acknowledged

 3         that you got notification.

 4    A.   I did.  In the meeting for December of 2005,

 5         yes.  I got a certified letter, I think, or a

 6         registered letter saying there was a meeting.

 7    Q.   Well, you came to that one, right?

 8    A.   Right.

 9    Q.   Then your husband came to some of them,

10         didn't he, without you?

11    A.   You'll have to ask -- yes, he did.  I don't

12         know how many.

13    Q.   Okay.  Well, would you agree with me that for

14         him to know the date and the time and the

15         place, that he would have had to have had

16         notice of the meeting?

17    A.   Yes.  That's why he knew when to come.

18    Q.   That's right.  So when you say that you

19         didn't get any notice of the meeting, that

20         would not be accurate, would it?

21    A.   It doesn't look like it would be.

22    Q.   Stripped I-65 of future profits by acquiring

23         most land surrounding I-65.  Tell me what
```

95

| | | |
|---|---|---|
| 1 | | you're talking about there. |
| 2 | A. | Maybe it went back to the option. |
| 3 | Q. | Well, we had some discussion yesterday about |
| 4 | | I believe CD&O owning four lots on the other |
| 5 | | side of the service road that comes in.  Do |
| 6 | | you recall that? |
| 7 | A. | Yes.  I recall that at one point, I-65 had an |
| 8 | | option on the land. |
| 9 | Q. | We also had discussion of the fact that CD&O |
| 10 | | or somebody, Dick -- anyway, somebody that |
| 11 | | Dick was associated with had purchased the |
| 12 | | property that is due south of the I-65 |
| 13 | | property.  Do you recall that? |
| 14 | A. | Yes. |
| 15 | Q. | Is that what you're referring to? |
| 16 | A. | I'm referring to the option that I-65 had on |
| 17 | | that land -- or some of it. |
| 18 | Q. | Well, it says here -- |
| 19 | A. | Or option, yeah. |
| 20 | Q. | Okay.  It says here by acquiring most land |
| 21 | | surrounding.  Do you see that language? |
| 22 | A. | Uh-huh. |
| 23 | Q. | Okay.  Is it your contention that because he |

96

1          is a shareholder in I-65, Inc., that he

2          cannot acquire other property in that

3          vicinity without you or I-65 being a party to

4          it?

5                    MR. ROBERTS:  Objection to form as to

6                         he acquire.  And you can answer if

7                         you know.  That calls for a legal

8                         conclusion.

9                    MR. CLEVELAND:  I'm just going over her

10                        allegations.

11                   MR. ROBERTS:  The only reason I want to

12                        do it -- that's probably my first

13                        objection -- as to whether or not

14                        he can acquire, whether it's in

15                        his capacity individually or if he

16                        had a duty to acquire in -- first

17                        in the name of I-65 Investment

18                        Properties -- or I-65 or whatever

19                        it is.

20     Q.    Do you remember my question?

21     A.    No.

22                   MR. ROBERTS:  Ask it again.

23     Q.    Is it your contention that Dick has an

97

| | | |
|---|---|---|
| 1 | | obligation to you as a shareholder or to I-65 |
| 2 | | Properties, Inc., before he acquires, in |
| 3 | | whatever capacity, any other property in that |
| 4 | | general vicinity? |
| 5 | A. | I mean, can he just go and buy property |
| 6 | | anywhere?  He doesn't need to check with |
| 7 | | me -- |
| 8 | Q. | Yeah. |
| 9 | A. | -- just because of I-65. |
| 10 | Q. | Yeah.  Yeah. |
| 11 | A. | Sure.  Yes.  No.  Yes.  Yes meaning I'm sure |
| 12 | | he can go buy it anywhere without checking |
| 13 | | with me. |
| 14 | Q. | Let's use, for example, the piece of property |
| 15 | | that's due south of I-65.  You know what I'm |
| 16 | | talking about?  That's on the other side of |
| 17 | | the branch or the creek or whatever we looked |
| 18 | | at yesterday? |
| 19 | A. | Where the church is? |
| 20 | Q. | Yeah.  Yeah.  Could you and your husband have |
| 21 | | bought that piece of property without letting |
| 22 | | Dick be a partner or participate in it in |
| 23 | | some way? |

98

```
 1   A.   We couldn't even think about buying that
 2        property.
 3   Q.   I mean, if you had the resources.  If you had
 4        the financial resources, a piece of property
 5        is on the market, it's got a for sale sign on
 6        it, could you and your husband have gone and
 7        bought it; or is it your contention that you
 8        couldn't have bought it without calling Dick
 9        and saying, hey, we can't buy this because it
10        adjoins I-65, Inc., and I'm a shareholder in
11        I-65, Inc.?
12   A.   We could have done it just like he could.
13   Q.   Yeah.  Nothing wrong with that, is there?
14             MR. ROBERTS:  Object to nothing wrong
15                  with that.  That calls for a legal
16                  conclusion.
17             MR. CLEVELAND:  I'm asking in her --
18   Q.   In your opinion, is there anything wrong with
19        that?
20   A.   With Dick buying the land around it?
21   Q.   Yeah.
22   A.   It was all for Dick.
23   Q.   Okay.  Number 11 says that he has engaged in
```

|   |   |   |
|---|---|---|
| 1 | | a course of self-dealing that has permitted |
| 2 | | him unlawfully to participate in profits of |
| 3 | | the business at the expense of the minority |
| 4 | | shareholder and I-65 as a whole.  What are |
| 5 | | you talking about? |
| 6 | A. | At the 2005 meeting, when he gave me the |
| 7 | | financial statements to look at to explain |
| 8 | | why I owed the half million, when I was |
| 9 | | looking over it, I asked the question, I |
| 10 | | didn't know who CD&O was, I didn't know |
| 11 | | who -- if -- whatever else was on there.  And |
| 12 | | he said it was a company that -- I've |
| 13 | | forgotten what CD&O was.  One did real |
| 14 | | estate.  That was the answer.  I said what |
| 15 | | is -- I mean, who -- what is the company, |
| 16 | | who?  And then he said it was his company and |
| 17 | | he was the president and CEO. |
| 18 | | And then I asked about another one, and |
| 19 | | he said what it did.  I said, well, what does |
| 20 | | it mean, the initials?  And he said it was |
| 21 | | his company, and he was the president and |
| 22 | | CEO. |
| 23 | Q. | Okay.  Well -- |

```
1    A.   He just -- I didn't know.  He handed me this
2         (indicating), said, you know, these are the
3         things that -- it's costing us a debt of a
4         million some dollars, and you owe half a
5         million because of your 30 percent.
6    Q.   Because you go on and say, in the next
7         sentence, As a result, plaintiff has been
8         demanded to pay a mortgage on behalf of I-65
9         to Defendant's other corporation, Dorsey
10        Motor Sales, Inc., which inure exclusively to
11        the benefit of defendant.
12   A.   That was --
13   Q.   Are we back to the mortgage?
14   A.   No.  We're back to the debt of I-65.
15   Q.   The debt.  That's what I'm -- yeah.
16   A.   And he said, We have to do something about
17        this.  I mean, this has to be settled.
18   Q.   Is it your contention that the mortgage --
19        and you use the word mortgage in your -- and
20        I realize a lawyer, so --
21   A.   Thank you.
22   Q.   If you and I want to use the word debt, we'll
23        use debt instead of mortgage -- the original
```

101

```
 1              debt on October the 1st, 1990 was unlawful in

 2              some way?

 3       A.     I didn't know there was a debt then.  I

 4              didn't understand; didn't know.  Still don't

 5              understand it.  I just know that when he told

 6              me I owed half a million dollars, it was

 7              frightening.

 8       Q.     I understand that part.  But my question was

 9              is it your contention -- is it your

10              allegation that the original debt of October

11              the 1st, 1990 was unlawful in some way?

12       A.     I didn't think there was a debt.

13       Q.     Do you have -- do you know of any facts

14              whatsoever that would indicate that the

15              original debt was unlawful in any way?

16       A.     I guess because I didn't see the note and

17              didn't know about it.  I don't know.

18       Q.     The fact that you didn't see it, is that the

19              basis for your contending that it was

20              unlawful?

21       A.     I just didn't -- I just didn't understand.

22       Q.     The fact that you didn't understand, is that

23              the only basis that you have that that debt
```

1             was unlawful?

2     A.    No.

3     Q.    Well, tell me what else you have.

4     A.    I don't know how to explain it.

5     Q.    Just in your own words.

6     A.    I mean, what do you mean, if I have?

7     Q.    Your allegation here is that it --

8     A.    I just --

9     Q.    -- that the debt was unlawful.  I want to

10           know every fact that you know of or every

11           fact that you contend made it unlawful.

12    A.    I just know that my father would not have

13           done this if he thought the end result was

14           going to be that I was going to owe half a

15           million dollars on the property.  That's not

16           my father.

17    Q.    You saw where your father signed that closing

18           statement, did you not?

19    A.    Yes, I did.  Today.

20    Q.    Okay.

21    A.    But believe me, my father --

22           MR. ROBERTS:  Answer his question.

23           Just answer his question.

103

```
 1    Q.   Would it be accurate to say that you know of
 2         no facts that indicate that the original debt
 3         was unlawful?
 4    A.   You mean from what daddy -- I saw his
 5         signature today on that?
 6    Q.   Just any -- you know, any facts that you
 7         have.  I know what you tell me that your gut
 8         tells you about your daddy.  I want facts.
 9    A.   You need to ask Jack.
10    Q.   You realize that Jack's name is not on the
11         top of this complaint, don't you?  Your name
12         is the one that's up there.
13    A.   I know.
14              MR. ROBERTS:  That's in the record, and
15                   she knows.  And her answer is
16                   you'll have to ask Jack.  And
17                   that's the best she seems to be
18                   able to do.  I hope we can move
19                   along.
20    Q.   You know of no facts, do you?
21    A.   You'll have to ask Jack.  I -- I gave him my
22         power of attorney in 2000.  And I promise
23         you, I can't answer yes or no.
```

104

| | | |
|---|---|---|
| 1 | Q. | I will -- I will ask Jack.  You, Donna Davis, |
| 2 | | know of no facts, do you.  And if you do, |
| 3 | | speak up now.  And if you -- just tell me yes |
| 4 | | or no, and I'll move on. |
| 5 | A. | Is there a maybe? |
| 6 | Q. | No, there's not a maybe. |
| 7 | A. | No. |
| 8 | Q. | Okay. |
| 9 | A. | Not that I can remember. |
| 10 | Q. | Number 12 -- paragraph number 12, Defendant |
| 11 | | has denied plaintiff any meaningful |
| 12 | | participation in the management of I-65 by |
| 13 | | using his position as controlling shareholder |
| 14 | | and the holder of 70 percent of the |
| 15 | | outstanding shares of I-65.  Tell me what you |
| 16 | | are speaking of there. |
| 17 | A. | He just has free rein.  I mean, he can do |
| 18 | | whatever he wants to do. |
| 19 | Q. | Why? |
| 20 | A. | Because he is the majority stockholder. |
| 21 | Q. | Has he always been majority stockholder? |
| 22 | A. | Yes.  Yes.  He runs the show exactly like he |
| 23 | | wants to do it. |

105

```
1    Q.   But you have participated in the management,

2         have you not?

3    A.   In what way?

4    Q.   You have been an officer and a director, have

5         you not?

6    A.   With my name on the paper saying that?  Yes.

7    Q.   You have attended shareholder meetings, have

8         you not?

9    A.   I went to the one in 2005.

10   Q.   Your husband has attended shareholder

11        meetings on your behalf, has he not?

12   A.   He's -- yes.

13   Q.   You accuse him of willfully miscommunicating

14        the timing of the meetings so that the

15        meeting was finished upon your arrival.

16   A.   You need to ask Jack about that.

17   Q.   Tell me the basis for that.

18   A.   You need to ask Jack about that.

19   Q.   Well, tell me what you know about it.

20   A.   You really need to ask Jack.

21             MR. ROBERTS:  He's asked you, though,

22                  Donna.  Not to tie down anything

23                  other than he wants you to tell
```

106

```
 1                      him just what you know.  And that

 2                      would be anything you know that

 3                      Jack told you.  That would be

 4                      anything that you know like I

 5                      showed up and --

 6       A.   He came to a meeting --

 7                 MR. ROBERTS:  And go slow.  I'm not

 8                      trying to -- I'm not prepping

 9                      you.  I want you to answer his

10                      question.

11       A.   He came to a meeting here -- I guess it was

12            here -- and due to a wreck on the interstate,

13            he was late by five to ten minutes; the

14            meeting was over.

15                 MR. ROBERTS:  Is "he" Jack, for the

16                      record?

17                 THE WITNESS:  Yes, Jack.

18       Q.   Okay.  So that allegation is based upon Jack

19            was coming to the meeting, had a wreck on the

20            interstate --

21       A.   No.  No.  There was a wreck on the

22            interstate.

23       Q.   There was a wreck?  There was --
```

107

```
 1      A.   Or something.

 2      Q.   There was --

 3      A.   Yes.   Somewhere, there was.

 4      Q.   Traffic slowed him on the interstate --

 5      A.   Yes.

 6      Q.   -- as to where --

 7      A.   Yes.

 8      Q.   -- he was 10 or 15 minutes late getting

 9           here --

10      A.   Yes.

11      Q.   -- and the meeting was over?

12      A.   Right.

13      Q.   Okay.   Tell me everything you know of your

14           own knowledge, been told by anybody except

15           your lawyer as to how the timing of the

16           meeting was willfully miscommunicated,

17           willfully being intentionally

18           miscommunicated.

19      A.   I think it was probably notification of the

20           meeting.

21      Q.   Okay.   Tell me what you're talking about.

22      A.   The time that Dick decided to call the

23           meeting.   The date and the place and the
```

108

```
 1        time.
 2    Q.  So it's your allegation -- okay.  Well --
 3    A.  And you asked me what I thought, in my
 4        opinion.
 5    Q.  Well, I'm asking you what your allegation
 6        is.  Did he -- so you're saying that he set
 7        it at one time and told you another time?
 8    A.  No.  No.  No.  No.  No.  No.  If he decided
 9        to have the meeting on the 5th, he might have
10        just decided that on the 2nd, to have this
11        meeting.  It's the time factor, notification
12        of the meetings, and the meeting.
13    Q.  So you're saying that he didn't give -- not
14        that he willfully miscommunicated the time;
15        he just didn't give you adequate notice?
16    A.  Notice.
17    Q.  Okay.  Number 13 says, To further squeeze
18        plaintiff out of I-65, defendant offered to
19        buy plaintiff's stock in I-65 to satisfy a
20        mortgage that was made to defendant's
21        corporations.  Do you see that, the first
22        sentence of paragraph number 13?
23    A.  Yes, I do see it.
```

109

```
 1     Q.   Okay.  The truth of the matter is that you're

 2          the one that made that offer, correct?  And I

 3          think you've acknowledged that today.

 4     A.   Yes.

 5     Q.   Okay.  The actual value of your stock is

 6          approximately triple the value that defendant

 7          offered.

 8     A.   Well, since there's been no appraisal of the

 9          land, I don't know.

10     Q.   That was my question.  What is the basis of

11          the allegation that your stock is worth

12          triple the value?

13     A.   If I was going to sell him my stock for a

14          dollar.

15     Q.   So you're saying it's worth $3, then?

16     A.   I guess so.  No.  I don't know.

17     Q.   Okay.  You're not saying that.  That would be

18          ridiculous, wouldn't it?

19     A.   I know.

20     Q.   Yeah.  Is the truth of the matter that you

21          don't have any basis for that allegation?

22     A.   I can't see one.

23     Q.   It goes on to say that, Said mortgage is
```

110

| | | |
|---|---|---|
| 1 | | purported -- purported by whom? |
| 2 | A. | I guess me. |
| 3 | Q. | Okay. |
| 4 | A. | Since I thought the land was paid for. |
| 5 | Q. | Okay -- to be inadequate and false upon its |
| 6 | | conception.  Is that what you're -- is that |
| 7 | | your allegation there? |
| 8 | A. | I guess so. |
| 9 | Q. | That you thought it was paid for? |
| 10 | A. | I didn't know about the note.  So I guess |
| 11 | | that's why that's there. |
| 12 | Q. | So that language goes back to the note at its |
| 13 | | inception that you say you didn't know |
| 14 | | anything about? |
| 15 | A. | Right. |
| 16 | Q. | Okay.  Paragraph number 14, Defendant |
| 17 | | breached his fiduciary duties of good faith |
| 18 | | and ordinary care owed to I-65.  How did he |
| 19 | | breach his fiduciary duties? |
| 20 | A. | Tell me what that means. |
| 21 | Q. | Well, fiduciary duties are -- |
| 22 | | MR. ROBERTS:  Would you read the whole |
| 23 | | one or let her read -- you read |

111

```
1                    ·part of it.  I'm only asking would

2                     you read it --

3         MR. CLEVELAND:  I read the entire

4                     sentence.

5         MR. ROBERTS:  I missed it.  In that he

6                     has exposed I-65 -- am I on the

7                     wrong one -- to financial

8                     obligations?

9         MR. CLEVELAND:  Paragraph number 14.

10        MR. ROBERTS:  Okay.  You read a

11                     sentence, but not all of 14.  I'm

12                     just asking, in context, would you

13                     allow her to respond -- or at

14                     least have time to read all of

15                     14?

16   Q.   Yeah.  Well, read all of paragraph 14, and

17        then I'm going to ask you about each

18        allegation.

19        MR. ROBERTS:  Right.  That's fine.  It

20                     will be easier to get the whole

21                     thing.

22                  (Brief pause)

23   A.   Okay.
```

112

```
1    Q.   You've read it?

2    A.   Uh-huh.

3    Q.   Okay.  How has he breached his fiduciary

4         duties to I-65?

5    A.   Tell me again fiduciary duties.

6    Q.   Financial.

7    A.   I think he might have used it to buy up the

8         other land.

9    Q.   Okay.  Tell me your basis for thinking that.

10   A.   Because, originally, I thought it was paid

11        off.  And he could have used it for whatever

12        you call it to buy the other land.

13   Q.   You think he's used it for collateral?  Is

14        that the word you were looking for?

15   A.   I think so.

16   Q.   So it's your allegation -- one of the things

17        you're talking about there in number 14 is

18        that it's your allegation that Dick has used

19        the I-65 property as collateral to buy other

20        property?

21   A.   Yes.

22   Q.   Now, are -- and we went into this yesterday.

23        Are you saying that he has directly, in other
```

113

| | | |
|---|---|---|
| 1 | | words, placed a mortgage or a lien on it, or |
| 2 | | that he has indirectly used it by showing his |
| 3 | | ownership as an asset? |
| 4 | A. | I don't know. |
| 5 | Q. | Have you ever shown that asset -- your |
| 6 | | ownership as an asset for you and your |
| 7 | | husband? |
| 8 | A. | To buy something?  No. |
| 9 | Q. | To buy something. |
| 10 | A. | Unh-unh. |
| 11 | Q. | Never put it on a financial statement? |
| 12 | A. | I don't believe so. |
| 13 | Q. | Okay.  If you had, then you would be doing |
| 14 | | the same thing you accused him of, correct? |
| 15 | | MR. ROBERTS:  Object to the form of the |
| 16 | | question. |
| 17 | Q. | You can go ahead and answer it.  He's just |
| 18 | | putting his objection on the record. |
| 19 | A. | Oh.  I never knew what you were doing |
| 20 | | yesterday.  And he started doing it. |
| 21 | | If you put -- I mean, to put it on a |
| 22 | | financial statement, if you're not buying |
| 23 | | anything, I don't see how that's the same if |

114

```
1            you use the land to -- for collateral.
2       Q.   Well, by collateral, are you talking about
3            putting a lien on it, putting a mortgage on
4            it?
5       A.   No, I don't think so.
6       Q.   Well, what do you mean?  Tell me what you
7            mean by using it for collateral.
8       A.   I guess maybe it is -- I don't know -- so you
9            can get a loan to buy the others.
10      Q.   So is it your allegation there that Dick has
11           mortgaged or used this property as
12           collateral, given some financial institution
13           a lien on this property so he could buy
14           something else?
15      A.   I think there's a possibility.
16      Q.   Just tell me what you know.
17      A.   You know --
18                MR. ROBERTS:  If you don't know, just
19                     say I don't know.
20      Q.   Tell me why you think there's a possibility.
21      A.   I don't know.  I don't know.
22      Q.   Okay.  Do you have any basis whatsoever --
23      A.   I don't know.
```

115

1     Q.    Any factual basis for that allegation?

2     A.    I don't know.

3     Q.    Well, either, yes, you do, or, no I don't.

4           MR. ROBERTS:  No.  I'm afraid she can

5                 say I don't know.

6           MR. CLEVELAND:  No.  I disagree with

7                 you.

8           MR. ROBERTS:  Well, on the record, let

9                 me go ahead and clear that up.

10          MR. CLEVELAND:  Well, make it real

11                quick, because you're the one

12                trying to get out of here.

13          MR. ROBERTS:  Well, I understand.

14          MR. CLEVELAND:  And I'm trying to

15                accommodate you.

16          MR. ROBERTS:  Well, and I appreciate

17                that.  But there are three answers

18                to any question.  It's yes, no,

19                and I don't know.

20                Now, all I'm saying is you

21                have the right to argue at trial

22                that her "I don't know" is

23                equivalent to that is a no.  But

```
1                        she still has the right to answer
2                        not in.  We're not in a police
3                        thing where she's under a light.
4                        There's yes, no, I don't know.
5                        And, actually, there's another
6                        one, maybe so.
7          MR. CLEVELAND:  Okay.  Are you
8               finished?
9          MR. ROBERTS:  I'm finished.  But I'm
10              just telling you -- and it's the
11              only time I've really objected --
12              if she says I don't know, that's
13              an answer
14   Q.   Ms. Davis, these are your -- and you've heard
15        his objection.  But I'm going to ask you my
16        question anyway.  These are your factual
17        allegations.  Factual allegations are the
18        facts that you know of your own knowledge to
19        file this lawsuit.
20             Now, what I'm asking you, what facts do
21        you have to accuse Dick of using that
22        property, the I-65 property, for collateral
23        on other business transactions?
```

117

```
1    A.    I don't know.

2    Q.    I know of none.  Would that be a more correct

3          answer?

4    A.    I think I just have to get back to you on

5          that one.

6    Q.    As we sit here today, do you know of a single

7          fact that supports that allegation?

8    A.    I'll have to get back to you.

9    Q.    Do you know of a single fact --

10              MR. ROBERTS:  All right.  Now, that's

11                 asked and answered.  And --

12              MR. CLEVELAND:  No, it's not answered.

13              MR. ROBERTS:  All right.  Then --

14              MR. CLEVELAND:  It's not answered.

15              MR. ROBERTS:  Take it to the judge or

16                 take an objection.  If she says I

17                 don't know -- now, we're not going

18                 to badger her.  I didn't badger

19                 Dick when he played games with me

20                 and went around the world --

21              MR. CLEVELAND:  You asked the same

22                 question a hundred times.

23              MR. ROBERTS:  Well, you've got an
```

118

```
 1              answer of I don't know which I

 2              agree may be interpreted as, at

 3              this point, I don't know and

 4              potentially I don't have any.

 5                    I would submit to you that

 6              Dick's testimony yesterday is

 7              replete with every reason for

 8              forcing a stockholder out and not

 9              managing the company.  So read his

10              deposition to tell you --

11       MR. CLEVELAND:  This is not Dick's --

12              this is not Dick's complaint.

13              It's your client's complaint.

14       MR. ROBERTS:  I understand.  And all

15              we're talking about is --

16       MR. CLEVELAND:  And I have every

17              right --

18       MR. ROBERTS:  -- she gave an answer,

19              and that's all.  It's asked and

20              answered.  That's why we have that

21              little legal term, asked and

22              answered.  The answer was, I don't

23              know.
```

119

```
1    Q.    So your answer was I know of no fact that

2          would support the allegation that Dick has

3          used this property for collateral on another

4          business deal?

5    A.    I don't know.

6    Q.    You mentioned Myron Thompson's name

7          yesterday.  I -- we'll see how far those

8          answers get.

9              MR. ROBERTS:  Well, if he wants to jump

10                  on a school teacher, then that's

11                  fine with me.

12             MR. CLEVELAND:  I can tell you, he'll

13                  jump on anyone that he thinks is

14                  playing with his court.

15             MR. ROBERTS:  And I'm really pleased to

16                  hear that.  We've got the right

17                  judge when it comes to playing.

18             MR. CLEVELAND:  We do have the right

19                  judge.  We do.  I've been in front

20                  of him a number of times, and he's

21                  an outstanding judge.

22             MR. ROBERTS:  Well, I agree.

23    Q.    Number 15.  Would you read 15 in its
```

120

```
1        entirety, and then we will address the

2        different allegations.

3                    (Brief pause)

4   A.   Okay.

5   Q.   Are you ready?

6   A.   Uh-huh.

7   Q.   The second sentence says that, The defendant

8        has used the resources of CD&O to the

9        detriment of I-65.  What fact do you have to

10        support that allegation?

11  A.   It's -- is that the advertising company?

12  Q.   It's CD&O is all I know.

13  A.   Well, I have to remember what it -- CD&O is

14        before I can answer it.  So I have to say I

15        don't know.

16  Q.   Okay.  Well, let's do it this way.  Let's

17        assume, for purposes of my question, that

18        CD&O is the advertising company.  What facts

19        do you have as it relates to the advertising

20        company?

21  A.   On the financial statement from the 2005

22        meeting, the moneys involved with CD&O.

23  Q.   Tell me what you're talking about.
```

121

| | | |
|---|---|---|
| 1 | A. | The financial statement and CD&O and the |
| 2 | | money listed for CD&O on the financial |
| 3 | | statement of the 2005 meeting. |
| 4 | Q. | The money owed to CD&O? |
| 5 | A. | It may have been money paid to CD&O. |
| 6 | Q. | Or money paid by CD&O? |
| 7 | A. | I need the financial statement. |
| 8 | Q. | Okay.  Well, let's look at it.  I'm going to |
| 9 | | show you what was marked yesterday as |
| 10 | | Plaintiff's Exhibit #8.  Is that the |
| 11 | | financial statement that you were referring |
| 12 | | to? |
| 13 | A. | Yes. |
| 14 | Q. | Okay.  If you would look at it and tell me |
| 15 | | what, off that financial statement relating |
| 16 | | to CD&O, is the basis of this allegation. |
| 17 | A. | I can't find it.  On the back, TD&O. |
| 18 | Q. | The last page? |
| 19 | A. | Yes. |
| 20 | Q. | Okay. |
| 21 | A. | $3,000. |
| 22 | Q. | TD&O? |
| 23 | A. | Uh-huh. |

122

```
 1    Q.   $3,000?

 2    A.   And --

 3    Q.   Wait.  Keep your spot and try to hold your

 4         train of thought.  Is that money paid to TD&O

 5         or paid by TD&O --

 6    A.   It says --

 7    Q.   -- on behalf of I-65?

 8    A.   I don't know.  It doesn't have a top.  It has

 9         TD&O -- May 14th, TD&O, $3,000.

10    Q.   Okay.  So is your allegation based upon the

11         fact that from looking at that, it's your

12         understanding that that's money that I-65

13         paid to TD&O?

14    A.   I don't know.

15    Q.   Well, if it was paid by TD&O on behalf of

16         I-65, that would be to the benefit of I-65,

17         would it not?

18    A.   Yes.

19    Q.   Okay.  So that would -- that could not be

20         what you're talking about, is it?

21    A.   I don't know what it means.  It has TD&O and

22         $3,000.

23    Q.   Okay.  Well, your allegation says that he has
```

123

| | | |
|---|---|---|
| 1 | | used the resources of CD&O to the detriment |
| 2 | | of I-65. And my whole point, Ms. Davis, is |
| 3 | | that if it's money that was paid to TD&O, I |
| 4 | | can understand your allegation. If it was |
| 5 | | money that was paid by TD&O on behalf of |
| 6 | | I-65, then that would be no detriment to |
| 7 | | I-65, would it? |
| 8 | A. | Right. But you see on here where it's listed |
| 9 | | and it has money? It doesn't say what it is. |
| 10 | Q. | Okay. And you are speaking of -- and I want |
| 11 | | you to confirm it for me -- the November |
| 12 | | 24th, 1993 entry concerning CD&O; is that |
| 13 | | right? |
| 14 | A. | It says November the 24th, CD&O, Inc. |
| 15 | Q. | Right. |
| 16 | A. | No year. |
| 17 | Q. | Well, it's 1993. |
| 18 | A. | Oh, yeah. Yeah. Excuse me. Yes. |
| 19 | Q. | I just wanted -- |
| 20 | A. | Yes. |
| 21 | Q. | So that when we all look back at this record, |
| 22 | | we'll know what line item you're looking at. |
| 23 | A. | And then the -- in 2003, May 14th, TD&O, |

124

```
 1          Inc., 3,000.

 2     Q.   Okay.  And that's another line item that

 3          you're looking at?

 4     A.   Yes.

 5     Q.   Okay.  And those two line items are the

 6          factual allegations for paragraph number 15?

 7     A.   Yes.

 8     Q.   Okay.  Read 16, if you would, and then we'll

 9          try to see if we can break it down.

10     A.   Okay.

11     Q.   Defendant engaged in a series of conflicting

12          interest transactions that put I-65 at

13          immediate risk of serious loss either without

14          disclosure to the board or without approval

15          or ratification of a majority of qualified

16          shareholders.  What are you talking about?

17     A.   I don't know.

18     Q.   Honest answer.

19     A.   You believe me now, don't you?

20     Q.   Well, that's all I wanted you to say before.

21     A.   I know.

22     Q.   Do you have any facts to -- do you know of

23          any facts --
```

125

```
 1    A.   I don't know.

 2    Q.   Okay.  Number 17.  The paragraphs are getting

 3         a little shorter, thank goodness.  We thank

 4         the author for that.

 5    A.   Okay.

 6    Q.   Defendant made it impossible to obtain a

 7         quorum of qualified directors to review,

 8         ratify, or approve any conflicting interest

 9         transactions relating to himself.  What are

10         the factual -- or what are the facts behind

11         that allegation?

12    A.   I don't know.

13    Q.   Do you know of anything that he has done to

14         make it impossible to obtain a quorum of

15         qualified directors?

16    A.   With the 70 percent that he owns, he can do

17         anything he wants.

18    Q.   I understand that.  But how did he make it

19         impossible?

20    A.   He can do -- he can vote any -- anything that

21         he wants to do.  I'm a minority stockholder.

22         I can't outvote him if I disagree with

23         something.
```

126

```
1    Q.    Read number 18, if you would.  Paragraph

2          number 18.

3                       (Brief pause)

4    A.    Okay.

5    Q.    What facts do you have to support the

6          allegation that he has not committed the time

7          or resources to I-65?

8    A.    I think the upkeep of the land, the

9          maintenance.  As we talked about, the bamboo

10         and everything way back when; that the County

11         wanted the land presentable or maintained.

12         And it didn't look like it was maintained

13         yesterday.

14   Q.    So is the maintenance of the property the

15         only thing that you're talking about there?

16   A.    I don't know.

17   Q.    Well, how do you think it should be

18         maintained?

19   A.    I guess where it looks like a property.

20   Q.    I mean, what would you have to do?  In your

21         mind, what's your opinion of what would need

22         to be done out there on that nine acres to

23         make it look like a property?
```

127

```
 1      A.    When the County was having him keep the

 2            bamboo in check.  And originally, it just

 3            didn't look like it does now.

 4      Q.    Tell me about the -- who did you hear from

 5            that the County was requiring the bamboo be

 6            cut?

 7      A.    Alan Taunton.

 8      Q.    So Alan told you that?

 9      A.    Yes.

10      Q.    But my question to you is -- you said that

11            the maintenance is not what you think it

12            should be --

13      A.    Yes.

14      Q.    -- based upon the way it looked yesterday?

15            What would you do to maintain it at a level

16            that you think would be acceptable and would

17            not constitute negligence on his part?

18      A.    I would clean up the property.

19      Q.    How would you clean it up?  What would you

20            do?

21      A.    I guess I'd get the Vietnamese back and give

22            them the bamboo.

23      Q.    Where would you get -- would you get --
```

```
 1              MR. ROBERTS:  Off the record a minute.

 2                   (Off-the-record discussion)

 3   Q.   Let's get back to my serious question and to

 4        your allegation.  Your allegation --

 5   A.   What number are we on?

 6   Q.   We're on number -- we're on number 18.  Your

 7        response to my question was you said that the

 8        property was not being maintained -- you

 9        thought he was negligent because the property

10        was not being maintained as it should be

11        maintained.

12             My question back to you is, well, how

13        would you maintain it?  And we'll leave the

14        Vietnamese out of it.  How would you maintain

15        it to have it at the standard that you think

16        it should be?

17   A.   I don't think it has to look exactly like the

18        surrounding property, but I think the bamboo

19        is out of control.  I would clean it up.

20   Q.   Would you bring a bulldozer in and clean it?

21        I mean, what would you do?

22   A.   I'm not a -- I don't know.  I wouldn't

23        bulldoze it; I'd just clean it up.  It's
```

129

```
 1            never been just clear from the beginning.
 2       Q.   Do you have any idea of the cost that would
 3            be associated --
 4       A.   I don't, no.
 5       Q.   -- with bringing it to the level that you
 6            want it?
 7       A.   No.
 8       Q.   Would you acknowledge that all of that costs
 9            money?
10       A.   Yes.
11       Q.   Okay.  Have you spent any money whatsoever on
12            maintaining or taking care of the I-65
13            property?
14       A.   No.
15       Q.   Look at paragraph number 21.
16       A.   Okay.
17       Q.   Is it your contention that there have been
18            profits made and that there are dividends to
19            be distributed which have not been
20            distributed?
21       A.   I don't know.
22       Q.   Do you know of any fact that would indicate
23            that I-65 has made a profit?
```

1    A.    I don't know.

2    Q.    Do you know of any fact to support your

3          allegation that he has manipulated corporate

4          earnings to squeeze you out?

5    A.    A debt of a half a million.  Next year it may

6          be 700,000.  That's scary.

7    Q.    I understand that.  But your allegation is

8          that he has manipulated corporate earnings.

9          Do you have any facts to support that

10         allegation?

11   A.    When he gave me this in the meeting

12         (indicating), this is the financial statement

13         he said.  And then yesterday it was said, no,

14         no, no, this isn't a true financial

15         statement.  But at the December 2005 meeting,

16         he told me it was a financial statement.  Not

17         a make believe one, but it was the financial

18         statement explaining why I owed half a

19         million dollars.  And there's a page missing

20         off of this six of six.

21   Q.    Those are the documents that y'all had

22         produced yesterday, not the ones we

23         introduced.

131

```
1    A.   Yeah.  There's a six of six.

2    Q.   Are you aware of any earnings, any corporate

3         profits?

4    A.   I don't know.

5    Q.   Look at paragraph number 23, if you would.

6         Just let me know -- when you finish reading

7         it, let me know.

8                    (Brief pause)

9    A.   Okay.

10   Q.   I'm going to paraphrase this allegation, if I

11        may.  You say he's liable for mismanagement

12        because he has refused or denied you your

13        right to participate in your fair share of

14        corporate gains.  Is that your allegation?

15   A.   With the option that I-65 had that I didn't

16        know about, maybe that's it.

17   Q.   Okay.  No.  What do you think your fair share

18        of corporate gains are?

19   A.   I mean, does that go like 60 percent -- I

20        mean, 70 percent and 30 percent?

21   Q.   I'm just asking you.

22   A.   I don't know.

23   Q.   And also that he has, in the management of
```

132

```
 1          the affairs -- that's the same thing we're

 2          going back to earlier?

 3     A.   Uh-huh.

 4     Q.   Nothing new about -- I mean, that's the same

 5          allegation?

 6     A.   Where?

 7     Q.   The end of the sentence.  I was trying not to

 8          ask you two questions at one time.  I was

 9          trying to ask you about corporate gains and

10          then the second part being the management of

11          the affairs of I-65.

12     A.   Yes.

13     Q.   Okay.  The same thing that we had talked

14          about before?

15     A.   Right.

16     Q.   Okay.

17     A.   Yes.

18     Q.   Nothing new?

19     A.   No.

20     Q.   Then 25, is that the same allegation that we

21          have talked about before about the adjoining

22          land or is that anything -- do you have

23          anything additional you want to add there?
```

133

```
 1    A.    Okay.  Let me read it, because --

 2    Q.    Do.

 3    A.    Well, I look at you while you're talking and

 4          I'm not reading it.

 5    Q.    Okay.  Yeah.

 6                         (Brief pause)

 7    A.    It goes back to the option.

 8    Q.    It goes back to the option?

 9    A.    Yeah.

10    Q.    Nothing new there?

11    A.    Not that I can see.

12    Q.    Okay.  Look at number 28.  Does that relate

13          back to the allegations that we have

14          discussed earlier, or are there new items

15          there that have not been included that I

16          haven't asked you about before?

17    A.    Are you talking about the 12 percent rate for

18          all these years?

19    Q.    Yeah.  The 12 percent and the mortgage.

20    A.    It's --

21    Q.    Do you understand my question?

22    A.    Yes.  I'm trying to figure out, since I

23          understand it, is it a yes or a no that I
```

134

```
1              say.

2     Q.      Well, my question is is this the same -- is

3              this allegation the same thing that you had

4              talked about earlier?

5     A.      Yes.  To my knowledge, yes.

6     Q.      Okay.  Nothing new here that we haven't

7              already talked about?

8     A.      No.

9     Q.      Let's look at 31.

10    A.      Okay.

11    Q.      It appears that this allegation is that he

12             has willfully and wantonly allowed CD&O to

13             purchase surrounding land without giving an

14             option to I-65 and entering into the mortgage

15             agreement with Dorsey Motors, Inc., at an

16             exorbitant interest rate.  Are these the same

17             allegations that we have previously

18             discussed?

19    A.      I believe so.

20    Q.      Okay.  Nothing new?

21    A.      Not to my knowledge.

22    Q.      Look at 34.

23    A.      Okay.
```

135

```
1    Q.   Are these the same items that we have

2         discussed before?

3    A.   Yes.

4    Q.   And I think we went into some detail on

5         that.  Nothing new?  No new allegations here

6         in count six under your paragraph number 34

7         that we have not previously discussed?

8    A.   Correct.

9    Q.   Look at paragraph number 36, if you would.

10   A.   Okay.

11   Q.   What facts do you have that Dick has

12        defrauded you?

13   A.   I guess at the 2005 meeting when he said I

14        owed half a million dollars.  And I have no

15        say-so or control or anything in this.  And

16        then, next year, if we meet, he could come,

17        like I said, and say now it's 700,000.

18   Q.   Well, let's talk about fraud in the past.

19   A.   Well, I think that is.  If I don't have

20        the -- the true -- I thought this was a true

21        financial statement.  If I don't -- if

22        somebody tells me this is a financial

23        statement, I assume this is a true one.  And
```

136

1        now, yesterday, he said it wasn't.  I don't

2        know whether you call that fraud or just

3        plain -- I don't know what you call it.

4   Q.  This complaint was filed in August of '06,

5        according to the stamp.  Okay.  I want to

6        know what facts you knew in August of '06

7        that Dick had defrauded you and not something

8        that you heard yesterday.

9   A.  This is in a board -- a meeting for I-65.

10       And that was in 2005.  So this was before

11       this.  This is part of it.

12  Q.  So you knew immediately that there was

13       something wrong with that?

14  A.  No.  I -- in the meeting, he said this is the

15       financial statement.  Through the years --

16       and I'm going to show you why you owe half a

17       million dollars.  I thought this was a

18       legitimate, true financial statement.

19  Q.  Okay.  But my question to you, as of August

20       of 2006 when this complaint was filed, what

21       basis do you have that he had defrauded you?

22       What did you know in August of 2006 -- or

23       what did you think you knew in August of 2006

137

```
 1            that would mean that Dick had defrauded you

 2            in some way?

 3    A.     I just didn't trust him anymore.

 4    Q.     Okay.  A lack of --

 5    A.     And I am afraid.

 6    Q.     A lack of trust, then?

 7    A.     I am afraid -- I am afraid of him, and I

 8            don't trust him.  That's the honest truth.

 9    Q.     As of August 2006, what facts did you have

10            that Dick had been deceitful or had deceived

11            you?

12    A.     At this board meeting of 2005, there was a

13            tape recorder.  And I -- somebody said in

14            Alabama you don't have to tell somebody

15            they're being tape.  I wasn't -- I didn't

16            even realize it was being taped.  At one

17            point we were talking, and Dick said that

18            when daddy and mamma gave us the land, they

19            had a verbal agreement -- he had -- he and

20            daddy had a verbal agreement that it was in

21            lieu of my percent -- my 30 percent that I

22            would inherit when they died of the

23            dealership.
```

138

Q.   And that statement was made in --

A.   At the 2005 meeting.

Q.   That was when that -- that statement was
     made, at that time --

A.   Yes.

Q.   -- in 2005?

A.   And I said, well, if that's true, why
     didn't -- why didn't daddy change his will?
     And Dick said, I don't know.  Because when my
     father died, the will said that when mamma
     died, I would get 30 percent and Dick would
     get the -- whatever is left, the 40 or -- to
     make him -- I'd have 30 and he'd have 70 of
     the dealership.

Q.   Of the dealership.

A.   Uh-huh.  That's why it says verbal agreement
     with dad.  That's what he said.

          MR. ROBERTS:  Answer his questions,

               not --

          THE WITNESS:  Okay.  Oh, that's right.

Q.   Okay.  I want to be sure I understand, now.
     The deceit occurred at the shareholders
     meeting in December of 2005?

139

```
 1    A.    Yes.  And then when daddy -- it was before

 2          that, too.

 3    Q.    When was that?

 4    A.    When daddy had a stroke.

 5    Q.    In '93?

 6    A.    In '93.  We brought him home from the

 7          hospital five or six days later.  And when

 8          daddy died, Dick brought a black case over

 9          with all the records for mamma and daddy,

10          insurance, et cetera.  And in there, there

11          were two pieces of paper that -- like durable

12          power of attorney for daddy that he had

13          signed and a durable power of attorney for

14          mother.  And the date that supposedly my

15          father signed this was the date we brought

16          him home from the hospital after his stroke.

17          I was with him the whole time, and he

18          couldn't have written his name like it was on

19          that durable power of attorney.

20    Q.    But that was in '96, right?

21    A.    And that was giving Dick the durable power of

22          attorney, not Dick and me.  It was just

23          giving Dick the durable power of attorney.
```

140

```
1    Q.   And that was in '96 when your dad died that
2         Dick brought the box over?
3    A.   Yes.
4    Q.   Okay.
5    A.   Yes.  And he wanted to know if I'd look
6         through it.
7    Q.   Okay.  And you say that he has suppressed
8         material facts from you.  What material facts
9         do you contend have been suppressed from you?
10   A.   I don't know.
11   Q.   This is an interesting allegation.  Perhaps
12        it's -- that you relied, to your detriment,
13        on nondisclosure of material facts.
14   A.   Where are you?
15   Q.   I'm at the --
16   A.   The same one?
17   Q.   I'm at the last -- I'm in the last sentence
18        of 36.
19   A.   I think that means that -- it's a horrible
20        thing to find out your brother -- you can't
21        trust your brother.  And I just -- it's
22        horrible.
23   Q.   Would you be surprised to know that he feels
```

141

```
 1              the same way?
 2    A.    Would you be surprised to know that I don't
 3          believe that?
 4    Q.    No, I'm not surprised.
 5              MR. ROBERTS:  You're asking questions
 6                     again.
 7              THE WITNESS:  I know it.
 8              MR. ROBERTS:  I've got a lot of
 9                     questions for her.  So if you can
10                     hurry.  I say a lot.  I need to
11                     get through pretty quick.
12    Q.    What do you want out of this lawsuit?
13    A.    Peace.
14    Q.    Okay.
15    A.    P-E-A-C-E.
16    Q.    What would it take to give you peace?
17              MR. ROBERTS:  I'm going to object to
18                     that.  I'm her attorney, and I
19                     think I'd have to -- as you would,
20                     Cliff, I think I'd -- I'd have to
21                     have an appraisal of the property
22                     to give you an answer to that.  I
23                     mean, if you're soliciting an
```

142

| | | |
|---|---|---|
| 1 | | offer, we'd be glad to talk about |
| 2 | | it. |
| 3 | | But I think I said on the |
| 4 | | record we are going to have, at |
| 5 | | our own expense, the property |
| 6 | | appraised by an MAI. And then she |
| 7 | | and I both will be able to come to |
| 8 | | Dick and see if we can resolve |
| 9 | | some of this. |
| 10 | Q. | Well, you have asked for compensatory and |
| 11 | | punitive damages. In what amount? |
| 12 | A. | I don't know. |
| 13 | Q. | Do you know what punitive damages are? Do |
| 14 | | you know that they are damages to punish? |
| 15 | A. | Explain it a little more. |
| 16 | Q. | Well, punitive damages are money damages to |
| 17 | | punish Dick. |
| 18 | A. | It's like spanking a bad child when they do |
| 19 | | something? |
| 20 | Q. | Okay. How bad do you want this bad child |
| 21 | | spanked? And put that into dollars for me. |
| 22 | A. | I want him to -- |
| 23 | Q. | Because that's the only way you can spank |

143

```
 1              somebody in civil court.  This is not a

 2              criminal case.  We can't lock them up or

 3              anything.  You spank them with money.

 4      A.      First of all, I want him to have a happy

 5              life.  He has a gorgeous son.  And I want him

 6              to be happy.  And as far as the punitive

 7              damages, I don't know at this time.

 8      Q.      Undecided?

 9      A.      Yes.

10      Q.      More than $100,000?

11      A.      Y'all did not give me that word before.

12      Q.      Pardon?

13      A.      I couldn't use -- I should have had

14              undecided.  Undecided.  Undecided.  You just

15              said "or undecided".

16      Q.      You lost me.  Would 100,000 be enough?

17      A.      Undecided.

18      Q.      A million?

19      A.      Undecided.

20      Q.      A dollar?

21      A.      Undecided.  Not the dollar.  I know the

22              answer to that.  No.

23      Q.      More than a dollar?
```

144

```
 1    A.   Yes.

 2    Q.   How much more?

 3    A.   Undecided.

 4    Q.   $1,000?

 5    A.   Undecided.

 6    Q.   What about compensatory damages; how much for

 7         that?

 8    A.   Explain.

 9    Q.   That's what you think your share of the

10         profits are, I suppose.

11    A.   I don't know at this time until the land is

12         appraised.

13    Q.   Well, I'm talking about profits, now, not --

14         I'm not talking about the sale value of the

15         property.

16    A.   Okay.  Undecided.

17    Q.   You also ask for attorney's fees.  Do you

18         have a legal contract with these two

19         attorneys to represent you?

20    A.   I hope so.

21    Q.   Okay.  Are you on an hourly basis with them?

22              MR. ROBERTS:  I think that invades the

23                   province of the lawyer/client
```

145

```
 1              relationship.
 2              MR. CLEVELAND:  I don't think it does.
 3                   I mean, that's part of the relief
 4                   you've asked for.  We have a right
 5                   to know what we're facing.
 6              MR. ROBERTS:  If she knows, she can
 7                   answer.
 8    A.    Honestly --
 9    Q.    Your husband did that?
10    A.    No.
11    Q.    Okay.
12    A.    No.
13    Q.    You don't know what your financial
14          relationship with your attorneys are?
15    A.    I can get it for you.
16    Q.    You can get it for me?
17              MR. ROBERTS:  Don't look at me.  Don't
18                   look at me.
19    A.    I mean, I'd have to look at it to tell you
20          specifically.
21    Q.    Okay.  You also ask for costs other than
22          filing fees.  Do you know what other costs
23          you are referring to there?
```

146

| | | |
|---|---|---|
| 1 | A. | I don't know. |
| 2 | Q. | You own no interest in CD&O, LLC, do you? |
| 3 | A. | No. |
| 4 | Q. | And have never owned any interest in that? |
| 5 | A. | No. |
| 6 | | MR. CLEVELAND:  Give us about four or |
| 7 | | five minutes.  We're getting |
| 8 | | close. |
| 9 | | MR. ROBERTS:  All right. |
| 10 | | (Brief recess) |
| 11 | Q. | Mrs. Davis, you made reference to a will |
| 12 | | earlier.  And maybe I just didn't hear you |
| 13 | | correctly or didn't understand.  I'm going to |
| 14 | | get you to clear it up for me.  Did you say |
| 15 | | that your mother or father's will left you 30 |
| 16 | | percent of the dealership -- |
| 17 | A. | No.  When daddy died -- |
| 18 | Q. | -- in '96? |
| 19 | A. | -- everything went to mamma. |
| 20 | Q. | Correct. |
| 21 | A. | And then, on her death, Dick and I -- let me |
| 22 | | see -- Dick and I would -- I'd get 30 percent |
| 23 | | and Dick would get 30 percent, their stock in |

147

| | | |
|---|---|---|
| 1 | | Dorsey Motor Sales. |
| 2 | Q. | Okay.  And that was in your mother's will? |
| 3 | A. | Well, now that I think about it, it was |
| 4 | | originally until the lawsuit between Dorsey |
| 5 | | and Dorsey when Robert Faulk had to bring |
| 6 | | that lawsuit.  And then they deleted the |
| 7 | | dealership part out of that because Dick had |
| 8 | | had mamma sign her shares over to him before |
| 9 | | that saying that if she didn't, the |
| 10 | | dealership would go under. |
| 11 | Q. | But that was not your mother's will at the |
| 12 | | time of her death, was it? |
| 13 | A. | No.  I'm sorry. |
| 14 | Q. | Okay. |
| 15 | A. | It wasn't. |
| 16 | Q. | Okay.  I misunderstood -- |
| 17 | A. | It was her will with the exception of that. |
| 18 | Q. | And you mentioned that -- how many times have |
| 19 | | you sued Dick? |
| 20 | A. | I don't know. |
| 21 | Q. | More than this once? |
| 22 | A. | I don't believe so. |
| 23 | Q. | Do you think this is the only time you've |

148

| | | |
|---|---|---|
| 1 | | ever sued him? |
| 2 | A. | Yes. |
| 3 | Q. | Okay.  You also mentioned earlier about a |
| 4 | | recorder.  Was the -- this was the recorder |
| 5 | | during the -- |
| 6 | A. | 2005 meeting? |
| 7 | Q. | Yeah.  I mean, was it sitting out on the |
| 8 | | table? |
| 9 | A. | No.  It was not like in the middle of the |
| 10 | | table. |
| 11 | Q. | Where was it? |
| 12 | A. | When I noticed it, it was, I think, over to |
| 13 | | the right of Jo Anne who was taking the |
| 14 | | minutes.  Actually, when I noticed it is when |
| 15 | | Dick and I were talking about -- when he said |
| 16 | | when daddy gave us the land, he had a -- he |
| 17 | | had a verbal agreement that that was in lieu |
| 18 | | of my ownership in the dealership. |
| 19 | Q. | And who was present when that was said?  You |
| 20 | | were present, because he said it to you -- |
| 21 | A. | Dick. |
| 22 | Q. | -- and Dick was present? |
| 23 | A. | And I'm not sure -- he turned off the |

149

| | | |
|---|---|---|
| 1 | | recorder.  I don't know whether that was on |
| 2 | | the tape recorder, but then he turned it |
| 3 | | off.  And then -- at some point.  So it may |
| 4 | | be on the tape.  I don't know. |
| 5 | Q. | Was Jo Anne present? |
| 6 | A. | Yes. |
| 7 | Q. | Anyone else? |
| 8 | A. | No.  And she was taking the minutes.  I don't |
| 9 | | know that she -- I don't know whether -- I |
| 10 | | don't know what her instructions were when |
| 11 | | the tape recorder went off, and then it was |
| 12 | | turned back on. |
| 13 | Q. | Is it your contention that you are entitled |
| 14 | | to 30 percent of the profits of I-65 |
| 15 | | Properties? |
| 16 | A. | I don't understand what you're saying. |
| 17 | Q. | I'm just asking you, you own 30 percent of |
| 18 | | the stock; do you not? |
| 19 | A. | Yes, I do. |
| 20 | Q. | Is it your contention that you are entitled |
| 21 | | to 30 percent of the profits of I-65? |
| 22 | A. | I would think so. |
| 23 | Q. | Would it also be your understanding that you |

| | |
|---|---|
| 1 | would be responsible for 30 percent of the |
| 2 | debt of I-65? |
| 3 | A.   A true debt? |
| 4 | Q.   Yeah, a true debt.  Whatever the true numbers |
| 5 | work out to be. |
| 6 | A.   Yes. |
| 7 | MR. CLEVELAND:  Okay.  That's all I |
| 8 | have.  Thank you. |
| 9 | MR. ROBERTS:  Thank you.  I'm going to |
| 10 | move as quickly as I can.  And if |
| 11 | you'll allow me a little room, |
| 12 | Mr. Cleveland, rather than reading |
| 13 | all of the articles of |
| 14 | incorporation and the bylaws which |
| 15 | are marked in this case -- what |
| 16 | are the markings on them?  Did you |
| 17 | submit them in this case? |
| 18 | MR. CLEVELAND:  I did. |
| 19 | MR. ROBERTS:  I just want to refer to |
| 20 | them. |
| 21 | THE WITNESS:  The last is #5. |
| 22 | MR. CLEVELAND:  No.  #1 and #2. |
| 23 | MR. ROBERTS:  #1 and #2.  All right. |

151

```
 1                      EXAMINATION

 2    BY MR. ROBERTS:

 3    Q.   Ms. Dorsey, I've studied them, and I've had

 4         my co-counsel study them.  And,

 5         Mr. Cleveland, the only thing I can find

 6         about any duties in either of these about a

 7         vice president -- which I think we've

 8         established she was scrivener and vice

 9         president -- is that if the president dies or

10         is unable -- and I'm referring to Article

11         II -- Roman numeral II of the bylaws -- then

12         the vice president can perform other duties

13         of the corporation.  I may stand to be

14         corrected.  The two documents are in

15         evidence.

16              But assuming that there are no duties

17         set out in either -- for a vice president in

18         either of the I-65 Properties' articles of

19         incorporation or in the bylaws -- now, listen

20         to my question -- assuming that no duties are

21         prescribed, what duties would you think you

22         would be able to perform if they're not

23         authorized as vice president?
```

152

1    A.    I guess I could call a meeting and say I
2          don't know what the duties are.
3    Q.    All right.  But assuming there are no duties,
4          did Dick ever tell you what rights you had as
5          a vice president, i.e --
6    A.    No.
7    Q.    -- if you had any rights?
8    A.    No.
9    Q.    Okay.  Now, you've heard -- we went through
10         this complaint laboriously.  And I notice in
11         the complaint that you asked -- I'll start
12         with the factual allegations.  One of the
13         allegations in the facts is that Mr. Dorsey,
14         your brother, denied you meaningful
15         participation in the management of the
16         corporate affairs as required under Alabama
17         law.
18             If the vice president doesn't have any
19         prescribed duties in the bylaws or in the
20         articles of incorporation, do you believe you
21         had a right to, as we say here in the factual
22         allegations, have meaningful participation in
23         the management of the corporate affairs?

153

```
 1              MR. CLEVELAND:  Object to the form.

 2    Q.   Yes or no?

 3    A.   Yes.

 4    Q.   Okay.  You believe you were denied?

 5    A.   Right.

 6    Q.   Okay.

 7    A.   Correct.

 8    Q.   I'm sorry.  All right.  The next one in the

 9         factual allegations, Failed to allow you to

10         participate in annual stockholder meetings

11         directly or indirectly with the exception of

12         the meetings.

13              And if you'll tell me how many -- from

14         let's say 1990 to today, approximately how

15         many stockholder meetings did he allow you to

16         participate in, meaning Mr. Dorsey.

17              MR. CLEVELAND:  We'll see if her memory

18                   has improved.  She didn't remember

19                   when I asked her that question.

20              MR. ROBERTS:  It's because you're a bad

21                   guy, and I'm asking them sweet.

22              MR. CLEVELAND:  Maybe that's it.

23              THE WITNESS:  No.  You were very nice.
```

154

```
 1    Q.   Question, now.  See, you got off on that.

 2         I'm just asking you for an estimate from -- I

 3         want you to listen.  I don't think you

 4         listened to his questions.  From 1990 --

 5              MR. CLEVELAND:  Well, I think you know

 6                   she didn't.

 7    Q.   From 1990 --

 8              MR. CLEVELAND:  I didn't ask her but

 9                   six times -- I didn't ask until

10                   you objected.

11    Q.   From 1990 to the present as we sit here

12         today, will you tell this Court approximately

13         how many times you ever participated in any

14         meetings -- formal meetings -- I'm not

15         talking about Christmas and Thanksgiving --

16         formal meetings in regards to I-65 investment

17         properties -- or I-65 Properties

18         approximately?

19    A.   I went to the one in 2005.

20    Q.   No.  I'm going to ask you the question

21         again.  And we're going to stay here all day

22         if we have to.  I want you to listen.

23    A.   Okay.
```

155

```
 1    Q.   It's simple.  You either know or you don't.

 2         From about 1990 --

 3    A.   That's a long time ago.

 4    Q.   Okay.  That's a statement, not a question.

 5         From about 1990 to as we sit here today,

 6         approximately how many I'll call them formal

 7         meetings did you attend that were held --

 8         that was held by I-65?

 9    A.   One.

10    Q.   One.  Is that from '90 to today, one formal

11         meeting?

12    A.   To the best of my knowledge.

13    Q.   Okay.  Now -- all right.  While Ms. Lindsay

14         Erwin finds it, I'm going to direct your

15         attention --

16              MR. ROBERTS:  Cliff, I'm on the bylaws.

17    Q.   Now, I'm going to ask you to read it from

18         this one.  I want you to read Article VIII.

19              MR. CLEVELAND:  The bylaws have been

20                   offered twice.  The bylaws stand

21                   for themselves.

22              MR. ROBERTS:  Well, that's fine.  This

23                   is my turn.  You've been from nine
```

156

| | |
|---|---|
| 1 | o'clock until one.  Let me have -- |
| 2 | MR. CLEVELAND:  And you were all day |
| 3 | long yesterday. |
| 4 | MR. ROBERTS:  No -- |
| 5 | MR. CLEVELAND:  I mean, I know what -- |
| 6 | I know what you're trying -- |
| 7 | MR. ROBERTS:  Cliff -- |
| 8 | MR. CLEVELAND:  I know what you're |
| 9 | trying -- |
| 10 | MR. ROBERTS:  Well, let me do it. |
| 11 | MR. CLEVELAND:  Well, do it right, |
| 12 | though. |
| 13 | MR. ROBERTS:  Okay.  I'm going to ask |
| 14 | her to read it. |
| 15 | Q.  Read Article VIII out loud for the court |
| 16 | reporter. |
| 17 | A.  The books of the corporation shall be audited |
| 18 | once a year at the close of the fiscal year |
| 19 | by a disinterested auditor who shall prepare |
| 20 | a balance sheet. |
| 21 | Q.  Okay.  Now, my question -- which he's done a |
| 22 | great job of trying to keep me from asking |
| 23 | it -- do you know if these bylaws were |

157

```
1        complied with?  Did Dick ever give you an

2        audited copy by a disinterested auditor of

3        the books of I-65?

4   A.   No.

5   Q.   No.  Is that one of the reasons you feel like

6        that you were squeezed out, pushed out?  And

7        your whole testimony was I never got a real

8        accounting.  Was that what you said earlier?

9   A.   Correct.  Yes.

10  Q.   Do you believe you have a right, as a

11       minority stockholder, to rely on the bylaws

12       of the corporation?

13  A.   Yes.

14  Q.   Okay.  The same article says they will

15       prepare a profit and loss statement.  Did you

16       ever get a profit and loss statement?

17  A.   No.

18  Q.   Okay.  Do you know what a profit and loss

19       statement is?  Income, expenses; that's what

20       a profit and loss statement is.

21  A.   Other than that (indicating).

22  Q.   Okay.  And are you referring to what I'll

23       call a recapitulation that was provided in
```

158

1          2005?

2     A.   Yes.

3     Q.   And that recapitulation, as I'll call it,

4          went back to 1990, correct?

5     A.   Yes.

6     Q.   Okay.  Or '91.  To that date, other than what

7          I'll call the recapitulation which is in

8          evidence, you never got these things

9          annually, meaning '91 --

10    A.   No.

11    Q.   -- '92; is that right?

12    A.   '93 --

13    Q.   All the way through.  Do you consider a

14         majority stockholder, Dick Dorsey,

15         responsible to abide by the bylaws of this

16         corporation?

17              MR. CLEVELAND:  Object to the form.

18    Q.   You can answer.

19    A.   Yes.

20    Q.   Did he abide by the bylaws of this

21         corporation in your opinion?

22    A.   No.

23    Q.   Did he make every effort in his ability to

159

```
 1            freeze you out, coerce you, frighten you by

 2            telling you that you personally -- now,

 3            remember, personally -- would owe $500,000?

 4                 MR. CLEVELAND:  I object.  She'd have

 5                      absolutely no way of knowing.  She

 6                      can have an opinion.

 7                 MR. ROBERTS:  Your objection is there.

 8       Q.   I'll ask you your opinion.

 9                 MR. CLEVELAND:  But she would have no

10                      way of knowing -- she would have

11                      no way of knowing whether he made

12                      every effort.  And that was your

13                      question.  It's beyond her mental

14                      capacity to reach that conclusion

15                      and even have an opinion on it.

16                 MR. ROBERTS:  Okay.  Withdraw the

17                      question.  And I'm going to re-ask

18                      it.  And I'm going to give you a

19                      continuing objection in any form

20                      you want.

21                 MR. CLEVELAND:  I will object to the

22                      question as presented.  I don't

23                      need a continuing objection.
```

1    Q.  Do you believe that Mr. Dorsey, the majority

2         stockholder's failure to provide what is

3         required in the bylaws -- a balance sheet and

4         a profit and loss statement -- for

5         potentially a period of from 1990 to 2005

6         constitutes an abuse of his power as the

7         majority stockholder, yes or no?

8    A.  Yes.

9    Q.  Am I right -- now, I'm like Mr. Cleveland.  I

10       want to really tie it down, the issue of how

11       many formal stockholders meetings were held.

12       I've already asked it to you.  But in

13       fairness to Mr. Dorsey, from 1990 to around

14       2005, how many stockholder meetings were

15       noticed per the minutes of the bylaws and

16       attended by you?

17    A.  None.

18    Q.  Okay.  Ms. Dorsey, is the fact that he never

19       noticed you during that 15 year period --

20       whatever it is -- part of the allegations of

21       your complaint that he was attempting to

22       freeze you out, keep you out of the business,

23       and keep you uninformed, yes or no?

161

```
 1    A.   Yes.
 2    Q.   Okay.  You heard Mr. Dorsey say yesterday in
 3         his testimony that the reason that the
 4         beautiful big sign on the property, the
 5         billboard, that the income is not flowing
 6         from Lamar Advertising to I-65 was because
 7         his son had the permit for the sign?  Did you
 8         hear him say that?
 9    A.   Yes.
10    Q.   Did you notice that there was a significant
11         difference -- I don't know the exact fact,
12         but it seems like I-65 gets about $600 a
13         year; and his son, who I think is eight years
14         old, is getting $600 a month or $5,400 a
15         year.  Did you hear that testimony?
16    A.   Yes.
17    Q.   Did it cross your mind as to whether or not
18         Mr. Dorsey could have acquired a permit for
19         the sign in the name of his company, I-65
20         Properties, rather than his son?  Did that
21         raise any question in your mind?
22    A.   Yes.
23    Q.   Did that likewise raise any question in your
```

162

1          mind as related in this complaint that the

2          profits of I-65 have been diverted by your

3          brother, Mr. Dorsey, from I-65 to his son?

4     A.   Yes.

5     Q.   Okay.  You heard your brother's testimony

6          yesterday; is that correct?

7     A.   Yes.

8     Q.   If I were to summarize his testimony with

9          regard to the I-65 option on the four tracts

10          of property contiguous to and across from

11          east of the service road, would I be correct

12          in saying that he said that I-65 did have an

13          option on those four tracts at one time?

14               MR. CLEVELAND:   Object to the form.

15     Q.   You can answer it.

16     A.   Yes.

17     Q.   Were you aware that I-65 had an option on

18          those four tracts?

19     A.   No.

20     Q.   Were you aware that Mr. Dorsey, the majority

21          stockholder, either allowed them to expire or

22          transferred them to a corporation known as

23          Connie, Dick & Others, or an LLC or some

163

1          entity, CD&O?

2     A.   Was I aware?  No.

3     Q.   Is that fact alone sufficient grounds for

4          your lawsuit against a majority stockholder

5          for diversion of corporate funds from I-65 to

6          himself or others?  Standing alone, is that a

7          basis for your complaint that he has diverted

8          funds and opportunity from I-65, yes or no?

9               MR. CLEVELAND:  Object to the form and

10                   the question.

11    Q.   You can answer.

12    A.   Yes.

13              MR. CLEVELAND:  It calls for a legal

14                   conclusion.  And she would have no

15                   way of knowing whether it

16                   constituted grounds for a lawsuit

17                   or not.

18    Q.   Do you own or does I-65 own the four tracts

19         of property immediately east Mr. Mattress is

20         on?  Does I-65 or you own those tracts right

21         now?

22    A.   No.

23    Q.   Okay.  Did Mr. Dorsey tell you when he was

164

| | | |
|---|---|---|
| 1 | | buying the Well Spring Church property and |
| 2 | | offer you or I-65 the opportunity to buy |
| 3 | | them? |
| 4 | A. | No. |
| 5 | Q. | When did you first find out that he bought |
| 6 | | what we call the Well Spring property, which |
| 7 | | is on our Exhibit #7 to his deposition? |
| 8 | | That's the property south of the -- |
| 9 | A. | The church? |
| 10 | Q. | -- I-65 property. |
| 11 | A. | The church? |
| 12 | Q. | The property itself. |
| 13 | A. | Near the mattress place? |
| 14 | Q. | Yes.  No.  South of -- |
| 15 | A. | Oh, behind it? |
| 16 | Q. | No.  The property, as I saw this morning, |
| 17 | | that's immediately south of the I-65 property |
| 18 | | has what is known as a church.  I don't know |
| 19 | | what y'all called it, but as it sits today, |
| 20 | | it says Well Spring Church.  If I have to, I |
| 21 | | can get the map. |
| 22 | A. | No.  It's where the Suzuki dealership was. |
| 23 | Q. | Assume that.  Did you know that -- strike |

165

```
 1              that.  Did Mr. Dorsey either give the

 2              corporation, I-65, or you an opportunity to

 3              buy that property?

 4      A.      No.

 5      Q.      I think Mr. Dorsey indicated yesterday that

 6              one reason he did not think I-65 should or

 7              could buy it was because it had so much debt

 8              and couldn't afford it.  Is that your

 9              understanding of his testimony?

10      A.      Yes.

11      Q.      And that was his reason for not offering it

12              to yourself or the corporation; is that

13              correct?

14      A.      Yes.

15      Q.      You heard Mr. Dorsey's testimony, your

16              brother, stating that -- or asking, I guess,

17              did -- and you were questioned this morning

18              did you ever try to refinance the debt.  My

19              question is do you believe the majority

20              stockholder, Mr. Dorsey, had a duty as the

21              majority stockholder to try to refinance the

22              debt?

23      A.      Yes.
```

166

```
1    Q.   In other words, if the interest rate at

2         certain times was five and a half percent,

3         would the fact that he was charging -- his

4         company, Dorsey Motor Company, was charging

5         12 percent constitute wrongful conduct, in

6         your opinion, by him as the majority

7         stockholder?

8    A.   Yes.

9    Q.   Would that be even more so where it's his own

10        flesh and blood; it's you, his sister, that

11        he's charging?

12              MR. CLEVELAND:  Object to the form.

13   Q.   You can answer.

14   A.   Yes.

15   Q.   Did that hurt your feels?

16   A.   Yep.  Yes.

17   Q.   But you didn't find out about the 12 percent

18        until way late in the game, did you?

19   A.   Correct.

20   Q.   Okay.  You don't really understand the

21        difference sometimes between -- or do you

22        understand the difference between you as a 30

23        percent stockholder of I-65 and you as a
```

167

```
1           retired teacher?
2                I'll restate it.  I'm asking you what
3           led up to your agreeing to convey your share
4           to Mr. Dorsey in exchange for his forgiving
5           the debt.  Are you with me on that?
6     A.    Yes.
7     Q.    Okay.  Follow me.  When Mr. Dorsey -- or did
8           there come a time when Mr. Dorsey told you
9           that you -- and I mean you, not you as a
10          minority stockholder.
11    A.    Right.
12    Q.    -- owed 500,000 plus debt?
13    A.    Yes.
14    Q.    Did you understand that, at that time, you
15          never signed a note?
16    A.    Correct.
17    Q.    Did you understand at that time that you
18          might, as a result of his comment that you
19          owed it, lose your home, business?
20    A.    Yes.
21    Q.    Did that frighten you?
22    A.    Extremely.  Yes.
23    Q.    Did he ever tell you, Donna, the corporation
```

168

1      is the only one that owes the debt and the

2      worst that could ever happen is I, Dorsey

3      Motor, could foreclose on the corporation,

4      I-65, and take the property if it was a valid

5      debt?  Did he tell you that?

6   A.  No.

7   Q.  Did you understand that you would have no

8      personal liability if Mr. Dorsey -- and we're

9      assuming if he holds this to the year 2090,

10     the debt is going to increase.

11  A.  Yes.

12  Q.  Did he ever tell you that the worst you could

13     lose would be your share, your 30 percent of

14     the property?

15  A.  No.

16  Q.  Did he ever tell you that if he foreclosed on

17     the property, he, Dorsey Motor Sales, would

18     have ordinary income of approximately

19     $1,700,000?

20          MR. CLEVELAND:  Mr. Roberts, I mean,

21               you're --

22  A.  No.

23          MR. ROBERTS:  She can answer.

169

```
 1              MR. CLEVELAND:  Hey, no.

 2              MR. ROBERTS:  No?

 3              MR. CLEVELAND:  I'm going to object.

 4                   You're testifying for her.  You're

 5                   not asking --

 6              MR. ROBERTS:  I thought that was a

 7                   question.

 8              MR. CLEVELAND:  No, it wasn't.  You are

 9                   creating a scenario.  You are

10                   creating scenario.  I mean, you

11                   can ask her did he ever tell you

12                   you were going to go to the moon.

13                   I mean, it --

14    Q.    Did he ever tell you you were going to go to

15          the moon?

16    A.    No.

17              MR. CLEVELAND:  Did he ever tell you he

18                   was going to go to the moon?

19              MR. ROBERTS:  Did you want to object to

20                   that?  I allowed you free reins

21                   with her.  I let you run in an 80

22                   acre field with her and never

23                   objected but once.
```

170

```
1        MR. CLEVELAND:  I ran in an 80 acre

2              field and kept my questions

3              directed to the allegations before

4              us.  All you're doing is

5              testifying -- or attempting to

6              testify for her and creating these

7              scenarios and saying follow me,

8              follow me, and she's sitting there

9              saying yes and no.  She hasn't

10             given a substantive answer yet.

11       MR. ROBERTS:  Oh, really?

12       MR. CLEVELAND.  No.  That's my opinion.

13       MR. ROBERTS:  Well, when you said no,

14             that strikes me as being a

15             substantive answer.

16       MR. CLEVELAND:  Well, I thought you

17             said her answers were I don't

18             know, maybe.  But --

19       MR. ROBERTS:  Maybe I'm making the

20             questions where she can understand

21             them.  All I'm saying --

22       MR. CLEVELAND:  No, what you're doing

23             is you are --
```

171

```
 1              MR. ROBERTS:  I consider you a good
 2                  lawyer.  And you are --
 3              MR. CLEVELAND:  -- attempting to
 4                  testify for her.  And it's totally
 5                  improper.
 6              MR. ROBERTS:  Well, let me try to see
 7                  if I -- I don't think I was.  But
 8                  let's go forward, and let me ask
 9                  her straight questions.  I'm not
10                  giving her answers.  I'm asking
11                  her straight questions.  And
12                  here's one, for example.
13     Q.   Have you been kept in the dark and not
14          allowed to participate in the day-to-day
15          decisions of I-65 Properties?
16              MR. CLEVELAND:  And I would object to
17                  the form of that.
18     Q.   And you can answer, Donna.
19              MR. CLEVELAND:  You know, what does
20                  keep in the dark -- kept in the
21                  dark mean?
22     Q.   You can answer.
23              MR. ROBERTS:  And you can object to
```

172

```
 1              form.

 2      Q.   You may answer the questions.

 3      A.   Yes.

 4      Q.   And is that one of the basis of your --

 5           continuing basis of your complaint against

 6           the majority stockholder:  That he has failed

 7           to inform you, failed to hold regular

 8           meetings, failed to audit the balance sheet

 9           as required by the bylaws, failed to provide

10           profit and loss statements?  Are those some

11           of the allegations in your complaint?

12      A.   Yes.

13      Q.   Does transferring -- I think I've already

14           asked you, but I want to keep it simple for

15           Mr. Cleveland.  Does obtaining a lease for

16           his son on a billboard which creates revenue

17           for his son and not for I-65 in your opinion

18           constitute all through your complaint an

19           abuse by him as majority stockholder?

20      A.   If that's true, yes.

21      Q.   Okay.  If he testified to that yesterday, do

22           you have any reason to disagree with your

23           brother's testimony that that's what he did?
```

173

```
 1    A.   No.

 2    Q.   Just skipping around.  But, now, we talked

 3         about your husband, Jack's real estate

 4         license.  And you testified he wasn't a

 5         broker.  During the period of time he had his

 6         license in Birmingham, did he sell

 7         residential or commercial properties?

 8    A.   Residential.

 9    Q.   And at no time did he sell or lease

10         commercial properties?

11    A.   No.

12    Q.   Meaning no, he didn't sell commercial?

13    A.   No, he didn't sell.  He did residential.

14    Q.   In fact, approximately how many sales, if you

15         know, did Jack have during his tenure with

16         his real estate license of properties?

17    A.   I don't know.

18    Q.   More than ten?

19    A.   Yes, I believe so.

20    Q.   Okay.  Did you consider it your duty as a

21         minority stockholder to go out and shop for

22         interest rates to reduce the 12 percent loan

23         individually?
```

174

| | | |
|---|---|---|
| 1 | A. | I didn't know that there was a 12 percent |
| 2 | | loan. |
| 3 | Q. | I'm saying after you found out it was. |
| 4 | | Mr. Cleveland asked you this morning if you |
| 5 | | made any attempt individually to refinance |
| 6 | | the 12 percent debt. |
| 7 | A. | No. |
| 8 | Q. | Okay.  And I'm asking you whose duty did you |
| 9 | | consider it in the corporation, based on |
| 10 | | minutes and the articles of incorporation, to |
| 11 | | try to reduce the interest rate? |
| 12 | A. | My brother. |
| 13 | Q. | You're referring to the defendant, Mr. Dick |
| 14 | | Dorsey? |
| 15 | A. | Yes. |
| 16 | Q. | Did you hear Mr. Dorsey testify yesterday, |
| 17 | | when I asked him if he got a contract for the |
| 18 | | purchase of the property, what he would do |
| 19 | | with it?  At the risk of missummarizing it, |
| 20 | | he said I would look at it and decide whether |
| 21 | | or not to accept it.  Do you think that's a |
| 22 | | fair recantation of his testimony? |
| 23 | A. | Yes. |

175

1     MR. CLEVELAND: Object to the form.

2 Q. You can answer it.

3 A. Yes.

4     MR. CLEVELAND: Well, first, she hasn't

5       even acknowledged that she

6       recalled the testimony.

7 Q. Okay.  Do you recall the testimony?

8 A. Yes.

9 Q. Okay.  Do you also recall that he adamantly

10  stated numerous times that he did not intend

11  to get an appraisal of the property?

12 A. Yes.

13 Q. Do you think that considering a contract

14  solely by Mr. Dorsey based on his extensive

15  knowledge of real estate is a prudent thing

16  for the majority stockholder to do when

17  considering a contract absent having the

18  property appraised?

19 A. Yes.

20 Q. Okay.  You think it is prudent to consider

21  the contract and not have the property

22  appraised?

23 A. Oh, no.

176

1       MR. CLEVELAND:  You gave the wrong

2            answer, Ms. Davis.

3       THE WITNESS:  I did.

4       MR. CLEVELAND:  Yeah, you gave the

5            wrong answer.

6       THE WITNESS:  Yeah.  At this point --

7       MR. CLEVELAND:  I'm disappointed in

8            you.

9       MR. ROBERTS:  No, I think it's fine.

10           She gave the --

11      THE WITNESS:  No.  No.  No.

12      MR. ROBERTS:  You benefited from it.

13           Maybe --

14      THE WITNESS:  Can I just say -- oh, I

15           have to say yes or no.

16      MR. CLEVELAND:  She gave the wrong

17           answer.

18      MR. ROBERTS:  Well, let's just put

19           this --

20      MR. CLEVELAND:  He's trying to hand

21           feed you.  All you got to do is

22           say yes or no instead of my I

23           don't know, I don't remember, I

177

```
 1                    don't recall.

 2              MR. ROBERTS:  Go slow so she can get

 3                    it.

 4              MR. CLEVELAND:  Oh, she can get it.

 5                    She's good.

 6         Q.    In fact, Ms. Dorsey, it's good that he said

 7              hand feed, because I noticed when you were

 8              answering questions, every answer to the

 9              question he asked you was contained in the

10              complaint.  Specifically like why did he do

11              this, and said he did this because.  But

12              that's okay.  He hand fed you a little bit;

13              maybe I'll hand feed you.

14              MR. ROBERTS:  All right.  And I will

15                    point out for Mr. Cleveland that

16                    my client teared up twice where

17                    yours didn't, and perhaps she is

18                    under a little emotional pressure

19                    and maybe didn't understand either

20                    of our questions.  But let's go

21                    ahead.

22              MR. CLEVELAND:  Appreciate you pointing

23                    that out to me.  I missed it.
```

178

```
 1              MR. ROBERTS:  Okay.  Well, you were too

 2                  busy laughing.

 3              MR. CLEVELAND:  No, I was laughing at

 4                  you is what I was laughing at.

 5              MR. ROBERTS:  Oh, okay.  Off the

 6                  record.

 7                  (Off-the-record discussion)

 8      Q.   So would you say, Ms. Dorsey -- Ms. Davis,

 9           excuse me, that Dick's testimony yesterday

10           that you heard, when one reads it in his

11           deposition, without me summarizing all of it,

12           that his testimony alone is a basis for your

13           allegation of freeze out, failure to keep

14           informed, all of the allegations in your

15           complaint?

16      A.   Yes.

17      Q.   You're a retired school teacher, aren't you?

18      A.   Yes.

19      Q.   And Mr. Cleveland is an accomplished lawyer.

20           You said you liked him, didn't you?

21      A.   Yes.

22      Q.   Okay.  That's the two yeses.  You like him

23           and he's an accomplished lawyer, right?
```

179

```
 1     A.   Yes.

 2     Q.   Okay.  When he went over this complaint with

 3          you, you didn't draft the complaint yourself,

 4          did you?

 5     A.   No.

 6     Q.   You simply gave -- did you give information

 7          to your lawyer at that time, Ms. Erwin, upon

 8          which she put all the legalese of what we'll

 9          call your grievances against Dick?

10     A.   Yes.

11     Q.   Okay.  So when he -- I won't say grilled, but

12          when he went over that complaint with you and

13          asked you all these questions, although

14          you're not on any drugs, were you in a total

15          state of confusion, yes or no, as to legal

16          terms?

17     A.   Yes.

18     Q.   Okay.  Now, at the time the alleged

19          promissory note was signed, it was signed by

20          Dick Dorsey, 70 percent stockholder and

21          president, and his, at that time, wife,

22          Connie Dorsey; is that right?

23     A.   Yes.
```

180

1    Q.    Okay.  Since neither the bylaws or the

2          articles of incorporation provide for any

3          duties of the vice president, is it your

4          opinion that that's why they didn't ask you

5          to sign the note?

6                MR. CLEVELAND:  I object to the form.

7                      She would have no way of knowing

8                      the mental operation of either

9                      Dick or Connie Dorsey.

10   Q.    Okay.  Did the fact that you didn't sign the

11         note, in your opinion, give rise to the fact

12         that you didn't know about such a note until

13         much later?

14               MR. CLEVELAND:  Object to the form.

15   A.    Yes.

16   Q.    You can answer.  Answer.

17   A.    Yes.

18   Q.    Okay.  Mr. Cleveland opened the door as to

19         had you ever -- how many times, was his

20         question, had you sued your brother?  Did you

21         hear him ask you that?

22   A.    Yes.

23   Q.    And your answer was, to my knowledge, none,

181

```
 1              correct, other than this one?
 2    A.   Yes.
 3    Q.   Okay.  Did there come a time when a lawyer,
 4              Mr. Robert Faulk, was appointed by the Court
 5              to oversee your mother's affairs?
 6    A.   Yes.
 7    Q.   As a result of that appointment, did
 8              Mr. Faulk, as conservator, sue your brother
 9              on behalf of your mother?
10    A.   Yes.
11    Q.   Were the allegations of that complaint that
12              Mr. Dorsey had defrauded your mother?
13    A.   Yes.
14    Q.   Were the allegations of that complaint that
15              by defrauding your mother of stock in a
16              dealership, it consequently defrauded you as
17              a future beneficiary?
18    A.   Yes.
19    Q.   Did there come a time when Mr. Dorsey,
20              through his lawyers -- I believe this firm --
21              I'm not going to get into the amount, but
22              that he settled by repaying money to your
23              mother's estate?
```

182

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Do you feel like that as a result of his |
| 3 | | actions and his admission by settling the |
| 4 | | case, that he is attempting here to recoup |
| 5 | | some of the money he had to pay as a result |
| 6 | | of the allegations of defrauding his mother? |
| 7 | A. | Yes. |
| 8 | | MR. CLEVELAND: Object to the form. |
| 9 | Q. | You can answer. |
| 10 | A. | Yes. |
| 11 | Q. | What kind of relationship do you have |
| 12 | | presently with your brother, if any? Just |
| 13 | | describe it. Good, bad? |
| 14 | A. | None. |
| 15 | Q. | Do you love your brother? |
| 16 | A. | I'll have to get back to you on that one. |
| 17 | Q. | Okay. There was a previous time when you |
| 18 | | said even though -- in a deposition -- |
| 19 | A. | That's true. |
| 20 | Q. | -- you said you loved him, didn't you? |
| 21 | A. | Yes. |
| 22 | Q. | Mr. Cleveland opened the door again -- and |
| 23 | | I'm glad he did -- to ask you all about what |

1        you wanted in this lawsuit.  I think you've

2        already testified you'd like for Mr. Dorsey

3        to get an independent MAI appraisal; is that

4        correct?

5    A.  That would be nice.

6    Q.  And that would help you, as a minority

7        stockholder, to make up your mind as to

8        whether or not -- if he presents an offer to

9        you, whether or not to accept it or reject

10       it; is that right?

11   A.  Yes.

12   Q.  Okay.  Do you think failing to have the

13       property appraised in all these years with

14       the massive -- I think the Court will take

15       notice of the massive growth at this

16       intersection -- probably the most in the

17       state -- is negligence on his part not having

18       an appraisal?

19   A.  Yes.

20   Q.  I'm going to ask you this, Ms. Dorsey --

21       Ms. Davis.  I'm conceding that after he told

22       you you personally -- you perceived that you

23       personally would owe 500,000 plus debt; is

184

```
1              that correct?

2      A.     Yes.

3      Q.     That's your earlier testimony.  And I think

4              you testified that it frightened you; isn't

5              that right?

6      A.     Definitely.  Yes.

7      Q.     So at that point, all you wanted was out; is

8              that correct?

9      A.     Yes.

10     Q.     You hadn't spoken to a lawyer?

11     A.     No.

12     Q.     Or an accountant?

13     A.     Nope.

14     Q.     And Dick wrote you at a point and said it

15             sounds good, right?

16     A.     I called him, and he said it sounds good.

17     Q.     Okay.

18     A.     But that he had to talk to his accountant.

19     Q.     As majority stockholder and you minority, him

20             president, you vice president with no duties

21             that I can see prescribed, would he have had

22             a better opinion -- and this is in your

23             opinion -- of the market value of the
```

185

| | | |
|---|---|---|
| 1 | | property and thus whether it was a good deal |
| 2 | | for the minority stockholder, meaning you, to |
| 3 | | sell out to him? |
| 4 | A. | Yes, I think so. |
| 5 | Q. | Did he suggest to you, Donna, I want to be |
| 6 | | fair with you so let's get the property |
| 7 | | appraised and that way I can buy your share |
| 8 | | for the debt?  Did he suggest that? |
| 9 | A. | No. |
| 10 | Q. | In fact, he's basically been camped out on |
| 11 | | this property on one side of the freeway or |
| 12 | | another for years, hasn't he?  The Suzuki |
| 13 | | dealership, Victory.  He's been here almost |
| 14 | | every day of his life in Prattville, Alabama |
| 15 | | except when he was traveling; is that |
| 16 | | correct, to your knowledge? |
| 17 | A. | Yes. |
| 18 | Q. | Adult life I should say.  And I think the |
| 19 | | record shows that for many of these years, |
| 20 | | you lived either in Greenville or Birmingham; |
| 21 | | is that correct? |
| 22 | A. | Atlanta. |
| 23 | Q. | So you -- |

```
1    A.   Birmingham.

2    Q.   You, as a minority stockholder, would have

3         had very little opportunity to observe the

4         growth or, for that matter, what was going on

5         with the I-65 property; is that correct?

6    A.   Yes.  When I came down to take care of mamma

7         I certainly -- I mean, I certainly saw

8         changes when we would visit.  But when it

9         really started booming --

10   Q.   Now, that's interesting.  When you came down

11        to take care of mamma.  I think you testified

12        on direct that your mother suffered a serious

13        stroke; is that correct?

14   A.   Yes.

15   Q.   Approximately how long did you take care of

16        mamma?  From the time of the stroke to her

17        death, approximately how long was that?  How

18        long did you actually take care of her?

19   A.   Almost nine years.

20   Q.   Did you hire sitters during that time?

21   A.   Yes.

22   Q.   Did you sit yourself?

23   A.   Yes.
```

187

```
 1      Q.   Did you drive back and forth from Birmingham

 2           in order to do that?

 3      A.   Yes.

 4      Q.   Approximately how many times, if you had to

 5           guess, over nine years did you sit with your

 6           mother, you personally?

 7      A.   I have a record of it, but I -- I don't know.

 8      Q.   Approximately how many times?

 9      A.   I don't know.

10      Q.   Okay.  Did you ever charge --

11      A.   I came every week.  And -- and depending --

12           the first three years, I don't know.  I

13           really need to look at the records.

14      Q.   Did you ever charge -- now, I'm not talking

15           about expenses.  Did you ever charge an

16           hourly rate for sitting with Mr. Dorsey's

17           mother?

18      A.   No.

19      Q.   What hourly rate were the sitters paid?

20      A.   At what -- I mean, through the nine years?

21      Q.   Most any time.  An average.  Average, if you

22           know.

23      A.   In the beginning -- the very beginning, it
```

188

```
 1          went from $5.  At the end, Annitta was making

 2          $11 an hour.

 3    Q.    Okay.

 4    A.    Others made eight and six.

 5    Q.    Is it your testimony you never charged hourly

 6          rates for sitting with your mother?

 7    A.    Yes.

 8    Q.    Yes, you charged, or, no --

 9    A.    No, I did not charge.

10    Q.    All right.  Now, Mr. Dorsey testified that he

11          talked to you on numerous times.  I don't

12          think he ever went to say that it was

13          actually a meeting.  But you heard him say

14          that he talked with you from time to time at

15          your mother's house.  Did you hear him

16          testify to that?

17    A.    At Thanksgiving and Christmas or something?

18    Q.    Yes.

19    A.    Yes.

20    Q.    Did you consider those, per the bylaws and

21          the articles of incorporation, to be formal

22          stockholders meetings?

23    A.    No.
```

189

```
1    Q.   Okay.

2    A.   If it happened.

3    Q.   Ms. Davis, final question.  Do you believe

4         that not only as your brother but as the

5         majority stockholder, that Mr. Dick Dorsey

6         has a duty to treat you fairly as a minority

7         stockholder in I-65?

8    A.   Yes.

9    Q.   Do you believe that he did treat you fairly?

10   A.   No.

11              MR. ROBERTS:  Any follow-up,

12                   Mr. Cleveland?

13                   EXAMINATION

14   BY MR. CLEVELAND:

15   Q.   Ms. Davis, I understood one of your responses

16        to be that you want Dick to buy you out; is

17        that right?  Out of the property?

18   A.   I think that is a nice possibility.

19   Q.   Is that why you want the appraisal, so he can

20        buy you out?

21   A.   I want the appraisal to know what the land is

22        worth.

23   Q.   Do you have someone that's interested in the
```

190

```
 1          land?

 2     A.   Me personally, no.

 3     Q.   Well, has anyone told you that they were

 4          interested in the land?

 5     A.   No.

 6     Q.   Okay.  But you want -- you're just kind of

 7          wondering what it's worth?  Is that what

 8          you're telling us?

 9     A.   Exactly.

10     Q.   Don't you agree with me -- or wouldn't you

11          agree with me that it would be much more

12          appropriate to have an appraisal done when

13          you have someone that is a legitimate buyer

14          than just to randomly have appraisals done

15          and incur those expense on a periodic basis?

16     A.   I think, due to the number of years, it would

17          be very smart to have an appraisal of the

18          land at this point.

19     Q.   To use in what way?  How are you going to

20          utilize the appraisal?

21     A.   Well, I think when -- when you own 30 percent

22          of something and you don't know what it's

23          worth, that that's not very good.  I think
```

191

```
 1            anybody would want to know what it's worth.

 2      Q.    Have you --

 3      A.    An owner.

 4      Q.    Have you ever asked Dick to have an appraisal

 5            done, yes or no?

 6      A.    I have to think.  I can't just say no, I

 7            didn't.  And then what if I had?  And then

 8            I've answered you, and then I really don't

 9            know.

10      Q.    Well, you had a real fast yes or no to

11            Mr. Roberts' questions.  I just thought maybe

12            you could give me a real fast yes or no.

13      A.    Well, you asked me about something did I, you

14            know.

15      Q.    Yeah.  Did you ever ask him to have an

16            appraisal done, yes or no?

17      A.    Not to my knowledge, no.

18      Q.    Okay.  Did you ever ask him for a copy of an

19            audit, yes or no.

20      A.    That's what I thought we got in the meetings.

21      Q.    Did you ever ask him for a copy of an audit,

22            yes or no?

23      A.    Yes.
```

1    Q.    When?

2    A.    I don't know.  I don't recall.

3    Q.    Don't recall.  Maybe, perhaps.  Did you ever

4          ask him for a financial statement, yes or no?

5    A.    Yes.

6    Q.    When?  Don't recall, correct?

7               MR. ROBERTS:  Now, we'll move -- it's

8                    okay for her to ask you questions,

9                    but you don't ask and answer them,

10                   okay?  I can direct you to Article

11                   VIII of the bylaws, which --

12   Q.    Did you understand as a shareholder that you

13         had the right to call a shareholder meeting?

14   A.    No, I didn't.

15   Q.    Did not know that.  Did you understand that

16         as a shareholder that you had a right to ask

17         for a copy of the profit and loss or any

18         other corporate records?

19   A.    We did request -- it was requested, but it

20         didn't happen.

21   Q.    Okay.

22   A.    It was asked for, but it didn't -- there was

23         no response.

193

```
 1    Q.    Do you recall the correspondence back to your

 2          attorney, Ms. Erwin, that said that you or

 3          your auditor or anyone could go up to Alan

 4          Taunton's office and go through any of these

 5          records whenever you wanted?  Do you recall

 6          that correspondence?

 7    A.    No.

 8                MR. ROBERTS:  It's in this one.

 9                     Mr. Cleveland, I'll submit there

10                     has been a document in evidence

11                     where Mr. Taunton responded and

12                     said if there are any other

13                     questions, you can come to my

14                     office and I'll go over them with

15                     you.

16                MR. CLEVELAND:  That was my

17                     recollection, but I can't see

18                     that.

19                MR. ROBERTS:  Well, you're correct.

20                MR. CLEVELAND:  I can't see that.

21                MR. ROBERTS:  And somewhere, as her

22                     attorney, I'll remind her that

23                     there is a document perhaps in the
```

194

```
1                          rest of those exhibits.  But in

2                          the interest of time, that

3                          Mr. Taunton -- now, it did come at

4                          a matter of time, maybe 2005 or --

5                    MR. CLEVELAND:  Yeah.  Well, I want her

6                          to look at it.  Perhaps it will

7                          refresh her recollection as to

8                          some other issues.

9                              I'm going to come over and

10                         look over her shoulder if I may.

11                   MR. ROBERTS:  Sure.  You may approach

12                         the witness.

13     Q.    I didn't ask you about this.  I'm glad

14           Mr. Roberts reminded me of it.  Do you recall

15           this exhibit from yesterday?

16     A.    Yes.

17     Q.    Okay.  Did your attorney forward a copy of

18           that correspondence to you in February of

19           '06?

20     A.    I think so, yes.

21     Q.    Okay.  The correspondence says that on

22           October the 18th of 2003, he sent you copies

23           of the tax returns for '98, '99, 2000, 2001,
```

195

| | | |
|---|---|---|
| 1 | | and 2002.  Do you acknowledge receipt of |
| 2 | | those tax returns? |
| 3 | A. | You'd have to talk to my husband. |
| 4 | Q. | Okay.  Do you have any recollection of |
| 5 | | receiving those tax returns? |
| 6 | A. | You'd have to talk to my husband. |
| 7 | Q. | Would your answer be, then, that you have no |
| 8 | | recollection? |
| 9 | A. | I have no recollection. |
| 10 | Q. | That's -- that was my -- |
| 11 | A. | That was 2003.  So -- |
| 12 | Q. | And that was my question.  Do you have any |
| 13 | | recollection? |
| 14 | A. | No. |
| 15 | Q. | And your answer is, no, I don't? |
| 16 | A. | No. |
| 17 | Q. | But I guess a follow-up to the answer would |
| 18 | | be, but my husband may know something about |
| 19 | | it? |
| 20 | A. | Yes. |
| 21 | Q. | Okay.  Now, he also says that the 2003 and |
| 22 | | 2004 -- and he didn't know if Mr. Dorsey had |
| 23 | | forwarded you a copy or not.  Do you see |

196

1       that?

2   A.   Yeah.   Okay.

3   Q.   Okay.   He said if he didn't, I'll be happy to

4        provide a copy.   Do you have any recollection

5        of asking for or receiving the '03 or '04 tax

6        returns for I-65?

7   A.   You'll have to ask Jack.

8   Q.   But you have no recollection of that?

9   A.   No.

10  Q.   He also says that it should be a fairly

11       straightforward task to verify the debt of

12       the company.

13  A.   Okay.

14  Q.   Did you make any effort, prior to filing this

15       lawsuit, to exercise that straightforward

16       task of verifying the debt of the company?

17  A.   You'll have to ask Jack.

18  Q.   Did you?

19  A.   No.

20              MR. ROBERTS:   Objection to the form of

21                   your question, because I don't

22                   know if debt includes expenses of

23                   cleaning the property or if you're

197

```
 1                    referring to debt meaning the
 2                    infamous note to brother Dick.
 3          MR. CLEVELAND:  I'm --
 4          MR. ROBERTS:  I'm just asking --
 5          MR. CLEVELAND:  She said that she had
 6                    received this correspondence.
 7          MR. ROBERTS:  I'm just asking you if
 8                    debt means -- if your question was
 9                    if debt means the note -- I'm not
10                    trying to be picky.  Just if it
11                    means the note or if debt of the
12                    corporation meant cost of cleaning
13                    the property, paying taxes, and
14                    things like that.
15          MR. CLEVELAND:  This is not my letter,
16                    so I don't know.
17          MR. ROBERTS:  Well, you can ask her --
18          MR. CLEVELAND:  Yeah.
19          MR. ROBERTS:  She can answer
20                    anything --
21    Q.    My real question is did you make any effort
22          to exercise this option for the debt,
23          whatever debt may mean?
```

198

```
 1    A.    Me personally --

 2    Q.    And I think the answer was no.

 3    A.    -- no.

 4    Q.    Okay.

 5    A.    Right.

 6    Q.    Okay.  And this is also -- I believe this --

 7          and Mr. Roberts was right.  This was the

 8          correspondence that I was thinking about.

 9          And he says if you want to come up and look

10          at the books or have your auditor audit the

11          books, you're welcome to do so.  Did anyone

12          exercise that option?

13    A.    You'll have to ask Jack.

14               MR. ROBERTS:  Just on a follow-up on

15                    that when you get through.  I

16                    wasn't rushing you.  We can

17                    follow-up on that.  We can do this

18                    all day.

19    Q.    You testified a moment ago to a question

20          presented to you by Mr. Roberts that learning

21          about the sign was the basis for your

22          lawsuit, did you not?  That in and of itself

23          would constitute the basis for your lawsuit?
```

199

```
1    A.   Is there any way we can play this thing
2         back?  Is that the question that he asked
3         me?
4              MR. ROBERTS:  Well, he asked you a
5                   question.  Just answer if you
6                   know.
7              THE WITNESS:  He's asking me a question
8                   that you asked me.
9    Q.   I'm following up on a question that he asked
10        you.  And I believe your answer was yes.
11   A.   Okay.
12   Q.   And the question related to testimony that
13        Dick gave yesterday.  Does that help refresh
14        your recollection any?
15   A.   Yes.
16   Q.   Okay.  Was that the first you knew about the
17        sign was yesterday?
18   A.   The TD&O Advertising?
19   Q.   Yeah.
20   A.   No.  And the -- I learned that in the 2005
21        meeting when I asked what TD&O was.
22   Q.   But he asked you a number of questions about
23        what Dick testified to yesterday.  Do you
```

200

1          recall those questions by Mr. Roberts?

2     A.   Just a minute ago?

3     Q.   Yeah, just a minute ago.

4     A.   Do I recall all of them?  Can I say what they

5          are right now?

6     Q.   No.

7     A.   No.

8     Q.   Just generally do you recall them?  I'm not

9          asking you to recite them.  I couldn't.

10    A.   Yes.

11    Q.   Okay.  Now, which of those did you have

12         knowledge of in August of '06 when you filed

13         this complaint?

14    A.   Which of what?

15    Q.   Of the various things that Dick testified to

16         yesterday that you said in and of themselves

17         would constitute grounds for you suing your

18         brother.

19    A.   I can't give you a day and a date.

20    Q.   Well, which ones?  Which items?

21    A.   The fact that I couldn't get the meetings and

22         not knowing what was going on.

23    Q.   What do you mean couldn't get the meetings?

201

| | | |
|---|---|---|
| 1 | | What do you mean by that? |
| 2 | A. | Notes from meetings -- the yearly meetings. |
| 3 | | I still haven't gotten them from the 200 -- |
| 4 | | the 2005 that I requested. |
| 5 | Q. | The minutes? |
| 6 | A. | As -- as far as I know, yes.  Yes. |
| 7 | Q. | He also asked you how much -- about how much |
| 8 | | time you spent with your mother and did you |
| 9 | | charge for that time.  Do you know what that |
| 10 | | has to do with this lawsuit?  I mean, if you |
| 11 | | do, tell me.  If you don't -- |
| 12 | A. | He said something about because you had said |
| 13 | | something he could ask that, I thought. |
| 14 | Q. | Do what?  That I did what? |
| 15 | | MR. ROBERTS:  Ask her a question. |
| 16 | | MR. CLEVELAND:  Well, I'm asking her to |
| 17 | | explain what she's saying.  I |
| 18 | | didn't understand her answer. |
| 19 | A. | You're asking me why he asked me that or how |
| 20 | | he -- |
| 21 | Q. | I'm asking you do you know or do you have an |
| 22 | | opinion as to what the relationship that -- |
| 23 | | how much time you spent with your mother |

1      would have to do with this lawsuit?

2              MR. ROBERTS:  That's a yes or no.

3   A.   No.

4   Q.   Okay.  I don't either.

5              MR. ROBERTS:  I can't tell him

6                 everything I know.

7   Q.   And you were in Atlanta and you were in South

8        Carolina and you were in Birmingham, and you

9        didn't have a clue that Prattville was

10       growing, did you?

11  A.   I said driving down here when it started

12       booming, yes, you could see that it was

13       growing.

14  Q.   When was that?

15  A.   When it started booming.  I don't know the

16       year.  I'm sure y'all do.

17  Q.   Well, I guess different people have different

18       opinions --

19  A.   Yes.

20  Q.   -- as to when the real boom hit.

21  A.   Basically, when I came to Prattville, I came

22       to mom and daddy's.

23  Q.   They lived over on Adell, didn't they?

203

```
 1    A.   What?

 2    Q.   They lived over on Adell?

 3    A.   Yes.

 4    Q.   Yeah.

 5    A.   Yes.  We didn't -- if we went -- I mean, we

 6         played golf sometimes.  But basically we were

 7         there.  It wasn't go out to restaurants and

 8         stuff.  It was stay at the house.

 9    Q.   So you were not aware of the growth that was

10         taking place out Main Street or Cobbs Ford or

11         out Highway 14 toward --

12    A.   As it gradually happened, yeah.

13    Q.   Okay.

14    A.   I mean, we'd go down to Hope's and downtown

15         and -- but we didn't -- it was simple

16         things.

17              MR. CLEVELAND:  Okay.  That's all I

18                   have.  Thank you.

19              MR. ROBERTS:  About two follow-ups.

20                        EXAMINATION

21    BY MR. ROBERTS:

22    Q.   He showed you -- Mr. Cleveland showed you a

23         February 3rd, 2006 letter with a marked
```

204

| | | |
|---|---|---|
| 1 | | Plaintiff's Exhibit #9.  And you're not sure |
| 2 | | if you got the tax returns.  Your testimony |
| 3 | | was, if I did, Jack would be able to answer |
| 4 | | that. |
| 5 | A. | Correct. |
| 6 | Q. | Okay.  Now, think with me.  Do you think that |
| 7 | | providing tax returns -- and we're assuming |
| 8 | | the date of the letter, February 3rd, 2006 -- |
| 9 | | for eight years ago -- meaning he says '98, |
| 10 | | '99, 2000, 2001, 2002 -- is that timely to be |
| 11 | | provided these tax returns? |
| 12 | | MR. CLEVELAND:  Object to the form. |
| 13 | Q. | You can answer. |
| 14 | A. | No. |
| 15 | Q. | Would it have been nice for the president to |
| 16 | | have authorized the accountant or perhaps |
| 17 | | even made a copy of the tax returns and |
| 18 | | mailed them to you? |
| 19 | A. | Yes. |
| 20 | | MR. CLEVELAND:  Object to the form. |
| 21 | Q. | Are you offended because he didn't? |
| 22 | | MR. CLEVELAND:  Object to the form. |
| 23 | A. | Yes. |

205

```
1     Q.   Is that part of your complaint in the --
2               MR. ROBERTS:   Continuing object to the
3                    form.
4     Q.   Is that part of the complaint contained in
5          the complaint you filed against your brother?
6               MR. CLEVELAND:   Object to the form.
7     A.   Yes.
8     Q.   Okay.  Now, I'm looking again at what I'll
9          call the bullet document, the bylaws.  And I
10         think bylaws -- and I think Mr. Cleveland
11         will admit that every stockholder is deemed
12         to know the bylaws of the corporation.  Do
13         you understand that?
14    A.   Yes, I do.
15    Q.   Okay.  When I think as I call it the bullet,
16         if -- I'm not an accountant, and you're a
17         school teacher.  But if the bylaws required
18         every single year that a balance sheet be
19         prepared, it is my understanding and I submit
20         to you that a balance sheet is the value of
21         the assets of the company less the
22         liabilities which gives you the net worth.
23         In other words, what we own, the value of
```

206

1      what we own, what we owe, and you're either

2      positive or negative somewhere down there.

3      Is that your understanding of a balance

4      sheet?

5           MR. CLEVELAND:  Object to the form.

6    A.  Yes.

7    Q.  Okay.  Do you consider the fact that -- well,

8        let me strike that.  Without an appraisal --

9        assuming Mr. Dorsey had followed the bylaws

10       of which he's the majority stockholder, how

11       could anyone know, to prepare a balance

12       sheet, what the value of the assets are

13       without an appraisal?  Help me with that.

14   A.  I don't know.

15   Q.  Do you think -- I guess I'm missing

16       something.  But perhaps Dick Dorsey had the

17       right to ignore, as majority stockholder,

18       Article VIII of the bylaws of the company.

19       Do you think he had a right to ignore that?

20           MR. CLEVELAND:  Object to the form.

21   A.  No.

22   Q.  Had he abided by that and provided you with

23       an audited, by a disinterested party, balance

207

```
 1          sheet, profit and loss statement during all

 2          of those years, do you think you'd have a

 3          complaint against him as we sit here today?

 4                  MR. CLEVELAND:  Object to the form.

 5     A.   No.

 6                  MR. ROBERTS:  She can answer it.

 7                  MR. CLEVELAND:  She did.

 8                  MR. ROBERTS:  No further questions.

 9                  MR. CLEVELAND:  I have none.

10                  MR. ROBERTS:  Thank you.  Thank you,

11              Mr. Dorsey.

12                      (The deposition concluded at

13                  2:02 p.m.)

14                  * * * * * * * * * *

15              FURTHER DEPONENT SAITH NOT

16                  * * * * * * * * * *

17

18

19

20

21

22

23
```

208

REPORTER'S CERTIFICATE

STATE OF ALABAMA

ELMORE COUNTY

    I, Dee Coker, Registered Professional Reporter and Commissioner for the State of Alabama at Large, hereby certify that on Tuesday, March 13, 2007, I reported the deposition of DONNA DORSEY DAVIS, who was first duly sworn or affirmed to speak the truth in the matter of the foregoing cause, and that pages 4 through 207 contain a true and accurate transcription of the examination of said witness by counsel for the parties set out herein.

    I further certify that I am neither of kin nor of counsel to any of the parties to said cause, nor in any manner interested in the results thereof.

    This 16th day of March, 2007.

DEE COKER, CSR, RPR
Commissioner for the
State of Alabama at Large

MY COMMISSION EXPIRES: 1/25/2009

*DUNN, KING & ASSOCIATES*
*Montgomery, Alabama*
*(334) 263-0261 or (800) 359-8001*

209

SIGNATURE OF WITNESS

1

2          I, DONNA DORSEY DAVIS, hereby certify

3     that I have read the transcript of my deposition

4     consisting of pages 4 through 207, and except for

5     the corrections listed below, certify that it is

6     a true and correct transcription.

7     _____

8     DONNA DORSEY DAVIS

9

10    SWORN TO AND SUBSCRIBED before me
      this _____ day of _____, 2007.

11

12    _____

13    NOTARY PUBLIC

14             * * * * * * * * * *

15    Page    Line    Correction and reason therefor

16

17

18

19

20

21

22

23

# Exhibit

## "B"

1

# ORIGINAL

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE MIDDLE DISTRICT OF ALABAMA

 3                       NORTHERN DIVISION

 4

 5       DONNA DORSEY DAVIS,

 6                    Plaintiff,

 7       vs.                          CASE NO. 2:06CV766-MHT

 8       RICHARD M. DORSEY, etc.,
         and CD&O, LLC, etc.,
 9
                      Defendants.
10

11

12

13              * * * * * * * * * *

14              DEPOSITION OF RICHARD M. DORSEY, taken

15       pursuant to stipulation and agreement before Dee

16       Coker, Registered Professional Reporter and

17       Commissioner for the State of Alabama at Large,

18       in the Law Offices of Cleveland & Colley, 744

19       East Main Street, Prattville, Alabama, on Monday,

20       March 12, 2007, commencing at approximately

21       10:03 a.m.

22              * * * * * * * * * *

23
```

2

1                          APPEARANCES

2      FOR THE PLAINTIFF:

3      Mr. James E. Roberts
       Attorney at Law
4      4908 Cahaba River Road
       Birmingham, Alabama  35243

5
       Ms. Lindsay Erwin
6      MEACHAM, EARLEY & FOWLER
       Attorneys at Law
7      1321 Broad Street
       Phenix City, Alabama  36867

8
       FOR THE DEFENDANTS:
9
       Mr. Clifford W. Cleveland
10     CLEVELAND & COLLEY
       Attorneys at Law
11     744 East Main Street
       Prattville, Alabama  36067

12
       ALSO PRESENT:
13
       Ms. Donna Dorsey Davis

14

15            * * * * * * * * * * *

16                    EXAMINATION INDEX

17     RICHARD M. DORSEY
           BY MR. ROBERTS                    5

18

19                     EXHIBIT INDEX

20     PLAINTIFF'S EXHIBIT NO.:

21     1    Certificate of Incorporation    9,167
            of I-65 Properties, Inc.

22
       2    Name Reservation Certificate    10
23          for I-65 Properties, Inc.

| 1 | PLAINTIFF'S EXHIBITS continued: | |
|---|---|---|
| 2 | 3 | Articles of Incorporation of I-65 Properties, Inc. | 10,11 |
| 3 | | |
| 4 | 4 | By-Laws of I-65 Properties, Inc. | 12 |
| 5 | 5 | 10/1/90 Promissory note by Richard M. Dorsey | 13,42 |
| 6 | | |
| 7 | 6 | 2/17/2000 letter to John Davis from Alan Taunton | 32,36 |
| 8 | 7 | Map | 63-65,69,83 89,91,97-99 |
| 9 | | | 106,129,177 |
| 10 | | | 180-185,190 223-224 |
| 11 | 8 | I-65 Properties expense spreadsheet for years 1990-2005 | 124,185 |
| 12 | | |
| 13 | 9 | 2/3/06 letter to Lindsay Erwin from Alan Taunton | 150,157 |
| 14 | | |
| 15 | 10 | 3/18/06 letter to Lindsay Erwin from Alan Taunton with attached closing statement, warranty deed, and promissory note | 157 |
| 16 | | |
| 17 | | |
| 18 | 11 | 1/17/06 letter to Donna Davis from Dick | 194 |
| 19 | 12 | Answer of Richard M. Dorsey and CD&O, LLC, and Counterclaim Against Donna Dorsey Davis | 202 |
| 20 | | |
| 21 | | |
| 22 | * * * * * * * * * * * | |
| 23 | | |

<pre>
 1                    STIPULATIONS

 2          It is hereby stipulated and agreed by

 3    and between counsel representing the parties that

 4    the deposition of RICHARD M. DORSEY is taken

 5    pursuant to the Federal Rules of Civil Procedure

 6    and that said deposition may be taken before Dee

 7    Coker, Registered Professional Reporter and

 8    Commissioner for the State of Alabama at Large,

 9    without the formality of a commission; that

10    objections to questions other than objections as

11    to the form of the questions need not be made at

12    this time but may be reserved for a ruling at

13    such time as the deposition may be offered in

14    evidence or used for any other purpose as

15    provided for by the Federal Rules of Civil

16    Procedure.

17          It is further stipulated and agreed by

18    and between counsel representing the parties in

19    this case that said deposition may be introduced

20    at the trial of this case or used in any manner

21    by either party hereto provided for by the

22    Federal Rules of Civil Procedure.

23              * * * * * * * * * *
</pre>

5

RICHARD M. DORSEY

1

2          The witness, having first been sworn to

3     speak the truth, the whole truth and nothing but

4     the truth, testified as follows:

5                         EXAMINATION

6     BY MR. ROBERTS:

7     Q.   Mr. Dorsey, my name is Jim Roberts.  I met

8          you a long time ago.  And this is Lindsay

9          Erwin.  And we're representing your sister

10         Donna in this case.  I don't usually go

11         through all the niceties; but if you don't

12         understand any questions, please let me

13         know.  I tend to ask long questions.  I'll

14         try to shorten them.  And I'll be glad to go

15         back and make them as quick as possible

16              I realize that a lot of things that have

17         happened in this case are years ago; and,

18         therefore, your memory may be not exactly up

19         to par.  So if possible, I'll try to make a

20         list of some documents.  We didn't ask you

21         for any documents at this time because we

22         didn't really know what to ask for.

23              So with that said, your full name is?

| | | |
|---|---|---|
| 1 | A. | Richard M. Dorsey. |
| 2 | Q. | Okay.  And where do you reside? |
| 3 | A. | 548 Selma Highway. |
| 4 | Q. | And how long have you lived at that address? |
| 5 | A. | 20 years. |
| 6 | Q. | Okay.  Tell me, Mr. Dorsey, are you currently |
| 7 | | employed? |
| 8 | A. | Yes. |
| 9 | Q. | And where? |
| 10 | A. | Victory Motor Company. |
| 11 | Q. | Okay.  And what is your position there? |
| 12 | A. | Landlord, general manager. |
| 13 | Q. | And what type of an operation is Victory? |
| 14 | A. | Chrysler Jeep Dodge dealership. |
| 15 | Q. | Okay.  And are you the sole owner? |
| 16 | A. | No. |
| 17 | Q. | Okay.  Who else is -- is it a corporation? |
| 18 | A. | I own the facility. |
| 19 | Q. | And you're the -- so when you said owner and |
| 20 | | manager, do you actually manage the |
| 21 | | dealership itself, the sales and that type of |
| 22 | | thing? |
| 23 | A. | I manage some of it, yes, sir. |

```
1    Q.   Okay.  And you don't own any stock in the
2         corporation Victory, meaning the Jeep dealer?
3    A.   No.
4    Q.   You don't.  Okay.  How long have you been
5         employed in that capacity?
6    A.   Since -- seven years.
7    Q.   All right.  And what did you do prior to
8         that?
9    A.   I was the dealer at Dorsey Motor Sales.
10   Q.   Okay.  And was Dorsey also a -- have a
11        recognized franchise, Chrysler or --
12   A.   Yes.
13   Q.   Is that right?  Okay.  And then there came a
14        time, I assume, when you sold Dorsey to
15        Victory; is that correct?
16   A.   No.  I sold it to Victory Motor Company in
17        Selma.
18   Q.   Okay.  And then did they eventually sell it
19        back to the current owner now?
20   A.   Yes.
21   Q.   And that was six, seven years ago?
22   A.   Yes, sir.
23   Q.   If you -- all right.  And in your capacity
```

8

```
 1              there, do you handle any financing of

 2              automobiles?  Just give me an idea of what

 3              you do as a manager, what your daily routine

 4              is like there.  Do you actually sell some

 5              automobiles?

 6     A.       I do whatever it takes to run a dealership.

 7     Q.       Okay.  And in that capacity, do you work with

 8              people -- district managers from Chrysler and

 9              the other franchises?

10     A.       No.

11     Q.       Who handles that function?

12     A.       Mr. Wagner.

13     Q.       Okay.  What's his first name?

14     A.       Lamar Wagner.

15     Q.       So is he actually owner of the franchise

16              itself?

17     A.       He's one of them.

18     Q.       Okay.  And who else?  Who are the other

19              owners?

20     A.       Mr. Taunton and Mr. Cleveland.

21     Q.       Okay.  Now, is it Alan Taunton?

22     A.       Yes, sir.

23     Q.       Okay.  And when you say Cliff, Mr. Cliff
```

|   |   |   |
|---|---|---|
| 1 |  | Cleveland, this -- your attorney? |
| 2 | A. | Yes. |
| 3 | Q. | All right.  Now, I understand that there came |
| 4 |  | a time -- and I want to get some documents in |
| 5 |  | because, as I said, most of this goes back to |
| 6 |  | the '90s.  And there came a time when there |
| 7 |  | was an incorporation of a company called I-65 |
| 8 |  | Properties, comma, Incorporated; is that |
| 9 |  | correct -- |
| 10 | A. | Correct. |
| 11 | Q. | -- to the best of your knowledge?  Okay.  I |
| 12 |  | call this housekeeping, just to get them in |
| 13 |  | so that when we question -- |
| 14 |  | MR. ROBERTS:  Here's a copy, |
| 15 |  | Mr. Cleveland.  Here's a copy of a |
| 16 |  | document, and we'll mark that |
| 17 |  | Plaintiff's #1, please. |
| 18 | Q. | Does that appear, to the best your knowledge, |
| 19 |  | to be a copy of the certificate of |
| 20 |  | incorporation of the company? |
| 21 | A. | Yes. |
| 22 | Q. | All right.  And I notice the date is the 9th |
| 23 |  | day of October, 1990, and it is sealed by the |

1       Judge of Probate and signed by the Judge of

2       Probate.  So for our purposes here today, we

3       can assume that this is a correct copy of the

4       certificate of incorporation; is that

5       correct?

6  A.  Yes.

7  Q.  All right.  Now, I likewise --

8          MR. ROBERTS:  Let me give your attorney

9             a copy of this.  We'll mark this

10            Plaintiff's #2.

11 Q.  I'll go ahead and give this to you.  This

12      appears to be a recognition by the Secretary

13      of State as to the name reservation for I-65

14      Properties, Inc.  Does that appear to be a

15      correct document to you?

16 A.  Yes.

17 Q.  Okay.  And it appears to be dated -- the name

18      was reserved September 24th of 1990.

19         MR. ROBERTS:  All right.  Plaintiff's

20            #3 in order.

21 Q.  I'll next show you a certificate -- excuse

22      me -- articles of incorporation which are

23      dated -- stamped by the Elmore County Circuit

11

| | | |
|---|---|---|
| 1 | | Court dated October 9th of 1990. And I'll |
| 2 | | represent to you that -- including the |
| 3 | | Exhibit B, that this is a copy of the |
| 4 | | subscription list and the articles of |
| 5 | | incorporation on I-65. |
| 6 | | MR. ROBERTS: That will be #3. |
| 7 | Q. | Take your time and -- okay. Does that appear |
| 8 | | to be a valid copy of the original articles |
| 9 | | of incorporation? |
| 10 | A. | Yes. |
| 11 | Q. | As far as you know, this corporation has not |
| 12 | | been changed. I understand there was, at |
| 13 | | some point, an LLC formed that bears a |
| 14 | | somewhat similar name; but this is still in |
| 15 | | effect, the corporation I-65 Properties, |
| 16 | | Inc.; is that correct? |
| 17 | A. | Yes. |
| 18 | Q. | Okay. I noticed besides Ms. Davis's name, |
| 19 | | your sister, and your name, Jo Anne Perry's |
| 20 | | name appears. Is Ms. Perry -- at one time, I |
| 21 | | understand she was employed by you; is that |
| 22 | | correct? |
| 23 | A. | Yes. |

```
 1    Q.    Is she still around or employed, or do you

 2          know?

 3    A.    Yes.

 4    Q.    And where does she work now?

 5    A.    At Victory.

 6              MR. ROBERTS:  All right.  That's going

 7                  to be #4.  This just appears to be

 8                  the bylaws of the I-65.  Take your

 9                  time if you would like to look at

10                  them.

11                      I do notice there's a few

12                  markings on there, and we'll

13                  stipulate that those are something

14                  that someone added afterwards.

15                      I do notice the RMD, the

16                  initials; and that would be

17                  Richard M. Dorsey -- in the

18                  right-hand corner.  We'll

19                  stipulate any handwritten or

20                  anything we don't know who did it

21                  and only as to the document as --

22                  nothing else is what we're

23                  contending is the original
```

13

| | | |
|---|---|---|
| 1 | | incorporation -- or the original |
| 2 | | bylaws. |
| 3 | Q. | Are those your initials, RMD, to the best of |
| 4 | | your knowledge? |
| 5 | A. | Yes. |
| 6 | Q. | Okay.  And absent -- and without regard to |
| 7 | | any markings that may be on it, it looks like |
| 8 | | there's some typos.  Well, the word on page 9 |
| 9 | | says, certificate property endorsed, someone |
| 10 | | has slashed in properly; but we will |
| 11 | | stipulate that anything other than the typed |
| 12 | | word is what you've signed.  And that is your |
| 13 | | signature attached hereto; is that correct? |
| 14 | A. | Yes. |
| 15 | Q. | Okay.  And that document is likewise dated |
| 16 | | the 1st day of October, 1990. |
| 17 | | MR. ROBERTS:  This will be Plaintiff's |
| 18 | | #5 in order. |
| 19 | Q. | Okay.  Does that appear to be a true and |
| 20 | | correct copy of a note signed October 1st, |
| 21 | | 1990, a promissory note from I-65 Properties |
| 22 | | to Dorsey Motor Sales, Inc.? |
| 23 | A. | Correct. |

14

```
1    Q.    Okay.  And it is attested by Connie Dorsey.

2          Now, I believe that was your -- she was your

3          wife at the time; is that correct?

4    A.    Yes.

5    Q.    Is she still -- does she still live in

6          Prattville?

7    A.    Yes.

8    Q.    And it shows you as president.  Who do -- who

9          is the current secretary of I-65 Properties,

10         Inc., if you know?

11   A.    I -- I'd have to look at the minutes.

12   Q.    Okay.  And who normally keeps the minutes?

13         Who drafts the minutes of I-65?

14   A.    Either Mr. Cleveland's office or my secretary

15         over at the dealership.

16   Q.    Is that Ms. Perry?

17   A.    Yes.

18   Q.    That is her.  Okay.  Now, I may be skipping

19         around a little bit; but I understand, just

20         for the record, that from about 1990, the

21         inception of the corporation, until maybe

22         2000 -- somewhere, give or take, around

23         2000 -- there were no minutes taken of the
```

15

```
1              corporation; is that correct?
2    A.   I haven't looked at my records, so I can't
3         answer that.
4    Q.   All right.  And how would we -- where are the
5         records of I-65 kept?
6    A.   Kept at the dealership.
7    Q.   Okay.  Kept in a file cabinet or --
8    A.   I would say so.
9    Q.   If your sister said that between the year --
10        from the inception of the corporation until
11        2000, there were no meetings held of the
12        corporation and she didn't receive any
13        correspondence during that period, would you
14        have any reason to disagree with that?
15   A.   I wouldn't think that would be correct.
16   Q.   Okay.  If I asked your attorney to provide
17        all the minutes and records and, of course,
18        at our expense, the copying, would you have
19        any problem with agreeing to furnish all the
20        minutes from the inception of the corporation
21        to the current date?
22   A.   No.
23   Q.   All right.  Let me see what else I need to
```

16

1      get, and then we'll go to some questions.

2          All right.  Now, I'm informed, back to

3      the I-65 investment -- and I'll just -- for

4      the record, I'll just call it I-65 -- that

5      there came a time in 1990 when Dorsey Motor

6      Sales was defending a lawsuit regarding the

7      running back of a speedometer.  Does that

8      ring a bell to you?  Are you -- do you

9      remember that?

10   A.   No.  Had nothing to do with that.

11   Q.   I mean, are you aware that there was such a

12       lawsuit?

13   A.   Oh, there's been several lawsuits.

14   Q.   All right.  Are you aware that sometime

15       around '88, '89, '90, there was a particular

16       lawsuit that involved the turning back of a

17       speedometer?

18   A.   No.

19   Q.   All right.  Let's go back to Mr. -- your dad,

20       Richard T. Dorsey, and your mother owned --

21       about the time that this transfer -- that the

22       I-65 was formed, I think they owned 60

23       percent, together, of Dorsey Motor Sales and

*DUNN, KING & ASSOCIATES*
*Montgomery, Alabama*
*(334) 263-0261 or (800) 359-8001*

17

```
1          you owned 40 percent; is that a correct
2          statement?
3     A.   That's correct.
4     Q.   Okay.  Now, I'm also informed that sometime
5          around the inception of this corporation,
6          I-65, that Mr. and Mrs. Dorsey elected to
7          make a gift of 30 percent of a parcel of
8          property that we'll refer to in a minute as
9          the I-65 nine point some acres and that she
10         gave that 30 percent -- by she, your mother
11         and dad -- gave that 30 percent to Donna; is
12         that correct?
13    A.   No.
14    Q.   That's not correct.  All right.  Then I'm
15         also incorrect if I say that since they owned
16         60 percent of the dealership and you owned
17         40, meaning the Chrysler dealership, Dorsey
18         Motor -- it is Dorsey Motor Sales back then?
19         Is that the correct name?
20    A.   Correct.
21    Q.   Okay.  And that since you owned 40 percent,
22         that they gave you a 30 percent, Donna a 30
23         percent; and since you already owned 40 of
```

|    |    |                                                          |
|----|----|----------------------------------------------------------|
| 1  |    | the dealership, that's how we got to the 70              |
| 2  |    | percent of I-65 owned by you and 30 by                   |
| 3  |    | Donna.  Is that incorrect?                               |
| 4  | A. | That's incorrect.                                        |
| 5  | Q. | Tell me how I-65 wound up owning -- you                  |
| 6  |    | owning 70 percent of the stock and Donna                 |
| 7  |    | owning 30.                                               |
| 8  | A. | My father and I had had a discussion                     |
| 9  |    | concerning the property that Dorsey Motor                |
| 10 |    | Sales, Inc., owned at I-65.  And we decided              |
| 11 |    | that the property was vulnerable connected to            |
| 12 |    | Dorsey Motor Sales and the automobile                    |
| 13 |    | business at that time due to litigation in               |
| 14 |    | the state, the atmosphere of litigation.  And            |
| 15 |    | we elected to move the property out of Dorsey            |
| 16 |    | Motor Sales, Inc., into a company called I-65            |
| 17 |    | Properties, Inc.                                         |
| 18 | Q. | Okay.  And how had Dorsey Motor Sales                    |
| 19 |    | acquired the property we're referring to, the            |
| 20 |    | nine point something acres?                              |
| 21 | A. | They purchased it.                                       |
| 22 | Q. | And who did they purchase it from?                       |
| 23 | A. | From the Cobb family.                                    |

```
1    Q.   Okay.  And approximately what year did they
2         purchase it?
3    A.   1987.
4    Q.   And roughly how much did they pay -- did
5         Dorsey pay for it?
6    A.   $100,000.
7    Q.   Okay.  And when you say a somewhat -- I don't
8         want to misquote you, but a bad environment,
9         were -- what do you mean by that as far as
10        the dealership deciding to transfer it out?
11   A.   Just that there was a bad legal environment
12        in the state at that time versus car dealers.
13   Q.   Okay.  And help me with that.  Not being a
14        car dealer, I don't -- I don't know what a
15        bad environment was.
16   A.   There was a lot of litigation going on in the
17        state.
18   Q.   And what was the nature of the litigation?
19   A.   Frivolous.
20   Q.   Okay.  Frivolous what?
21   A.   Frivolous litigation.
22   Q.   All right.  Now, I submit to you that in
23        1990, I represented numerous car dealers in
```

1        Alabama.  And one of them, Lonnie Russell

2        Ford, Stokes Chevrolet, Art Blue Chevrolet in

3        Decatur.  And as attorney for them, I don't

4        remember any frivolous litigation.  So I'm

5        not trying to tie you down, but I think we're

6        going to need -- in order to make me

7        understand what you're saying, I'm going to

8        have to have a little more suits for -- I

9        thought it was what we used to call tuning up

10       speedometers.

11   A.  That has nothing to do with it.

12   Q.  Okay.  No bondo in the side, no banana peels

13       in the transmissions to make them run better?

14   A.  No.

15   Q.  Okay.  Well, now, I've given you three that I

16       know were occurring, not by our dealerships;

17       but help me with what -- this pervasive cloud

18       over the automobile industry in 1990, since I

19       don't know.

20   A.  I don't really recall, but I remember there

21       was a lot of litigation going on in the

22       state.

23   Q.  Okay.  So it just behooved Mr. Dorsey, R.T.,

1          your dad, and you. Who else was in on the

2          decision to transfer that property out of

3          I-65?

4   A.    Our mother.

5   Q.    Okay. And that would be Mrs. -- your

6          mother's name again?

7   A.    Ann.

8   Q.    Ann Madre Dorsey, right. All right. How did

9          y'all decide that Donna, your sister, would

10         only get 30 percent and you would get 70 of

11         I-65?

12   A.    My father asked me to consider my sister in

13         moving the land out of the dealership into

14         the corporation.

15   Q.    And help me with consider. What did he mean

16         by consider?

17   A.    I'm not really sure, but I took it as meaning

18         to give her some of that land.

19   Q.    Okay. And I totally agree with your -- I

20         don't think he meant to say it, but to give

21         as opposed to sell. Was that just a mistake

22         of words on your part?

23   A.    He asked --

1   Q.  It's my position that it was a gift.

2   A.  No, it was not a gift.  It was a sale.

3   Q.  So you would like to change that and say it

4       was the family decision to sell my sister 30

5       percent and me 70; is that right?

6   A.  It was the family position to move the land

7       out of Dorsey Motor Sales, Inc., and sell it

8       to another corporation, I-65 Properties,

9       Inc.  My father then asked me to consider my

10      sister in this matter.

11  Q.  Okay.  But the fact that you owned 40 percent

12     of Dorsey Motor Sales and that Donna got 30

13     and that you would have gotten your 40 that

14     you owned plus a 30, you're saying that's

15     just a coincidence; that those numbers just

16     happened to be she gets 30, you got an

17     additional 30 -- because you already owned 40

18     percent of the assets of Dorsey Motor Sales?

19     So it is strictly a coincidence; is that

20     right?

21  A.  That was the formula that I came up with when

22     I met back with my mother and father two

23     weeks later.

1   Q.   Okay.  And by that formula, you indicated

2        since I own 40 percent, it would only be fair

3        for Donna to only get 30; I own 40.  And

4        whether it was a gift or a sale, the

5        additional 30 would go to you.  I mean, that

6        makes sense.  Is that --

7   A.   That's not the way I looked at it.

8   Q.   Well, help me.  How did you look at it?

9   A.   I looked at it as if my mother and father

10       were both deceased at the same time and that

11       my sister would get half of the estate and I

12       had get the other half; therefore, 30 and 30.

13  Q.   Well, I'm sorry, then.  I totally apologize.

14       That's exactly what I was -- the point I was

15       trying to make.  And you already owning 40

16       percent and the land was in Dorsey Motor

17       Sales, it -- it wouldn't be fair for you --

18       I'm not challenging the 30 to Donna.  It

19       wouldn't be fair for you to get 50 and 50,

20       because you already owned 40.  So we've got

21       30 to you, 30 to Donna, which represented the

22       sum total of your mother and father's

23       ownership stock in Dorsey Motor?

24

1            MR. CLEVELAND:  I think you're taking

2                it a step beyond what he did.

3            MR. ROBERTS:  All right.  Well, let's

4                say what they did, then.

5    Q.   The sum total --

6            MR. CLEVELAND:  Well, I think he was

7                the one that said that he came up

8                with the proposal.

9            MR. ROBERTS:  Okay.

10            MR. CLEVELAND:  I mean, you're the one

11                that's adding the 40 back to it.

12            MR. ROBERTS:  Okay.  Well, I guess

13                you're right.  Let me -- I don't

14                want to belabor this, because I

15                think --

16            MR. CLEVELAND:  Well, we're getting

17                real close to it.  We've been on

18                this for some time now.

19            MR. ROBERTS:  Well, we may have to stay

20                on it for a while.

21            MR. CLEVELAND:  Well, we need to move

22                on.  I mean, you know, once a

23                question has been asked and

25

1              answered, we need to move on to

2              something else.

3         MR. ROBERTS:  All right.  Will you

4              stipulate, as his attorney, that

5              there came a time when Dorsey

6              Motor Sales was owned 60 percent

7              by the parents, 40 by Mr. Dick

8              Dorsey; and there came a time

9              when -- if I go too fast, stop

10             me -- when Mr. and Mrs. Dorsey

11             elected to convey 30 percent of

12             the land from Dorsey Motor Sales

13             to Donna, 30 percent to Dick,

14             meaning he already owned 40

15             percent, thus, we arrive at the

16             70/30 today?

17        MR. CLEVELAND:  I'm not willing to

18             stipulate anything.  I

19             mean, you're here to take his

20             deposition, Mr. Roberts.

21        MR. ROBERTS:  Well, then, if you'll let

22             me --

23        MR. CLEVELAND:  But you need -- but you

```
 1              need -- you know, once -- let's

 2              don't ask the same question over

 3              and over.

 4     MR. ROBERTS:  Let me say this.  I'm

 5              not -- this is not anything other

 6              than establishing a corporation

 7              that I contend had no minutes, no

 8              records for ten years.  My client

 9              did not have a copy of the

10              infamous note for which there is a

11              counterclaim.

12     MR. CLEVELAND:  I mean --

13     MR. ROBERTS:  So I have a right to go

14              into this.

15     MR. CLEVELAND:  And you've gone into

16              it.  And I'm saying once you've

17              gone into it, let's -- my

18              original -- my original point I

19              was making is that you were taking

20              the calculations further than he

21              was making.  I mean, there seems

22              to be some confusion back and

23              forth.  And that was my --
```

27

1              MR. ROBERTS:  Okay.  Well, let's --

2              MR. CLEVELAND:  He said half of 60 is

3                   30.  Then you started the

4                   mathematical gyrations that --

5                   that got us to the point where we

6                   are.

7    Q.   Did there -- this is a new question.  Did

8         there come a time when the property was

9         transferred from DMS, Dorsey Motor Sales, to

10        I-65, that you believed that you already

11        owned 40 percent of the nine point something

12        acres?  Yes or no?

13   A.   No.  I -- I sat down and proposed to my

14        parents how the property would move to I-65.

15        And then I also honored my father's wishes

16        and included Donna in I-65.

17   Q.   Okay.  Tell me about their wishes.  They just

18        wanted to see that Donna got 30 percent,

19        correct?  That was their wishes?

20   A.   I'm not sure what their wishes were, because

21        Donna had nothing to do with the property.

22        I -- you know, it was just something my dad

23        asked, and -- and I honored that wish.  And I

1    told my father that I would honor that wish

2    in lieu of any ownership of Dorsey Motor

3    Sales, Inc.

4  Q.  All right.  Let's move along, then.  Let's

5    assume that Dorsey -- according to your

6    testimony, DMS paid 100,000 for the

7    property.  That's what you've previously

8    testified to; is that correct?

9  A.  Correct.

10  Q.  And I think there came a time when, in 1990,

11    the transfer from DMS to I-65 was apparently

12    sold for somewhere around $230,000.  228.  Is

13    that correct?

14  A.  No.  250.

15  Q.  250.  How was the 250 figure arrived at?

16  A.  The 250 figure was arrived at from an

17    approximate evaluation that arose in another

18    matter.

19  Q.  Okay.  And what was the other matter?

20  A.  The litigation that we -- we had somebody

21    value the property at 250,000.

22  Q.  All right.  Which litigation are you talking

23    about?

```
 1    A.   Auto -- automobile litigation.  It was the
 2         Alice Braden case.
 3    Q.   Okay.  And I'm not familiar with this.  I
 4         don't know anything about it.  But the --
 5         Braden had sued Dorsey Motor Sales, correct?
 6    A.   Correct.
 7    Q.   Okay.  And there came a time when you had to
 8         give a financial statement or something
 9         showing what Dorsey Motor Sales owned?  Is
10         that what you're telling me?
11    A.   During the Braden case?
12    Q.   Well, I'm -- I'm trying to get back to this
13         overall reason for the transfer.  And you
14         said that the Braden case may have had -- or
15         had been some motivation for the transferring
16         the property out of DMS.
17    A.   That's correct.
18    Q.   Okay.  Do you know if the Braden people in
19         that lawsuit ever asked about the ownership
20         of the -- what's now the I-65 property?
21    A.   No.
22    Q.   Were they aware of it?
23              MR. CLEVELAND:  If you know.
```

```
 1    A.   I don't know.

 2    Q.   Are you aware that the basis -- that a

 3         witness has stated in this case that -- and I

 4         think it's consistent with what you're

 5         saying -- that the transfer from Dorsey Motor

 6         to I-65 was a defensive maneuver only?

 7    A.   A defensive maneuver?

 8    Q.   Yes.  And all I'm -- I'll show you a document

 9         in a minute that refers to it.  I think he

10         calls it a manover, a spelling mistake.  I

11         think the intention was defensive maneuver.

12         And I think that's consistent with what your

13         testimony has been thus far, that because of

14         prevailing litigation over the state, that

15         was the reason for the transfer from Dorsey

16         to I-65, to protect the property.  Is that

17         right?

18    A.   Well, we had discussions about it.  And the

19         litigation at the state level was -- was -- I

20         thought was pretty hot at that time.  And my

21         father and I discussed it, and along with my

22         mother, and decided to move the property out

23         of Dorsey Motor Sales, Inc., to I-65
```

31

```
 1            Properties, Inc.
 2     Q.   And how do you spell it?  Was it the
 3            Braden -- spell the name of the litigation
 4            for me that was --
 5     A.   Alice Braden.
 6     Q.   A-L-I-C-E, B-R-A-D-E-N?  Is that how --
 7                  MR. CLEVELAND:  If you know.
 8     A.   I don't know how she spelled it.
 9     Q.   But that was a suit in the Autauga County
10            Circuit Court, correct?
11     A.   Correct.
12     Q.   Okay.  Just so I'll know, did -- was the
13            Braden case the one case at that point,
14            though, that caused the transfer of the
15            property?  Maybe I misunderstood.
16     A.   No.
17     Q.   Okay.  So that was just one of many other
18            cases going on in the state?
19     A.   Correct.
20     Q.   But that case was against Dorsey Motors.
21     A.   Correct.
22     Q.   Just generally, five words or less, what were
23            the allegations of the Alice Braden case
```

1    against DMS?

2  A.  The allegation was that we sold a used car

3      for a new car.

4  Q.  Okay.  And I apologize.  I thought it was a

5      speedometer had something to do with it.  Was

6      there any allegation during that case that

7      the speedometer had in fact been reversed?

8  A.  Correct -- no.

9  Q.  No.  All right.

10          MR. ROBERTS:  Now, let me see if I can

11              find the defensive maneuver

12              language.  Okay.  Plaintiff's #6.

13              I'm going to give you time -- we

14              can go off the record for a few

15              minutes while he studies that

16              document.  It's very extensive.

17              (Brief pause)

18  Q.  You've got a copy of this, I assume?

19  A.  Somewhere probably.

20  Q.  Okay.  I wanted to give you a chance to study

21      it before I asked you questions about it.

22      And the primary point, before we went off the

23      record to allow you time to read it, was

33

```
1              the -- this appears to be a document which

2              was produced by Mr. Alan Taunton in response

3              to questions by -- we call him Jack, but John

4              Davis, your sister's husband, your

5              brother-in-law.  Is that your understanding

6              of it at this point?

7    A.   It's a letter from Alan Taunton to John H.

8         Davis.

9    Q.   Okay.  And it appears to be in response to

10        questions that Mr. Davis had asked.  Okay.

11        Now, was Mr. Taunton your accountant at the

12        time of this letter, around February of 2000?

13   A.   Yes.

14   Q.   And he also represented the corporation DMS,

15        Dorsey Motor Sales?

16   A.   Yes.

17   Q.   Okay.  And does he represent you personally?

18        Does he do your personal tax returns also?

19   A.   Yes.

20   Q.   And has he continuously been representing you

21        from let's just say the '90s through the date

22        of this deposition, March of '07?

23             MR. CLEVELAND:  Can you get closer on
```

34

1            the '90s?

2        MR. ROBERTS:  I don't have -- I

3            guess -- well, that's a good

4            question.

5    Q.   Did he represent you at the time of the

6        transfer of the property from DMS to I-65?

7    A.   I'm not sure if it was him or one of the

8        other partners in the firm.

9    Q.   Okay.  But the firm actually, Mr. Diamond or

10       someone, has represented you consistently?

11   A.   Yes.

12   Q.   All right.  Now, I direct your attention in

13       this document to a question called the

14       bullet, meaning a specific pointed question,

15       where Mr. Davis asks for a copy of the note

16       and -- which was dated October -- excuse me.

17       He said, we have a copy of the note; and it

18       was dated October 1, 1990, signed by yourself

19       as president.  And the payee of the note, he

20       responds, which is correct, does not have to

21       sign the note; in other words, the person who

22       is getting the note.  Only the obligor signs

23       the note.

35

```
 1              Okay.  Now, he -- I draw your attention

 2       specifically to Mr. Taunton's statement in

 3       the first paragraph under bullet three, This

 4       transaction was a defensive manover -- one

 5       word, M-A-N-O-V-E-R -- designed to protect

 6       the property from possible seizure in the

 7       event a judgment was ever rendered against

 8       DMS.  Do you see that?

 9    A.  Yes, sir.

10    Q.  Do you disagree with Mr. Taunton that the

11       transfer was in the nature of a defensive

12       maneuver, or manover?

13    A.  I -- I can't speak for what Mr. Taunton is

14       thinking.

15    Q.  Okay.  So -- but I'm asking you for your

16       opinion.  It's one of the allegations in this

17       complaint that the transfer was in fact not

18       an arms-length transfer, that it was a --

19       call it a defensive maneuver, call it a

20       gift.  You disagree about both of

21       those categorizations?

22    A.  I disagree with them.

23    Q.  Okay.  And would Mr. Taunton -- do you have
```

| | | |
|---|---|---|
| 1 | | any idea where -- where or why he would have |
| 2 | | responded in writing that it was just a |
| 3 | | defensive manover, maneuver? |
| 4 | A. | No, sir. |
| 5 | Q. | We'd have to ask him, I assume, right? |
| 6 | A. | Yes, sir. |
| 7 | Q. | All right.  Now, when he says -- and I'm |
| 8 | | still on bullet three of Plaintiff's #6: |
| 9 | | There was no distribution of proceeds by DMS |
| 10 | | because no cash was collected from I-65.  DMS |
| 11 | | did report a taxable gain from the sale even |
| 12 | | though no cash was collected. |
| 13 | | Is that a correct statement by |
| 14 | | Mr. Taunton, as to the best of your |
| 15 | | knowledge? |
| 16 | A. | You would have to ask Mr. Taunton. |
| 17 | Q. | Well, I'm actually asking you, though.  Do |
| 18 | | you know if -- what was your title at DMS in |
| 19 | | 1990 -- or in 2000? |
| 20 | A. | President. |
| 21 | Q. | Okay.  And what was your title in 1990? |
| 22 | A. | President. |
| 23 | Q. | Okay.  So here today, you can't say that you |

37

```
 1              know whether or not any cash was collected

 2              from I-65 as Mr. Taunton is saying that there

 3              was none?

 4     A.       I can't remember that far back.

 5     Q.       Okay.  So the best evidence would be a

 6              closing statement or something like that?

 7     A.       Yes, sir.

 8     Q.       To the best of your knowledge, was a closing

 9              statement prepared between DMS and I-65?

10     A.       Yes.

11     Q.       Who closed the transaction?

12     A.       Mr. Walthall.

13     Q.       Okay.  And what is his first name?

14     A.       George.

15     Q.       Is he still in Prattville?

16     A.       Yes, sir.

17     Q.       Still practicing law, as far as you know?

18     A.       Yes, sir.

19     Q.       Do you know the name of his firm, or is he a

20              solo practitioner?

21     A.       I think he's a solo practitioner.

22     Q.       Okay.  And in order to know if DMS reported a

23              taxable gain, as was stated, even though no
```

38

1    cash was collected, you don't have a copy of

2    the 1990 tax returns for DMS, I assume, do

3    you?

4  A. No, sir.

5  Q. If there is a copy still in existence, I

6    assume Mr. Taunton would have it in his file?

7  A. You would have to ask Mr. Taunton.

8  Q. All right.  The next sentence in 2000 was

9    that they do have a copy of the 1990 tax

10    return for Mr. and Mrs. Dorsey.

11     Okay.  I'm on the next page, page 2 of

12    3.  And it indicates that there was a meeting

13    of the stockholders on October 1st of 1990,

14    and Mr. Dorsey and Donna -- well, excuse

15    me -- that's you, Dick Dorsey, and Donna were

16    in attendance.  Was that correct, to the best

17    of your knowledge?

18  A. I -- I can't remember back to 1990.

19  Q. I can't either, so.  All right.  Tell me, at

20    this point, over the years -- I don't want to

21    get off this letter; but who has been keeping

22    up with the expenses of I-65, Inc., taxes,

23    bush hogging, those kind of things?

| | | |
|---|---|---|
| 1 | A. | Taxes would be Alan Taunton.  Bush hogging -- |
| 2 | Q. | I'm just using that as an example.  There |
| 3 | | came a time, which we'll put it in evidence |
| 4 | | later, when someone prepared a |
| 5 | | recapitulation, I'll call it, of expenses |
| 6 | | over the past years going back from I think |
| 7 | | 2000 back to the inception of I-65.  I've |
| 8 | | seen the document, and I'll fish it out in a |
| 9 | | minute.  You might have prepared it in |
| 10 | | response to your sister's request? |
| 11 | A. | Either myself or Jo Anne Perry. |
| 12 | Q. | All right.  Now, tell me, in this letter -- |
| 13 | | while we're here, an LLC was apparently |
| 14 | | formed.  Can you help me with why the LLC -- |
| 15 | | and I believe it was I-65 Properties, LLC; is |
| 16 | | that right? |
| 17 | A. | Yes, that's what this says. |
| 18 | Q. | Do you remember when it was formed? |
| 19 | A. | No. |
| 20 | Q. | Do you know the purpose for which it was |
| 21 | | formed? |
| 22 | A. | I think there was some discussion and |
| 23 | | consideration given to tax benefits, but it |

40

1          was later decided that that was not

2          beneficial.

3    Q.    Okay.  About when was the LLC formed, just

4          roughly?  Between '90 and 2000, I assume.

5    A.    I would assume.

6    Q.    Okay.  Did there come a time when Mr. Taunton

7          advised you, as president of I-65 and a

8          partial owner of DMS, that if all of this

9          interest was ever collected, it would all be

10         ordinary income to you -- or to DMS, excuse

11         me -- to your company?

12   A.    I don't recall that.

13   Q.    Do you own DMS still, Dorsey Motor Sales?

14   A.    Yes.

15   Q.    But it is not the -- what we call Victory?

16         It's just a separate corporation, correct?

17   A.    Yes.

18   Q.    What does it do now, if anything?

19   A.    It has an automobile franchise.

20   Q.    Okay.  What kind?

21   A.    Suzuki.

22   Q.    Okay.  And where is it located?  Where does

23         it do business?

41

```
1     A.   At 621 East Main Street.

2     Q.   I'm not familiar.  Is that toward downtown?

3     A.   Yes.

4     Q.   But it's not the same premises as Victory?

5     A.   Yes.

6     Q.   So it's run -- although in the same place,

7          the same location, it's a completely separate

8          corporation?

9     A.   The Suzuki franchise is incorporated in the

10         state of Alabama at 621 East Main Street,

11         which is the used car lot down there at

12         Victory.

13    Q.   I see.  But it still operates, correct?

14    A.   Yes.

15    Q.   Okay.  So DMS owns the Suzuki franchise.  And

16         what other assets does DMS have?

17    A.   It owns the facility.

18    Q.   The properties which you've referred to?

19    A.   Correct.

20    Q.   Okay.  And is it your position that DMS still

21         is the holder of a note from -- I think we've

22         already introduced it.  Have we introduced

23         the note?  Yes.  What we'll call Plaintiff's
```

1          Exhibit #5, that note?

2    A.   Correct.

3    Q.   Okay.  Does DMS operate on a cash basis or an

4          accrual basis?  By that, I mean an annual,

5          like cash is January 1 to December 31st.

6    A.   I don't know the --

7    Q.   You don't know?

8    A.   -- the closing date on -- on the taxes.

9    Q.   Has Mr. Taunton -- to the best of your

10         knowledge, he does do the return for DMS,

11         Dorsey Motor Sales?

12   A.   Yes.

13   Q.   Okay.  Has he been accruing this interest

14         over all these years that you're claiming --

15         I think you filed a counterclaim, or your

16         attorney did, claiming that I-65, the

17         corporation, owes a million seven, something

18         like that?

19   A.   I don't know how Mr. Taunton treated it.

20   Q.   Okay.  Are you aware that if it is ever

21         collected, that it would all be ordinary

22         income?  And you're the sole stockholder of

23         DMS; is that right?

43

| | | |
|---|---|---|
| 1 | A. | Correct. |
| 2 | Q. | That you would have DMS and consequently -- |
| 3 | | is it a sub S corporation, or do you know? |
| 4 | A. | Dorsey Motor Sales, Inc.? |
| 5 | Q. | Yes, sir. |
| 6 | A. | Yes, it's a sub S. |
| 7 | Q. | I'm just curious because this will help me. |
| 8 | | If that note was ever collected, you would |
| 9 | | have ordinary income passed through to you of |
| 10 | | about a million seven of interest income? |
| 11 | A. | I can't speak to that.  I'm not a tax -- a |
| 12 | | tax person. |
| 13 | Q. | But are you aware that when we earn |
| 14 | | interest -- if we have money in the bank and |
| 15 | | it earns interest, sometimes we call it the |
| 16 | | tree is the principal, the fruit is the |
| 17 | | interest -- that interest is taxable in the |
| 18 | | United States by the Internal Revenue |
| 19 | | Service? |
| 20 | | MR. CLEVELAND:  Object to the form. |
| 21 | Q. | You can answer. |
| 22 | A. | I'm sure interest is taxable in some form |
| 23 | | unless it's tax free. |

1    Q.    Right.  And as far as we know, absent you

2          being a government agency, if this note were

3          ever collected, you, as 70 percent

4          stockholder in I-65 and your sister as 30

5          percent, DMS would owe ordinary income on

6          close to a million seven?

7    A.    I'm -- I'm not a tax person.

8    Q.    Okay.  We'd have to ask Mr. Taunton about

9          that, is that right, the effect if it were

10         collected?

11   A.    Yes.

12   Q.    Because you have filed -- you are aware you

13         filed a counterclaim claiming that you -- by

14         you, DMS -- is owed in excess of a million

15         five in interest.  Are you aware of that?

16   A.    Not a million five.

17   Q.    All right.

18   A.    No, sir.

19   Q.    Let me look at the counterclaim.  How much do

20         you believe it is?  It's just a little

21         unusual to let that much interest accrue, if

22         it is in fact interest.  Let's see if we can

23         find it.

45

```
 1              Do you not know off the top of your

 2          head, just roughly, give or take a couple

 3          hundred thousand dollars, how much you're

 4          claiming against Donna?  Although, Donna --

 5          strike that.

 6              Well, that's right.  You're claiming

 7          that Donna owes $518,000; but if you do the

 8          math and if Donna's share was 30 percent,

 9          then you would have about 70 percent of

10          that.  And if I do the math, you would owe

11          taxes -- that DMS would owe taxes on a

12          million five or so, right?

13              MR. CLEVELAND:  Object to the form.

14    Q.    You can answer.

15              MR. CLEVELAND:  If you know.

16    A.    I don't know.

17    Q.    Well, let me submit to you, you would -- you

18          do -- if that claim were successful.  You

19          understand that I-65 is a corporation, we do

20          believe, and that you are 70 percent owner

21          and Donna is 30, right?

22    A.    Yes.

23    Q.    So if you've claimed in federal court that
```

1    Donna -- I don't know how you got to that,

2    because it's the corporation that owes it.

3    It's not Donna. Am I correct?

4 A. Correct.

5 Q. Okay. But together, I-65 owes, it's your

6    contention, DMS somewhere above a million

7    five in interest; is that correct?

8 A. A million five in interest and principal.

9 Q. And principal. Okay. And the principal, you

10    would contend, is somewhere around 250 or

11    220; is that right?

12 A. No. It's more than that.

13 Q. How much, roughly, would the principal be?

14 A. I don't know.

15 Q. All right. But I think you said that at the

16    time the property was purchased by I-65, the

17    sales price was around 250,000?

18 A. Correct.

19 Q. And there was no cash collected; is that

20    correct?

21 A. That's correct.

22 Q. So I'm jumping ahead of you, but I guess what

23    you're saying is -- I'm not talking about the

```
 1              purchase.  You're saying there are still
 2              other moneys owed either to you or DMS for
 3              cost of -- expenses of maintaining the
 4              corporation; is that correct?
 5     A.       Yes.
 6     Q.       But as far as the principal goes, I'm talking
 7              about the original purchase price.  So we can
 8              agree it was around 250?
 9     A.       It was 250,000.
10     Q.       So if the interest is now a million -- the
11              accrued interest, meaning built up over the
12              years, if you were correct and the interest
13              is around a million seven or a million five
14              at 12 percent, that's how we arrive at the
15              amount that DMS claims to be owed?
16              MR. CLEVELAND:  If you know.
17     Q.       If you know.
18     A.       I -- I don't.
19              MR. CLEVELAND:  I mean, this is his
20                     mental gyrations.  Don't let it be
21                     yours.
22     Q.       I'm not holding you to that.  I'm just
23              saying --
```

1              MR. CLEVELAND:  He is holding you to

2                   it.

3    Q.  Okay.  No.  I'm saying -- I treat you as

4        being a very knowledgeable businessman, owner

5        of a franchise, successful in litigation

6        against Chrysler.  And, therefore, I believe

7        it's reasonable to assume that you understand

8        what interest is.  You do.  That's the

9        automobile business.  Do you know what the

10       Rule of 76 is?

11   A.  No.

12             MR. CLEVELAND:  Object to the form.

13   Q.  Do you know what a floor plan is?

14   A.  Yes.

15   Q.  Isn't a floor plan glorified interest that we

16       pay to our supplier, the manufacturer,

17       whether it be Ford, Chrysler, whoever?  Isn't

18       that what a floor plan is?

19   A.  No.  A floor plan is to buy product with.

20   Q.  Okay.  And you pay interest, correct?

21   A.  Sure.  You pay interest any time you borrow

22       money.

23   Q.  Okay.  Now, on that point, I think your

49

```
 1              position in this counterclaim to this lawsuit

 2              is that Donna -- or her 30 percent maybe is a

 3              better way to put it -- owes a lot of

 4              interest to DMS; is that right?

 5     A.    That's correct.

 6     Q.    Okay.  And you acknowledge that if her 30

 7              percent owes half a million dollars, your 70

 8              percent would owe roughly twice that, a

 9              million dollars worth of interest, if you

10              know.

11     A.    I don't know the figure.  I'm sure.

12                   MR. ROBERTS:  Okay.  Now, I'm going to

13                      depart a little bit because I'm

14                      like you, Cliff, I'm getting bored

15                      on this.

16     Q.    Have you been the executive officer and the

17              manager of the nine acres which we're talking

18              about that's owned by I-65 from 1990 to the

19              present?

20     A.    Yes.

21     Q.    Okay.  Tell me a little bit about that nine

22              acres.  And my first and most important

23              question is do you know how much that
```

50

1          property is worth as we sit here today?

2     A.   No, sir.

3     Q.   No idea?

4     A.   (Witness shaking head)

5               MR. CLEVELAND:  Answer verbally.

6     A.   No.

7     Q.   All right.  Do you know how many square feet

8          are in an acre?

9     A.   Approximately.

10    Q.   43,560 roughly?

11    A.   43,000, yeah.

12    Q.   Okay.  Now, have you had the property

13         appraised in the last five years?

14    A.   No.

15    Q.   As president of the corporation, you will

16         admit that there's been a massive expansion

17         of the western quadrant of what I'll call 82

18         and also the bypass to Montgomery, the

19         eastern quadrant, in the last three or four

20         years?

21    A.   Cities grow.

22    Q.   But has it been massive, perhaps the greatest

23         in Alabama?

51

```
1    A.    Maybe.  Maybe so; maybe not.  I don't know.

2    Q.    Okay.  Is it prudent for the president of a

3          corporation to keep up with the value of its

4          assets?

5    A.    Sure.

6    Q.    But it's your testimony you haven't?

7    A.    I don't know the value of the asset today,

8          no, sir.

9    Q.    Do you have a rough opinion?

10   A.    I would hope it's worth what the debt is.

11   Q.    If I told you that it is Ms. Davis's informed

12         opinion that the value is a minimum of $8 a

13         square foot, would you have any reason, since

14         you don't know the value, to argue with that?

15   A.    I -- I don't have an argument one way or the

16         other with it.

17   Q.    Don't you have to know in case an offer is

18         made?  Since you're our -- you're the pilot

19         of the airplane of I-65, don't you need to

20         know the value so that you could consider if

21         we get an offer -- by we, I-65 -- gets an

22         offer to purchase the property?

23   A.    No, not really.  Why?
```

1 Q. Well, I'm curious.  I think you're answering

2   my question.  I-65 doesn't have any other

3   business.  It simply holds title to a piece

4   of naked real estate, unimproved, on I-65 and

5   what I call 82 or the Wetumpka Road; is that

6   correct?

7 A. There's a road through it.

8 Q. All right.  Did you put the road in?

9 A. Yes, sir.

10 Q. How long ago?

11 A. 1991.

12 Q. And who installed the road?  Who was the

13   contractor?

14 A. Bobby Carter.

15 Q. All right.  And what was the approximate cost

16   of the road?

17 A. I don't recall.

18 Q. All right.  Is it your intention as

19   president -- well, let me go back.  Let me

20   strike that.

21     Absent the road through it, isn't it a

22   fact that I-65 Properties, Inc.'s sole

23   business is to hold title to that piece of

53

```
1              property?

2    A.    That's -- that's the main asset of I-65.

3    Q.    Uh-huh.  And I think earlier you said if this

4              interest were deemed to be correct, it was a

5              true -- it wasn't a subversive maneuver or

6              whatever, wouldn't it be prudent for you as

7              president of I-65 to at least know if the

8              corporation is now upside down, meaning it

9              owes more money to DMS than the fair market

10             value of the property?

11   A.    Well, that's only if you plan on selling it.

12   Q.    Okay.  And along that line, do you plan on

13             holding it forever?

14   A.    No, sir.

15   Q.    What do you plan on doing with it?

16   A.    Waiting for the best offer.

17   Q.    And along that line, now, I am informed there

18             have been some offers.  So I'm -- we're in

19             federal court and you're under oath.  Have

20             you had any offers on the property?

21   A.    No.

22   Q.    Have you discussed a possible sale of the

23             property to anyone in the last five years?
```

54

```
1    A.   No.

2    Q.   As a prudent president of a corporation, then

3         I-65 could be virtually bankrupt.  And I'm

4         talking about -- it's convenient that the

5         money you claim is owed to you, meaning DMS

6         and you as a sole stockholder; but let's

7         assume that debt was owed to a bank.

8         Wouldn't we be wanting to file bankruptcy or

9         do something before they sue I-65 and take

10        the property away?

11   A.   I don't know.

12   Q.   You don't know?  Do you think we might need

13        to get a new chief executive of I-65 that

14        could answer some of these questions to

15        protect the minority stockholder?

16             MR. CLEVELAND:  Object to the form.

17   A.   No.

18   Q.   You don't?

19   A.   No.

20   Q.   Is it your opinion you're doing a good job,

21        an excellent job?

22   A.   Excellent job.

23   Q.   So holding something without knowing its
```

55

```
 1          value for 17 years is, in your opinion, a

 2          good job?

 3    A.    Yes.

 4    Q.    Would you consider it prudent at this point

 5          to get an appraisal of the property?

 6    A.    No.

 7    Q.    And why would that be?

 8    A.    Extra expense.

 9    Q.    Three or $4,000?

10    A.    At least.

11    Q.    If you get an offer next week to purchase the

12          property, would you consider it prudent to

13          get an appraisal at that time to determine

14          whether or not it's a good offer or not?

15    A.    No, sir.

16    Q.    Because you would just turn it down anyway,

17          right?

18    A.    That's not my plan for the property.

19    Q.    Okay.  That's going to help me.  When you say

20          your plans, you mean as president of I-65,

21          correct?

22    A.    Correct.

23    Q.    Would you mind sharing your plans with my
```

1    client, the 30 percent minority stockholder?

2 A. Well, I'm waiting to see if someone wants to

3    long-term lease the property.

4 Q. Ground lease?

5 A. Excuse me?

6 Q. A ground lease?

7 A. Ground lease.

8 Q. Why would you prefer -- well, how old are

9    you, Mr. Dorsey?

10 A. 61.

11 Q. Why would you prefer a ground lease to a

12    sale?

13 A. Well, once you sell, it's sold.

14 Q. You don't own it anymore, do you?

15 A. Correct.

16 Q. Do you know the difference -- and I'll tell

17    you the difference.  If you ground lease,

18    it's all ordinary income.  You're aware of

19    that?

20 A. No.

21 Q. You're not?  Are you aware that if you sold

22    the property, it is capital gain at a very,

23    very low taxable rate?

1    A.    No.

2    Q.    You're not aware of that?  Mr. Taunton has

3          never advised you of that?

4    A.    I've never asked him.

5    Q.    Are you aware that the corporation, with a

6          very little bit of work, could sell that

7          property for -- if it brought $5 million and

8          pay absolutely -- absolutely no income taxes

9          on the sale?

10   A.    No.

11   Q.    Well, let me -- without trying to educate

12         you, I am concerned that you're not aware of

13         these things and you're in charge of my

14         client's 30 percent interest.  It just so

15         happens that -- are you aware that I also own

16         a piece of property known as I-65 Investment

17         Properties?

18   A.    No.

19   Q.    I submit to you it's Calera, the water tank;

20         and you go by it every time you go to

21         Birmingham.  And all I have to do is

22         distribute the asset out 30 percent to Donna,

23         70 to you, and then I can avail myself of

58

1       Section 1031 of the Internal Revenue Code,

2       meaning Donna could buy her 30 percent,

3       whatever the proceeds are, you could buy your

4       70, pay no taxes.  You were not aware of

5       that?

6  A.   No.

7  Q.   Wouldn't it be prudent, since you have a

8       CPA -- am I right that, in effect, you're

9       directing Donna's 30 percent?  You're in

10      charge of caring for her 30 percent; is that

11      correct?

12  A.   I'm in charge of caring for the asset of the

13      corporation.

14  Q.   Okay.  And if she's a 30 percent stockholder,

15      then -- I'm not playing games with you, but

16      you're the boss, right?

17          MR. CLEVELAND:  Object to the form.

18  Q.   You can answer the question.

19  A.   I hold 70 percent of the stock.

20  Q.   And that makes you the lead dog?

21          MR. CLEVELAND:  Object to the form.

22  A.   Majority stockholder.

23  Q.   Okay.  And as a majority stockholder, what

59

```
 1              you do or don't do directly bears on the

 2              value of your sister's interest, 30 percent.

 3              Is that right or wrong?

 4                   MR. CLEVELAND:   Object to the form.

 5       A.     I would say that's true.

 6       Q.     Okay.   Is it your opinion here today that

 7              from the period 1990 to as we sit here today,

 8              that you have properly discharged your duties

 9              as president such as to prevent loss to my

10              client's 30 percent interest in I-65?

11       A.     Yes.

12       Q.     Can you think of any area in which you have

13              failed to protect her interest?

14       A.     No.

15       Q.     If you were going to buy a piece of property

16              individually or otherwise, wouldn't it be

17              prudent to appraise the property or have it

18              appraised before you purchased it?

19       A.     Not necessarily.

20       Q.     Is that because you have a specific -- and

21              I'm not arguing that you don't -- a knowledge

22              of value of real estate and you could apply

23              your knowledge of real estate and, therefore,
```

1       not need an appraisal to know if it's a fair

2       value?

3   A.   I would hope so.

4   Q.   All right.  But you don't have an opinion as

5       to the value of the property, the nine point

6       acres, today as we sit here?

7   A.   No, sir.

8   Q.   Kind of like the bigger than a bread basket,

9       do you think it's more than $7 a square foot?

10   A.   No, sir.

11   Q.   Less than seven?

12   A.   I don't know.

13   Q.   Is the property served by sewer?

14   A.   No, sir.

15   Q.   By city water?

16   A.   No, sir.

17   Q.   Where is the closest sewer?

18   A.   The sewer is in Millbrook.

19   Q.   Okay.  When I see the motels across -- and

20       there are -- there's a Country Inn across.

21       Are they on sewer or some type of ergonomic

22       system?

23   A.   I don't know.

61

| | | |
|---|---|---|
| 1 | Q. | Have you talked to any engineers about the |
| 2 | | property with regard to sewer, water, those |
| 3 | | kind of infrastructures, as we call them? |
| 4 | A. | No.  I've talked to an engineer about some |
| 5 | | drainage problems. |
| 6 | Q. | Okay.  Runoff? |
| 7 | A. | There's drainage through the property. |
| 8 | Q. | All right.  And who was that engineer? |
| 9 | A. | I don't recall.  I'd have to pull the -- pull |
| 10 | | the letter. |
| 11 | Q. | Okay.  And if we asked through your attorney, |
| 12 | | could you provide us with a copy of the |
| 13 | | letter? |
| 14 | A. | I'll try and find it. |
| 15 | Q. | Has it created a problem, a stormwater runoff |
| 16 | | problem, in your opinion? |
| 17 | A. | To the property? |
| 18 | Q. | Yeah. |
| 19 | A. | Yes. |
| 20 | Q. | Okay.  Has ADEM contacted you about it? |
| 21 | A. | No. |
| 22 | Q. | Are there any silt fences on the property? |
| 23 | A. | No, sir. |

62

```
 1     Q.   Are you familiar with an ADEM word "best
 2          management practices"?
 3     A.   No, sir.
 4     Q.   Are you aware that if you're not carrying out
 5          best management practices, significant fines
 6          can and will be levied by ADEM?
 7     A.   No, sir.
 8     Q.   Okay.  So you have no consultant to help you
 9          with the management of the property other
10          than this one engineer; is that right?
11     A.   No.  This is an engineer we spoke to divert
12          the stormwater runoff that was cutting
13          through the property to a common line with
14          the State, State of Alabama.
15     Q.   Okay.  Had the State requested that you do
16          that?
17     A.   No, sir.
18     Q.   How did it come to your attention that it was
19          doing it?
20     A.   Say again.  I'm sorry.
21     Q.   How did it come to your attention that the
22          water was creating that problem?
23     A.   Walking on the property.  There's an erosion
```

63

1          ditch through it.

2               MR. ROBERTS:  And by the way,

3                    Mr. Dorsey, or the court reporter,

4                    if you need a break at any time --

5                    I'm 63, and I occasionally need

6                    one -- please let me know.

7                      I'll give it to your lawyer

8                    first and then give you one.

9                    We'll mark this Plaintiff's

10                  Exhibit #7 in order.

11   Q.  All right.  What we have marked as

12       Plaintiff's Exhibit #7, I'd like you to take

13       a few minutes and look at it because I'd like

14       to question you while we're at this point on

15       a number of matters pertaining to this

16       Plaintiff's Exhibit #7.

17         I'll submit to you that this is

18       apparently a shorthand copy of the tax map

19       maintained by the tax assessor of Elmore

20       County.  Do you have any reason to disagree

21       with that?

22   A.  No.

23   Q.  Okay.  I would appreciate it if you would be

1              so kind as to mark on -- I'm going to give

2              you the #7 -- where the water problem is,

3              just the flow of the water.  I'm going to

4              hand you a green Sharpie.  And just roughly.

5              It will help me to understand this.

6    A.   (Witness complies)

7    Q.   All right.  Thank you.  Okay.  And I'll give

8              you back -- where's my copy?  There it is.

9              Yeah.  I gave you back Exhibit #7.

10             All right.  And just for my benefit,

11            that's the official, but it looks like it

12            roughly runs from the corner -- it runs

13            roughly from the exit ramp on the freeway

14            down and intersects the 161.6, roughly.  And

15            I've gone that in green.

16            All right.  Will you also be so kind as

17            to mark -- you mentioned the road that runs

18            through the property.  I'll hand you a yellow

19            Magic Marker.  Will you just highlight the

20            road?

21    A.   (Witness complies)

22    Q.   Okay.  Thank you, sir.  All right.  I'll try

23            to do mine the same way.

65

```
 1              Okay, sir.  Now, tell me what's along
 2         the yellow road, what, if anything.  Are
 3         there any improvements on either side?  As we
 4         look at Plaintiff's Exhibit #7, are there any
 5         improvements on either the east or west
 6         side?  And by the way, so we get acclimated,
 7         if we look at the top of this map, am I
 8         correct that most maps are drawn to the
 9         north, so the top, up where Plaintiff's
10         Exhibit #7 is, would be the northerly
11         direction?
12    A.   I would guess.
13    Q.   Close to it.  Because I-65 runs north and
14         south.  Okay.  So for our purposes, the
15         left -- everything to the left we'll call
16         west; and everything to the right we'll call
17         east, toward Atlanta.  Am I okay with that?
18    A.   Okay.
19    Q.   All right.  Is there anything -- any
20         improvements on the yellow road on the left
21         or the right?
22    A.   On the right, there's some security pipes
23         there.
```

1    Q.    Okay.  Security pipes?

2    A.    Uh-huh.

3    Q.    Which are?

4    A.    Security pipes.

5    Q.    What would --

6    A.    To keep people out of there.

7    Q.    Oh, okay.  So there's fences along there?

8    A.    There's a chain.

9    Q.    There's a chain.  Okay.  Let's -- if you'll

10         mark the chain with yellow, just roughly

11         where it is, that will help me.

12   A.    (Witness complies.)

13   Q.    Okay.  So it's right at the entrance of that

14         road off of -- you call this -- it says

15         public road.  What is the name of this what

16         we'll call public road?

17   A.    The service road.

18   Q.    Okay.  That's a service road.  If you will --

19         do you have your pen so I can keep mine?  Do

20         you have a pen with you?

21   A.    Uh-huh.

22   Q.    Just mark that Service Road, because this is

23         going to become a court exhibit.

67

```
1    A.   You mark it.

2    Q.   Okay.

3    A.   You're getting paid, not me.

4    Q.   Yeah, there you go.  That's in question.

5         Service road.  My client may have a big debt

6         she may not be able to pay.

7              All right.  I've marked service road.

8         Now, the yellow road, what do we call it?

9         Private road?  Is that okay?  I mean, it is

10        private?  It's not a deeded easement?

11   A.   No.

12   Q.   Okay.  And that's the one that was put in

13        some years ago, correct?

14   A.   Correct.

15   Q.   I'm going to mark that private, meaning the

16        yellow road.  What was the purpose of putting

17        in the private road, if you can help me with

18        that?

19   A.   We had an interested party in building a

20        business on the property.

21   Q.   Okay.  What kind of business?

22   A.   A Nissan dealership.

23   Q.   Okay.  And would you have been the primary
```

1      stockholder of the Nissan dealership?

2  A.  No.  The guy that owned it was -- I don't

3      recall his name.  I don't remember.

4  Q.  Would you have had any ownership of the

5      Nissan dealership?

6  A.  No.

7  Q.  Isn't it a little unusual to construct a road

8      before a contract is finalized?

9  A.  It's what my father said do.

10  Q.  Okay.  That's a good reason.  Is the road

11      30-feet wide or more, roughly?

12  A.  I don't know if it's 30-feet wide.  I'd --

13      I'd have to go measure it.  I don't know the

14      width of it.

15  Q.  Are there locks, as you call them, security

16      posts, on the Cobbs Ford -- is that what

17      locally people call it, the Cobbs Ford Road,

18      or what is that referred to now?

19  A.  Cobbs Ford Road.

20  Q.  Cobbs Ford Road.  It's an extension of 82,

21      though, correct?

22  A.  No.

23  Q.  It isn't?  Okay.  I don't know.  Are there

```
 1              gates on the north side of the property --
 2              security gates on the north side up towards
 3              Cobbs Road and on the -- along what we call
 4              the service road?
 5     A.   No.  Just on the service road.
 6     Q.   Okay.  Why?  Is it impassable up on the -- it
 7              seems like the flow of traffic would be more
 8              up around Cobbs Ford Road.
 9     A.   There's a steep bank there.
10     Q.   A steep bank.  All right.  Now, apparently on
11              Plaintiff's Exhibit #7 -- everything I'm
12              questioning you on will be Plaintiff's
13              Exhibit #7.  It's my understanding that the
14              tract in which this water was running would
15              have been onto a tract that is labeled on the
16              tax tract 10.01; is that correct?
17     A.   Does the water run on that tract?
18     Q.   Well, it appears that that's exactly where
19              you drew the green line.  It would go right
20              onto that property; is that correct?
21     A.   No.  It drops into a branch.
22     Q.   Oh, okay.  And the branch, is this the Hudson
23              Branch that I'm look at right here?  Is that
```

1      the branch that I'm --

2   A.   I didn't know the name of it.

3   Q.   All right.  So that branch is a conduit for

4        the water.  And it does have a sharp V, if

5        you'll notice; but the water flows freely all

6        along the Hudson Branch.  Is that right?

7   A.   I've never walked it.  I assume it does.

8   Q.   All right.  So did you say earlier, though,

9        that there was a problem with the water flow

10       over the 9.6 acres of I-65?

11  A.   Yes.  It's causing erosion to the property.

12  Q.   I see.  And how did you plan to stop that?

13       Water bars?  Riprap?

14  A.   No.  We had a study done to take the water --

15       pick the water up here and run it down a

16       common line and drop it into the head of the

17       branch here.

18  Q.   Okay.  Now, let the record show that the

19       witness is testifying that along the west

20       property line, a possibility of diverting the

21       water down the west line along the service

22       road and hitting the Hudson Branch at the

23       southwest corner of the 9.6 acres.

1    A.    Yes.

2    Q.    Is that correct?  All right.  And that would

3          be a significant improvement to the property

4          with regard to future development, because

5          the branch would have to be dealt with.

6    A.    No.  The branch --

7    Q.    I mean -- excuse me -- the water would have

8          to be dealt with.  If it could be diverted

9          straight, it would be more developable

10         property in the 9.6 acres.

11   A.    Maybe; maybe not.

12   Q.    I'm complimenting you.  How long ago did you

13         first come up with the idea of perhaps doing

14         this, and what is the status of it?

15   A.    I don't remember how long ago it was.  The

16         status of it is just a proposal on paper.

17   Q.    Okay.  And approximately how much was the

18         cost of doing that?

19   A.    I don't recall.  To do the study or do the --

20   Q.    Well, both.  The study and then the

21         projection.

22   A.    I don't know.

23   Q.    And about how long ago was the study?

72

1    A.   I don't recall.

2    Q.   Okay.  Three years?  Four years?

3    A.   Oh, no.  This goes back -- I just don't

4        recall.  Over ten years.

5    Q.   That's all right.  Okay.  So we've still got

6        water running, eroding the property, correct?

7    A.   It's still running through the property.

8    Q.   If I walked the property, would it be pretty

9        obvious that it's digging a pretty deep

10       trench in there?

11   A.   I don't know.

12   Q.   Okay.  How long has it been since you walked

13       the property?

14   A.   I'd say six months.

15   Q.   Okay.  And what was the purpose of that last

16       visit?

17   A.   Someone had dropped some junk tires on the

18       property.

19   Q.   Did you remove them?

20   A.   No.  I had -- made contact with somebody to

21       remove them.

22   Q.   Okay.  Who was that?

23   A.   Some junk tire person.

73

| | | |
|---|---|---|
| 1 | Q. | And what did they charge for that? |
| 2 | A. | They haven't charged anything because I |
| 3 | | haven't had them removed yet. |
| 4 | Q. | Okay.  Did they given you a quote? |
| 5 | A. | No.  It's -- he said he'd be glad to come |
| 6 | | take a look at it and call me. |
| 7 | Q. | 30 or 40 tires or a hundred? |
| 8 | A. | I don't know.  I haven't counted them. |
| 9 | Q. | Is that what caused you to put up the |
| 10 | | security gate on the service road? |
| 11 | A. | No. |
| 12 | Q. | If it had a chain -- who has the key to that |
| 13 | | chain? |
| 14 | A. | I do. |
| 15 | Q. | How do you think they got in there? |
| 16 | A. | The tires? |
| 17 | Q. | Yeah. |
| 18 | A. | The tires are not in there. |
| 19 | Q. | They're not.  Where are they? |
| 20 | A. | They're on the eastern side of that security |
| 21 | | gate. |
| 22 | Q. | Okay.  So -- all right.  Now, when I look at |
| 23 | | this -- and help me with this, because I |

74

```
 1            don't know.  Am I correct that the service

 2            road is the eastern boundary of what we call

 3            the I-65 property?  Am I wrong on that?

 4    A.      That's correct.

 5    Q.      Okay.  And the southern boundary is what I've

 6            referred to as Hudson Creek; is that correct?

 7    A.      Hudson Branch.

 8    Q.      Or Hudson Branch.  Excuse me.  Is that

 9            correct?

10    A.      That's correct.

11    Q.      And the western boundary is the fence for the

12            service road for that off ramp; is that

13            right?

14    A.      Yes.

15    Q.      Okay.  What is the exit number here?  What is

16            that off ramp number?

17    A.      179.

18    Q.      All right.  And am I correct -- I'm going to

19            go ahead and mark this Exit 179.  Am I

20            correct that directly across the street from

21            the property is a Country Inn hotel?

22    A.      Directly across the street I think is a

23            filling station.
```

```
 1      Q.    Okay.   To the west of that is a Country Inn,

 2            is that right, Countrywide Inn or something?

 3      A.    A motel.

 4      Q.    A motel.   Do you know what per square foot

 5            the motel sold for?   The land, not the

 6            motel.

 7      A.    No, sir.

 8      Q.    Do you know what the Chevron station sold for

 9            per square foot?

10      A.    No, sir.

11      Q.    Are you aware that by simply going on your

12            computer, you probably could have found out

13            what the sales price was?

14      A.    No, sir.

15      Q.    Are you aware you could have gone to the

16            courthouse and checked?

17      A.    No, sir.

18      Q.    As president of I-65, again, wouldn't it be

19            prudent to know what surrounding properties

20            are selling for per square foot?

21      A.    I haven't really inquired.

22      Q.    Wouldn't it be of help to you as president to

23            know, if you got an offer, what comparable
```

```
 1              properties were selling for?

 2    A.    If I --

 3                 MR. CLEVELAND:  Object to the form.

 4    A.    If somebody told me, it would be interesting.

 5    Q.    But you haven't had time or the inclination

 6          to find out; is that right?

 7    A.    Just hadn't needed to.

 8    Q.    Okay.  So I think it's correct that you have

 9          no plans in the immediate future to either

10          appraise the property, market the property --

11          those two; is that correct?

12    A.    No, that's not correct.

13    Q.    All right.  Help me where it's incorrect.

14    A.    Property is always marketable.

15    Q.    Do you have a sign on it that says for sale

16          by I-65?

17    A.    It's not for sale.

18    Q.    Okay.  Property is always marketable, but

19          it's not for sale.  Is that an oxymoron?

20    A.    No, sir.

21    Q.    Is it for sale?  You just said it wasn't.

22    A.    It would take a lot.

23    Q.    A lot of money.  Ten bucks a square foot
```

77

```
 1         probably, right?
 2              MR. CLEVELAND:  Object to the form.
 3    Q.   You can answer it.
 4    A.   I don't know.
 5    Q.   Suppose I -- I love property.  We have the
 6         same name.  We have hundreds of acres.  The
 7         GMC dealership, I sold to a partner.  And I
 8         know what the land is worth.  I'm an
 9         attorney; I'm not a -- whatever.  I mean, I
10         know what my land is worth.  And you don't
11         know what it's worth, what your I-65 is
12         worth, correct?
13    A.   That's -- I don't know what it's worth today,
14         no, sir.
15    Q.   Has there ever been any confusion between our
16         I-65 Investment Properties and yours?  Have
17         you ever gotten any of our mail?
18    A.   No, sir.
19    Q.   Okay.  Have you ever thought about hiring
20         someone to oversee the marketing, at least
21         keep up with the value of the property and
22         perhaps put out fliers for interested parties
23         that might come along and want to purchase
```

78

```
 1          the property?

 2    A.    No, sir.

 3    Q.    Are you aware that property values sometimes

 4          go down rather than up?

 5    A.    Yes, sir.

 6    Q.    And are you aware that a piece of property

 7          that sits for too long undeveloped, you may

 8          miss all the motels; you may miss the

 9          McDonald's, the Arby's, the Wendy's?  Are you

10          aware of that?

11    A.    No, sir.

12    Q.    Would you be willing to admit, then, that

13          you're not the proper person, based on your

14          lack of all this knowledge, to really be in

15          charge of my client's 30 percent interest?

16          Would you admit that?

17    A.    No, sir.

18    Q.    Would you say that you are operating in a

19          good, businesslike manner in running this

20          company when you don't know its value, it's

21          not on the market, and you will admit you

22          could miss a good sale?  Would you admit

23          that?
```

79

```
 1    A.   No, sir.

 2    Q.   You won't admit that?  Because you think

 3         they'll seek you out if they want it; is that

 4         right?

 5    A.   No, sir.

 6    Q.   Then, why do you think you're doing a good

 7         job?  I mean, if you -- if it's not for sale

 8         and you don't think they will seek you out --

 9         isn't it a fact that you're just sitting on

10         it like a mother hen?

11              MR. CLEVELAND:  Object to the form.

12    A.   My opinion.

13    Q.   Isn't it a fact, Mr. Dorsey, that one of the

14         allegations of your sister's complaint is

15         you're trying to squeeze her out?

16    A.   That's one of the allegations.

17    Q.   Is it a fact?

18    A.   No, sir.

19    Q.   But it's your opinion you prefer to ground

20         lease rather than sell; is that right?

21    A.   Yes, sir.

22    Q.   And that goes back to the old theory they're

23         not making any more real estate, right?
```

80

```
 1    A.   I don't know about that theory.

 2    Q.   Well, you do know they're not making any

 3         more, right?

 4    A.   I don't know that either.

 5    Q.   Well, wouldn't that be why you would want to

 6         ground lease it?  Because you want, into

 7         posterity, your children's children to own a

 8         nice piece of property and draw income on it?

 9    A.   I just know that ground leasing is what I

10         think is the best cause of action for the

11         property.

12    Q.   Or course of action.  Have you ever consulted

13         with Donna about your wishes to -- the

14         minority stockholder -- to do a ground lease

15         rather than a sale?

16    A.   Yes.

17    Q.   Okay.  And what was her response to that?

18    A.   I don't recall it.

19    Q.   Are you aware, as the president of I-65, that

20         you have a duty to a minority stockholder to

21         act in that stockholder's best interest as

22         well as your own?

23              MR. CLEVELAND:  Object to the form.
```

81

```
1     Q.   You can answer it.

2     A.   Yes.

3     Q.   All right.  Are you aware that a majority

4          stockholder should always give the minority

5          stockholder equal opportunity with regard to

6          things affecting the corporation?

7               MR. CLEVELAND:  Now, that's your

8                    assertion, correct?

9               MR. ROBERTS:  Okay.  Yeah, I'll say

10                   that's mine, but I think that's

11                   the law, Cliff.

12              MR. CLEVELAND:  I disagree with you.

13                   That's the reason I was trying to

14                   be sure.

15              MR. ROBERTS:  Well, let me restate it,

16                   then.

17    Q.   Do you believe that the majority stockholder

18         has a duty to the minority stockholder to act

19         fairly so that all interests, including the

20         majority and the minority, are fairly dealt

21         with, yes or no?

22              MR. CLEVELAND:  And that's your

23                   interpretation.
```

1           MR. ROBERTS: Well, I'll ask him --

2               I'll admit that's my

3               interpretation.

4  Q.  And I'll ask you now, do you agree with that

5      proposition?

6  A.  Restate it.  I'm confused.

7  Q.  All right.  Do you believe that you -- I'm

8      going to make it clear -- you, as a majority,

9      70 percent stockholder, have an absolute duty

10     under Alabama law -- case law -- to your

11     sister, 30 percent stockholder, that whatever

12     you do is fair to both of you?

13  A.  Correct.

14  Q.  Okay.  Now, let's take the map.  And I

15     understand that there are some properties

16     that you have purchased, that you have

17     purchased individually or in some other

18     corporate form, on Plaintiff's Exhibit #7.

19     Is that a fair statement?

20  A.  Yes.

21  Q.  I hand you the yellow Magic Marker.  Let's go

22     one at a time.

23         MR. ROBERTS:  Do we need to take a

```
 1                          break before we do?  Because this
 2                          is going to take a while.  Do we
 3                          need a break?  No?  Let's go,
 4                          then.
 5      Q.   Let's start with the first one you purchased,
 6           if you know, either by yourself, the
 7           corporation, and most importantly, that Donna
 8           Davis, the minority stockholder, is not a
 9           partner in.  And you can color them with that
10           yellow, and we'll mark them as we go.
11                     MR. ROBERTS:  All right.  The defendant
12                          has marked four parcels on this
13                          map from -- one, two, three,
14                          four -- ending at the south end as
15                          sister's and on the east side --
16                          the west side, the service road,
17                          the right side, Market Street as
18                          its called, and the north side,
19                          Cobbs Ford Road.
20      Q.   Is that a fair depiction?
21      A.   Correct.
22      Q.   Okay.  When did you purchase -- or who
23           purchased these and when, if you know?
```

84

```
 1    A.    CD&O Properties -- or CD&O purchased those.

 2          And I want to say it was in 1991 or '92.

 3    Q.    All right.  And who is CD&O?

 4    A.    Just a corporation that -- that I formed.

 5    Q.    Okay.  A corporation you formed?

 6    A.    Uh-huh.  Excuse me.  An LLC, I mean.

 7    Q.    An LLC.  And am I right, just from somewhere

 8          in a public record, that's Connie, Dick &

 9          Others?

10    A.    Yes.

11    Q.    Okay.  Who are the others?

12    A.    Others?

13    Q.    Yeah.  Are others people?

14    A.    People.

15    Q.    Who are the people?

16    A.    People of America.

17    Q.    Okay.  I really enjoy this, but it's going to

18          delay it.  We can start with a phone book.

19          If we have to, we'll do that.  Is there some

20          reason why you don't want your minority

21          stockholder to know who the others were?

22    A.    No.  Just others.

23    Q.    Okay.  Well, now, we're in federal court.
```

85

```
1            You understand that?  We're not in state
2       court, right?  Do you understand that?
3   A.  Yes, sir.
4   Q.  And Myron Thompson is the judge.  Do you
5       understand that?
6   A.  I don't know who Myron Thompson is.
7   Q.  Well, trust me.  He is.  Now, I'm going to
8       ask you one more time.  And I agree with
9       Cliff; we want to move along.  I'm going to
10      ask you, who are the others, question mark?
11  A.  Just others.  I don't know.  No names.  Just
12      other people.  Other people.  Everybody that
13      helps me or helps the business or helps us do
14      business.
15  Q.  All right.  Well, that's good.  So these
16      others are basically -- you really don't know
17      their names.  It's just -- is Connie still in
18      the corporation -- or in the LLC?
19  A.  No.
20  Q.  No.  Did you receive it in the divorce, her
21      share?
22  A.  I'm not sure.  I'm not sure when I received
23      it from her.
```

86

Q.   Okay.  But we can start with -- I'm going to
     take an X on my little paper and mark Connie
     out, because she's not a part of it.

A.   Right.

Q.   Now I've got a D.  We can agree that Dick
     is -- and that's you.  That's Dick Dorsey,
     right?

A.   Yes.

Q.   Okay.  Now, if you'd just help me with the O,
     which is others.  I don't care if you don't
     know all of them, but if you can give me a
     couple of their names.

A.   Others are just other people that -- just
     other people that can talk to me about
     business and -- it's no named person.

Q.   Could I be others?  I mean, I've helped you
     with the tax effect on the property, 1031
     exchange.

A.   Sure.

Q.   So I could be one of the others, right?

A.   If you want to be.

Q.   Which means I don't own any interest.  It's
     just that O means, really, anybody?

87

```
 1      A.    You're an other.  I declare it.

 2      Q.    All right.  I decline, but thank you.  All

 3            right.  Where would I find the LLC so that I

 4            can see who the others are?

 5      A.    I'd have to pull the paperwork on it.

 6            There's no others.  I mean, others are just

 7            other people.

 8      Q.    All right.  I did see a TD&O at some point.

 9            While we're here, before we get there, what's

10            the TD&O?

11      A.    That's Taylor, Dick & Others.

12      Q.    Is that Ted Taylor?

13      A.    No.

14      Q.    Okay.  Who is Taylor?

15      A.    My son.

16      Q.    Oh, good.  I'm sorry.  Taylor, Dick &

17            Others.  All right.  That will help me when

18            we get there later.

19                  Okay.  Now, it's your testimony here

20            today that the CD&O is basically, as far as

21            ownership goes, the right to sell or mortgage

22            or whatever reposes solely in Dick, yourself,

23            right?
```

88

1    A.    CD&O?

2    Q.    Yes.

3    A.    Yes.

4    Q.    Okay.  And you're not a managing partner for

5          some other people who are, let's say, silent

6          partners?

7    A.    No.

8    Q.    All right.  Do you know when the LLC was

9          formed, CD&O?

10   A.    No.

11   Q.    You don't?  I think you said around '91 or

12         '92?

13   A.    No.  That's when the property was purchased.

14   Q.    All right.  And it was purchased, though, in

15         the name CD&O.  So, obviously, CD&O was in

16         existence around '91 or '92, right?

17              MR. CLEVELAND:  Object to the form.

18   Q.    You can answer it.

19              MR. CLEVELAND:  I mean, he's assuming

20                   it was purchased in the name --

21              MR. ROBERTS:  Oh, okay.

22              MR. CLEVELAND:  I don't know if that's

23                   accurate or not, Dick.  It may be;

89

```
 1                            it may not be.  That's

 2                            Mr. Roberts' -- that's his

 3                            statement.

 4      A.   I'd have to pull the papers.

 5      Q.   So you don't know who holds title to it?

 6                  MR. CLEVELAND:  That's not what he

 7                            said.  You said it was purchased

 8                            in the name of CD&O.

 9                  MR. ROBERTS:  Well, the reason I asked

10                            that question -- and you're --

11                            thank you, Cliff.  That helps me.

12      Q.   Whose name was these four tracts that you've

13           shown on Plaintiff's Exhibit #7 purchased in?

14      A.   I believe CD&O.

15      Q.   Okay.  We got that covered.  Okay.  Were

16           there any O's back then, or were they the

17           same as now?  Others means nobody, no

18           persons; is that right?

19      A.   There was others, just general people.

20      Q.   Yeah.

21      A.   No named person.

22      Q.   No named person.  All right.  But as of this

23           deposition today, those four tracts are owned
```

| | | |
|---|---|---|
| 1 | | by D of CD&O; is that correct? |
| 2 | A. | They're owned by CD&O. |
| 3 | Q. | Okay.  And CD&O is an LLC? |
| 4 | A. | Yes. |
| 5 | Q. | And the managing partner and sole owner of |
| 6 | | CD&O, LLC, is Dick Dorsey, one and the same |
| 7 | | as I'm deposing; is that right? |
| 8 | A. | Yes. |
| 9 | Q. | Okay.  Now, I compliment you on the purchase. |
| 10 | | It's contiguous property and could have an |
| 11 | | effect, either positive -- this is my |
| 12 | | statement -- or negative on the 9.6 acres. |
| 13 | | Is that a correct statement or incorrect? |
| 14 | A. | I think it's incorrect. |
| 15 | Q. | Okay.  Tell me why. |
| 16 | A. | It's separated by a road. |
| 17 | Q. | Okay.  Now, that road -- I think you're |
| 18 | | probably aware that that road could be |
| 19 | | vacated.  Are you aware of a vacation?  Not |
| 20 | | the one we go to Disney World on, but the |
| 21 | | giving up a road. |
| 22 | A. | No. |
| 23 | Q. | Are you aware that if two property owners own |

91

```
 1              property on both sides of the road, a road

 2              can either be vacated or sometimes

 3              relocated?  Were you aware of that?

 4    A.   No.

 5    Q.   All right.  When you purchased -- or excuse

 6              me.  When CD&O purchased the four tracts

 7              shown on #7 on the service road, did you

 8              contact your sister, the minority

 9              stockholder, and discuss the purchase with

10              her?

11    A.   I -- I don't recall.

12    Q.   Is it safe to say if you don't recall, that

13              your best judgment is you didn't?

14              MR. CLEVELAND:  Object to the form.

15    A.   No.  I don't recall.

16    Q.   If she testifies you didn't, would you

17              disagree with that?

18    A.   I don't recall.

19    Q.   My question is -- okay.  You don't recall.

20              But if Donna, your sister and your only

21              sister, testifies that you didn't contact

22              her, since you don't recall, would you accept

23              her testimony as being correct?
```

92

1            MR. CLEVELAND:  Object to the form.

2    Q.   You can answer.

3    A.   I don't remember.

4    Q.   Would it have been prudent, since you are the

5         captain of the 9.6 -- I'll call it the

6         ship -- to have contacted the minority and

7         suggested that she might want to buy it with

8         you, become an other?

9    A.   I don't think so.

10   Q.   Has anyone ever told you that you had a duty

11        under Alabama law to not act against the

12        interest of your sister, the minority

13        stockholder?

14            MR. CLEVELAND:  Object to the form.

15   Q.   You can answer it.

16   A.   I thought we were talking about purchasing

17        the property.

18   Q.   When you point to it, we're talking about

19        those four tracts.  And I'll restate the

20        question.  Has anyone ever told you that it

21        would be improper as the CEO, the captain of

22        the ship, whatever you want to call your 70

23        percent in I-65, to purchase property,

```
 1              particularly contiguous to the 9.6 acres,

 2              without giving the minority partner an

 3              opportunity to join in that purchase?

 4    A.   No.

 5    Q.   No one has ever told you that?

 6    A.   No, sir.

 7    Q.   At the time, did it ever cross your mind to

 8              do that?

 9    A.   I'd have to look at the time that I purchased

10              the property.

11    Q.   Do you know that sometimes small tracts of

12              property, in real estate nomenclature, tails

13              wag dogs.  Have you ever heard that?

14    A.   No.

15    Q.   Were you not aware that the purchase of those

16              four tracts that we're talking about by CD&O

17              could either increase their value by virtue

18              of ownership of the 9.6 or they could

19              decrease the value of the 9.6?

20    A.   No.

21    Q.   You're not aware of that?  You just thought

22              it would be a good idea to buy them, right?

23    A.   Just an opportunity came up and we bought
```

94

1           them.

2     Q.    And when you say we, CD&O?

3     A.    Right.

4     Q.    Okay.  And that's exactly what one of the

5           allegations of the complaint is, that it was

6           a missed opportunity for my client, your

7           sister, but an opportunity for you.

8     A.    No.  I-65 had no income.  How could they buy

9           that property?

10    Q.    Well, let's assume for the moment that

11          there's -- I think this is an old Regions

12          Bank, isn't it?

13    A.    Excuse me?

14    Q.    Isn't this where we're sitting -- was a

15          Regions Bank or something?

16    A.    I don't know.

17    Q.    Without being flippant, that's what banks

18          do.  They loan money to minority stockholders

19          to buy property.

20    A.    In the name of the corporation?

21    Q.    Well, it could be.  Yes, that would be a good

22          point.  I-65 could have purchased the

23          property instead of Dick.

95

```
 1              MR. CLEVELAND:  Is that a question?
 2     Q.   Well, let me ask the question.  Could --
 3              MR. ROBERTS:  You're helping me.
 4     Q.   Could --
 5              MR. CLEVELAND:  I'm trying to.  I'm
 6                   trying to get through this.
 7              MR. ROBERTS:  Well, Cliff, it's a big
 8                   matter, a lot of money.
 9     Q.   Could I-65 have purchased the property --
10          assuming it had a loan, or my client, as a
11          school teacher, had socked away money --
12          could I-65 have purchased the property, the
13          four tracts?
14     A.   I don't -- I don't think so, no, sir.
15     Q.   And why?
16     A.   They have no income.  They have no worth.
17     Q.   Okay.  Don't people sometimes loan money to
18          corporations?
19     A.   I don't know.
20     Q.   Well, you should know because Dorsey Motor
21          Sales is contending in a counterclaim, if you
22          do the math, that it loaned, including
23          accrued interest, a million six to I-65.
```

1    A.    I don't think they loan money to corporations

2           that have no worth and no income.

3    Q.    All right.  So you assumed that Donna could

4           not come up with sufficient moneys -- and I

5           mean, this is what I think you're saying --

6           to allow I-65 to have purchased this

7           property.  Is that your assumption -- or was

8           your assumption?

9    A.    The property became available for sale.  And

10         myself and Connie looked at it and came up

11         with what we thought was a business plan that

12         she wanted to do, and we purchased the

13         property.

14    Q.    Okay.  And I think your testimony is you did

15         not, to your recollection, notify the

16         minority stockholder of I-65.

17    A.    No.  It's separated by a service road.

18    Q.    And, therefore, you didn't deem it to be

19         necessary?  That's fine.

20             COURT REPORTER:  I'm sorry?

21             THE WITNESS:  No.

22             MR. ROBERTS:  Separated by a service

23               road and no, he didn't deem it

```
 1                  necessary to contact Donna.

 2     Q.   Let's go to the next one.  Let's do -- we did

 3          yellow on that one.  Let's do green for

 4          anything else you purchased.

 5               Okay.  I think the record will show in

 6          #7 that -- and by the way, this is CD&O

 7          purchased what we called tax tract 10.01,

 8          which shows to be 2.52 acres; is that

 9          correct?  Is that what you marked?

10     A.   Yes.

11     Q.   And what was on we'll call it tax tract 10.01

12          at the time you purchased it, if anything?

13     A.   A building.

14     Q.   Is that building still on there today?

15     A.   Yes.

16     Q.   And that building -- it's a metal building,

17          correct?

18     A.   Yes, metal and brick.

19     Q.   And it has been added on to at least once,

20          correct?

21     A.   Yes.

22     Q.   Okay.  Is CD&O the landlord of that property?

23     A.   Yes.
```

98

```
1    Q.   What is the rental per month on that
2         property?
3    A.   Right now, about $3200.
4    Q.   Per month?
5    A.   Yes, sir.
6    Q.   All right.  What else, if anything, have you,
7         CD&O, others, or anyone purchased on our
8         Plaintiff's Exhibit #7?
9    A.   I'm sorry.  Say that again.
10   Q.   Any other properties, you, CD&O, or anyone in
11        your family, friends, have purchased.  For
12        example, 03.04.  Do you know who owns that,
13        this tract right here?  It's 2.86 acres.
14   A.   I don't know who owns that.
15   Q.   Okay.  Do you know who owns 17.01?  That's
16        this tract right there.
17   A.   No.  It's an insulation company.
18   Q.   Okay.  So this Plaintiff's Exhibit #7 fairly
19        depicts at this point two tracts of property
20        that either you or CD&O has purchased, the
21        green and the yellow; is that correct?
22   A.   Correct.
23   Q.   Have you, at any time since 1990, owned any
```

99

```
 1              of these other tracts and now don't own them,

 2              either you, CD&O or anyone else?

 3     A.   No, sir.  I can't -- wait a minute.  Let me

 4              rephrase that.  I can't go back to 1990,

 5              because I don't know who owned them then.

 6     Q.   No.  I'm just saying have you owned them and

 7              sold them to someone else since 1990?

 8     A.   No.

 9     Q.   That was the answer.  All right.  Have you

10              had any offers on any of the four tracts in

11              L-7, boundaried by the yellow, to sell them?

12     A.   No.

13     Q.   Okay.  And I assume you wouldn't have an idea

14              of the fair market value of those either,

15              correct?

16     A.   No, sir.

17     Q.   Okay.  Just real quick, what is on --

18              starting with the one that says "Sisters" on

19              there, what's on there now, on that lower of

20              the four tracts, just south of the four

21              tracts?  Just run through for me real quick.

22     A.   The sister's building.

23     Q.   And what is Sisters?  What does it do?
```

1    A.   It's a mattress sales company.

2    Q.   Okay.   That's good.   That's what I saw, a

3         mattress company.   What is the next one,

4         coming north, the next track above Sisters?

5    A.   Vacant land.

6    Q.   Vacant land.   And what about the next one

7         above that?

8    A.   Vacant land.

9    Q.   And vacant on Cobbs Ford Road?

10   A.   Correct.

11   Q.   All right.   Now, where -- am I wrong that you

12        may have had the Suzuki dealership out there

13        at one point on one of these parcels of

14        property?

15   A.   No.

16   Q.   I'm wrong?

17   A.   No, you're not wrong.

18   Q.   Okay.   Which tract would have you have had it

19        on?

20   A.   The 10.01.

21   Q.   Okay.   And what about antique cars or

22        anything like that?   Have you had a place

23        there?   I just vaguely remember seeing some

```
 1              antique cars coming by there, vintage cars or

 2              something like that.

 3      A.      Well, they have some cars over there across

 4              the street at 10.008, but they're not --

 5              that's not mine.

 6      Q.      Okay.  Do you know who owns that?

 7      A.      Yes.

 8      Q.      Who owns that?

 9      A.      Vintage Autos.

10      Q.      Okay.  And I'm looking for where you're

11              saying.  I just don't see 1008.  Which one is

12              that, now?

13      A.      Right there.

14      Q.      Oh, I see it now.  Do you know who owns

15              Vintage Autos?

16      A.      Wasn't Smith.

17      Q.      And he was a partner at some point, or am I

18              wrong, of yours in some other endeavor?

19      A.      No.

20      Q.      He wasn't?  He never worked for the

21              dealership?

22      A.      Yes.

23      Q.      Okay.  Does he still work for the dealership?
```

1    A.    No.

2    Q.    And he is the only titled owner?  You've

3          never owned any interest in that yourself?

4    A.    No, sir.

5    Q.    Okay.  And the RV center, 10.03, do you know

6          who owns that?

7    A.    It's Saxon Properties.

8    Q.    All right.  No -- you've never had any tie

9          with them at all or anything?

10   A.    Yes.

11   Q.    You have?  What tie have you had with them?

12   A.    I'm a part owner of Saxon.

13   Q.    All right.  How much owner are you?

14   A.    50 percent.

15   Q.    Any buy and sell agreements on it?

16   A.    Not that I -- no.  I don't know.

17   Q.    Okay.  It's a corporation?

18   A.    No.  It's an LLC.

19   Q.    And the other man is Wayne Smith?  No.

20         Excuse me.  Wayne is over on 1008.  Who are

21         the other partners of Saxon Properties?

22   A.    Now, there's another property in between

23         Wayne and Saxon.  That's the 10.03.  And I --

103

```
 1              I don't know.  I think Jim Sullivan still

 2              owns that.

 3         Q.   All right.  Now, there's not a mark.  It

 4              would indicate that that -- that there's no

 5              break between the two properties, but

 6              there -- you're saying there is a difference.

 7         A.   There's another property there.

 8         Q.   Okay.

 9         A.   I think it's a radio business or something.

10         Q.   Okay.  And you think it's not -- it's not

11              part of Saxon property?

12         A.   No.

13         Q.   Okay.  How did you come to become an owner of

14              Saxon Properties and the -- and that

15              particular tract of property?  Was it again

16              found out it was for sale?

17         A.   Yeah.  Found out it was for sale and came

18              available.

19         Q.   About when was that bought?

20         A.   I --

21         Q.   If you know.

22         A.   I'm guessing.  2000, 2001.

23         Q.   Okay.  Now, although it's not contiguous, the
```

| | |
|---|---|
| 1 | same question, did you ever contact Donna, |
| 2 | the minority stockholder, and tell her that |
| 3 | it was available and would she like to buy in |
| 4 | either individually or as I-65? |
| 5 | A. No. |
| 6 | Q. Okay. The same reason, corporation had too |
| 7 | much debt, meaning I-65, and you just assumed |
| 8 | that she wouldn't want to purchase; is that |
| 9 | right? |
| 10 | A. No. I just didn't think about it at all. |
| 11 | Q. Who found out about it being for sale? Was |
| 12 | it Mr. Saxon -- excuse me. No. No. You own |
| 13 | 50 percent. Who owns the other percentage? |
| 14 | A. Mr. Cleveland. |
| 15 | Q. Okay. Are we talking about the same attorney |
| 16 | here today? |
| 17 | A. Yes, sir. |
| 18 | Q. Did you or Mr. Cleveland, which one of you |
| 19 | first learned about the property coming for |
| 20 | sale? |
| 21 | A. The property has been up for sale and off of |
| 22 | sale and up for sale several times. I -- I |
| 23 | think we both knew about it. It's a pretty |

105

```
 1                 infamous property.
 2     Q.    Really?
 3     A.    Yeah.
 4     Q.    How so infamous?
 5     A.    The guy that was involved in it -- it goes
 6           back, but there had been an auction house out
 7           there.  And a German man named Mr. Leuter had
 8           run it, and he -- just I've known him just
 9           through the antique business.
10     Q.    I see.  Was there a real state agent involved
11           in the sale?
12     A.    No.
13     Q.    It was not listed?
14     A.    No.
15     Q.    Who did you or Mr. Cleveland deal with that
16           actually handled the sale?
17     A.    The bank.
18     Q.    Which bank?
19     A.    Peoples Bank & Trust.
20     Q.    Okay.  And it was a foreclosure, then?
21     A.    I think so.
22     Q.    And that was purchased, when did you say,
23           roughly?
```

1    A.    2000, 2001.

2    Q.    So am I correct that the two owners of the

3          property, if you're looking at the LLC, is

4          Cliff Cleveland and yourself; is that right?

5    A.    Yes.

6    Q.    And Mr. Cleveland owns 50 percent and you own

7          50?

8    A.    That's right.

9    Q.    There are no buy and sell agreements between

10         y'all?

11   A.    I don't know.  I don't know.

12   Q.    All right.  Parcel -- what we show as 10

13         here, somebody wrote dealership.  And you

14         don't own what I'll call 10 on #7, do you, or

15         have any interest in it?

16   A.    Oh, that.

17   Q.    Yeah.  Do you or don't you?

18   A.    No.

19   Q.    Have you ever owned it?

20   A.    No.

21   Q.    Have you ever leased it?

22   A.    No.

23   Q.    Why do we have dealership on here?  Help me

1        with that.

2                MR. CLEVELAND:  If you know.

3    Q.   If you know.  That's all a deposition is.

4         I'm not asking you to make things up.  If you

5         know, since you've been around dealerships.

6         I thought someone mentioned or said at some

7         time you had a dealership there.

8                MR. CLEVELAND:  See where he's talking

9                    about, Dick?

10   Q.   Number 10 right here.

11   A.   I was trying to read that writing.  CU 7?

12   Q.   I didn't write it.  Did you?

13   A.   I didn't write it.  I don't know.

14   Q.   But, I mean, the question is -- if you don't

15        know, you don't know.  You've never leased

16        it, owned it, been a silent partner in it or

17        anything, right?

18   A.   No, sir.

19   Q.   And who does own it?

20   A.   Don't know.

21   Q.   All right.  So is it safe to say other than

22        parcel 03.04 -- and you see that's the

23        question mark piece.  I'll mark it on here,

108

1         question mark.  I just want to see --

2    A.   Oh, that one?

3    Q.   Yes, sir.  You said you don't know who owns

4         that?

5    A.   I do not.

6    Q.   So, other than that parcel, is it safe to say

7         that properties owned by you or under your

8         control completely surround the 9.606 acres?

9             MR. CLEVELAND:  Other than what

10                 parcel?

11            MR. ROBERTS:  Other than 03.04.

12   A.   Well, 17.01.

13   Q.   Oh, excuse me.  Who owns that?

14   A.   I don't know.

15   Q.   So your answer is that other than those two

16        parcels, you or entities owned or controlled

17        by you virtually surround the property; is

18        that right?

19   A.   On the east side and the south side.

20   Q.   All right.  Is it your testimony here today

21        that you don't believe that your ownership or

22        other entities -- and I'm not even including

23        Mr. Cleveland and your other tract -- that

109

```
 1              they would not impact the fair market value,

 2              either up or down, of I-65 investment

 3              properties?

 4       A.     I don't think they would.

 5       Q.     If something were done negatively, nasty

 6              warehouses on I-65, Inc., are you telling me

 7              you don't think that would affect your

 8              parcels in yellow and green below it?

 9       A.     I can't speak for what somebody would do on

10              the property.

11       Q.     I'm just asking you assuming -- I'm trying to

12              get back to -- I think your answer was it's

13              your opinion that what happens on the

14              contiguous properties owned by you and/or

15              others would not have an effect on I-65's

16              property, and, conversely, I-65 would not

17              have an effect, potentially, on your

18              properties.

19       A.     If I --

20                    MR. CLEVELAND:  I mean, is your

21                        question based upon no zoning,

22                        no restrictions; you can put

23                        anything you wanted to there?
```

1          MR. ROBERTS:  Yes.

2          MR. CLEVELAND:  A garbage dump?

3          MR. ROBERTS:  Anything.

4     A.   No ADEM?  No nothing?

5     Q.   That's a good question.  What is the property

6          zoned?  Both tracts, yours and the subject

7          property.

8     A.   I'd have to look at the zoning for Millbrook.

9          I don't really recall.  I think it's B1.  Is

10         there a B1?

11    Q.   General business where I'm from, but it might

12         not be down here.

13    A.   Yeah.  I don't know.

14    Q.   So as far as you know, all of those

15         properties are B1 or something along that

16         line?

17    A.   Yes, sir.

18    Q.   Okay.  But, again -- and I -- in deference to

19         Mr. Cleveland's comment, my question is do

20         you believe that -- and we're assuming that

21         it operates within the acceptable zoning --

22         that what happens to one -- and by one, I

23         mean does not necessarily affect the other.

111

```
 1    A.   That's -- that's really hypothetical.   I

 2         can't -- I can't --

 3    Q.   Let me ask you.

 4    A.   I can't answer something that hypothetical.

 5    Q.   Let's just say -- I don't know if what they

 6         call smut, porno sales places -- are you

 7         saying that if that was on either one of

 8         those, it wouldn't have an adverse impact on

 9         either one of them, potentially?

10    A.   I'm sorry.  I don't have an opinion on that.

11    Q.   Okay.  What about mini warehouses on one?

12         Would that affect the commercial nature of

13         the other?  And it's either one.  You can put

14         them on I-65 or you can put them on your

15         other properties.

16    A.   As far as mini warehouses, anything can be

17         built can be removed.  So I don't know.  I

18         don't -- I don't see the connection.

19    Q.   All right.  Well, I got you.  Where -- I

20         mean, I completely understand you.  It is

21         your opinion, your professional opinion, that

22         what happens on one tract, I-65, doesn't

23         impact your other tracts, meaning the green,
```

112

```
 1              and advice versa; that to your knowledge

 2              right now, neither tract could impact the

 3              value of the other depending on what's built

 4              there?

 5      A.      I don't think the three tracts are really

 6              connected.  One is separated by the road; the

 7              other one is separated by a natural branch.

 8      Q.      All right.  Do you believe -- for example,

 9              you see Market Street on there, 50 foot

10              right-of-way?

11      A.      Yes, sir.

12      Q.      All right.  Do you believe that Market Street

13              could become the access and the service road

14              could be eliminated because persons exiting

15              Cobbs Ford Road could simply come down the 50

16              foot right-of-way, which appears to be

17              significantly greater than the service road,

18              and then re-intersect the service road going

19              south, which would mean that all four

20              properties would become part -- could become

21              part of I-65?  Had you not thought about

22              that?

23      A.      No, sir.
```

113

```
1    Q.   Sound like a good idea if somebody needed --
2         say a dealership says, we've got to have at
3         least 14 acres; you know, churches need 30.
4         It wouldn't be a great help to I-65, if
5         somebody needs 14 acres, if these four tracts
6         were joined to the 9.6?
7    A.   I never thought of doing away with the road.
8    Q.   Okay.  I'll ask you here today.  Not that I'm
9         the real estate guru, but it's a possibility,
10        isn't it?
11   A.   Anything is possible.
12   Q.   Okay.  And Market Street looks like a better
13        road, would you agree, than the service road?
14   A.   I -- I can't say that.
15   Q.   Okay.  Do you know who put the service road
16        in?  Was it there when you bought the I-65,
17        or when Dorsey bought the I-65?
18   A.   Yes, sir.
19   Q.   Okay.  Now, this -- we go back to my original
20        assumption.  Had Donna or I-65 -- we'll call
21        it I-65 -- purchased the CD&O property, it
22        could have been blended with the 9.606?
23             MR. CLEVELAND:  Object to the form.
```

114

Q.  You can answer.

A.  No, I don't think so.

Q.  You don't think so.  Why not?

A.  I-65 couldn't pay for it.

Q.  Okay.  And that's based on the fact that I-65
    didn't have any money?

A.  That's right.

Q.  All right.  I'll move right along on this.
    Is it your opinion that I-65 partners,
    meaning you and your sister or whoever,
    couldn't have borrowed the money and
    purchased it?

A.  I don't think so, no, sir.

Q.  All right.  How do you -- does that mean that
    Dick Dorsey couldn't have?  Were you so
    extended you couldn't have borrowed money?

A.  I don't think somebody is going to loan me
    money when I don't have the income to repay
    it.

Q.  But, now, we're not looking at just income
    from I-65.  We're looking at income from any
    other source.  Banks don't care about
    unimproved property; they'll look at your

115

```
 1          personal financial statement.  So I'll ask

 2          you that question.  Somebody had the money to

 3          buy it.  How did you get your money to buy

 4          it?

 5    A.    We presented a business plan to the bank.

 6    Q.    Okay.  And which bank?

 7    A.    Regions.

 8    Q.    Which office?

 9    A.    Main.

10    Q.    Downtown, Birmingham, or here?

11    A.    Montgomery.

12    Q.    All right.  And what loan officer did you

13          present it to?

14    A.    Spencer Knight.

15    Q.    Is he still with Regions?

16    A.    Yes, sir.

17    Q.    Did he require the LLC to personally endorse

18          the loan, meaning you and Connie?

19    A.    Yes, sir.

20    Q.    So he wasn't just looking to the raw land for

21          repayment, was he?

22    A.    No, sir.  He was looking to us to repay.

23    Q.    Had personal guarantees, correct?
```

116

A.   Yes, sir.

Q.   Okay.  So what's different about I-65 having
     purchased it and we get Spencer Knight to
     agree that you and Donna personally guarantee
     the loan?

A.   I-65 had negative equity at the time.

Q.   All right.  But let's assume it had negative
     equity.  They ultimately are looking at the
     personal guarantee, aren't they?

A.   I don't know.

Q.   Well, in other words, if my net worth was
     $7 million and I've got a piece of property
     with a negative worth, isn't it a fact that
     Regions wouldn't be worried about the
     property; they'd be looking at my assets?

A.   Boy, that sounds great to me.

Q.   You weren't aware of that, then?

A.   No, sir.

Q.   I submit to you that I leased to Regions Bank
     for years in Birmingham and that's how they
     work.  They'll loan you money on triple
     negative if you're -- if you've got $500,000
     in cash sitting in their bank.  But that's a

```
 1              problem.  I mean, you're the CEO.  You're the
 2              leader.  You didn't know that.  And that's
 3              one of the reasons that you didn't allow
 4              Donna to participate in that.  That is your
 5              testimony, isn't it?
 6      A.      No.  I didn't allow I-65 to participate.
 7      Q.      Excuse me.  Well, I-65.  Is that correct?
 8      A.      That's right.
 9      Q.      And who was the 30 percent owner of I-65?
10      A.      Donna.
11      Q.      Donna.  So didn't you indirectly, by virtue
12              of her 30 percent ownership, keep her from
13              being able to participate in that sale, yes
14              or no?
15                   MR. CLEVELAND:  Object to the form.
16                   MR. ROBERTS:  You can answer.
17      Q.      Yes or no?
18      A.      I didn't have any consideration of I-65
19              Properties, Inc., buying this property,
20              because they had a negative equity, had zero
21              income, and could not pay for the property.
22      Q.      Okay.  Now, I-65 -- I may be wrong; but if I
23              check the bank records, hasn't I-65 --
```

```
1          haven't you used that property, which doesn't

2          have a recorded mortgage, as collateral for

3          another loan?  Yes or no?

4    A.    I --

5    Q.    I'll restate it.  I'll go slow.  There is no

6          outstanding recorded mortgage by I-65 on this

7          piece of property, meaning the I-65 property;

8          is that right?

9    A.    That's correct.

10   Q.    Okay.  And with it being unrecorded, is it

11         your testimony here today that you have never

12         pledged, assigned, or otherwise used this,

13         quote, negative value property as collateral

14         for any other loans?

15   A.    Well, it's on my financial statement.  So if

16         I personally guarantee something, then I'm

17         pledging my personal assets, which is stock

18         of I-65 to that debt, am I not?

19   Q.    Yes, sir, you are.

20               MR. CLEVELAND:  His question was have

21                    you mortgaged it, though.

22   A.    No.

23   Q.    Or pledged it?
```

119

```
1    A.   No.

2    Q.   When was your last financial statement that

3         you filed?

4    A.   I don't remember.

5    Q.   Other than Spencer Knight and Regions, what

6         other banks, local, have you dealt with in

7         the last five years?

8    A.   To borrow money?

9    Q.   Yeah.  Or anything.  Put money in or take it

10        out.

11   A.   First Community Bank.

12   Q.   Okay.  And who's the loan officer there?

13   A.   Tracey Alexander.

14   Q.   Are they local here in Prattville?

15   A.   Yes.

16   Q.   Okay.  Name any others for me, if you will.

17   A.   I have an account at -- what is it, River

18        Bank.

19   Q.   No loans, just a bank account?

20   A.   Just a bank account.

21   Q.   Who does the Dorsey Motor Sales Suzuki

22        dealership have its bank account with?

23   A.   With the First Community.
```

1    Q.    Who does Victory have their main account

2          with?

3    A.    First Community.

4    Q.    All right.  Do you happen to remember what

5          value you put your 70 percent interest in

6          I-65 on your last statement, what you valued

7          it at?

8    A.    I don't remember.

9    Q.    Normally, banks like to get them about every

10         two years.  So am I correct you would have

11         filed one within the last couple of years?

12   A.    I would say so.

13   Q.    Now, since it is material to this case the

14         value you placed on it, I would like to ask

15         you if a request is made through your

16         attorney, Mr. Cleveland, if you would have

17         any problem with providing a copy of that

18         financial statement.

19   A.    No.

20   Q.    No, you wouldn't or, no, it's okay?

21   A.    It's okay.

22   Q.    All right.  Now, concluding on this -- and

23         it's about time for a break -- did you ever

```
 1              use any of the I-65 property, other than

 2              indirectly, pledged as collateral for any

 3              loans?

 4     A.   No, sir.

 5     Q.   And to date, there are no debts other than

 6              the alleged mortgage or promissory note

 7              outstanding against the I-65 property?

 8     A.   That's correct.

 9              MR. ROBERTS:  The time is five after

10                   12.  I'm going to need either a

11                   short break, or we can break for

12                   45 minutes or an hour.

13              MR. CLEVELAND:  Let's go ahead and

14                   break for lunch and let

15                   everybody --

16              MR. ROBERTS:  Back at one?

17              MR. CLEVELAND:  Yeah.  Sounds good.

18                   (Lunch recess)

19     Q.   Just one question.  And certainly -- did you

20              have a chance to discuss the maps or anything

21              with your attorney when we were -- during the

22              break?

23     A.   No.  I mean, was I supposed to?
```

1    Q.   No.  No.  I was just going to ask you did

2         you.

3    A.   No.

4    Q.   I always ask that question just so you know.

5         Okay.  Now we're back to the map.  And I

6         think you've told me everything you know

7         about the map as far as ownerships, as far as

8         ever owned, not owned, no offers of sale on

9         the -- I mean no offers to buy the 9.6.  Any

10        offers to buy the 10.01?  That's the --

11   A.   Oh, the --

12   Q.   The CD&O.

13   A.   No.

14   Q.   No?  Any offers to buy the four lots owned by

15        CD&O?

16   A.   No.

17   Q.   No.  Okay.  Now, I notice -- and I'm skipping

18        ahead of myself, but we noticed that a

19        complainant in -- and this may be a legal

20        question, and you're perfectly okay to

21        answer.  I don't know why they did that.

22        TD&O, which is your son Taylor, Dick &

23        Others, apparently has filed a counterclaim

| | | |
|---|---|---|
| 1 | | against Donna individually.  Can you help me |
| 2 | | with why TD&O has anything to do with this? |
| 3 | A. | TD&O has been one of the companies that I've |
| 4 | | borrowed money for, for I-65. |
| 5 | Q. | Oh, I got you. |
| 6 | A. | To pay property taxes, maintenance, upkeep. |
| 7 | Q. | Okay.  Got you.  And will that show -- |
| 8 | | here's -- it's all marked up, so I almost |
| 9 | | hate to use it, but this was furnished at a |
| 10 | | point.  I think Ms. Perry did it.  It was |
| 11 | | furnished to my client.  Forget all the |
| 12 | | writing.  She took notes.  It's the only copy |
| 13 | | she had.  So will that show on here?  It's |
| 14 | | got loans Dorsey Motors, Dorsey Motors.  I |
| 15 | | haven't studied it.  I didn't see TD&O on |
| 16 | | here. |
| 17 | A. | I haven't seen the document. |
| 18 | Q. | Okay.  Well, we'll go to that -- well, we may |
| 19 | | as well go to it, because I'm trying to |
| 20 | | ascertain how TD&O -- I didn't know they |
| 21 | | were, because you told me it's Taylor.  So |
| 22 | | we'll go ahead and use this document. |
| 23 | | MR. ROBERTS:  Now, I don't have a clean |

```
 1              copy.  And, Cliff, if it's all
 2              right with you -- and y'all have
 3              one -- I will introduce it with
 4              the idea that we can substitute a
 5              perfectly clean copy or we can
 6              redact any and all writing.
 7              Because in the meeting that Donna
 8              had, she didn't have an extra copy
 9              or a paper and she wrote on the
10              only copy.
11         MR. CLEVELAND:  Okay.
12         MR. ROBERTS:  If you have a clean copy,
13              it is my representation to the
14              Court that will be Plaintiff's
15              #8.  I'll give it to you.  It's
16              kind of out of order, but a good
17              time to cover it.
18    Q.   I'm going to let you study it for a minute,
19         because I haven't studied it.
20                   (Brief pause)
21    Q.   Okay.  Have you had a chance to look at it?
22    A.   Uh-huh.
23    Q.   I now see that you are completely correct.
```

```
 1              There is one entry there on the 2003 schedule

 2              where TD&O is owed a $3,000 fee for Diamond,

 3              Roller, Taunton.  I assume that's accounting

 4              fees, is that correct, or is that a running

 5              balance?  Excuse me.  It's $862.58.  I stand

 6              corrected.  The last page.

 7      A.      Okay.  The question?

 8      Q.      Yes, sir.  The TD&O, Inc., just to help me,

 9              the fee was 862.58.  And the 3,000 on the

10              right column, what is that far right column?

11              That's a cumulative figure, so to speak?

12      A.      I really -- I -- these are -- this is

13              something that Jo Anne put together.

14      Q.      Okay.  That's fine.

15      A.      She would have to speak to it because I --

16              I -- I don't know if it's complete.

17      Q.      That's fine.

18      A.      I don't see --

19      Q.      No.  That's fine.

20      A.      -- check numbers or --

21      Q.      But there is apparently a TD&O involvement as

22              far as having some loans, allegedly if not

23              actually, advanced to I-65.  Just out of
```

126

```
 1            curiosity, why did TD&O advance rather than

 2            the rest of them or Dick Dorsey -- Dick

 3            Dorsey, Dorsey Motors, and then a CD&O.  Is

 4            there any reason why you sought to involve

 5            Taylor -- I mean TD&O in this, bring them

 6            into this mix?

 7      A.    No.  I might have been out of money.

 8      Q.    Okay.  How old is Taylor?

 9      A.    Eight and a half.

10      Q.    Oh.  I was going to ask him if he knew the

11            fair market value of the property.  I think

12            I'll pass.  That's a good question, though.

13            Does anybody else that you know possibly have

14            an opinion as to fair market value, other

15            than yourself, of the I-65 Property?

16      A.    I'm sure you could ask a hundred people and

17            get a hundred opinions.

18      Q.    But I mean somebody you know.

19      A.    No, not without paying them.

20      Q.    All right.  Now, again, we're disregarding

21            any notes on here; but to help me, there was

22            a note somewhere that indicated that it might

23            have been provided by you or someone to Donna
```

127

```
 1        somewhere around December of 2005.  Is that
 2        anywhere close?  Not holding you to it.
 3   A.   I don't know.
 4   Q.   Okay.  Jo Anne Perry would be the one that
 5        would know?  She would know when she made it
 6        up, wouldn't she?
 7   A.   If she made it up.
 8   Q.   Okay.  I thought earlier you may be -- I'm
 9        probably wrong.  I thought you -- who
10        actually does this, keeps the books, so to
11        speak, on 65.  I mean, this is a
12        compilation.
13   A.   Jo Anne and Alan Taunton.
14   Q.   Okay.  So we'd ask both of them and somebody
15        would know.  All right.  And the reason I
16        said, if you'll look at the first page, under
17        amount, Department of Revenue and Bob Gray,
18        it looks like the total is 5,000.  And the
19        actual figures over here was $35 and 140.
20        And it must be carrying it forward in order
21        to get $5,000.  Do you see the first page I'm
22        talking about?
23   A.   I -- I don't follow you.
```

1    Q.  Well, 35 and 140 equals $175.  Those two

2        fees.  And then on the right, it would appear

3        that Dorsey Motors loaned the $35 and the

4        140; but on the far right column, it says

5        4,000 and 1,000.  And I'm assuming that

6        begins the running total.  I don't know what

7        the 4,000 and the 1,000 represents.

8    A.  I don't either.

9    Q.  Okay.  Taunton and Jo Anne Perry.  All

10       right.  But let's talk about artist sketches,

11       Bob Gray.  Do you have any idea?  Was that

12       something to deal with the property itself

13       for a sales tool or something?

14   A.  I don't know.  I think my dad spoke to Bob

15       and -- and asked him to sketch some things on

16       the property.  Don't know what it was in

17       regards to.

18   Q.  Is Bob still around?

19   A.  Yes.

20   Q.  Is he an architect?  Engineer?

21   A.  No.

22   Q.  What does he do?

23   A.  Works for the Water Works.

129

1   Q.   All right.  Let's go as fast as we can

2        through.  Let's go '91, option on four lots.

3        So that would be the property that you have

4        already shown us right here, okay, meaning on

5        Plaintiff's Exhibit #7.

6             MR. ROBERTS:  Wait.  Plaintiff's

7                  Exhibit #7, the one that's marked,

8                  where is that, the exhibit?

9                  Okay.  Good.  I just wanted to be

10                 sure it was Exhibit #7.

11  Q.   So that's the four lots.  So we -- if this is

12       correct, we can assume that that gives us an

13       idea of when the property was purchased

14       beings or optioned, the beginning.  And that

15       was 1991.  And we had an appraisal to Carmike

16       on Carmichael.  Are they local?

17  A.   I think they're in Montgomery.

18  Q.   Okay.  You don't know if they're MAIs, I

19       guess, do you?

20  A.   I don't know.

21  Q.   All right.  Why did you deem it necessary to

22       have it appraised back then and not, as you

23       said, you don't want to do it now?

1    A.   At this time, there was an offer on the table

2          with the Nissan dealership.

3    Q.   Okay.  And that fell through, I assume?

4    A.   Yes.

5    Q.   All right.  The option was extended to Ralph

6          Bennett.  And there was a design -- Southern

7          Survey and Design.  Are they still around?

8    A.   I -- I think so.

9    Q.   Okay.  Do you have a survey on the property?

10   A.   Yes.

11   Q.   Okay.  Again, we should make a note we'd like

12         to request a copy of the survey through your

13         attorney.  We'll file, but if you could be

14         getting it together.

15         All right.  Quite a good bit of money

16         went to Southern Survey and Design.  Am I

17         right to assume that you would have had some

18         nonrefundable earnest money before you spent

19         all this money on a proposed sale?

20   A.   I don't understand.  What nonrefundable

21         earnest money are you talking about?

22   Q.   Well, were you willing to spend all this

23         money prior to having some reimbursement if

131

```
 1              the Nissan deal went south?
 2     A.   Well, I don't know.  Dad did most of the
 3              discussion with Southern Survey and Design.
 4     Q.   That's fine.  That's the answer.  No
 5              problem.  So ultimately, as far as you know,
 6              the money was defaulted?  I mean, when they
 7              didn't go forward, y'all didn't get any --
 8              get to keep any of the earnest money?
 9     A.   There was no earnest money.  It was strictly
10              a proposal.
11     Q.   Okay.  So there wasn't really a contract at
12              all, then, if you know.  Long time ago.  I
13              wouldn't know.
14     A.   I -- I don't recall.
15     Q.   That's all right.  It would have shown up as
16              income to I-65 if there had been; is that
17              correct?
18     A.   Oh, yes.
19     Q.   Okay.  Now, along this line, there's
20              virtually no income all these years.
21              Everything I see on this recapitulation, as
22              I'll call it, is expenses.  So am I correct,
23              other than the billboard, there's virtually
```

1    been no income off of I-65 Investment,

2    Inc. -- or I-65 -- excuse me -- Properties?

3 A. That's right.

4 Q. What is the rental -- is there only one

5    billboard on the property on I-65?

6 A. Only one billboard.

7 Q. And what is the annual rental on that?

8 A. $600 year.

9 Q. Okay.  And how long is the lease on that, if

10    you know, approximately?

11 A. I don't recall.

12 Q. Was it perhaps a 20-year lease is why it's so

13    low at 600?

14 A. I don't know.

15 Q. Okay.  Similar billboards, unless it's been

16    under a long-term lease and got the Lady Bird

17    Johnson brouhaha, but normally would be about

18    $800 a month.  So are you just under a real

19    restrictive lease that you can't go up on the

20    rent?

21 A. I -- I don't know about $800 a month.

22 Q. Okay.  Who is the tenant?  Which company is

23    the -- is the tenant on the billboard?

133

```
 1    A.    Okay.  TD&O leases the land from I-65
 2          Properties.  Okay?  They, in turn, turn
 3          around and lease their permit to Lamar
 4          Advertising.
 5    Q.    Okay.  That's good.  So as far as you know,
 6          TD&O could be getting significantly more
 7          money than $600 a year; is that right?
 8    A.    Yes, sir.
 9    Q.    Do you know how much TD&O does in fact get?
10    A.    They get $5400 a year.
11    Q.    Okay.  Do the math for me.  It's not much
12          more.  About 12 -- all right.  Was there any
13          reason that TD&O was the -- that there is
14          that lease to TD&O by I-65 and then TD&O --
15          was there some kind of a legal liability,
16          some reason TD&O got into it, as opposed to
17          just a direct lease from I-65 to Lamar
18          Advertising?
19    A.    Well, TD&O had the permit.
20    Q.    Okay.  They took out the permit?
21    A.    They owned the permit.
22    Q.    Okay.  But anybody could take out -- if you
23          could get the permit, I-65 could have just as
```

        easily got the permit, right?

A.    I don't know.  I -- TD&O is really an

      advertising company.

Q.    Okay.  Does TD&O -- I would like to get a

      copy of the lease, because if the -- if the

      sign cannot be moved to another location or

      pay a default amount, it could have an impact

      on the fair market value of the property.

      Are you aware of that?

A.    I -- I'd have to look at the terms of the

      lease.

Q.    I'd like to get a copy.  And we'll ask for

      it, if it's a lease, between TD&O and Lamar

      Advertising.  And then if I understand you

      right, TD&O pays I-65 about $600 a year; is

      that right?

A.    Yes, sir.

Q.    And TD&O earns around $5400 a year.  And TD&O

      has the sign permit.  And you're not sure if

      the lease can be canceled based on --

      withdraw that.

            When billboards are put up like that,

      frequently, Lamar Advertising, in particular,

| | | |
|---|---|---|
| 1 | | will build the billboard at its own expense |
| 2 | | in return for less rent.  Is it your |
| 3 | | understanding that's what happened in this |
| 4 | | case? |
| 5 | A. | Yes.  Lamar owns the billboard. |
| 6 | Q. | Okay.  So y'all -- |
| 7 | A. | Steel. |
| 8 | Q. | Yeah.  Y'all did not have to put forth the |
| 9 | | money to build -- to put it up. |
| 10 | | All right.  I'm on 1994 now.  And the -- |
| 11 | | Mike Harper is the tax collector, correct? |
| 12 | A. | Yes.  Elmore County. |
| 13 | Q. | Yes.  All right.  Legal fees, McDowell, Faulk |
| 14 | | & McDowell, K Bar K legal.  Is that a suit or |
| 15 | | something against K Bar -- against I-65? |
| 16 | A. | No.  It was a suit against K Bar K. |
| 17 | Q. | And who are they? |
| 18 | A. | K Bar K is the travel trailer place down -- |
| 19 | | down the road. |
| 20 | Q. | And what -- which property are they on?  Who |
| 21 | | owns the property that K Bar K is on? |
| 22 | A. | They own their own property. |
| 23 | Q. | Okay.  So what was McDowell and Faulk |

1    defending -- and there's another one up

2    there, too.  Why was I-65 paying legal fees

3    for something relating to K Bar K?

4  A.  K Bar K had a sign on the I-65 property that

5    was illegal.

6  Q.  I see.  So y'all were required to force them

7    to remove it; is that right?

8  A.  Yes.

9  Q.  Okay.  I see.  All right.  Crumpton and Davis

10   on '96, Millbrook sewer.  There was a sewer

11   charge, 783.75.  I asked you earlier before

12   the lunch hour if there was sewer.  Is that

13   for a sewer charge?

14  A.  No.

15  Q.  What is that for?

16  A.  That's for Mr. Crumpton going before the

17   Millbrook City Council to inquire about the

18   possibility of tying onto their sewer across

19   the road.

20  Q.  Is it possible the mobile home company -- I

21   mean, the motel is on the Millbrook sewer?

22  A.  I have no idea.

23  Q.  You're familiar with lift stations?

137

```
1    A.   No, sir.

2    Q.   Okay.  Because the -- going from north to

3         south, Birmingham, 600 feet elevation; the

4         beach is zero.  I would assume Montgomery

5         elevation, field, at Prattville airport is

6         around 400 feet above mean sea level.  You'd

7         have to pump uphill, and you'd have to

8         install a pumping station to get up -- if

9         that sewer is along Cobbs Ford Road.  Was he

10        successful, Crumpton and Davis, in tapping

11        onto the Millbrook sewer?

12   A.   No.  He was strictly there to inquire about

13        the possibility of being able to tap into

14        their sewer.

15   Q.   Okay.  And you don't know if he -- he was

16        there to check on it, but he never reported

17        back to you?  And Crumpton and Davis is a

18        tenant now?  Is that what you're telling me?

19   A.   No.  Mr. Crumpton is an attorney.

20   Q.   An attorney.  Okay.  Not engineers?

21   A.   No.

22   Q.   What town is Mr. Crumpton in?

23   A.   I don't know.
```

1    Q.    All right.   You've never filed for a permit

2         to tap onto either Millbrook or any other

3         sewer?

4    A.    No, sir.

5    Q.    And I-65 hasn't either?

6    A.    No, sir.

7    Q.    Don't you consider it absolutely critical to

8         the fair market value of the property?   As

9         the saying goes, without sewer you have

10        nothing other than a septic tank.

11    A.    If you file to tap onto a sewer, you have to

12        follow through with it in a certain period of

13        time.   And that would incur more expense

14        without any interest in the property at that

15        time.

16    Q.    Are you aware, as frequently happens in

17        places like Shelby County, that the

18        moratorium all over the state of Alabama is

19        going on, on being able to tap onto a sewer?

20    A.    No.

21    Q.    Are you aware that as a prudent director of a

22        real estate development company, it is often

23        extremely valuable to go ahead and purchase a

139

```
 1            sewer tap?
 2                 MR. CLEVELAND:  Object to the form.
 3     Q.    You can answer.
 4     A.    I'm a director of a real estate development?
 5     Q.    Excuse me.  As a majority stockholder of
 6           I-65, are you aware that if a sewer tap can
 7           be purchased, that it is an extremely
 8           valuable asset to the property?
 9                 MR. CLEVELAND:  Object to the form.
10     Q.    You can answer.
11     A.    My understanding, that once you purchase a
12           sewer tap, you have a certain period of time
13           to act on it.
14     Q.    Right.
15     A.    And if you don't act on it, then it goes
16           away.
17     Q.    All right.  And you don't know if the
18           sewer -- the Millbrook sewer is on the south
19           side of Cobbs Ford Road or on the north
20           side?  Do you know either of those?
21     A.    The --
22     Q.    Yes.
23     A.    Where?
```

```
1    Q.   In other words, is it on your side, I-65

2         side, or on the other side, if you know?

3    A.   I don't know.  I know there's a pumping

4         station down here on the east side of the

5         branch.

6    Q.   All right.

7    A.   And where it goes from there, I don't know.

8    Q.   Well, now, that answers a quick question that

9         I missed earlier.  And I apologize.  That

10        means, as we all know, that sewers' gravity

11        flows follows creeks, because that's the

12        lowest back to the mean level.  So I'm going

13        to put right here -- you tell me where to put

14        my pen and put sewer manhole.

15   A.   By the six.

16   Q.   Okay.  by the six.  So I assume that 10.01

17        owned by CD&O are on the sewer.  Am I wrong

18        in my assumption?

19   A.   I'd have to -- I assume so, yes.  I'd have to

20        check it.

21   Q.   Now, I thought before the break that I asked

22        you if sewer was available to the I-65

23        property which we're litigating over today.
```

```
 1              And I thought you said it was not.
 2   A.    No.  I did not understand that question that
 3         way.
 4   Q.    Okay.
 5   A.    You asked me if it had sewer, and it does
 6         not.
 7   Q.    That's a fine line.  You're probably right.
 8         But a fair --
 9              MR. CLEVELAND:  Fine, but accurate.
10              MR. ROBERTS:  Well, I got to be careful
11                   with Mr. Dorsey.  You're right.
12                   What does what mean in the Clinton
13                   case.
14   Q.    Am I correct -- I'm not a good to scale; but
15         I'm assuming that along the service road to
16         the manhole, which is apparently gravity feed
17         because it's downhill, the distance is no
18         more than about 25 feet.  Is that right or
19         wrong?
20   A.    Wrong.
21   Q.    About how many feet?
22   A.    I don't know.
23   Q.    That's a good one.  How can I be wrong if you
```

1        don't know?

2   A.   Not 25 feet.

3   Q.   Well, give me an estimate.  Help me.

4   A.   I have no idea.

5   Q.   50 feet?  Well, let me show you how you do

6        that.  And you've probably testified you're

7        not versed in real estate, but let's just

8        take a 50 foot right-of-way right there.  You

9        see what I'm using as my scale?  I'm using

10       Market Street.  Now, Mr. Dorsey --

11          MR. CLEVELAND:  Now, the assumption,

12              Mr. Roberts, is that that is drawn

13              to scale.

14          MR. ROBERTS:  Well, it's a tax map, so

15              let's assume that it's close.

16   Q.   50 feet -- that's the way we normally do

17        it -- would indicate -- you see where I'm

18        holding my finger?  It would indicate that

19        it's only about 50 feet to that manhole.

20   A.   You're not on the property yet.

21   Q.   Okay.  Is that the property right there?

22   A.   Yes, sir.

23   Q.   All right.  Well, let's get on it.  How far

```
 1              is your estimate now based on that being 50

 2              feet?

 3       A.    60, 75 feet.

 4       Q.    Okay.  Good.  Now, are you -- do you know --

 5              and I mean you're in charge of a very, very

 6              valuable piece of property, am I right?  You

 7              are the lead, senior, majority stockholder;

 8              is that right?

 9       A.    I'm senior stock -- majority stockholder.

10       Q.    Do you know what size cast-iron pipe is

11              required when extending a sewer?

12       A.    No.

13       Q.    Or excuse me.  To serve ten acres to that

14              gravity feed?

15       A.    Depends on the tenants on the ten acres,

16              doesn't it?

17       Q.    Right.  The amount of usage.  All right.

18              Let's assume six-inch cast-iron pipe.  Do you

19              have any knowledge of how much it costs to

20              extend -- and six inches, I'll submit, will

21              cover a host of ten acres.  Do you have any

22              idea of what the cost would be to extend a

23              six-inch cast-iron main to that manhole?  I'm
```

1               assuming it's a manhole.

2   A.   No, sir.

3   Q.   And you've never inquired about availability,

4               if you had an offer tomorrow, of whether or

5               not you could actually tap onto that manhole?

6   A.   Availability of what?

7   Q.   Capacity.  In other words, all over the state

8               of Alabama, kind like the dealership --

9               remember you said there's lawsuits all over

10              the state of Alabama.  For years, some sewers

11              have had a moratorium; they can't handle the

12              capacity.  In other words, you could dump it

13              into the manhole; but when it hits the

14              treatment station, you're going to have a

15              backup.  In fact, it backs up into the Cahaba

16              River all the time.  We had a big suit -- or

17              Jefferson County was sued by ADEM.

18                   So my question is, you don't know the

19              capacity of the Millbrook sewer; is that

20              right?

21   A.   No, sir.

22   Q.   You've never inquired as to what the capacity

23              is?

145

```
 1     A.   Not that I recall.

 2     Q.   Okay.  And --

 3     A.   The capacity of that line?

 4     Q.   Yes.  Well, not the line.  Ultimately, the --

 5          the pumping station itself.  Question, do you

 6          know --

 7     A.   No.

 8     Q.   -- where the pumping station is for

 9          Millbrook?

10     A.   I -- no, sir.

11     Q.   Okay.  And you've never inquired as to

12          whether or not you could -- the property,

13          I-65, could tap onto it, correct?

14     A.   Have I inquired about it?

15     Q.   Yes.  Yes.

16     A.   Yes, sir.  That's what Mr. Crumpton did.

17     Q.   Yeah, but I'm talking about recently, in the

18          year.

19     A.   No, sir.

20     Q.   So you haven't -- maybe since 2003, you

21          haven't inquired?

22     A.   No, sir, not that I remember.

23     Q.   You're a partner in Saxon Properties.  And it
```

1       appears that the creek, Millbrook -- well,

2       no, what's the name of the creek?  Hudson

3       Branch.  It appears that it goes right

4       through the Saxon Properties.  Do you know,

5       as a 50 percent owner, if that Saxon

6       Properties, the 5.3 acres, is tapped onto

7       that sewer?

8   A.  Yes.

9   Q.  Okay.  And how -- when did they tap on?

10  A.  In 2005.

11  Q.  Okay.  Who secured the permit to tap on?

12  A.  Saxon Properties, I would think.

13  Q.  Okay.  But who would I want to talk to

14      about -- since you don't know many about taps

15      and sewers and that, who would I want to talk

16      to, to get that information?

17  A.  Millbrook Sewer.

18  Q.  Okay.  Who from Saxon Properties would have

19      made contact in order to get the tap?  I

20      think Mr. Cleveland is a 50 percent owner.

21      Would it be him maybe?

22  A.  I -- I don't recall.  Either him or me.

23  Q.  Okay.  So that was around 2005.  I think this

```
 1              is 2007.  In two years, you don't remember
 2              who set about to get the tap?
 3    A.   No, sir.  I'm sorry.  I don't remember.
 4    Q.   That's okay.  I can only ask you what you
 5              know.  Do you know what the tap fee was for
 6              Saxon Properties?
 7    A.   I don't remember, no, sir.
 8    Q.   Okay.  You don't know what the usage is
 9              either, the number of gallons per day?
10    A.   No, sir.
11    Q.   All right.  Is there a chance that there's a
12              boring under the road and that the motel --
13              remember I asked you earlier -- the motel and
14              the service station are gravity feeding down
15              here to that?
16    A.   I have no idea.
17              MR. CLEVELAND:  Object to the form.
18    Q.   All right.  Let's get through this real
19              quick.  I notice you've got Diamond -- if
20              you'll address 2001, you've got Diamond,
21              Roller and Taunton and you've got legal
22              fees.  Was that just a mistake?  I know one
23              of them may be a lawyer, but should that have
```

1          been accounting fees?

2    A.   I'm sure.

3    Q.   Just a mistake?  All right.  You wouldn't

4          know -- that's too far back.  You wouldn't

5          know what it was even about, would you?

6    A.   No, sir.

7    Q.   Okay.  And there is a Cleveland & Colley on

8          2000 with a Z on it going back up to 2000.

9          I'm sure you wouldn't know about that either,

10        would you?

11   A.   I -- I don't know what it's for.

12   Q.   All right.  Review notes, 2002, Cleveland &

13        Colley.  What notes would that have been?

14   A.   I'm not sure.

15   Q.   You don't know?  All right.  Cleveland and

16        Colley, 4,210.  I never question other

17        lawyers' fees.  But do you remember what the

18        4,210 would have been for?

19   A.   No.  I'm sorry.

20   Q.   So we'd have to ask them if we wanted to know

21        the answer to that, Cleveland & Colley?

22   A.   Yes, sir.

23   Q.   Okay.  Regions Bank, service charges, that

149

```
1              would be for the checking account, right?

2    A.   Yes, sir.

3    Q.   Some other legal fees in 2003.  Again, you

4              don't remember what that would have been

5              about, correct?

6    A.   No, sir.  It might have been -- might have

7              been about that sign.  K Bar K.

8    Q.   Right.  All right.  Now, am I correct that

9              this recapitulation -- you're not claiming

10             it's necessarily accurate or not accurate,

11             but it shows a figure of amount owed on the

12             last page to Dorsey Motor Sales of 35,900.

13             Do you see that?

14   A.   Yes, sir.

15   Q.   And when it says plus interest, does it mean

16             35,900 not including interest or that the

17             thirty-five nine has already included

18             interest?

19   A.   I don't know.

20   Q.   You don't know.  All right.  You've got a

21             couple of letters, which you may not be able

22             to identify, but I want to get them in the

23             record.  Let's start with -- let's go off the
```

150

1                record for a minute while he previews.

2                         (Brief recess)

3     Q.   All right.  We went off the record in order

4           for you to have time to read Plaintiff's #9,

5           purporting to be a letter Mr. J. Alan Taunton

6           to my co-counsel, Lindsay B. Erwin.  Have you

7           ever seen a copy of this letter, if you know?

8     A.   I'm sure he copied me, but I don't directly

9           recall it, no.

10    Q.   All right.  Let's take a little bit of time

11          on this.  I'm going to summarize that it's a

12          letter from Mr. Taunton responding to

13          Ms. Erwin's several different questions.  And

14          it says that you, Mr. Dorsey, asked

15          Mr. Taunton to reply to her request for

16          information.  Is that a fair statement?

17    A.   Yes.

18    Q.   All right.  Mr. Taunton indicates that he's

19          been a friend of the family for a long time

20          and would like to see the matter handled

21          expeditiously.  You don't have any

22          disagreement with that, do you?

23    A.   No.

151

```
1    Q.   Okay.  Now, the last paragraph on the first

2         page goes into the second page, page 2 of 2.

3         This paragraph may more succinctly express

4         what I was trying to express prior to the

5         break, that being that Donna Davis, my

6         client, holds 30 percent and you own 70

7         percent -- now, we can agree thus far -- of

8         I-65, right?

9    A.   Yes.

10   Q.   We can also agree that the real estate was

11        originally owned by Dorsey Corporation?

12   A.   Yes.

13   Q.   Which really means Dorsey Motor Sales, Inc.

14        That's really what Dorsey Corporation is,

15        correct?

16   A.   Yes.

17   Q.   And it says there was a time that it was in

18        the best interest of all involved to take the

19        real estate out of Dorsey.  The new

20        corporation, which is the one we're here

21        about today, I-65 was formed with 70 percent

22        in you and with 30 percent in Donna.  It goes

23        on to say -- and this is what I tried to
```

1      cover prior to the break.  It explains the

2      reasoning; and that was that Dick, Richard

3      M., already owned 40 percent and so that Dick

4      and Donna would each get 50 percent of their

5      parents' 60 percent upon their death, 30

6      percent would go to Donna and 30 percent to

7      you, which added to your existing 40 percent

8      is how we now have 70 percent ownership by

9      you and 30 by Donna.

10          Is that a correct statement?  Is

11     Mr. Taunton correct and am I correct in

12     reading what he has told my co-counsel,

13     Ms. Erwin?

14          MR. CLEVELAND:  Now, that was two

15              different questions.

16          MR. ROBERTS:  Okay.  I do ask long

17              questions.

18   Q.  Well, let's start with is the statement to

19       the second sentence of page 2 regarding

20       how -- and the whole first paragraph, is that

21       a correct statement by Mr. Taunton that I can

22       rely on in this lawsuit?

23   A.  You can rely on the fact that I own 70

153

```
 1              percent of I-65 Properties, Inc.; my sister

 2              owns 30 percent of I-65 Properties, Inc.  As

 3              far as reasoning, if Mr. Taunton says that

 4              was the reasoning, then that's his statement.

 5        Q.    Okay.  But I've got to have an answer.

 6              Either you agree or you don't agree?

 7        A.    I don't have to agree or not agree to

 8              anything.  This is Mr. -- Mr. Taunton's

 9              statement.

10        Q.    I'm not asking you to agree to it.  I'm

11              asking you principally with regard to the

12              facts that Mr. Taunton has alleged in this

13              letter -- he was acting responding to a

14              lawyer's request.  Do you disagree that it

15              was your parents' intent that in order to

16              have an equal distribution, you would get 30,

17              Donna gets 30; and you own 40 of the

18              corporation anyway of Dorsey Motor?

19                    MR. CLEVELAND:  And you've already

20                        asked him that question, and he

21                        has already told you that the --

22                        the 60 -- that 30 was half of 60.

23                        And that's where the calculation
```

```
1                         stopped.
2      Q.   So -- and you've got to either disagree or
3           agree.  This is a letter.  And I'm asking.
4           And it's an exhibit.  You are not sure if
5           Mr. Taunton's remembrance of the facts is
6           correct here?  Is that right?
7      A.   You'll have to ask Mr. Taunton that.
8      Q.   Okay.  But I'm asking you.  You have to have
9           an opinion it either is correct or not.
10          That's called yes or no.
11     A.   No.  There was a lot of other factors that
12          went into taking the property out of Dorsey
13          Motor Sales.  This is one of them.
14     Q.   Well, give me some of the other factors.
15     A.   Factors?
16     Q.   Yes, sir.
17     A.   Just that we thought it was best to take it
18          out of Dorsey Motor Sales and to protect it.
19          That was one of them.
20     Q.   Okay.  Well, then, I'm specifically -- the
21          reasoning -- I'm going to read it to you:
22          The reasoning was that Richard M. Dorsey
23          already owned 40 percent and he and Donna
```

155

```
1              would each receive 50 percent of their
2              parents' 60 percent.  Now, if you know, was
3              that the reasoning of your parents, yes or
4              no?
5      A.      I don't know.
6      Q.      You don't know.  Have you ever known
7              Mr. Taunton to make mistakes.  He's a CPA,
8              and they're not like lawyers.  They're very
9              detailed.  Is that right?
10     A.      I don't know that.
11     Q.      Would Mr. Taunton take seriously -- as your
12             accountant responding to an attorney, would
13             he take that seriously and try to verify
14             things that he says in the letter?
15     A.      I think he would take it serious and produce
16             the information that was requested.
17     Q.      So at this point, since you don't know what
18             your parents' intent was, you don't have any
19             reason to question Mr. Taunton's opinion at
20             this point, do you?
21             MR. CLEVELAND:  Nor substantiate it.
22             MR. ROBERTS:  Nor substantiate it.
23     Q.      Is that correct?
```

1    A.    That's correct.

2    Q.    All right.  Read the rest of that.  I've let

3          you read it off the record, but read the rest

4          of it.  I just want to be sure, since you

5          weren't sure of that -- and I'm trying not to

6          take a lot of time, but I-65 didn't pay cash

7          but tendered a mortgage.  No problem with

8          that, right?

9    A.    Yes.

10   Q.    Yes.  She can't read it a head shake.

11         Subsequent to the corporation acquiring the

12         real state, there have been ongoing costs,

13         such as property taxes, annual franchise

14         privilege.  You don't have a disagreement

15         with that.  We have a document that appears

16         to be ongoing costs, correct?

17   A.    Yes.

18   Q.    All right.  And there were -- as time passed,

19         you don't have any argument that you either

20         paid some of those expenses or put money into

21         the account to pay the expenses, correct?

22   A.    Correct.

23   Q.    Okay.  That's #9.  Following up, we have

157

| | | |
|---|---|---|
| 1 | | Plaintiff's #10.  Have you had time to look |
| 2 | | it over? |
| 3 | A. | Yes. |
| 4 | Q. | Okay.  Now, just for the record, this Exhibit |
| 5 | | #10 has an attached closing statement, it has |
| 6 | | a document purporting to be a promissory |
| 7 | | note, and it has one page of a warranty deed; |
| 8 | | is that correct? |
| 9 | A. | Yes, sir. |
| 10 | Q. | Okay.  If you need to take that, we can |
| 11 | | convene -- |
| 12 | A. | No.  I turned it off. |
| 13 | Q. | Okay.  Mr. Taunton is again responding to |
| 14 | | Ms. Erwin on questions about I-65 |
| 15 | | Properties.  And he says the sale took place |
| 16 | | October 1 of 1990; and he attaches the |
| 17 | | warranty deed, which was recorded, he says, |
| 18 | | on October 3rd of 1990; but I'll address your |
| 19 | | attention to the warranty deed and see if we |
| 20 | | might have a mistake.  Mr. Taunton might have |
| 21 | | just made a scrivener's error, the warranty |
| 22 | | deed being the last document.  And I'll |
| 23 | | direct your attention to a certification, I |

1      believe, by the Elmore County Probate Court

2      that the deed was not recorded until December

3      31st of 1992.  Do you see that at the top

4      right corner?

5  A.   That's what it says, yes.

6  Q.   Between a certified stamp by Elmore County

7      and Mr. Taunton's remembrance, would you go

8      with the court's stamp or Mr. Taunton, the

9      date in his letter?

10  A.   I -- I don't know.  I'd have to go by the

11      original signed closing statement.

12  Q.   Okay.  And it is a long time ago and -- and

13      that just began to raise questions in my

14      mind.  And I don't expect -- I can't remember

15      one year from the next; but the promissory

16      note is dated -- if you'll look at it, it's

17      dated October 1st of 1990, correct?

18  A.   Correct.

19  Q.   And you signed it as president and Connie

20      Dorsey signed it as secretary, correct?

21  A.   Correct.

22  Q.   Is there -- do I have any reason to believe

23      that that is not a correct date, October 1 of

159

1          1990?

2     A.   I don't know.

3     Q.   Well, Jo Anne Perry notarized it.  We've got

4          kind of a double check.  She notarized it on

5          the 1st day of October of 1990; is that

6          correct?

7     A.   Yes, sir.

8     Q.   Okay.  Would your best judgment be that if it

9          is signed by you, you would have dated it the

10         date you signed it and, as a double blind

11         check, that Jo Anne Perry would have

12         notarized it the correct day?

13    A.   I'm sorry.  Say that again, now.

14    Q.   Well, if Jo Anne Perry dated it the 1st day

15         of October, 1990, and you signed it alleging

16         that it was 1990, October 1, have you got any

17         reason at all to believe it wasn't October 1

18         of 1990?

19    A.   No, sir.

20    Q.   Okay.  For purposes of this litigation, may I

21         assume that that is a correct date, to the

22         best of your knowledge?

23    A.   Yes.

1    Q.    I can?

2    A.    Yes, sir.

3    Q.    Okay.  The reason I said that, because we may

4          have a mistake in Mr. -- it may just be a

5          typo; but, again, if I direct your attention,

6          he says the warranty deed was recorded

7          October 3rd of 1990 and that the promissory

8          note was October 1.  So I'm assuming that the

9          promissory note is correct.  The warranty

10         deed, I never got the second page.  Somebody

11         back may have -- Donna's husband may have

12         furnished it to me.  And all I have to go on

13         is that it was recorded December of '92.

14              So assuming that was correct, would

15         you have any reason to believe that it was

16         not recorded December of '92?  In other

17         words --

18              MR. CLEVELAND:  And you're basing that

19                   question --

20              MR. ROBERTS:  It was a couple years

21                   lapse, just based on the recording

22                   stamp that I see on the front.  It

23                   could be wrong.

161

1        MR. CLEVELAND:  Well, I see some

2             additional recording information

3             on there.

4        MR. ROBERTS:  Good.

5        MR. CLEVELAND:  And we don't have the

6             second page.  I don't -- I don't

7             challenge your question,

8             Mr. Roberts; I just, you know,

9             don't want Dick assuming something

10            that doesn't have the information.

11       MR. ROBERTS:  I agree with you.

12       MR. CLEVELAND:  It is what it is.

13       MR. ROBERTS:  All right.  I think

14           something may help us with that,

15           because on the 1992

16           recapitulation, I saw $1

17           difference, which appeared to be a

18           recording fee.  Did you see it?

19             Oh, no.  Excuse me.  That

20           goes back in the stack.  On the

21           closing statement, which is

22           attached --

23       MR. CLEVELAND:  The recording fees are

1          included.

2          MR. ROBERTS:  Well, included and paid.

3          MR. CLEVELAND:  Yes.

4          MR. ROBERTS:  But not -- excuse me --

5                withheld, but not necessarily

6                paid.  In other words, the closing

7                attorney, if I'm right, who was

8                George Walthall, withheld the sum

9                of $260 for recording fees.

10                Apparently, the only way, unless

11                he knows --

12          MR. CLEVELAND:  Well, it's a matter of

13                semantics on the withheld.

14          MR. ROBERTS:  Well, the court record --

15                we'll both agree, then, the court

16                record -- we just need to get a

17                copies from Elmore County Circuit

18                Court and see when it was --

19          MR. CLEVELAND:  Yeah.  Because the way

20                real estate transactions are done

21                here, the 260 indicates that the

22                recording fees were paid to the

23                attorney for recording purposes.

163

1          MR. ROBERTS:  Right.

2          MR. CLEVELAND:  On October the 1st of

3               1990.

4          MR. ROBERTS:  And the fact that the

5               deed itself -- I'm like you.  I'll

6               yield to whatever the original

7               document shows.  And I guess, do

8               y'all -- would you have a copy of

9               the document perhaps?

10         MR. CLEVELAND:  I don't.

11    Q.   Would you have a copy of the deed?

12    A.   Not with me.

13    Q.   If you would, we need to request that to

14         avoid a trip to the Elmore Circuit Court.

15         I'll going to ask you through your attorney

16         to produce the full copy of it, not

17         necessarily the original; but if I get the

18         back page, that's going to help.

19              All right.  This is really important

20         because we have some critical legal gaps in

21         this transaction.  And I'm going to go ahead

22         and tell you what the gaps are.

23              Well, let me cover the rest of the

164

```
1     letter.  Did you have an opinion as to what

2     Alan Taunton's word "defensive manover,"

3     meaning maneuver, was about?  Do you have any

4     idea?  It's not in here.  I'm asking you,

5     though, since Taunton -- Mr. Taunton wrote

6     this letter.  Do you have any opinion as to

7     what he meant by that?

8           MR. CLEVELAND:  You mean other than

9                what he's already told you this

10               morning about -- you asked him

11               that same question.

12          MR. ROBERT:  Oh, yeah, yeah.

13          MR. CLEVELAND:  And I think he said a

14               lot of litigation in 1990 directed

15               toward the automobile industry.

16          MR. ROBERTS:  Right.

17    Q.    Okay.  The sale price in this letter, March

18          18th, was prepared prior to the time of

19          sale.  The appraisal was made to ensure the

20          stockholders purchased the property from the

21          corporation at, quote, fair market value, end

22          quote, and avoid any issues with the IRS or

23          the courts in the event the lawsuit's results
```

165

```
 1          were unfavorable.

 2                 Okay.  Is that a correct statement by

 3          Mr. Taunton, as far as you know, of the

 4          reason for appraisal and the reason that it

 5          was made?

 6     A.   Well, you would have to ask Mr. Taunton.  He

 7          wrote the letter.

 8     Q.   That's fine.  Okay.  Did you ever ask Donna

 9          or discuss the note with Donna, since she was

10          not on the note or anything, prior to the

11          year 2000?

12     A.   Discuss the note with her?

13     Q.   The note that's attached here, the promissory

14          note.

15     A.   Absolutely.

16     Q.   You did?

17     A.   Yes, sir.

18     Q.   And what, if anything, did you discuss or

19          tell her?

20     A.   Just that we owed that money to Dorsey Motor

21          Sales.

22     Q.   Do you have any kind of a letter or anything

23          where you forwarded it to her?
```

166

1    A.    No.

2    Q.    Okay.  When did --

3    A.    I think we were at Mom and Dad's house.

4    Q.    Okay.  And that would have been your -- I

5          think your testimony is it would have been

6          contemporaneous sometime around the '90 --

7          '90s is when you signed the note?

8    A.    Contemporaneous?

9    Q.    Contemporaneous.  Would it have been before

10         you signed the note or after?

11   A.    I think it was before we signed the note.

12   Q.    Okay.  Would anyone else -- would Ms. Dorsey

13         your former -- Connie.  Does she still go by

14         Dorsey?

15   A.    I don't think so.

16   Q.    I'll just have to call her by her first

17         name.  Would Connie know potentially about

18         that?

19   A.    I don't know.

20   Q.    Okay.  Have you discussed this lawsuit with

21         your former wife, Connie?

22   A.    No.

23   Q.    Where does she live, if you know?  In

167

1          Prattville?

2     A.    In Prattville.

3     Q.    Okay.  Has she remarried, if you know?

4     A.    I don't know.

5     Q.    All right.  Now -- and if you have it, I

6          think I've already said we need the last page

7          of the warranty deed.  That will help us,

8          too.

9               MR. ROBERTS:  Okay.  Let me look at one

10                   of the other documents.  This is

11                   already in.

12    Q.    Okay.  You have Exhibit #1 before you.

13              MR. ROBERTS:  And I think you've got a

14                   copy I furnished you, Cliff.

15    Q.    Will you give me the date of the official

16          certificate of incorporation by the State of

17          Alabama, Elmore County, of a corporation

18          known as I-65 Properties, Inc.?

19    A.    It says the official seal on this, the 9th

20          day of October, 1990.

21    Q.    Okay.  Do you remember off your head what the

22          note that you're claiming as a counterclaim

23          in this case against Donna -- we'll go

1              through that individually, but do you have

2              any idea what date that promissory note was

3              allegedly signed?

4    A.    This note was signed October 1, 1990.

5    Q.    You're looking at the closing statement.

6              I'll address you to go to the note.

7    A.    I'm sorry.

8    Q.    Keep going to the note.

9    A.    October 1 of 1990.

10   Q.    Okay.  Do you -- were you ever aware of that

11             fact prior to me showing it to you today?

12   A.    No.

13   Q.    Do you understand the significance of it?

14   A.    No.

15   Q.    Mr. Cleveland can explain after the fact; but

16             it has been my understanding that until a

17             corporation is actually incorporated, it is a

18             nonentity.  So it's our position in this

19             lawsuit that there is no I-65 in being on

20             October 1st, the date of the alleged

21             promissory note; hence, there is no note.

22             That's just our position.  Do you have a

23             position on that?

1    A.    I think you're wrong.

2    Q.    Well, let me ask you this.  Am I correct that

3          a corporation has to be incorporated before

4          it becomes a corporation?

5              MR. CLEVELAND:  That's a legal issue.

6                    He wouldn't -- that's not a

7                    question of fact.  That's a legal

8                    issue that you and I and Lindsay

9                    will have to resolve.  You know,

10                   the flip side of that may be that

11                   the property is still in Dorsey

12                   Motor Company's name, then.

13             MR. ROBERTS:  Tell him -- off the

14                   record.

15                       (Off-the-record discussion)

16   Q.    But you weren't aware of that, were you?

17   A.    Of what?

18   Q.    Of the fact -- now, I'm not asking you for a

19         legal opinion.  When you signed the note on

20         behalf of my client, the 30 percent and your

21         70 percent to your company, you weren't aware

22         that I-65, Incorporated, one, hadn't been

23         incorporated and, two, didn't exist.  You

1           were not aware of that.

2                MR. CLEVELAND:  Did you have a

3                     recollection at that time.

4      A.   No.  I thought everything was done at the

5           time of closing and down there by the

6           attorney, because the same attorney that did

7           this also did the closing document and the

8           note.

9      Q.   And that was George Walthall?

10     A.   Yes, sir.

11     Q.   Looks like he just got nine days behind on

12          getting this.  All right.  From here on out,

13          everything is downhill, so maybe we can move

14          pretty quickly.

15               All right.  Now, this is important.

16          From 1990 to 2000, Donna alleges there were

17          no meetings that she attended or was invited

18          to by I-65.  Is that a correct statement or

19          not correct?

20               MR. CLEVELAND:  I think --

21     A.   No.

22               MR. CLEVELAND:  -- you've already asked

23                    that, and he told you he would

171

```
 1                        have to check his records.
 2           MR. ROBERTS:  No.  I asked about
 3                        minutes.  I'm asking about a
 4                        meeting, just a meeting.
 5           MR. CLEVELAND:  You mean a meeting
 6                        other than a shareholders'
 7                        meeting?
 8           MR. ROBERTS:  Yes.  Well, just a
 9                        meeting.  I'm trying to
10                        establish -- the purpose --
11           MR. CLEVELAND:  I'm trying to
12                        understand.
13           MR. ROBERTS:  Let me tell you where I'm
14                        going.
15      Q.   Let me tell you where I'm going.  I'm going
16           with I don't think this is a corporation.  I
17           think it's property owned tenancy in common
18           or whatever.  And I don't think for ten
19           years, there was absolutely any communication
20           with my client about the property or what's
21           going on or whatever.  Am I wrong on that?
22      A.   That's wrong.
23      Q.   Okay.  Now, tell me why I'm wrong.
```

172

A.  Because we would talk about it at Mom and
    Dad's house.

Q.  Okay.  About how many times in ten years did
    we talk about it at your mother and dad's?

A.  I don't recall.

Q.  Less than ten?

A.  I don't recall.

Q.  Okay.  We don't have fees for meetings of
    I-65; so if there were meetings during that
    ten-year period, it would have had to have
    been very informal and not held at a lawyer's
    office.  Is that correct?

A.  It was held at my mother and father's house.

Q.  Okay.  Thanksgiving, Christmas, something
    like that?

A.  I don't recall.

Q.  No formal meetings, though, am I correct?

A.  I don't recall.  I don't remember.

Q.  If Donna says there were none, do you have
    any reason to challenge that?

A.  Yes.

Q.  Why if you don't recall?

A.  That's not the truth.

173

```
1     Q.   Well, then, I need the truth.  You either
2          recall or you don't.  So there were formal
3          meetings or there weren't.  Which one?
4     A.   There was no formal meetings.  There were
5          meetings at the house where we discussed the
6          property.  We discussed a lot of things in
7          business.
8     Q.   Were they called meetings?
9              MR. CLEVELAND:  What do you mean by
10                  called?
11             MR. ROBERTS:  The bylaws say that
12                  they're to be called and all of
13                  this.  We've got the bylaws if you
14                  need to see them.  They're in
15                  evidence.
16    Q.   I understand brothers and sisters sometimes
17         don't go through total formalities, but I'm
18         really trying to ascertain if there were
19         formal meetings for a ten-year period from
20         '90 to 2000.
21    A.   I'd have to check my records on that.
22    Q.   If you'll do that and let me know, I will
23         hold you to that and appreciate it.
```

174

1        All right.  Do you ever remember your

2        father telling you and Donna or Donna that

3        the note, meaning the promissory note, was

4        paid off?

5  A.  Paid off by who?

6  Q.  Just paid off.  I don't know by who.  I'm

7        traveling on a document that I have.

8  A.  No.

9  Q.  You don't?

10  A.  Unh-unh.

11  Q.  Are you aware that until a December 2000

12        meeting with Alan Taunton, Ms. Dorsey

13        indicated at that meeting that she didn't

14        have any knowledge of the note until December

15        2000?  Do you remember her saying that?

16  A.  Ms. Dorsey --

17  Q.  Donna.

18  A.  Donna.

19  Q.  Your sister.

20  A.  No.

21  Q.  Excuse me.  Donna Davis.  You don't remember

22        that?

23  A.  No.

175

```
 1    Q.   Do you believe -- and I think your earlier
 2         testimony was that you discussed the note or
 3         the promissory note, we'll call it, with
 4         Donna.  Is that your testimony?
 5    A.   Correct.
 6    Q.   And that she knew about it completely during
 7         this ten years?
 8    A.   She knew about it at the time the property
 9         was moved.
10    Q.   Okay.  She knew about the note?
11    A.   Yes.
12    Q.   Okay.  Now, have you been carrying the
13         interest that you claim to be owing by I-65
14         on your tax return as an account -- or your
15         balance sheet -- as an account receivable?
16         In other words --
17    A.   On my personal tax return?
18    Q.   No.  Dorsey Motors purports to be the holder
19         of the note.  Have you been carrying --
20    A.   I don't know.  We'd have to ask Mr. Taunton
21         that.
22    Q.   Well, now, I do need -- that's going to be
23         critical.  Part of our allegation in this
```

1          complaint is that this note is nothing, that

2          it was a gift.  So I do need copies.

3    A.   It wasn't a gift.

4    Q.   I need copies.  I think you used the word

5          gave, and I corrected you on that.  I'm

6          sorry.  I was using your word "gave," and

7          that's what threw me off.  I'm assuming that

8          we can get, through your attorney, if we ask

9          for them, the tax returns of Dorsey Motor for

10         the last five years?

11   A.   Sure.

12   Q.   Okay.  Do you know if Donna was furnished

13        those returns earlier, from the year 1990

14        through about 2000?  Did she get copies of

15        the corporate tax returns?

16   A.   Corporate tax returns for what?

17   Q.   For I-65.

18   A.   I'd have to check my notes.  I thought you

19        were talking about Dorsey Motor Sales.

20   Q.   No, no, no.  She wasn't have had any reason

21        to get that.  All right.  Was there ever a

22        meeting after 2000 that Donna was invited to

23        attend that the meeting had already

177

```
 1              occurred?  And I think it would maybe have

 2              been in this office.  Do you know about that?

 3       A.     Not that I'm aware of, no, sir.

 4       Q.     Did I understand you earlier to say that you

 5              never operated the Suzuki dealership on

 6              property -- now, not I-65 -- but any

 7              properties on the west -- on the east side of

 8              I-65?

 9       A.     Which is it, west or east?

10       Q.     I'll go with east where the sun rises.

11       A.     Okay.  No, I've never operated any Suzuki

12              dealership --

13       Q.     Did you work for --

14       A.     -- on the east side of I-65.

15       Q.     Okay.  And that's -- that's Plaintiff's #7,

16              the map.  There's never -- nowhere around the

17              I-65 property or any of your other

18              properties?  I just vaguely remember seeing

19              frequently a Suzuki sign somewhere around

20              there.  So I'm in error?

21       A.     It was here.

22       Q.     Okay.  Who operated that?

23       A.     I did.
```

178

```
1    Q.    I thought you said you had never operated a

2          Suzuki dealership?

3    A.    Nothing here.

4    Q.    Huh?

5    A.    Nothing here.

6    Q.    I didn't ask that.

7    A.    Yes, you did.

8    Q.    Pardon me, then, if I did.

9    A.    You asked about that one.

10   Q.    No, no, no.   I said on the east side.

11   A.    That is the east side.

12   Q.    Let's read the question back.

13              MR. CLEVELAND:  Why don't you just ask

14                  the question over?

15         MR. ROBERTS:  No.  I had an evasive

16                  answer, and he's been doing that

17                  all along.  Let that go on the

18                  record.  I want to read back the

19                  question.  If you'll concede that

20                  I asked had him had he ever

21                  operated a Suzuki dealership on

22                  the east side of I-65 --

23   A.   On the east side of I-65 --
```

179

1    Q.   Yes.   That's the side that --

2    A.   -- interstate or property?

3    Q.   I-65 -- oh, okay.   You're drawing a

4         distinction between --

5    A.   Well, there is one.

6    Q.   -- on the interstate; is that right?   I want

7         to get that on the record.

8    A.   This is the property.

9    Q.   Yeah, but you're just saying -- hey, you are

10        playing with me.   I-65 is not Properties,

11        Inc.   I-65 is a road out here that runs north

12        and south.   So you misunderstood me when I

13        said --

14   A.   I'm sorry.

15   Q.   -- had you operated a Suzuki dealership on

16        the east side of I-65.

17   A.   Yes, sir.

18   Q.   What period of time did you operate a Suzuki

19        dealership?

20   A.   2001 to 2003.

21   Q.   That would account for why I saw a Suzuki's,

22        right?

23   A.   Yes, sir.

180

```
 1    Q.   Okay.  And that was on the property you have

 2         identified, I think, as 10.01 on Plaintiff's

 3         #7; is that correct?

 4    A.   Yes, sir.  And not the property as 10.

 5    Q.   I understand.  I don't remember saying 10.

 6         10.01.  All right.  And you -- that is a

 7         property owned by CD&O still, right?

 8    A.   Yes.

 9    Q.   Okay.  And did there come a time when you

10         decided to move the dealership to another

11         location?

12    A.   Yes.

13    Q.   And that was when?

14    A.   Approximately 2003.

15    Q.   As a condition of locating the Suzuki

16         dealership there, did you have to provide an

17         appraisal to the regional or someone with

18         Suzuki to show what the value of the property

19         was?

20    A.   Of this property?

21    Q.   Yes, sir.  Where the Suzuki dealership was.

22    A.   No, sir.

23    Q.   Did not.  When was the last time that
```

| | | |
|---|---|---|
| 1 | | property was appraised, if you know? |
| 2 | A. | This property? |
| 3 | Q. | Yes, sir.  We'll call it the old Suzuki |
| 4 | | property. |
| 5 | A. | I would say in '98. |
| 6 | Q. | Okay.  Does Connie own any of the properties |
| 7 | | on the east side of what I call the I-65 |
| 8 | | freeway? |
| 9 | A. | No, sir. |
| 10 | Q. | So am I right, now, anyone that you're in |
| 11 | | con -- you're co-ownership or any equitable |
| 12 | | interest, if I said one of the persons is |
| 13 | | Cliff Cleveland and another one is your son |
| 14 | | Taylor -- no, Taylor is too young.  Excuse |
| 15 | | me.  Basically, you are now -- Connie is out, |
| 16 | | Dick is in, others are nobody.  So the only |
| 17 | | two property owners, either direct or |
| 18 | | indirect, is Cliff Cleveland or yourself of |
| 19 | | everything I'm looking at on Plaintiff's #7. |
| 20 | | Is that a fair statement? |
| 21 | A. | Except my sister. |
| 22 | | MR. CLEVELAND:  Other than Donna |
| 23 | | Dorsey. |

1          MR. ROBERTS:  Yes.  Yes.

2    Q.   All right.  Yeah, east of I-65, the freeway.

3              Okay.  I'm getting there.  Thank you for

4         your patience.  I understand from some of the

5         notes that there was a December 2005

6         stockholders meeting and that Jo Anne Perry

7         tape-recorded the meeting.  Is that correct,

8         if you know?

9    A.   As far as I know, yes.

10   Q.   Okay.  And were minutes never -- formal

11        written minutes never reduced to writing of

12        that meeting?

13   A.   Yes.

14   Q.   There were?  And do you have a copy of those?

15   A.   Not on me.

16   Q.   But you could furnish them?

17   A.   Yes.

18   Q.   All right.  Now, James Striplin, Jr., he was

19        with the Prattville Bank.  Is he still -- you

20        may have given me his name earlier.  I don't

21        remember.  Did you list him as one of the

22        people that you had done business with, you

23        meaning I-65, Suzuki, Dorsey Motor?

183

```
1    A.   I don't know if I did or not.  Mr. Striplin

2         is retired.

3    Q.   He is?

4              MR. CLEVELAND:  I believe your question

5                   was the last five years.

6              MR. ROBERTS:  And that was before that.

7              MR. CLEVELAND:  That would have been

8                   before that.

9              MR. ROBERTS:  Thank you.  I appreciate

10                  that.

11   Q.   Now, Ralph Bennett is -- who is Ralph

12        Bennett?

13   A.   Ralph Bennett owns a business adjacent to

14        some of the property.

15   Q.   Okay.  And what's -- is he -- I've

16        forgotten.  Which business?

17   A.   Toys for Men.

18   Q.   Motorcycles, if I took a long --

19   A.   A lot of things.

20   Q.   A lot of things.  All right.  And you bought

21        some property from him?

22   A.   Yes, sir.

23   Q.   Okay.  Were any of the I-65, Incorporation,
```

184

```
 1            funds used to purchase that property?

 2    A.     I-65 had the options on a property when the

 3           we were working on the Nissan project.  When

 4           the Nissan project went away, then rather

 5           than lose the options that had been paid to

 6           Ralph Bennett, because I-65 couldn't afford

 7           to buy the property, then I turned around and

 8           had a couple of weeks and I developed a

 9           business plan and purchased the property in

10           CD&O.  And we bought the options from I-65.

11    Q.     Okay.  And which one of these properties is

12           the one we're talking about on Plaintiff's

13           #7?

14    A.     These.

15    Q.     All four properties?

16    A.     Yes, sir.

17    Q.     Now, pardon me, but I didn't understand

18           earlier that I-65 ever had an option on these

19           four properties shown on Plaintiff's #7

20           immediately south of the Cobbs Ford Road.  I

21           just missed that, didn't I?

22    A.     Well, I had forgotten about it myself until I

23           saw this option check in here, Ralph Bennett
```

185

```
1              option.

2    Q.    Okay.  And he's referring to Plaintiff's --

3    A.    On 01, looks like January 10th of '91.

4    Q.    You're referring to Plaintiff's Exhibit #8?

5    A.    Yes, sir.  It's been a long time ago.

6    Q.    And the money to Ralph Bennett was paid by

7              I-65.  So I-65 actually had the option on

8              four lots, January 10th, 1991?

9                   MR. CLEVELAND:  It was paid from I-65,

10                       right.  Right.

11   Q.    Paid from I-65.

12   A.    Right.

13   Q.    Now, did you tell Donna that I-65 had an

14             option to buy those four tracts of property?

15   A.    Well, an option is not a business deal.  An

16             option is a plan.  And this was something

17             that my dad and I talked about long before

18             I-65 occurred.  And so we said that if the

19             Nissan dealership comes there, then, like you

20             said, that other property adjacent is going

21             to be more valuable.  And so we were looking

22             to get some expanding land.  And we went to

23             see Mr. Bennett, and Mr. Bennett gave us an
```

1        option on it.

2    Q.   Okay.  But now you said long before I-65.

3         And by any account of these exhibits, I-65

4         came into being sometime around 1990.

5    A.   Right.

6    Q.   So this money was paid the 10th of January

7         1991.  So it wouldn't be long before I-65 was

8         started.

9    A.   I'm talking about the Nissan negotiations.

10   Q.   Okay.  Okay.  But my point is I-65, meaning

11        the corporation, was in existence at the time

12        it purchased an option for $2700 to buy those

13        four lots from Ralph Bennett; is that

14        correct?

15   A.   Yes.

16   Q.   Okay.  Ultimately, it is your position that

17        that $2700 that was paid and another 3,000

18        extension on the option, total of five -- how

19        did that money come back into I-65 if I-65

20        didn't exercise the option, or did it lose

21        the money?

22   A.   Well, it would have lost the money to Ralph

23        Bennett, but what happened was CD&O picked up

```
 1              the option from I-65 with a check in '90 --
 2              it looks like November 24th of '93.
 3         Q.   Okay.
 4         A.   And I -- these -- these records -- I must beg
 5              off.  These are not my initial records.  I'd
 6              have to go through my files and get these --
 7              get these checks, if they exist at all.  That
 8              long ago, 14, 15 years --
 9         Q.   Oh, I understand completely.  Question,
10              though.  How did you -- help me how you
11              looked at the '93 and you arrived at the fact
12              that this option was picked up by somebody
13              else.  Help me with that.
14         A.   Just remembered.  That's all.
15         Q.   But it's not on here, right?
16         A.   Yes, sir.  November 24th.  But it doesn't say
17              what it's for.  No, it does not.
18         Q.   Okay.  But that --
19         A.   CD&O wrote a check for $2100.
20         Q.   All right.  So now -- you mean for $2,000?
21              Oh, I see the 2100 over there.  I see 2,000
22              in the left column and 2100 in the other.
23         A.   Well, that's what I'm saying.  These are
```

```
 1            not --
 2     Q.     Okay.  But is this money that came out of --
 3            is this money owed by I-65 or -- or money
 4            that came from CD&O on behalf of I-65?
 5     A.     I don't know.
 6     Q.     Okay.  You said earlier -- and I'm -- at one
 7            point, you don't purport to be that
 8            knowledgeable in real estate; but on the
 9            other hand, a person who holds an option on a
10            piece of property has superior title during
11            the option period.
12                 MR. CLEVELAND:  Superior title or
13                      superior right?
14                 MR. ROBERTS:  Superior -- it's really
15                      title because it's the right to
16                      buy.  I'll use his word.
17     Q.     Superior right.  In other words, if I've got
18            an option to buy Cliff's office, he may be on
19            record as the 100 percent fee simple owner;
20            but he can't sell it if I've recorded an
21            option or even if I haven't.  So this option
22            would have allowed I-65, had you chosen to do
23            it, to buy the property.  Right or wrong?
```

189

1    A.    Ask that again.

2    Q.    I-65 had a legal option to purchase the four

3          lots that as we sit here today, CD&O hold

4          title to.  Yes or no?

5    A.    We had a -- we had an option to buy with

6          Mr. Ralph Bennett those four lots.

7    Q.    Is we I-65?

8    A.    Well, I'll have to go back and rebuild it and

9          see if that's how it originally started.  It

10         may have originally started with Dorsey Motor

11         Sales.

12   Q.    But at some point, I-65, according to this --

13   A.    I-65 picked one of the option payments up.

14   Q.    Okay.

15   A.    Okay?  And made -- and then it looks like

16         they picked up something else January 29th of

17         '92 with Ralph Bennett.

18   Q.    Okay.

19   A.    Okay?  But that's not to say that Dorsey

20         Motor Sales may not have originally optioned

21         the property prior to the formation of I-65

22         Properties.

23   Q.    And that option could have expired, right?

1    A.    Don't know.

2    Q.    Okay.  But I'm asking you in this deposition,

3          is it your opinion, as president and majority

4          stockholder of I-65, that I-65 had a legal

5          right to exercise the option to Ralph Bennett

6          and own the four lots on Plaintiff's #7?

7                MR. CLEVELAND:  If you have any

8                     recollection.

9    A.    I -- I don't have a -- an opinion as far as

10         that's concerned.

11   Q.    Do you have a copy of the options in your

12         files anywhere?

13   A.    I may, may not.  Don't know.

14                MR. ROBERTS:  I'm going to ask for his

15                     entire file on the Ralph Bennett

16                     four lots, Exhibit #7.

17   Q.    Okay.  Do you remember or did you discuss

18         with Donna whether or not, as a minority

19         stockholder, she would like to go forward

20         with the purchase of those four lots?

21   A.    I don't recall.

22   Q.    If Donna testifies under oath in this case

23         that you never gave her that right or

191

```
 1              discussed it, do you have any reason to

 2              challenge Donna's remembrance?

 3       A.     Yes.

 4       Q.     If you don't know, how can you challenge it?

 5              I'm just curious.

 6       A.     She has remembrances of a lot of things that

 7              didn't happen.

 8       Q.     Okay.  That's fine.  We're all guilty of

 9              that, I think.  All right.  But you can't

10              deny -- you're in an awkward position if you

11              don't remember it and she does.  Tie goes to

12              the runner, doesn't it?

13                   MR. CLEVELAND:  Object to the form.

14                        Don't answer that.

15                   MR. ROBERTS:  Well, that will be up to

16                        the jury on that.

17                   MR. CLEVELAND:  That's right.  That's

18                        who makes those decisions.

19                   MR. ROBERTS:  We agree on that except

20                        for a summary judgment.

21       Q.     All right.  Basically --

22                   MR. CLEVELAND:  I don't think the tie

23                        goes to the runner.  It's the
```

1          moving party who has the burden of

2          proof.

3              MR. ROBERTS:  We may have gone further

4                than you think today.

5  Q.   All right.  Now, I hate to -- I'm not

6        invading the province, but there's things

7        that refer to the fact that your attorney,

8        Cliff Cleveland, was at some point a board

9        member of I-65.  Is that right or wrong?

10 A.   He was an acting secretary at one time when

11       Jo Anne was out sick.

12 Q.   Okay.  And about how long did he act?

13 A.   I don't know.

14              MR. CLEVELAND:  I can -- one meeting.

15 Q.   Okay.

16              MR. CLEVELAND:  I --

17              MR. ROBERTS:  Be enough to depose you

18                  on.

19              MR. CLEVELAND:  Well --

20 Q.   That's all right.  Okay.  Did Mr. Cleveland

21       ever have an interest in any of these

22       companies, other than the one you've shown,

23       I-65 Property -- I-65, Incorporated, or

| 1 | | Suzuki or any of these others?  And I think |
| 2 | | your testimony was he did have an interest in |
| 3 | | the tract known as Shaw whatever.  Not Shaw, |
| 4 | | but the camper property.  Is that the only |
| 5 | | one, to your knowledge, that he is a co-owner |
| 6 | | with you, either directly or indirectly or |
| 7 | | otherwise? |
| 8 | A. | Yes. |
| 9 | Q. | All right.  Did Mr. Cleveland, to your |
| 10 | | knowledge, ever have an interest in the TD&O |
| 11 | | or the DO or any of these others? |
| 12 | A. | No. |
| 13 | Q. | It was, yeah, CD&O.  Was Alan Taunton ever |
| 14 | | made a board member of I-65, Property, Inc.? |
| 15 | A. | He was nominated, and he declined the |
| 16 | | nomination. |
| 17 | Q. | And he, I assume, never owned an interest in |
| 18 | | any of these properties either; is that |
| 19 | | correct? |
| 20 | A. | No. |
| 21 | Q. | No, he never owned an interest, right? |
| 22 | A. | No. |
| 23 | Q. | We're getting close.  I've got a few |

194

1    questions, and then we're going to go over

2    the complaint and your countercomplaint, but

3    I've got a couple more documents to show

4    you.

5         I'm showing you Plaintiff's #11.  And

6    before we get into that, did there ever come

7    a time when you offered if Donna would give

8    up her 30 percent of I-65 Properties, Inc.,

9    that you would forgive -- meaning Dorsey

10   Motor would forgive -- 30 percent of the

11   total debt owed to, in your opinion, Dorsey

12   Motor?

13   A.   That I made the proposal to her?

14   Q.   Well, I'm asking you.  Did you ever make that

15   proposal?

16   A.   No.

17   Q.   All right.  Is it your position per this

18   letter that Donna made the overture?

19   A.   Yes, sir.

20   Q.   And you did acknowledge -- you acknowledge

21   that you got a fax from Donna rescinding the

22   verbal offer; is that right?

23   A.   Yes, I got a fax.

195

```
1    Q.   And that was before anything else had been
2         done to accept it; is that right?
3    A.   Before anything else had been --
4    Q.   Well, it hadn't been formally accepted.
5         Documents hadn't been drawn.
6    A.   No.  It had only been five days, and we had
7         to complete the document.
8    Q.   I understand.  All right.
9    A.   I got a fax with Donna's signature on it.
10   Q.   All right.  Now, you state in here, I think
11        it's time to stop fighting and move ahead
12        with our lives.  I represent Donna agrees
13        with that.  Do you agree with that statement
14        you made?
15   A.   Yes, sir.
16   Q.   Now, Mr. Dorsey, you've testified you don't
17        know the value; but you are willing, whether
18        it was your offer or Donna's offer, to have
19        Donna walk away from her share of the
20        property, meaning the stock, in return for
21        your, meaning Dorsey Motor, erasing $500,000
22        worth of debt.  Right or wrong?
23   A.   No.  She made the offer to me.
```

```
 1   Q.   No, no, no.  It doesn't matter who made it.
 2        I'm saying that would have been agreeable
 3        with you, correct?
 4   A.   No.  She also wanted to settle the estate,
 5        too.
 6   Q.   That would have been agreeable with you
 7        because you said the proposal sounded good,
 8        right?
 9   A.   Yes, sir.
10   Q.   And in order to know if the proposal is good
11        or bad for Donna or you or I-65 or Dorsey
12        Motor, you would have had to have known the
13        value of the property, wouldn't you?
14             MR. CLEVELAND:  Object to the form.
15   A.   No, sir.
16   Q.   You wouldn't?
17   A.   No, sir.
18   Q.   So my client Donna would be passing you 30
19        percent of a beautiful piece of property on
20        I-65, the freeway, in return for a debt on a
21        promissory note signed by you and Connie; is
22        that right?
23   A.   Yes, sir.
```

197

```
1     Q.   To your company; is that right?

2     A.   Yes, sir.

3     Q.   At a time, which I submit to you, there was

4          no I-65 Properties even in existence at the

5          time the note was signed, is that correct,

6          from what you've seen?  I'm not asking you

7          for a legal opinion.

8     A.   I don't agree.

9     Q.   You don't?

10    A.   I-65 Properties existed at the time the note

11         was made.

12    Q.   Incorporated; is that right?

13    A.   Yes, sir.

14    Q.   And what do you base that on?

15    A.   Good faith.  Somebody made a clerical error,

16         an attorney missed a date, he got buried on

17         the desktop, any number of things.

18    Q.   Kind of like good intentions?  He had --

19    A.   Sir?

20    Q.   Kind of like you said good faith.  You're

21         saying that lawyer had good intentions to

22         actually get this thing -- get the cart back

23         out?
```

1    MR. CLEVELAND: Well, that -- Dick, I

2       don't want you -- you have no way

3       of knowing what George Walthall's

4       intentions were.

5 A. Exactly. I don't know what his intentions

6    were. I don't know what went on down there

7    at the office.

8 Q. But it's your opinion that I-65 was a valid

9    corporation on the date that you signed that

10   note to your company, Dorsey Motor?

11 A. Yes, sir.

12 Q. Okay. Now, you and Donna are blood kin, is

13   that right? Whether either one of you wants

14   to claim it. Same mom and same daddy, right?

15 A. Yes, sir.

16 Q. Assume with me one time, the only

17   hypothetical I've asked you I think in this

18   case, if that property was worth eight or ten

19   dollars a square foot and the proposal had

20   sounded good to you, Donna could have been

21   out -- even if you except the note, the

22   promissory note -- it could have placed her a

23   million dollars in the hole. Do you disagree

```
 1            with that?
 2                  MR. CLEVELAND:  Don't answer that.
 3                        That's a -- Mr. Roberts, that's a
 4                        hypothetical question upon which
 5                        there's no basis whatsoever.  You
 6                        could say ten; he could say fifty
 7                        cents.
 8                  MR. ROBERTS:  For 35 years, I've
 9                        understood that hypotheticals were
10                        acceptable as long as they were
11                        prefaced as a hypothetical.
12                  MR. CLEVELAND:  But they have to have a
13                        factual basis.  There is no
14                        factual basis of that.
15                  MR. ROBERTS:  You're exactly right,
16                        because the president of the
17                        corporation hasn't got a tinker's
18                        you know what idea of what it's
19                        worth, but the deal sounded good
20                        to him.
21                  MR. CLEVELAND:  It was her -- it was
22                        her proposal.  I'll ask her
23                        tomorrow why she made the
```

200

|     |     |                                                    |
| --- | --- | -------------------------------------------------- |
| 1   |     | proposal.  Okay?                                   |
| 2   |     | MR. ROBERTS:  Okay.  that's fine.                  |
| 3   |     | MR. CLEVELAND:  She made it and he                 |
| 4   |     | accepted it.  That's the long and                  |
| 5   |     | the short of it.                                   |
| 6   |     | MR. ROBERTS:  Okay.  And are you                   |
| 7   |     | testifying for him?                                |
| 8   |     | MR. CLEVELAND:  I'm just kind of -- you            |
| 9   |     | know, you've been testifying                       |
| 10  |     | some.  You and I are just                          |
| 11  |     | exchanging --                                      |
| 12  |     | MR. ROBERTS:  Well, let me ask the                 |
| 13  |     | hypothetical and --                                |
| 14  | A.  | I'll tell you a hypothetical answer.               |
| 15  | Q.  | Okay.  All right.                                  |
| 16  | A.  | It was very brave on my sister's part to do        |
| 17  |     | what she did.                                      |
| 18  | Q.  | Why do you say brave?  Because that is a good      |
| 19  |     | answer.  I'd like to know.                         |
| 20  | A.  | Because I think she's been under a lot of          |
| 21  |     | pressure.                                          |
| 22  | Q.  | From?                                              |
| 23  | A.  | Her husband.                                       |

```
 1      Q.   Okay.  And so you think by being brave, she

 2           just wanted to get out of it and not owe you

 3           any money?

 4      A.   I -- I don't -- I can't speak for her.

 5      Q.   That's good enough.  But the point remains,

 6           you were ready to go forward without an

 7           appraisal and you didn't have an opinion as

 8           to the value of the property; is that

 9           correct?

10      A.   That's correct.

11      Q.   Okay.  We've got that one marked.  I've got

12           to go to the counterclaim or the claim.

13           Let's go to the counterclaim first.

14                Okay.  Mr. Dorsey, there has been a

15           counterclaim filed by you in this case.  Are

16           you aware of that fact?

17      A.   Yes.

18      Q.   Even though it's a matter of record, I'm

19           going to mark it.  Okay.  This is marked

20           Plaintiff's Exhibit #12.  Did you have a

21           chance to go over this with your attorney,

22           Clifford Cleveland?

23      A.   I read it last night.
```

1    Q.    Okay.  And it was filed the 8th day of

2          February, 2007, it appears to be, the

3          certificate of service; is that correct?

4    A.    I don't know what the question was you asked

5          me.

6    Q.    Well, I'm looking at the certificate of

7          service, 8th day of February, 2007.  My

8          question is, did you give him all the

9          information in this complaint?  You said you

10         read it last night.  How did he get all of

11         this information?

12   A.    I supplied him with it.

13   Q.    Okay.  In a meeting?

14   A.    Several meetings.

15   Q.    Okay.  I'm not asking you what was said

16         between you.  That's attorney/client

17         privilege.  Okay.  But the first time you

18         actually saw the complaint was last night?

19   A.    No.  I picked it up sometime last week.  Just

20         glanced at it.

21   Q.    All right.  Picked it up from here or at your

22         office?

23   A.    From here.

203

```
1    Q.   Okay.  Now, a few questions.  This is long,
2         but let me ask you a couple of questions.  If
3         Donna didn't sign the note and the
4         corporation -- the note was signed by you,
5         meaning I-65, what is the basis of suing
6         Donna Dorsey Davis?
7    A.   Well, she owns 30 percent of the corporation.
8    Q.   All right.  You said --
9    A.   And she was aware of the debt that came with
10        the asset.
11   Q.   Okay.  Is she, in your opinion, personally
12        liable for you to be able to sue her
13        personally?
14   A.   Yes.
15   Q.   She is?
16   A.   Yes.
17   Q.   Could you show me that document?
18   A.   Say it again.
19   Q.   Could you show me the document where she
20        personally endorsed a note?
21   A.   Oh, I don't have that.
22   Q.   You don't have that.  Do you think because
23        she is a 30 percent stockholder of the
```

204

```
 1              corporation, that that makes her personally

 2              liable on the note?

 3      A.      Yes.

 4      Q.      Why?

 5      A.      I don't know.

 6      Q.      Just picked it out of the air?

 7              MR. CLEVELAND:  Well, you asked him if

 8                   he thought that, and he said -- he

 9                   answered yes.

10      Q.      I'm going to suggest to you that unless you

11              have something -- and it's -- I'll make it

12              through your attorney.

13              MR. ROBERTS:  That this suit against

14                   Donna Dorsey Davis, unless you

15                   have something more, should be

16                   dismissed at least as it relates

17                   to that note.  And I'm putting you

18                   on notice to that, Cliff.

19      Q.      Are you also personally liable on the note to

20              Dorsey Motor Company if you thought Donna

21              was?

22      A.      Yes.

23      Q.      Did you sign a guarantee from the corporation
```

```
 1            to yourself -- I mean, from you to the
 2            corporation?
 3       A.   No.
 4       Q.   Okay.  Other than believing that Donna Dorsey
 5            Davis, your sister, somehow has acquired
 6            personal liability, what else do you claim in
 7            your counterclaim that my client, Donna
 8            Dorsey Davis, is liable to you for?
 9       A.   I'm sorry.  You lost me on the question.
10       Q.   Okay.  Well, Donna Dorsey Davis is a 30
11            percent stockholder of I-65 Properties, Inc.,
12            correct?
13       A.   Correct.
14       Q.   And in that capacity, she is just a
15            stockholder, right?
16       A.   Correct.
17       Q.   If I own stock in General Motors and they --
18            which looks like they're going to -- they go
19            defunct, can whoever they owe money to sue me
20            individually?
21       A.   I don't know.
22       Q.   A lot of people would be very concerned about
23            knowing the answer to that.  I'll submit to
```

1    you that Donna Dorsey Davis is a stockholder

2    alone and not personally liable on that note,

3    if the note is even good.  So now my question

4    to you is, you have filed a lawsuit against

5    Donna.  Mr. Cleveland will be able to talk to

6    Donna about her lawsuit tomorrow.  Tell me

7    with detail what else you claim that Donna

8    Dorsey Davis individually owes Dorsey Motor,

9    I-65, or anybody else?

10  A.  She owes her portion of the debt that's been

11      accrued over the 17 years that I-65 has

12      existed.

13  Q.  And you believe she owes it personally?

14  A.  I think she owes it, period.

15  Q.  Okay.  Well, let me ask you one question

16      beyond period.  Do you think she owes it

17      personally?

18          MR. CLEVELAND:  You asked him that and

19              he answered it.  And you also

20              asked him did he think he owed the

21              70 percent, and he said yes.

22          MR. ROBERTS:  Well, this is for summary

23              judgment purposes, Cliff, and you

```
 1                    know it.
 2              MR. CLEVELAND:  Well, you've asked him
 3                    that same thing.
 4    Q.   So you have nothing at all to show that Donna
 5         owes it personally other than your opinion
 6         that she's a stockholder, she owes it?  Yes
 7         or no and we can move right on.
 8    A.   I know that she was knowledgeable of the
 9         debt.  She acknowledged the debt.  She, just
10         like me, put it on her personal financial
11         statement.  I -- that's my reasoning.
12    Q.   Okay.  Have you ever seen her personal
13         financial statement?
14    A.   Yes.
15    Q.   In what capacity did you see that?
16    A.   When we were working the Nissan deal.
17    Q.   Okay.
18    A.   And she owned 30 percent of the property.
19         And I was talking to the banks about
20         financing the construction of the Nissan
21         property, and I needed her personal financial
22         statement.
23    Q.   Okay.  And that was so that it could be
```

208

```
 1              personally endorsed, if necessary, right --
 2       A.     Yes.
 3       Q.     -- to borrow money?  All right.  So other
 4              than that, what other complaints, sitting
 5              here today, do you have with Donna Dorsey
 6              Davis individually?
 7       A.     I don't know because I'm not knowledgeable
 8              enough as to how to connect it to the debt.
 9       Q.     Okay.  Now, you state in your counterclaim
10              that Donna personally owes DMS, TD&O
11              $518,000.  And that would be Count II, open
12              account -- excuse me -- Count III.  I think
13              it's in all of them that Donna Davis owes
14              Dorsey Motors and TD&O $518,645.16.  Do you
15              see it?
16       A.     Yes.
17       Q.     Why would she owe TD&O?  I understand your
18              allegation that because she's a member of the
19              corporation, somehow she personally owes it;
20              but why would she owe TD&O anything?
21       A.     TD&O had loaned I-65 money to pay their
22              bills.
23       Q.     Approximately how much?
```

209

```
1    A.   I don't know.

2    Q.   Under $500,000?

3    A.   I don't know.

4    Q.   So when you say -- and I realize your lawyer

5         drafted the counterclaim, but Davis owes

6         Dorsey Motors -- excuse me -- owes Dorsey --

7         that would be you individually -- Dorsey

8         Motors, and TD&O the sum of $518,645.16,

9         correct?

10   A.   Correct.

11   Q.   Would you break that down for me, just

12        roughly, since we're all friends, at a half

13        million how much you think she owes Dorsey

14        Motors, you individually, and TD&O?

15   A.   Well, the only way to do that is to take the

16        $250,000 original amount and extrapolate it

17        out at 12 percent a year and come up with

18        that figure.  And of course, Dorsey Motor

19        Sales also paid some of the other expenses

20        and ad valorem taxes and, you know, loaned

21        money to I-65 for that.  And then TD&O loaned

22        I-65 money, too.

23   Q.   A couple thousand dollars?
```

210

```
1    A.   I don't know.

2    Q.   Okay.  That brings up the main point.  Did

3         there ever come a time that you felt like

4         charging -- meaning Dorsey Motor charging

5         I-65 12 percent when LIBOR was down around

6         four, that that was usurious and outrageously

7         high?

8              MR. CLEVELAND:  Object to the form.

9    Q.   You can answer.

10   A.   What's LIBOR?

11   Q.   It's a method by which banks -- today you can

12        borrow money at 4 percent.  LIBOR is about

13        five, and it changes daily.  So most banks

14        love -- it's kind like a floating amount.

15        They like to have you sign on at LIBOR plus

16        2 percent or LIBOR plus three.  It's an

17        index.

18   A.   Kind of like prime?

19   Q.   Like prime, yes, only they like it better.  I

20        think they created it.  So now my question is

21        this is your sister, Donna Davis.  We

22        established that, somewhat reluctantly.  Did

23        you ever come to a point where since you were
```

1           the beneficiary of the 12 percent and you

2           also owed interest at 12 percent to yourself

3           that you could forgive anytime you wanted to,

4           that it was unfair to charge one sister 12

5           percent when prevailing rate was somewhere

6           between five and six?

7      A.   Well, I don't know what the rate was back

8           then, but my dad set the interest rate.  And

9           as far as I can forgive myself the interest

10          rate, I'd like that.  That would be good.

11          But you can't do that.

12     Q.   Is that because you would have to pay

13          ordinary income tax on all this money?

14     A.   I have no clue about that, but you can't do

15          for one that you don't do for the other.

16     Q.   Well, that's exactly right.  And you could

17          have done for yourself and for Donna.  You

18          could have adjusted the -- we contend the

19          note is a gift and that it's bogus from the

20          beginning.

21     A.   Well, not so.

22     Q.   Well, I'm accepting that --

23     A.   My father knew differently.  He set the

```
 1              interest rate.

 2    Q.    Right.

 3    A.    And I'll leave it at his interest rate.

 4    Q.    Oh.  So we don't change the interest rate

 5          when the interest rate drops; we just

 6          continue conveniently.

 7    A.    My father had a reason for doing it, and I'll

 8          bow to him.

 9    Q.    You'll stay with that.

10    A.    Yes, sir.

11    Q.    Even though there was a time, many times,

12          when a fair interest rate would have been, do

13          you agree, significantly less than 12

14          percent?

15                MR. CLEVELAND:  Object to the form.

16    Q.    You can answer.

17                MR. CLEVELAND:  Whatever significantly

18                    means.

19    A.    I have no idea.  I just know that that's what

20          my dad did, and he had a reason for doing it.

21    Q.    And your dad and your mother are dead.  And

22          your only surviving sibling is my client,

23          Donna Dorsey Davis.  So she lives with this
```

213

| | | |
|---|---|---|
| 1 | | high interest rate, which probably was market |
| 2 | | at the time that your dad set it. |
| 3 | A. | I don't know. |
| 4 | Q. | And Dick Dorsey is perfectly happy to float |
| 5 | | along all these years and say, Daddy did 12, |
| 6 | | 12 is what it is.  You didn't cut her any |
| 7 | | slack at all, did you, yes or no? |
| 8 | A. | I haven't been asked anything yet.  You're |
| 9 | | telling a story.  What's the question? |
| 10 | Q. | I'm asking you if you ever thought about |
| 11 | | reducing the rate to the prevailing rate as |
| 12 | | the majority stockholder -- |
| 13 | A. | And I told you no. |
| 14 | Q. | -- oppressing a minority.  You didn't think |
| 15 | | about it because -- |
| 16 | A. | Any other -- any other loans made to the |
| 17 | | corporation have been at less rates.  And |
| 18 | | they fluctuate depending on -- on the prime. |
| 19 | Q. | You're telling me -- |
| 20 | A. | I don't know LIBOR. |
| 21 | Q. | Okay.  You're telling this jury -- |
| 22 | A. | Jury? |
| 23 | Q. | Yes.  This is deposition testimony, in case |

1        you don't know.  That's why this dear lady is

2        taking it down.  You're telling this jury

3        that because Daddy said 12 percent, you never

4        thought about cutting your sister any slack

5        and reducing it to whatever prevailing rate

6        was, whether it's prime, LIBOR, 5 percent.

7        Is that your testimony?

8   A.   It's never been brought up in any

9        stockholders meeting, and I've thought about

10        cutting it.

11  Q.   And that's your story and you're sticking

12        with it, right?  And we'll move right on.  Is

13        that right?

14  A.   Yes, sir.

15  Q.   Okay.  All right.  And like you said earlier,

16        you don't have a duty to her at all as the

17        majority stockholder who signed the note to

18        Dorsey Motor, which is you.  You have no duty

19        whatsoever to her as your sister and a

20        minority stockholder.  Is that correct?

21  A.   Sure I have a duty to her as a minority

22        stockholder.

23  Q.   What duty?

```
 1    A.   I have to treat her the same as I treat
 2         myself.
 3    Q.   So by charging yourself 12 percent, you were
 4         treating her fairly, then, right?
 5    A.   I would think so.
 6    Q.   Even though you were -- the 12 percent was
 7         coming to Dick Dorsey.
 8              MR. CLEVELAND:  Is that -- I mean,
 9                   you've --
10              MR. ROBERTS:  That's a question.
11              MR. CLEVELAND:  It's not a question.
12                   You're arguing with him.  Let's
13                   move on.
14              MR. ROBERTS:  Well, I think he's
15                   answered the question.
16              MR. CLEVELAND:  Well, that's fine.
17    Q.   Did you ever make a request on Donna to pay
18         her share of the expenses?
19    A.   Yes.
20    Q.   And when did you do that?
21    A.   In stockholders meetings.
22    Q.   Okay.  Are there minutes to that?
23    A.   Yes.
```

1    Q.    Can you produce those minutes?

2    A.    Yes.

3    Q.    And where are they at this time?

4    A.    In a file somewhere.

5    Q.    Okay.   Somewhere meaning Dorsey Motor Sales?

6    A.    Dorsey Motor Sales; Diamond, Roller, Taunton

7          and Carmichael, the accountant.   Somewhere.

8    Q.    Wouldn't it be more accurate to say that

9          Dorsey Motor Sales should bring an action

10         against I-65 for the payment of the note

11         rather than Donna individually in this

12         counterclaim?

13   A.    I can't answer that.

14   Q.    Okay.   And the part about Donna owing you

15         personally, you're not sure about that

16         518,000.   That just may be a mistake that she

17         personally owes you that money?   Owes you.

18   A.    I think it's more.

19   Q.    Okay.   Tell me about how the LLC, the I-65

20         LLC, if you know -- how it came about and who

21         suggested it be formed?   Mr. Taunton?

22   A.    I believe Mr. Taunton talking to me and

23         suggested that I investigate the LLC aspects

```
 1          of it as far as accountability, but -- and I
 2          don't even remember when it was.  It was some
 3          time ago.
 4     Q.   Do you think that it was his opinion that the
 5          property should be transferred from the
 6          corporation to the LLC?
 7     A.   Well, I -- I think that's where he was going;
 8          but after I got into it, the LLCs are such an
 9          unknown quantity and, to me, appear to be
10          loose.
11     Q.   Did it ever come up from Mr. Taunton to you
12          that it could create a large tax liability to
13          Dorsey Motor Sales if that note was
14          transferred out of I-65?
15     A.   No.  Because we didn't do that.
16     Q.   Okay.  Was I-65, in your opinion,
17          undercapitalized at its conception; in other
18          words, didn't have enough money to pay its
19          bills and all, had no visible source of
20          income other than a billboard?
21     A.   That's true.
22               MR. CLEVELAND:  You mean at inception,
23                    though?
```

```
1    Q.   Yes.

2    A.   At inception.  That's why the Nissan deal, we

3         worked so hard on that.

4    Q.   All right.  And since that, you really

5         haven't worked hard on any other sales, have

6         you?

7    A.   Sure.

8    Q.   You have?

9    A.   Yes.

10   Q.   I was going to ask you earlier, you know,

11        shopping centers are being sold over the

12        Internet now based on fair market value,

13        appraisals.  Wouldn't it be a great idea at

14        least to put it on the Internet, beautiful

15        property located at the intersection of Cobbs

16        Road and I-65, sewer available?  And you

17        never know.  The Japanese might pick that one

18        up.  I mean, a lot of property sells sight

19        unseen.  Would that not be a good idea to

20        market it, or do you really want to market

21        that property?

22   A.   Sure.  Property is always marketable.

23   Q.   If I had come to you and said I want to buy
```

219

```
1                it, what price would you have quoted me?
2       A.       You're the one that wants to buy it.  You
3                make the offer.
4       Q.       Okay.  And then what would you have done with
5                my offer in order to ascertain if it was
6                reasonable, besides consult with your sister,
7                of course?
8       A.       Looked at it.
9       Q.       Looked at the offer?
10      A.       Yeah.  I don't -- that's a nonsensical
11               question.
12      Q.       Well, I mean, you just looked at it.  Here's
13               the offer.  Pretend I'm holding your answer,
14               and you just -- you just look at it, right?
15               That's all you would do?
16      A.       Yes.
17      Q.       You would have just looked at it?
18      A.       Looked at it and gave you an answer.
19      Q.       Okay.  How do you know you wouldn't be
20               selling it to me too cheap?
21      A.       I don't.
22      Q.       You would just throw out -- I mean, I'm not
23               arguing with you at all.  Your management
```

1        style is better than mine.  You just would

2        give an answer based on nothing if you liked

3        it; is that right?

4   A.   I'm sorry.  What was the question?

5   Q.   If I made you an offer and it was a written

6        offer, you said I'd just look at it and give

7        you an answer; is that right?

8   A.   That's right.

9   Q.   What would happen -- and this is a

10       hypothetical -- if later, a month later, we

11       find out you sold it for half of what it's

12       worth?

13  A.   That's business.

14  Q.   Is that business or is that bad business?

15  A.   I don't know.

16  Q.   Do you think you would be responsible to a

17       minority stockholder, whether it was your

18       sister or not, for selling it too cheap?

19  A.   You never know in business.  How are you

20       going to know that?  You're asking to know

21       the future.

22  Q.   An appraisal is the best science we have.

23  A.   It is?

221

1    Q.    I think so.

2    A.    Okay.

3    Q.    Do you have any problem with Donna -- if

4          you're not willing to pay for it, with Donna

5          having it appraised?

6    A.    No.

7    Q.    Okay.  That's exactly what we plan to do.

8          I'm giving you an offer to choose an MAI of

9          our joint choosing.  And I'll leave it open

10         for Mr. Cleveland.  That way, it might be a

11         little more salient if we get down to a point

12         where this corporation is not an entity and

13         it's just property owned 70-30.  But if you

14         choose to, let us know.  If not, we'll go

15         ahead with the best MAI we can get.

16              All right.  I think we're almost

17         through.  All I've got to do is go through

18         the complaint with you.

19              MR. ROBERTS:  And I need about a

20                   ten-minute break max, and it

21                   shouldn't take us -- the time is

22                   three o'clock.

23                   (Brief recess)

1    Q.    All right.  Tell me if I'm wrong.  We're

2          moving fast.  You own 100 percent of CD&O,

3          LLC, and you own 100 percent of TD&O, LLC.

4    A.    TD&O, Inc.

5    Q.    Oh.  you own 100 percent of that?

6    A.    Yes, sir.

7    Q.    And 100 percent of CD&O, LLC?

8    A.    Yes, sir.

9    Q.    All right.  I'm just going to go over the

10         complaint very quickly with you.  Donna, your

11         sister, alleges on behalf of herself and,

12         derivatively, on behalf of the corporation

13         I-65 basically that you have done a lousy job

14         of managing the property.  Some of the

15         reasons we can augment today:  Don't know

16         what the property is worth, would consider an

17         offer without an appraisal; don't know for

18         sure where the sewer is; don't, don't, don't.

19         So, that's the essence.  That's a summary.

20               Donna alleges that the note itself -- by

21         the way, have you read the complaint?

22    A.    Yes, back when it was filed.

23    Q.    All right.  She alleges that -- let's see.

```
 1              I've got to go to three -- that you used your
 2              position -- this is under factual
 3              allegations, number 10 -- used your position
 4              to control I-65 and its assets and to manage
 5              I-65 in a manner oppressive to her, the other
 6              stockholder, in violation of what we lawyers
 7              call a fiduciary duty.  And she alleges you
 8              failed to provide her with documents and
 9              access information as required by law; denied
10              the shareholders meaningful participation in
11              the management of the affairs, either
12              directly or through proxy; and that you have
13              caused I-65 -- stripped it of any future
14              profits by acquiring all of the surrounding
15              land on Plaintiff's Exhibit #7.
16                   If my memory serves you right -- and you
17              have an excellent lawyer.  He denied all of
18              that, I assume.  Do you deny that here today?
19         A.   Yes.
20         Q.   Okay.  That's the way we move faster.  She
21              alleges you engaged in self-dealing, that
22              it's permitted you to unlawfully participate
23              in profits of the business at the expense of
```

1      the minority shareholder and I-65 as a

2      whole.  That, we didn't know for sure; but

3      that would be by taking an option in I-65's

4      name and then using it yourself to purchase

5      adjoining property.  And I don't think you

6      deny that you bought -- I mean your testimony

7      is you took the I-65 option and either

8      assigned it or let it lapse such that one of

9      your companies was able to buy the four

10     properties shown on Plaintiff's #7.  Do you

11     disagree with that?

12  A.  Well, CD&O took the option, because I-65 was

13     going to let it lapse and lose the money.

14     And CD&O then took the option and paid the

15     money to I-65, which I think, in turn, paid

16     the money back to Dorsey Motor Sales, where

17     they borrowed it.  I'd have to go trace it

18     back, but this was back in 1991.

19  Q.  I will greatly appreciate it if you can trace

20     back and maybe a copy of the option.

21          MR. CLEVELAND:  That's what I was going

22               to say.  Before we start admitting

23               or denying our understanding about

```
 1                        an option, I'd like for us to

 2                        first know that there was an

 3                        option.

 4            MR. ROBERTS:  I understand.  Right.

 5                        Well, something was paid.  That's

 6                        what gives me --

 7            MR. CLEVELAND:  I understand that, but

 8                        that --

 9            MR. ROBERTS:  I understand.

10            MR. CLEVELAND:  -- wouldn't be the

11                        first time that I've saw that

12                        done.

13    A.   I'll have to check the documents.

14    Q.   All right.  And I assume on that, that if

15         somebody else picked up the option and there

16         was credit for that option money -- there was

17         credit for the option money, that I-65 would

18         have been repaid its money.

19    A.   Yes.  Yes.

20    Q.   Correct.  Okay.  Ms. Davis, your sister, says

21         you have denied her meaningful participation

22         and she has had no actual or effective

23         participation in the management and little,
```

1           if no access to information regarding.  Do

2           you disagree with that?

3      A.   Yes.

4      Q.   She also alleges that CD&O is a competing

5           land development in which you own the

6           majority, if not the whole interest; and you

7           used resources of CD&O to the detriment of

8           I-65; and also impaired financial standing of

9           I-65 by buying the land around it.  And you

10          disagree with that, I assume.

11     A.   I do.

12     Q.   And am I right, though, that because I-65

13          didn't have the money to go forward with

14          certain things, that's why you felt like it

15          was all right for CD&O to buy those four

16          tracts?  Is that a good summary of your

17          testimony?

18     A.   Yeah.  I'm not going to write checks that

19          bounce.

20     Q.   That you don't have money for, right.  And is

21          it your testimony -- or was it -- that you

22          told Donna about those options and she said,

23          yeah, Dick, let's don't buy them?

227

| | | |
|---|---|---|
| 1 | A. | I'm sure I told her about the options and the |
| 2 | | Nissan project. |
| 3 | Q. | Okay. |
| 4 | A. | Because they were in conjunction together. |
| 5 | Q. | About the same time. Okay. So Nissan -- as |
| 6 | | I said earlier, a dealership would need more |
| 7 | | than ten acres. I mean, that's -- am I |
| 8 | | wrong? |
| 9 | A. | I think so. |
| 10 | Q. | Wouldn't a dealership normally need at least |
| 11 | | 20 acres? |
| 12 | A. | I don't think so. |
| 13 | Q. | Really? Okay. You think ten acres is |
| 14 | | sufficient on a freeway? |
| 15 | A. | I don't think it needs ten acres. |
| 16 | Q. | Okay. She also alleges that you acted |
| 17 | | negligently towards the interest of I-65 by |
| 18 | | failing and refusing to commit the time and |
| 19 | | resources that were necessary to oversee I-65 |
| 20 | | as opposed to your competing businesses. You |
| 21 | | disagree with that? |
| 22 | A. | I disagree with that. |
| 23 | Q. | She claims that under certain case law, that |

228

```
 1            you have been oppressing her and attempting
 2            to squeeze her out.  Disagree?
 3     A.     Disagree.
 4     Q.     Okay.  We're almost there.  She claims you
 5            breached your fiduciary duty to her as a
 6            minority stockholder.  Disagree?
 7     A.     Disagree.
 8     Q.     Negligence.  She claims that you have been
 9            negligent in the operation of the Dorsey --
10            of the I-65 by virtue of, among other things,
11            like today, not having appraisals, not
12            knowing the location of the sewer or tap
13            fees, paying advanced tap fees.  Disagree
14            with that?
15     A.     I disagree.
16     Q.     Okay.  Other than sitting on the property,
17            what have you -- and paying the bills -- what
18            have you done that would -- would refute
19            these allegations as to your proficiency as a
20            manager of this very valuable real estate, if
21            any?
22     A.     Well, I think the records you produced showed
23            some action when we entertained the Nissan
```

229

| | | |
|---|---|---|
| 1 | | project, when we hired an attorney to speak |
| 2 | | to Millbrook City Council on the sewer |
| 3 | | question, when we defended the illegal |
| 4 | | placement of the signs at the entrance to the |
| 5 | | property by K Bar K., when we also acquired a |
| 6 | | movement of Millbrook's -- I mean -- excuse |
| 7 | | me -- Prattville city limits across the |
| 8 | | interstate.  We had the city limits moved. |
| 9 | Q. | All right.  To be in Prattville? |
| 10 | A. | Yes. |
| 11 | Q. | Okay. |
| 12 | A. | When we engineered -- or not engineered -- |
| 13 | | got the estimate on repiping the drainage |
| 14 | | from across the property to a common line |
| 15 | | with the State of Alabama to move the |
| 16 | | drain -- the drainage from the center.  We |
| 17 | | paid our taxes. |
| 18 | Q. | Okay.  That's good.  I just wanted to give |
| 19 | | you an opportunity -- since Ms. Davis is |
| 20 | | alleging that you breached your duty and all, |
| 21 | | I wanted to give you an opportunity to state |
| 22 | | what all you felt like you did that was |
| 23 | | right. |

1    A.   Told people to stop dropping old washing

2         machines on the property.

3    Q.   And tires.

4    A.   Run off Vietnamese picking bamboo shoots for

5         their restaurant, put up security poles and

6         chain, reported the illegal dumping of the

7         tires on the property, among other things

8         that I can remember right off the top of my

9         head.

10   Q.   Let the record show I'm not saying that

11        that's all that you've done.  That just gives

12        you an opportunity to respond.

13           Okay.  Now, do you have any problem with

14        erecting a sign that has an outline of the

15        property?  You know, you can take a

16        four-by-eight sheet of weather-proof plywood,

17        marine plywood, and you can reproduce the

18        outline of the property and maybe, this

19        desirable nine point acres with sewers,

20        zoned, available for ground lease or sale?

21        Wouldn't that be a good idea to -- it's like

22        fishing.  You throw that hook out there and

23        see if you can catch somebody.  If it isn't,

```
1              just tell me why it isn't.

2     A.    Well, I don't think it is.  I could have done

3            that back in 1991, and I would be running up

4            and down the road to meet dreamers out there

5            and want-to-bes and everything else and

6            listen to their superb plans that -- you

7            know, if it's -- you don't know who's

8            legitimate and who's not, but I don't need to

9            be bugged all the time about that property.

10           And I don't think that -- that wasn't the

11           plan.  That wasn't the good thing to do back

12           then, and I don't think it's a good thing to

13           do now.

14    Q.    All right.

15    A.    Then all the -- all your real estate people

16           are going to get mad as to why didn't you

17           give them the listing.

18    Q.    Okay.  I'll work in reverse based on my I-65

19           properties.  Simply telling the agent up

20           charge it, be a buyer-broker, and the

21           commission comes out of your money, had you

22           ever thought about that?

23    A.    No.
```

1    Q.    Okay.  It works great.  It's just like an

2          auction with a buyer's premium.  You do know

3          what a buyer's premium is, right?

4    A.    No.

5    Q.    If I want to auction that property out there,

6          assuming I get the chance to, I simply put

7          that the successful bidder will pay an

8          additional 10 percent of whatever their bid

9          is.  So if their bid is 100,000, when the

10         closing contract is signed, it's a 110.  So

11         that way, you don't have to pay.

12              The next thing is Prattville is probably

13         a smaller town than Shelby County.  Would you

14         agree with that?

15   A.    I don't know.

16   Q.    Well --

17              MR. CLEVELAND:  Than Shelby County?

18              MR. ROBERTS:  Yeah.

19              MR. CLEVELAND:  Yeah, I would agree

20                   that Prattville is smaller than

21                   Shelby County.

22   A.    Oh, yes.

23   Q.    I submit to you -- and I'm not trying to tell

233

```
 1        you how to sell real estate.  I think that

 2        based on my client's position, that what you

 3        just said proves -- nothing personal, but

 4        that you have not managed the property

 5        properly.  Because I agree with you,

 6        lookie-lou's all the time.  But approximately

 7        a week ago, got a contract for a million

 8        seven from Graham and Company on I-65

 9        property that I own with a couple of

10        partners.  Graham and Company has a net worth

11        of probably $150 million.  I didn't have to

12        run up and down the highway wondering if they

13        were good.

14            In Cliff Cleveland was buying it with

15        their money -- and I'm not being facetious,

16        but someone of means -- I'd go talk to Cliff

17        if he came up there and wanted to buy some

18        property or the GMAC dealership or the bank.

19        So I'm just saying to you it strikes me as

20        there is a reason that you have sat on it

21        like a mother hen.  Am I wrong that you have

22        sat on it without advertising it, doing

23        anything to try to sell it?
```

1   A.   I thought it was a good business decision.

2   Q.   Okay.

3   A.   Prattville is going to grow.  And I knew

4        eventually the property would go up in value.

5        As far as whether I'm open for legitimate

6        offers, bring me a legitimate offer, then

7        we'll look, then we'll talk, then we'll think

8        about an expensive appraisal.

9   Q.   But what about people that don't know -- I

10       mean, with no sign, how do they even know

11       it's for sale or ground lease?  If I give you

12       that, how do they know it's available for

13       ground lease?

14  A.   Real legitimate land developers find out who

15       owns what.

16  Q.   Because they have to go to the courthouse,

17       run the records, find Dick Dorsey.  It's a

18       little harder than seeing a sign, this

19       property for ground lease.  I won't argue

20       with you on it.  I'm just saying I thought it

21       might be, after this deposition, that as this

22       litigation progresses, it might be favorable

23       to help you get this interest you're claiming

```
 1              for yourself and Donna to try to sell the

 2              property.

 3     A.       I thinks think it's in the best interest of

 4              the property and I-65 to work the property

 5              for a ground lease.  I think it's in the best

 6              interest of I-65 to work the property

 7              possibly on a co-development basis.

 8     Q.       Okay.  Now, let me ask you a question on

 9              that.  This is probably the last one.  I

10              reserve the right for Ms. Erwin to feed me

11              one more or two questions.  But if the

12              property were ground leased tomorrow, it

13              wouldn't be for anywhere near its fair market

14              value; and you would still have a meter of 12

15              percent running on Donna Dorsey Davis, which

16              she probably couldn't come up with five or

17              600,000 dollars.  And there's where you would

18              wipe her right off the map.  Right or wrong?

19     A.       I don't think like that.

20     Q.       You don't?

21     A.       No, sir.

22     Q.       Well, let's say it was worth $10 million.

23              With a 10 percent return -- we'll just throw
```

1         that out -- would be a million dollars a year

2         for the ground lease.  And you look over at

3         Donna and say, now, Donna, we're only getting

4         a million dollars a year.  We got to pay

5         taxes, upkeep.  We got to do all these

6         things.  And now you owe Dorsey Motor 600,000

7         and counting.  She wouldn't have enough money

8         to pay you if that is a legitimate debt to

9         pay Dorsey, right?

10  A.    I don't know.  I don't know your numbers.

11  Q.    Well, that's just her problem, then, right?

12         She owes money -- or at least her 30 percent,

13         owes that money?

14  A.    We both owe the money.

15  Q.    Okay.  And a ground lease is what is your

16         preference, and that's what you've been

17         looking for.  And you're waiting on somebody

18         to find you, right?

19  A.    Ground lease or co-development.

20  Q.    All right.  Now, if a co-development took

21         place, are you familiar with subordination?

22  A.    You'll have to give it to me simple.

23  Q.    Normally in a ground lease, any lender that

```
 1              would put an adequate sized building on that

 2              property wants to have you and Donna, the

 3              corporation, agree that if there's a

 4              foreclosure, they get the property and y'all

 5              get nothing.  That's what subordinating is,

 6              to come under.  Wouldn't that be extremely

 7              risky to subordinate?

 8    A.        I don't think I would.

 9    Q.        That's why I don't think a ground lease will

10              do.  Let -- that's why we think a sale is the

11              appropriate thing.

12                    MR. ROBERTS:  Okay.  I don't have

13                          anything further.  You can answer

14                          Mr. Cleveland's questions, please.

15                    MR. CLEVELAND:  I have no questions.

16                    MR. ROBERTS:  The deposition is over.

17                          Thank you.  Thank you, Dick.

18                    MR. CLEVELAND:  Thank you.

19                          (The deposition concluded at

20                          3:38 p.m.)

21                    * * * * * * * * * *

22                    FURTHER DEPONENT SAITH NOT

23                    * * * * * * * * * *
```

REPORTER'S CERTIFICATE

STATE OF ALABAMA

ELMORE COUNTY

 I, Dee Coker, Registered Professional Reporter and Commissioner for the State of Alabama at Large, hereby certify that on Monday, March 12, 2007, I reported the deposition of RICHARD M. DORSEY, who was first duly sworn or affirmed to speak the truth in the matter of the foregoing cause, and that pages 5 through 237 contain a true and accurate transcription of the examination of said witness by counsel for the parties set out herein.

 I further certify that I am neither of kin nor of counsel to any of the parties to said cause, nor in any manner interested in the results thereof.

 This 16th day of March, 2007.


DEE COKER, (CSR, RPR)
Commissioner for the
State of Alabama at Large

MY COMMISSION EXPIRES: 1/25/2009

1
SIGNATURE OF WITNESS

2
I, RICHARD M. DORSEY, hereby certify

3
that I have read the transcript of my deposition

4
consisting of pages 4 through 237, and except for

5
the corrections listed below, certify that it is

6
a true and correct transcription.

7

8
_____

9
RICHARD M. DORSEY

SWORN TO AND SUBSCRIBED before me
10
this _____ day of _____, 2007.

11

12
_____
NOTARY PUBLIC

13
* * * * * * * * * * *

14
Page    Line    Correction and reason therefor

15

16

17

18

19

20

21

22

23